ACCEPTED
15-25-00016-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
2/11/2025 3:36 PM
CHRISTOPHER A. PRINE
CLERK

No. 15-25-00016-CV

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
2/11/2025 3:36:52 PM
CHRISTOPHER A. PRINE
Clerk

**IN THE**

**FIFTEENTH COURT OF APPEALS**

**AUSTIN, TEXAS**

In re,

MARTY BERRY AND AXIS MIDSTREAM HOLDINGS, LLC

*Relators*

**RELATORS' APPENDIX
VOLUME 2 OF 5**

Original proceeding brought from Business Court 11A,
Cause No. 24-BC11A-0025
The Honorable Sofia Adrogue, Presiding

Douglas A. Allison
State Bar No. 01083500
LAW OFFICES OF
DOUGLAS A. ALLISON
403 N. Tancahua Street
Corpus Christi, TX 78401
Telephone: (361) 888-6002
Facsimile: (361) 888-6651
Email: doug@dallisonlaw.com

COUNSEL FOR RELATORS

# VERIFICATION OF APPENDIX

STATE OF TEXAS                    §
COUNTY OF NUECES                  §

Before me, the undersigned notary, on this day personally appeared Douglas A. Allison, the affiant, a person whose identity is known to me. After I administered an oath to affiant, affiant testified:

"My name is Douglas A. Allison. I am of sound mind and capable of making this affidavit. The facts in this affidavit are within my personal knowledge and are true and correct.

"I am serving as counsel for the relater. All of the documents included in the appendix to this petition are true copies."

/s/ Douglas A. Allison

_Kim Brunkenhoefer_
NOTARY SIGNATURE

KIM BRUNKENHOEFER
Notary ID #5348297
My Commission Expires
August 4, 2025

8-4-25
COMMISSION EXPIRATION

60

APPENDIX VOLUME 2 OF 5

TABLE OF CONTENTS

APPENDIX 31……………………………………………..…….….Dec. 6, 2024
Partial Hearing Transcript
Cause No. 24-BC11A-0025
11th Business Court, Harris County, Texas

REPORTER'S RECORD
VOLUME 1 OF 1 VOLUMES
THE BUSINESS COURT OF TEXAS,
11TH DIVISION

ALBERT THEODORE POWERS;  )
ALLIED PORTS, LLC        )
    Plaintiffs,          )
                )
V.                       )
                ) CAUSE NO. 24-BC11A-0025
AXIS MIDSTREAM HOLDINGS, )
LLC; ALLEN LAWRENCE      )
BERRY; MARVIN GLENN      )
BERRY; AND BONNIE BERRY, )
As successor in interest )
To DENNIS WAYNE BERRY    )
    Defendants.          )

*******************************************

HEARING ON MARTY GLENN BERRY'S PLEA
AND ABATEMENT AND MOTION TO ABATE;
THE MOVANT'S MOTION TO REMAND, DISMISS,
AND TRANSFER VENUE PURSUANT TO CHAPTER 25;
DEFENDANT, AXIS MIDSTREAM HOLDINGS',
MOTION TO TRANSFER VENUE

*******************************************

On the 6th day of December, 2024, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Sofia Adrogue, Judge presiding for the 11th Division Business Court, held in Houston, Harris County, Texas:

Proceedings reported by machine shorthand.

                    A P P E A R A N C E S


Mr. Alistair B. Dawson
BECK REDDEN, LLP
SBOT: 05596100
Mr. M. Jake McClellan
SBOT: 24109525
1221 McKinney Street
Suite 4500
Houston, Texas 77056
713-951-3700
ATTORNEYS FOR ALBERT T. POWERS

        -AND-

Mr. Roland Garcia
GREENBERG TRAURIG, LLP
SBOT: 07645250
1000 Louisiana Street
Suite 7600
Houston, Texas 77002
713-374-3500
ATTORNEY FOR ALLIED PORTS, LLC

        -AND-

Mr. Barrett Reasoner
GIBBS & BRUNS LLP
SBOT: 16641980
Mr. Michael Absmeier
SBOT: 24050195
Mr. Bruce Baldree
SBOT: 24116064
1100 Louisiana
Suite 5300
Houston, Texas 77002
713-650-8805
ATTORNEYS FOR A. LAWRENCE BERRY

-AND-

Mr. Douglas Allison
LAW OFFICES OF DOUGLAS ALLISON
SBOT: 01083500
403 N. Tancahua Street
Corpus Christi, Texas 78401
361-888-6002
Ms. Vanessa Diane Gilmore
SBOT: 07960010
609 Main Street
Suite 3930
Houston, Texas 77002
713-651-1400
ATTORNEYS FOR DEFENDANTS MARTY BERRY, BONNIE BERRY & AXIS
MIDSTREAM HOLDINGS, LLC

**I N D E X**
**VOLUME 1**
**HEARING ON MARTY GLENN BERRY'S PLEA**
**AND ABATEMENT AND MOTION TO ABATE;**
**THE MOVANT'S MOTION TO REMAND, DISMISS,**
**AND TRANSFER VENUE PURSUANT TO CHAPTER 25;**
**DEFENDANT, AXIS MIDSTREAM HOLDINGS',**
**MOTION TO TRANSFER VENUE**

|  | Page | Vol. |
|---|---|---|
| **DECEMBER 6, 2024** | | |
| Appearances..................... | 9 | 1 |
| Defendant Marty Berry's Plea and Abatement and Motion To Abate...................... | 9 | 1 |
| Plaintiff Albert Powers' Argument on the Plea and Abatement and Motion to Abate... | 31 | 1 |
| Movant's Argument on The Motion To Remand, Dismiss, and Transfer Venue............................ | 60,99 | 1 |
| Plaintiff Albert Powers' Argument on the Motion to Remand, Dismiss,and Transfer Venue............................ | 95 | 1 |
| Defendant Axis Midstream Holdings' Argument on the Motion To Transfer Venue.............. | 99 | 1 |
| Plaintiff Albert Powers' Argument on the Motion to Transfer Venue................ | 100 | 1 |
| Court Reporter's Certificate... | 103 | 1 |
| Exhibit Certificate........... | 104 | 1 |

**EXHIBITS**

**MARTY BERRY'S EXHIBIT**

| NO. | DESCRIPTION | OFFERED | ADMITTED | VOL. |
|---|---|---|---|---|
| 1 | Companies' Organizational Chart | | 74 | 1 |
| 2 | Axis Midstream Holdings,LLC Application for Permit | | 75 | 1 |
| 3 | Map of Real Property Owned | | 76 | 1 |

MARTY BERRY'S EXHIBIT CONT.D.

| NO. | DESCRIPTION | OFFERED | ADMITTED | VOL. |
|---|---|---|---|---|
| 4 | Overlay Image | | 76 | 1 |
| 5 | Van Huseman E-mail to Barrett Reasoner | | 76 | 1 |
| 6 | Plaintiffs' Verified Original Petition And App for TRO | | 76 | 1 |
| 7 | Agreement | | 77 | 1 |
| 8 | Investment Agreement | | 77 | 1 |
| 11 | Signed TRO | | 78 | 1 |
| 12 | Plaintiffs' Verified First Amended Petition And Application for Temporary Restraining Order and Temporary Injunction | | 78 | 1 |
| 13 | Plaintiffs' Verified Second Amended Petition And Application for Temporary Restraining Order and Temporary Injunction | | 78 | 1 |
| 14 | Plaintiffs' Verified Third Amended Petition And Application for Temporary Restraining Order and Temporary Injunction | | 78 | 1 |
| 15 | Plaintiffs' Original Verified Petition And Application for Temporary Restraining Order and Temporary Injunction | | 79 | 1 |
| 16 | Signed TRO Against Defendants and Order Setting Hearing for TI | | 79 | 1 |
| 17 | Signed Amended TRO | | 79 | 1 |
| 18 | Signed Order Transferring Venue | | 80 | 1 |
| 19 | Plaintiffs' Second Amended Petition | | 80 | 1 |
| 20 | Counter-Plaintiffs' First Amended Original Petition Asserting Counter-Claim | | 80 | 1 |
| 21 | Motion for Temporary Injunction Transcript | | 81 | 1 |
| 22 | Judge's Ruling | | 81 | 1 |
| 23 | First Set of Requests For Production to Allen Lawrence Berry | | 81 | 1 |

**MARTY BERRY'S EXHIBIT CONT.D**

| NO. | DESCRIPTION | OFFERED | ADMITTED | VOL. |
|---|---|---|---|---|
| 25 | Counter-Plaintiffs' Second Amended Original Petition Asserting Counter-Claims | 82 | 1 | |
| 26 | Amended and Restated Operating Agreement - In Camera Review | 83 | 1 | |
| 27 | Transfer of Interest - In Camera Review | 83 | 1 | |
| 28 | Transfer of Interests and Change of Manager Agreement - In Camera Review | 83 | 1 | |
| 29 | Bylaws - In Camera Review | 83 | 1 | |
| 30 | Transfer of Interests - In Camera Review | 83 | 1 | |
| 31 | Bylaws of Red Fish Bay Terminal, Inc.- In Camera Review | 83 | 1 | |
| 32 | Loan Star Ports - Term Sheet | 83 | 1 | |
| 33 | LSP Compensation and Investment Agreement | 83 | 1 | |
| 34 | Letter Dated Sept. 25, 2019 From Berry GP | 83 | 1 | |
| 35 | Transfer of LSPE Interests - In Camera Review | 83 | 1 | |
| 36 | Termination of Lease - POCCA | 83 | 1 | |
| 37 | E-mail From G. Reed Requesting Reimbursement | 83 | 1 | |
| 38 | E-mail From Ramirez to Powers | 83 | 1 | |
| 39 | E-mail Dated July 26, 2024 From Doug Allison To Mike Hummell | 83 | 1 | |
| 40 | Beacon, Inc. - Aug. 6, 2024 | 83 | 1 | |
| 42 | Plaintiffs' Original Petition | 83 | 1 | |
| 43 | Plaintiffs' First Amended Petition | 83 | 1 | |
| 44 | Orca Assets GP, LLC Organizational Meeting | 84 | 1 | |
| 45 | Purchase and Sale Agreement | 84 | 1 | |
| 46 | E-mail - Organizational Structure | 84 | 1 | |

**MARTY BERRY'S EXHIBIT CONT.D.**

| NO. | DESCRIPTION | OFFERED | ADMITTED | VOL. |
|---|---|---|---|---|
| 50 | Affidavit of Mike Hummell | | 84 | 1 |

**ALBERT POWERS' EXHIBIT**

| NO. | DESCRIPTION | OFFERED | ADMITTED | VOL. |
|---|---|---|---|---|
| 1 | Temporary Injunction | | 84 | 1 |
| 2 | Investment Agreement | | 84 | 1 |
| 3 | Consulting Agreement | | 84 | 1 |
| 4 | Plaintiffs' Second Amended Petition | | 84 | 1 |
| 5 | Counter-Plaintiffs' First Amended Original Petition Asserting Counter-Claims | | 84 | 1 |
| 6 | Motion to Temporary Injunction Transcript | | 84 | 1 |
| 7 | Temporary Injunction Hearing (March 22, 2024) Small Version | | 84 | 1 |
| 8 | Temporary Injunction Hearing (March 22, 2024) Large Version | | 84 | 1 |
| 11 | Transfer - Allen Lawrence Berry Trust | | 84 | 1 |
| 12 | Transfer - Axis Midstream Holdings , LLC | | 84 | 1 |
| 13 | Transfer - Gansevoort Investments, LLC | | 84 | 1 |
| 14 | April 23, 2020 E-mail | | 84 | 1 |
| 15 | Counter-Plaintiffs' Second Amended Original Petition Asserting Counter-Claims | | 86 | 1 |
| 16 | Demonstrative Handout | | 86 | 1 |

**P R O C E E D I N G S**

THE COURT: Good morning. We will now be on the record and thank you very much. This is the Cause No. 24-BC11A-0025. And before us, from our perspective, we have notices of hearing of Marty Glenn Berry's plea and abatement and motion to abate; the Movant's motion to remand, dismiss, and transfer venue pursuant to Chapter 25; we also have the Defendant, Axis Midstream Holdings', motion to transfer venue. And I am appreciative --

Let's see, where are all my boxes, the two boxes?

Okay. I'm going -- I have -- thank you for all the great work. We appreciate it and actually they were used and scrutinized. I can't say I've memorized them, but I definitely, definitely looked at them, so we appreciate it very, very much. Okay. If we will make appearances by counsel.

MR. ALLISON: Plaintiff first or...

THE COURT: Go ahead. Yes, please.

MR. DAWSON: Your Honor, Alistair Dawson for Albert Ted Powers, Plaintiff.

MR. GARCIA: Roland Garcia for Allied Ports.

MR. MCCLELLAN: Jake McClellan for Plaintiff, Ted Powers.

MR. REASONER: Barrett Reasoner for Defendant,

Lawrence Berry.

MR. BALDREE: Bruce Baldree also for Defendant, Lawrence Berry.

MR. ABSMEIER: Mike Absmeier also for the Defendant, Lawrence Berry.

MS. GILMORE: Vanessa Gilmore here for one of the named Defendants, Marvin Berry, goes by Marty Berry.

MR. ALLISON: And Doug Allison also here for Marty Berry, and Bonnie Berry, and Axis Midstream Holdings, LLC.

THE COURT: Thank you very much. Okay. Are you ready to proceed?

MR. ALLISON: My motion?

THE COURT: Yes.

MR. ALLISON: Okay. And my intention, your Honor, right now is to probably give you some background.

THE COURT: Perfect.

MR. ALLISON: And then to offer some exhibits; and then if need be, I don't think we're going to get there, but if need be, to offer some predicate for exhibits if the Court chooses.

THE COURT: Okay.

MR. ALLISON: Okay.

THE COURT: And if to the degree that you are adhering to the exhibits you gave me in the notebook, just --

just tell me.

MR. ALLISON:  And I'm sorry, say that...

THE COURT:  If -- if you are referencing the exhibits from the notebook that you gave me, as I surmise you are --

MR. ALLISON:  Yes.

THE COURT: -- if you give me the number, then I can prepare.

MR. ALLISON:  Okay.

THE COURT:  Thank you.  Okay.

MR. ALLISON:  And at first -- okay.  And I think we are addressing first the plea and the abatement is my understanding?

THE COURT:  Yes.

MR. ALLISON:  And I think I need to give the Court probably some more general background just so you have some --  it's not a small timeframe we're looking at here. We're looking at really going back to 2018.

THE COURT:  Absolutely.

MR. ALLISON:  Okay.

THE COURT:  Yes.

MR. ALLISON:  And really we go before that in the sense that Marty Berry and Bonnie Berry, she is the surviving wife of Dennis Berry, who recently passed.  So, you'll hear me say Bonnie or Dennis sometimes interchangeably;

and then Lawrence Berry, who's -- what I've characterized in my pleadings as the friendly Defendant, okay, those three brothers really through their father and their mother were in business really for the last 20, 30 years, okay. And it has been for years two out of three votes is what's required according to the bylaws and the rules, and those bylaws are in the -- in the Court's record. The bylaws for Red Fish Bay Terminal and Berry GP, Inc., which we call Berry GP, all of those entities require two out of three votes. And that has always for a long time, for years and years been two out of three brothers and now Bonnie in the place of Lawrence.

They developed or wanted to develop a project in Harbor Island. That is our backyard down there in Nueces County, Texas. And the idea was to put a large-scale terminal into place there, an oil -- crude oil transport facility. And so that idea became something that got some momentum back in 2018 by their doing some development on it on their own, maybe even 2017, and they had agreements with the Port of Corpus Christi. By the way, that lease with the Port of Corpus Christi has since terminated, and that's, I think, in some of the records. And then they did -- Lawrence, actually, not they. That's actually a very important distinction. Lawrence Berry contacted Ted Powers and brought him in. I know your Honor knows that there is a dispute with regard to -- with regard to whether that document was signed by all the

brothers, okay. But they brought in -- or Lawrence, like I say, really brought in Ted Powers and they paid him. There's no doubt they compensated them. I think our view is we did pay him about 2 million dollars, and that 2 million dollars is for services rendered. And those were really services rendered with regard to a lease. This group had a lease with the Port of Corpus Christi, which the Port of Corpus Christi terminated and the project died, done, okay.

Separately, and it's very separately, there are companies (and this becomes very important, your Honor) the companies really to understand the structure, it's Marty, Lawrence, and Dennis were the three brothers.

MR. GARCIA: May we approach?

THE COURT: Of course. No problem.

MR. ALLISON: I'll get back as far as I can, too, where I have a little bit of a stand.

THE COURT: That's fine. Perfect. Thank you so much. We can all join.

MR. ALLISON: Sure.

THE COURT: That's a good use.

MR. ALLISON: Talk about underutilization.

THE COURT: I can't even -- I'm ignoring y'all.

MR. ALLISON: It's not what I meant. It's not what I meant.

MS. GILMORE: Donna, Vanessa.

MR. ALLISON: Okay. The corporate structure that the Berrys have operated with for years is -- it's a series of limited partnerships, and corporations, and LLC obviously, designed for what we all know it's designed for in terms of allocating business and also protection, okay. And Marty, and Lawrence, and Dennis for years were the three percent, okay, and the 97 percent of LDMA. By the way, that's Laura, that's mom; D is Dennis; M is Marty; A is Allen Lawrence Berry. Don't get it confused, it's Allen Lawrence, but he goes by Lawrence. Okay. So the control always has been the three brothers with 97 percent of the company being -- well, most of that 97 percent being held in trust and also individually and as limited partners, the other 97 percent.

So LDMA then is the partnership that chooses the directors for Berry GP, which I always call the mother ship. It's the everything happens through Berry GP. Berry GP, for example, owns a hundred percent of Red Fish Bay Terminal. And I'm not going to get all the percentages right, but Berry GP through those three directors operates through Bay, Inc., Big Con Holdings, Inc., Berry Holdings, LP, Berry Operating Company, and Bay, LTD. You'll see in the financial exhibits, for example, that the money for this Midstream project, this Axis Midstream project and that work, all the workers, the people that run the office, all of them are here so really everything flows here, to Red Fish Bay or here out

of the trusts to Canada Programs Holdings, and from here to what we call Lone Star Ports Holdings, which owns some land, okay.

That has been the structure for a long, long time. Lawrence separately created, he did, he created Axis Midstream. And this part, by the way, on this chart, I think this is the only section that's not disagreed on.

THE COURT: Okay.

MR. ALLISON: Lawrence created Axis Midstream and through his trust transferred it to Gooseabort [sic] Investments, which was solely his, also. Sorry, Gansevoort Investments, okay.

THE COURT: That's okay.

MR. ALLISON: And then into Berry GP, okay. And to be honest with you, your Honor, that's the -- that's where the agreement between the parties ends, okay. And what I mean by that is their claim is that then Axis went to Red Fish Bay Terminals, which by the way has been a Berry company since 1978, okay, and then it's their claim that Berry GP, even though there was no two-out-of-three vote, even though the other brothers, Dennis and Marty, didn't know about it, their claim is that Dennis unilaterally transferred Axis to Red Fish Bay Terminals. Red Fish Bay Terminals, and I think up here there's three people who control Berry GP, Red Fish Bay Terminals a hundred percent owned by GP, but there's four

directors instead of three. But you still need a majority vote, but Lawrence Berry unilaterally, only his signature on the document, transferred to Lone Star Holdings, to Lone Star Ventures, to Lone Star Enterprises, to Axis.

So these are things that were done -- the only signature -- and just to be candid, it's certainly worth looking at their exhibits. We don't disagree, again, that Lawrence had ability to transfer through these entities over here. He did, he was sole owner and sole manager; but we are certain that it would require two out of three votes. And I need to make a correction. I had double-dipped accidently when I was merging some spreadsheets on costs and there's some numbers in the briefing that say 25 million invested, it's 15 million.

THE COURT: Thank you.

MR. ALLISON: And it's 10 million from Berry GP directly, which really came from Bay, LTD, and then it's 6.2 million from -- and this is really nine something and then this one 6.2, 6.2 million through Canada Programs Holdings, which is owned by Marty's, Lawrence's, and Dennis' trusts. Those were all set up, I think, in 2007. It goes back a long ways.

So -- sorry, let me go for a while.

MS. GILMORE: Okay. You got it.

MR. ALLISON: The corporate structure is so --

it just really highlights, your Honor, how this -- how this is intertwined, which I know your Honor knows this is a $64,000 question. Right now they think that Axis Midstream is owned and controlled by Allied. We don't think any of these transfers are valid from Berry to Red Fish or from Red Fish to Lone Star Holdings. So, we think that Axis is still up here in Berry GP. I bet it's interesting in the case, your Honor, that they've sued Marty Berry, who doesn't claim ownership in Axis. They've sued Bonnie Berry who does not claim ownership in Axis. They haven't even sued the entity. And of course the reason they haven't is this entity is in the Corpus litigation, too. They haven't even sued the entity that owns Axis Holdings Midstream, according to the paperwork as implemented through the bylaws. And what I'm saying there is they haven't sued the company that requires a two-out-of-three vote in order to transfer it.

So what we really have we think, your Honor, is we have a fight -- and I get that they want to say this is all about our contract, okay, which by the way, we didn't even know he was claiming. We thought when -- we thought when Lone Star Ports and there's -- it's all in the record, too, your Honor. When Lone Star Ports, the project died over there as with Carlyle and Mr. Powers, when that died and first of all, his contract was terminated for -- the compensation agreement was clearly terminated in early 2020. We have

records that show -- and they're in the record. There was a lawsuit here in Harris County as between the Berry brothers and between them and Carlyle where Butch Boyd, who you'll recall was on the phone call the other day --

THE COURT: Yes, thank you.

MR. ALLISON: Okay -- he's Lawrence's lawyer and he filed a lawsuit getting it to have it declared that the Berrys, the three brothers, were a hundred percent owners of this project, which then the lease got terminated on. So we hadn't heard -- Marty Berry and Mr. Dennis Berry haven't heard from Mr. Powers for three, four years until we get the permit from Axis, okay, and then here we are. We set up a meeting. I would invite you to read the transcript of the meeting from August 6th, 2024. We started that meeting to try to figure out what's going on because we had no idea that he was going to be claiming an interest in it four years after the fact when we thought that the project with the Port had died.

Now, how does that relate specifically then to the litigation in Corpus Christi? That litigation in Corpus Christi was originally instituted by Lawrence Berry here in Harris County.

THE COURT: 2023.

MR. ALLISON: The Court -- Judge, I think it's Reeder. I apologize. At one point I couldn't read the signature and I wrote Redden.

THE COURT: It's fine.

MR. ALLISON: Okay. I figured that out finally.

THE COURT: We figured it out.

MR. ALLISON: Judge Reeder entered the TRO. It enjoined Berry GP and Marty, just like he's been enjoined in this lawsuit, from selling real property or encumbering it. It's the same real property, okay. So that lawsuit got filed and then got transferred to Corpus Christi, Nueces County by agreement, because that's where we still believe all the venue should lie. We then proceeded to do discovery, and I guess this is probably the best way to put it. I reference all the transactions that occurred or they say Axis is now over here that we're just now really coming to appreciate what they've done. Lawrence Berry -- think about this for a minute -- Lawrence Berry knows there's a two-out-of-three vote required. It's in the transcripts that are in the record, exhibits in this case. He testified all the time two out of three votes for this, two out of three votes for that, sometimes we win, sometimes it's me against the two, sometimes I'm on the winning side, sometimes it's usually unanimous, okay.

So for years when they were working effectively, everybody understands it takes a two-out-of-three vote to get anything out of Berry GP; but nonetheless, if you look at the documents, the one person who signed for Berry GP

was Lawrence Berry. I will say Dennis Berry's name is on it for Red Fish Bay, and that really didn't alarm us because Red Fish Bay Terminal is a hundred percent owned by Berry GP. So they wanted to do that, we really -- it doesn't comply with the two-out-of-three rule out of Berry GP, but that's what the document says. But to get from Berry GP to Red Fish Bay Terminal, Inc. -- oh, excuse me, to get from Red Fish Bay Terminal, Inc. to Lone Star Ports Holdings would require majority of the four directors. All this paperwork is in the record. Those four directors, so you'd need three out of four to sign it or approve it at a board meeting. Never happened, nobody even disputes or says it happens. If you look at their briefing, their argument is, "Well, we sent it to them, so they should have known." That's not the same "them" as respectfully -- it's not the same thing as a corporate approval or resolution. In fact, it's way, way short of that.

But Dennis -- excuse me, Lawrence is the only one who signed that document supposedly transferring from Red Fish Bay Terminals to Lone Star Ports Holdings. And he signed it for Red Fish Bay Terminal, even though he's not majority, and he signed it for Lone Star -- excuse me, Lone Star Ports Holdings. And then he signed another document, Lawrence Berry did. He signed the one that went from Lone Star Ports Holdings saying I'm transferring it to Lone Star -- Lone Star Ports Ventures and then he, Lawrence, also signed for Lone

Star Ports Ventures saying I accept it. And then he signed another one that says he was for Lone Star Ports Ventures and he says he signed it for them again transferring it to Lone Star Ports Enterprises saying I'm accepting it for Lone Star Ports Enterprises.

So we haven't even seen -- by the way, there's these other entities up here. They say I think it's Lawrence's position and I guess Mr. Powers' position that these entities up here, Capella, Arcturus, and Sirius, which we've never heard of, okay, they say they created those companies for Marty and Dennis, but I'm guessing that Lawrence signed those papers, too. That's a guess at this point. I've asked for that paperwork, haven't gotten it. So, I mean, Lawrence is sort of truly the Don Juan of any blank that needs to be signed for any of these corporations. I mean, he -- he apparently thinks he can work unilaterally.

Why is that important? Because the lawsuit in this -- I got digressed there a little bit, but the lawsuit in Nueces County was all about that. The lawsuit was all about how he thought he was the sole disinterested director and, therefore, should be unilaterally allowed to sign documents for transfer of real property. Okay. And I think for all purposes. We had that huge fight. That ended up with the judge ruling because they had put it also in their temporary restraining order. They had put it in the TRO in then what's

now in the Nueces County lawsuit. They had put it in there that we could not remove him as a director because when we started finding out that he's out there signing things like, you know, and we have no idea what he signed, okay, and people might misinterpret that, we said we've got to be real clear he's not a director, so we removed him from the board. We only removed him from the board after the judge ruled on the temporary injunction and denied their relief requested with regard to that.

The judge also -- originally, the TRO in Nueces County, like I said, tied up the Berry entities, all of them, just like the one does in this case. It ties up all the Berry entities. Well, I say that. It says, all the Berry entities related to the project, and the Berry entities related to the project would be Marty, Lawrence, Dennis, the three trusts. Canada Programs Holdings, by the way, I didn't point this out earlier, is the one that owns all the land -- excuse me, leases all the land in Harbor Island. There's going to be a huge fight between Canada Programs Holdings, and I think they think the land ought to be in Harbor Island properties. There's going to be a huge fight because they -- they can't develop the project without the land.

We've been paying Berry GP and Canada Programs Holdings have paid 6.2 million dollars over the last three or four years in order to have this land on hold. That is the

very land that Axis' permit is approved for. They cannot do the project without this fight, okay. I mean, we have the land under lease and have for years. It's cost us 6.2 million dollars over the last three or four years to hold on to that land. They also need this land that's right here that Marty Berry and his trust paid a million dollars for. That's going to be a fight. And that has to do with Marty's trust. They also then when you get into this Red Fish Bay Terminals land, there's an employee of Berry GP and really Bay, LTD through Berry GP because all the control is here, there's an employee named Robert Rickett. And Robert Rickett was sued, even though he's a land guy basically, he got sued in the lawsuit that is now in Nueces County. He got sued because what they do, and they've done it for years, is they would have people like Robert go out and buy land and hold it in their name because they didn't want to run up the price. They didn't want the word out that Berry's buying land, okay. And so he holds it nominally in his name for Berry GP, and so they sued him and it's all in the Court's documents, they sued him saying we want that land. You've got to transfer that for the project, for this project. That hasn't happened yet either.

So there's going to be a huge fight. That one's really going to be Berry GP who controls where Robert Rickett will put that name into whichever entity and the directors here. And really, I guess, it's going to be

controlled here, but all that control comes from the top, okay. And so that land is the very land that they need in order to do storage tanks. In order to develop the project, there's going to have to be storage tanks somewhere other than Harbor Island.

And let me give you that picture so you'll understand it. I just talked about Marty owning some land, Marty Berry owning some land that was -- that he spent the million dollars on through his trust. That land is in Taft, Texas. Think of it as further north in San Patricio County. And then we have the land held by Robert Rickett, some of it is, and some of it is held by Red Fish Bay Terminals. All of it controlled by Berry GP, which is controlled by two-thirds vote, which is Bonnie and Marty, Defendants, my clients. So I wouldn't hold my breath looking for a vote to give it away to them now, okay. And so we're going to have a huge fight about them needing that land. That is the very land within the Axis permit. Let me say that again. The Axis permit identifies the land way north in Taft that it wants to use that Marty Berry paid for. That's part of the permit. And it has a pipeline that goes down to Aransas Pass which is there on the water which is where Red Bay Fish Terminals owns land. And that land is owned and controlled by Berry GP, some of it nominally through Robert Rickett; and then in order to do anything with the permit, they also have to have land over on

Harbor Island. Harbor Island is the place where the ship docks can be built, okay. So they are on the ship channel and that land is leased by Canada Programs Holdings from what we call the Ed Rachal Foundation.

Okay. They're the owner of the property, but we have that leasing agreement to use it for this project, which again, we've been owning that for years and paid millions for it. So although on the one hand, you know -- well, and I should tell the Court this. And we have -- I looked hard at the case law and I didn't -- sometimes when you do something that people go, "Oh, yeah, we had to do that otherwise there's no overlap and the cases aren't intertwined." The case law is very, very clear if you looked at the White opinion or the Cleveland opinion. And I always cite to those because those were just sort of bedrock, okay, to me and I've been in these jurisdictional fights before. But I will say that in terms of really understanding dominant jurisdiction, some of the cases they cite and I cite is that JB Hunt case, and the Encore case, and the Phillips case. And all of those cases make it very clear that when there's a plea of privilege filed, like we have here, that there is a -- it's the first pleading to be heard. And the reason for that speaks volumes; and that is, we show respect in Texas to other Texas courts. It is about comity, it is about convenience, it is about honoring another court's jurisdiction. All those

cases very clearly say that once a court accepts jurisdiction, which down in Nueces County that's been happening for the past year, accepts and exercises -- really they don't have to exercise. Once they acquire, is the word the cases use, once they acquire jurisdiction, that it is their case, the Nueces County Court in this instance, it is their case to adjudicate all of it and whatever are the interrelated matters until conclusion, okay, period.

And we do that because, and I'm going to, respect for the law and the respect that is shown from one court to another. And I'm sure you're keenly aware of this, so I probably don't have to say this and it's in the briefing. But the statute says you have concurrent jurisdiction. It doesn't say that it's a superior jurisdiction. You certainly -- this Court has a unique carveout of the types of cases it has and has a right and jurisdiction. I know I've pushed back a little bit on subject matter jurisdiction. We probably have subject matter jurisdiction, okay, but the cases are very clear when two courts have subject matter jurisdiction and when two courts can have proper venue, you go with the first filed and that's what dominant jurisdiction is. And the last three cases I named, the J.B. Hunt, the Phillips, and the Encore case really do a nice job of saying, and we know it's kind of a quasi-venue issue because really what you're doing is letting another venue take care of the

litigation.

And I would really commend those cases for a close read, but again I always start with Wyatt and I always start with Cleveland because it shows how long this time-honored process is for courts with concurrent jurisdiction to have respect for each other. And I get into the else what. What happens if we don't do that? I mean, I already have pleadings down there in Nueces County and we went ahead and filed them; although, I can file them at any time because the court down there requires jurisdiction not only of the pleadings that have already been filed, but any -- and Cleveland and Wyatt are very clear on this -- that court down in Nueces has jurisdiction of any intertwined-related litigation that it takes on that's related to the dispute before it, okay. I can't come out of the blue with something, but anything that would be interrelated, that court in Nueces requires first jurisdiction. I say that with respect. I've learned a long time ago never tell a court you don't have power. You have subject matter jurisdiction, like I said.

But it is a matter of respect, and comity, and honoring what's been Texas jurisprudence for, you know, ten decades. Else we do what? We have a pleading down there that says what, that we're asking the Court to declare this transfer void and to declare this transfer void. They don't have a project without it. How much more intertwined can we

be? We have -- right now these three trust -- again, Dennis is now exercised by Berry -- that's by Bonnie, excuse me. And then so with Bonnie and Marty, two out of three votes control Canada Programs Holdings. They don't have any land for their permit without this land. They can't do it. You've got to have water on the ship channel to build a port. This land up here, I suppose they could try to go to another location, but the Axis permit specifies this location already. They'd have to go change the permit, which you don't want to do. I've been down that road. That's a -- when you start amending permits, anything that's a major amendment with Army Corps of Engineers is not a small task. So all of this -- in our mind, to say that this does not -- this is just one piece.

By the way, we have another company and I've put a little bit in the pleadings and a little bit in the exhibits to show it. There's another company where right now Lawrence sort of did the same thing or did the same thing with Orca, started signing things and transferring property; and we still haven't traced it all down yet either, okay. But remember, it's been going on for about a year, but it's taking a while and we're figuring out where all the properties are. And, again, if you look at that August 6, 2024 recent transcript, you'll see Marty Berry on there and Bonnie Berry on there saying, "We're just trying to figure out what you did and what's happening; we didn't know." And I know they have

some e-mails that said we sent it to you, but if you know Marty Berry much, that's not saying much. And it's certainly not a two-thirds vote.

I know that's been a lot of explanation. I guess I'm going to yield to other counsel. I think it probably makes sense to me that I not offer the exhibits. They're already in the record, but I'll offer them formally in a moment, but I think I'm better probably yielding now.

MS. GILMORE: Your Honor, may I just add one or two things to my co-counsel's argument this morning?

THE COURT: Of course.

MS. GILMORE: And I want to state for the record, your Honor, that that was not my phone that went off a few moments ago.

THE COURT: I didn't even hear it. I didn't -- I'm so --

MS. GILMORE: I'm going to -- I'm going to -- I'm going to be up here to support him and throw him under the bus at the same time.

MR. ALLISON: I didn't know.

THE COURT: The good news is I'm worried about my phone going off. I think we are all good.

MS. GILMORE: But to put it a little bit differently, you know, Mr. Allison obviously is concerned about making sure that we're not seeing anything that could be

potentially offensive to the Court in terms of you don't have jurisdiction, but, you know, for almost 30 years I had a book on my shelf by James Wagstaffe called Three Cases Off Your Docket By Monday. And the very first point in that book was that you should test jurisdiction first. And as Ms. Johnson already pointed out, not subject matter jurisdiction. Obviously, both courts have subject matter jurisdiction, but both of these cases are about control of the Axis property. Both Marty Berry and Lawrence Berry are both involved in both lawsuits. Now, the Defendant's position is going to be that everybody wasn't involved in the other lawsuit, and that is true; but all of the things that in which people are interested in, the control of that property, are the subject of both lawsuits. Frankly, it would probably be wise of them to come down and try to intervene in that other lawsuit in Nueces County to make sure that their interests are protected in that case. But we've already got a scenario where we had a three-day hearing in Nueces County in which the court did not grant all of the relief that was originally requested in the first lawsuit by Lawrence Berry and has allowed the company to go forward with some of the things that it needs to do to handle and run his businesses.

So we have already a potential conflict setup here because we've got a TRO in place that is really contrary to the ruling that's already in place in Nueces County that

did not give Lawrence Berry the relief that he wanted in terms of controlling what happens. So we've got already a conflict situation set up. So it's not an issue of whether or not both courts have subject matter jurisdiction, they do. Dominant jurisdiction is really the issue here, in which case should go forward first and should it be the case that was first filed. Even though all the parties that are in this litigation are involved in that other litigation, all of the interests and issues that both sides are interested in already involved in that Nueces County. So that's sort of the 10,000-foot view. And Mr. Allison was in the weeds explaining all of the things that make us clear -- that make it clear that the issues are inextricably intertwined, that the parties are intertwined, that the interests are intertwined. And so given the fact that he's sort of laid the groundwork for all that already showing how intertwined they are, then we really do have to just look at the dominant jurisdiction issue, which is really more of a venue issue. You can either, you know, abate this case and wait until the Nueces County case is finished or dismiss this case and say everybody should go down to Nueces County or transfer the venue of this case to the Nueces County case and ask for those cases and the issues to be consolidated. Any of which would be appropriate and the thing that should happen as the first order of business.

I don't think that we're going to get to

needing to do another temporary injunction hearing in this case because the issues are so interrelated that it really is frankly a waste of the Court's judicial resources to start all over again. And then if you have a ruling that is contrary to the ruling of the court in Nueces County, then what do we do? That judge says we can do one thing, this Court says we do something else. We've got a complete impasse in terms of which court has the proper authority or which court we should follow in terms of what actions we take as a company. And so I think that that really puts us in a situation where we really should be here talking only about whether or not this case should be abated, whether or not there is actual jurisdiction, and whether or not we could get this case off your docket by Monday.

THE COURT: Thank you.

MR. DAWSON: May I proceed, your Honor?

THE COURT: Of course.

MR. DAWSON: Your Honor, today is not the day to get into the merits of this case. I will respond, just to clarify the record a little bit, to some of what I've heard from opposing counsel, but that is not the issue before the Court. Respectfully, the only issue that you have to decide today is the venue issue, and I'll get to that in a moment. But just so, you know, I heard Mr. Allison say, "Well, my clients, Marty and Bonnie, they don't claim to own Axis

Midstream." Well, that's not what they said before they came into this courtroom. The documents that are attached as Exhibit 3, 4, and 5 to our third amended petition, they are communications involving Bonnie, and Marty, and Mr. Hummell, who is here today, in which they claim they owned a hundred percent of Axis. And they called a meeting for the purpose of removing the manager and setting forth new directors. And that's what prompted this case, that's what prompted the initial temporary restraining order. They were claiming to be owners and they were claiming that they were going to call a meeting for purposes of doing whatever they had in mind, which we don't know yet.

They now acknowledge that they are not owners, and they now acknowledge that they are not even the manager. They had no legal authority to call that meeting. They say, "Well, Lawrence Berry signed all these documents, and we didn't know about it, and he didn't have authority." I invite you to look at Exhibit 7 to the papers we've submitted in connection with today's motion. It is an e-mail from Mr. Powers to a Scott Baker and a Bill Schoppe. They were potential investors in this project. And Marty Berry and Bonnie -- excuse me, Marty Berry and Dennis Berry were copied on the e-mail. And he attaches all of the operating agreements for all of the companies that they claim they knew nothing about, all of them. And they're all signed by

Mr. Berry on behalf of the various entities. He also describes/includes the legal descriptions for Midway Junction Land and Red Fish Bay Land. That was in April of 2020.

Not once, until about a week ago, not once did any of the people, Marty Berry, Bonnie Berry, Dennis Berry say, "Wait a minute, you didn't have authority to sign that." Here, they're sending documents to a potential investor which has all kinds of securities potential, you know, liability. They didn't say to that potential investor, "Wait a minute, you shouldn't rely on those documents because Lawrence Berry wasn't authorized to sign them." They were fine with him signing them. This was largely a project that he ran with. He and Mr. Powers were the ones doing all the work on this project up here in Houston. So I just wanted to clarify that.

Now, the first thing, your Honor, I want to tell you is that -- and Judge Gilmore said this -- is that while it's called dominant jurisdiction, it's really a venue issue; it is not a jurisdictional issue. And I will refer the Court to the Phillips versus Phillips case. And I have an extra copy if you would like it.

THE COURT: Absolutely.

MR. DAWSON: The Phillips versus Phillips case -- if I may approach, your Honor?

THE COURT: Of course.

MR. DAWSON: And I know you'll probably want

one, too.

THE COURT: I want him to have one.

MR. DAWSON: This was a case, your Honor, in which there was a divorce that was filed in one court in Harris County; and then in another court, one of the parties filed for a projective order. I believe the wife filed for a protective order, but not in a divorce court, in a different court. And the question was whether there was a dominate jurisdiction question in that case. For the second filed case, did dominant jurisdiction exist in the first filed case. And if you look at Footnote Four on this case, it says, "Despite it's name, the doctrine of dominant jurisdiction is not jurisdictional." That's what the court says. And if you continue on in the footnote, it discusses why it's not jurisdictional and then the last sentence says, "Therefore, the doctrine of dominant jurisdiction pertains to venue and is not jurisdictional." And similarly, your Honor, in the Gordon versus Jones case, if I may, I have a copy of it as well.

THE COURT: Yes.

MR. DAWSON: May I approach?

THE COURT: Of course.

MR. DAWSON: Thank you. In the Gordon versus Jones case, your Honor, there's a case filed in county court to determine heirship and then a second suit was filed in Fort Bend County for trespass to try title. And the question --

and then what happened was it got dismissed -- no, no, I'm sorry, there was a dominant jurisdiction question. And if you'll look at Heading C, it says, "Dominant jurisdiction," colon, "A venue doctrine." And it says, "Dominate jurisdiction applies when venue is proper in two or more Texas counties." And then it went on to say at the second heading it says, "Venue is not jurisdictional." And here, if I remember correctly, they determined that because they had filed this motion after they had filed their -- their answer, their -- they filed the general denial and they determined because this is a venue issue, you waived it because as the Court knows if you don't assert venue first, then you waive it.

And so but my point is is that the question for the Court is: Is there jurisdiction of this case? I mean, is there venue of this case in Nueces County? And the answer to that question is absolutely not because if you look at Exhibit 1 to our pleadings that we filed in connection with this -- these motions, it is the fully-signed investment agreement signed by all parties. And we have an affidavit, a declaration from Mr. Powers in which he says that he has the original, that it is signed in ink, and that what we have attached is a true and correct copy of the original document.

Now, your Honor, I know I said at the previous that I was going to have a copy of it. I did not feel

comfortable asking Mr. Powers to put it in the mail to me. He lives in New York. And I was like "If something happens and that thing gets lost, then I'm going to feel terrible," so I 9had him put that in his declaration that he has the original and that what's been attached and filed with the Court is a true and correct copy of that original. And I will tell the Court that if we do have the injunction hearing, you will get to look at the original for yourself. He can bring it down on the plane. I don't have to worry about it getting lost in the mail.

Your Honor, the documents that we have attached in his declaration establish prima facia evidence that there is a fully-signed investment agreement that has a forum selection clause that I'm going to get to in a minute. And in the Sustainable Texas Oyster Resources versus Hannah Reef case, which again, I have a copy for your Honor.

THE COURT: Okay. Thank you.

MR. DAWSON: In that case, your Honor, if you look at Head Notes Four, Five, and Six on Page 9, it says, "A Plaintiff independently establishes venue with prima facia proof that venue is proper." It goes on to say, "Prima facia proof is made when the venue facts are properly pleaded in an affidavit and any duly-proved attachments to the affidavit are filed fully and specifically setting forth the facts supporting each venue." And then if you go on to the last

sentence -- oh, no, no, the next sentence, excuse me, it says very important, your Honor, "A Plaintiff's prima facia proof is not subject to rebuttal, cross-examination, impeachment or disproof." So we have proved that there's a fully-executed document. We've given the Court prima facia evidence of a fully-executed document that has a forum selection clause in it and they can't challenge that. They can't say it's not fully signed, they can't -- they can do nothing to disprove the fully-executed document because the law doesn't permit them because at a venue hearing, you're not getting into -- it's not a summary judgment hearing; it's not other issues of material fact. Once we establish prima facia evidence, it is established and the Court must accept it.

And there you have -- and so not only that, your Honor, I also point out that in the Knox Waste Services versus Sherman case that we've cited in our papers, a mere denial by the party that he did not sign the agreement without more, fails to create a genuine issue of material fact. And so even if -- so the sort of venue hearing, you still -- mere denial is not enough, but the Court must accept respectfully that we have this fully-signed agreement. The other thing I will point out to your Honor is the conduct of the parties is consistent with there being two fully-signed agreements, both the one that deals with compensation, and the investment agreement, which is what we're about here today. If you look,

Mr. Powers says in his declaration and I think Mr. Allison has acknowledged, he was paid 2 million dollars pursuant to this agreement, the compensation agreement, which is Exhibit 2 to our pleadings.

And if you look at Exhibits 3 and 4, Exhibit 3 is where they terminate the compensation portion of the agreement. It's a letter from Mr. Boyd, and it references the compensation agreement. And it says, "We're terminating the compensation," the monthly stipend. He was paid a hundred thousand dollars a month for 18 months and he was also reimbursed expenses. And it says in there that we'll continue -- "If you want to keep working on this, we will continue to reimburse your expenses," which they did. They reimbursed his expenses through June of 2023. And so if there wasn't a fully-signed agreement, why would it be necessary to terminate the compensation portion of it. And if you look at Exhibit 4, it's Mr. Powers' response to the letter saying, "Okay, fine, I will continue to work on it and you'll pay me my monthly expenses I incur. And oh, by the way, by not getting my monthly compensation, it does nothing to change my ownership interest in this project, my 20 percent ownership interest, which is set forth in the investment agreement." Nobody writes back and says, "What, what are you talking about; what ownership interest; you don't have an ownership interest."

And then if you look also at Exhibits 5 through

8, there are various documents where Mr. Powers' 20 percent ownership interest is circulated among the parties and nobody challenges it. Nobody says, "You didn't have this ownership interest." So the conduct of the parties is consistent with there being this signed agreement that's before the Court. And then Section 5A of the investment agreement is the forum selection clause. And, your Honor, I have created a chart that I would like to hand to you. It's a demonstrative aid.

THE COURT: Okay. Thank you.

MR. DAWSON: And what this is, your Honor, is the first section is Section 5A from the investment agreement. And it says, "That any disputes arising under this agreement," quote, "Shall be brought in the state or federal courts in Harris County, Texas." And it goes on to say "Powers and each of the Berrys hereby irrevocably consents to the exclusive jurisdiction of such courts, such courts being state or federal in Harris County, and irrevocably waives any objection to the filing in Harris County." And what I have below that, your Honor, these are quotes from the various cases that we've cited in our papers. And these are the forum selection causes from these various cases. And in every one of these cases, in every one that I have in this handout, those forum selection clauses were held to be enforceable and were upheld and enforced.

And if you look at the language that I've

highlighted, the language from each of these cases is consistent with the language in Section 5A of the investment agreement. So in the Automated Collection case, they consent to the exclusive jurisdiction of courts of Montgomery County, Pennsylvania. And that -- in that case, the court held that's mandatory. The forum selection clause is mandatory. The court has to follow it. And then in the next case, the Lion Financial Services case, which is also out of the Texas Supreme Court, in that case the forum selection clause said that they agreed to the exclusive jurisdiction of the courts of the Commonwealth of Pennsylvania, courts of the United States of America for the Commonwealth, and they waive any objection they have to venue.

In that case, they said it's an abuse of discretion for the court not to follow the forum selection clause unless the party challenging it meets a very heavy burden, which I'm going to get to. Similarly, in the International Profit Association case, the language there was exclusive jurisdiction of venue in the 19th Judicial District Court of Lake County, Illinois. But you can see, your Honor, all these cases, many of which are from the Texas Supreme Court, some of which are from the Houston Court, all have language that is virtually identical to the language that we have in Section 5A of the investment agreement which is the -- which is the basis for this lawsuit. We're saying that

Mr. Powers and his company that he created are entitled to a 20 percent ownership in the project and a 20 percent ownership in -- this is the corporate structure, your Honor, for this Lone Star Ports Project. And you'll see Allied Ports is represented by Mr. Garcia is the entity that owns the 20 percent interest. It owns it in Lone Star Ports Holdings. These sump companies Sirius, Arcturus, Capella, and Red Fish Bay Terminals, my understanding is they're all owned by the other individuals -- excuse me, Capella, Arcturus, and Sirius are owned by the Berrys and I forget which one. Mr. Lawrence Berry owns one, Marty Berry owns the other, and then Dennis now -- Dennis Berry at the time and now Bonnie Berry owns one. So they all own this collectively, this Lone Star Ports Holdings, and which in turn -- I got it -- which in turn owns these entities.

MR. GARCIA: Would you like to hold it for me?

THE COURT: No comment, Mr. Garcia.

MR. DAWSON: And then it's Lone Star Ports Enterprises that owns -- that owns these various interests here. And these properties at the bottom, they -- some of them have land, Axis Midstream is the owner of the permit and what have you. So that's the corporate structure. And by the way, your Honor, it is Mr. Powers that set up this corporate structure. That's part of the reason that he was hired is he's a corporate transactional lawyer by background. He had

done work for the Berrys for many, many years, particularly when he was in Hong Kong. He helped them with some projects in China. They worked with him for years and so they called him and asked him not only to set up the corporate structure. And the reason it's important is because these are very wealthy people and they want to set up their corporate structure that minimizes their tax obligations. And I'm not critical of that, but that was why it was important that they have this complicated corporate structure is to avoid taxes or unnecessary taxes.

And the other thing they wanted him to do is they wanted him to negotiate the deal that they were -- they were in discussions with the Carlyle Group, which as the Court knows is a very, very big, you know, joint private equity firm. They were in negotiations and you'll hear testimony if we get to the injunction hearing that they were a little in over their head and they needed somebody to help come and negotiate the deal. And you'll hear that Mr. Powers negotiated with Carlyle and that he took the value for the Berry interest, he took it for something like 40 million -- and I may have these numbers a little bit -- but he negotiated where they were going to get 400 million dollars on this transaction. And there's a term sheet and it's attached I believe as Exhibit 8 or 9 to our pleadings. There's a term sheet with Carlyle where they acknowledge that the Berry

interests are worth 400 million dollars on this project alone. And so that was part of the work that he did.

But now our clients are because they were trying to deny Mr. Powers his interest, his 20 percent interest, you'll see in our attachments to our third amended petition where they are saying no, no, this project is only owned by the Berrys. And Mr. Powers implicitly doesn't have an ownership interest. That's what prompted this lawsuit. So he's filed this lawsuit under the investment agreement. He is entitled to a 20 percent ownership interest. And that -- that -- the forum selection clause is mandatory. And it is presumptively valid under Texas law. If you look at Reeder versus Woods and In Re: Lion Financial Services, they say in there and here's a quote from Reeder which is -- he's co-counsel, your Honor. I don't know.

THE COURT: They don't know what to do. We don't know what to do with Mr. Garcia.

MR. DAWSON: In the Reeder case, your Honor, which is from the Texas Supreme Court, it says, "Such clauses," referring to forum selection clauses, "Are presumptively valid and constitute consent to jurisdiction in the agreed forum." That's from the Texas Supreme Court. Now, I said earlier that there is a circumstance under which they can be ignored; and that is, that you -- the party challenging venue in the selective forum must show -- clearly

show that the enforcement would be unreasonable or unjust, that the clause is invalid for reasons of fraud, that enforcement would contravene a strong public policy of the forum where the suit was brought or that the selective forum would be seriously inconvenient for the parties. And it is described as a, quote, "particularly heavy burden," end quote.

And in the Pinto Tech. Ventures case with Sheldon, a Texas Supreme Court, and I've got that if you want it.

THE COURT: I do.

MR. DAWSON: Here is a copy, your Honor.

THE COURT: Thank you.

MR. DAWSON: There on Page 7 in heading four, five, and six it says, "Forum selection clauses provide parties with an opportunity to contractually pre-select the jurisdiction for dispute resolution. In Texas, forum selection clauses are generally enforceable and should be given full effect. Failing to give effect to contractual forum selection clauses, enforcing a party to litigate in a forum other than the contractually chosen one amounts to clear harassment, injecting inefficiency by enabling a forum shopping wasting judicial resources, delaying adjudication on the merits, and skewing settlement dynamics."

And so, your Honor, I respectfully -- where's my notes -- submit that what you have before you in Section 5A

is a forum selection clause that is enforceable, that they have not put forth any evidence that meets the very heavy burden to avoid application of the forum selection clause. There's no evidence in the record before you that it would be unreasonable or unjust or that there's fraud or it would contravene public policy or that it would be seriously inconvenient. There's no evidence. They do make an argument about it's more convenient in Corpus. We respectfully disagree. Mr. Lawrence Berry lives here in Houston, much of the work that was done on the project was done here in Houston; but regardless, they haven't met the burden, the heavy burden that's required in order to avoid the forum selection clause.

And if you determine -- and I will remind the Court that the clause in 5A is exclusive, exclusive jurisdiction to Harris County. And what that means, if that is a valid and enforceable forum selection clause, which we say it is, means this case can only be in Harris County; it cannot be in Nueces County. And not only can you not transfer it to Nueces County, but it totally obliterates the plea -- the plea and abatement because the plea and abatement presumes that venue would be appropriate in the first filed court. And here, it would not. Jurisdiction is exclusive in Harris County; therefore, the Court if it reaches that conclusion on the forum selection clause, you can deny both motions. You

don't have to go any further. You don't have to analyze whether the claims in this case are interwoven or intertwined with the case -- the case in Nueces County. It's -- that's the end of the analysis for the Court if you determine that the forum selection clause is enforceable, which I submit to you, your Honor, you should because it's presumptively valid. We have given you prima facia evidence and they have not met their heavy burden.

If for some reason you disagree with me on the forum selection clause, in the alternative, it's a venue clause which is enforceable under Section 15.020 of the Texas Civil Practice and Remedies Code. And in that case in the Texas Practice and Remedies Code it says, "That if parties to a venue selection clause and it's a major transaction, that is mandatory." And not only is it mandatory, it trumps all other venue provisions. So if you have -- if you have mandatory venue as a major transaction under 15.020, then even if there's another mandatory venue provision, it doesn't matter, 020 trumps. And that's not only set forth in the statute itself, but one of the cases is Fisher, in re: Fisher. I was -- I was -- I heard from the gallery.

THE COURT: An important part of the gallery, if I may say.

MR. DAWSON: Yes, indeed. You know, your Honor, I'll digress a moment. I once went to London and

watched the -- went to the arguments in one of the ports of justice. And there were three justices up with their wigs and they asked a question. And the barrister said, "My Lord, I should require instruction on that issue." And the little fellah came running up from behind him. He leaned over and he whispered something in his ear, and he comes back and he says, "My, Lord, I have been instructed that..." I thought what a civilized system. I wish we could do that instead of us having to whisper from the gallery.

But In Re: Fisher, it says that the venue provision in 15.020 trumps all over provisions. And the other thing I'll point out, your Honor, is that you may -- you can look at the investment agreement itself, but you can also consider other evidence. In the SM Energy versus Union Pacific case, which I have, in that case what happened was there was an agreement and the question was whether it was a major transaction. And you'll see in that court that the court looked beyond the face of the agreement itself and it saw that one of the parties had offered to pay I think it was 2.4 million. And so they said, "The fact that they had offered to pay 2.4 million makes this a major transaction." And so we say, your Honor, that the investment agreement is a major transaction. You've already heard from Mr. Allison and from me, and it's in the declaration of Mr. Powers that he received over 2 million dollars. And the threshold for a

major transaction is 1 million, so he's already received more than is required for the major transaction doctrine.

You'll also see in the agreement, it says, "That the Berrys are entitled to receive the first 250 million dollars of this project." His -- Mr. Powers' ownership interest only kicks in after the Berrys have received 250 million. And that -- under the statute, the language of the statute is whether anyone is entitled to receive consideration with the value over 1 million. The agreement on its face says that they are entitled to receive consideration of 250 million and, therefore, makes it a major transaction. And the -- the Carlyle offer is Exhibit 9. That's where they offer or their terms were 400 million. That document was executed about the same time or close in time to the investment agreement. The Court can consider that. That is Exhibit 9 to our response and is on Page 318. And Mr. Alistair represented to Judge Reeder at the temporary restraining order or at the -- where did you represent the... but Exhibit 10 to our pleading -- oh, in this Court, I think, maybe. I can't remember. It's Exhibit 10, wherever Exhibit 10 took place. Oh, it was to judge -- I'm sorry, now I remember. It was to Judge Palmer.

THE COURT: Yes.

MR. DAWSON: Told Judge Palmer when we had our hearing over there in the 215 that this is a billion dollar project. And that's Exhibit 10 at Page 4 of our pleading.

And the other thing, your Honor, under the Shamoun -- and I don't have an extra copy of this. I have one copy, but it's all highlighted. Under the Shamoun & Norman, LLP versus Yarto International Group case 398 S.W.3d, 272, in that case, it doesn't matter whether they actually got the 250 million or the 400 million. It doesn't matter that it hasn't come in yet and may or may not happen in the future because in that case, they said the fact that the document entitles you to receive it, and I'm paraphrasing, I mean, it doesn't matter. That's enough for the major transaction doctrine even if you haven't gotten it yet. And I think what happened in that case is that they -- they were obligated to pay up to a certain amount and the court -- the party challenging the transaction said, "But we haven't received that." And he says, "It doesn't matter. Under the document, you were entitled to receive it. That makes it a major transaction."

And so if -- if the Court determines that this is a valid and enforceable venue provision under 15.020, that again ends the analysis because it's mandatory in Harris County and it cannot be transferred to Nueces County. That addresses the plea and abatement and it addresses the motion to transfer venue. And so briefly I'll just on their venue issues, I'll just say that this is not a land dispute. One of their arguments is that there's a mandatory venue under Section 15.00 -- excuse me, 15.011 because they say that Axis

Midstream owns some property. This is not a land dispute. If you look at 15.011, land disputes are defined in the statute as suits where somebody is either trying to recover property, recover an interest in property, partition property, remove incumbrances to title on property, recover damages to property or quiet title to property. And you can look in the relief that we're seeking in this lawsuit, there is no request for anything having to do with real property. And then I'll also say that Nueces County we do not believe is more convenient for some of the reasons I have articulated previously.

Now, let me also -- I do this all the time, I make a mess. Let me address the allegations and why these lawsuits are different. If you get to the question of whether this case and the Nueces case are intertwined, inherently interrelated, if you get to that question, the Court -- what the Court should ask is are the claims asserted in this case compulsory counterclaims to the claims that were asserted or are asserted in Nueces County. That's the standard. If you look at the cases that we've cited, you hear the courts say the definition of inherently interrelated is whether the second-filed case in this -- this one, the case that we're here on today, is that -- are the claims asserted in this case compulsory counterclaims to the claims in Nueces County?

If you look at Mr. Allison's, he likes the Wyatt case and he likes the Cleveland case. If you look at

those two cases, what they show is that where -- there are two lawsuits that all arise out of the same transaction; then, dominant jurisdiction may be appropriate. In the Cleveland case, Mr. Cleveland signed seven promissory notes having to do with his house. And he filed suit in Johnson County seeking to cancel those notes. Well, then the bank filed suit in Dallas County over the same notes and said we want to enforce the notes. And so the court said, "No, you can't file that. There was dominant jurisdiction in Johnson County because they had -- both lawsuits have to do with these promissory notes."

In Wyatt versus Shaw Plumbing, there Shaw Plumbing provided services for the Wyatt's house in Duval County. And Wyatt sued saying, "You did a bad job and we're suing you for DTPA." Well, then the plumbing company sued, and ironically in Nueces County, for breach of contract saying we did this work for you and you haven't paid us. Both lawsuits had to do with the work done by the plumbing company and they say that that was -- there was dominant jurisdiction.

Here, it's completely different. So the standard for compulsory counterclaims -- oh, and the J.B. Hunt case that he talks about, they both involved the same car crash. Here, the first question in a compulsory counterclaim analysis is whether the court in Nueces County has jurisdiction. And we've already established that we do not

believe it does based on the forum selection clause and the venue selection clause. Secondly, the claims asserted in this case must be claims that the Plaintiffs here have against the opposing party in Nueces County. And that's in rule -- Texas Rule of Civil Procedure 97a and it's also in the J.B. Hunt case where in order for dominant jurisdiction to exist, the pleader, the Plaintiffs in this case, must be asserting claims that they have against the opposing party. Well, your Honor, we're not a party to Nueces County. We don't have claims against anybody in Nueces County because we're not a party. And so it cannot be a compulsory counterclaim to us because we're not parties to that case. So that's the second part of the compulsory counterclaim analysis that fails.

And then if you look at, your Honor, Exhibits 1 and 5 to the plea and abatement from Mr. Allison, Exhibit 1 is the lawsuit that Lawrence Berry filed originally. If you look at that claim, your Honor, in Paragraph One they say, "This actually concerns the management and finances of several Texas companies and they're listed." That's what that lawsuit is about is the management and finances of several Texas companies. And in Paragraph 3, Lawrence Berry asserts that "Marty Berry has been mismanaging the Berry entities' finances and he's engaged in self-dealing loan agreement for Marty and Dennis to the Berry entities." If you go on and look at the Heading B on Page 7, it says, "That Defendants have excluded

Lawrence from key decisions relating to the Berry entities, including improper self-interested transactions." If you go on to Paragraph C on Page 10, Marty, Dennis, and a different person named Powers, not my Powers, have threatened the financial operations of the Berry entities.

If you look through Exhibit 1, your Honor, it is clear that Mr. Lawrence Berry is complaining about the mismanagement of these various Berry entities. That is not a claim that we assert. Exhibit 5 to Mr. Allison's plea and abatement is the counterclaim that was filed by various Berry entities. And again, the allegations, they claim that Lawrence Berry engaged in conversion, breach of -- this is Paragraph 11 on Page 3. Counter-Plaintiffs filed this counterpetition asserting claims against L. Berry for conversion, breach of fiduciary duty, breach of contract, unjust enrichment, breach of constructive trust, fraud and others. And they accuse Mr. Lawrence Berry of self-dealing and breach of fiduciary duty. And those are claims not asserted here.

In Paragraph 14, Mr. Allison in filing this pleading, he defines what he calls Berry-related entities. And you can read them all. There's no mention of Ted Powers, there's no mention of Allied Ports, there's no mention of Axis Midstream. Now, in fairness to Mr. Allison, I think a few days he did amend his counterclaim to throw in some stuff

about Axis Midstream. And I don't think you can create dominant jurisdiction that by filing pleadings after this case has already been filed; but in any event, and so there isn't -- and in a different pleading, there isn't a mention of Axis pleading. But if you go through, they allege that there was self-dealing by Lawrence Berry, that he hasn't paid up some money that was owed on an Orca transaction. None of that has anything to do with this lawsuit.

And if you look at those two lawsuits, there's no question that my client, Mr. Powers or Mr. Garcia's client, Allied, they are not parties to that case. They're not mentioned in either of the pleadings that are before the Court. There's no mention of Ted Powers, there's no mention of Allied Ports, there's no mention about their ownership interest in this project. I don't think, I'm almost certain, that there's no mention of the Lone Star Ports project, which is what this case is all about. And if you look at what's in this lawsuit, this lawsuit is about Mr. Powers or his company's ownership interest in really it's in Lone Star Ports Holdings. That's the top -- that's who he has the ownership interest in Lone Star Ports Holdings, which in turn has an ownership interest in the various other companies that are part of the project. That's what this lawsuit is about. There's no -- and it's about breach of the investment agreement. There's no mention of the investment agreement in

Nueces County. Not mentioned anywhere in that case. So -- and if you look at the claims that we are asserting, then you'll see that they are not being asserted in Nueces County.

Now, there's been mention about the injunction that was granted by the judge in Nueces County and how there might be inconsistencies. I promise your Honor that I will -- I didn't know about that injunction when I filed this lawsuit, and I promise you that I will draft our proposed injunction in a way that it will not interfere at all with whatever the injunction that exists down in Nueces County. It is not our intention to get into those issues, and we can certainly craft an injunction that does not in any way impinge or infringe upon what the Judge Galvan, I think is his name, down in Corpus Christie, what he's doing. I just wanted to let the Court know that.

And the Dolan's case says that you should not -- there is no dominant jurisdiction when the judgment in the first case will not foreclose all issues in the second case. That's what they put in the Dolan's case. And you can look at the relief that is sought in the petition and in the counterclaim and the court down there can give all that relief and it won't have one -- it won't have any bearing at all on this case. And so I think that -- I think that there is no dominant jurisdiction. I also will refer the Court to kind of three cases: One is the Ruebbling versus Foremost County

Mutual Insurance. Hold on a second. I have some cases, copies for your Honor.

THE COURT: Thank you.

MR. DAWSON: In that case, your Honor, the Ruebbling case, there was a car crash and the family sued in Travis County. And the insurance company said, "We're tendering policy limits." And the family members could not agree on how to divide up the insurance money, and the insurance company tried to work with them to get them to work it out and they couldn't get it worked out, so the insurance company interpled the insurance proceeds into the county -- into the court in Caldwell County. The first case was in Travis County and they interpled the funds in Caldwell County. And there was a question of whether there was dominant jurisdiction and the court said, "No, one, the insurance company is not a party to the Travis County case; and two, interpleading the funds is different." They both -- both cases had to do with the underlying car crash, but they were not -- they were not inextricably interwoven or whatever the language is. The court said, "No, the case is not subject to dominant jurisdiction."

In the Forney case, if I could give the Court --

THE COURT: Thank you.

MR. DAWSON: -- in the Forney case, the suit

was filed in Harris County for breaches of certain agreements. And then the Defendant sued the Plaintiffs in Bexar County for breach of fiduciary duty for having set up a competing business. Both lawsuits related to the underlying employment agreement. The Plaintiff sued in Harris County, said, "I'm entitled to be -- to get certain compensation under these employment agreements," and then the Bexar County case said, "Well, you have set up a competing company. That's in violation of the same employment agreements." And the court said, "No, even though there are overlapping parties and that both lawsuits arise out of the employment relationship," here's a quote on the last page, Page 6, in the middle of the paragraph: "Although the two suits involve overlapping parties and claims and both suits arise out of the prior employment relationship between realtors and Makomes (phonetic) Energy, the subject matter of the two suits is not inherently interrelated." And so they found no dominant jurisdiction.

And in the In Re: Martin case, the case which Mr. Reasoner is familiar, Scott Martin filed suit in Harris County. And he said, "It's kind of funny, it's somewhat similar analogous to this case." The father, Mr. Martin, had set up the company and then there it was left to the -- his three children: Scott Martin, Ruben Martin, and a daughter. The daughter passed away and so there was a fight among the

brothers, Scott Martin and Ruben Martin, for control of the company. And the company issued shares to its employees and Scott Martin sued in Harris County, said, "That was an unauthorized issuance of shares and it was done to dilute me so that I wouldn't have control of the company." And thereafter there was a suit filed I believe in Gregg County if I remember correctly where they said there the claim was you're interfering with the company's business. And part of their claim was you filed suit in Harris County. That was part of their claim in Gregg County was that they had filed suit in Harris County. And so the dominant jurisdiction question was raised and the court said, "No, they are not interrelated," even though the second suit relied upon in some sense the suit that was filed Harris County.

And I guess last point before I sum up, your Honor, is the plea and abatement must be supported by a preponderance of the evidence. There's an evidentiary requirement and this is in the In Re: HPGM case.

THE COURT: Thanks.

MR. DAWSON: And if you look on Page 6, it says at the top of the page under Heading 14, "The verification of a plea does not do away with the requirement that one urging the plea," the plea and abatement, "Prove the grounds by a preponderance of the evidence at the time the plea is presented to the court. And if you look at the heading under

17, your Honor, it says, "Indeed it is well-established that pleadings are generally not competent evidence even if sworn or verified." And I will tell your Honor the plea and abatement in this case is not verified. The vast majority of the exhibits that Mr. Allison has tendered are pleadings. All of the attachments with the exception of one to his plea and abatement are pleadings. He also attaches a transcript of a court hearing. And there's no declaration in support of the plea and abatement. There's no affidavit in support of the plea and abatement. And so my point is that they have not met their burden of proof. If you get to that issue, which I don't think you need to, but if you get to that issue, they have not met their burden of proof.

So, your Honor, I would just respectfully say that the motions should be denied on many grounds. We have mandatory forum selection clause that mandates Harris County and Harris County only. We have a mandatory -- in the alternative, we have a mandatory venue provision that mandates exclusive jurisdiction in Harris County. I'll also remind the Court that in the agreement that they signed, they agreed to waive any objections to proceeding with a case in Harris County. That was their agreement. And candidly, your Honor, they should be held to their agreement. And so we would ask the Court to deny the motion to transfer, and deny the transfer venue, and deny the plea and abatement. And I

believe Mr. Reasoner, since he's the removing party, I think he will address the remand issues that were raised. I don't think there's any question about that this Court, and in fact I heard several times counsel say that the Court has subject matter jurisdiction. I think they had some procedural arguments about the removal that I'll let Mr. Reasoner address. And if the Court has any questions, I'm happy to answer them, otherwise I will cede time.

THE COURT: Thank you, not at this moment. May I ask the only question I have is do you need a five-minute break? You okay, okay. Only because we've got -- I know we have to get Mr. Alistair to Austin.

MR. DAWSON: I'm not going anywhere.

THE COURT: Oh, I'm sorry.

MR. DAWSON: In fact, I sent the chief a nice note. I did not mention your name. I did not.

THE COURT: I'm sure you highlighted it.

MR. DAWSON: I just said a court in Harris County.

THE COURT: That's okay. That's okay. I will let him know I was the culprit.

MR. DAWSON: Thank you, your Honor.

THE COURT: Thank you very much.

Mr. Reasoner.

MR. REASONER: Good morning, your Honor,

Barrett Reasoner on behalf of Mr. Lawrence Berry. May it please the Court --

THE COURT: Of course.

MR. REASONER: -- counsel. Your Honor, I'm going to, as Mr. Dawson indicated, I'm going to touch on our response on the motion for remand. I also, because I lived it, am going to talk a little bit about some of the interrelated arguments just because I was -- I have been involved in that case for the duration. I do want to note at the outset, Mr. Allison went through musing thoughts, facts, observations really about the merits and we've known each other a long time. He's very eloquent always, but that's not what we're here about, your Honor. What we're here about is an evaluation of these cases as pled and what the law tells you should or respectfully must be done in certain instances in that regard.

I had a little section here on subject matter jurisdiction, but as -- as counsel eluded to, you're going to be spared hearing that because both counsel for the other side or the Co-Defendants have acknowledged that subject matter jurisdiction is proper in this Court, which is important. So that leaves them with only really two arguments in the papers that the Court has reviewed on why this should be remanded. One, is they point to the Texas Government Code 25A.006(e). And, frankly, your Honor, I think respectfully there's a

misapprehension of what that says in their argument. They say they rely on this provision which simply stands for pretty unremarkable proposition, Judge. It says, "If a case is filed in a county that does not have an operating business court, then you cannot remove that case to the business court." Okay, not controversial here. What they tried to say is, "Well, because Lawrence is a party to a case, another case in Nueces County, that -- and Nueces County does not yet have a business court, he can't remove this Harris County case to the Harris County business court." I'm not going to linger on that, your Honor. That's not what it says, not what it means, and there's zero support for that proposition. It's simply a misreading of that pretty straightforward and plain provision.

Next, in passing, they argue that our removal papers did not plead sufficient facts to support removal. Now, they cite no law for this proposition that what we pled was somehow inadequate. And because you-all are new here, there is no business court authority on this, not surprisingly; but when you look at federal removal cases, your Honor, I think that that provides very useful guidance on what the standards should be and what is required. And I'll cite exclusively Supreme Court cases and statutes, just to make it quite clear, but under 28 U.S. Code 1446(a), it says, "Containing a short and plain statement of the grounds for removal is sufficient." In the Mount Healthy City Board case,

the court said, "That when the amount in controversy is alleged in the petition, that is accepted, if made in good faith," so, you know, you rely on what's pled there. And that when the removing party, the removing party in the Gasch case, G-A-S-C-H, the removing party can rely on the facts pleaded. And if you look back at our notice of removal, your Honor, we noted what had been pleaded and why that fell within the subject matter jurisdiction. And we attached Mr. Dawson's client's pleading, and the court said -- the courts have said throughout the federal cases a short plain statement need not contain evidentiary submissions.

So those two arguments I think on why the case should be remanded are without merit. It's also, as Mr. Dawson I believe pointed out, they talk about, I think, at one point a remand to Nueces County. That would not be in the unlikely event I believe that this Court decided that a case should be remanded. It would not go to Nueces County, it would go to the Harris County Court from which it came, but that would not be appropriate here.

Now, if I can talk for a moment about the interrelated issue, but I want to touch on a point that I think is extremely important. And Mr. Dawson made it, but it bears reiteration; and that is, that you only get to that issue, this dominant jurisdiction question and the question of whether they are interrelated, if you find that there's proper

venue in both places. And if I may hand the Court the Gonzalez case. May I approach, your Honor?

THE COURT: Of course. Thanks.

MR. REASONER: Your Honor, and we've highlighted for both counsel and the Court, but in looking at the fourth page of that opinion, the court rejected Gonzalez's argument that the Hidalgo County Probate Court had dominant jurisdiction over the case holding "It is axiomatic that a court cannot have dominant jurisdiction if it does not have proper venue." And I won't reiterate Mr. Dawson's arguments there, but again when you have an investment agreement signed by the parties that says mandatory jurisdiction in Harris County, there is no argument to be made that you need to take the next step and look at the interrelatedness. Now, if they are at this point it sounds like they're going to try to say, "Well, that's a forgery," you know, you hope that looking at the surrounding circumstances, they will be refreshed and that won't be the testimony you will hear at the TI. But that's a factual issue for another day, but things like I think -- "I don't remember that, I think somebody might have forged it, I don't read my e-mail, so the fact that people were e-mailing me things," you know, all of those deep factual questions are not what this Court is asked at this stage of a proceeding to evaluate. You look at what's pled, you look at the documents that are provided. Clearly in a situation with signed

documents, the Court can rely on those and the pleadings to make a decision at this initial stage. They are not precluded from at a TI hearing or at a trial making arguments that documents are fictitious or created or falsely signed or whatever they may claim. That's an important issue there. And there was several of the things that Mr. Allison stated in his factual recitation respectfully we disagree with; but again, it's premature to go into that issue at this time. I think Mr. Dawson pointed out, and we had it in Exhibit 14 of our response to the motion for remand, the sending of the investment agreement signed by all to third parties with copies to the other Berry brothers. They received them at a time. Also, Mr. Allison, although I think he corrected it later, suggested that a transfer to Red Fish was not signed -- was only signed by Lawrence, but that was also signed by Dennis Berry and that's also in Exhibit 14. So their factual points that we will take issue with at the appropriate time, but I think that's a premature discussion at this point.

Now, if I could turn your Honor just to the interrelated argument, and I want to focus on and let me say, you know, as the Irish would say fair play to Mr. Allison, we largely lost the temporary injunction hearing. Now we're going to live to fight another day at trial, but what we've lost sight of here in this discussion is what was actually sought there and what was actually involved. And I think that

there is honestly they are trying to muddy those waters. The TI that we asked for was twofold, your Honor, to keep the other brothers from removing Lawrence Berry from the board of the Berry entities. Again, as Mr. Dawson pointed out, a defined term in our pleading that did not in any way implicate the Lone Star entity or Axis. It was specifically defined Berry entities; and we said, "Judge, keep them from removing Lawrence Berry until this case can be tried from that board." Denied, we lose that, okay.

Second point we said, "Keep them from selling real property without giving us two weeks' notice." The judge threw us a bone on that one. We got two days.

THE COURT: 48 hours.

MR. REASONER: Yeah, 48 hours exactly. But again as Mr. Dawson has repeatedly noted, his case has zero to do with real property. He is not asking this Court nor will he be asking this Court to enter any relief that would address real property. So the point is it is an absolute red herring to suggest that some order that this Court would be asked to enter would conflict with what Judge Galvan entered in Nueces County. It's simply not true. And I think Mr. Allison acknowledged what mister -- what Judge Galvan entered, denied our request to keep Lawrence on the Berry entity board and gave us a little bit of what we wanted on property, that's it. That's the order. There is zero -- and Mr. Dawson expressed

his intentions, but you don't have to take his word for it, although he is a credible man. You look at what he's pled here, the relief that he is asking for, your Honor, would not lead this Court to enter a temporary injunction that would conflict in any way, shape or form with Judge Galvan. So that's -- that's a very critical thing I think to keep in mind here, your Honor.

And on the interrelatedness piece, if I may just briefly approach.

THE COURT: Of course.

MR. REASONER: And I gave one of these -- it's just a simple few pages with some excerpts from our pleadings and an or charge, your Honor. But, again, just to bring home the issue, if you look at that first slide, you see the introduction of our Nueces County case and what -- and the fact that it's relating to the management and finances of these Berry entities listed there. And the specifics, your Honor, which I -- you know, are not things that come up here, but just to tell you the disparate nature of them, there was an allegation that the two other brothers engaged in self-dealing loans; that is, loaned the company money without notifying, some $75,000,000 to the Berry entity without notifying or getting approval from the board. You know, they will characterize that to the jury there as a selfless act and we will, of course, be talking about the hazards of a

self-dealing loan that's not disclosed and approved. And that's going to be a fact issue fought out before the jury there in Nueces County.

There's also an allegation there that Mr. Marty Berry bought some cranes, some heavy equipment and in his entity of his very own and leased those to the Berry entity, again, without disclosure and approval by the board. So that again is something that's going to -- and they're going to have their explanations and reasons for that. That'll be hard fought there. Now, the counterclaim, again, these brothers over the years the evidence shows spend some of their own money, get reimbursed, you know, do different things in terms of how they are managing things. And they have alleged in counterclaims there specifically focused on Orca, which is an entity that was involved that their investments were made, that Lawrence owes some money or, you know, misallocated certain money in that regard, etc. But the counterclaims do not in any way, shape or form make allegations about Lone Star Ports or Axis. In three -- as opposing counsel pointed out -- three days of testimony in that case in the TI, the only mention ever of anything to do with any of this was Tonya Fulgum (phonetic) who is Lawrence Berry's lieutenant, you know, she was asked, "Well, what are you working on now?" She said, "I'm working on a Lone Star Ports project," full stop. And that's all that came up in the three days of what I think

the judge and probably we would all admit was pretty extensive testimony and a lengthy process. That was it.

So, and again as Mr. Dawson eluded to, they on Tuesday, a couple of days ago, they have sprinkled in the word "Axis" and "Lone Star Ports" in a couple of places to their counterclaim; but again, the first point, Mr. Dawson saying, "You know, you can't add something. Hey, you know, first filed." But more importantly, it still -- it still does not address the claims that Mr. Powers and Allied are bringing here. They're not -- there is no addition of any sort of recitation about that or asking for relief with regard to Mr. Powers' assertion of his ownership based on the documents. And, again, circling back to what Mr. Dawson said, how could they, your Honor? I mean, there is -- Mr. Powers is not in that proceeding, and he's got an investment agreement that tells him where he has to bring a proceeding, Harris County. That's what he's done. And that's where you get to the Dolan's case, your Honor, that counsel mentioned. And I think that is -- that's one worth if you don't mind handing -- handing up as well.

THE COURT: And, Mr. Reasoner, I know Mr. Foster is going to ask me afterwards. Do you have an extra copy of this document?

MR. REASONER: I do. And I will give him -- I will give him that.

THE COURT: Please, give him a copy right now. That shouldn't be on the record.

MR. REASONER: I will give him a copy of Gonzalez and Dolan's as well.

I apologize, I should have given those to you earlier, sir.

MR. BAIRD: I appreciate you. Thank you.

THE COURT: Thank you.

MR. REASONER: But when you look, your Honor, at Dolan's, there in the court -- and this is Texas Supreme Court -- one of few arguments I've ever given where I'm only U.S. or Texas Supreme Court, your Honor. Dolan's, the court held that there was no abusive discretion denying a plea and abatement where judgment in the first filed suit would not have foreclosed all issues between the parties, okay. The judgment would not have foreclosed all issues. And that's -- that's important here because as Mr. Dawson indicated, Mr. Powers, we can litigate that, try that in Nueces County for a year, you know, for a year from now or whatever. It's not going to address whether or not Mr. Powers has ownership or not because that's not -- he's not a party to that case and that issue is not raised in that case, so what the Texas Supreme Court is talking about there is you shouldn't abate in a situation where judgment in the other case would not foreclose all issues between the parties.

Now, mind you, that's in Dolan's you're talking about a situation where you have gotten past that first step that Gonzalez tells you about, which is is venue proper in both places. It's not here, so you don't even get to that next stage of interrelated analysis. And, your Honor, just to briefly take you through the rest of these -- these slides on this -- not slides, handout -- the second page, as I indicated, the Berry entities are specified in the petition there and laid out. And then if you go to the -- in what Lawrence Berry filed in Nueces County, if you go to the next page, you see the chart of the entities that are involved and at issue in this case -- in that case in Nueces County.

Now, the third -- Page No. 3 is where you see the entities in this Harris County case brought by Mr. Powers and Allied. Again, not -- none of the Berry entities that are in that other case are here. And if you look at the relief on Page 4, we just point you to the relief that Mr. Powers is looking to, he's asking about compensation under an agreement. And then if you go to the fifth page, he's asking about declaratory relief, asking for -- talking about his ownership. And if you go to the sixth page, you look at Mr. Powers' petition and it does not include disputes about control over the Berry entities, but rather ownership or control of the separate project entities.

Okay. So I just wanted to walk through that

because I think it's very important. You know, there is a tendency to talk about these things in a sweeping way and say, "Well, maybe the judge will just throw up her hands and say, well, it all kind of sounds interrelated." As Mr. Dawson talked about, there is a lot of authority out there that talks about when you -- if you get to the interrelatedness phase, the analysis that you have to do and it is a strict analysis. And Mr. Dawson talked to you about the In Re: Martin case. There's also the Coastal case, which was a Texas Supreme Court Coastal Oil & Gas v. Garza, 2008 where parties overlapped and some things were legally similar, but these claims were not identical. And in that situation, the court held not abating was proper. So the bar is high and several of the cases cited by Mr. Allison have been talked about by Mr. Dawson, but if you look also at the Encore case that Mr. Allison cited, that was a case involving the same parties and the same contribution agreement was at issue in Encore. In J.B. Hunt, both cases involved the same automobile accident. In Phillips v. Phillips, the case involved one and order against domestic violence against the husband and the other the divorce proceedings. So those were all cases where venue -- first, venue was proper in both places; but secondly, it was about the absolute same thing. When you look at this clearly, your Honor, it's not. There is no basis to either remand this case or grant the other relief that is being asked for by the other

side. Thank you for your time, your Honor.

THE COURT: Thank you.

MR. ALLISON: Your Honor, I kind of outlaid a process and I think I want to stick to that; and that is, to offer exhibits at this time. I think most of them or many of them --

THE COURT: Mr. Garcia, do you have them?

MR. ALLISON: I apologize.

THE COURT: No, that's okay. Not since you just joined?

MR. GARCIA: I think they are totally right, Judge.

THE COURT: Your guesstimate.

MR. ALLISON: Was that a my Cousin Vinny argument? You have time.

THE COURT: Sorry.

MR. ALLISON: Sorry about that.

THE COURT: And that is my question for you and I should have said this at the beginning. What I'm noting, that I have his exhibit. I should have made this clear. The exhibit, your great demonstrative, that you had Judge Gilmore hold for you, that is Exhibit 1?

MR. ALLISON: Yes.

THE COURT: And it is that one exactly?

MR. ALLISON: I think it is exactly.

THE COURT:  Yes, I just wanted -- I'm not questioning it, I just wanted to make sure.  And I should have said that at the moment, at the time.

MS. GILMORE:  Yes.

THE COURT:  Thank you very much.

MR. GARCIA:  I think -- I believe it is.

THE COURT:  Okay.  Thank you very much.  Sorry about that.

MR. ALLISON:  I didn't think any changes have been made.

THE COURT:  No, it's fine.  I'm not suggesting that.

MS. GILMORE:  So can we offer the rest of the exhibits in now, your Honor?

THE COURT:  Yes.

MR. ALLISON:  Okay.  We would offer Exhibit 1.

THE COURT:  Yes.  And...

MR. DAWSON:  No objection.

THE COURT:  Okay.  Thank you.

(Exhibit No. 1 was admitted)

MR. ALLISON:  We would offer Exhibit 2 which --

THE COURT:  May I have some stickies.  I usually have all these stickies.  I have all of these things.  Oh, wait, yes, I do.  The nerd in me has stickies.  Go ahead.  Thank you.  I'm sorry, you said Exhibit 1?

MR. ALLISON: And that's admitted, your Honor?

THE COURT: Yes.

MR. ALLISON: And we would offer Exhibit 2, which is the actual permit. It has two parts to it. It's the public notice that describes what the permit application is and then it's the actual slides that show the permit.

MR. DAWSON: No objection.

THE COURT: Thank you.

MR. ALLISON: Counsel, I'm going to jump over to the ones that I think are agreed to.

(Exhibit No. 2 was admitted)

MR. ALLISON: Do you want to talk about -- let's go through it now. Exhibit 3 we will go ahead and offer.

MR. DAWSON: And Mr. Allison has made a representation to me about Exhibits 3 and 4 and accepting that representation, we have no objection.

THE COURT: Thank you very much.

MR. ALLISON: So we would offer 3 and 4, your Honor, at this time.

THE COURT: And just for the Court's clarity, these are? I'm looking at them.

MR. ALLISON: Three, the orange shading is the land that Robert Rickett holds in his name nominally for the company for Berry JP, and Four is it's a combination of Two

and Three and let me tell you what I mean by that. If you look at slide -- and this is in the briefing -- if you look at Slide 32 of the Exhibit 2, which is the permit, and you overlay it with Exhibit 3, which shows Robert Rickett, you can see that the permit land is exactly overlapping with the Robert Rickett's land. And we have that in there, your Honor, to demonstrate that there is real property and that is part of and parcel to this permit and project; and so we overlaid them. And that's what the overlay is Exhibit 4.

THE COURT: Thank you.

(Exhibit Nos. 3, 4 were admitted)

THE COURT: And then we offer Exhibit No. 5 and that's an e-mail exchange relating to the exchange between counsels to release Robert Rickett.

MR. DAWSON: No objection.

THE COURT: Thank you.

(Exhibit No. 5 was admitted)

MR. ALLISON: We would offer Exhibit No. 6, which is the Plaintiff's petition or pleading in this case.

MR. DAWSON: No objection.

(Exhibit No. 6 was admitted)

MR. ALLISON: We would offer Exhibit No. 7, which is the agreement in the form that was attached to the original petition.

MR. DAWSON: No objection.

(Exhibit No. 7 was admitted)

MR. ALLISON: We would offer Exhibit No. 8, which is also an exhibit that was attached to the Plaintiff's original petition.

THE COURT: And I should be stating admitted, sorry. I'm busy doing stickies.

MR. ALLISON: And I apologize, and have all of those been admitted?

THE COURT: Yes. It's my fault because I'm -- I'm writing A, but I'm not saying it, so thank you. Yes, go ahead.

MR. ALLISON: So I think we're at One through Eight, we are asking those be admitted so we have a clear record.

MR. DAWSON: No objection.

MR. ALLISON: And, your Honor?

THE COURT: So just to be clear, Eight, Exhibit 8 which is the one that has two of the four signatures?

MR. ALLISON: Correct. And that's in the form that was attached to the original petition.

THE COURT: I agree. I recall. Thank you. Admitted.

(Exhibit No. 8 was admitted)

MR. ALLISON: And just so I'm clear, just a little housekeeping, maybe we didn't, maybe my fault, One

through Eight I think have been offered without objection?

THE COURT: Correct.

MR. ALLISON: And admitted?

THE COURT: Yes, and thank you.

MR. ALLISON: Okay. And we would offer Exhibit No. 11, which is the signed TRO in this case.

THE COURT: Yes, October 31st from Harris County.

MR. ALLISON: That's our Exhibit 11.

MR. DAWSON: No objection.

THE COURT: Admitted.

(Exhibit No. 11 was admitted)

MR. ALLISON: We would offer Exhibit 12, which is the first amended petition in this case.

MR. DAWSON: No objection.

THE COURT: Admitted.

(Exhibit No. 12 was admitted)

MR. ALLISON: And I'll go ahead and offer Exhibits 13 and 14, which respectively are the second amended and third amended petitions in this lawsuit.

MR. DAWSON: No objection.

THE COURT: And they are admitted.

(Exhibit Nos. 13, 14 were admitted)

MR. ALLISON: Then we would offer -- it says on its face Harris County, but it's the Nueces County case

because it got transferred by agreement.

THE COURT: In 2023.

MR. ALLISON: And that's Exhibit No. 15. We would offer that Plaintiff's original petition of Lawrence Berry's original petition filed here in Harris County transferred to Nueces, we would offer that.

MR. DAWSON: No objection.

THE COURT: Admitted.

(Exhibit No. 15 was admitted)

MR. ALLISON: We would offer Exhibit No. 16 into evidence, which is the temporary restraining order signed in Harris County, but relating to what is now and so it was in effect even after the transfer now, the Nueces County lawsuit.

MR. DAWSON: No objection.

THE COURT: Admitted.

(Exhibit No. 16 was admitted)

MR. ALLISON: There was also an amended temporary restraining order signed in that first filed case from a year ago where Lawrence Berry sued, that case now being in Nueces County. And we'd offer Exhibit No. 17, which is that amended TRO.

MR. DAWSON: No objection.

THE COURT: Admitted.

(Exhibit No. 17 was admitted)

MR. ALLISON: We would offer Exhibit No. 18,

which is the agreed transfer order.

MR. DAWSON:  No objection.

THE COURT:  Admitted.

(Exhibit No. 18 was admitted)

MR. ALLISON:  We would offer Exhibit No. 19, which is Plaintiff's second amended petition.

MR. DAWSON:  No objection.

THE COURT:  Admitted.

(Exhibit No. 19 was admitted)

MR. ALLISON:  When I say "Plaintiffs," I need to clarify.  Not the Plaintiff here, but the Plaintiff down in Nueces County.

THE COURT:  Thank you.

MR. ALLISON:  I don't want to be misleading.

THE COURT:  Thank you.

MR. ALLISON:  And then we offer Exhibit No. 20, which is the Counter-Plaintiffs, that is Marty Berry, and Berry Operating Company, and Berry Contracting, LP, and Berry GP counterclaims against Lawrence Berry down in Nueces County. That's Exhibit 20.  We offer it at this time.

MR. DAWSON:  No objection.

THE COURT:  Admitted.

(Exhibit No. 20 was admitted)

MR. ALLISON:  I think both parties, your Honor, have the transcript from the temporary injunction hearing that

occurred in Nueces County.  We have it as Exhibit 21 and we would offer it.

MR. DAWSON:  No objection.

THE COURT:  And the Court wants to thank you for the large file.  I tried hard with four to a page.

MR. ALLISON:  And that is admitted.

MR. DAWSON:  No objection.

THE COURT:  Admitted.  Thank you.

(Exhibit No. 21 was admitted)

MR. ALLISON:  And we would offer Exhibit No. 22, which is the ruling of the Nueces County.  It's the transcript of it.

MR. DAWSON:  No objection.

THE COURT:  Admitted.

(Exhibit No. 22 was admitted)

MR. ALLISON:  And we would offer Exhibit No. 23, which is the discovery in Nueces County that we propounded to Lawrence Berry and his trust, which by then was a party. And we'd offer that at this time, and it's the one -- it's the discovery that specifically asked about Axis and Lone Star Ports, all the entities.

MR. DAWSON:  No objection.

THE COURT:  Admitted.

(Exhibit No. 23 was admitted)

MR. ALLISON:  Before that discovery was sent --

I'm a little out of order -- we would offer what is the Counter-Plaintiffs, again that's Marty Berry, Berry GP, and Berry Operating, and Berry Consulting -- excuse me, Berry Contracting, it's their second amended counterclaim down in Nueces County.  It's Exhibit 25 and we would offer it at this time.

MR. DAWSON:  No objection.

THE COURT:  Admitted.

(Exhibit No. 25 was admitted)

MR. DAWSON:  Counsel, are you going to speed this along if you want.

MR. ALLISON:  I'm trying to just have a clear record, and I didn't want to -- I didn't want to take your right away to object to any of them.

MR. DAWSON:  I will have no objections to 25 through 40.

MR. ALLISON:  25 through 40?

MR. DAWSON:  Yes.

MR. ALLISON:  We would offer Exhibits 25 through 40, your Honor.

MR. DAWSON:  No objection.

THE COURT:  Terrific.  Although I have to say I appreciate it, I actually have in the first -- well, the first TI so far, there are actually a fair amount of issues among the 139 exhibits.  So I do not --  I do not discredit you for

doing that, but thank you.

MR. ALLISON:  Thank you.

THE COURT:  So just to be clear through...

MR. DAWSON:  No objections to Exhibits 25 through 40.

THE COURT:  Thank you.

(Exhibit Nos. 26-40 were admitted)

MR. ALLISON:  We would have offered Exhibit No. 42, which is the lawsuit filed by Lawrence Berry's lawyer, Butch -- Butch Boyd here in Harris County against the Carlyle Group.  We would offer it at this time your Honor.

MR. DAWSON:  No objection.

THE COURT:  Admitted.

(Exhibit No. 42 was admitted)

MR. ALLISON:  And then Exhibit No. 43 in that same lawsuit is just an amended pleading.  We'd offer it.

THE COURT:  And to be clear, also admitted, too.

(Exhibit No. 43 was admitted)

MR. DAWSON:  Counsel, we will have no objections through to Exhibit 50.

MR. ALLISON:  Through 50, okay.

MS. GILMORE:  And, your Honor, 25 through 40 also admitted?

THE COURT:  Yes.  Thank you very much.

MS. GILMORE:  Thank you, your Honor.

THE COURT:  No, thank you.  And I'm sorry, you just said it.

MR. DAWSON:  I have no objections from 42 to 50.

MR. ALLISON:  And so I offer them at this time.

THE COURT:  Admitted.

(Exhibit Nos. 44-50 were admitted)

THE COURT:  Good.  Including the Orca asset.  Okay.  Thank you.

MR. ALLISON:  That's it.

MR. DAWSON:  And, your Honor, while we're -- if you don't mind, while we're on the subject of offering exhibits, we offer all the exhibits that are attached to our response to their motion to remand, and their motion to transfer venue, and the plea and abatement.

THE COURT:  Any objections?

MR. ALLISON:  We have no objection.

THE COURT:  Admitted.  Thank you.

(Exhibit Nos. 1-14 were admitted)

MR. REASONER:  Your Honor, just for good order, we would like to offer the exhibits to our response to their motion for remand.

THE COURT:  No objections?

MR. ALLISON:  No objection.

THE COURT: Admitted. Thank you.

MR. ALLISON: Now, I think we have everything in the record. I know that took a little time. I apologize, your Honor.

THE COURT: No, no, that's perfect.

MR. REASONER: And, your Honor, one other thing just for the Court's convenience.

THE COURT: Sure.

MR. REASONER: We had done just a red line of their first versus the second amended petition just to show the Court could easily see the differences. I'm just handing that to Mr. Allison so he can double-check me on that.

MR. ALLISON: I did it, so -- well, I'm sure I believe him, but let me look.

THE COURT: We believe Mr. Reasoner. I'm impressed. Did you do this, Mr. Reasoner, or did someone whisper?

MR. REASONER: I will not mislead this Court.

THE COURT: Did someone whisper or did you ask for an instruction?

MR. ALLISON: Compare PDFs.

THE COURT: Did you -- wait, wait. Except I didn't give it the right...

MR. ALLISON: I was going to say.

MR. REASONER: Neither of.

THE COURT: You can imagine as an Argentine, I'm not sure how to give it the British accent. Let me go through my Venus versus (inaudible).

MR. REASONER: Neither of my colleagues, I think, have claimed to have done this either, your Honor.

THE COURT: I should have done that off the record, but I guess it's too late. Thank you.

MR. ALLISON: We have no objection to what is it numbered or how do you want to do it, just for the record?

MR. REASONER: We have 14 exhibits to our response. I believe this would be Exhibit 15, next in line to --

THE COURT: Okay. Thank you, Barrett.

MR. ALLISON: We have no objection to Exhibit No. 15, which is the red line between our two pleadings in Nueces County, our two counterclaims.

(Exhibit No. 15 was admitted)

MR. REASONER: And, your Honor, if we could also have Exhibit 16, understanding it's a demonstrative that I handed up to the Court. Yes, we would offer that.

MR. ALLISON: No objection, your Honor.

THE COURT: Okay. Thank you very much.

(Exhibit No. 16 was admitted)

MR. REASONER: Is that admitted, your Honor?

THE COURT: Pardon me? It is admitted. Sorry,

yes.

MR. ALLISON:  You're like me.

THE COURT:  No, it's good.  Thank you.  You're keeping me honest.

MR. ALLISON:  Your Honor, I checked the time.  It's about 11:00.  I'm going to say if you'll give me 15 minutes, I would like to do some rebuttal.

THE COURT:  I have no problem, but indulge me.  Why don't we take -- should we just take a quick break?

MR. ALLISON:  Thank you.

THE COURT:  Should we have five minutes, ten minutes?

MR. ALLISON:  Whatever you say.

THE COURT:  We can do about 10 minutes.

(Short break)

MR. ALLISON:  If you'll give me one second just because I was going to pull to a certain exhibit real quick.

MS. GILMORE:  We are not going to take as much time as we say.

MR. ALLISON:  We're not.

THE COURT:  It is fine.  The beauty of just starting this process, we're just so excited and please pardon my huge tea thing.  Ready?  Thanks.

MR. ALLISON:  May it please the Court, counsel.  I will be brief.  At it's core, it is incredibly important to

point out that many, in fact, all of the venue-only cases that were referred to that are forum cases, forum selection clauses or venue selection clauses, the ones where it talks about oh, you know, it's mandamusable or it's an abuse of discretion are not dominant jurisdiction cases. So we've got to not conflate the two. We cannot confuse the two. We cannot -- we cannot allow that law to invade dominant jurisdiction law. And so, again, I do commend to you the Wyatt case, the Cleveland case, the Encore case, the Phillips case, and the J.B. Hunt case on dominant jurisdiction. Those cases and then I would also suggest to maybe review of the combined response because at it's core, the first thing to get to, and they mix, they continually mix venue and dominant jurisdiction. The first thing to get to is dominant jurisdiction, which is the focus of my combined reply. And it can be boiled down as clearly as this: I'm going to digress a little and say I agree we're not here trying to prove our case; they're not here trying to prove their case. What I said in my opening is not that we're not right, we're trying to convince you that we're right. Those are the allegations that are inevitably related to this project. We have these different entities that are really -- we're not suing the entities that we own. They sued an entity we owned. We think the fight really is between Berry GP and -- and I guess Allied, not even Mr. Powers.

But all of those statements that I made, I want

to be very clear, are not evidence and not me trying to say we're addressing the merits today. This Court, and what I think you are charged with doing, is looking at all of those allegations and looking at all of their allegations and seeing if the two collide and looking at how they've gotten an injunctive relief based on their pleadings in this case and how there was injunctive relief requested in the first case. Because those pleadings, nobody has stood up in front of you and said the TROs in this case or the TROs in the previous case were beyond the scope of the pleadings, they're not. They had to be within the scope of the pleadings to grant the relief requested. In this case, the TRO says that Marty Berry -- and by the way, and it says, "All companies associated with the project." You can look at the chain, the title, you know, the transfer of access from where I said, "It's all green and everybody agrees it's going from Lawrence to Berry GP," everybody knows Berry GP is the one that spent the 15 million dollars. And that's while the permit was owned by them and while they were the sole manager. And they still think they own it and are sole manager. And the TRO signed by the judge in this case precludes Marty Berry and all other entities or -- let me just read it.

THE COURT: Yes.

MR. ALLISON: "Holding any meeting that in any way seek to affect the management or ownership interest of

Axis or any other entity, property or tangible or intangible rights associated with the project." That means Berry GP, which we think owns Axis, they're directly affecting Berry GP by the order in this case. They are directly affecting Canada Program -- sorry, Canada Project Holdings, LLC because that is absolute -- they are the ones who hold the lease on Harbor Island. They are -- they have pled a case and gotten relief that collides with our ability to operate, quite frankly, huge employers and huge companies in Nueces County. It is -- it is a great gravidus to us to have abided by that for the period that we have abided by that.

They have also in this case asked for injunctive and obtained injunctive relief to this day changing, altering or transferring in any way management of access or any other entity associated with the project. Red Fish Bay Terminal, which we a hundred percent own, nobody disputes that, is associated with the project. They own all the land. They own all the land in Aransas Pass. Canada Project Holdings owns all the land and is paying -- not owns, has been paying 6.2 million, 5 million of which is Berry GP money when you look at the exhibit, and has spent that money to lease the property that the Axis permit is for. They are as interrelated -- I mean, and they are not just interrelated, they are married to each other. They are forever bound to each other. Then the third piece of relief they get is

changing, altering -- this is what they have precluded us from doing -- changing, altering or transferring in any way ownership property or tangible or intangible rights of any entity associated with the project.

In other words, they are telling us even though we have a clear reason because of a lack of a majority vote, we have a clear reason and belief. And by the way, Hummell and Marty -- Mike Hummell, and Marty Berry, and all the people sitting over here and my clients, they were the ones listed with the Texas Secretary of State (and I should ask to supplement the record on this if you want) until about a week ago. During the existence of the TRO, they went out and changed management on us. Think about that. They went and kicked us off the board while they had a TRO and put themselves on the board. But they have had a TRO in place that says we cannot do anything to affect management or ownership or property or intangible or tangible rights. All of that would occur through Berry GP, so we can't have a Berry GP meeting? All of that would occur if you're talking about Canada Projects Holdings would occur through the three trusts. I guess we can't even have the trust be operating or hold meetings or do things with the property they own? Of course they're interrelated. That's the very property on Harbor Island. Those are the allegations. I'm not saying it because you have to believe it or find that it's true, but those are

the allegations.

And then the last thing that I just wanted to obviously -- or show as an obvious point of collision -- by the way, I almost had a red line that I meant to bring and do the same thing, so I'm so thankful. What you'll see is in order to include Axis in the pleadings, and I did this very intentionally, I changed almost nothing in the pleading. What Lawrence Berry did, and we have discovered recently and filed the counterclaim, what Lawrence Berry did with Orca by signing his name, and acting like he's solely in control, and transferring things around, and hiding assets, which is the fight in Nueces, that is exactly the same thing he did here with this whole Axis entity. What he told the court, he signed that he's -- he's signed for every entity. I think he signed 18 different times his name as transferring it and receiving it, and transferring it and receiving it. And we have asked the court in Nueces County for this relief because it's the exact same conduct that's been the subject of litigation in our counterclaim up in Nueces County.

The exact relief we asked for was the Counter-Plaintiffs, that's us, seek a declaration pursuant to 37.004. A declaration that transfers, conveyances, contracts, manager appointments executed or accepted by Lawrence Berry, purportedly involving Orca and/or Axis, because it's the same conduct, without majority approval of the board should be

void, void ab-- found void, void ab initio, voidable, invalid, and of no legal force or affect. They've told you -- they've told you what we do here, "Oh, Judge, we don't want to do anything here. We're not going to do anything that has anything to do with what's up in Nueces." In Nueces, we've made it very clear, we're going to go make sure ownership of Axis is where we think it's always been when we were spending our 15 million dollars. We're going to make sure that it's with Berry GP. And if that doesn't matter to them, if they think that's unrelated, then why do they have pleadings on file that say they don't want us to change ownership, they don't want us to change management, they don't want us to do anything with Axis? We are on a direct collision course.

Okay. They are not just intertwined and they are intertwined. They're not just interrelated and they are interrelated. They are in a -- on a continuing collision course demonstrated easily by the fact that the breathe of the TRO in this case, clearly contradicts the relief in Nueces County. In Nueces County we can sell property with 48 hour notice to the board. We don't have to give notice to Lawrence; he's not on the board anymore. In Nueces County we can sell property with 48 hours' notice. Here, they have prohibited us from selling property, period, or exercising control over our property, which we must do. So, respectfully, we ask that you do note that they are

interrelated. That's the only issue we think you should, quite frankly, get to. The case law is very clear that you address dominate jurisdiction first. Please read carefully the cases because we cannot conflate the venue cases and the forum -- by the way, very quick note. It is a -- it's not a forum selection clause, it is a venue selection clause because it chooses one county, Harris County. That means you do go to 15.020 if you ever get there, and then read the Pearcy case that makes it clear you don't look at future earnings that may or may not happen. And so clearly under that case, 15.020 does not apply, but that's all in the briefing.

But let me get back on track; and that is, you'll never get there because clearly the conflict exists between the breadth of the jurisdiction previously exercised in the what is now the Nueces County case because we were originally prohibited from selling any of our property, just like they did here, same thing. And, you know, that -- those rights, you cannot unring that bell. I think it's so interesting he pledges -- and I'm sure he would try to do it, you know, to say, "Oh, well, we're only going to plead this, and we're only going to ask for that, we're really not going to ask for this over here." You can't unring the bell. They have had this pleading in a different court, different judge exercise jurisdiction in a way that is directly in conflict with what has happened and is happening in Nueces County.

Under the cases, we think dominant jurisdiction is absolutely the controlling issue, and the matter can be dismissed or abated. That is, I think, within the judicial prerogative of your Honor; and, you know, clearly we have to move forward with all. The cases are quite clear. The first filed case has to exhaust its remedies, exhaust it's exercise of jurisdiction before any other interrelated or any other intertwined case can go forward. Thank you.

THE COURT: Thank you very much.

MR. DAWSON: May I have a very brief reply, your Honor?

THE COURT: Yes.

MR. DAWSON: First of all, if you look at the -- I give you the handout of the enforceable forum selection clauses. If you look at many, most of those enforceable forum selection clauses specify a particular venue. And so just because the forum selection clause in this case specifies a particular venue doesn't say -- doesn't mean it's not a forum selection clause. Many of those cases, and I think most of those cases, they say in this particular venue of this particular state, which is exactly what our -- the clause here says.

I think my fundamental disagreement with Mr. Allison is he says you have to determine dominant jurisdiction first, but you only -- in order -- the first

starting place for dominant jurisdiction is venue proper in Nueces County? That's the first hurdle. And so really -- and as I told you earlier, dominant jurisdiction is really a venue question. And because there is no jurisdiction in Nueces County, their dominant jurisdiction argument fails.

Secondly, your Honor, they have -- I have heard them, I think, stipulate that subject matter jurisdiction exists in this case. I think I heard both Judge Gilmore and Mr. Allison say that. I'll remind the Court that the jurisdiction that gets us to this court is that the dispute has to exceed 10 million dollars. And so to me that's a stipulation that this qualifies as a major transaction. We're bringing suit under an agreement, an investment agreement. We stipulated that has a value in excess of 10 million dollars. They've stipulated to subject matter jurisdiction, so I think you get to major transaction under Section 15.020. If you agree with us on either the forum selection clause, which I think is where you should start or 15.020, you don't have to worry about whether this case and the Nueces case are interrelated. That stops the analysis for the Court or it ends the need for the Court to do further analysis if you agree with us on either of those two points.

With respect to the companies that are the subject of the TRO, they are the companies that are listed on that chart that is included in the third amended petition.

Those are the companies associated with the project. These companies that he's talking about, Orca and all those other companies, they are not mentioned in our petition, they are not companies that we're seeking to stop people from -- so what happened was Bonnie and Marty called a meeting. The first meeting, just so you know, they called a meeting for August 6th. You have a partial transcript of that meeting and they called a meeting of all these entities. And if you read the transcript, they're asking Lawrence Berry "Who owns Axis," and he says, "You have to ask Ted Powers, he set this thing up; you need to ask him." And what's not in the recording that you have is Mr. Powers comes and he attends that meeting. He sends them a letter ahead of time that says, "By the way, I'm a 20 percent owner of this project. I'm a 20 percent owner of Lone Star Ports Holdings," and he comes down, and if we get to the injunction hearing, you will see. He draws a diagram for them to show them the corporate ownership interest for the project.

And in that discussion, he tells them he owns 20 percent. They don't dispute him. They don't say, "Wait a minute, what are you talking about? What do you mean you own 20 percent?" Never disputed. And then thereafter having been told that Axis is owned by Lone Star Ports Enterprises, having been told that, they tried to call a meeting saying that they are owners, which they now admit that they know that they're

not. Mr. Hummell was told that Lone Star Ports Enterprises is the owner, sole owner and sole manager of Axis Midstream. Notwithstanding him being told that, he calls for the meeting. And it's in the attachments to our third amended petition.

But in any event, the companies that are the subject of the TRO and the subject of this claim are those that are listed in the diagram that's in the third amended petition. And then finally, your Honor, I would -- it's not part of today's argument, but I would ask the Court without pre-judging any ruling on the motions that you have taken up today, to go ahead and tell us if there is an injunction hearing, it will be on whatever particular day. And I do that really for two reasons: One, is so that the lawyers can get it on their calendar and we don't lose those dates between now and whenever the Court rules on the pending motions. And the other thing is I'm going to ask -- the TRO expires today, and I'm going to ask Mr. Allison to extend it for a period of seven days after the injunction hearing, that way it gives the Court time to rule on whatever the Court -- assuming the Court -- and I'm not pre-judging your ruling, but assuming there is one, I'm going to ask him to do that. And if he wants modifications to address what companies are the subject of the extension, I'm happy to do that as well. And so if we could, whenever the Court -- whenever it's convenient for the Court, if you could tell us there's a conditional setting or

whatever without pre-judging your ruling on today's motions, that would be helpful, I think, to the lawyers.

THE COURT: Thank you very much.

MR. DAWSON: Thank you. If you have any questions...

THE COURT: Not at this moment. Let's allow and I think there's going to be some -- there may be a sur-reply for lack of a better terminology. So I will take that up momentarily, but Mr. Reasoner is at the reply.

MR. REASONER: I'll be shorter than both, your Honor. I just -- first, I'm not -- don't take it by my silence that I --

THE COURT: Silence does not deep consent.

MR. REASONER: The aspersions against my client...

THE COURT: Many fall seasons, understood. Yes, go ahead.

MR. REASONER: Two quick points, your Honor.

THE COURT: Yes.

MR. REASONER: First, they made no claims in the Nueces County case against involving Axis or Lone Star Ports until after Mr. Powers filed his case, until Tuesday of this week. That paragraph he was reading to you filed on Tuesday, it'll be in blue in exhibit, I think, it's 16, your Honor, that we tendered. Secondly, and we -- and the term

"dominant jurisdiction" has been thrown around a lot, and there's an effort to try to distinguish it from the venue problem. Again, Gonzalez, if you look at Page 6 of Gonzalez, if I may quote, "With regard to the parties' arguments as to which court had dominant jurisdiction, quote, unquote, "Over the wrongful debt suit, we agree with the Court of Appeals, that a less venue would be proper in both Harris and Hidalgo Counties. The concept of dominant jurisdiction," quote, unquote, "Is inapplicable to this case," Texas Supreme Court.

There is an agreement here that Harris County is the forum selected or at minimum the venue. And as Mr. Dawson has pointed out, that means others are not. That is the mandatory venue. Thank you, your Honor.

THE COURT: Thank you.

MR. ALLISON: I'll just very briefly, I will say this: That when the cases talk about dominant jurisdiction being really a venue issue, it takes precedence over all other --  in fact, there's cases cited, all other Texas Rule of Civil Procedure venue rules, period. There's a case that is cited in there that talks about, "Hey, I know that this one says this and it's mandatory venue, but you don't even get there because it gets decided by the dominant jurisdiction issue." And so I think that's very much a red herring to suggest to you that venue has to be proper in Nueces. I think they're wrong. Having said that, remember we

have an affidavit on file that the property is in Nueces County. It's another mandatory venue provision.

So for all of the reasons -- to be honest with you, you don't even get to the whole venue discussion like they want to try to put it first. They are trying to leapfrog it. The dominant jurisdiction is the venue and we do also know if we were going to go to the rules, the venue over one Defendant is venue over all of them, okay. So there's a lot of -- you cannot get -- you cannot put the venue discussion ahead of the dominant jurisdiction discussion. And if they're interrelated, I think the case law is very clear what the course -- the proper course of action is.

All of that being said, I do want to jump to one thing. He asked about the TRO, and the Court's aware I think we did it on the record last time. I think we extended it until today. I eluded to it a moment ago. And let me just start by saying this: I'm sure everybody's aware that injunctive relief is an equitable remedy. In order to ask for an equitable remedy, you have to have clean hands. To say that we are flabbergasted to learn yesterday that they have gone out and I think thrown Mr. Hummell out as general counsel and removed Marty Berry, they've gone and had a meeting, the exact thing that they enjoined, they went and did. There's no equity. And I need to say on top of that, the way that which they're asking us to extend affects Berry GP and companies are

the very decision-makers for a multi, multi-million dollar company and we've been tied up long enough. We cannot -- we just cannot. And I don't think under the circumstances since they've breached and they've breached, for them to go out and have a secret meeting during the existence of a TRO that they went and got is about as wrong of a breach of the spirit of that TRO as I can imagine. So the short answer to your question is we cannot agree.

MR. DAWSON: Well, your Honor, let me address one thing. There was no meeting. They had filed papers with the Secretary of State's office that inaccurately set forth who the manager of Axis Midstream was and who the officers were. And all my client did was file a document with the Secretary of State's office that clarifies the appropriate manager of Axis Midstream, according to the corporate documents that had been signed. That's all that happened. If he doesn't want to extend it, I can't force him to. The Court did ask us in a prior communication to have meaningful negotiations about trying to extend it. If he doesn't and they go out and try and do something, we'll come back and talk to you.

MR. ALLISON: Agreed. I think that's the way we have to go now.

THE COURT: Okay. Understood. Off the record.

(End of proceedings)

THE STATE OF TEXAS       )

COUNTY OF HARRIS         )

   I, Benjamin Alva, Official Court Reporter in and for the 165th District Court of Harris County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

   I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted, tendered in an offer of proof or offered into evidence.

   WITNESS MY OFFICIAL HAND this the __24th__ day of __January__, 2025.

                                        01-24-25

BENJAMIN ALVA, Texas CSR 6499
Expiration Date:  04/30/25
Official Court Reporter
165th Judicial District Court
201 Caroline, 12th Floor
Houston, Texas 77002

REPORTER'S RECORD
VOLUME 1 OF 1 VOLUMES
THE BUSINESS COURT OF TEXAS,
11TH DIVISION

ALBERT THEODORE POWERS;  )
ALLIED PORTS, LLC        )
    Plaintiffs,          )
                )
V.                       )
                ) CAUSE NO. 24-BC11A-0025
AXIS MIDSTREAM HOLDINGS, )
LLC; ALLEN LAWRENCE      )
BERRY; MARVIN GLENN      )
BERRY; AND BONNIE BERRY, )
As successor in interest )
To DENNIS WAYNE BERRY    )
    Defendants.          )

    I, Benjamin Alva, Official Court Reporter in and for the 165th District Court of Harris County, Texas, do hereby certify that the following exhibits constitute true and complete duplicates of the original exhibits, excluding physical evidence, offered into evidence during the hearing on Marty Glenn Berry's Plea and Abatement and Motion to Abate; The Movant's Motion to Remand, Dismiss, and Transfer Venue Pursuant to Chapter 25; Defendant, Axis Midstream Holdings', Motion to Transfer Venue in the above-entitled and numbered cause as set out herein before the Honorable Sofia Adrogue, Judge for the 11th Division Business Court, Harris County, Texas.

    WITNESS MY OFFICIAL HAND on this, the__24th__day of__January_____, 2025.

01-24-25
_____
BENJAMIN ALVA, Texas CSR 6499
Expiration Date: 04/30/23
Official Court Reporter
165th Judicial District Court
201 Caroline, 12th Floor
Houston, Texas 77002

# EXHIBIT 1



EXHIBIT 2



PROPOSED MIDWAY TANK FARM

P.O.B. PROPOSED 1-2" FIBER OPTIC LINE 2-36" CRUDE OIL PIPELINES

P.O.B. PROPOSED 1-6" GAS SUPPLY PIPELINE

PROPOSED ARANSAS PASS STAGING FACILITY

P.O.E. PROPOSED 1-2" FIBER OPTIC LINE 2-36" CRUDE OIL PIPELINES

P.O.B. PROPOSED 1-2" FIBER OPTIC LINE 1-6" GAS SUPPLY PIPELINE 1-16" REMIX PIPELINE 2-42" CRUDE OIL PIPELINES

P.O.E. PROPOSED 1-2" FIBER OPTIC LINE 1-6" GAS SUPPLY PIPELINE 1-16" REMIX PIPELINE 2-42" CRUDE OIL PIPELINES

PROPOSED HARBOR ISLAND TERMINAL

0'  500'  10,000'  20,000'

NOTE: THE CONTENT OF THIS DRAWING IS DESIGNED SPECIFICALLY FOR THE PURPOSE OF SECURING FEDERAL, STATE AND LOCAL ENVIRONMENTAL/ REGULATORY AUTHORIZATIONS ONLY.

Date: 12/27/2018
Revised: 04/23/2020

**VICINITY MAP**
PLs & Facility.: Midway T.F. to Harbor Island

## U.S. ARMY CORPS OF ENGINEERS PERMIT APPLICATION SWG-2018-00789

# AXIS MIDSTREAM HOLDINGS, LLC
## Proposed Pipelines & Facilities
## MIDWAY to HARBOR ISLAND PROJECT
### SAN PATRICIO & NUECES COUNTIES, TEXAS

AXIS MIDSTREAM



PROPOSED 102,229' OF 2-36" PIPELINES

DETAIL A

BEGINNING OF ROUTE

PROPOSED MIDWAY TANK FARM (SEE SHT. 31 OF 41)

COUNTY ROAD 2004

Gas Well

SEE DETAIL A

M.P. 0.97

MP 1

P.O.B.
1-2" FIBER OPTIC LINE
2-36" PIPELINES
X= 1,339,182.09'
Y= 17,219,888.37'
LAT: 27° 54' 23.27"
LON; 97° 24' 3.97"

1-2" FIBER OPTIC LINE
2-36" CRUDE PIPELINES

PIPELINE CROSSING WORKSPACE

COUNTY ROAD 3365

**Detail A:**
EDGE OF TWS
20' | 20' | 40'
PERMANENT ROW
36" PIPELINE
2" FIBER OPTIC LINE
36" PIPELINE
130'
PERMANENT ROW
20' | 30'
EDGE OF TWS

Scale: 0' 400' 800' 1600'

PROPOSED PIPELINES — WORKSPACE — FACILITY

NOTE: THE CONTENT OF THIS DRAWING IS DESIGNED SPECIFICALLY FOR THE PURPOSE OF SECURING FEDERAL, STATE AND LOCAL ENVIRONMENTAL/ REGULATORY AUTHORIZATIONS ONLY.

Date: 12/27/2018
Revised: 04/23/2020

## PLAN VIEW
PLs: Midway T.F. to Aransas

# U.S. ARMY CORPS OF ENGINEERS PERMIT APPLICATION SWG-2018-00789

# AXIS MIDSTREAM HOLDINGS, LLC
## Proposed Pipelines & Facilities
## MIDWAY to HARBOR ISLAND PROJECT
### SAN PATRICIO & NUECES COUNTIES, TEXAS

AXIS MIDSTREAM



COUNTY ROAD 1906

COUNTY ROAD 3463

M.P. 0.97

M.P. 2.39

MP 1

MP 2

EDGE OF TWS

PERMANENT ROW

36" PIPELINE
2" FIBER OPTIC LINE
36" PIPELINE

PERMANENT ROW

EDGE OF TWS

20' 20' 40'

130'

20' 30'

DETAIL A

SEE DETAIL A

PIPELINE CROSSING
WORKSPACE

1-2" FIBER OPTIC LINE
2-36" CRUDE PIPELINES

WATERBODY #1

PIPELINE CROSSING
WORKSPACE

45'

40

0'    400'    800'    1600'

PROPOSED PIPELINES       WORKSPACE       FACILITY

NOTE: THE CONTENT OF THIS DRAWING IS DESIGNED SPECIFICALLY FOR THE PURPOSE OF SECURING FEDERAL, STATE AND LOCAL ENVIRONMENTAL/ REGULATORY AUTHORIZATIONS ONLY.

Date: 12/27/2018
Revised: 04/23/2020

PLAN VIEW
PLs: Midway T.F. to Aransas

**U.S. ARMY CORPS OF ENGINEERS
PERMIT APPLICATION
SWG-2018-00789**

**AXIS MIDSTREAM HOLDINGS, LLC**
Proposed Pipelines & Facilities
MIDWAY to HARBOR ISLAND PROJECT
SAN PATRICIO & NUECES COUNTIES, TEXAS

AXIS MIDSTREAM



DETAIL A

EDGE OF TWS
20' 20'
PERMANENT ROW
40'
36" PIPELINE
2" FIBER OPTIC LINE
36" PIPELINE
130'
PERMANENT ROW
20' 30'
EDGE OF TWS

San Patricio Memorial Gardens (Cem)

M.P. 2.39

40

MP 3

MP 4

M.P. 4.36

COUNTY ROAD 3567

COUNTY ROAD 1906

41

40

CR 3677

SEE DETAIL A

PIPELINE CROSSING WORKSPACE

1-2" FIBER OPTIC LINE
2-36" CRUDE PIPELINES

WATERBODY #2

0'    400'    800'    1600'

PROPOSED PIPELINES     WORKSPACE     FACILITY

NOTE: THE CONTENT OF THIS DRAWING IS DESIGNED SPECIFICALLY FOR THE PURPOSE OF SECURING FEDERAL, STATE AND LOCAL ENVIRONMENTAL/ REGULATORY AUTHORIZATIONS ONLY.

Date: 12/27/2018
Revised: 04/23/2020

PLAN VIEW
PLs: Midway T.F. to Aransas

## U.S. ARMY CORPS OF ENGINEERS PERMIT APPLICATION SWG-2018-00789

AXIS MIDSTREAM

# AXIS MIDSTREAM HOLDINGS, LLC
Proposed Pipelines & Facilities
MIDWAY to HARBOR ISLAND PROJECT
SAN PATRICIO & NUECES COUNTIES, TEXAS



DETAIL A

EDGE OF TWS
20' 20' 40'
PERMANENT ROW
36" PIPELINE
2" FIBER OPTIC LINE
36" PIPELINE
130'
PERMANENT ROW
20' 30'
EDGE OF TWS

M.P. 4.36

M.P. 5.95

MP 5

WATERBODY #3

1−2" FIBER OPTIC LINE
2−36" CRUDE PIPELINES

COUNTY ROAD 3677

COUNTY ROAD 1612

SEE DETAIL A

38

39

38

40

0'    400'   800'        1600'

PROPOSED PIPELINES    WORKSPACE    FACILITY

PLAN VIEW
PLs: Midway T.F. to Aransas

NOTE: THE CONTENT OF THIS DRAWING IS DESIGNED SPECIFICALLY FOR THE PURPOSE OF SECURING FEDERAL, STATE AND LOCAL ENVIRONMENTAL/ REGULATORY AUTHORIZATIONS ONLY.

Date: 12/27/2018
Revised: 04/23/2020

**U.S. ARMY CORPS OF ENGINEERS PERMIT APPLICATION SWG-2018-00789**

AXIS MIDSTREAM

# AXIS MIDSTREAM HOLDINGS, LLC
Proposed Pipelines & Facilities
MIDWAY to HARBOR ISLAND PROJECT
SAN PATRICIO & NUECES COUNTIES, TEXAS



DETAIL A

EDGE OF TWS
PERMANENT ROW
36" PIPELINE
2" FIBER OPTIC LINE
36" PIPELINE
PERMANENT ROW
EDGE OF TWS

20' 20' 40' 130' 30'

MP 6

M.P. 5.95

MP 7

M.P. 7.67

PIPELINE CROSSING WORKSPACE

SEE DETAIL A

PRIVATE ROAD 3749

1-2" FIBER OPTIC LINE
2-36" CRUDE PIPELINES

WATERBODY #4

US HWY 181

0'    400'    800'    1600'

PROPOSED PIPELINES        WORKSPACE        FACILITY

NOTE: THE CONTENT OF THIS DRAWING IS DESIGNED SPECIFICALLY FOR THE PURPOSE OF SECURING FEDERAL, STATE AND LOCAL ENVIRONMENTAL/ REGULATORY AUTHORIZATIONS ONLY.

Date: 12/27/2018
Revised: 04/23/2020

PLAN VIEW
PLs: Midway T.F. to Aransas

**U.S. ARMY CORPS OF ENGINEERS PERMIT APPLICATION SWG-2018-00789**

AXIS MIDSTREAM

**AXIS MIDSTREAM HOLDINGS, LLC**

Proposed Pipelines & Facilities
MIDWAY to HARBOR ISLAND PROJECT

SAN PATRICIO & NUECES COUNTIES, TEXAS



EDGE OF TWS

PERMANENT ROW

36" PIPELINE
2" FIBER OPTIC LINE
36" PIPELINE

PERMANENT ROW

EDGE OF TWS

20' 20' 40' 130' 30' 20'

DETAIL A

M.P. 7.67

MP 8

M.P. 8.90

MP 9

SEE DETAIL A

1-2" FIBER OPTIC LINE
2-36" CRUDE PIPELINES

30

0'    400'    800'    1600'

PROPOSED PIPELINES    WORKSPACE    FACILITY

NOTE: THE CONTENT OF THIS DRAWING IS DESIGNED SPECIFICALLY FOR THE PURPOSE OF SECURING FEDERAL, STATE AND LOCAL ENVIRONMENTAL/ REGULATORY AUTHORIZATIONS ONLY.

Date: 12/27/2018
Revised: 04/23/2020

PLAN VIEW
PLs: Midway T.F. to Aransas

**U.S. ARMY CORPS OF ENGINEERS PERMIT APPLICATION SWG-2018-00789**

AXIS MIDSTREAM

**AXIS MIDSTREAM HOLDINGS, LLC**
Proposed Pipelines & Facilities
MIDWAY to HARBOR ISLAND PROJECT
SAN PATRICIO & NUECES COUNTIES, TEXAS



DETAIL A

EDGE OF TWS
20' | 20' | 40'
PERMANENT ROW
36" PIPELINE
2" FIBER OPTIC LINE | 130'
36" PIPELINE
PERMANENT ROW
20' | 30'
EDGE OF TWS

M.P. 8.90

MP 9

MP 10

M.P. 10.04

X 28

SEE DETAIL A

PIPELINE CROSSING WORKSPACE

COUNTY ROAD 1722

1-2" FIBER OPTIC LINE
2-36" CRUDE PIPELINES

HIGHWAY 3284

27

X 29

0'      400'      800'      1600'

—— PROPOSED PIPELINES    ☐ WORKSPACE    ⌐–⌐ FACILITY

NOTE: THE CONTENT OF THIS DRAWING IS DESIGNED SPECIFICALLY FOR THE PURPOSE OF SECURING FEDERAL, STATE AND LOCAL ENVIRONMENTAL/ REGULATORY AUTHORIZATIONS ONLY.

Date: 12/27/2018
Revised: 04/23/2020

**PLAN VIEW**
PLs: Midway T.F. to Aransas

**U.S. ARMY CORPS OF ENGINEERS PERMIT APPLICATION SWG-2018-00789**

AXIS MIDSTREAM

**AXIS MIDSTREAM HOLDINGS, LLC**
Proposed Pipelines & Facilities
MIDWAY to HARBOR ISLAND PROJECT
SAN PATRICIO & NUECES COUNTIES, TEXAS



DETAIL A

SEE DETAIL A

1-2" FIBER OPTIC LINE
2-36" CRUDE PIPELINES

PIPELINE CROSSING
WORKSPACE

Radio Tower (KTCA)

HIGHWAY 136

COUNTY ROAD 1722

COUNTY ROAD 1836

INTERSTATE 35

M.P. 10.04

M.P. 11.70

MP 11

27

25

**Detail A labels:**
EDGE OF TWS
PERMANENT ROW
36" PIPELINE
2" FIBER OPTIC LINE
36" PIPELINE
PERMANENT ROW
EDGE OF TWS
20' 20' 40' 30' 20' 30' 130'

**Scale:**
0'   400'   800'   1600'

PROPOSED PIPELINES    WORKSPACE    FACILITY

NOTE: THE CONTENT OF THIS DRAWING IS DESIGNED SPECIFICALLY FOR THE PURPOSE OF SECURING FEDERAL, STATE AND LOCAL ENVIRONMENTAL/ REGULATORY AUTHORIZATIONS ONLY.

Date: 12/27/2018
Revised: 04/23/2020

**PLAN VIEW**
PLs: Midway T.F. to Aransas

# U.S. ARMY CORPS OF ENGINEERS PERMIT APPLICATION SWG-2018-00789

AXIS MIDSTREAM

# AXIS MIDSTREAM HOLDINGS, LLC
Proposed Pipelines & Facilities
MIDWAY to HARBOR ISLAND PROJECT
SAN PATRICIO & NUECES COUNTIES, TEXAS



DETAIL A

EDGE OF TWS
20' | 20'
PERMANENT ROW
40'
36" PIPELINE
2" FIBER OPTIC LINE
36" PIPELINE
130'
PERMANENT ROW
EDGE OF TWS
20' | 30'

INTERSTATE 35

MP 12
M.P. 11.70

SEE DETAIL A

PIPELINE CROSSING WORKSPACE

1–2" FIBER OPTIC LINE
2–36" CRUDE PIPELINES

MP 13
M.P. 13.16

PIPELINE

COUNTY ROAD 4195

COUNTY ROAD 4241

0'    400'    800'    1600'

—— PROPOSED PIPELINES    ⬜ WORKSPACE    ⬚ FACILITY

NOTE: THE CONTENT OF THIS DRAWING IS DESIGNED SPECIFICALLY FOR THE PURPOSE OF SECURING FEDERAL, STATE AND LOCAL ENVIRONMENTAL/ REGULATORY AUTHORIZATIONS ONLY.

Date: 12/27/2018
Revised: 04/23/2020

**PLAN VIEW**
PLs: Midway T.F. to Aransas

**U.S. ARMY CORPS OF ENGINEERS PERMIT APPLICATION SWG-2018-00789**

AXIS MIDSTREAM

**AXIS MIDSTREAM HOLDINGS, LLC**
Proposed Pipelines & Facilities
MIDWAY to HARBOR ISLAND PROJECT
SAN PATRICIO & NUECES COUNTIES, TEXAS



DETAIL A

EDGE OF TWS
20' 20'
PERMANENT ROW
40'
36" PIPELINE
2" FIBER OPTIC LINE
36" PIPELINE
130'
PERMANENT ROW
EDGE OF TWS
20' 30'

M.P. 13.16

M.P. 14.58

COUNTY ROAD 4343

MC CAMPBELL

GAS FIELD

OIL

OIL

MP 14

SEE DETAIL A

1-2" FIBER OPTIC LINE
2-36" CRUDE PIPELINES

PIPELINE CROSSING
WORKSPACE

PIPELINE CROSSING
WORKSPACE

0'    400'    800'    1600'

——— PROPOSED PIPELINES    ☐ WORKSPACE    ⌐⌐ FACILITY

NOTE: THE CONTENT OF THIS DRAWING IS DESIGNED SPECIFICALLY FOR THE PURPOSE OF SECURING FEDERAL, STATE AND LOCAL ENVIRONMENTAL/ REGULATORY AUTHORIZATIONS ONLY.

Date: 12/27/2018
Revised: 04/23/2020

PLAN VIEW
PLs: Midway T.F. to Aransas

**U.S. ARMY CORPS OF ENGINEERS PERMIT APPLICATION SWG-2018-00789**

**AXIS MIDSTREAM HOLDINGS, LLC**
Proposed Pipelines & Facilities
MIDWAY to HARBOR ISLAND PROJECT

SAN PATRICIO & NUECES COUNTIES, TEXAS

AXIS MIDSTREAM



EDGE OF TWS

PERMANENT ROW

36" PIPELINE
2" FIBER OPTIC LINE
36" PIPELINE

PERMANENT ROW

EDGE OF TWS

DETAIL A

M.P. 16.19

MP
16

WATERBODY #5

WETLAND #1B

MP
15

SEE DETAIL A

WETLAND #1A

M.P. 14.58

PIPELINE

1-2" FIBER OPTIC LINE
2-36" CRUDE PIPELINES

PIPELINE

15

15

10

0'    400'    800'    1600'

——— PROPOSED PIPELINES    [ ] WORKSPACE    [ - ] FACILITY

NOTE: THE CONTENT OF THIS DRAWING IS DESIGNED SPECIFICALLY FOR THE PURPOSE OF SECURING FEDERAL, STATE AND LOCAL ENVIRONMENTAL/ REGULATORY AUTHORIZATIONS ONLY.

Date: 12/27/2018
Revised: 04/23/2020

**PLAN VIEW**
PLs: Midway T.F. to Aransas

**U.S. ARMY CORPS OF ENGINEERS
PERMIT APPLICATION
SWG-2018-00789**

AXIS MIDSTREAM

**AXIS MIDSTREAM HOLDINGS, LLC**
Proposed Pipelines & Facilities
MIDWAY to HARBOR ISLAND PROJECT
SAN PATRICIO & NUECES COUNTIES, TEXAS



DETAIL A

EDGE OF TWS
PERMANENT ROW
36" PIPELINE
2" FIBER OPTIC LINE
36" PIPELINE
PERMANENT ROW
EDGE OF TWS

20' 20' 40'
30'
30'

1-2" FIBER OPTIC LINE
2-36" CRUDE PIPELINES

SEE DETAIL A

WATERBODY #6

WETLAND #3

WETLAND #2

WETLAND #1B

WATERBODY #5

M.P. 16.19

MP 17

M.P. 17.39

BEASLEY

MOONEY

MORGAN

KENNEY

AVENUE B

AVENUE A

0' 400' 800' 1600'

PROPOSED PIPELINES    WORKSPACE    FACILITY

NOTE: THE CONTENT OF THIS DRAWING IS DESIGNED SPECIFICALLY FOR THE PURPOSE OF SECURING FEDERAL, STATE AND LOCAL ENVIRONMENTAL/ REGULATORY AUTHORIZATIONS ONLY.

Date: 12/27/2018
Revised: 04/23/2020

PLAN VIEW
PLs: Midway T.F. to Aransas

**U.S. ARMY CORPS OF ENGINEERS PERMIT APPLICATION SWG-2018-00789**

AXIS MIDSTREAM

# AXIS MIDSTREAM HOLDINGS, LLC
## Proposed Pipelines & Facilities
## MIDWAY to HARBOR ISLAND PROJECT
### SAN PATRICIO & NUECES COUNTIES, TEXAS



DETAIL A

EDGE OF TWS
20' | 20' | 40'
PERMANENT ROW
36" PIPELINE
2" FIBER OPTIC LINE
36" PIPELINE
PERMANENT ROW
20' | 30'
EDGE OF TWS

DETAIL B

EDGE OF TWS
20' | 20' | 40'
PERMANENT ROW
36" PIPELINE
2" FIBER OPTIC LINE
36" PIPELINE
6" PIPELINE
PERMANENT ROW
10' | 10' | 30'
EDGE OF TWS

MOONEY LANE

M.P. 17.39

MOONEY LANE

LANE

25

MP 18

1–2" FIBER OPTIC LINE
1–6" GAS SUPPLY PIPELINE
2–36" CRUDE PIPELINES

WATERBODY #7

361

M.P. 18.52

HIGHWAY 361

1–2" FIBER OPTIC LINE
2–36" CRUDE PIPELINES

23

SEE DETAIL A

SEE DETAIL B

MORGAN

LANE

MORGAN LANE

Drive-in Theater

AVENUE A

P.O.B./TIE–IN
6" GAS SUPPLY PL
1.56 MILES
X= 1,411,005.28'
Y= 17,212,627.18'
LAT: 27° 53' 4.56"
LON: 97° 10' 44.33"

PIPELINE

13

KENNY LANE

Cem

20

LANE

E

0'    400'    800'    1600'

PROPOSED PIPELINES | WORKSPACE | FACILITY

NOTE: THE CONTENT OF THIS DRAWING IS DESIGNED SPECIFICALLY FOR THE PURPOSE OF SECURING FEDERAL, STATE AND LOCAL ENVIRONMENTAL/ REGULATORY AUTHORIZATIONS ONLY.

Date: 12/27/2018
Revised: 04/23/2020

PLAN VIEW
PLs: Midway T.F. to Aransas

U.S. ARMY CORPS OF ENGINEERS
PERMIT APPLICATION
SWG-2018-00789

AXIS MIDSTREAM

AXIS MIDSTREAM HOLDINGS, LLC
Proposed Pipelines & Facilities
MIDWAY to HARBOR ISLAND PROJECT
SAN PATRICIO & NUECES COUNTIES, TEXAS



DETAIL B

EDGE OF TWS
PERMANENT ROW
36" PIPELINE
2" FIBER OPTIC LINE
36" PIPELINE
6" PIPELINE
PERMANENT ROW
EDGE OF TWS

P.O.E.
1-2" FIBER OPTIC
1-6" PIPELINE
2-36" PIPELINES
X= 1,417,145.16'
Y= 17,210,915.07"
LAT: 27° 52' 46.97"
LON: 97° 9' 36.12"

P.O.B.
1-2" FIBER OPTIC LINE
1-6" GAS SUPPLY PIPELINES
1-16" INTERMIX PIPELINES
2-42" CRUDE OIL PIPELINES
X= 1,418,522.59'
Y= 17,209,874.99'
LAT: 27° 52' 36.52"
LON: 97° 9' 20.90"
(± 28,215' IN LENGTH)

Gas Well

WATERBODY #7

M.P. 18.52

SEE DETAIL B

PROPOSED ARANSAS PASS
STAGING FACILITY
BOUNDARY FOR DETAILS
SEE SHT. 32 OF 41

WETLAND #5

WETLAND #4

1-2" FIBER OPTIC LINE
1-6" GAS SUPPLY PIPELINE
2-36" CRUDE PIPELINES

Drive-in Theater

Cem

GULF INTRACOASTAL WATERWAY

Beacon

Salt

BM 10

MP 19

0'   400'   800'   1600'

PROPOSED PIPELINES          WORKSPACE          FACILITY

NOTE: THE CONTENT OF THIS DRAWING IS DESIGNED SPECIFICALLY
FOR THE PURPOSE OF SECURING FEDERAL, STATE AND LOCAL
ENVIRONMENTAL/ REGULATORY AUTHORIZATIONS ONLY.

Date: 12/27/2018
Revised: 04/23/2020

PLAN VIEW
PLs: Midway T.F. to Aransas

U.S. ARMY CORPS OF ENGINEERS
PERMIT APPLICATION
SWG-2018-00789

AXIS MIDSTREAM

AXIS MIDSTREAM HOLDINGS, LLC
Proposed Pipelines & Facilities
MIDWAY to HARBOR ISLAND PROJECT
SAN PATRICIO & NUECES COUNTIES, TEXAS



P.O.B.–HDD
X= 1,418,263.22'
Y= 17,210,080.91'
LAT: 27° 52' 38.59"
LON: 97° 9' 23.76"

P.O.E.
1–2" FIBER OPTIC
1–6" PIPELINE
2–36" PIPELINES
X= 1,417,145.16'
Y= 17,210,915.07'
LAT: 27° 52' 46.97"
LON: 97° 9' 36.12"

P.O.B.
1–2" FIBER OPTIC LINE
1–6" GAS SUPPLY PIPELINES
1–16" INTERMIX PIPELINES
2–42" CRUDE OIL PIPELINES
X= 1,418,522.59'
Y= 17,209,874.99'
LAT: 27° 52' 36.52"
LON: 97° 9' 20.90"
(± 28,215' IN LENGTH)

WETLAND #8

WETLAND #7

WETLAND #6

WETLAND #5

300' X 200'
WORKSPACE

ESTUARINE
WETLAND #1

WETLAND #9

GULF INTRACOASTAL WATERWAY

1–2" FIBER OPTIC LINE
1–6" GAS SUPPY PIPELINE
1–16" INTEREMIX PIPELINE
2–42" CRUDE PIPELINES

FOR HDD PLAN AND PROFILE
SEE SHT. 21 OF 41

M.P. 0.66

MP 1

SEAGRASS BED #1

260' X 300'
WORKSPACE

SEAGRASS BED #2

P.O.E.–HDD
X= 1,421,684.88'
Y= 17,207,336.81'
LAT: 27° 52' 11.06"
LON: 97° 9' 45.97"

PROPOSED ARANSAS PASS
STAGING FACILITY BOUNDARY
FOR DETAILS
SEE SHT. 32 OF 41

0'     400'     800'          1600'

PROPOSED PIPELINES    ☐ WORKSPACE    ⌐ ⌐ FACILITY

NOTE: THE CONTENT OF THIS DRAWING IS DESIGNED SPECIFICALLY
FOR THE PURPOSE OF SECURING FEDERAL, STATE AND LOCAL
ENVIRONMENTAL/ REGULATORY AUTHORIZATIONS ONLY.

Date: 12/27/2018
Revised: 04/23/2020

**PLAN VIEW**
PLs: Aransas To Harbor Island

**U.S. ARMY CORPS OF ENGINEERS
PERMIT APPLICATION
SWG-2018-00789**

**AXIS MIDSTREAM HOLDINGS, LLC**
Proposed Pipelines & Facilities
MIDWAY to HARBOR ISLAND PROJECT

SAN PATRICIO & NUECES COUNTIES, TEXAS

AXIS MIDSTREAM

N

EDGE OF WORKING
ROW/TURBIDITY CURTAIN

PERM. ROW

60'

PERM. ROW

75' TRENCHING SIDE

150' ENTIRE WORKING ROW

75' TEMP. SPOIL SIDE

ROW/TURBIDITY CURTAIN
EDGE OF WORKING

**DETAIL C**

RANSOM ISLAND

SEAGRASS BED #1

M.P. 0.66

MP 1

260' X 300'
WORKSPACE

A'

SEE DETAIL C

1-2" FIBER OPTIC LINE
1-6" GAS SUPPY PIPELINE
1-16" INTEREMIX PIPELINE
2-42" CRUDE PIPELINES

M.P. 1.88

SEE SHT. 22 OF 41

A

SEAGRASS BED #2

SEE SHT. 22 OF 41

B

SEE SHT. 22 OF 41

C

B

C

SEAGRASS BED #5

SEAGRASS BED #3

SEAGRASS BED #4

P.O.E.—HDD
X= 1,421,684.88'
Y= 17,207,336.81'
LAT: 27° 52' 11.06"
LON: 97° 9' 45.97"

REDFISH BAY

0'    400'    800'    1600'

PIPELINE TO BE INSTALLED
WITHIN EXISTING OIL FIELD
CANAL, CHANNEL & SLIP.

⸺⸺ PROPOSED PIPELINES      ▭ WORKSPACE      ⸺⸺⸺ FACILITY

NOTE: THE CONTENT OF THIS DRAWING IS DESIGNED SPECIFICALLY
FOR THE PURPOSE OF SECURING FEDERAL, STATE AND LOCAL
ENVIRONMENTAL/ REGULATORY AUTHORIZATIONS ONLY.

Date: 12/27/2018
Revised: 04/23/2020

**PLAN VIEW**
PLs: Aransas To Harbor Island

**U.S. ARMY CORPS OF ENGINEERS
PERMIT APPLICATION
SWG-2018-00789**



AXIS MIDSTREAM

**AXIS MIDSTREAM HOLDINGS, LLC**
Proposed Pipelines & Facilities
MIDWAY to HARBOR ISLAND PROJECT
SAN PATRICIO & NUECES COUNTIES, TEXAS

DETAIL C

EDGE OF WORKING
ROW/TURBITIY CURTAIN

PERM. ROW

60'

75' TRENCHING SIDE

PERM. ROW

75' TEMP. SPOIL SIDE

150' ENTIRE WORKING ROW

ROW/TURBITIY CURTAIN
EDGE OF WORKING

M.P. 1.88

MP 2

SEE SHT. 23 OF 41

D'

D

SEE DETAIL C

1-2" FIBER OPTIC LINE
1-6" GAS SUPPY PIPELINE
1-16" INTEREMIX PIPELINE
2-42" CRUDE PIPELINES

E'

M.P. 3.09

SEE SHT. 23 OF 41

E

SEAGRASS BED #6

MP 3

REDFISH BAY

PIPELINE TO BE INSTALLED
WITHIN EXISTING OIL FIELD
CANAL, CHANNEL & SLIP.

0'    400'    800'    1600'

——— PROPOSED PIPELINES    [ ] WORKSPACE    [- -] FACILITY

NOTE: THE CONTENT OF THIS DRAWING IS DESIGNED SPECIFICALLY
FOR THE PURPOSE OF SECURING FEDERAL, STATE AND LOCAL
ENVIRONMENTAL/ REGULATORY AUTHORIZATIONS ONLY.

Date: 12/27/2018
Revised: 04/23/2020

PLAN VIEW
PLs: Aransas To Harbor Island

**U.S. ARMY CORPS OF ENGINEERS
PERMIT APPLICATION
SWG-2018-00789**



AXIS   MIDSTREAM

# AXIS MIDSTREAM HOLDINGS, LLC
Proposed Pipelines & Facilities
MIDWAY to HARBOR ISLAND PROJECT
SAN PATRICIO & NUECES COUNTIES, TEXAS

DETAIL C

EDGE OF WORKING
ROW/TURBIITY CURTAIN

PERM. ROW
60'
PERM. ROW

75' TRENCHING SIDE
150' ENTIRE WORKING ROW
75' TEMP. SPOIL SIDE

ROW/TURBITITY CURTAIN
EDGE OF WORKING

DETAIL D

PIPELINE PROTECTION
ROCK, CONCRETE MATS
OR OTHER SUITABLE MATERIAL
15,927 cu. yds.

NATURAL GROUND EL.

SEE SHT. 23 OF 41

F

F

M.P. 3.09

SEE DETAIL C

1-2" FIBER OPTIC LINE
1-6" GAS SUPPY PIPELINE
1-16" INTEREMIX PIPELINE
2-42" CRUDE PIPELINES

SEE SHT. 24 OF 41

G'

SEAGRASS BED #7

G

SMOOTH CORD GRASS

MP 4

H

BLACK MANGROVE #3

ESTUARINE WETLAND #2

M.P. 4.62

J

SEE SHT. 24 OF 41

I

TIDAL FLAT

BLACK MANGROVE #2

BLACK MANGROVE #1

SEE SHT. 24 OF 41

H

SEE DETAIL D

PIPELINE TO BE INSTALLED
WITHIN EXISTING OIL FIELD
CANAL, CHANNEL & SLIP.

0'    400'    800'    1600'

PROPOSED PIPELINES    WORKSPACE    FACILITY

NOTE: THE CONTENT OF THIS DRAWING IS DESIGNED SPECIFICALLY
FOR THE PURPOSE OF SECURING FEDERAL, STATE AND LOCAL
ENVIRONMENTAL/ REGULATORY AUTHORIZATIONS ONLY.

Date: 12/27/2018
Revised: 04/23/2020

PLAN VIEW
PLs: Aransas To Harbor Island

U.S. ARMY CORPS OF ENGINEERS
PERMIT APPLICATION
SWG-2018-00789



AXIS MIDSTREAM

AXIS MIDSTREAM HOLDINGS, LLC
Proposed Pipelines & Facilities
MIDWAY to HARBOR ISLAND PROJECT
SAN PATRICIO & NUECES COUNTIES, TEXAS



PIPELINE PROTECTION
ROCK, CONCRETE MATS
OR OTHER SUITABLE MATERIAL
15,927 cu. yds.

NATURAL GROUND EL.

DETAIL D

M.P. 4.62

MP 5

END OF ROUTE

J'

SEE SHT.
J 24 OF 41

ESTUARINE WETLAND #2
BLACK MANGROVE #3

BLACK MANGROVE #2

TIDAL FLAT

SEE DETAIL D

1-2" FIBER OPTIC LINE
1-6" GAS SUPPLY PIPELINE
1-16" INTEREMIX PIPELINE
2-42" CRUDE PIPELINES

P.O.E.
1-2" FIBER OPTIC LINE
1-6" GAS SUPPLY PIPELINES
1-16" INTERMIX PIPELINES
2-42" CRUDE OIL PIPELINES
X= 1,418,522.59'
Y= 17209874.99'
LAT: 27° 52' 36.52"
LON: 97° 9' 20.90"

PROPOSED HARBOR ISLAND
TERMINAL BOUNDARY
FOR DETAILS SEE
SHT. 34 & 35 OF 41

| 0' | 400' | 800' | 1600' |

PROPOSED PIPELINES    WORKSPACE    FACILITY

NOTE: THE CONTENT OF THIS DRAWING IS DESIGNED SPECIFICALLY FOR THE PURPOSE OF SECURING FEDERAL, STATE AND LOCAL ENVIRONMENTAL/ REGULATORY AUTHORIZATIONS ONLY.

Date: 12/27/2018
Revised: 04/23/2020

**PLAN VIEW**
PLs: Aransas to Harbor Island

**U.S. ARMY CORPS OF ENGINEERS
PERMIT APPLICATION
SWG-2018-00789**

**AXIS MIDSTREAM HOLDINGS, LLC**
Proposed Pipelines & Facilities
MIDWAY to HARBOR ISLAND PROJECT
SAN PATRICIO & NUECES COUNTIES, TEXAS

AXIS MIDSTREAM

## PLAN
### PLAN
SCALE: 1" = 1000'

PROPOSED HDD ENTRY
X= 1,418,263.22'
Y= 17,210,080.91'
LAT: N027° 52' 38.59"
LON: W097° 09' 23.76"

CORE B-1
X= 1,418,490.10'
Y= 17,210,051.96'
LAT: N027° 52' 38.28"
LON: W097° 09' 21.24"

300'X200'

1301+000

PROPOSED AXIS PIPELINES

1302+000

GULF INTRACOASTAL WATERWAY

260'X300'

PROPOSED HDD EXIT
X= 1,421,684.88'
Y= 17,207,336.81'
LAT: N027° 52' 11.06"
LON: W097° 08' 45.97"

1000'  0'  1000'
SCALE

### SECTION
SCALE: N.T.S

DRILL A
DRILL B    DRILL C
20' MIN.
20' MIN.    20' MIN.

### LEGEND

| | |
|---|---|
| SILTY SAND – SM | |
| FAT CLAY – CH | |
| CLAYEY SAND | |

4386'

0+00 DRILL ENTRY
EL. 5.86'
CORE B-1
~EL. 4.5'
~EL. -115.5'

13+36 WATERWAY TOE
13+99 C/L WATERWAY
14+63 WATERWAY TOE

EXCLUSION ZONE

43+86 P.I. & HDD EXIT
EL. (-)7.34'

12'
~120.00'

P.C.1  P.C.1  R2400'
P.T.1  R4200'
P.T.1

40' MIN.
20' MIN.

A
THIS DWG.

R4200'  R2400'
R4200'  P.C.2
P.C.2  P.T.2
P.T.2

PROPOSED AXIS PIPELINES

20.00
0.00
-20.00
-40.00
-60.00
-80.00
-100.00
-120.00
-140.00

20.00
0.00
-20.00
-40.00
-60.00
-80.00
-100.00
-120.00
-140.00

### PROFILE
HORIZONTAL SCALE: 1" = 1000'
VERTICAL SCALE: 1" = 250'

DRILL A
DRILL B & C

### SPECIFICATIONS:
CARRIER PIPE:
DRILL A BUNDLE
  16.000" O.D. *
  6.625" O.D. *
  2" FIBER OPTIC CABLE
DRILL B
  42.000" O.D. *
DRILL C
  42.000" O.D. *
* PIPE WALL THICKNESS AND COATING TO BE DETERMINED.

### GENERAL NOTES:
1) GRID PROJECTION BASED UPON TEXAS STATE PLANE COORDINATE SYSTEM, CENTRAL ZONE (GRID UNITS IN FEET) GEODETIC DATUM: NAD 1983, CLARKE SPHEROID, 1866.
2) CONTRACTOR IS RESPONSIBLE FOR FIELD VERIFYING ALL FOREIGN PIPELINE CROSSINGS AND COVER PRIOR TO CONSTRUCTION.
3) 3 PROPOSED HDD WILL BE INSTALLED IN THE EASEMENT. DRILL A WILL CONSIST OF A BUNDLED ON 16.000" O.D., ONE 6.625" O.D. AND 2" O.D. DRILL B WILL BE A 42.000" O.D. PIPELINE AND DRILL C WILL BE A 42.000" O.D. PIPELINE.
4) THE CONTRACTOR WILL BE RESPONSIBLE FOR DETERMINING THE ORDER OF THE DRILLS.
5) THE ENGINEER'S SEAL AFFIXED TO THIS DRAWING REPRESENTS THE ENGINEERING DESIGN OF THE 3 HDD PROFILES SHOWN ON THIS DRAWING. THE DESIGN IS BASED UPON THE SURVEY INFORMATION PROVIDED BY GULLETT & ASSOCIATES DISPLAYED HEREIN. THE ISSUANCE OF THIS DRAWING IS NOT INTENDED AS A SURVEYING DOCUMENT AND SHOULD NOT BE USED FOR ESTABLISHMENT OR RECORD OF BOUNDARY, EASEMENTS OR ANY OTHER SURVEYING PURPOSE.

NOTE: THE CONTENT OF THIS DRAWING IS DESIGNED SPECIFICALLY FOR THE PURPOSE OF SECURING FEDERAL, STATE AND LOCAL ENVIRONMENTAL/ REGULATORY AUTHORIZATIONS ONLY.

Date: 12/27/2018
Revised: 04/23/2020

## PLAN PROFILE
PLs: GIWW HDD

## U.S. ARMY CORPS OF ENGINEERS PERMIT APPLICATION SWG-2018-00789



AXIS MIDSTREAM

## AXIS MIDSTREAM HOLDINGS, LLC
### Proposed Pipelines & Facilities
### MIDWAY to HARBOR ISLAND PIPELINES & TERMINAL
SAN PATRICIO & NUECES COUNTIES, TEXAS

SWG-2018-00789; Axis Midstream Project Plans

SECTION A–A' (HDD EXIT SITE)

- 60'
- 10'
- CL PIPE
- 10'
- 60'
- TURBIDITY CURTAIN
- TURBIDITY CURTAIN
- 5'
- 0'
- -5'
- -10'
- -15'
- -20'
- 9'
- 7'
- NATURAL BOTTOM
- 8'
- 25'
- 50'
- 25'
- 240' (WORKSPACE)

SECTION B–B'

- CL PIPE
- 10'
- 60'
- TURBIDITY CURTAIN
- TURBIDITY CURTAIN
- 5'
- 0
- -5'
- -10'
- -15'
- -20'
- 2'
- 7'
- 9'
- 8'
- 6'
- 4'
- NATURAL BOTTOM
- 8'
- 24'
- 26'
- 24'
- 150' (WORKSPACE)

SECTION C–C'
HORIZONTAL SCALE: 1"–60'
VERTICAL SCALE: 1"–20'

- 60'
- 10'
- CL PIPE
- TURBIDITY CURTAIN
- TURBIDITY CURTAIN
- 5'
- 0'
- -5'
- -10'
- -15'
- -20'
- 10'
- 7'
- NATURAL BOTTOM
- 8'
- 24'
- 26'
- 24'
- 150' (WORKSPACE)

NOTE:
TRENCH SIDE SLOPES ARE 3:1.

| NOTE: THE CONTENT OF THIS DRAWING IS DESIGNED SPECIFICALLY FOR THE PURPOSE OF SECURING FEDERAL, STATE AND LOCAL ENVIRONMENTAL/ REGULATORY AUTHORIZATIONS ONLY. | Date: 12/27/2018 Revised: 04/23/2020 | CROSS-SECTIONS PLs: Aransas Fac. to Harbor Island |
|---|---|---|

**U.S. ARMY CORPS OF ENGINEERS PERMIT APPLICATION SWG-2018-00789**



AXIS MIDSTREAM

# AXIS MIDSTREAM HOLDINGS, LLC
Proposed Pipelines & Facilities
MIDWAY to HARBOR ISLAND PIPELINES & TERMINAL
SAN PATRICIO & NUECES COUNTIES, TEXAS



SECTION D–D'

SECTION E–E'

SECTION F–F'

HORIZONTAL SCALE: 1"–60'
VERTICAL SCALE: 1"–20'

NOTE:
TRENCH SIDE SLOPES ARE 3:1.

NOTE: THE CONTENT OF THIS DRAWING IS DESIGNED SPECIFICALLY FOR THE PURPOSE OF SECURING FEDERAL, STATE AND LOCAL ENVIRONMENTAL/ REGULATORY AUTHORIZATIONS ONLY.

Date: 12/27/2018
Revised: 04/23/2020

CROSS-SECTIONS
PLs: Aransas Fac. to Harbor Island

**U.S. ARMY CORPS OF ENGINEERS
PERMIT APPLICATION
SWG-2018-00789**

AXIS MIDSTREAM

AXIS MIDSTREAM HOLDINGS, LLC
Proposed Pipelines & Facilities
MIDWAY to HARBOR ISLAND PIPELINES & TERMINAL
SAN PATRICIO & NUECES COUNTIES, TEXAS

## SECTION G–G'

TURBIDITY CURTAIN
TURBIDITY CURTAIN
CL PIPE
NATURAL BOTTOM
60'
10'
8'
24' 26' 24'
150' (WORKSPACE)

## SECTION H–H'

CL PIPE
NATURAL GROUND
60'
10'
8'
24' 26' 24'
150' (WORKSPACE)

## SECTION I–I'

CL PIPE
NATURAL GROUND
60'
10'
8'
24' 26' 24'
150' (WORKSPACE)

## SECTION J–J'

CL PIPE
NATURAL GROUND
60'
10'
8'
24' 26' 24'
200' (WORKSPACE)

HORIZONTAL SCALE: 1"–60'
VERTICAL SCALE: 1"–20'

NOTE:
TRENCH SIDE SLOPES ARE 3:1.

NOTE: THE CONTENT OF THIS DRAWING IS DESIGNED SPECIFICALLY FOR THE PURPOSE OF SECURING FEDERAL, STATE AND LOCAL ENVIRONMENTAL/ REGULATORY AUTHORIZATIONS ONLY.

Date: 12/27/2018
Revised: 04/23/2020

### CROSS-SECTIONS
PLs: Aransas Fac. to Harbor Island

## U.S. ARMY CORPS OF ENGINEERS PERMIT APPLICATION SWG-2018-00789



AXIS MIDSTREAM

# AXIS MIDSTREAM HOLDINGS, LLC
## Proposed Pipelines & Facilities
## MIDWAY to HARBOR ISLAND PIPELINES & TERMINAL
### SAN PATRICIO & NUECES COUNTIES, TEXAS

SWG-2018-00789; Axis Midstream Project Plans

## INSTALLATION OF PIPELINE #1



TEMPORARY R.O.W. BOUNDARY

TEMPORARY R.O.W. BOUNDARY

TEMPORARY R.O.W. BOUNDARY

TRENCH SPOIL

SPOIL SETBACK

5'

WELDING SHACK

SEGREGATED TOPSOIL

SEGREGATED TOPSOIL

7'-9'

| 30' SPOIL AREA | 5' SPOIL SETBACK | 30' DITCH | 55' WORKING SIDE AND TRAVEL LANE | 10' |

| 30' TEMPORARY CONSTRUCTION R.O.W. | 20' | 40' | 40' TEMPORARY CONSTRUCTION R.O.W. |
| | 60' PERMANENT R.O.W. | | |

130' CONSTRUCTION R.O.W.

**NOTES:**

1. ALTHOUGH THE DIMENSIONS SHOWN ARE TYPICAL, SOME VARIATIONS MAY EXIST DUE TO SITE SPECIFIC CONDITIONS. UNLESS OTHERWISE INDICATED ON THE ALIGNMENT SHEETS, THE MAXIMUM WIDTH OF THE CONSTRUCTION RIGHT-OF-WAY SHALL BE AS SHOWN IN THE TABLE FOR THE APPROPRIATE PIPE DIAMETER.

2. TOPSOIL AND SUBSOIL SHALL BE SEGREGATED WITHIN WETLAND, RESIDENTIAL, AGRICULTURAL, PASTURES, HAYFIELDS AND OTHER AREAS AT LANDOWNER'S OR LAND MANAGING AGENCY'S REQUEST.

3. 6" PIPELINE (NOT SHOWN) WILL BE PLACED IN DITCH WITH 1 FT WALL TO WALL SEPARATION WITH EITHER 36" PIPELINE #1 OR #2 DEPENDING ON CONTRACTOR SEQUENCE PREFERENCE AT TIME OF INSTALLATION.

## TERRESTRIAL PIPELINE TYPICAL CONSTRUCTION PLAN



TEMPORARY R.O.W. BOUNDARY

TEMPORARY R.O.W. BOUNDARY

SEGREGATED TOPSOIL

TRENCH SPOIL

SPOIL SETBACK

5'

SEGREGATED TOPSOIL

AXIS PIPELINE NO. 1

7'-9'

| 10' | 40' SPOIL AREA | 5' SPOIL SETBACK | 30' DITCH | 45' WORKING SIDE AND TRAVEL LANE |

| 30' TEMPORARY CONSTRUCTION R.O.W. | 20' | 20' | 20' | 40' TEMPORARY CONSTRUCTION R.O.W. |
| | 60' PERMANENT R.O.W. | | | |

130' CONSTRUCTION R.O.W.

## INSTALLATION OF PIPELINE #2

NOTE: THE CONTENT OF THIS DRAWING IS DESIGNED SPECIFICALLY FOR THE PURPOSE OF SECURING FEDERAL, STATE AND LOCAL ENVIRONMENTAL/ REGULATORY AUTHORIZATIONS ONLY.

Date: 12/27/2018
Revised: 04/23/2020

## TYPICAL CROSS-SECTION
PLs: Midway T.F. to Aransas Fac.

# U.S. ARMY CORPS OF ENGINEERS PERMIT APPLICATION SWG-2018-00789



AXIS MIDSTREAM

# AXIS MIDSTREAM HOLDINGS, LLC
Proposed Pipelines & Facilities
MIDWAY to HARBOR ISLAND PIPELINES & TERMINAL
SAN PATRICIO & NUECES COUNTIES, TEXAS

EDGE OF ROAD

PIPELINE

ARO COATING

ROAD BED

**PLAN VIEW**
NOT TO SCALE

DRILLING RIG EXIT SITE LIMITS

OPEN CUT TRENCH

CONSTRUCTION R.O.W.

EXTRA WORK SPACE

100'

MARKER (TYP.)

C/L ROAD

EDGE OF ROAD

R.O.W. LIMIT

DIRECTION OF BORE

R.O.W. LIMIT

PIPELINE

SILT FENCE OR STRAW BALES

50' SETBACK FROM ROAD R.O.W.

ROAD BED

100'

OPEN CUT TRENCH

DRILL STRING

EXTRA WORK SPACE

50' SETBACK FROM ROAD R.O.W.

SILT FENCE OR STRAW BALES

CONSTRUCTION R.O.W.

DRILLING RIG ENTRY SITE LIMITS

**PLAN VIEW**
NOT TO SCALE

NOTES:

1. EXTRA WORK SPACE NOT LOCATED IN WETLAND WHEN POSSIBLE AND PRACTICAL.

2. RIGHT-OF-WAY LIMITS AS SHOWN ON ALIGNMENT SHEETS.

3. WORK AREA WILL BE TEMPORARILY MATTED FOR MARSH AREAS.

NOTE: THE CONTENT OF THIS DRAWING IS DESIGNED SPECIFICALLY FOR THE PURPOSE OF SECURING FEDERAL, STATE AND LOCAL ENVIRONMENTAL/ REGULATORY AUTHORIZATIONS ONLY.

Date: 12/27/2018
Revised: 04/23/2020

**TYPICAL CONST. LAYOUT**
PLs: Road Crossing Bore

**U.S. ARMY CORPS OF ENGINEERS PERMIT APPLICATION SWG-2018-00789**



AXIS MIDSTREAM

**AXIS MIDSTREAM HOLDINGS, LLC**
Proposed Pipelines & Facilities
MIDWAY to HARBOR ISLAND PIPELINES & TERMINAL

SAN PATRICIO & NUECES COUNTIES, TEXAS

SWG-2018-00789; Axis Midstream Project Plans

EDGE OF RAILROAD

PIPELINE

ARO COATING

RAILROAD BED

**PLAN VIEW**
NOT TO SCALE

DRILLING RIG EXIT SITE LIMITS

CONSTRUCTION R.O.W.

OPEN CUT TRENCH

MARKER (TYP.)

EXTRA WORK SPACE

100'

EDGE OF RAILROAD BED

R.O.W. LIMIT

DIRECTION OF BORE

R.O.W. LIMIT

SILT FENCE OR STRAW BALES

50' SETBACK FROM RAILROAD R.O.W.

PIPELINE

RAILROAD BED

100'

OPEN CUT TRENCH

DRILL STRING

EXTRA WORK SPACE

50' SETBACK FROM RAILROAD R.O.W.

SILT FENCE OR STRAW BALES

CONSTRUCTION R.O.W.

DRILLING RIG ENTRY SITE LIMITS

**PLAN VIEW**
NOT TO SCALE

NOTES:

1. EXTRA WORK SPACE NOT LOCATED IN WETLAND WHEN POSSIBLE AND PRACTICAL.

2. RIGHT-OF-WAY LIMITS AS SHOWN ON ALIGNMENT SHEETS.

3. WORK AREA WILL BE TEMPORARILY MATTED FOR MARSH AREAS.

| NOTE: THE CONTENT OF THIS DRAWING IS DESIGNED SPECIFICALLY FOR THE PURPOSE OF SECURING FEDERAL, STATE AND LOCAL ENVIRONMENTAL/ REGULATORY AUTHORIZATIONS ONLY. | Date: 12/27/2018<br>Revised: 04/23/2020 | TYPICAL CONST. LAYOUT<br>PLs: Railroad Crossing Bore |
| --- | --- | --- |

**U.S. ARMY CORPS OF ENGINEERS**
**PERMIT APPLICATION**
**SWG-2018-00789**



AXIS MIDSTREAM

# AXIS MIDSTREAM HOLDINGS, LLC

Proposed Pipelines & Facilities
MIDWAY to HARBOR ISLAND PIPELINES & TERMINAL

SAN PATRICIO & NUECES COUNTIES, TEXAS

SWG-2018-00789; Axis Midstream Project Plans

50' MIN SETBACK

STRAW BALES

SILT FENCE

TOP OF BANK
EDGE OF WATER

## PLAN VIEW
SCALE: NOT TO SCALE

DRILLING RIG EXIT SITE LIMITS

CONSTRUCTION R.O.W.

PIPELINE

SHORELINE

WATER

EXIT PIT

EXTRA WORK SPACE

DIRECTION OF DRILL

SHORELINE

WATER

DRILL STRING

SILT FENCE OR STRAW BALES AS REQUIRED

50' MINIMUM SETBACK FROM TOP OF BANK

WATER

SHORELINE

ENTRY PIT

R.O.W. LIMIT

R.O.W. LIMIT

WATER

SHORELINE

EXTRA WORK SPACE

CONSTRUCTION R.O.W.

50' MINIMUM SETBACK FROM TOP OF BANK

SILT FENCE OR STRAW BALES AS REQUIRED

DRILLING RIG ENTRY SITE LIMITS

## PLAN VIEW
NOT TO SCALE

NOTES:

1. EXTRA WORK SPACE NOT LOCATED IN WETLANDS WHEN POSSIBLE.

NOTE: THE CONTENT OF THIS DRAWING IS DESIGNED SPECIFICALLY FOR THE PURPOSE OF SECURING FEDERAL, STATE AND LOCAL ENVIRONMENTAL/ REGULATORY AUTHORIZATIONS ONLY.

Date: 12/27/2018
Revised: 04/23/2020

### TYPICAL CONST. LAYOUT
PLs: Waterbody Crossing

## U.S. ARMY CORPS OF ENGINEERS PERMIT APPLICATION SWG-2018-00789



AXIS MIDSTREAM

## AXIS MIDSTREAM HOLDINGS, LLC
Proposed Pipelines & Facilities
MIDWAY to HARBOR ISLAND PIPELINES & TERMINAL

SAN PATRICIO & NUECES COUNTIES, TEXAS

DRILLING SUPPORT BARGE

DIRECTION OF BARGE

TRANSITION
PIPE DITCH

EXCAVATED
EXIT PIT

PIPE PRE-LAID
ON BOTTOM

TURBIDITY CONTAINMENT
AS REQUIRED BY REGULATORY
AGENCY

DRILL STRING

WATER

SHORELINE

300'

ENTRY
PIT

DRILL
RIG

200'

SHORELINE

WATER

DRILLING RIG ENTRY
SITE LIMITS

## HORIZONTAL DIRECTIONAL DRILLING LAND TO WATER

SCALE: N.T.S
CONDENSED FOR ILLUSTRATIVE PURPOSES

| NOTE: THE CONTENT OF THIS DRAWING IS DESIGNED SPECIFICALLY FOR THE PURPOSE OF SECURING FEDERAL, STATE AND LOCAL ENVIRONMENTAL/ REGULATORY AUTHORIZATIONS ONLY. | Date: 12/27/2018<br>Revised: 04/23/2020 | TYPICAL CONST. LAYOUT<br>PLs: Land to Water |
|---|---|---|

**U.S. ARMY CORPS OF ENGINEERS
PERMIT APPLICATION
SWG-2018-00789**



AXIS MIDSTREAM

# AXIS MIDSTREAM HOLDINGS, LLC

Proposed Pipelines & Facilities
MIDWAY to HARBOR ISLAND PIPELINES & TERMINAL

SAN PATRICIO & NUECES COUNTIES, TEXAS

EDGE OF WORKSPACE

EDGE OF WORKSPACE

BARGE
CONTROL
TOWER

LINE—UP

WELDING

LAY BARGE

DIRECTION OF TRAVEL

NDE

PIPE COATING

STINGER

SUBSEA
PIPELINE

SPOIL

## TYPICAL PIPELINE LAY BARGE SPREAD

SCALE
CONDENSED FOR ILLUSTRATIVE PURPOSES

| NOTE: THE CONTENT OF THIS DRAWING IS DESIGNED SPECIFICALLY FOR THE PURPOSE OF SECURING FEDERAL, STATE AND LOCAL ENVIRONMENTAL/ REGULATORY AUTHORIZATIONS ONLY. | Date: 12/27/2018<br>Revised: 04/23/2020 | **TYPICAL CONST. LAYOUT**<br>PLs: Shallow Water Lay Barge |
|---|---|---|

**U.S. ARMY CORPS OF ENGINEERS
PERMIT APPLICATION
SWG-2018-00789**



AXIS MIDSTREAM

# AXIS MIDSTREAM HOLDINGS, LLC

Proposed Pipelines & Facilities
MIDWAY to HARBOR ISLAND PIPELINES & TERMINAL

SAN PATRICIO & NUECES COUNTIES, TEXAS

SWG-2018-00789; Axis Midstream Project Plans

SPACE RESERVED FOR PUMP,
MANIFOLD AND PIGGING EQUIPMENT

175' BUFFER

2579.4'

DEPARTING
PIPELINES

CONTAINMENT BERM

FM 893

DRAINAGE DITCH

DRAINAGE DITCH

CONTAINMENT BERM

CONTAINMENT BERM

1024'

1029.9'

**TK-1**
264' DIA
500K BBL

**TK-2**
264' DIA
500K BBL

**TK-3**
264' DIA
500K BBL

**TK-4**
264' DIA
500K BBL

**TK-11**
188' DIA
250K BBL

**TK-12**
132' DIA
100K BBL

**TK-5**
222' DIA
350K BBL

**TK-6**
222' DIA
350K BBL

**TK-7**
188' DIA
250K BBL

**TK-8**
188' DIA
250K BBL

**TK-9**
188' DIA
250K BBL

**TK-10**
188' DIA
250K BBL

CONTAINMENT BERM

2593.6'

175' BUFFER

WINDFARM ACCESS RD.

AGRICULTURE ACCESS RD.

FM 893

DRAINAGE DITCH

DRAINAGE DITCH

MIDWAY SITE LAYOUT

150' 50' 0    200'
100'   100'

NOTE: THE CONTENT OF THIS DRAWING IS DESIGNED SPECIFICALLY
FOR THE PURPOSE OF SECURING FEDERAL, STATE AND LOCAL
ENVIRONMENTAL/ REGULATORY AUTHORIZATIONS ONLY.

Date: 12/27/2018
Revised: 04/23/2020

**PLAN VIEW**
Midway Tank Farm

**U.S. ARMY CORPS OF ENGINEERS
PERMIT APPLICATION
SWG-2018-00789**



AXIS MIDSTREAM

**AXIS MIDSTREAM HOLDINGS, LLC**
Proposed Pipelines & Facilities
MIDWAY to HARBOR ISLAND PIPELINES & TERMINAL
SAN PATRICIO & NUECES COUNTIES, TEXAS



ARANSAS PASS STAGING FACILITY

RAILROAD

TK-0350 222' DIA 350K BBL
TK-0351 222' DIA 350K BBL
TK-0352 222' DIA 350K BBL
TK-0501 264' DIA 500K BBL
TK-0502 264' DIA 500K BBL
TK-0503 264' DIA 500K BBL
TK-0504 264' DIA 500K BBL
TK-0505 264' DIA 500K BBL
TK-0353 222' DIA 350K BBL
TK-0354 222' DIA 350K BBL
TK-0250 75' DIA 25K BBL
TK-0251 75' DIA 25K BBL

CONTAINMENT

175' BUFFER

RELOCATED W.BEASLEY AVE.

E. BEASLEY AVE.

Fire Water Site Rainwater to be collected here (1.5 AC)

175' BUFFER

EXISTING PIPELINES

RELOCATED E.BEASLEY AVE.

PROPOSED ARANSAS PASS STAGING FACILITY EMERGENCY ACCESS ROAD SEE SHEET 33 OF 41 FOR DETAILS

GULF INTERCOASTAL WATERWAY

| EQUIPMENT LEGEND | |
| --- | --- |
| ITEM | DESCRIPTION |
| 1. | OPERATIONS CENTER, 50' X 60' |
| 2. | WAREHOUSE/SHOP, 80' X 100' |
| 3. | PIG LAUNCHER AND RECEIVER AREA |
| 4. | SHIP LOADING PUMP 1 & 2 AREA |
| 5. | TRANSFER PUMP |
| 6. | MCC BUILDING 1, 2 & 3. 16' X 100' |
| 7. | FIRE SUPPRESSION EQUIPMENT AREA |
| 8. | RECEIVER/CHECK METER SITE, INCOMING |
| 9. | FIREWATER POND, 1.5 ACRES |
| 10. | POWER GENERATION |
| 11. | OUTGOING METERS 1 & 2 |
| 12. | OUTGOING METERS 1 & 2 |

WETLAND AREA

600'  300'  0'  600'
SCALE: 1" = 600'

C/L EXISTING ROAD
WETLAND BOUNDARY
C/L E. BEASLEY AVE.
C/L RELOCATED E. BEASLEY AVE.

BACKFILL TO EL.+6'
EXISTING GROUND PROFILE
BACKFILL TO EL.+6'

20'  10'  0'  −10'  −20'

R1  CROSS SECTION
SCALE: 1"=150'
VERT. SCALE: 1"=75'

NOTE: THE CONTENT OF THIS DRAWING IS DESIGNED SPECIFICALLY FOR THE PURPOSE OF SECURING FEDERAL, STATE AND LOCAL ENVIRONMENTAL/ REGULATORY AUTHORIZATIONS ONLY.

Date: 12/27/2018
Revised: 04/23/2020

PLAN VIEW/CROSS-SECTION
Aransas Pass Staging Facility

U.S. ARMY CORPS OF ENGINEERS PERMIT APPLICATION SWG-2018-00789

AXIS MIDSTREAM HOLDINGS, LLC
Proposed Pipelines & Facilities
MIDWAY to HARBOR ISLAND PIPELINES & TERMINAL
SAN PATRICIO & NUECES COUNTIES, TEXAS

AXIS MIDSTREAM

PLAN

WATERBODY #8

ESTUARINE WETLAND #3

PROPOSED 15' WING

RIP RAP

20'

PROPOSED EMERGENCY ACCESS ROAD

15' WING

ESTUARINE WETLAND #4

3-48" CONCRETE BOX CULVERTS 40' LONG

PROFILE

HORIZONTAL SCALE: 1"-60'

VERTICAL SCALE: 1"-20'

1000.0'

EXISTING ROAD

NATURAL GROUND

12" OF LIMESTONE AGGREGATE

WETLAND BOUNDARY

SEE DETAIL A

EXISTING ROAD

10'
5'
0
-5'
-10'

10'
5'
0
-5'
-10'

DETAIL A

12" OF LIMESTONE AGGREGATE

EARTHEN FILL

OHW

EXCAVATION

ELEV. (-)1.00'

3-48" CONCRETE BOX CULVERTS 40' LONG

NOTES:

| | |
|---|---|
| LIMESTONE AGGREGATE (EAST SIDE) | 195 CU. YDS. |
| LIMESTONE AGGREGATE (IN WETLANDS) | 540 CU. YDS. |
| EARTHEN FILL FOR ROAD | 163 CU. YDS. |
| RIP-RAP | 17 CU. YDS. |
| EXCAVATION FOR CULVERTS | 102 CU. YDS. |

NOTE: THE CONTENT OF THIS DRAWING IS DESIGNED SPECIFICALLY FOR THE PURPOSE OF SECURING FEDERAL, STATE AND LOCAL ENVIRONMENTAL/ REGULATORY AUTHORIZATIONS ONLY.

Date: 12/27/2018
Revised: 04/23/2020

PLAN VIEW/CROSS SECTION
ACCESS ROAD – ARANSAS FAC.

**U.S. ARMY CORPS OF ENGINEERS PERMIT APPLICATION SWG-2018-00789**



AXIS MIDSTREAM

**AXIS MIDSTREAM HOLDINGS, LLC**
Proposed Pipelines & Facilities
MIDWAY to HARBOR ISLAND PIPELINES & TERMINAL
SAN PATRICIO & NUECES COUNTIES, TEXAS



PROPOSED BULKHEAD

PROPERTY LINE

SLOPE 3:1

76.18'

−60' MLLW (DESIGN DEPTH)

SLOPE 3:1

EXISTING GRADE ASSUMED TO BE EL. +14.0'

PROPERTY LINE

255.00'

197.00'

TIE BACKS
PROPERTY LINE

105.00'

76.18'

−54' MLLW (DESIGN DEPTH)

105.00' 198.02'

SLOPE 3:1

130.00'

DOCKING DETAILS ADAPTED FROM 12/2018 DATA PROVIDED BY LLOYD ENGINEERS, INC.

CURRENT PLANNED DREDGE = −54'+4' +2' = -60' MLLW

350'   175'   0'        350'
SCALE:   1" = 350'

℄ CORPUS CHRISTI SHIP CHANNEL

NOTE: THE CONTENT OF THIS DRAWING IS DESIGNED SPECIFICALLY FOR THE PURPOSE OF SECURING FEDERAL, STATE AND LOCAL ENVIRONMENTAL/ REGULATORY AUTHORIZATIONS ONLY.

Date: 12/27/2018
Revised: 04/23/2020

PLAN VIEW
Harbor Island Marine Terminal

**U.S. ARMY CORPS OF ENGINEERS PERMIT APPLICATION SWG-2018-00789**

AXIS MIDSTREAM

**AXIS MIDSTREAM HOLDINGS, LLC**
Proposed Pipelines & Facilities
MIDWAY to HARBOR ISLAND PIPELINES & TERMINAL
SAN PATRICIO & NUECES COUNTIES, TEXAS

SWG-2018-00789; Axis Midstream Project Plans



EQUIPMENT LEGEND

| ITEM | DESCRIPTION |
|------|-------------|
| 1. | OFFICE |
| 2. | 16" PIG LAUNCHER/RECEIVER |
| 3. | 42" PIG LAUNCHER/RECEIVER #1 |
| 4. | 42" PIG LAUNCHER/RECEIVER #2 |
| 5. | METER SKID #1 |
| 6. | METER SKID #2 |
| 7. | COMBUSTOR UNIT #1 |
| 8. | COMBUSTOR UNIT #2 |
| 9. | CONTROL BUILDING |
| 10. | 80K BBL. TANK |
| 11. | 80K BBL. TANK |

CROSS HATCHED AREA DEPICTS EXCAVATION BOUNDARY

℄ CORPUS CHRISTI SHIP CHANNEL

500'  250'  0'  500'

SCALE: 1" = 500'

BATHYMETRIC CONTOUR DATA ADAPTED FROM NAISMITH MARINE SERVICES DATA 01/2018

1313'

ELEV. 0.00' MLLW

EL.-2'  EL.-60'  EL.-60'  EL.+14'

A CROSS SECTION
SCALE: 1"=150'

NOTE: THE CONTENT OF THIS DRAWING IS DESIGNED SPECIFICALLY FOR THE PURPOSE OF SECURING FEDERAL, STATE AND LOCAL ENVIRONMENTAL/ REGULATORY AUTHORIZATIONS ONLY.

Date: 12/27/2018
Revised: 04/23/2020

PLAN VIEW/CROSS SECTION
Harbor Island Marine Terminal

U.S. ARMY CORPS OF ENGINEERS
PERMIT APPLICATION
SWG-2018-00789

AXIS MIDSTREAM HOLDINGS, LLC
Proposed Pipelines & Facilities
MIDWAY to HARBOR ISLAND PIPELINES & TERMINAL
SAN PATRICIO & NUECES COUNTIES, TEXAS

AXIS MIDSTREAM



DOCKING DETAILS ADAPTED FROM 12/2018
DATA PROVIDED BY LLOYD ENGINEERS, INC.

TIE BACKS

MIRAFI 500X FABRIC

65.0'   105.0'

EL. +10.0'
℄ EL. +3.0'
DRAINS @ EL. +2.0'
EL. 0.00'
EL. −12' MLLW (INITIAL DREDGE DEPTH)
EL. −54' MLLW (DREDGE DEPTH)

30"∅x¾" W.T.
60"∅x¾" W.T. X 100' LG.
TIP EL. −116.0'
TIP EL. −96.0'
TIP EL. −70.0'
AZ26 INFILL SHEETS
TIP EL. −100.0'

**B** TYPICAL OVERALL BULKHEAD SECTION
SCALE: 1"=100'

120.0'

46.5'
17.0'
36.5'
12.0'
60.0'
100.0'
12.0'
30.0'   60.0'   30.0'

**1** SHIP DOCK INSET
SCALE: 1"=75'

204.3'   150.0'   260.5'   15.0'   260.5'   150.0'   165.3'

BREASTING LINE

SEE INSET "1"
SEE INSET "2"
BREASTING LINE

15.0'

130.0'

50.0' 50.0'   114.8'   114.8'   50.0' 50.0'

24.0'
24.0'
30"∅x1"WT PIPE BRACES (TYP.)
30"∅x1" WT PIPE BRACES (TYP.)
60"∅x1"PIPE JACKET (TYP)

**2** TYP. MOORING DOLPHIN INSET AT EL +2.00'
SCALE: N.T.S.

150'  75'  0'  150'
SCALE: 1" = 150'

24.0'
60"∅x1"PIPE JACKET (TYP)
W24X104 (TYP)
1¼" GRATING (TYP)
24.0'
30"∅x1" WT PIPE BRACES (TYP.)
MCS 1150 G2.0 FENDER SYSTEM

**2** TYP. MOORING DOLPHIN INSET AT EL +15.75'
SCALE: N.T.S.

NOTE: THE CONTENT OF THIS DRAWING IS DESIGNED SPECIFICALLY FOR THE PURPOSE OF SECURING FEDERAL, STATE AND LOCAL ENVIRONMENTAL/ REGULATORY AUTHORIZATIONS ONLY.

Date: 12/27/2018
Revised: 04/23/2020

PLAN VIEW/CROSS SECTIONS
Harbor Island: Structures

# U.S. ARMY CORPS OF ENGINEERS PERMIT APPLICATION SWG-2018-00789

AXIS MIDSTREAM

# AXIS MIDSTREAM HOLDINGS, LLC
Proposed Pipelines & Facilities
MIDWAY to HARBOR ISLAND PIPELINES & TERMINAL
SAN PATRICIO & NUECES COUNTIES, TEXAS



APPROACH AND PIPE TRESTLE ENLARGED PLAN
SCALE: 1"=30'-0"

1.0' SQ. CURB AND GUARDRAIL

℄ APPROACH TRESTLE

50.0' 50.0' 50.0' 50.0' 26.3'

7.5' 8.5'

36"∅ PILE (TYP.)

EL. +10.0'

EL. +25.0'

APPROACH TRESTLE SECTION
SCALE: 1"=30'-0"

30' 15' 0' 30'
SCALE: 1" = 30'

DOCKING DETAILS ADAPTED FROM 12/2018 DATA PROVIDED BY LLOYD ENGINEERS, INC.

NOTE: THE CONTENT OF THIS DRAWING IS DESIGNED SPECIFICALLY FOR THE PURPOSE OF SECURING FEDERAL, STATE AND LOCAL ENVIRONMENTAL/ REGULATORY AUTHORIZATIONS ONLY.

Date: 12/27/2018
Revised: 04/23/2020

PLAN VIEW/CROSS SECTIONS
Harbor Island: Structures

**U.S. ARMY CORPS OF ENGINEERS PERMIT APPLICATION SWG-2018-00789**

**AXIS MIDSTREAM HOLDINGS, LLC**
Proposed Pipelines & Facilities
MIDWAY to HARBOR ISLAND PIPELINES & TERMINAL
SAN PATRICIO & NUECES COUNTIES, TEXAS

AXIS MIDSTREAM

**Proposed Temporary and Permanent Impacts to Waters of the U.S.**

| Feature ID | Cowardin Classification | Temporary Impact Area (Ac) | Permanent Impact Area (Ac) | Associated Project Component |
|---|---|---|---|---|
| Black Mangrove #1 | E2SS Wetland | 0.00 | 0.03 | Pipeline Installation (trenched) [1] |
| Black Mangrove #2 | E2SS Wetland | 0.00 | 0.34 | Pipeline Installation (trenched) [1] |
| Black Mangrove #3 | E2SS Wetland | 0.00 | 0.08 | Pipeline Installation (trenched) [1] |
| Estuarine Wetland #1 | E2EM Wetland | 0.00 | 0.23 | Aransas Pass Staging Facility (filled) [2] |
| Estuarine Wetland #2 | E2EM Wetland | 0.11 | 0.00 | Pipeline Installation (trenched) [3] |
| Estuarine Wetland #3 | E2EM Wetland | 0.00 | 0.09 | Aransas Pass Staging Facility Emergency Access Road (filled) [2] |
| Estuarine Wetland #4 | E2EM Wetland | 0.00 | 0.01 | Aransas Pass Staging Facility Emergency Access Road (filled) [2] |
| Seagrass Bed #1 | E1AB Seagrass | 0.00 | 1.45 | Pipeline Installation (trench) [4] |
| Seagrass Bed #2 | E1AB Seagrass | 0.00 | 0.02 | Pipeline Installation (trench) [4] |
| Seagrass Bed #3 | E1AB Seagrass | 0.00 | 0.04 | Pipeline Installation (trench) [4] |
| Seagrass Bed #4 | E1AB Seagrass | 0.00 | 0.11 | Pipeline Installation (trench) [4] |
| Seagrass Bed #5 | E1AB Seagrass | 0.00 | 0.32 | Pipeline Installation (trench) [4] |
| Seagrass Bed #6 | E1AB Seagrass | 0.00 | 2.31 | Pipeline Installation (trench) [4] |
| Seagrass Bed #7 | E1AB Seagrass | 0.00 | 3.59 | Pipeline Installation (trench) [4] |
| Smooth Cordgrass | E2EM Wetland | 0.02 | 0.00 | Pipeline Installation (trenched) [3] |
| Tidal Flat | E2US Tidal Flat | 10.64 | 0.00 | Pipeline Installation (trenched) [3] |
| Waterbody #1 | Perennial Stream | 0.00 | 0.00 | Pipeline Installation (bored) [5] |
| Waterbody #2 | Drainage Ditch | 0.08 | 0.00 | Pipeline Installation (trenched) [3] |
| Waterbody #3 | Drainage Ditch | 0.00 | 0.00 | Pipeline Installation (bored) [5] |
| Waterbody #4 | Drainage Ditch | 0.00 | 0.00 | Pipeline Installation (bored) [5] |
| Waterbody #5 | Perennial Stream | 0.24 | 0.00 | Pipeline Installation (trenched) [3] |
| Waterbody #6 | PUB Pond | 0.03 | 0.00 | Pipeline Installation (trenched) [3] |
| Waterbody #7 | PUB Pond | 0.15 | 0.00 | Pipeline Installation (trenched) [3] |
| Waterbody #8 | Tidal Stream | 0.00 | 0.02 | Aransas Pass Staging Facility Emergency Access Road (filled) [2] |
| Wetland #1A | PEM Wetland | 5.54 | 0.00 | Pipeline Installation (trenched) [3] |
| Wetland #1B | PEM Wetland | 2.03 | 0.00 | Pipeline Installation (trenched) [3] |
| Wetland #2 | PEM Wetland | 0.03 | 0.00 | Pipeline Installation (trenched) [3] |
| Wetland #3 | PEM Wetland | 0.05 | 0.00 | Pipeline Installation (trenched) [3] |
| Wetland #4 | E2EM Wetland | 0.10 | 0.00 | Pipeline Installation (trenched) [3] |
| Wetland #5 | E2EM Wetland | 5.77 | 0.00 | Pipeline Installation (trenched) [3] |
| Wetland #6 | E2EM Wetland | 0.00 | 0.92 | Aransas Pass Staging Facility (filled) [2] |
| Wetland #7 | E2EM Wetland | 0.00 | 0.07 | Aransas Pass Staging Facility (filled) [2] |
| Wetland #8 | E2EM Wetland | 0.00 | 0.20 | Aransas Pass Staging Facility (filled) [2] |
| Wetland #9 | E2EM Wetland | 0.00 | 15.80 | Aransas Pass Staging Facility (filled) [2] |

| TOTALS | | | |
|---|---|---|---|
| PEM Wetlands (4) | 7.65 | 0.00 | |
| E2SS Wetlands (3) | 0.00 | 0.45 | |
| E2EM Wetland (11) | 6.00 | 17.32 | |
| PUB Pond (2) | 0.18 | 0.00 | |
| E1AB Seagrass (7) | 0.00 | 7.84 | |
| E2US Tidal Flat (1) | 10.64 | 0.00 | |
| Perennial Stream (2) | 0.24 | 0.00 | |
| Drainage Ditch (3) | 0.08 | 0.00 | |
| Tidal Stream (1) | 0.00 | 0.02 | |
| Total Impacts (34) | 24.78 | 25.63 | |

**Table Footnotes**

1. Impacts to this feature were considered permanent due to the required clearing of woody black mangrove vegetation within the construction workspace.
2. Impacts to this feature were considered permanent due to the required discharge of fill material to support the construction of the Aransas Pass Facility/Emergency Access Road.
3. Impacts to this feature were considered temporary as pre-construction contours and conditions will be restored following the completion of construction activities.
4. Impacts to all seagrass located within the construction footprint were considered permanent due to the proposed disturbance and temporary excavation of material. However, pre-construction contours and conditions will be restored following the completion of construction activities.
5. Both temporary and permanent impacts to this feature were avoided using HDD/boring pipeline installation techniques.

NOTES FOR TERRESTRIAL CROSS SECTIONS:

1.) PRIOR TO COMMENCEMENT OF EXCAVATION ACTIVITIES THE APPLICANT OR THEIR CONTRACTOR SHALL NOTIFY TEXAS811.
2.) SPOIL WILL BE TEMPORARILY STOCKPILED ADJACENT TO THE PIPELINE TRENCH AND USED AS BACKFILL UPON COMPLETION.

NOTES ON MARINE CROSS SECTIONS:

1.) PRIOR TO COMMENCEMENT OF EXCAVATION ACTIVITIES THE APPLICANT OR THEIR CONTRACTOR SHALL NOTIFY TEXAS811.
2.) SPOIL WILL BE TEMPORARILY STOCKPILED ADJACENT TO THE PIPELINE TRENCH AND USED AS BACKFILL UPON COMPLETION.
3.) PILE SUPPORTED SIGNS WILL BE DEPLOYED ADJACENT TO THE TEMPORARY SPOIL AREAS TO NOTIFY MARINERS OF THE POTENTIAL SUBMERGED HAZARD

NOTE: THE CONTENT OF THIS DRAWING IS DESIGNED SPECIFICALLY FOR THE PURPOSE OF SECURING FEDERAL, STATE AND LOCAL ENVIRONMENTAL/ REGULATORY AUTHORIZATIONS ONLY.

Date: 12/27/2018
Revised: 04/23/2020

**IMPACT TABLES & NOTES**
PLs & Fac: Midway T.F. to Harbor Island

**U.S. ARMY CORPS OF ENGINEERS PERMIT APPLICATION SWG-2018-00789**



AXIS MIDSTREAM

**AXIS MIDSTREAM HOLDINGS, LLC**
Proposed Pipelines & Facilities
MIDWAY to HARBOR ISLAND PROJECT
SAN PATRICIO & NUECES COUNTIES, TEXAS



Harbor Island Terminal Facility

Harbor Island Terminal Dredge Footprint

Corpus Christi New Work ODMDS

**Vicinity Map**
1 in = 158 miles

San Antonio

Houston

**Legend**

▨ Harbor Island Terminal Dredge Footprint
▨ Harbor Island Terminal Site
▩ Corpus Christi New Work ODMDS
— Corpus Christi Ship Channel Limits

Coordinate System: GCS WGS 1984
Datum: WGS 1984
Units: Degree

0    0.5    1    2 Miles

**SHEET 39 of 39**

Proposed Dredge Material Placment Areas

Midway to Harbor Island Pipelines
& Facilities Project
Axis Midstream Holdings, LLC
USACE Permit No. SWG-2018-00789
San Patricio and Nueces Counties, Texas

| | |
|---|---|
| Date: Apr 22, 2020 | **LLOYD** |
| Prepared By: C. Gerken | ENGINEERING, INC. |
| Project: Axis | |
| 1 inch = 6,261.04 feet | |

SWG-2018-00789; Axis Midstream Project Plans

Sheet 39/39



# Public Notice

| U.S. Army Corps Of Engineers | Permit Application No: | SWG-2018-00789 |
|---|---|---|
| | Date Issued: | 7 July 2020 |
| **Galveston District** | Comments Due: | 6 August 2020 |

## U.S. ARMY CORPS OF ENGINEERS, GALVESTON DISTRICT

**PURPOSE OF PUBLIC NOTICE:** To inform you of a proposal for work in which you might be interested. It is also to solicit your comments and information to better enable us to make a reasonable decision on factors affecting the public interest. The U.S. Army Corps of Engineers (Corps) is not the entity proposing or performing the proposed work, nor has the Corps taken a position, in favor or against the proposed work.

**AUTHORITY:** This application will be reviewed pursuant to Section 10 of the Rivers and Harbors Act of 1899, Section 404 of the Clean Water Act, and Section 103 of the Marine Protection, Research, and Sanctuaries Act.

**APPLICANT:** Axis Midstream Holdings, LLC
5005 Riverway, Suite 110
Houston, Texas 77056
Telephone: (713) 623-2412
POC: Matt Marra

**AGENT:** Lloyd Engineering, Inc.
6565 West Loop South, Suite 708
Bellaire, Texas 77401
Telephone: (832) 426-4656
POC: Marisa Weber

**LOCATION:** The proposed project is located in Taft, Gregory, Ingleside, and Aransas Pass, in San Patricio County, Texas; the Gulf Intracoastal Waterway (GIWW); Redfish Bay; the Corpus Christi Ship Channel (CCSC); and terminates on Harbor Island in Port Aransas, Nueces County Texas. The project can be located on the U.S.G.S. quadrangle maps entitled: Taft, Gregory, Aransas Pass, Ingleside-On-the-Bay, and Port Aransas, Texas.

**PROJECT DESCRIPTION:** The applicant (Axis Midstream Holdings, LLC) proposes to construct a series of facilities and pipelines to store, transport, and load crude oil into marine transport vessels. The proposed project components are composed of:
   a. The Midway Tank Farm (Midway Facility) located south of the City of Taft, Texas.

b.  The Aransas Pass Staging Facility (Aransas Facility) located west of the City of Aransas Pass.

c.  A pipeline bundle that would connect the Aransas and Midway Facilities.  This pipeline bundle would consist of
    i.  one (1) 2-inch fiber optic;
    ii.  one (1) 6-inch gas supply (last mile); and
    iii.  two (2) 36-inch crude oil pipelines.

d.  Harbor Island Loading Terminal (Harbor Island Terminal) located on the west side of the CCSC on Harbor Island in Port Aransas, Texas.

e.  A pipeline bundle that would connect the Aransas and Harbor Island Facilities. This pipeline bundle would consist of:
    i.  one (1) 2-inch fiber optic;
    ii.  one (1) 6-inch gas supply;
    iii.  one (1) 16-inch intermix return; and
    iv.  two (2) 42-inch crude oil pipelines.

1.  The proposed 60-acre Midway Tank Farm (Sheet 31 of attached plans) project site would be located south of the intersection of Farm-to-Market (FM) 72 and FM 893 in Taft.  The facility will consist of multiple sized above ground bulk fluids storage tanks.  The 60-acre site is currently being used for agriculture, specifically row crops, and is surrounded by wind energy turbines.  Midway was selected as the bulk storage site due to the growing nexus of crude oil pipeline infrastructure in this area.  Work associated with the construction of this facility is not regulated.

2.  Midway to Aransas Facility Pipelines:  The Midway to Aransas Facility Pipelines (Sheets 2-15 of attached plans) will consist of the installation of approximately 19.5 miles of one (1) 2-inch fiber optic line, one (1) 6-inch gas supply line, and two (2) 36-inch crude oil pipelines.  Each of the 36-inch pipelines are sized to move 80,000 barrels of crude per hour to the Aransas Pass Staging Facility.  The bundle would be installed mainly in agricultural fields starting at the Midway Tank Farm to FM 1069.  From there to Aransas Pass, the bundle will parallel an existing pipeline corridor adjacent to a residential area located on Live Oak Ridge, north of Ingleside, Texas.  The 6-inch gas supply pipeline will be installed and co-located with the two 36-inch pipelines from a tie-in point to the Aransas Pass Staging Facility.  The method of installation involves conventional trenching along with horizontal directional drilling (HDD) or the jack and bore method for roadway and waterway crossings.  The proposed construction ROW for this segment of the project is 130 feet.  The permanent ROW width is 60 feet with the additional 70 feet utilized as temporary workspace.  Additional temporary construction workspace outside of the 130-foot wide ROW is proposed at various locations to accommodate foreign pipeline crossings, road crossings, waterway crossings, and points of inflexions (PI), etc., encountered along the route from the Midway Tank Farm to the Aransas Pass Staging Facility.  All these features require additional workspace for temporary spoil stockpiling, construction equipment installation, etc., which is needed to safely achieve the required crossings depths.  The proposed alignment involves nineteen (19) road crossings, seven (7) waterbody crossings, and six (6) wetland crossings.  No road crossing workspaces are located within wetlands.  Three (3) of the seven (7)

2

waterbody crossings will be crossed using HDD or the jack and bore method avoiding impacts to waters of the United States (WOUS).  The remaining four (4) waterbodies within the alignment are proposed to be trenched.  Six (6) wetlands were identified within this alignment.  The installation of the proposed Midway to Aransas pipeline bundle would result in 14.01 acres of temporary trench and fill impacts in WOUS, including wetlands.

3.  Aransas Pass Staging Facility (Latitude: 27.876527; Longitude: 97.158305 W):  The approximate 60-acre Aransas Pass Staging Facility (Sheet 32 of attached plans) site is located south of the intersection of State Highway (SH) 361 and FM 2725 adjacent to the Gulf Intercostal Waterway (GIWW).  The Aransas Pass Staging Facility is proposed to include multiple above ground bulk liquids storage tanks with associated piping, tank manifolds, incoming and outgoing pigging areas, two ship loading pumps, a recycle pump area, and an emergency access road.  Of the 60-acre project site, approximately 17.33 acres are jurisdictional WOUS which are proposed to be permanently filled.

4.  Aransas Facility to Harbor Island Pipelines:  The Aransas Facility to Harbor Island Pipelines (Sheets 16-20 of attached plans) will consist of the installation of one (1) 2-inch diameter fiber optic line, one (1) 6-inch diameter gas supply pipeline, one (1) 16-inch diameter intermix return pipeline, and two (2) 42-inch diameter crude oil pipelines approximately 5.5 miles in length.  The lines would be installed from the Aransas Facility across the GIWW and Redfish Bay and terminate at Harbor Island. The pipelines will be installed via HDD from the mainland below the GIWW and a portion of Redfish Bay spanning approximately 4,250 feet.  From the HDD point of exit to Harbor Island the lines will be trenched and backfilled at a minimum depth of cover of 3 feet.  The 42-inch diameter crude oil pipelines are designed to allow the loading of two marine vessels at a maximum rate of 80,000 barrels/hour.  The 6-inch diameter gas supply pipeline will serve as a fuel source for the vapor destruction equipment. The 16-inch diameter intermix return pipeline will move product from the remix tanks at Harbor Island Terminal back to the Aransas Pass Staging Facility.  The fiber optic lines will be installed to facilitate operational communications.  Field instrumentation for automated valves, tank levels, etc., will be monitored and operated from within a centralized control room. The Aransas Facility to Harbor Island Pipelines require both water and land construction and installations.  The construction requirements and sequence for installations for these pipelines can be broken down into five segments. The following sections describes each segment and the associated construction requirements.

    a.  HDD across the GIWW (Sheet 21 of attached plans): The first portion of the Harbor Island route will consist of utilizing the HDD method from a land-based drilling location within the proposed Aransas Facility extending southeasterly approximately 4,250 feet to an exit within an abandoned oil and gas well slip in Redfish Bay.  The pipelines will be installed in three separate drilling operations at various depths.  The shallowest drill, the center HDD, will be a bundle drill consisting of the one (1) 2-inch diameter fiber optic conduit, one (1) 6-inch diameter gas supply pipeline, and the one (1) 16-inch diameter return remix line and will be

3

drilled first. The two outermost and deepest drills will be the two (2) individual 42-inch diameter crude pipelines which will be installed separately during the second and third drills. The pilot hole will be drilled from the Aransas Pass Staging Facility site to the oil and gas well slip within the proposed 200-foot by 300-foot HDD workspace. The existing oil and gas slip will be utilized for the 260-foot by 300-foot HDD exit workspace. The oil and gas slip access canal will be utilized for marine vessel access, assembly of the pipelines and for floatation of the HDD back-string. Once the drilling operation is complete, the pipelines will be assembled, pre-hydrotested and pulled from the location canal back to the Aransas Pass Staging Facility.

b.  Installation within existing Oil and Gas Canal System (Sheet 17 of attached plans): To further avoid and minimize impacts during the installation of the series of pipelines, the applicant proposes to utilize a series of abandoned oil and gas canals on the northwest side and southeast side of Redfish Bay (approximate 5,000 linear feet). As detailed in the permit drawings, a trench will be excavated within the canal bottoms and the excavated material will be temporarily stockpiled adjacent to the trench. Excavation will be done with barge mounted dredging equipment. The individual lines will be fabricated on a pipe lay barge and installed within the common trench. The trench will be backfilled utilizing the stockpiled material to provide the required protective cover. Excavation and spoil placement within the existing canal systems will avoid impacts to seagrass to the fullest extent practicable. The proposed workspace is 150-foot wide, with 75 feet being designated as the trench/workspace, and 60 feet designated as temporary spoil placement area. Turbidity curtains or other equivalent measures will be installed adjacent to the workspaces to reduce the potential for secondary impacts to adjacent seagrass habitats in addition to using the existing oil and gas access canals to minimize the required impacts to the seagrass beds.

c.  Installation across Redfish Bay (Sheet 18 of attached plans): Similar to the oil and gas canal installation methodology, a 75-foot wide trench will be excavated within the bay bottom and excavated material will be temporarily stockpiled on the bay bottom adjacent to the trench. Excavation will be done with barge mounted dredging equipment. The individual lines will be fabricated on a pipe lay barge and installed within the common trench. The trench will be backfilled utilizing the stockpiled material to provide the required protective cover. During bay construction the work areas and temporary spoil placement sites will be marked, and signage maintained to provide for safe marine traffic. Due to its location being at the mouth of the existing oil and gas access canal located on the south side of Redfish Bay, potential impacts to seagrass resources are unavoidable along this 5,800 linear foot segment. The minimum workspace needed to install the pipelines across this area is being proposed to reduce impacts.

d.  Seagrass Shallows and Tidal Flat Installation (Sheets 19 of attached plans): When departing the most southerly canal reach, the pipelines are proposed to be installed within shallow open water of Redfish Bay onto the southern reach of Harbor Island and then easterly on the island roughly parallel to the Corpus Christi

4

Ship Channel for approximately 4,000 feet. This sandy area (tidal flat) is situated above mean high water and is generally devoid of vegetation. A trench will be excavated within the bay shallows and on the tidal flat utilizing a mechanical excavator on pontoons (marsh buggy). The excavated material will be temporarily stockpiled adjacent to the trench. In the bay shallows the individual lines will be fabricated on a pipe lay barge and pushed into the common trench to a tie-in point with the land-based segment. On the tidal flats, the lines will be assembled adjacent to the trench and placed within the trench by cranes. The trench would be backfilled utilizing the stockpiled material to provide the required protective cover. Within the shallow bay area, turbidity curtains or other equivalent measures would be installed adjacent to the workspaces to reduce secondary impacts to adjacent seagrass resources. On the tidal flats, industry standard terrestrial best management practices (e.g., silt curtains, haybales, etc.) would be utilized to reduce secondary adverse impacts from runoff. Seagrass would be impacted by the proposed alignment and are located just north of the point where the alignment turns easterly across the tidal flat area. Approximately 10.64 acres of tidal flats would be temporarily impacted during the installation. Construction across the tidal flats would also result in impacts to approximately 0.45 acres of black mangrove. Additionally, approximately 0.13 acres of estuarine wetlands would be impacted.

e. Installation within the Dredge Material Placement Area (Sheet 20 of attached plans): The pipeline approach to the Harbor Island Terminal within the existing DMPA would be installed by conventional land-based trench and backfill method. The trench would be excavated, and material placed adjacent to the trench within the workspace. The lines would be laid out adjacent to the trench, welded and placed into the common trench. All the lines would be hydrotested and then the trench backfilled utilizing the stockpiled material to provide the required protective cover. Standard terrestrial best management practices (e.g., silt curtains, hay bales, etc.) would be utilized to reduce secondary impacts from runoff. No impacts to WOUS, including wetlands, are proposed for this section of the Aransas to Harbor Island Pipelines.

5. Harbor Island Terminal (Latitude: 27.844767 N; Longitude: 97.083002 W): The Harbor Island Terminal is located 0.5 miles west of the intersection of Hwy 361 along the western slope of the Corpus Christi Ship Channel (between Stations 110+00 and 90+00) southwest of Port Aransas, Texas (Sheet 34 of attached plans). An approximately 20-acre site would contain the necessary infrastructure behind the two vessel berthing slips (piping, loading equipment, above ground bulk fluid remix tanks, etc.). A bulkhead would be constructed on the northwest and southwest sections of the vessel berthing slips. The berthing area would contain a 675-foot long by 17-foot wide approach trestle standing on 36-inch diameter pilings that leads to a 120-foot long by 100-foot wide terminal pier structure that would act as a ship dock platform. There would also be twenty one (21) 24-foot by 24-foot mooring dolphins installed. Refer to Sheet 36 and 37 for detailed plan and profile drawings of the proposed Harbor Island Terminal. The proposed Harbor Island Terminal is designed to accommodate up to two (2) Very Large Crude Carriers (VLCC) sized vessels.

5

The construction and operation of the Harbor Island Terminal would require the removal and relocation of approximately 5.6 million cubic yards (MCY) of new work material to provide the space necessary to safely maneuver and berth incoming and outgoing vessels. Dredging and excavation activities for the Harbor Island Terminal would occur within an approximate 82-acre dredge footprint to depths of -54 feet mean lower low water (MLLW), plus 4 feet advanced maintenance, and 2 feet of allowable overdredge (-60 feet MLLW).

The excavation/dredging activities will be accomplished in a phased approach. The first phase of dredging (Terrestrial) will involve the use of dragline bucket dredge and/or other earth moving equipment within an approximate 22.6-acre existing terrestrial area. In order to facilitate the terrestrial dredging, sheet piles will temporarily be placed across the slip width in order to dewater and isolate the northern terrestrial portion of the slip. Excavators will be used to remove material from the 22.6-acre existing terrestrial area to a depth of -25 feet MLLW. The top 6 feet of material located within the existing 22.6-acre terrestrial area totals approximately 0.22 MCY and would be separated for placement and or use on-site. The initial dredged material will be used for on-site buildup for the Harbor Island Terminal and construction of containment berms.

The second phase (Marine) of dredging will be accomplished via hydraulic cutter-head suction dredge. This phase involves removal of the temporary sheet pile in order to provide flotation across the overall 82-acre dredge footprint for the dredging vessels. Dredging will begin at the southern end of the slip area, adjacent to the ship channel and fan across the entire slip in a northerly direction. The material will be removed in layers across the slip until the desired depth of -54 feet MLLW, plus 4 feet advanced maintenance, and a 2 feet overdredge (-60 feet MLLW) is achieved.

The applicant conducted an alternatives analysis of potential dredged material disposal options to determine the most practical and feasible alternatives for the placement of dredged material associated with the construction of the Harbor Island Terminal. The above proposed project is the applicant's preferred alternative.

**PROPOSED COMPENSATORY MITIGATION:** The applicant has proposed a two part compensatory mitigation plan to offset the unavoidable impacts to jurisdictional waters of the US. The first conceptual permittee responsible mitigation plan is entitled *Mustang Island – Croaker Hole Sea Grass Restoration Plan* dated April 2020 (refer to attached plan in 73 sheets). The proposed mitigation plan would compensate for the potential unavoidable temporary impacts of 7.84 acres of seagrass beds and 0.33 acre of estuarine emergent *Spartina alterniflora* living shoreline wetlands associated with the proposed Midway to Harbor Island Pipeline and Terminal Project. The second conceptual compensation mitigation plan for additional permanent proposed project impacts associated with the Aransas Pass Staging Facility will be addressed in a separate mitigation plan. Mitigation for unavoidable temporary impacts to seagrass beds will use a minimum ratio of 2:1 (mitigation acre to impact acre).

6

**SECTION 103:**

**NEW WORK ODMDS:**  The New Work Ocean Dredged Material Disposal Site (ODMDS) is located 3.4 miles offshore of Nueces County, Texas (refer to sheet 39) and 6,200 feet southwest of the centerline of the Outer Bar Channel.  The site is rectangle-shaped and covers approximately 1.36 square nautical miles of open-ocean.  Corner Coordinates are provided in Table 1.  Placement of dredged material in the New Work ODMDS is limited to a 4,000 feet by 5,000 feet specified release zone.  The release zone site corners are detailed in Table 2.

Table 1.  New Work ODMDS Corner Coordinates

| New Work Corner | Latitude (NAD 83) | Longitude (NAD 83) |
|---|---|---|
| Northwest | 27.795307 | -97.003598 |
| Northeast | 27.787807 | -96.990542 |
| Southwest | 27.771697 | -97.020265 |
| Southeast | 27.763919 | -97.007209 |

Table 2.  New Work Discharge Area Corner Coordinates

| New Work Corner | Latitude (NAD 83) | Longitude (NAD 83) |
|---|---|---|
| Northwest | 27.792472 | -97.004042 |
| Northeast | 27.786583 | -96.993992 |
| Southwest | 27.780584 | -97.012687 |
| Southeast | 27.774584 | -97.002492 |

The Corpus Christi New Work ODMDS was designated by the Environmental Protection Agency (EPA) in 1988 as the Homeport Project ODMDS.  The purpose was to provide a disposal area for new work dredged material from the planned U.S. Navy's Homeport Project at Corpus Christi/Ingleside, Texas.  Ultimately, the Homeport Project was never constructed.

In August of 2014, the name was changed from the Homeport Project ODMDS to Corpus Christi New Work ODMDS and the period of use and use restriction were changed to suitable dredged material from the greater Corpus Christi, Texas vicinity over an indefinite period of time.

In September of 2015 the use restrictions of several Texas ODMDS sites including the Corpus Christi New Work ODMDS, were modified to include suitable dredged material from the greater vicinity of the respective federal channels. The modification allowed the disposal of suitable dredged material by non-federal entities (port authorities, private parties, etc.) in Corpus Christi area.  This change was made at the request of the US Army Corps of Engineers, Galveston District based on modeling showing that, absent expansion of ocean disposal use, the Corps would have insufficient future capacity at the nearshore placement areas typically used for operations and maintenance activities.

7

Since its initial designation, the Corpus Christi New Work ODMDS has been utilized once for disposal of dredged material. The Corpus Christi Ship Channel Improvement Project (CCSIC) site disposed of 4.7 MCY in 2020.

Designation of the ODMDS by the EPA does not constitute approval by the EPA for placement of materials at the site. Prior to each placement event, the concurrence by the EPA must be given after determination that the materials meet all environmental criteria and regulatory requirements pursuant to MPRSA.

**AUTHORIZED DISPOSAL EFFECTS**: Dredged material deposited at the site is expected to disperse and erode quickly. There are no significant environmental resources delineated within or immediately outside of the designated ODMDS. Since this site is dispersive in nature, the primary concern of the use of the site is the potential short-term buildup of dredged material, such that a hazard to navigation is presented. During the site selection process EPA excluded areas that would interfere with shipping, fishing, recreation, mineral extraction, desalinization, fish and shellfish culture, areas of special scientific importance and other legitimate uses of the ocean.

Another concern is short-term transport of the dredged material beyond the ODMDSs boundaries; specifically, the benthic community can be impacted if significant rapid movement of material off the site occurs, resulting in burial of benthic populations outside the site. In the 1987 designation of the ODMDS, the EPA concluded the primary environmental impact from use of the site would be burial of the benthic infaunal community at the site. Furthermore, the site was sized with a buffer zone developed to ensure that perturbations caused by disposal would be reduced to ambient conditions at the boundaries of the site.

The 2018 Site Management and Monitoring Plan (SMMP) added several additional requirements including use of bathymetric surveys before and every month during work, as well as specific methodologies for the time, location and method of placement of material in the disposal zone to ensure material placed in the site would not adversely affect the surrounding environment.

**CHARACTERISTICS AND COMPOSITION OF THE DREDGED MATERIAL**: In accordance with the February 1991 E*valuation of Dredged Material Proposed for Ocean Disposal Testing Manual* (Green Book) the applicant completed a Tier I analysis of the dredged material. A primary purpose of Tier I is to identify the contaminants of concern (if any) in that particular dredged material. This information is used to select subsequent analyses in Tiers II, III, and IV. Preliminary results submitted with the application indicates the material to be dredged at Harbor Island is predominantly fine sand with silt and clay.

The CCSIP tested the suitability of both new work material and maintenance material from the Corpus Christi Ship Channel for offshore disposal under Marine Protection, Research and Sanctuaries Act (MPRSA) Section 103. The results were documented in the *Sampling, Chemical Analysis, and Bioassessment in Accordance with MPSRA Section 103* report (2018 Report.) Based on the results of the sampling, testing, and

evaluation completed in 2018, site water, and elutriate, as well as toxicity and bioaccumulation testing, a lines of evidence analysis concluded that no adverse environmental effects would be expected from dredging or placement of the sediment from the project area into the New Work ODMDS.

**AVOIDANCE AND MINIMIZATION**:  The sediments proposed for transportation and disposal will be evaluated pursuant to Section 103 of the Marine Protection Research and Sanctuaries Act (MPRSA) and the EPA Region 6's RIA to ensure any dredged material transported is suitable for ocean disposal.  In addition, all work will be completed in accordance with the 2018 Corpus Christi New Work, Site Management and Monitoring Plan, as well as, any additional requirements from state and federal agencies.

**NOTES:**  This public notice is being issued based on information furnished by the applicant.  This project information has not been verified by the Corps.  As of the date of this Public Notice, the Corps has received but not yet verified the wetland delineation.  The applicant's plans are enclosed in 39 sheets.

A preliminary review of this application indicates that an Environmental Impact Statement (EIS) is not required.  Since permit assessment is a continuing process, this preliminary determination of EIS requirement will be changed if data or information brought forth in the coordination process is of a significant nature.

Our evaluation will also follow the guidelines published by the U.S. Environmental Protection Agency pursuant to Section 404 (b)(1) of the Clean Water Act (CWA).

**OTHER AGENCY AUTHORIZATIONS:**  The applicant has stated that the project is consistent with the Texas Coastal Management Program (CMP) goals and policies and will be conducted in a manner consistent with said Program.  The Texas Railroad Commission will determine if the project is consistent with the goals and policies of the CMP and will review this application under Section 401 of the CWA to determine if the work as well as return water from the upland contained dredge material placement areas would comply with State water quality standards.

The proposed project will require Section 408 coordination and review.  This is a requirement for activities that seek permission from the US Army Corps of Engineers pursuant to 33 USC 408 because the proposed project will alter or temporarily or permanently occupy or use a US Army Corps of Engineers federally authorized civil works project.  Changes to the proposed project, from the Section 408 process, may warrant additional coordination.

**NATIONAL REGISTER OF HISTORIC PLACES:**  The staff archaeologist has not reviewed the latest published version of the National Register of Historic Places, lists of properties determined eligible, and other sources of information.  The following is current knowledge of the presence or absence of historic properties and the effects of the undertaking upon these properties:  The staff archeologist is currently reviewing the applicant cultural resource information and will initiate consultation with the SHPO if necessary.

9

**THREATENED AND ENDANGERED SPECIES:** Threatened and/or endangered species and/or their critical habitat may be affected by the proposed work. Consultation with the U.S. Fish and Wildlife and/or the National Marine Fisheries Service will be initiated to assess the effects on listed endangered species.

**ESSENTIAL FISH HABITAT:** This notice initiates the Essential Fish Habitat consultation requirements of the Magnuson-Stevens Fishery Conservation and Management Act. Our initial determination is that the proposed action would have an adverse impact on Essential Fish Habitat or federally managed fisheries in the Gulf of Mexico. Our final determination relative to project impacts and the need for mitigation measures is subject to review by and coordination with the National Marine Fisheries Service.

**PUBLIC INTEREST REVIEW FACTORS:** This application will be reviewed in accordance with 33 CFR 320-332, the Regulatory Programs of the Corps of Engineers, and other pertinent laws, regulations and executive orders. The decision whether to issue a permit will be based on an evaluation of the probable impacts, including cumulative impacts, of the proposed activity on the public interest. That decision will reflect the national concern for both protection and utilization of important resources. The benefits, which reasonably may be expected to accrue from the proposal, must be balanced against its reasonably foreseeable detriments. All factors, which may be relevant to the proposal, will be considered: among those are conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food and fiber production, mineral needs and, in general, the needs and welfare of the people.

**SOLICITATION OF COMMENTS:** The Corps of Engineers is soliciting comments from the public, Federal, State, and local agencies and officials, Indian tribes, and other interested parties in order to consider and evaluate the impacts of this proposed activity. Any comments received will be considered by the Corps of Engineers to determine whether to issue, modify, condition or deny a permit for this proposal. To make this decision, comments are used to assess impacts on endangered species, historic properties, water quality, general environmental effects, and the other public interest factors listed above. Comments are used in the preparation of an Environmental Impact Assessment and/or an Environmental Impact Statement pursuant to the National Environmental Policy Act. Comments are also used to determine the need for a public hearing and to determine the overall public interest of the proposed activity.

This public notice is being distributed to all known interested persons in order to assist in developing facts upon which a decision by the Corps of Engineers may be based. For accuracy and completeness of the record, all data in support of or in opposition to the proposed work should be submitted in writing setting forth sufficient detail to furnish a clear understanding of the reasons for support or opposition.

10

**PUBLIC HEARING:** The purpose of a public hearing is to solicit additional information to assist in the evaluation of the proposed project. Prior to the close of the comment period, any person may make a written request for a public hearing, setting forth the particular reasons for the request. The District Engineer will determine if the reasons identified for holding a public hearing are sufficient to warrant that a public hearing be held. If a public hearing is warranted, all known interested persons will be notified of the time, date, and location.

**CLOSE OF COMMENT PERIOD:** All comments pertaining to this Public Notice must reach this office on or before **6 August 2020**. Extensions of the comment period may be granted for valid reasons provided a written request is received by the limiting date. **If no comments are received by that date, it will be considered that there are no objections**. Comments and requests for additional information should reference our file number, **SWG-2018-00789**, and should be submitted to:

> Corpus Christi Field Office
> Regulatory Division, CESWG-RD-R
> U.S. Army Corps of Engineers
> 5151 Flynn Parkway, Suite 306
> Corpus Christi, TX 78411-4318
> 361-814-5847 Phone
> SWG201800789@usace.army.mil


> DISTRICT ENGINEER
> GALVESTON DISTRICT
> CORPS OF ENGINEERS

PERMIT APPLICATION #SWG-2018-00789



EXHIBIT 3

GRAPHIC SCALE

( IN FEET )
1 inch = 200 ft.

NOTES:

BEARINGS AND DISTANCES ARE BASED ON THE TEXAS STATE PLANE COORDINATE SYSTEM, NORTH AMERICAN DATUM OF 1927, SOUTH ZONE.

ELEVATIONS ARE BASED ON THE NORTH AMERICAN VERTICAL DATUM OF 1988.

● = SET 5/8" IRON ROD MARKED WITH A CAP STAMPED "RPLS 6198"

PLAT SHOWING SURVEY OF
270.62 ACRES
BURTON & DANFORTH SUBDIVISION
W. MCDONOUGH, A-184
W. MCDONOUGH, A-185
SAN PATRICIO COUNTY, TEXAS

PRELIMINARY, THIS DOCUMENT SHALL NOT BE RECORDED FOR ANY PURPOSE AND SHALL NOT BE USED OR VIEWED OR RELIED UPON AS A FINAL SURVEY DOCUMENT

# EXHIBIT 4



# EXHIBIT 5

---

**From:** Van Huseman <VHuseman@husemanlawfirm.com>
**Sent:** Tuesday, February 13, 2024 2:24 PM
**To:** Barrett H. Reasoner <BReasoner@gibbsbruns.com>
**Subject:** Re: Robert Rickett dismissal?

As you are doubtless aware, whatever Mr. Rickett purchased was made as Berry/Bay's nominee—and not for his personal interest. Since there is no dispute about that, whenever it is appropriate in the judgment of the entities, I am sure that the legal and equitable ownership will be made one.

---

**From:** Barrett H. Reasoner <BReasoner@gibbsbruns.com>
**Date:** Tuesday, February 13, 2024 at 2:15 PM
**To:** Van Huseman <VHuseman@husemanlawfirm.com>
**Subject:** RE: Robert Rickett dismissal?

Van – we are busy getting ready for the TI hearing but are happy to evaluate and discuss Mr. Rickett's situation next week. I can tell you that we will not be subpoenaing Mr. Rickett to the TI hearing. One thing that would be helpful to know next week would be what the expected plan is for transferring the properties back to the company. Thanks - Barrett

Barrett H. Reasoner
Gibbs & Bruns LLP
713-751-5244
breasoner@gibbsbruns.com



---

**From:** Van Huseman <VHuseman@husemanlawfirm.com>
**Sent:** Tuesday, February 13, 2024 1:57 PM
**To:** Barrett H. Reasoner <BReasoner@gibbsbruns.com>
**Subject:** Robert Rickett dismissal?

External Sender

Barrett,

I have attached below a resolution concerning Robert Rickett which was passed today with the approval of Lawrence Berry.

Would you kindly consider voluntarily dismissing Rickett from your suit?

The Shareholders met in a special called meeting this 13th day of February 2024. All Shareholders were present.

BE IT RESOLVED that Robert Rickett was acting with the full knowledge of the board when acquiring property in his name, or in the name of companies he owns and controls, using Berry funds. His actions in this regard are ratified and his affidavit recognizing that he holds the properties in name only, and that the land belongs to the Berry companies is accepted.

*PASSED*

| Marty Berry | Lawrence Berry | Bonnie Berry |
|---|---|---|
| *Yes* | *Yes* | *Yes* |

# EXHIBIT 6

CAUSE NO. _____

| | | |
|---|---|---|
| ALBERT THEODORE POWERS;<br>ALLIED PORTS LLC, | § § § § § | IN THE DISTRICT COURT |
| *Plaintiffs,* | § § | |
| v. | § § § | HARRIS COUNTY, TEXAS |
| AXIS MIDSTREAM HOLDINGS,<br>LLC; ALLEN LAWRENCE BERRY;<br>MARVIN GLENN BERRY; AND<br>BONNIE BERRY, as successor in<br>interest to DENNIS WAYNE BERRY | § § § § § § § | |
| *Defendants.* | § § | ____ JUDICIAL DISTRICT |

## PLAINTIFFS' VERIFIED ORIGINAL PETITION AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION

### SUMMARY OF PLAINTIFFS' CLAIMS

Plaintiffs Albert Theodore Powers ("Powers") and Allied Ports LLC ("Allied") file this lawsuit to protect their management rights and 20% interest in a crude oil delivery system and terminal project to which the Berry Defendants agreed and Plaintiffs earned. Marvin Glenn Berry ("Marty") and Bonnie Berry, as successor in interest to Dennis Wayne Berry ("Bonnie"), have made clear they will not honor their agreements even though their own brother Defendant Allen Lawrence Berry ("Lawrence") acknowledges Plaintiffs' interest. Plaintiffs need immediate assistance from the Court to restrain Defendants from conducting an unauthorized and improper purported November 6, 2024 meeting in which Marty and Bonnie intend to illegally and without authority transfer management, ownership and control of Axis Midstream Holdings, LLC ("Axis") into Berry GP, Inc., which is an entity outside the agreed to structure for the project.

1

In so doing, the Berry Defendants plan to take control of the project and deprive Plaintiffs of their management and ownership interest. If the unauthorized and improper November 6, 2024 meeting is allowed to go forward, Plaintiffs will be irreparably harmed and will have no adequate remedy for the loss of their rights and interest.

## PARTIES

1. Plaintiff Albert Theodore Powers is an individual residing in New York, New York.

2. Plaintiff Allied Ports, LLC is a Delaware limited liability company and designee of Powers' interest under the agreements with the Berry Defendants. Its registered agent's address is at 16192 Coastal Hwy, Lewes, Delaware 19958.

3. Defendant Marvin Glenn Berry is an individual residing in Nueces County, Texas. He can be served at 1414 Corn Products Road, Corpus Christi, Texas or wherever he may be found.

4. Defendant Bonnie Berry is an individual residing in Nueces County, Texas. On information and belief,[1] she is the widow and successor in interest to Dennis Wayne Berry, who is deceased. She can be served at 1414 Corn Products Road, Corpus Christi, Texas or wherever she may be found.

5. Defendant Allen Lawrence Berry is an individual residing in Harris County, Texas. He can be served at 5005 Riverway, Suite 440, Houston, Texas 77056 or wherever he may be found.

6. When appropriate, Marty, Bonnie, and Lawrence will be referred to collectively as the "Berry Defendants."

---

[1] Throughout this Petition, references to the "Berry Defendants" includes actions taken by Dennis Wayne Berry, whose interest in the Project discussed further below is now understood to be owned by his widow, Bonnie Berry.

2

7. Defendant Axis Midstream Holdings, LLC is a Texas limited liability company. Its sole member and manager is Lone Star Ports Enterprises, LLC. Axis can be served through its registered agent, Mike H. Hummell, at 1414 Valero Way, Corpus Christi, Texas 78409.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction because the relief sought is within the jurisdictional limits of this Court. At this time, Plaintiffs seek monetary and non-monetary declaratory relief and attorneys' fees and expenses. Tex. R. Civ. P. 47.

9. Venue is proper in this district because Powers and the Berry Defendants entered into written agreements constituting a "major transaction" providing for venue in Harris County, Texas. Tex. Civ. Prac. & Rem. Code § 15.020. Venue is additionally proper because one of the defendants is a citizen of Harris County, Texas, and a substantial part of the events giving rise to Plaintiffs' claims occurred in Harris County, Texas. Tex. Civ. Prac. & Rem. Code §15.002.

## FACTS

10. In 2018, Defendant Lawrence came up with the idea of creating a crude oil delivery and export facility in and around the Corpus Christi Port (the "Project"). Lawrence and his brothers Marty and Dennis decided to pursue the Project. The Project has been touted by the Port of Corpus Christi as a "state-of-the-art petroleum export terminal" and the "deepest-draft safe harbor crude export facility in the nation when commissioned."[2]

11. On October 31, 2018, Defendant Lawrence telephoned Plaintiff Powers in New York and requested him to come to Houston because he and his brothers needed Powers' expertise for the Project. The Berry Defendants had previously worked with Powers (who was at the time of the prior engagement a business transaction lawyer). The Berry Defendants engaged Plaintiff

---

[2] https://portofcc.com/port-of-corpus-christi-commission-approves-50-year-lease-agreement-with-carlyle-group-joint-venture/ (last accessed October 30, 2024).

3

Powers to represent them and advise them in shaping, structuring, securing financing for, and furthering development of the Project. The Berry Defendants sought Powers' expertise because they were in the process of negotiating with a private equity firm to obtain financing for the Project.

12. Powers met with the Berry Defendants in Houston in November 2018 to, among other things, discuss his compensation in connection with his role in the Project. Powers and the Berry Defendants agreed that Powers would be paid a base compensation of $100,000 per month plus expenses.

13. Additionally, the Berry Defendants agreed that Powers would receive a 20% interest in the Project subject to priority distributions to the Berry Defendants of $250,000,000 plus a 10% preferred return on the outstanding balance of such amount. This agreement was confirmed by the Berry Defendants at a later meeting in Houston in late November 2018 and later memorialized in a written Compensation Agreement and written Investment Agreement in 2019 (collectively, the "Agreements"). **Ex. 1**; **Ex. 2**.

14. At first, all parties performed the Agreements. Powers spent most of his working time in Houston where he stayed in an apartment paid for by the Berry Defendants and he worked tireless hours on the Project. Powers' work involved developing and implementing a structure for the Project and trying to arrange a financing package for the Project. On behalf of the Berry Defendants and himself, Powers created several entities and drafted operating agreements for those entities. Those documents were shared and fully discussed with all of the Berry Defendants. There were various meetings (most of which took place in Houston, Texas) between Powers and the Berry Defendants to discuss the Project and the structure of the Project. In addition, Powers negotiated the terms of a potential transaction with a private equity firm on behalf of the Berry Defendants and himself. Eventually, in February 2019, Powers' efforts resulted in a signed term

4

sheet with a well-respected private equity firm, the Carlyle Group, though that transaction ultimately was not completed. As the parties had agreed, the Berry Defendants paid Powers $100,000 per month plus expenses beginning in November 2018.[3]

15.     The Investment Agreement sets forth a specific process for creating and structuring the entities involved in the Project. **Ex. 2** at ¶¶ 1-2. Accordingly, Powers and the Berry Defendants set about to structure the chain of entities to hold different interests. Pursuant to the Investment Agreement, Powers formed and designated Plaintiff Allied Ports LLC to own his 20% interest.

16.     In most of the documents exchanged between the parties, the agreed to corporate structure for the Project was as follows:



---

[3] In April 2020, the Berry Defendants asked Powers to defer his monthly compensation to free up cash for the Project. Knowing he had an interest in the Project, Powers agreed to do so. Since April 2020, Powers has not been paid his monthly compensation. The Berry Defendants continued to pay Powers' expenses under the agreement until June 2023. Since June 2023, Powers has neither been paid his monthly compensation nor reimbursed his expenses, in breach of the Agreements.

17.     In this agreed to structure for the Project, the five owners of the Project are listed along the top.  Redfish Bay Terminals, Inc. ("Redfish") is owned by Berry GP, Inc. (the Berry Defendants' company), Capella is believed to be beneficially owned by or for the benefit of Lawrence and his family, Arcturus is believed to be beneficially owned by or for the benefit of Bonnie (through Dennis) and her family, Sirius is believed to be beneficially owned by or for the benefit of Marty and his family, and Allied Ports is owned by Powers.  Thus, the Parties agreed that the Project is owned in equal percentages by the three Berry Defendants, Powers (subject to the $250 million hurdle and the 10% priority return thereon) and Redfish.  This structure was reaffirmed and further memorialized in two separate written Amended and Restated Operating Agreements of Lone Star Ports Holdings, LLC (including the current Operating Agreement[4]) and has been in place for more than five years.

18.     Of the several entities formed, in particular focus in this lawsuit (and the temporary relief sought) is Defendant Axis.  Axis was formed to hold intangible property of the Project, including the permitting rights associated with development of the Project. Axis's sole Member and Manager is Lone Star Ports Enterprises, LLC ("LSPE"), which through the chain of entities above is ultimately managed by Plaintiff Allied Ports, LLC.[5]  Most importantly, none of the Berry Defendants (including Marty and Bonnie) have individual ownership or management rights in Axis or any other of the entities in its chain of ownership.[6]

---

[4] Lone Star Ports Holdings, LLC's applicable Operating Agreement will be provided to the Court *in camera* and separately to counsel and labeled **Exhibit 6**.

[5] LSPE's sole Member and Manager is Lone Star Ports Ventures, LLC ("LSPV").  LSPV's sole Member and Manager is Lone Star Ports Holdings, LLC ("LSPH").  LSPH has five Members, each owning 20% of the membership units.  Plaintiff Allied Ports LLC is LSPH's sole Manager.

[6] Axis's applicable Operating Agreement will be provided to the Court *in camera* and separately to counsel and labeled **Exhibit 7**.

19.     During the first six years of the development of the Project, almost all of the work was performed by Lawerence, Powers, staff, and third-party consultants. Very little, if any, of the work was done by Marty or Dennis Berry. However, things changed in 2024 when Marty and Bonnie sensed that the permit for the Project was about to be approved. Now, Marty and Bonnie contend that the Project is owned by the Berry Defendants and that the Plaintiffs have no ownership interest in the Project. On August 28, 2024, Mike Hummell, the General Counsel of Berry GP, Inc wrote to Lawerence expressing that the Project was only owned by the Berry Defendants:

> The Berry Companies appreciate your stated willingness to make sure that each of the companies owned jointly by you, Dennis (now Bonnie) and Marty are properly papered to reflect that ownership and management rest exclusively with the three of you. As of this writing I have not seen anything to reflect follow through on your commitment. For entities which list you as sole manager, you can make the changes without the need for any additional meetings. Some of the entities reflected involvement of people that were not or have not been approved by the Owners. Getting these matters clarified is good for everybody.

**Ex. 3**.

20.     In the same letter, Hummell suggested that ownership and control of the Project should be transferred to Berry GP. *See id.* ("I suggest you, Bonnie and Marty consider consolidating ownership into a Berry entity to reflect this.").

21.     In the same letter, Hummell recognized that Berry GP, Marty, or Bonnie did not own Axis and that it was instead owned by Lone Star Ports Enterprises LLC—one of the entities in the chain of ownership created as contemplated by the Investment Agreement. *Id*. The letter further requested that Lawrence provide Marty and Bonnie "with the name or names of the true owner of Axis Midstream Holdings, LLC." *Id*.

7

22.    On October 22, 2024, the Project received monumental news—the Department of the Army issued Axis a permit for construction of the Project. Almost six years of work was beginning to take shape. But just days later, Berry GP's General Counsel Hummell sent an email (acting for Berry GP, Marty, and Bonnie) indicating that he was "going to file paperwork" to change the ownership of the Axis solely to the Berry Defendants, even after he previously recognized that the Berry Defendants did not own Axis. **Ex. 4**. Changing the ownership of Axis is part of an overall plan to divest Plaintiffs of their interest by breaching the Investment Agreement by taking Axis out of the established and agreed to ownership chain of the Project now that the permit has been issued.

23.    Marty and Bonnie have purported to call a "meeting of owners" of Axis for November 6, 2024, where they intend to take action on (1) "Appointment and/or removal of Company Managers" and (2) Appointment and/or removal of Officers." **Ex. 5**. This meeting is obviously improper given Marty and Bonnie are admittedly not "owners" of Axis. Moreover, changing the ownership and management would effectively divest Allied Ports of its ownership and management rights in the Project, which constitutes a breach of the Investment Agreement.

## CAUSES OF ACTION
### COUNT I- DECLARATORY JUDGMENT

24.    Plaintiffs reallege and incorporate all preceding allegations.

25.    Plaintiffs seek a declaratory judgment to determine the rights, status, or other legal relations of the parties related to the ownership, the applicable operating agreements, and corporate structure of the project at issue. See Tex. Civ. Prac. & Rem. Code § 37.004(a). A dispute exists between the parties, as the Investment Agreement sets forth the proper entity structure, ownership, and management of the Project. Importantly, the Investment Agreement may be construed by the Court before there has been an actual breach. Tex. Civ. Prac. & Rem. Code 37.004.

8

26. Plaintiffs seek the following declarations:

  a. The Compensation Agreement is a valid, enforceable, agreement against Lawrence Berry, Marty Berry, and Bonnie Berry (as successor to Dennis Berry);

  b. The Investment Agreement is a valid, enforceable agreement against Lawrence Berry, Marty Berry, and Bonnie Berry (as successor to Dennis Berry);

  c. The Investment Agreement provides that Plaintiff Powers owns, through his designee, Allied Ports, LLC, a twenty percent (20%) interest in the Project (as defined in the Investment Agreement) subject to "priority distributions to the Berry Defendants or their designees of Two Hundred Fifty Million United States Dollars ($250,000,000) plus a ten percent (10%) cumulative preferred return on the outstanding balance of such amount."

  d. Transferring ownership, management, and control of Axis or any other interest of the entities involved in the Project inconsistent with the entity structure provided under the Investment Agreement constitutes a breach of the Investment Agreement.

## COUNT II- BREACH OF CONTRACT

27. Plaintiffs reallege and incorporate all preceding allegations.

28. Under the Compensation Agreement and Investment Agreement, Powers is entitled to $100,000 per month plus expenses in cash compensation. Powers performed and continues to perform by providing the services set forth in the Agreements.

9

29. Lawrence, Marty, and Bonnie (through Dennis) have failed to pay Powers' compensation and expenses incurred under the Compensation Agreement and Investment Agreement, breaching the Agreements.

30. Powers has been damaged in an amount that exceeds the jurisdictional limits of this Court.

## REQUEST FOR TEMPORARY RESTRAINING ORDER

31. Plaintiffs reallege and incorporate all preceding allegations.

32. Marty and Bonnie have breached and/or intend to breach their agreements with Powers and have expressed their intent to proceed with a course of action that will result in additional breaches in the future. More specifically, if Marty and Bonnie are allowed to proceed with the purported November 6, 2024 meeting and transfer ownership, management, and control of Axis to themselves, Plaintiffs will be deprived of their agreed to and bargained for management rights and 20% interest in the Project. Indeed, "loss of management rights over a company are unique, irreplaceable, and cannot be measured by a certain pecuniary standard." *Cheniere Energy, Inc. v. Parallax Enterprises LLC*, 585 S.W.3d 70, 83 (Tex. App.—Houston [14th Dist.] 2019, pet. dism'd); *see also Sonwalker v. St. Luke's Sugarland P'ship, L.L.P.*, 394 S.W.3d 186, 201 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (holding that termination of interest in a limited liability partnership would irreparably injure the Plaintiff because the Plaintiff would lose management rights like selecting a governing board and blocking major actions).

33. If Defendants are not immediately restrained from violating the Investment Agreement, Plaintiffs will suffer concrete, particularized and irreparable harm. Plaintiffs will lose their management rights and 20% interest, both of which are unique and cannot be purchased on the open market.

10

34. Therefore, absent Court intervention, Plaintiffs will have no adequate remedy at law. The only adequate relief, while the merits of the claims are being determined, is to maintain the status quo of ownership of Axis and all other entities and assets associated with the Project. Otherwise, Plaintiffs bargained-for rights and interest could be irreparably lost forever.

35. The injury to Plaintiffs should Defendants be allowed to proceed with breaching their agreements would greatly outweigh any injury (to the extent there is injury at all) to Defendants in delaying any change in ownership of Axis or of any other entity, property, or tangible or intangible rights associated with the Project until the Court rules on the merits of Plaintiffs' claims.

36. Accordingly, to preserve the status quo during the pendency of this action, Plaintiffs respectfully request a temporary restraining order precluding Defendants, their employees, agents, representatives, and any others acting on their behalf from taking any of the following actions:

    a. Holding the "Meeting of Owners" of Axis noticed for November 6, 2024;

    b. Holding any meetings that in any way seek to affect the management or ownership interest of Axis or any other entity, property, or tangible or intangible rights associated with the Project until further order of the Court;

    c. Changing, altering, or transferring in any way the management of Axis or any other entity associated with the Project until further order of the Court;

    d. Changing, altering, or transferring in any way the ownership, property, or tangible or intangible rights of any entity associated with the Project until further order of the Court.

## REQUEST FOR TEMPORARY INJUNCTION

37. Plaintiffs reallege and incorporate all preceding allegations.

38.     Plaintiffs respectfully request that the Court set this application for temporary injunction for hearing.

39.     For the same reasons articulated in Plaintiffs' application for temporary restraining order, and to preserve the status quo and Plaintiffs' rights during the pendency of this action, Plaintiffs respectfully request that the Court grant and enter a temporary injunction precluding Defendants, their employees, agents, representatives, and any others acting on their behalf from taking any of the following actions:

    a.  Holding the "Meeting of Owners" of Axis noticed for November 6, 2024;

    b.  Holding any meetings that in any way seek to affect the management or ownership interest of Axis or any other entity, property, or tangible or intangible rights associated with the Project until further order of the Court;

    c.  Changing, altering, or transferring in any way the management of Axis or any other entity associated with the Project until further order of the Court;

    d.  Changing, altering, or transferring in any way the ownership, property, or tangible or intangible rights of any entity associated with the Project until further order of the Court.

## CONDITIONS PRECEDENT

40.     All conditions precedent have been performed or have been excused or waived.

## ATTORNEYS' FEES

41.     Plaintiffs invokes and pleads Chapters 37 and 38 of the Civil Practices and Remedies Code of the State of Texas and requests an award of attorneys' fees thereunder.

12

42.     Plaintiffs had to retain the undersigned law firm to file this lawsuit and protect their rights. Plaintiffs request that this Court grant such attorney's fees as this Court may deem reasonable and necessary for representing it in this action and for any appeals thereafter.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury in this action of all claims so triable.

## PRAYER FOR RELIEF

Plaintiffs request the following relief:

A.  A Declaration that:

   a.  The Compensation Agreement is a valid, enforceable, agreement against Lawrence Berry, Marty Berry, and Bonnie Berry (as successor to Dennis Berry);

   b.  The Investment Agreement is a valid, enforceable agreement against Lawrence Berry, Marty Berry, and Bonnie Berry (as successor to Dennis Berry);

   c.  The Investment Agreement provides that Plaintiff Powers owns, through his designee, Allied Ports, LLC, a twenty percent (20%) interest in the Project (as defined in the Investment Agreement) subject to "priority distributions to the Berry Defendants or their designees of Two Hundred Fifty Million United States Dollars ($250,000,000) plus a ten percent (10%) cumulative preferred return on the outstanding balance of such amount."

   d.  Transferring ownership, management, and control of Axis or any other interest of the entities involved in the Project inconsistent with the entity structure provided under the Investment Agreement constitutes a breach of the Investment Agreement.

13

B. Compensatory damages in an amount to be proven at trial;

C. Temporary and Injunctive Relief including:

    a. Holding the "Meeting of Owners" of Axis noticed for November 6, 2024;

    b. Holding any meetings that in any way seek to affect the management or ownership interest of Axis or any other entity, property, or tangible or intangible rights associated with the Project until further order of the Court;

    c. Changing, altering, or transferring in any way the management of Axis or any other entity associated with the Project until further order of the Court;

    d. Changing, altering, or transferring in any way the ownership, property, or tangible or intangible rights of any entity associated with the Project until further order of the Court.

D. An award of attorneys' fees in an amount to be proven at trial;

E. Pre- and post-judgment interest; and

F. All such other and further costs and relief as the Court deems just and proper.

DATED: October 31, 2024               Respectfully submitted,

                                    */s/ Alistair B. Dawson*
                                    Alistair B. Dawson
                                    State Bar No. 05596100
                                    M. Jake McClellan
                                    State Bar No. 24109525
                                    Madeline E. Gay
                                    State Bar No. 24138681
                                    E-mail: adawson@beckredden.com
                                    E-mail: jmcclellan@beckredden.com
                                    E-mail: mgay@beckredden.com
                                    1221 McKinney Street, Suite 4500
                                    Houston, Texas 77010-2010
                                    Telephone:    (713) 951-3700
                                    Telecopier:    (713) 951-3720

                                    **ATTORNEYS FOR PLAINTIFFS**

CAUSE NO. _____

| | | |
|---|---|---|
| **ALBERT THEODORE POWERS;** | § | **IN THE DISTRICT COURT** |
| **ALLIED PORTS LLC,** | § | |
| | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | **HARRIS COUNTY, TEXAS** |
| | § | |
| **AXIS MIDSTREAM HOLDINGS,** | § | |
| **LLC; ALLEN LAWRENCE BERRY;** | § | |
| **MARVIN GLEN BERRY; AND** | § | |
| **BONNIE BERRY, as successor in** | § | |
| **interest to DENNIS WAYNE BERRY** | § | |
| | § | |
| | § | |
| *Defendants.* | § | **\_\_\_ JUDICIAL DISTRICT** |

## <u>VERIFICATION</u>

| | |
|---|---|
| STATE OF NEW YORK | § |
| | § |
| COUNTY OF WESTCHESTER | § |

"My name is Albert Theodore Powers. I am over twenty-one (21) years of age and have never been convicted of a felony or crime of moral turpitude. I am of sound mind and am competent and capable of making this verification. I have read this Plaintiff's Verified Original Petition and Application for Temporary Restraining Order and Temporary Injunction (the "Petition"). The facts stated in the Petition are true and correct and based on my personal knowledge."

"My name is Albert Theodore Powers, my date of birth is February 11, 1953, and my address is 205 West 57th Street, Apartment 4C, New York, United States of America 10019. I declare under penalty of perjury that the foregoing is true and correct."

Executed in Westchester County, State of New York, on the 31st day of October, 2024.

*Albert Theodore Powers*

Albert Theodore Powers

Exhibit 1

# AGREEMENT

**THIS AGREEMENT** is made and entered into as of the 1st day of November, 2018 by and among Allen Lawrence Berry, Marvin Glen Berry, and Dennis Wayne Berry (collectively, the "**Berrys**"), and Albert Theodore Powers ("**Powers**") (each of the Berrys and Powers being referred to herein individually as a "**Party**" and collectively as the "**Parties**").

## RECITALS:

**WHEREAS**, the Berrys intend to develop, construct, own, and operate a system to allow hydrocarbon shippers maximum optionality to deliver hydrocarbons to local refinery markets in the vicinity of Corpus Christi, Texas and to export hydrocarbons via a premier United States Gulf Coast deep-water exporting facility, including without limitation shipping, reception, collection, consolidation, storage, staging, delivery, and exporting facilities, including a deep-water export terminal on Harbor Island, Texas, related tankage and pipelines, and other associated infrastructure, assets, facilities, and businesses, including without limitation certain real property and improvements currently owned, leased, optioned, or otherwise controlled by the Berrys at Redfish Bay, Midway Junction, and Harbor Island, Texas and additional properties and facilities to be acquired, leased, optioned, developed, or otherwise controlled by the Berrys (collectively, the "**Project**"); and

**WHEREAS**, the Berrys intend to finance the Project through a combination of contributions of cash and tangible and intangible property from their own resources, third party debt financing, government grants and/or subsidies, and equity contributions from outside investors; and

**WHEREAS**, the Berrys have been engaged for several months in discussions with The Carlyle Group regarding the Project and The Carlyle Group potentially providing a substantial equity investment in the Project; and

**WHEREAS**, the Berrys wish to appoint Powers to represent them and to act as their chief negotiator and adviser for the financing of the Project, including without limitation negotiations with The Carlyle Group, and to perform due diligence, advice, and assistance regarding the sourcing of capital, develop strategy, and provide financial management and structuring advice and services, upon and subject to the terms and conditions of this Agreement; and

**WHEREAS**, Powers is willing to represent the Berrys and to act as their chief negotiator and adviser for the financing of the Project, including without limitation negotiations with The Carlyle Group, and to perform due diligence, advice, and assistance regarding the sourcing of capital, develop strategy, and provide financial management and structuring advice and services upon and subject to the terms and conditions of this Agreement;

**NOW, THEREFORE**, in consideration of the foregoing recitals and other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the Berrys and Powers hereby agree as follows:

1.     **Appointment**.  The Berrys hereby appoint Powers as their representative and chief negotiator and adviser for the financing of the Project including without limitation negotiations with The Carlyle Group, and to perform due diligence, advice, and assistance regarding the sourcing of capital, develop strategy, and provide financial management and structuring advice and services.  It is understood that Powers shall investigate various alternatives for financing all or portions of the Project, discuss with the Berrys various financing alternatives, assist the Berrys in formulating and interpreting financial projections for the Project and various potential transactions relating to the Project, assist the Berrys in formulating strategies to arrange the most favorable forms of financing for the Project, make financing recommendations to the Berrys, assist the Berrys in formulating strategies for achieving the most favorable terms for financing the Project, assist the Berrys in formulating business and holding structures for the Project, and negotiate terms and conditions of financing for the Project on behalf of the Berrys with various potential finance providers, including without limitation The Carlyle Group.  In performing his duties under this Agreement, Powers shall at all times act as agent for the Berrys and shall have no power to conclude any financing arrangement for all or any portion of the Project without the express consent of the Berrys, in their sole discretion.

2.     **Term of Appointment**.  The term of Powers's appointment under this Agreement shall commence on the date first set forth above and shall continue until the Project is fully financed or until either the Berrys or Powers terminates this Agreement by providing at least three (3) month's written notice to the other Parties.

3.     **Compensation**.  As compensation for his services as representative and chief negotiator for the financing of the Project, the Berrys hereby agree to pay Powers compensation and to reimburse his expenses, as follows:

    (a)     **Compensation**.  The Berrys shall pay to Powers, Allied Pacific Group Limited, or such other individual or entity designated by Powers from time to time fixed ordinary compensation in the amount of One Hundred Thousand United States Dollars (US$100,000) per month during the term of his appointment under this Agreement ("**Compensation**").  Powers shall provide to the Berrys monthly invoices during the term which shall designate the account or accounts to which payments of Ordinary Compensation shall be made.

    (b)     **Expenses**.  In addition to Compensation, the Berrys shall promptly reimburse Powers for his actual out-of-pocket expenses incurred in performing his services pursuant to this Agreement, including without limitation travel and transportation expenses.  Powers shall provide to the Berrys invoices which shall indicate the expense amounts to be reimbursed and the account or accounts to which reimbursement payments shall be made.

2

(c)     **Interest on Late Payments.**  All amounts payable under this agreement shall be paid promptly and in cash or by wire transfer to such accounts as shall be designated from time to time by Powers.  In the event that any amounts are not paid promptly when due, the Party liable for making such payment shall pay such amounts, plus interest thereon, at the rate of ten percent (10%) per annum on the overdue amount, without prior demand or notice.

(d)     **No Offset.**  All payments of Compensation, reimbursements, and interest made pursuant to this Agreement shall be made in cash or by wire transfer to such accounts as shall be designated from time to time by Powers, without withholding or offsets of any kind, shall be non-refundable, and shall be free and clear of any and all encumbrances of any type or nature.

4.     **Investment Agreement.**  In addition to the Compensation and other matters described in this Agreement, the Berrys and Powers are simultaneously with this Agreement entering into another agreement (the "**Investment Agreement**") relating to the investment by Powers or an entity designated by him in one or more limited liability companies or other entities that will hold all of the Berrys' interests in the Project and its major components in exchange for a twenty percent (20%) overall carried interest and profits interest in such limited liability companies or entities after priority distributions to the Berrys of Two Hundred Fifty Million United States Dollars (US$250,000,000) plus a ten percent (10%) cumulative preferred return on the outstanding balance of such amount.  The ownership of such limited liability companies or other entities and the entitlement to distributions from such limited liability companies or other entities shall be governed by the Investment Agreement and the governing documents of such limited liability companies or other entities.

5.     **Miscellaneous Provisions.**

(a)     **Governing Law, Jurisdiction, and Venue**.  This Agreement and all issues and questions concerning its application, construction, validity, interpretation, and enforcement shall be governed by and construed in accordance with the laws of the State of Texas, without giving effect to any choice or conflict of laws provisions or rules (whether of the State of Texas or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Texas.  Powers and each of the Berrys hereby agrees that any suit, action, or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort, or otherwise, shall be brought in the state or federal courts in Harris County, Texas, so long as one of such courts shall have subject-matter jurisdiction over such suit, action, or proceeding, and that any cause of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Texas.  Powers and each of the Berrys hereby irrevocably consents to the exclusive jurisdiction of such courts and of the appropriate appellate courts therefrom in any

3

such suit, action, or proceeding and irrevocably waives, to the fullest extent permitted by relevant law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action, or proceeding in any such court or that any such suit, action, or proceeding which is brought in any such court has been brought in an inconvenient forum.

      **(b)**    **Notices**. All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of (i) actual receipt, (ii) the time of personal delivery to the party to be notified, (iii) when sent, if sent by electronic mail during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day, (iv) five (5) days after having been sent by registered or certified United States Post Office air mail, return receipt requested, postage prepaid, or (v) one (1) business day after deposit with a nationally recognized overnight air courier, freight prepaid, specifying next business day delivery, with written verification of receipt. All communications shall be sent to the respective Parties at their addresses as set forth in this section or to such addresses as subsequently modified by written notice given in accordance with this section. Each Party to this Agreement agrees to promptly notify the other Parties of any change in its address or electronic mail address, and any failure to do so shall not affect the foregoing.

      Mailing and delivery address for Allen Lawrence Berry, Marvin Glen Berry, Dennis Wayne Berry, Bay Ltd, and all Berry entities:

> Berry Group
> 5005 Riverway
> Suite 440
> Houston, Texas 77056
>
> Email address for Lawrence Allen Berry:
> alb@riverway.us
>
> Email address for Marvin Glen Berry:
> captberry@aol.com
>
> Email address for Dennis Wayne Berry:
> berryd@bayltd.com

      Mailing and delivery address for Albert Theodore Powers, Allied Pacific Group Limited, and all Powers entities:

4

Albert Theodore Powers
205 West 57th Street
Apartment 4C
New York, New York 10019

Email address for Albert Theodore Powers
atpowers@allied-pacific-group.com

**(c)** **Delays or Omissions**. No delay or omission to exercise any right, power, or remedy accruing to any Party under this Agreement, upon any breach or default of any other Party under this Agreement, shall impair any such right, power, or remedy of such non-breaching or non-defaulting Party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent, or approval of any kind or character on the part of any Party of any breach or default under this Agreement, or any waiver on the part of any Party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to any Party, shall be cumulative and not alternative.

**(d)** **Amendment, Waiver, and Termination**. This Agreement may be amended, modified, or terminated and the observance of any term hereof may be waived (either generally or in a particular instance and either retroactively or prospectively) only by a written instrument executed by all Parties. Any amendment, modification, termination, or waiver so effected shall be binding upon the Parties and all of their respective successors and permitted assigns whether or not such Party, successor, assignee, or other individual or entity entered into or approved such amendment, modification, termination, or waiver. No waivers of or exceptions to any term, condition, or provision of this Agreement, in any one or more instances, shall be deemed to be, or construed as, a further or continuing waiver of any such term, condition, or provision or any other term, condition, or provision.

**(e)** **Assignment of Rights**. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns. Nothing in this Agreement, express or implied, is intended to confer upon any individual or entity other than the Parties hereto or their respective successors and permitted assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement. Any successor or permitted assignee of any of the Berrys' interests in the Project, including any prospective transferee who purchases any direct or indirect interest in the Project and/or any inter vivos

5

or testamentary donee or transferee of any such interest, shall deliver to Powers, as a condition to any transfer or assignment, a counterpart signature page hereto pursuant to which such successor or permitted assignee shall confirm his or its agreement to be subject to and bound by all of the provisions set forth in this Agreement that were applicable to the predecessor or assignor of such successor or permitted assignee.

**(f)** **Severability**. The invalidity or unenforceability of any provision of this Agreement shall in no way affect the validity or enforceability of any other provision.

**(g)** **Titles and Subtitles**. The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

**(h)** **Counterparts**. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via electronic mail (including pdf or any electronic signature complying with the United States Federal ESIGN Act of 2000, i.e., www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

**(i)** **Specific Performance**. In addition to any and all other remedies that may be available at law in the event of any breach of this Agreement, each Party shall be entitled to specific performance of the agreements and obligations of the other Parties hereunder and to such other injunctive or other equitable relief as may be granted by a court of competent jurisdiction.

**(j)** **No Partnership**. This Agreement does not create or constitute any partnership, joint venture, or other similar relationship among the Parties, no such relationship shall be implied, and no Party shall make any representation to the contrary.

**(k)** **Advice of Counsel**. Each Party hereby acknowledges that he has sought and obtained the advice of legal counsel before entering into this Agreement and has fully read and understands the meaning and import of all terms in this Agreement.

6

(l)    **Entire Agreement**. This Agreement constitutes and expresses the entire agreement and understanding among the Parties in reference to all matters referred to; all previous discussions, promises, representations, and understandings relative thereto, if any, among the Parties, being herein merged. No modification of this Agreement shall be binding unless in writing and signed by authorized representatives of all Parties.

**IN WITNESS WHEREOF**, the Parties, intending to be bound, have executed this Agreement as of the date first written above.

_____
ALLEN LAWRENCE BERRY

_____
MARVIN GLEN BERRY

_____
DENNIS WAYNE BERRY

_____
ALBERT THEODORE POWERS

7

Exhibit 2

# INVESTMENT AGREEMENT

**THIS INVESTMENT AGREEMENT** (the "**Agreement**") is made and entered into as of the 1st day of November, 2018 by and among Marvin Glen Berry, Dennis Wayne Berry, and Allen Lawrence Berry (collectively, the "**Berrys**"), and Albert Theodore Powers ("**Powers**") (each of the Berrys and Powers being referred to herein individually as a "**Party**" and collectively as the "**Parties**").

## RECITALS:

**WHEREAS**, the Berrys have devised a plan to develop, construct, own, and operate a system to allow hydrocarbon shippers maximum optionality to deliver hydrocarbons to local refinery markets in the vicinity of Corpus Christi, Texas and to export hydrocarbons via a premier United States Gulf Coast deep-water exporting facility, including without limitation shipping, reception, collection, consolidation, storage, staging, delivery, and exporting facilities, including a deep-water export terminal on Harbor Island, Texas, related tankage and pipelines, and other associated infrastructure, assets, facilities, and businesses, including without limitation certain real property and improvements currently owned, leased, optioned, or otherwise controlled by the Berrys and others at Redfish Bay, Midway Junction, and Harbor Island, Texas and additional properties and facilities to be acquired, leased, optioned, developed, or otherwise controlled by the Berrys and others (collectively, the "**Project**"); and

**WHEREAS**, simultaneously with this Agreement, the Parties are entering into another Agreement, pursuant to which the Berrys are appointing Powers as their representative and chief negotiator and adviser for the financing of the Project including without limitation negotiations with The Carlyle Group, and to perform due diligence, advice, and assistance regarding the sourcing of capital, develop strategy, and provide financial management and structuring advice and services. It is understood that Powers shall investigate various alternatives for financing all or portions of the Project, discuss with the Berrys various financing alternatives, assist the Berrys in formulating and interpreting financial projections for the Project and various potential transactions relating to the Project, assist the Berrys in formulating strategies to arrange the most favorable forms of financing for the Project, make financing recommendations to the Berrys, assist the Berrys in formulating strategies for achieving the most favorable terms for financing the Project, assist the Berrys in formulating business and holding structures for the Project, and negotiate terms and conditions of financing for the Project on behalf of the Berrys with various potential finance providers, including without limitation The Carlyle Group; and

**WHEREAS**, the Berrys and Powers wish to cooperate to (a) devise an ownership structure for directly and indirectly holding the Project and each of its major components, (b) secure third party financing for the Project, and (c) own and hold a portion of all interests in the Project, upon and subject to the terms and conditions of this Agreement;

**NOW, THEREFORE**, in consideration of the foregoing recitals and other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the Berrys and Powers hereby agree as follows:

1. **Creation of Holding Structure and Contribution of Project and Project Interests**. On or before May 31, 2019 (a) the Berrys and all other owners of interests in the Project and its major components or their respective designees will form one or more corporations, limited liability companies, or other tax efficient limited liability entities (each a "**Project Company**" and, collectively, the "**Project Companies**) to collectively own and hold one hundred percent (100%) of all equity interests in the Project and its major components, (b) the Berrys will transfer to the Project Companies one hundred percent (100%) of their interests in the Project and each of its major components in exchange for one hundred percent (100%) of the equity interests in the Project Companies, (c) the Berrys will form a limited liability company or other tax efficient limited liability entity ("**Holding Company**") to hold all equity interests in the Project Companies, (d) the Berrys will contribute to Holding Company all equity interests in the Project Companies in exchange for one hundred percent (100%) of the equity interests in Holding Company, (e) the Berrys will form a limited liability company or other tax efficient limited liability entity ("**Investment Company**") to hold all equity interests in Holding Company, and (f) the Berrys will contribute to Investment Company all equity interests in Holding Company in exchange for one hundred percent (100%) of the equity interests in Investment Company.

2. **Investment By Manager in Investment Company**. Within fifteen (15) days after (a) the Berrys and all other owners of interests in the Project and its major components or their respective designees have formed the Project Companies and transferred one hundred percent (100%) of their interests in the Project and each of its major components to the Project Companies, (b) all equity interests in the Project Companies have been contributed to Holding Company, (c) all equity interests in Holding Company have been contributed to Investment Company, and (d) the Berrys or their designees have received all equity interests in Investment Company (i) Powers will form a limited liability company or other tax efficient limited liability entity that is wholly owned by, or for the benefit of, Powers or his designees ("**Manager**"), (ii) Powers will contribute Five Thousand United States Dollars (US$5,000.00) to Manager in exchange for one hundred percent (100%) of Manager's operating interests and other ownership rights and interests, and (iii) Manager will contribute Five Thousand United States Dollars ($5,000) to Investment Company in exchange for a twenty percent (20%) overall carried interest and future profits interest in Investment Company after priority distributions to the Berrys or their designees of Two Hundred Fifty Million United States Dollars ($250,000,000) plus a ten percent (10%) cumulative preferred return on the outstanding balance of such amount. Except for the Five Thousand United States Dollar ($5,000) contribution to Manager and Investment Company described above, none of Manager, Powers, or any of their respective designees shall have any other obligation to contribute any other amounts to Investment Company, Holding Company, or any Project Company. The governing documents of Investment Company will reflect the respective interests of the Berrys, including their entitlement to priority distributions and preferred returns, and Investment Manager's twenty percent (20%) overall carried interest and future profits interest in Investment Company. Until the Berrys receive a priority return from Investment Company, Holding Company, and/or the Project Companies of Two

2

Hundred Fifty Million United States Dollars ($250,000,000) plus a ten percent (10%) cumulative preferred return on the outstanding balance of such amount, all gross amounts received by, or distributions made to, or on behalf of, Investment Company, Holding Company, and the Project Companies, including without limitation all earnings, proceeds, dividends, refinancing proceeds, disposition proceeds, incentive units or payments, or other receipts of any type or nature, shall be distributed to and paid to or on behalf of the Berrys or their designees and none of such amounts shall be paid or payable to or for the benefit of Manager or its designees. After the Berrys or their designees have received their priority distributions of Two Hundred Fifty Million United States Dollars plus a ten percent (10%) cumulative preferred return on the outstanding balance of such amount and Manager has received catch-up distributions from the Investment Company, eighty percent (80%) of all gross amounts received by, or distributions made to, or on behalf of Investment Company, Holding Company, and the Project Companies, including without limitation all earnings, proceeds, dividends, refinancing proceeds, disposition proceeds, incentive units or payments, or other receipts of any type or nature, shall be distributed to and paid to or on behalf of the Berrys or their designees and twenty percent (20%) of such amounts shall be paid or payable to or for the benefit of Manager or its designees. It is intended that the interests of Manager in Investment Company will qualify (i) as a carried interest within the meaning of Section 1061 of the United States Internal Revenue Code, and (ii) as a future profits interest within the meaning of Revenue Procedure 93-27, and that the governing documents of Investment Company will be drafted to reflect this intent. It is also intended that the capital accounts to be established and maintened by Investment Company will comply with the requirements of Treasury Regulations §1.704-1(b)(2)(iv) or any successor provision, and that such provisions will be interpreted and applied in a manner consistent with such Treasury Regulations or successor provisions and that the targeted allocations to be made to such capital accounts will reflect the Members' interests in the Company and have substantial economic effect. On or before the fifth (5th) day of each month, the Berrys shall provide to Manager a statement setting forth the total amounts of preferred return and priority distributions, if any, that have been received by them from Investment Company, Holding Company, and the Project Companies. Manager shall review each such statement and either confirm its agreement with the amounts shown on such statement or provide an alternative calculation of such amounts. If the Berrys and Manager do not agree on such calculation, they shall meet and attempt to reconcile their differences in the calculation of such amounts before resorting to any other remedy.

3.    **Financing of Project**. To finance the development of the Project, it is anticipated that Investment Company will transfer its equity interests in Holding Company and/or one or more Project Companies to one or more other corporations, limited liability companies, or other tax efficient limited liability entities (each, a "**Project Entity**" and. collectively, the "**Project Entities**") that will be jointly owned by Investment Company and other investors that will contribute equity capital for the development of the Project. In exchange for contributing its interests in Holding Company and/or one or more of the Project Companies to such Project Entities, it is anticipated that Investment Company will receive (a) shares, operating interests, or other equity interests in the Project Entities, (b) other rights and interests, including incentive

interests, incentive units, or other benefits in or from the Project Entities, and (c) other amounts directly or indirectly received, or distributions made, in respect of the Project Entities, including without limitation earnings, proceeds, dividends, refinancing proceeds, disposition proceeds, incentive units or payments, and other receipts of any type or nature in respect of or relating to the Project or any Project Company (collectively, "**Project Interests**").

      **4.**     **Distributions From Project Entities**. All (a) shares, operating interests, or other equity interests in the Project Entities, (b) other rights and interests, including incentive interests, incentive units, or other benefits in or from the Project Entities, and (c) Project Interests shall be distributed to and held by Investment Company. Distributions shall be made from Investment Company in accordance with the governing documents of Investment Company, which shall reflect the interests of the Berrys, including their entitlement to priority distributions and preferred returns, and the twenty percent (20%) carried interest and future profits interest of Manager.

      **5.**     **Miscellaneous Provisions**.

      **(a)**     **Governing Law, Jurisdiction, and Venue**. This Agreement and all issues and questions concerning its application, construction, validity, interpretation, and enforcement shall be governed by and construed in accordance with the laws of the State of Texas, without giving effect to any choice or conflict of laws provisions or rules (whether of the State of Texas or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Texas. Powers and each of the Berrys hereby agrees that any suit, action, or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort, or otherwise, shall be brought in the state or federal courts in Harris County, Texas, so long as one of such courts shall have subject-matter jurisdiction over such suit, action, or proceeding, and that any cause of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Texas. Powers and each of the Berrys hereby irrevocably consents to the exclusive jurisdiction of such courts and of the appropriate appellate courts therefrom in any such suit, action, or proceeding and irrevocably waives, to the fullest extent permitted by relevant law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action, or proceeding in any such court or that any such suit, action, or proceeding which is brought in any such court has been brought in an inconvenient forum.

      **(b)**     **Notices**. All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of (i) actual receipt, (ii) the time of personal delivery to the party to be notified, (iii) when sent, if sent by electronic mail during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day, (iv) five (5) days after

4

having been sent by registered or certified United States Post Office air mail, return receipt requested, postage prepaid, or (v) one (1) business day after deposit with a nationally recognized overnight air courier, freight prepaid, specifying next business day delivery, with written verification of receipt. All communications shall be sent to the respective Parties at their addresses as set forth in this section or to such addresses as subsequently modified by written notice given in accordance with this section. Each Party to this Agreement agrees to promptly notify the other Parties of any change in its address or electronic mail address, and any failure to do so shall not affect the foregoing.

Mailing and delivery address for Marvin Glen Berry, Dennis Wayne Berry, Allen Lawrence Berry, Bay Ltd, and all Berry entities:

> Berry Group
> 5005 Riverway
> Suite 440
> Houston, Texas 77056
>
> Email address for Allen Lawrence Berry:
> alb@riverway.us
>
> Email address for Marvin Glen Berry:
> captberry@aol.com
>
> Email address for Dennis Wayne Berry:
> berryd@bayltd.com

Mailing and delivery address for Albert Theodore Powers and Manager:

> Albert Theodore Powers
> 205 West 57th Street
> Apartment 4C
> New York, New York 10019
>
> Email address for Albert Theodore Powers
> atpowers@allied-pacific-group.com

(c) **Delays or Omissions**. No delay or omission to exercise any right, power, or remedy accruing to any Party under this Agreement, upon any breach or default of any other Party under this Agreement, shall impair any such right, power, or remedy of such non-breaching or non-defaulting Party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any

5

waiver, permit, consent, or approval of any kind or character on the part of any Party of any breach or default under this Agreement, or any waiver on the part of any Party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to any Party, shall be cumulative and not alternative.

(d) **Amendment, Waiver, and Termination**. This Agreement may be amended, modified, or terminated and the observance of any term hereof may be waived (either generally or in a particular instance and either retroactively or prospectively) only by a written instrument executed by all Parties. Any amendment, modification, termination, or waiver so effected shall be binding upon the Parties and all of their respective successors and permitted assigns whether or not such Party, successor, assignee, or other individual or entity entered into or approved such amendment, modification, termination, or waiver. No waivers of or exceptions to any term, condition, or provision of this Agreement, in any one or more instances, shall be deemed to be, or construed as, a further or continuing waiver of any such term, condition, or provision or any other term, condition, or provision.

(e) **Assignment of Rights**. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns. Nothing in this Agreement, express or implied, is intended to confer upon any individual or entity other than the Parties hereto or their respective successors and permitted assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement. Any successor or permitted assignee of any of the Berry Interests, including without limitation any prospective transferee who purchases any direct or indirect interest in the Project and/or any inter vivos or testamentary donee or transferee of any such interest, shall deliver to Powers, as a condition to any transfer or assignment, a counterpart signature page hereto pursuant to which such successor or permitted assignee shall confirm his or its agreement to be subject to and bound by all of the provisions set forth in this Agreement that were applicable to the predecessor or assignor of such successor or permitted assignee.

(f) **Severability**. The invalidity or unenforceability of any provision of this Agreement shall in no way affect the validity or enforceability of any other provision.

(g) **Titles and Subtitles**. The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

(h) **Counterparts**. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which

6

together shall constitute one and the same instrument. Counterparts may be delivered via electronic mail (including pdf or any electronic signature complying with the United States Federal ESIGN Act of 2000, i.e., www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

     **(i)**    **Specific Performance**. In addition to any and all other remedies that may be available at law in the event of any breach of this Agreement, each Party shall be entitled to specific performance of the agreements and obligations of the other Parties hereunder and to such other injunctive or other equitable relief as may be granted by a court of competent jurisdiction.

     **(j)**    **No Partnership**. This Agreement does not create or constitute any partnership, joint venture, or other similar relationship among the Parties, no such relationship shall be implied, and no Party shall make any representation to the contrary.

     **(k)**    **Advice of Counsel**. Each Party hereby acknowledges that he has sought and obtained the advice of legal counsel before entering into this Agreement and has fully read and understands the meaning and import of all terms in this Agreement.

     **(l)**    **Entire Agreement**. This Agreement constitutes and expresses the entire agreement and understanding among the Parties in reference to all matters referred to; all previous discussions, promises, representations, and understandings relative thereto, if any, among the Parties, being herein merged. No modification of this Agreement shall be binding unless in writing and signed by authorized representatives of all Parties.

     **IN WITNESS WHEREOF**, the Parties, intending to be bound, have executed this Agreement as of the date first written above.

_____
ALLEN LAWRENCE BERRY

_____
MARVIN GLEN BERRY

_____
DENNIS WAYNE BERRY


_____
ALBERT THEODORE POWERS

Exhibit 3



P.O. Box 4858
1414 Valero Way
Corpus Christi, Texas
78469-4858
Bus: (361) 693-2100

August 28, 2024

Lawrence Berry
5005 Riverway, Ste 440
Houston, Texas 77056

**Re:    Harbor Island Project**

Lawrence:

The Berry Companies appreciate your stated willingness to make sure that each of the companies owned jointly by you, Dennis (now Bonnie) and Marty are properly papered to reflect that ownership and management rest exclusively with the three of you. As of this writing I have not seen anything to reflect follow through on your commitment. For entities which list you as sole manager, you can make the changes without the need for any additional meetings. Some of the entities reflected involvement of people that were not or have not been approved by the Owners. Getting these matters clarified is good for everybody.

As you might imagine, the Berry Companies are anxious to recover their investment in the oil terminal project. With the recent activity regarding the Corp of Engineers permit, there is a chance for renewed interest from potential investors. At this point the Berry Companies have in excess of $18,000,000 contributed to this effort, and we remain anxious to recover these funds, or have our interest in this project recognized on paper.

You have reported that Axis Midstream Holdings LLC, the permit applicant, is owned and controlled by an entity called Lone Star Ports Enterprises LLC. The Secretary of State website reflects that entity does not exist, and is only a name reservation, by your attorney Butch Boyd. This needs to be resolved. Please advise the attorney who created your ownership tree to provide me with the name or names of the true owner of Axis Midstream Holdings, LLC.

As you know, Midway Junction, the Taft property, is owned by Lone Star Ports Holdings, LLC. Redfish Bay Terminal is owned by Berry GP, Inc. The lease at Harbor Island is owned by Canada Projects Holdings, Inc which is owned and controlled by the Trusts owned and controlled by you, Bonnie, and Marty. While this scattered structure of different entities may have been helpful at some point in time, any value in retaining it is not apparent.

With the exception of the trust contributions to the Midway Junction purchase, the Berry Companies have been the life blood for this project. I suggest you, Bonnie and Marty consider consolidating ownership into a Berry entity to reflect this. The lease at Harbor Island has been paid by us, even though it is held in another entity. It is time to recognize the company contribution.

Sincerely,

*Mike Hummell*

Mike Hummell
Vice President/General Counsel
SBN: 10271100
1414 Valero Way
Corpus Christi, TX 78409
Hummellm@bayltd.com
(361) 693-2909

MH/sg

Exhibit 4

| | |
|---|---|
| **From:** | Hummell, Mike <HummellM@bayltd.com> |
| **Sent:** | Wednesday, October 23, 2024 5:35 PM |
| **To:** | Berry, Bonnie; ALB; Tonja Fulghum Riverway |
| **Cc:** | Marty Berry AOL |
| **Subject:** | RE: Axis Midstream Holdings LLC |

I spoke with Marty and he says Berry GP ownership is fine by him. Lawrence, if that works for you then we will file the paperwork. If not, we can schedule a meeting and take a vote. Seems like an unnecessary step, but either way works.

*Mike Hummell*
*Vice President/General Counsel*
*Bay Ltd.*
Office: 361.693.2909
1414 Valero Way, Corpus Christi, TX 78409
Hummellm@Bayltd.com / www.bayltd.com



**From:** bkbathome <bkbathome@aol.com>
**Sent:** Wednesday, October 23, 2024 5:15 PM
**To:** Hummell, Mike <HummellM@bayltd.com>; ALB <alb@riverway.us>; Tonja Fulghum Riverway <TFulghum@riverway.us>
**Cc:** Marty Berry AOL <captberry@aol.com>
**Subject:** RE: Axis Midstream Holdings LLC

> **Caution:** This is an external email and has a suspicious subject or content. Please take care when clicking links or opening attachments. When in doubt, contact your IT Department

It is my understanding that Berry GP has funded this project since its inception. Therefore I belive the ownership should be reflected through Berry GP.

If this is not the case, please advise.
Bonnie

Sent from my T-Mobile 5G Device

-------- Original message --------
From: "Hummell, Mike" <HummellM@bayltd.com>
Date: 10/23/24 9:17 AM (GMT-06:00)
To: ALB <alb@riverway.us>, Tonja Fulghum Riverway <TFulghum@riverway.us>

Lawrence, Bonnie and Marty, I am going to file the paperwork to reflect the ownership of Axis Midstream lies in equal shares with all 3 of you. Rather than wait for a meeting I thought it most expeditious to see if we can do it by acclamation. How would you like to have ownership reflected? Individually? Through the company? The company has all the money in the permit process, and you each own equal shares. I am not sure of the difference in the filing, except to the extent it might impact taxes way on down the road. It might be best to have ownership in the company for now, and then to break it out later if need be.

*Mike Hummell*

*Vice President/General Counsel*

*Bay Ltd.*

Office: 361.693.2909
1414 Valero Way, Corpus Christi, TX 78409

Hummellm@Bayltd.com / www.bayltd.com



Exhibit 5

**NOTICE OF MEETING OF OWNERS OF**
**AXIS MIDSTREAM HOLDINGS, LLC**

**OBJECTIVE**:  Meeting of Owners

---

Notice is now given that a Meeting of the Owners has been called by Marty Berry and Bonnie Berry and will be held on Wednesday, November 6, 2024 at 10:00 a.m. located at 1414 Valero Way, Corpus Christi, Texas 78409. The following matters in particular are to be presented to the Owners for action and approval:

1.  Appointment and/or removal of Company Managers.

2.  Appointment and/or removal of Officers.

Bonnie Berry (The Estate of Dennis Berry)
1414 Valero Way, Corpus Christ, Texas 78409
1000 Shares

Marty Berry
1414 Valero Way, Corpus Christi, Texas 78409
1000 Shares

Lawrence Berry
1414 Valero Way, Corpus Christi, Texas 78409
1000 Shares

CAUSE NO. _____

| | | |
|---|---|---|
| **ALBERT THEODORE POWERS;** | § | IN THE DISTRICT COURT |
| **ALLIED PORTS LLC,** | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | HARRIS COUNTY, TEXAS |
| | § | |
| **AXIS MIDSTREAM HOLDINGS,** | § | |
| **LLC; ALLEN LAWRENCE BERRY;** | § | |
| **MARVIN GLENN BERRY; AND** | § | |
| **BONNIE BERRY, as successor in** | § | |
| **interest to DENNIS WAYNE BERRY** | § | |
| | § | |
| *Defendants.* | § | **____ JUDICIAL DISTRICT** |

## <u>TEMPORARY RESTRAINING ORDER</u>

On this day, Plaintiffs appeared before this Court requesting that a Temporary Restraining Order be issued against Defendants Axis Midstream Holdings, LLC, Allen Lawrence Berry, Marvin Glenn Berry, and Bonnie Berry. The Court considered Plaintiff's Application for a Temporary Restraining Order ("Application") and the verification in support, and it appears from the specific facts set forth in said Application that immediate and irreparable injury, loss, and harm will result to Plaintiffs without entry of this Temporary Restraining Order. The Court finds that should the November 6, 2024 Axis Midstream Holdings, LLC meeting go forward and Defendants were to change, alter, or transfer the management and/or ownership of Axis Midstream Holdings, LLC, and such disposition would cause irreparable harm to Plaintiffs as the management and ownership interest of Plaintiffs would not likely be recovered.

**IT IS, THEREFORE, ORDERED**, that this Temporary Restraining Order shall continue in effect until the conclusion of the hearing on the Temporary Injunction hereinafter set, or until further order of this Court, restraining and enjoining Defendants Allen Lawrence Berry, Marvin

1

Glenn Berry, Bonnie Berry, Axis Midstream Holdings, LLC, their employees, agents, representatives, and any others acting on their behalf from:

    a. Holding the "Meeting of Owners" of Axis noticed for November 6, 2024;

    b. Holding any meetings that in any way seek to affect the management or ownership interest of Axis or any other entity, property, or tangible or intangible rights associated with the Project until further order of the Court;

    c. Changing, altering, or transferring in any way the management of Axis or any other entity associated with the Project until further order of the Court;

    d. Changing, altering, or transferring in any way the ownership, property, or tangible or intangible rights of any entity associated with the Project until further order of the Court.

**IT IS FURTHER ORDERED** that Plaintiffs post a bond in the amount of $_____.

This Order shall remain in effect until a hearing may be had on the Application for Temporary Injunction.

It is ORDERED that Defendants Allen Lawrence Berry, Marvin Glenn Berry, Bonnie Berry, Axis Midstream Holdings, LLC appeal on _____ at _____ a.m./p.m. for a hearing on Plaintiff's Application for a Temporary Injunction. The purpose of the hearing will be to determine whether this temporary restraining order should be made a temporary injunction pending a full trial on the merits.

Signed this _____ day of October, 2024 at _____ a.m./p.m.

_____
Judge Presiding

2

**EXHIBIT 7**

Exhibit 1

# AGREEMENT

THIS AGREEMENT is made and entered into as of the 1st day of November, 2018 by and among Allen Lawrence Berry, Marvin Glen Berry, and Dennis Wayne Berry (collectively, the "Berrys"), and Albert Theodore Powers ("Powers") (each of the Berrys and Powers being referred to herein individually as a "Party" and collectively as the "Parties").

## RECITALS:

WHEREAS, the Berrys intend to develop, construct, own, and operate a system to allow hydrocarbon shippers maximum optionality to deliver hydrocarbons to local refinery markets in the vicinity of Corpus Christi, Texas and to export hydrocarbons via a premier United States Gulf Coast deep-water exporting facility, including without limitation shipping, reception, collection, consolidation, storage, staging, delivery, and exporting facilities, including a deep-water export terminal on Harbor Island, Texas, related tankage and pipelines, and other associated infrastructure, assets, facilities, and businesses, including without limitation certain real property and improvements currently owned, leased, optioned, or otherwise controlled by the Berrys at Redfish Bay, Midway Junction, and Harbor Island, Texas and additional properties and facilities to be acquired, leased, optioned, developed, or otherwise controlled by the Berrys (collectively, the "Project"); and

WHEREAS, the Berrys intend to finance the Project through a combination of contributions of cash and tangible and intangible property from their own resources, third party debt financing, government grants and/or subsidies, and equity contributions from outside investors; and

WHEREAS, the Berrys have been engaged for several months in discussions with The Carlyle Group regarding the Project and The Carlyle Group potentially providing a substantial equity investment in the Project; and

WHEREAS, the Berrys wish to appoint Powers to represent them and to act as their chief negotiator and adviser for the financing of the Project, including without limitation negotiations with The Carlyle Group, and to perform due diligence, advice, and assistance regarding the sourcing of capital, develop strategy, and provide financial management and structuring advice and services, upon and subject to the terms and conditions of this Agreement; and

WHEREAS, Powers is willing to represent the Berrys and to act as their chief negotiator and adviser for the financing of the Project, including without limitation negotiations with The Carlyle Group, and to perform due diligence, advice, and assistance regarding the sourcing of capital, develop strategy, and provide financial management and structuring advice and services upon and subject to the terms and conditions of this Agreement;

NOW, THEREFORE, in consideration of the foregoing recitals and other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the Berrys and Powers hereby agree as follows:

1. **Appointment.** The Berrys hereby appoint Powers as their representative and chief negotiator and adviser for the financing of the Project including without limitation negotiations with The Carlyle Group, and to perform due diligence, advice, and assistance regarding the sourcing of capital, develop strategy, and provide financial management and structuring advice and services. It is understood that Powers shall investigate various alternatives for financing all or portions of the Project, discuss with the Berrys various financing alternatives, assist the Berrys in formulating and interpreting financial projections for the Project and various potential transactions relating to the Project, assist the Berrys in formulating strategies to arrange the most favorable forms of financing for the Project, make financing recommendations to the Berrys, assist the Berrys in formulating strategies for achieving the most favorable terms for financing the Project, assist the Berrys in formulating business and holding structures for the Project, and negotiate terms and conditions of financing for the Project on behalf of the Berrys with various potential finance providers, including without limitation The Carlyle Group. In performing his duties under this Agreement, Powers shall at all times act as agent for the Berrys and shall have no power to conclude any financing arrangement for all or any portion of the Project without the express consent of the Berrys, in their sole discretion.

2. **Term of Appointment.** The term of Powers's appointment under this Agreement shall commence on the date first set forth above and shall continue until the Project is fully financed or until either the Berrys or Powers terminates this Agreement by providing at least three (3) month's written notice to the other Parties.

3. **Compensation.** As compensation for his services as representative and chief negotiator for the financing of the Project, the Berrys hereby agree to pay Powers compensation and to reimburse his expenses, as follows:

   (a) **Compensation.** The Berrys shall pay to Powers, Allied Pacific Group Limited, or such other individual or entity designated by Powers from time to time fixed ordinary compensation in the amount of One Hundred Thousand United States Dollars (US$100,000) per month during the term of his appointment under this Agreement ("**Compensation**"). Powers shall provide to the Berrys monthly invoices during the term which shall designate the account or accounts to which payments of Ordinary Compensation shall be made.

   (b) **Expenses.** In addition to Compensation, the Berrys shall promptly reimburse Powers for his actual out-of-pocket expenses incurred in performing his services pursuant to this Agreement, including without limitation travel and transportation expenses. Powers shall provide to the Berrys invoices which shall indicate the expense amounts to be reimbursed and the account or accounts to which reimbursement payments shall be made.

2

(c)     **Interest on Late Payments.** All amounts payable under this agreement shall be paid promptly and in cash or by wire transfer to such accounts as shall be designated from time to time by Powers. In the event that any amounts are not paid promptly when due, the Party liable for making such payment shall pay such amounts, plus interest thereon, at the rate of ten percent (10%) per annum on the overdue amount, without prior demand or notice.

(d)     **No Offset.** All payments of Compensation, reimbursements, and interest made pursuant to this Agreement shall be made in cash or by wire transfer to such accounts as shall be designated from time to time by Powers, without withholding or offsets of any kind, shall be non-refundable, and shall be free and clear of any and all encumbrances of any type or nature.

4.      **Investment Agreement.** In addition to the Compensation and other matters described in this Agreement, the Berrys and Powers are simultaneously with this Agreement entering into another agreement (the "**Investment Agreement**") relating to the investment by Powers or an entity designated by him in one or more limited liability companies or other entities that will hold all of the Berrys' interests in the Project and its major components in exchange for a twenty percent (20%) overall carried interest and profits interest in such limited liability companies or entities after priority distributions to the Berrys of Two Hundred Fifty Million United States Dollars (US$250,000,000) plus a ten percent (10%) cumulative preferred return on the outstanding balance of such amount. The ownership of such limited liability companies or other entities and the entitlement to distributions from such limited liability companies or other entities shall be governed by the Investment Agreement and the governing documents of such limited liability companies or other entities.

5.      **Miscellaneous Provisions.**

(a)     **Governing Law, Jurisdiction, and Venue.** This Agreement and all issues and questions concerning its application, construction, validity, interpretation, and enforcement shall be governed by and construed in accordance with the laws of the State of Texas, without giving effect to any choice or conflict of laws provisions or rules (whether of the State of Texas or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Texas. Powers and each of the Berrys hereby agrees that any suit, action, or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort, or otherwise, shall be brought in the state or federal courts in Harris County, Texas, so long as one of such courts shall have subject-matter jurisdiction over such suit, action, or proceeding, and that any cause of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Texas. Powers and each of the Berrys hereby irrevocably consents to the exclusive jurisdiction of such courts and of the appropriate appellate courts therefrom in any

3

such suit, action, or proceeding and irrevocably waives, to the fullest extent permitted by relevant law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action, or proceeding in any such court or that any such suit, action, or proceeding which is brought in any such court has been brought in an inconvenient forum.

(b) **Notices**. All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of (i) actual receipt, (ii) the time of personal delivery to the party to be notified, (iii) when sent, if sent by electronic mail during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day, (iv) five (5) days after having been sent by registered or certified United States Post Office air mail, return receipt requested, postage prepaid, or (v) one (1) business day after deposit with a nationally recognized overnight air courier, freight prepaid, specifying next business day delivery, with written verification of receipt. All communications shall be sent to the respective Parties at their addresses as set forth in this section or to such addresses as subsequently modified by written notice given in accordance with this section. Each Party to this Agreement agrees to promptly notify the other Parties of any change in its address or electronic mail address, and any failure to do so shall not affect the foregoing.

Mailing and delivery address for Allen Lawrence Berry, Marvin Glen Berry, Dennis Wayne Berry, Bay Ltd, and all Berry entities:

Berry Group
5005 Riverway
Suite 440
Houston, Texas 77056

Email address for Lawrence Allen Berry:
alb@riverway.us

Email address for Marvin Glen Berry:
captberry@aol.com

Email address for Dennis Wayne Berry:
berryd@bayltd.com

Mailing and delivery address for Albert Theodore Powers, Allied Pacific Group Limited, and all Powers entities:

4

Albert Theodore Powers
205 West 57th Street
Apartment 4C
New York, New York 10019

Email address for Albert Theodore Powers
atpowers@allied-pacific-group.com

(c)     **Delays or Omissions.** No delay or omission to exercise any right, power, or remedy accruing to any Party under this Agreement, upon any breach or default of any other Party under this Agreement, shall impair any such right, power, or remedy of such non-breaching or non-defaulting Party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent, or approval of any kind or character on the part of any Party of any breach or default under this Agreement, or any waiver on the part of any Party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to any Party, shall be cumulative and not alternative.

(d)     **Amendment, Waiver, and Termination.** This Agreement may be amended, modified, or terminated and the observance of any term hereof may be waived (either generally or in a particular instance and either retroactively or prospectively) only by a written instrument executed by all Parties. Any amendment, modification, termination, or waiver so effected shall be binding upon the Parties and all of their respective successors and permitted assigns whether or not such Party, successor, assignee, or other individual or entity entered into or approved such amendment, modification, termination, or waiver. No waivers of or exceptions to any term, condition, or provision of this Agreement, in any one or more instances, shall be deemed to be, or construed as, a further or continuing waiver of any such term, condition, or provision or any other term, condition, or provision.

(e)     **Assignment of Rights.** The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns. Nothing in this Agreement, express or implied, is intended to confer upon any individual or entity other than the Parties hereto or their respective successors and permitted assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement. Any successor or permitted assignee of any of the Berrys' interests in the Project, including any prospective transferee who purchases any direct or indirect interest in the Project and/or any inter vivos

5

or testamentary donee or transferee of any such interest, shall deliver to Powers, as a condition to any transfer or assignment, a counterpart signature page hereto pursuant to which such successor or permitted assignee shall confirm his or its agreement to be subject to and bound by all of the provisions set forth in this Agreement that were applicable to the predecessor or assignor of such successor or permitted assignee.

(f) **Severability.** The invalidity or unenforceability of any provision of this Agreement shall in no way affect the validity or enforceability of any other provision.

(g) **Titles and Subtitles.** The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

(h) **Counterparts.** This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via electronic mail (including pdf or any electronic signature complying with the United States Federal ESIGN Act of 2000, i.e., www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

(i) **Specific Performance.** In addition to any and all other remedies that may be available at law in the event of any breach of this Agreement, each Party shall be entitled to specific performance of the agreements and obligations of the other Parties hereunder and to such other injunctive or other equitable relief as may be granted by a court of competent jurisdiction.

(j) **No Partnership.** This Agreement does not create or constitute any partnership, joint venture, or other similar relationship among the Parties, no such relationship shall be implied, and no Party shall make any representation to the contrary.

(k) **Advice of Counsel.** Each Party hereby acknowledges that he has sought and obtained the advice of legal counsel before entering into this Agreement and has fully read and understands the meaning and import of all terms in this Agreement.

6

(l) **Entire Agreement.** This Agreement constitutes and expresses the entire agreement and understanding among the Parties in reference to all matters referred to; all previous discussions, promises, representations, and understandings relative thereto, if any, among the Parties, being herein merged. No modification of this Agreement shall be binding unless in writing and signed by authorized representatives of all Parties.

**IN WITNESS WHEREOF**, the Parties, intending to be bound, have executed this Agreement as of the date first written above.


_____
ALLEN LAWRENCE BERRY


_____
MARVIN GLEN BERRY


_____
DENNIS WAYNE BERRY


_____
ALBERT THEODORE POWERS


7

**EXHIBIT 8**

Exhibit 2

# INVESTMENT AGREEMENT

THIS INVESTMENT AGREEMENT (the "Agreement") is made and entered into as of the 1st day of November, 2018 by and among Marvin Glen Berry, Dennis Wayne Berry, and Allen Lawrence Berry (collectively, the "Berrys"), and Albert Theodore Powers ("Powers") (each of the Berrys and Powers being referred to herein individually as a "Party" and collectively as the "Parties").

## RECITALS:

WHEREAS, the Berrys have devised a plan to develop, construct, own, and operate a system to allow hydrocarbon shippers maximum optionality to deliver hydrocarbons to local refinery markets in the vicinity of Corpus Christi, Texas and to export hydrocarbons via a premier United States Gulf Coast deep-water exporting facility, including without limitation shipping, reception, collection, consolidation, storage, staging, delivery, and exporting facilities, including a deep-water export terminal on Harbor Island, Texas, related tankage and pipelines, and other associated infrastructure, assets, facilities, and businesses, including without limitation certain real property and improvements currently owned, leased, optioned, or otherwise controlled by the Berrys and others at Redfish Bay, Midway Junction, and Harbor Island, Texas and additional properties and facilities to be acquired, leased, optioned, developed, or otherwise controlled by the Berrys and others (collectively, the "Project"); and

WHEREAS, simultaneously with this Agreement, the Parties are entering into another Agreement, pursuant to which the Berrys are appointing Powers as their representative and chief negotiator and adviser for the financing of the Project including without limitation negotiations with The Carlyle Group, and to perform due diligence, advice, and assistance regarding the sourcing of capital, develop strategy, and provide financial management and structuring advice and services. It is understood that Powers shall investigate various alternatives for financing all or portions of the Project, discuss with the Berrys various financing alternatives, assist the Berrys in formulating and interpreting financial projections for the Project and various potential transactions relating to the Project, assist the Berrys in formulating strategies to arrange the most favorable forms of financing for the Project, make financing recommendations to the Berrys, assist the Berrys in formulating strategies for achieving the most favorable terms for financing the Project, assist the Berrys in formulating business and holding structures for the Project, and negotiate terms and conditions of financing for the Project on behalf of the Berrys with various potential finance providers, including without limitation The Carlyle Group; and

WHEREAS, the Berrys and Powers wish to cooperate to (a) devise an ownership structure for directly and indirectly holding the Project and each of its major components, (b) secure third party financing for the Project, and (c) own and hold a portion of all interests in the Project, upon and subject to the terms and conditions of this Agreement;

NOW, THEREFORE, in consideration of the foregoing recitals and other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the Berrys and Powers hereby agree as follows:

1.     **Creation of Holding Structure and Contribution of Project and Project Interests.** On or before May 31, 2019 (a) the Berrys and all other owners of interests in the Project and its major components or their respective designees will form one or more corporations, limited liability companies, or other tax efficient limited liability entities (each a "**Project Company**" and, collectively, the "**Project Companies**) to collectively own and hold one hundred percent (100%) of all equity interests in the Project and its major components, (b) the Berrys will transfer to the Project Companies one hundred percent (100%) of their interests in the Project and each of its major components in exchange for one hundred percent (100%) of the equity interests in the Project Companies, (c) the Berrys will form a limited liability company or other tax efficient limited liability entity ("**Holding Company**") to hold all equity interests in the Project Companies, (d) the Berrys will contribute to Holding Company all equity interests in the Project Companies in exchange for one hundred percent (100%) of the equity interests in Holding Company, (e) the Berrys will form a limited liability company or other tax efficient limited liability entity ("**Investment Company**") to hold all equity interests in Holding Company, and (f) the Berrys will contribute to Investment Company all equity interests in Holding Company in exchange for one hundred percent (100%) of the equity interests in Investment Company.

2.     **Investment By Manager in Investment Company.** Within fifteen (15) days after (a) the Berrys and all other owners of interests in the Project and its major components or their respective designees have formed the Project Companies and transferred one hundred percent (100%) of their interests in the Project and each of its major components to the Project Companies, (b) all equity interests in the Project Companies have been contributed to Holding Company, (c) all equity interests in Holding Company have been contributed to Investment Company, and (d) the Berrys or their designees have received all equity interests in Investment Company (i) Powers will form a limited liability company or other tax efficient limited liability entity that is wholly owned by, or for the benefit of, Powers or his designees ("**Manager**"), (ii) Powers will contribute Five Thousand United States Dollars (US$5,000.00) to Manager in exchange for one hundred percent (100%) of Manager's operating interests and other ownership rights and interests, and (iii) Manager will contribute Five Thousand United States Dollars ($5,000) to Investment Company in exchange for a twenty percent (20%) overall carried interest and future profits interest in Investment Company after priority distributions to the Berrys or their designees of Two Hundred Fifty Million United States Dollars ($250,000,000) plus a ten percent (10%) cumulative preferred return on the outstanding balance of such amount. Except for the Five Thousand United States Dollar ($5,000) contribution to Manager and Investment Company described above, none of Manager, Powers, or any of their respective designees shall have any other obligation to contribute any other amounts to Investment Company, Holding Company, or any Project Company. The governing documents of Investment Company will reflect the respective interests of the Berrys, including their entitlement to priority distributions and preferred returns, and Investment Manager's twenty percent (20%) overall carried interest and future profits interest in Investment Company. Until the Berrys receive a priority return from Investment Company, Holding Company, and/or the Project Companies of Two

2

Hundred Fifty Million United States Dollars ($250,000,000) plus a ten percent (10%) cumulative preferred return on the outstanding balance of such amount, all gross amounts received by, or distributions made to, or on behalf of, Investment Company, Holding Company, and the Project Companies, including without limitation all earnings, proceeds, dividends, refinancing proceeds, disposition proceeds, incentive units or payments, or other receipts of any type or nature, shall be distributed to and paid to or on behalf of the Berrys or their designees and none of such amounts shall be paid or payable to or for the benefit of Manager or its designees. After the Berrys or their designees have received their priority distributions of Two Hundred Fifty Million United States Dollars plus a ten percent (10%) cumulative preferred return on the outstanding balance of such amount and Manager has received catch-up distributions from the Investment Company, eighty percent (80%) of all gross amounts received by, or distributions made to, or on behalf of Investment Company, Holding Company, and the Project Companies, including without limitation all earnings, proceeds, dividends, refinancing proceeds, disposition proceeds, incentive units or payments, or other receipts of any type or nature, shall be distributed to and paid to or on behalf of the Berrys or their designees and twenty percent (20%) of such amounts shall be paid or payable to or for the benefit of Manager or its designees. It is intended that the interests of Manager in Investment Company will qualify (i) as a carried interest within the meaning of Section 1061 of the United States Internal Revenue Code, and (ii) as a future profits interest within the meaning of Revenue Procedure 93-27, and that the governing documents of Investment Company will be drafted to reflect this intent. It is also intended that the capital accounts to be established and maintened by Investment Company will comply with the requirements of Treasury Regulations §1.704-1(b)(2)(iv) or any successor provision, and that such provisions will be interpreted and applied in a manner consistent with such Treasury Regulations or successor provisions and that the targeted allocations to be made to such capital accounts will reflect the Members' interests in the Company and have substantial economic effect. On or before the fifth (5th) day of each month, the Berrys shall provide to Manager a statement setting forth the total amounts of preferred return and priority distributions, if any, that have been received by them from Investment Company, Holding Company, and the Project Companies. Manager shall review each such statement and either confirm its agreement with the amounts shown on such statement or provide an alternative calculation of such amounts. If the Berrys and Manager do not agree on such calculation, they shall meet and attempt to reconcile their differences in the calculation of such amounts before resorting to any other remedy.

3. **Financing of Project.** To finance the development of the Project, it is anticipated that Investment Company will transfer its equity interests in Holding Company and/or one or more Project Companies to one or more other corporations, limited liability companies, or other tax efficient limited liability entities (each, a **"Project Entity"** and, collectively, the **"Project Entities"**) that will be jointly owned by Investment Company and other investors that will contribute equity capital for the development of the Project. In exchange for contributing its interests in Holding Company and/or one or more of the Project Companies to such Project Entities, it is anticipated that Investment Company will receive (a) shares, operating interests, or other equity interests in the Project Entities, (b) other rights and interests, including incentive

3

interests, incentive units, or other benefits in or from the Project Entities, and (c) other amounts directly or indirectly received, or distributions made, in respect of the Project Entities, including without limitation earnings, proceeds, dividends, refinancing proceeds, disposition proceeds, incentive units or payments, and other receipts of any type or nature in respect of or relating to the Project or any Project Company (collectively, "**Project Interests**").

4. **Distributions From Project Entities**. All (a) shares, operating interests, or other equity interests in the Project Entities, (b) other rights and interests, including incentive interests, incentive units, or other benefits in or from the Project Entities, and (c) Project Interests shall be distributed to and held by Investment Company. Distributions shall be made from Investment Company in accordance with the governing documents of Investment Company, which shall reflect the interests of the Berrys, including their entitlement to priority distributions and preferred returns, and the twenty percent (20%) carried interest and future profits interest of Manager.

5. **Miscellaneous Provisions**.

(a) **Governing Law, Jurisdiction, and Venue**. This Agreement and all issues and questions concerning its application, construction, validity, interpretation, and enforcement shall be governed by and construed in accordance with the laws of the State of Texas, without giving effect to any choice or conflict of laws provisions or rules (whether of the State of Texas or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Texas. Powers and each of the Berrys hereby agrees that any suit, action, or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort, or otherwise, shall be brought in the state or federal courts in Harris County, Texas, so long as one of such courts shall have subject-matter jurisdiction over such suit, action, or proceeding, and that any cause of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Texas. Powers and each of the Berrys hereby irrevocably consents to the exclusive jurisdiction of such courts and of the appropriate appellate courts therefrom in any such suit, action, or proceeding and irrevocably waives, to the fullest extent permitted by relevant law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action, or proceeding in any such court or that any such suit, action, or proceeding which is brought in any such court has been brought in an inconvenient forum.

(b) **Notices**. All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of (i) actual receipt, (ii) the time of personal delivery to the party to be notified, (iii) when sent, if sent by electronic mail during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day, (iv) five (5) days after

4

having been sent by registered or certified United States Post Office air mail, return receipt requested, postage prepaid, or (v) one (1) business day after deposit with a nationally recognized overnight air courier, freight prepaid, specifying next business day delivery, with written verification of receipt. All communications shall be sent to the respective Parties at their addresses as set forth in this section or to such addresses as subsequently modified by written notice given in accordance with this section. Each Party to this Agreement agrees to promptly notify the other Parties of any change in its address or electronic mail address, and any failure to do so shall not affect the foregoing.

Mailing and delivery address for Marvin Glen Berry, Dennis Wayne Berry, Allen Lawrence Berry, Bay Ltd, and all Berry entities:

> Berry Group
> 5005 Riverway
> Suite 440
> Houston, Texas 77056

> Email address for Allen Lawrence Berry:
> alb@riverway.us

> Email address for Marvin Glen Berry:
> captberry@aol.com

> Email address for Dennis Wayne Berry:
> berryd@bayltd.com

Mailing and delivery address for Albert Theodore Powers and Manager:

> Albert Theodore Powers
> 205 West 57th Street
> Apartment 4C
> New York, New York 10019

> Email address for Albert Theodore Powers
> atpowers@allied-pacific-group.com

(c) **Delays or Omissions.** No delay or omission to exercise any right, power, or remedy accruing to any Party under this Agreement, upon any breach or default of any other Party under this Agreement, shall impair any such right, power, or remedy of such non-breaching or non-defaulting Party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any

5

waiver, permit, consent, or approval of any kind or character on the part of any Party of any breach or default under this Agreement, or any waiver on the part of any Party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to any Party, shall be cumulative and not alternative.

(d)  **Amendment, Waiver, and Termination**. This Agreement may be amended, modified, or terminated and the observance of any term hereof may be waived (either generally or in a particular instance and either retroactively or prospectively) only by a written instrument executed by all Parties. Any amendment, modification, termination, or waiver so effected shall be binding upon the Parties and all of their respective successors and permitted assigns whether or not such Party, successor, assignee, or other individual or entity entered into or approved such amendment, modification, termination, or waiver. No waivers of or exceptions to any term, condition, or provision of this Agreement, in any one or more instances, shall be deemed to be, or construed as, a further or continuing waiver of any such term, condition, or provision or any other term, condition, or provision.

(e)  **Assignment of Rights**. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns. Nothing in this Agreement, express or implied, is intended to confer upon any individual or entity other than the Parties hereto or their respective successors and permitted assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement. Any successor or permitted assignee of any of the Berry Interests, including without limitation any prospective transferee who purchases any direct or indirect interest in the Project and/or any inter vivos or testamentary donee or transferee of any such interest, shall deliver to Powers, as a condition to any transfer or assignment, a counterpart signature page hereto pursuant to which such successor or permitted assignee shall confirm his or its agreement to be subject to and bound by all of the provisions set forth in this Agreement that were applicable to the predecessor or assignor of such successor or permitted assignee.

(f)  **Severability**. The invalidity or unenforceability of any provision of this Agreement shall in no way affect the validity or enforceability of any other provision.

(g)  **Titles and Subtitles**. The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

(h)  **Counterparts**. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which

6

together shall constitute one and the same instrument. Counterparts may be delivered via electronic mail (including pdf or any electronic signature complying with the United States Federal ESIGN Act of 2000, i.e., www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

(i)     **Specific Performance.** In addition to any and all other remedies that may be available at law in the event of any breach of this Agreement, each Party shall be entitled to specific performance of the agreements and obligations of the other Parties hereunder and to such other injunctive or other equitable relief as may be granted by a court of competent jurisdiction.

(j)     **No Partnership.** This Agreement does not create or constitute any partnership, joint venture, or other similar relationship among the Parties, no such relationship shall be implied, and no Party shall make any representation to the contrary.

(k)     **Advice of Counsel.** Each Party hereby acknowledges that he has sought and obtained the advice of legal counsel before entering into this Agreement and has fully read and understands the meaning and import of all terms in this Agreement.

(l)     **Entire Agreement.** This Agreement constitutes and expresses the entire agreement and understanding among the Parties in reference to all matters referred to; all previous discussions, promises, representations, and understandings relative thereto, if any, among the Parties, being herein merged. No modification of this Agreement shall be binding unless in writing and signed by authorized representatives of all Parties.

**IN WITNESS WHEREOF**, the Parties, intending to be bound, have executed this Agreement as of the date first written above.

_____
ALLEN LAWRENCE BERRY

_____
MARVIN GLEN BERRY

7

_____

DENNIS WAYNE BERRY


_____

ALBERT THEODORE POWERS

| | | |
|---|---|---|
| **ALBERT THEODORE POWERS;** | § | **IN THE BUSINESS COURT** |
| **ALLIED PORTS LLC,** | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| **v.** | § | **11A – STATE OF TEXAS** |
| | § | |
| **AXIS MIDSTREAM HOLDINGS LLC;** | § | |
| **ALLEN LAWRENCE BERRY;** | § | |
| **MARVIN GLENN BERRY; and** | § | |
| **BONNIE BERRY, as successor in** | § | |
| **interest to DENNIS WAYNE BERRY** | § | |
| | § | |
| *Defendants.* | § | **HONORABLE SOFIA ADROGUE** |

# DEFENDANTS' EXHIBIT 9

# AVAILABLE IN CAMERA

Exhibit 6

# AMENDED AND RESTATED OPERATING AGREEMENT
## of
## AXIS MIDSTREAM HOLDINGS, LLC

**THIS AMENDED AND RESTATED OPERATING AGREEMENT OF HARBOR ISLAND PROPERTIES, LLC** is made and entered into as of the 21st day of April, 2020, by and among Lone Star Ports Enterprises, LLC, a Delaware limited liability company ("**LSPE**"), and Axis Midstream Holdings, LLC, a Texas limited liability company (the "**Company**").

1.  **DEFINITIONS**. The following terms have the meanings ascribed to them below when used elsewhere in this Agreement with the initial letter capitalized.

    "**Acceptance Notice**" has the meaning ascribed to that term in Section 9.4(c).

    "**Act**" means the Texas Business Organizations Code, Chapter 101, as amended.

    "**Additional Acceptance Notice**" has the meaning ascribed to that term in Section 9.4(c).

    "**Additional Capital Contributions**" has the meaning ascribed to that term in Section 4.2.

    "**Affiliates**" means, with respect to a specified individual or entity (a) any individual who is related to such individual to any degree by blood, marriage, or adoption, (b) any entity that directly or indirectly through one or more intermediaries controls, is controlled by, or is under common control with such individual or entity, whether by ownership of voting interests, management policies, contract, or otherwise, and (c) any officer, director, shareholder, owner, partner, member, trustee, manager, employee, or agent of such individual or entity.

    "**Agreement**" means this Operating Agreement of Axis Midstream Holdings, LLC.

    "**Capital Account**" has the meaning ascribed to that term in Section 4.4.

    "**Code**" means the Internal Revenue Code of 1986, as amended.

    "**Company**" means Axis Midstream Holdings, LLC, a Texas limited liability company.

"**Company Assets**" means any and all assets of the Company including without limitation any (a) real property, securities, contracts, accounts receivable, cash, or any other asset or receivable of the Company, (b) shares, operating interests, or other equity interests in any Affiliate of the Company, (c) other rights and interests, including incentive interests, incentive units, or other benefits in or from any Affiliate of the Company, and (d) other amounts directly or indirectly received, or distributions made in respect of, any Affiliate of the Company, including without limitation earnings, profits, proceeds, dividends, refinancing proceeds, disposition proceeds, incentive units or payments, and other receipts of any type or nature in respect of or relating to any Affiliate of the Company.

"**Company Expenses**" includes but is not limited to Company organizational costs, costs for tax return preparation, financial statement preparation and/or audits, legal fees and costs, filing, licensing, or other governmental fees, other third party audits, loan fees and servicing fees, Company administration costs, capital acquisition fees and costs including without limitation payments to third parties who are contracted to raise capital for the Company, loan brokerage and origination and/or other fees associated with any credit facilities, costs associated with ownership or operation of real property (e.g., property improvement and rehabilitation costs not otherwise capitalized, sales and leasing commissions, property taxes, property management, insurance premiums, utilities, and other expenses associated with ownership or operation of the property), and any other expenses associated with the operation of the Company or the management of Company Assets. Company Expenses may be direct costs, or allocated costs reimbursable to third parties or entities (including Manager or its Affiliates).

"**Co-Sale Notice**" has the meaning ascribed to that term in Section 9.4(d).

"**Co-Sale Right**" has the meaning ascribed to that term in Section 9.4(d).

"**Distributable Cash**" means cash generated from the Company's Assets and other operations of the Company after payment of or provision for Company Expenses and such amounts as Manager deems reasonable in order to provide for any anticipated, contingent, or unforeseen expenditures or liabilities of the Company. Distributable Cash shall be determined without regard to (a) capital contributions made by Members or (b) principal advanced on Company indebtedness.

"**Distributions**" means amounts which are from time to time distributed in cash or property to holders of Units.

"**Fair Market Value**" shall be determined by Manager based upon a combination of recent appraisals, third party valuations, and additional internal valuation methods, including but not limited to capitalization rate and income valuations.

"**Information**" has the meaning ascribed to that term in Section 11.

2

"**Intangible Rights**" means various intangible rights relating to the Project, which are listed on Exhibit 1 attached to this Agreement.

"**Initial Capital Contribution**" has the meaning ascribed to that term in Section 4.1.

"**Issuing Notice**" has the meaning ascribed to that term in Section 9.7(a).

"**LSPE**" means Lone Star Ports Enterprises, LLC, a Delaware limited liability company.

"**Manager**" means LSPE and/or such other Person or Persons who may be appointed by the Member(s) from time to time as the Manager or one of the Managers of the Company.

"**Member**" means any individual or entity holding Units that is a party to this Operating Agreement. At the time this Agreement is signed, the sole Member is LSPE.

"**New Units**" has the meaning ascribed to that term in Section 9.7(a).

"**Offer**" has the meaning ascribed to that term in Section 9.4(a).

"**Offer Notice**" has the meaning ascribed to that term in Section 9.4(b).

"**Operator**" has the meaning ascribed to that term in Section 3.4.

"**Other Member**" has the meaning ascribed to that term in Section 9.4(a).

"**Ownership Interest**" means, for each Member, that percentage which is obtained by dividing the number of Units held by such Member by the total number of all Units held by all Members.

"**Person**" means any individual, partnership, association, corporation, company, trust, governmental authority, or other entity having a separate legal personality.

"**Project**" has the meaning ascribed to that term in Section 3.2.

"**Special Matter**" has the meaning ascribed to that term in Section 7.6.

"**Special Meeting**" has the meaning ascribed to that term in Section 9.7(b).

"**Special Transfer Notice**" has the meaning ascribed to that term in Section 9.4(e).

"**Substitute Member**" means a Member who acquires Units from another Member, in compliance with the terms and conditions of Section 9.1.

"**Transfer**" has the meaning ascribed to that term in Section 9.1.

"**Transferring Member**" has the meaning ascribed to that term in Section 9.4(a).

"**Treasury Regulations**" means the United States Treasury Regulations enacted pursuant to the Code.

"**Unit**" or "**Units**" has the meaning ascribed to that term in Section 4.3.

## 2.     ORGANIZATIONAL MATTERS.

**2.1     Formation**. The Company was organized under the Act as a Texas limited liability company on September 12, 2017 pursuant to the filing of a Certificate of Formation with the Secretary of State of Texas (Texas State File Number 802812872).

**2.2     Name**. The name of the Company is Axis Midstream Holdings, LLC.

**2.3     Principal Place of Business**. The principal place of business of the Company shall be 5005 Riverway Drive, Suite 440, Houston, Texas 77056, or such other place or places as Manager may from time to time determine.

**2.4     Registered Office and Registered Agent**. The Company's registered office shall be at 5005 Riverway Drive, Suite 440, Houston, Texas 77056, and the name of the initial registered agent is Allen Lawrence Berry at the same address.

**2.5     Names and Addresses of Members**. The name of the sole Member of the Company and its registered office address are as follows:

**Lone Star Ports Enterprises, LLC**
16192 Coastal Highway
Lewes, Delaware 19958

The names of the Members, as amended from time to time and maintained in the Company's records, are hereby incorporated by reference.

**2.6     Effect of Inconsistencies with the Act**. To the extent that the rights or obligations of any Member are different by reason of any provision of this

4

Agreement than they would be in the absence of this Agreement, this Agreement shall, to the extent permitted by the Act, control.

**2.7    Adoption of Agreement**. Each person acquiring Units in the Company shall be admitted as a Member and shall, by written instrument in form and substance acceptable to Manager, accept, adopt, and be bound by the terms and provisions of this Agreement, and such person shall each execute and deliver such other instruments as Manager reasonably deems necessary or appropriate to effect, and as a condition to, such acquisition of Units.

**2.8    Fiscal Year**. The Company's taxable year will end on the 31st day of December in each year unless the Members unanimously agree to change that date.

**2.9    Company Bank Accounts**. The Company's available cash will be deposited or placed in one or more accounts, which generally shall be at federally insured financial institutions. Each such account will consist of investments that are immediately liquid, and that are sufficiently safe while attempting to produce a yield (if any) on the Company's cash.

## 3.    PURPOSES AND BUSINESS OF THE COMPANY; PROJECT; COMPANY AND PROJECT STRUCTURE.

**3.1    Purposes and Business**. The purposes and businesses of the Company are to generate positive financial returns to Members by originating, acquiring, holding, operating, exploiting, and disposing of assets and conducting such other business activities as from time to time shall be determined by the Members and as shall be permissible under relevant laws.

**3.2    The Project**. The primary initial activities of the Company will be to serve as a holding company for various intangible rights relating to a hydrocarbons delivery system and export terminal to be developed, constructed, owned, and operated by LSPE and its Affiliates (collectively, the "**Project**").

**3.3    Structure of the Project**. The initial organizational and holding structure for the Project will be that (a) the Member(s) will own all equity and operating interests in the Company, (b) the Company will own the Intangible Rights, and (c) the Intangible Rights will be used in connection with the Project.

## 4.    CAPITAL AND CONTRIBUTIONS.

**4.1    Capital Contributions**. The initial capital of the Company is the contribution by LSPE to the Company of the capital to obtain and develop the Intangible Rights (the "**Initial Capital Contribution**").

**4.2    Additional Capital Contributions**. The Members shall contribute to the capital of the Company from time to time such additional amounts of cash or other

property as the Company determines is necessary to achieve the Company's purposes and conduct the Company's businesses, including without limitation all Company Expenses that cannot be paid from the Company's revenues ("**Additional Capital Contributions**"). No Member shall be required to make any Additional Capital Contributions.

**4.3** **Membership Units**. The interest of each Member in the capital and profits of the Company is represented by Units, which shall represent proportional Ownership Interests in the Company (each, a "Unit", and collectively, the "**Units**"). The initial number of Units in the Company is one (1) Unit, which Unit is held by LSPE and represents One Hundred Percent (100%) of the initial outstanding equity and operating interests in the Company.

**4.4** **Capital Accounts**. An individual capital account (a "**Capital Account**") shall be established and maintained for each Member in accordance with the following:

(a) There shall be credited to each Member's Account: (i) the amount of Capital Contributions by such Member to the Company in exchange for its Units in the Company pursuant to Section 4.1, (ii) the amount of cash and the Fair Market Value at the time of such contribution of any non-cash property contributed by such Member to the Company as Additional Capital Contributions, and (iii) such Member's share of the income and gain (and all items thereof) of the Company (including income or gain exempt from federal income tax and income and gain described in Treasury Regulation §1.704-1(b)(2)(iv)(g), but excluding income and gain described in Treasury Regulation §1.704-1(b)(4)(i)), as allocated pursuant to Section 5.1.

(b) There shall be charged against each Member's Capital Account: (i) the amount of cash and the Fair Market Value at the time of the relevant Distribution of all property distributed to such Member by the Company; (ii) such Member's share of expenditures of the Company described in Code §705(a)(2)(B); and (iii) such Member's share of the losses and deductions of the Company (including losses and deductions described in Treasury Regulations §1.704-1(b)(2)(iv)(g), but excluding such Member's share of expenditures of the Company described in Code §705(a)(2)(B) and losses and deductions described in Treasury Regulations §1.704-1(b)(4)(i)), as allocated pursuant to Section 5.1.

(c) It is the intent of the Members that the provisions of this Agreement relating to the establishment and maintenance of Capital Accounts comply with the requirements of Treasury Regulations §1.704-1(b)(2)(iv) or any successor provision, and that such provisions are interpreted and applied in a manner consistent with such Treasury Regulations or successor provision. Members' capital accounts may not necessarily reflect the stated value of the Members' investments and may not have a correlation to calculations of Unit

values or any amounts payable to the Members pursuant to this Agreement, but allocations are intended to reflect the Members' interests in the Company and to have substantial economic effect.

## 5. ALLOCATION OF PROFITS AND LOSSES; DISTRIBUTIONS.

**5.1 Allocation of Profits and Losses.** Each item of Company income, gain, loss, deduction, or credit shall be allocated among the Members in accordance with this Section 5.1. Net profits first shall be allocated to the Members having negative Capital Account balances, in proportion to their adjusted negative Capital Accounts. Any remaining profits or net losses shall be allocated to the Members to create Capital Account balances for the Members that are equal to the amount of cash that would be distributed under Section 5.2. If an allocation of net losses exceeds the positive Capital Account balances of the Members, the excess shall be allocated in accordance with the Members' Ownership Interests.

**5.2 Distributions of Cash and Property.** All distributions of cash and property from the Company shall be made in the following order of priority:

(a) First, one hundred percent (100%) to the payment of interest and principal payments on any credit facility and/or debt obligations of the Company, to the extent thereof;

(b) Second, one hundred percent (100%) to the payment of Company Expenses; and

(c) Thereafter, to the Members, pro rata in proportion to their Ownership Interests.

The amount of all distributions of cash shall be the face value of such distributed cash. The amount of all distributions of Company Assets other than cash shall be the Fair Market Value of such distributed Company Assets.

## 6. BOOKS OF ACCOUNT, RECORDS, AND REPORTS.

**6.1 Books and Records.** The Company shall maintain at its principal place of business the Company's books and records, a register showing a current and past list of the full names and last known addresses of its Members, a copy of its Certificate of Formation, a copy of this Agreement and all amendments thereto, copies of the Company's federal, state, and local tax returns and reports, if any, for the three most recent years, and copies of any financial statements of the Company for the three most recent years. The Company shall keep proper and complete records and books of account, entering fully and accurately all transactions and other matters relative to the Company's business as are usually entered into records and books of account maintained by persons engaged in businesses of a like character. The Company shall maintain its books and records in full accordance with generally accepted accounting principles and

7

on the accrual basis (except in circumstances where it determines that the cash or income tax basis of accounting will be in the best interest of the Company). Each Member shall have access to all such information at all reasonable times.

**6.2** **Financial Statements; Reports**. The Company will also employ a certified public accountant to prepare its tax returns and perform an audit of the Company's financial statements annually. The cost of any financial statements, tax returns, and audits will be paid by the Company. As soon as practicable following the close of each taxable year, the Company will provide the Members with information for their use in preparing documents required to be filed under federal and state income tax laws and other applicable laws. The cost for all such reports shall be borne by the Company.

**6.3** **Tax Matters.**

**(a)** **Tax Elections**. The Company shall, without any further consent of the Members being required, make any and all elections for federal, state, local, and foreign tax purposes, file any tax returns, and execute any agreements or other documents relating to or affecting such tax matters, including agreements or other documents that bind the Members with respect to such tax matters or otherwise affect the rights of the Company and the Members.

**(b)** **Tax Classification**. The Company shall take such action as may be required under the Code and the Treasury Regulations to cause it to be taxable as a partnership for federal and state income tax purposes.

**7.** **MEMBER; MEETINGS AND DECISIONS.**

**7.1** **Information Rights**. Each Member shall be entitled to full information regarding all Company, Project, and Project Company matters at all times.

**7.2** **Participation in Governance**. Each Member shall be entitled to participation in all significant Company management and operational matters and to participation on governing or management bodies for the Company and each Project Company commensurate with the relevant ownership interests of the owners of the Company or the relevant Project Company.

**7.3** **Members' Meetings**. The Company shall hold meetings of the Members at mutually-agreeable times and places (which meetings may be conducted wholly or partially by telephone or other electronic means in which all participants are able to communicate with one another simultaneously) and the quorum for such meetings shall be the Manager and a majority of Members measured by Operating Interests, not numbers. The Company shall hold at least one physical meeting of the Members in each year. In addition, a meeting of Members shall be held if it is called by either Member in a written request for the meeting, describing the purpose or purposes for which it is to be held. In either case, Manager shall call a meeting by providing written notice to the

Members stating the purpose of the meeting, and the date, time, and place of the meeting. Such meeting shall be held at a time and place designated by Manager not less than ten (10) days or more than thirty (30) days after Manager's written notice to the Members. All meetings of Members shall be held at the principal office of the Company or any other place specified in the Notice of Meeting.

**7.4     Proxies.** A Member may be represented at a meeting in person or by written proxy. A proxy shall be in writing executed by the Member and filed with Manager before the commencement of the meeting.

**7.5     Voting.** On each matter requiring action by the Members, each Member may vote the Member's Ownership Interest.

**7.6     Special Matters.** Decisions regarding actions to be taken by the Company on the following matters (each, a "**Special Matter**") shall be made by unanimous agreement of the Members:

(a)     approval of the Company's annual capital and operating budgets;

(b)     any contractual arrangement between a Member and/or one or more of its Affiliates and the Company or any Project Company, including without limitation the EPCM Contract;

(c)     any agreement pursuant to which the Company or any of its Affiliates could be obligated to pay an amount greater than One Million Dollars (US$1,000,000), including without limitation by way of any borrowing, guarantee, or pledge of assets by or on behalf of the Company or any of its Affiliates, except as provided in this Agreement or otherwise in the ordinary course of business;

(d)     any sale or other disposition of assets of the Company or any of its Affiliates having a value in excess of One Million Dollars ($1,000,000), other than in the ordinary course of business;

(e)     incurrence by the Company of capital or operating expenses in excess of budgeted amounts;

(f)     establishment and changes in the Company's audit policy and appointment of and changes in the Company's auditors;

(g)     appointment of legal counsel and the institution or settlement of legal proceedings by the Company;

(h)     related party and non-ordinary course transactions;

9

(i)     material change in the nature of the business of the Company;

(j)     issuing further Units or other equity, debt, or operating interests in the Company, the Project, or any Project Company; and

(k)     the termination, supersession, or amendment of this Agreement.

## 8.     MANAGER.

**8.1     Rights and Powers**. The Company shall be managed by the Manager. The initial sole Manager of the Company is Lone Star Ports Enterprises, LLC. Manager has all of the rights and powers of a Manager as provided in the Act, this Agreement, and as otherwise provided by law.

**8.2     Liability to the Company; Indemnification**. To the greatest extent permitted by law, neither Manager nor any of its Affiliates shall be liable, responsible, or accountable in damages or otherwise to the Company or any Member for any action taken or failure to act on behalf of the Company within the scope of the authority conferred on Manager by this Agreement or by law unless such act or omission was performed or omitted fraudulently or in bad faith. To the greatest extent permitted by law, the Company shall indemnify and hold harmless Manager and each of its Affiliates against and from any personal loss, expense, damage, or injury suffered or sustained by Manager or such Affiliate by reason of any acts, omission, or alleged acts or omissions arising out of its activities on behalf of the Company or in furtherance of the interests of the Company, including but not limited to any judgment, award, settlement, attorney fees, and other costs or expenses incurred in connection with the defense of any actual or threatened action, proceeding, or claim and including any payments made by Manager to any of its Affiliates if the acts, omissions, or alleged acts or omissions upon which the actual or threatened action, proceeding, or claim is based were for a purpose reasonably believed to be in the best interests of the Company, and were not performed or omitted fraudulently or in bad faith by Manager or its Affiliates and were not in violation of Manager's fiduciary obligations to the Company. Any indemnification shall only be from Company Assets.

**8.3     Prohibited Acts**. Anything in this Agreement to the contrary notwithstanding, Manager shall not cause or permit the Company to: (a) reimburse Manager for expenses incurred or for salaries of its officers except as otherwise expressly provided in this Agreement or otherwise authorized by the Members or their Affiliates, (b) pay for any services performed by Manager or its Affiliates, except as authorized by the Members or their Affiliates, or (c) receive any rebate, kickback, or other inducement in connection with Company activities, or participate in reciprocal business arrangements which circumvent this provision.

10

**8.4**    **Removal or Withdrawal of Manager**. The Members may, by unanimous written consent or affirmative vote, and with at least ninety (90) days' notice, remove Manager. The Members may then, by a majority vote or written consent, elect a new Manager provided; however, that such removal of Manager shall not become effective until the election of the new Manager. Manager may voluntarily resign as Manager at any time with at least ninety (90) days' written notice to the Members. In the event of Manager's resignation, a Manager may be substituted who is acceptable to Members holding a majority of the Ownership Interests. Manager's resignation shall not become effective until the election of a new Manager by the Members, or ninety (90) days from the date of Manager's resignation notice to the Members, whichever comes first. Any removal or resignation of Manager shall in no way impair or otherwise affect any rights of Manager attributable to the period prior to the effective date of removal, including without limitation Manager's Ownership Interest.

**8.5**    **Power of Attorney**. Each Member who executes a signature page to this Agreement thereby irrevocably constitutes and appoints Manager, with full power of substitution, as its true and lawful attorney-in-fact, in its name, place, and stead to execute, acknowledge, swear to, verify, deliver, file, and publish, if necessary: (a) this Agreement; (b) all amendments, alterations, or changes to this Agreement, including amendments admitting a substituted or additional Member, if otherwise authorized under this Agreement; (c) all instruments which effect a change in the Company or a change in this Agreement; (d) all certificates or other instruments necessary to qualify or maintain the Company as a limited liability company in which the Members have limited liability in the jurisdictions(s) where the Company may conduct business; and (e) all instruments necessary to effect a dissolution, termination, and liquidation of the Company and cancellation of this Agreement when such dissolution, termination, liquidation, or cancellation is otherwise provided in this Agreement. This power of attorney is deemed coupled with an interest and shall survive the death or disability of a Member or the assignment or transfer of all or any part of the interest of such Member in the Company until the transferee or assignee shall have become a Substitute Member and shall have executed such instruments as Manager deems necessary to bind such transferee or assignee under the terms of this Agreement as it may hereafter be amended. Manager may exercise this power of attorney for each Member by listing all of the Members and executing any instrument with a single signature of Manager acting as attorney-in-fact for all of them.

**9.**    **TRANSFERS OF UNITS.**

**9.1**    **Transfers and Transferors**. No Member or any other Person shall sell, assign, transfer, dispose of, donate, mortgage, pledge, hypothecate, charge or otherwise encumber or deal with (each, a "**Transfer**") any of his/her/its Units except in strict compliance with this Section 9.1. Each Member hereby agrees that (a) it will not Transfer all or any fraction of his/her/its Units, except as permitted by this Agreement, (b) in no event, shall all or any part of its Units be transferred to a minor or a person who is incapacitated, except in trust or by will or intestate succession, and (c) it will pay all expenses, including attorneys' fees, incurred by the Company in connection with a

11

Transfer of its Units. The Company shall not recognize for any purpose any purported Transfer of all or any part of any Units, unless (i) there shall have been filed with the Company a dated notice of such Transfer, in a form satisfactory to Manager, executed and acknowledged by both the transferor or such transferor's legal representative and the transferee, and (ii) such notice (A) contains the acceptance by the transferee of all the terms and provisions of this Agreement and such transferee's agreement to be bound hereby, and (B) represents that such Transfer was made in accordance with the terms and conditions of this Agreement and all applicable laws, rules, and regulations. Any Member which shall Transfer all of its Units shall cease to be a Member upon, but only upon, compliance with the provisions of this Section 9.1 and the admission by the Company of the transferee as a Member (a "**Substitute Member**") in such transferor Member's stead. Notwithstanding anything to the contrary contained in this Agreement, both the Company and Manager shall be entitled to treat a Member transferring all or any part of its Units as the absolute owner of such Units in all respects, and shall incur no liability for distributions made in good faith to such Member, until such time as a Substitute Member is admitted by the Company in such Member's stead in respect thereof.

**9.2** **Substitute Members**. No Member shall have the right to cause a transferee of all or any part of such Member's Units to become a Substitute Member, except in strict compliance with the terms and conditions of Section 9.1. Unless and until a transferee of Units becomes a Substitute Member, such transferee shall have no rights with respect to such Units other than those rights with respect to allocations and distributions. Any such transferee of Unit(s) (whether pursuant to a voluntary or involuntary Transfer) shall be admitted to the Company as a Substitute Member only by satisfying the requirements of Section 9.1. Each transferee of all or part of a Member's Membership Units, as a condition to its admission as a Substitute Member, shall execute and acknowledge such instruments, in form and substance satisfactory to Manager, as Manager reasonably deems necessary or desirable to effectuate such admission and to confirm the agreement of such person to be bound by all the terms and provisions of this Agreement with respect to the Membership Units acquired. All reasonable expenses, including attorneys' fees, incurred by the Company in this connection shall be borne by such transferee.

**9.3** **Bankruptcy or Incapacity of a Member**. In the event of the bankruptcy or incapacity of a Member, the Company shall not be dissolved, and the Member's trustee in bankruptcy or other legal representative shall have no rights with respect to such Units other than those rights with respect to allocations and distributions applicable to the Units of such bankrupt or incapacitated Member as provided herein. Any Transfer to or from any trustee in bankruptcy, guardian, conservator, or legal representative shall be subject to the provisions of this Agreement.

**9.4** **Rights of First Refusal.**

(a) **Transfer by Members**. No Member or other Person who legally or beneficially directly or indirectly owns Units or the shares or other

12

equity interests in a Member shall, directly or indirectly, Transfer any interest in or portion of any of the Units, the Company, any Member, any Person that directly or indirectly owns any shares or equity interests in a Member, or any of their respective Affiliates (each, a "**Transferring Member**"), unless it first shall have made an offer to sell to the other Members, in proportion to their Ownership Interests at the time of the proposed Transfer (the "**Other Members**"), the interest in or portion of the Units or other interests it proposes to Transfer in the manner prescribed in Section 9.4(b) (an "**Offer**"), and the Offer shall not have been accepted as prescribed in Section 9.4(c).

(b)     **Making of Offer**.  If a Transferring Member or other Person proposes to directly or indirectly Transfer any interest in or portion of any of the Units, the Company, a Member, any Person who directly or indirectly owns any shares or equity interests in a Member, or any of their respective Affiliates, it first shall make an offer to the Other Members, upon the terms and conditions of the proposed Transfer.  The Offer shall be set forth in a Notice to the Other Members (an "**Offer Notice**") and shall include the name and address of the prospective Transferee and the terms and conditions of the proposed Transfer.

(c)     **Acceptance of Offer**.  After receiving the Offer Notice, the Other Members shall have thirty (30) days within which to elect to purchase all, but not less than all, of the interest in or portion of any of the Units or other interests proposed to be Transferred, in proportion to their Ownership Interests as of the date of the Offer Notice, Notice of such acceptance (each, an "**Acceptance Notice**") to be communicated to the Transferring Member within such thirty (30)-day period, and they shall have the further right to purchase any Units that are so proposed to be Transferred for which Acceptance Notices are not received within such thirty (30)-day period, in proportion to the Ownership Interests as of the date of the Offer Notice by Members that have provided Acceptance Notices, Notice of such further acceptance (an "**Additional Acceptance Notice**") to be communicated to the Transferring Member within ten (10) days after the expiration of such initial thirty (30)-day period.

(d)     **Co-Sale Right**.  In lieu of accepting any Offer, the Other Members shall have thirty (30) days within which to elect to sell their Units to the prospective Transferee identified in the Offer, upon the same terms and conditions as contained in the Offer (the "**Co-Sale Right**").  If the Other Members elect to exercise this right, Notice of such election (a "**Co-Sale Notice**") shall be communicated to the Transferring Member within such thirty (30)-day period.

(e)     **Special Transfer Provision**.  In the event that (i) the Transferring Member or Transferring Members wish to make a bona fide Transfer of more than fifty percent (50%) of all outstanding Units to a bona fide third party Transferee, (ii) the Transferring Member makes an Offer to sell such Units to the Other Members in accordance with Sections 9.4(a) and 9.4(b), (iii) any Other Member does not accept such Offer in accordance with Section 9.4(c), and

13

(iv) any Other Member does not exercise the Co-Sale Right in accordance with Section 9.4(d), the Transferring Members shall have the right, but not the obligation, to compel the Other Members to Transfer their Units to the prospective Transferee identified in the Offer, and each Other Member shall have the obligation to so Transfer its Units, on the same terms and conditions as the Transfer made by the Transferring Members, if the Transferring Member so compels the Other Member, and the proceeds received by all Members for the Units shall be pro rata in accordance with their percentage ownership of the Units so Transferred. In the event the Transferring Members wish to exercise the right to compel the Other Members to Transfer its Units pursuant to this Section 9.4(e), Notice of such election (a "**Special Transfer Notice**") shall be communicated to the Other Members.

(f) **Consummation of Transfers**. Any Transfer by one Member or another Person of any interest in or portion of Units, the Company, a Member, any Person that directly or indirectly owns any Units or other equity interest in a Member, or any of their respective Affiliates, to another Member or other Person pursuant to this Section 9.4 shall be consummated within sixty (60) days after the date of the Transferee Member's acceptance of the Transferor Member's Offer or the date on which such Member is required to sell or purchase such Units.

(g) **Release from Restriction**. If (i) an Offer is not accepted pursuant to Section 9.4(c), (ii) the Other Members do not elect to exercise the Co-Sale Right granted pursuant to Section 9.4(d), or (iii) a purchase is not consummated within the sixty (60)-day time limit provided for in Section 9.4(f), the Transferring Member may make a bona fide Transfer to the prospective Transferee named in the Offer, in strict accordance with the terms and conditions stated in the Offer and only if, prior to such Transfer, such prospective Transferee shall have agreed to be bound by the terms of this Agreement as though he or it were a Member and this Agreement shall have been amended to reflect the Transfer to such prospective Transferee. If the Transferring Member shall fail to make such Transfer within sixty (60) days after the expiration of the time provided for the acceptance of its offer by the last Member to which it has made an offer, however, such Units again shall become subject to all of the restrictions of this Section 9.4.

9.5 **Transfers to Affiliates**. The terms of Section 9.4 shall not apply to proposed Transfers by Members to their Affiliates; provided, however, that (a) any such Affiliate Transferee shall be bound by all terms and conditions of this Agreement, or (b) the Transferring Member shall remain liable for all of its obligations under this Agreement.

9.6 **Legend on Certificates**. Each certificate representing Units or any other direct or indirect interest in the Company now or hereafter held by the

14

Members or their Affiliates shall be stamped with a legend in substantially the following form:

> "The transfer of and rights in the Units represented by this certificate are restricted under the terms of an Amended and Restated Operating Agreement of Axis Midstream Holdings, LLC, as amended from time to time, a copy of which is on file at the office of the Company issuing this certificate."

**9.7    Preemptive Rights**. The following shall apply to the allotment and issuance by the Company of any Units:

(a)    If the Company proposes to issue additional Units ("**New Units**"), the New Units shall be offered to the Members at a price and upon terms determined by the Manager. The Company shall give written notice (the "**Issuing Notice**") to each of the Members, setting forth the price at which, and terms on which the New Units are being offered.

(b)    The Issuing Notice shall state the time at which a special meeting of the Members (a "**Special Meeting**") shall be held for the purposes of this Section 9.7 at the principal office of the Company on a day which shall be not earlier than the 15th day following the date the Issuing Notice is given, provided that if the 15th day is a Saturday, Sunday, or statutory holiday, the date for the Special Meeting shall be the next following business day.

(c)    Each Member wishing to purchase part or all of the New Units may attend the Special Meeting either personally or by his/her/its representative duly appointed for such purpose. A Member proposing to be represented at the Meeting shall deposit with the Manager at or prior to the Special Meeting an instrument in writing, designating the representative and, if desired, an alternate representative or, alternate representatives, authorized to act on behalf of such Member at the Special Meeting.

(d)    The Manager shall preside at the Special Meeting and may prescribe such procedures for the conduct of the Special Meeting not inconsistent with the provisions of this Section 9.7 as he/she/it may consider appropriate for the purposes of carrying out the intent of this Section 9.7.

(e)    If the Members represented at the Special Meeting accept the offer stated in the Issuing Notice, the Members shall subscribe for the New Units in accordance with the Issuing Notice and shall execute a written subscription in accordance therewith which shall be accepted forthwith by the Company. The Members shall be entitled to subscribe for and purchase the New Units in such proportions as they may agree upon or, in default of such agreement, in proportion to their Ownership Interests.

15

(f)     Any New Units which are not subscribed for by the Members in accordance with this Section 9.7 may be offered by the Company to a third Person at the price and on the terms in the Issuing Notice, provided that no subscription shall be accepted by the Company for the sale of any such Units to a third Person except with the written consent of the holders of at least sixty percent (60%) of the Units outstanding at such time.

## 10.     TERM AND DISSOLUTION OF THE COMPANY.

**10.1     Term.** The Company is now existing and will continue indefinitely, except as provided in Section 10.2.

**10.2     Dissolution.** The Company will continue indefinitely until a date on which the Company has liquidated all of its Company Assets, or earlier upon the occurrence of any of the following events: (a) the disposition of all Company Assets and disbursement of all cash to the Members in accordance with Section 5.2; (b) the agreement by Members holding eighty percent (80%) of the Ownership Interests; or (c) the dissolution, bankruptcy, or resignation of Manager when an approved replacement is not obtained within a period of ninety (90) days after such dissolution, bankruptcy, or resignation.

**10.3     Liquidation.** If the Company dissolves, Manager (or if Manager has become bankrupt or terminated, then a liquidator or a liquidation committee selected by the holders of a majority of the Units) shall commence to wind up the affairs of the Company and to liquidate its investments. The holders of the Units shall continue to share profits and losses during the period of liquidation in the same proportion as before the dissolution. Manager (or such liquidator or liquidating committee) shall have full right and unlimited discretion to determine the time, manner, and terms of any sale or sales of Company Assets, having due regard to the activity and condition of the relevant market and general financial economic conditions. Upon dissolution of the Company, the Company will be liquidated and the proceeds of liquidation will be applied in the priority set forth in Section 5.2.

**10.4     Liquidation Statement.** Within a reasonable time following the completion of the liquidation of the Company Assets, Manager (or liquidator or liquidating committee) shall supply to each Member a statement by the Company's accountants setting forth the assets and liabilities of the Company as of the date of complete liquidation and each Member's portion of the liquidating Distributions pursuant to Section 5.2.

**10.5     No Recourse to Assets or Members.** Each Member shall look solely to Company Assets for all Distributions with respect to the Company and its Capital Contribution, subsequent contributions, or share of profits or losses, and shall have no recourse (upon dissolution or otherwise) against any Member or Manager or their Affiliates. No Member shall have any right to demand or receive property other than cash upon dissolution and termination of the Company.

16

**10.6 Termination.** Upon the completion of the liquidation of the Company and the distribution of all Company Assets, the Company shall terminate and Manager shall have the authority to execute and record the Certificate of Cancellation of the Company and any other documents required to effectuate the dissolution and termination of the Company.

**11. CONFIDENTIALITY.** Each of the Parties acknowledges that the Members will make available to one another certain documentation, information, and other matters in connection with the Members, the Company, their respective Affiliates, and their respective businesses (collectively, the "**Information**"). In consideration of receiving the Information, each of the Members undertakes and agrees, whether or not any such Information is strictly confidential or proprietary:

(a) not to make any use of the Information for any purpose other than in accordance with this Agreement;

(b) to hold all of the Information in the strictest confidence and not to disclose or divulge any part of the Information to any third Person without the prior written consent of the Member providing such Information, on such terms and conditions as such Member considers appropriate, unless such disclosure is absolutely required to be disclosed by a relevant governmental authority or stock exchange and the Person providing such Information is provided with a reasonable opportunity to object to the disclosure of such Information to such governmental authority prior to its disclosure;

(c) not to make or solicit any announcement or disclosure regarding this Agreement, the other Members, the Company, their respective Affiliates, or their respective businesses, without express prior written consent;

(d) to restrict access to the Information to those of its responsible employees and professional advisers who absolutely require such access and to impose upon all such employees and professional advisors obligations of confidentiality equivalent to those contained in this Agreement; and

(e) not to copy, reproduce, or part with possession of any of the Information except as is strictly necessary and as is consistent with its obligations contained in this Agreement.

**12. MISCELLANEOUS PROVISIONS.**

**12.1 Governing Law, Jurisdiction, and Venue.** This Agreement and all issues and questions concerning its application, construction, validity, interpretation, and enforcement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to any choice or conflict of laws provisions or rules (whether of the State of Delaware or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Delaware. The

17

Company and each of the Members hereby agrees that any suit, action, or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort, or otherwise, shall be brought in the state or federal courts in New Castle County, Delaware, so long as one of such courts shall have subject-matter jurisdiction over such suit, action, or proceeding, and that any cause of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Delaware. The Company and each of the Members hereby irrevocably consents to the exclusive jurisdiction of such courts and of the appropriate appellate courts therefrom in any such suit, action, or proceeding and irrevocably waives, to the fullest extent permitted by relevant law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action, or proceeding in any such court or that any such suit, action, or proceeding which is brought in any such court has been brought in an inconvenient forum.

**12.2    Notices.** All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of (a) actual receipt, (b) the time of personal delivery to the person to be notified, (c) five (5) days after having been sent by registered or certified United States Post Office air mail, return receipt requested, postage prepaid, or (d) one (1) business day after deposit with a nationally recognized overnight air courier, freight prepaid, specifying next business day delivery, with written verification of receipt. All communications shall be sent to the Company and/or the Members, as the case may be, at their addresses as set forth in Section 2.4 or 2.5 or to such addresses as subsequently modified by written notice given in accordance with this Section 12.2. Each Party to this Agreement agrees to promptly notify the other Parties of any change in its address, and any failure to do so shall not affect the foregoing.

**12.3    Delays or Omissions.** No delay or omission to exercise any right, power, or remedy accruing to the Company or any Member under this Agreement, upon any breach or default of the Company or any other Member under this Agreement, shall impair any such right, power, or remedy of such non-breaching or non-defaulting Company or Member nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent, or approval of any kind or character on the part of the Company or any Member of any breach or default under this Agreement, or any waiver on the part of the Company or any Member of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to the Company or any Member, shall be cumulative and not alternative.

**12.4    Amendment, Waiver, and Termination.** This Agreement is subject to amendment only with the written consent of all Members; provided, however, that this Agreement may be amended from time to time by Manager to (a) cure any

18

ambiguity or correct or supplement any provisions hereof which may be inconsistent with any other provision hereof, (b) correct any printing, stenographic, or clerical errors or omissions; (c) provide for the admission, withdrawal, or substitution of Members in accordance with this Agreement; (d) amend the maintained list of Members, any necessary information regarding any Member, (e) add and delete Members or Substitute Members; or (f) delete or add any provisions of this Agreement required to be so deleted or added by applicable law; provided, however, that no amendment shall be adopted pursuant to this Section 12.4 if such amendment would alter or result in the alteration of, the limited liability of the Members or the status of the Company as a partnership for federal income tax purposes. The power of attorney granted pursuant to Section 8.5 may be used by Manager to execute on behalf of a Member any document evidencing or effecting an amendment adopted in accordance with this Section 12.4. Any amendment, modification, termination, or waiver effected by written agreement of the Company and all Members, including pursuant to the foregoing two sentences, shall be binding upon the Company, all Members, and all of their respective successors and permitted assigns whether or not such successor, assignee, or other individual or entity entered into or approved such amendment, modification, termination, or waiver. No waivers of or exceptions to any term, condition, or provision of this Agreement, in any one or more instances, shall be deemed to be, or construed as, a further or continuing waiver of any such term, condition, or provision or any other term, condition, or provision.

   **12.5** **Binding Effect**. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the Company, all Members, and their respective successors and permitted assigns. Nothing in this Agreement, express or implied, is intended to confer upon any individual or entity other than the parties to this Agreement or their respective successors and permitted assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement. Any successor or permitted assignee of any of the Members, including without limitation any prospective transferee who purchases any direct or indirect interest in the Project and/or any inter vivos or testamentary donee or transferee of any such interest, shall deliver to Manager, as a condition to any transfer or assignment, a counterpart signature page hereto pursuant to which such successor or permitted assignee shall confirm his or its agreement to be subject to and bound by all of the provisions set forth in this Agreement that were applicable to the predecessor or assignor of such successor or permitted assignee.

   **12.6** **Severability**. The invalidity or unenforceability of any provision of this Agreement shall in no way affect the validity or enforceability of any other provision.

   **12.7** **Titles and Subtitles; Sections and Exhibits**. The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement. A reference in this Agreement to a Section or Exhibit is, unless otherwise stated, a reference to a Section of or Exhibit to this Agreement.

**12.8** **Counterparts**. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via electronic mail (including pdf or any electronic signature complying with the United States Federal ESIGN Act of 2000, i.e., www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

**12.9** **Injunctive Relief**. In addition to any and all other remedies that may be available at law in the event of any breach of this Agreement, each party to this Agreement shall be entitled to specific performance of the agreements and obligations of the other parties hereunder and to such other injunctive or other equitable relief as may be granted by a court of competent jurisdiction.

**12.10** **Advice of Counsel**. Each signatory to this Agreement hereby acknowledges that it has sought and obtained the advice of legal counsel before entering into this Agreement and has fully read and understands the meaning and import of all terms in this Agreement. No rule of construction shall apply to the disadvantage of Manager or any other Member because Manager or such other Member or its legal counsel was responsible for the preparation of this Agreement or any part of it.

**12.11** **Time of Essence**. The time and exactitude of the performance of each of the terms, obligations, covenants, and conditions of this Agreement are hereby declared and acknowledged by each signatory to this Agreement to be of the essence.

**12.12** **Entire Agreement**. This Agreement constitutes and expresses the entire agreement and understanding among the parties to this Agreement regarding all matters referred to herein; all previous discussions, promises, representations, and understandings relative thereto, if any, among the Parties, being been merged into this Agreement.

IN WITNESS WHEREOF, the signatories to this Agreement, intending to be bound, have executed this Agreement as of the date first written above.

For and on behalf of
**LONE STAR PORTS ENTERPRISES, LLC,**
a Delaware limited liability company:


By _____
Name: _____

For and on behalf of
**AXIS MIDSTREAM HOLDINGS, LLC,**
a Texas limited liability company


By _____
Name: _____

# EXHIBIT 1

## INTANGIBLE RIGHTS

| | | |
|---|---|---|
| ALBERT THEODORE POWERS; | § | IN THE BUSINESS COURT |
| ALLIED PORTS LLC, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | 11A – STATE OF TEXAS |
| | § | |
| AXIS MIDSTREAM HOLDINGS LLC; | § | |
| ALLEN LAWRENCE BERRY; | § | |
| MARVIN GLENN BERRY; and | § | |
| BONNIE BERRY, as successor in | § | |
| interest to DENNIS WAYNE BERRY | § | |
| | § | |
| *Defendants.* | § | HONORABLE SOFIA ADROGUE |

# DEFENDANTS' EXHIBIT 10

# AVAILABLE IN CAMERA

**EXHIBIT 11**

10/31/2024 9:24:46 AM
Marilyn Burgess - District Clerk
Harris County
Envelope No: 93776466
By: JACKSON, MONICA J
Filed: 10/31/2024 9:24:46 AM

Pgs-2

TRORX
STBNX
CASO

## 2024-76060 / Court: 215

CAUSE NO. _____

| | | |
|---|---|---|
| ALBERT THEODORE POWERS;<br>ALLIED PORTS LLC, | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| AXIS MIDSTREAM HOLDINGS,<br>LLC; ALLEN LAWRENCE BERRY;<br>MARVIN GLENN BERRY; AND<br>BONNIE BERRY, as successor in<br>interest to DENNIS WAYNE BERRY | § | |
| | § | |
| *Defendants.* | § | _____ JUDICIAL DISTRICT |

### TEMPORARY RESTRAINING ORDER

On this day, Plaintiffs appeared before this Court requesting that a Temporary Restraining Order be issued against Defendants Axis Midstream Holdings, LLC, Allen Lawrence Berry, Marvin Glenn Berry, and Bonnie Berry. The Court considered Plaintiff's Application for a Temporary Restraining Order ("Application") and the verification in support, and it appears from the specific facts set forth in said Application that immediate and irreparable injury, loss, and harm will result to Plaintiffs without entry of this Temporary Restraining Order. The Court finds that should the November 6, 2024 Axis Midstream Holdings, LLC meeting go forward and Defendants were to change, alter, or transfer the management and/or ownership of Axis Midstream Holdings, LLC, and such disposition would cause irreparable harm to Plaintiffs as the management and ownership interest of Plaintiffs would not likely be recovered.

**IT IS, THEREFORE, ORDERED**, that this Temporary Restraining Order shall continue in effect until the conclusion of the hearing on the Temporary Injunction hereinafter set, or until further order of this Court, restraining and enjoining Defendants Allen Lawrence Berry, Marvin

Unofficial Copy Office of Marilyn Burgess District Clerk

1

Glenn Berry, Bonnie Berry, Axis Midstream Holdings, LLC, their employees, agents, representatives, and any others acting on their behalf from:

    a. Holding the "Meeting of Owners" of Axis noticed for November 6, 2024;

    b. Holding any meetings that in any way seek to affect the management or ownership interest of Axis or any other entity, property, or tangible or intangible rights associated with the Project until further order of the Court;

    c. Changing, altering, or transferring in any way the management of Axis or any other entity associated with the Project until further order of the Court;

    d. Changing, altering, or transferring in any way the ownership, property, or tangible or intangible rights of any entity associated with the Project until further order of the Court.

**IT IS FURTHER ORDERED** that Plaintiffs post a bond in the amount of $ 500 .

This Order shall remain in effect until a hearing may be had on the Application for Temporary Injunction.

It is ORDERED that Defendants Allen Lawrence Berry, Marvin Glenn Berry, Bonnie Berry, Axis Midstream Holdings, LLC appeal on November 12, 2024 at 8:00 AM a.m./p.m. for a hearing on Plaintiff's Application for a Temporary Injunction. The purpose of the hearing will be to determine whether this temporary restraining order should be made a temporary injunction pending a full trial on the merits.

Signed this 31 day of October, 2024 at 2:23PM a.m./p.m.

Signed:
10/31/2024
2:23 PM

_____
Judge Presiding

2

# EXHIBIT 12

## CAUSE NO. 2024-76060

| | | |
|---|---|---|
| ALBERT THEODORE POWERS; ALLIED PORTS LLC, | § § § | IN THE DISTRICT COURT |
| *Plaintiffs,* | § § | |
| v. | § § § | HARRIS COUNTY, TEXAS |
| AXIS MIDSTREAM HOLDINGS, LLC; ALLEN LAWRENCE BERRY; MARVIN GLENN BERRY; AND BONNIE BERRY, as successor in interest to DENNIS WAYNE BERRY | § § § § § § § | |
| *Defendants.* | § | 215th JUDICIAL DISTRICT |

---

## PLAINTIFFS' VERIFIED FIRST AMENDED PETITION AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION

---

### SUMMARY OF PLAINTIFFS' CLAIMS

Plaintiffs Albert Theodore Powers ("Powers") and Allied Ports LLC ("Allied") file this lawsuit to protect their management rights and 20% interest in a crude oil delivery system and terminal project. The three Berry brothers entered into agreements with Powers wherein he and/or Allied was entitled to, among other things, a 20% ownership interest in what is referred to as the Lone Star Ports Project. After working for years on the Project – and with the Project on the verge of taking off, Defendants Marvin Glenn Berry ("Marty") and Bonnie Berry, as successor in interest to Dennis Wayne Berry ("Bonnie"), have made clear they will not honor their agreements even though their own brother Defendant Allen Lawrence Berry ("Lawrence") acknowledges Plaintiffs' interest. Plaintiffs need immediate assistance from the Court to enjoin Defendants from conducting any unauthorized and improper meetings in which Marty and Bonnie intend to illegally and without authority transfer management, ownership and control of Axis Midstream Holdings,

1

LLC ("Axis") into Berry GP, Inc. or another Berry-controlled entity outside the agreed to structure for the project and/or transfer the ownership, assets, tangible or intangible rights, or the permit for the Project to another Berry controlled interest. What limited documents have been obtained thus far confirm that the Berry Defendants plan to take control of the project and deprive Plaintiffs of their management and ownership interest. Without the Court's intervention, Plaintiffs will be irreparably harmed and will have no adequate remedy for the loss of their rights and interest.

## PARTIES

1. Plaintiff Albert Theodore Powers is an individual residing in New York, New York.

2. Plaintiff Allied Ports, LLC is a Delaware limited liability company and designee of Powers' interest under the agreements with the Berry Defendants. Its registered agent's address is at 16192 Coastal Hwy, Lewes, Delaware 19958.

3. Defendant Marvin Glenn Berry is an individual residing in Nueces County, Texas. He can be served at 1414 Corn Products Road, Corpus Christi, Texas or wherever he may be found.

4. Defendant Bonnie Berry is an individual residing in Nueces County, Texas. On information and belief,[1] she is the widow and successor in interest to Dennis Wayne Berry, who is deceased. She can be served at 1414 Corn Products Road, Corpus Christi, Texas or wherever she may be found.

5. Defendant Allen Lawrence Berry is an individual residing in Harris County, Texas. He can be served at 5005 Riverway, Suite 440, Houston, Texas 77056 or wherever he may be found.

6. When appropriate, Marty, Bonnie, and Lawrence will be referred to collectively as the "Berry Defendants."

---

[1] Throughout this Petition, references to the "Berry Defendants" includes actions taken by Dennis Wayne Berry, whose interest in the Project discussed further below is now understood to be owned by his widow, Bonnie Berry.

2

7.      Defendant Axis Midstream Holdings, LLC is a Texas limited liability company. Its sole member and manager is Lone Star Ports Enterprises, LLC. Axis can be served through its alleged registered agent, Mike H. Hummell, at 1414 Valero Way, Corpus Christi, Texas 78409.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction because the relief sought is within the jurisdictional limits of this Court. At this time, Plaintiffs seek monetary and non-monetary declaratory relief and attorneys' fees and expenses. Tex. R. Civ. P. 47.

9.      Venue is proper in this district because Powers and the Berry Defendants entered into written agreements constituting a "major transaction" providing for venue in Harris County, Texas. Tex. Civ. Prac. & Rem. Code § 15.020.[2] Venue is additionally proper because one of the defendants is a citizen of Harris County, Texas, and a substantial part of the events giving rise to Plaintiffs' claims occurred in Harris County, Texas. Tex. Civ. Prac. & Rem. Code §15.002.

## FACTS

10.      In 2018, Defendant Lawrence came up with the idea of creating a crude oil delivery and export facility in and around the Corpus Christi Port (the "Project"). Lawrence and his brothers Marty and Dennis decided to pursue the Project. The Project has been touted by the Port of Corpus Christi as a "state-of-the-art petroleum export terminal" and the "deepest-draft safe harbor crude export facility in the nation when commissioned."[3]

11.      On October 31, 2018, Defendant Lawrence telephoned Plaintiff Powers in New York and requested him to come to Houston because he and his brothers needed Powers' expertise

---

[2] While this lawsuit is based on agreements between Plaintiffs and the Berry Defendants, Plaintiffs are aware of a separate lawsuit pending in Corpus Christi among several members of the Berry family and employees of some of the companies that the Berry Defendants jointly own together. Plaintiffs are not parties to that lawsuit and do not seek to adjudicate any of the claims and issues being decided in that lawsuit.

[3] https://portofcc.com/port-of-corpus-christi-commission-approves-50-year-lease-agreement-with-carlyle-group-joint-venture/ (last accessed October 30, 2024).

3

for the Project. The Berry Defendants had previously worked with Powers (who was at the time of the prior engagement a business transaction lawyer). The Berry Defendants engaged Plaintiff Powers to represent them and advise them in shaping, structuring, securing financing for, and furthering development of the Project. The Berry Defendants sought Powers' expertise because they were in the process of negotiating with a private equity firm to obtain financing for the Project.

12. Powers met with Lawrence Berry in Houston in November 2018 to, among other things, discuss his compensation in connection with his role in the Project, they agreed that Powers would be paid a base compensation of $100,000 per month plus expenses and receive a 20% interest in the Project subject to priority distributions to the Berry Defendants. This agreement was confirmed by the Berry Defendants at a later meeting in Houston in early December 2018.

13. This agreement was later memorialized in a written Compensation Agreement and written Investment Agreement in 2019 (collectively, the "Agreements"), confirming the compensation of $100,000 per month plus expenses and a 20% interest in the Project subject to priority distributions to the Berry Defendants of $250,000,000 plus a 10% preferred return on the outstanding balance of such amount. **Ex. 1**; **Ex. 2**.

14. At first, all parties performed the Agreements. Powers spent most of his working time in Houston where he stayed in an apartment paid for by the Berry Defendants and he worked tireless hours on the Project. Powers' work involved developing and implementing a structure for the Project and trying to arrange a financing package for the Project. On behalf of the Berry Defendants and himself, Powers created several entities and drafted operating agreements for those entities. Those documents were shared and fully discussed with all of the Berry Defendants. There were various meetings (many of which took place in Houston, Texas) between Powers and the Berry Defendants to discuss the Project and the structure of the Project. In addition, Powers

4

negotiated the terms of a potential transaction with a private equity firm on behalf of the Berry Defendants and himself. Eventually, in February 2019, Powers' efforts resulted in a signed term sheet with a well-respected private equity firm, the Carlyle Group, though that transaction ultimately was not completed. As the parties had agreed, the Berry Defendants paid Powers $100,000 per month plus expenses beginning in November 2018.[4]

15. The Investment Agreement sets forth a specific process for creating and structuring the entities involved in the Project. **Ex. 2** at ¶¶ 1-2. Accordingly, Powers and the Berry Defendants set about to structure the chain of entities to hold different interests. Pursuant to the Investment Agreement, Powers formed and designated Plaintiff Allied Ports LLC to own his 20% interest. In most of the documents exchanged between the parties, the agreed to corporate structure for the Project was as follows:

---

[4] In January 2020, the Berry Defendants terminated the monthly compensation portion of the Compensation Agreement effective April 30, 2020, but requested that Powers continue to work on the Project. The Berry Defendants agreed that they would continue to reimburse Powers for his expenses incurred. Knowing he had an ownership interest in the Project, Powers agreed to do so. In response to the communication from the Berry Defendants, Powers confirmed that the termination of the monthly payment had no impact on the ownership interest in the Project under the terms of the Investment Agreement. The Berry Defendants continued to pay Powers' expenses under the agreement until June 2023, when the last payment from the Berry Defendants was received.



16.     In this agreed to structure for the Project, the five owners of the Project are listed along the top.  Redfish Bay Terminals, Inc. ("Redfish") is believed to be owned or beneficially owned by Berry GP, Inc. (the Berry Defendants' company), Capella is believed to be beneficially owned by or for the benefit of Lawrence and his family, Arcturus is believed to be beneficially owned by or for the benefit of Bonnie (through Dennis) and her family, Sirius is believed to be beneficially owned by or for the benefit of Marty and his family, and Allied Ports is owned by Powers.  Thus, the Parties agreed that the Project is owned in equal percentages by the three Berry Defendants, Powers (subject to the $250 million hurdle and the 10% priority return thereon) and Redfish.  This structure was reaffirmed and further memorialized in two separate written Amended and Restated Operating Agreements of Lone Star Ports Holdings, LLC (including the current Operating Agreement) and has been in place for more than five years.

17.     Of the several entities formed, in particular focus in this lawsuit (and the temporary relief sought) is Defendant Axis.  Axis was formed to hold intangible property of the Project, including the permitting rights associated with development of the Project. Axis's sole Member

6

and Manager is Lone Star Ports Enterprises, LLC ("LSPE"), which through the chain of entities above is ultimately managed by Plaintiff Allied Ports, LLC.[5]  Most importantly, none of the Berry Defendants (including Marty and Bonnie) have individual ownership or management rights in Axis.

18.     During the first six years of the development of the Project, almost all of the work was performed by Lawerence, Powers, staff, and third-party consultants.  Very little, if any, of the work was done by Marty or Dennis Berry.  However, things changed in 2024 when Marty and Bonnie sensed that the permit for the Project was about to be approved.  Now, Marty and Bonnie contend that the Project is owned by the Berry Defendants and that the Plaintiffs have no ownership interest in the Project.   On August 28, 2024, Mike Hummell, the General Counsel of Berry GP, Inc. wrote to Lawerence expressing that the Project was **only** owned by the Berry Defendants:

> The Berry Companies appreciate your stated willingness to make sure that each of the companies owned jointly by you, Dennis (now Bonnie) and Marty are properly papered to reflect that ownership and management rest exclusively with the three of you. As of this writing I have not seen anything to reflect follow through on your commitment. For entities which list you as sole manager, you can make the changes without the need for any additional meetings. Some of the entities reflected involvement of people that were not or have not been approved by the Owners.  Getting these matters clarified is good for everybody.

**Ex. 3**.  Stated differently, the Berry Companies were now trying to proceed with the Project without including Plaintiffs and were seeking to deprive the Plaintiffs of the ownership that they had earned.

---

[5] LSPE's sole Member and Manager is Lone Star Ports Ventures, LLC ("LSPV").  LSPV's sole Member and Manager is Lone Star Ports Holdings, LLC ("LSPH").  LSPH has five Members, each owning 20% of the membership units.  Plaintiff Allied Ports LLC is LSPH's sole Manager.

7

19.     In the same letter, Hummell suggested that ownership and control of the Project should be transferred to Berry GP or any Berry-owned entity. *See id.* ("I suggest you, Bonnie and Marty consider consolidating ownership into a Berry entity to reflect this.").

20.     In the same letter, Hummell recognized that Berry GP, Marty, or Bonnie did not own Axis and that it was instead owned by Lone Star Ports Enterprises LLC—one of the entities in the chain of ownership created as contemplated by the Investment Agreement. *Id.* The letter further requested that Lawrence provide Marty and Bonnie "with the name or names of the true owner of Axis Midstream Holdings, LLC." *Id.*

21.     On October 22, 2024, the Project received monumental news—the Department of the Army issued Axis a permit for construction of the Project. Almost six years of work was beginning to take shape. But just one day later, Berry GP's General Counsel Hummell sent an email (acting for Berry GP, Marty, and Bonnie) indicating that he was "going to file paperwork" to change the ownership of the Axis *solely* to the Berry Defendants, even after he previously recognized that the Berry Defendants did not own Axis. **Ex. 4**. Changing the ownership of Axis is part of an overall plan to divest Plaintiffs of their interest by breaching the Investment Agreement by taking Axis out of the established and agreed to ownership chain of the Project now that the permit has been issued.

22.     Marty and Bonnie purported to call a "meeting of owners" of Axis for November 6, 2024, where they intended to take action on (1) "Appointment and/or removal of Company Managers" and (2) Appointment and/or removal of Officers." **Ex. 5**. This meeting was obviously improper given Marty and Bonnie are admittedly not "owners" of Axis. Moreover, changing the ownership and management would effectively divest Allied Ports of its ownership and management rights in the Project, which constitutes a breach of the Investment Agreement. The

8

Court has since issued a Temporary Restraining Order that, among other things, restrained the November 6, 2024 meeting from moving forward. For the reasons set forth below, Plaintiffs assert their causes of action and seek the Court's assistance to enjoin the defendants from interfering with their ownership rights in the Project or otherwise interfering with the Project.

## CAUSES OF ACTION
## COUNT I- DECLARATORY JUDGMENT

23. Plaintiffs reallege and incorporate all preceding allegations.

24. Plaintiffs seek a declaratory judgment to determine the rights, status, or other legal relations of the parties related to the ownership, the applicable operating agreements, and corporate structure of the project at issue. See Tex. Civ. Prac. & Rem. Code § 37.004(a). A dispute exists between the parties, as the Investment Agreement sets forth the proper entity structure, ownership, and management of the Project. Importantly, the Investment Agreement may be construed by the Court before there has been an actual breach. Tex. Civ. Prac. & Rem. Code 37.004.

25. Plaintiffs seek the following declarations:

   a. The Compensation Agreement is a valid, enforceable, agreement against Lawrence Berry, Marty Berry, and Bonnie Berry (as successor to Dennis Berry);

   b. The Investment Agreement is a valid, enforceable agreement against Lawrence Berry, Marty Berry, and Bonnie Berry (as successor to Dennis Berry);

   c. The Investment Agreement provides that Plaintiff Powers owns, through his designee, Allied Ports, LLC, a twenty percent (20%) interest in the Project (as defined in the Investment Agreement) subject to "priority distributions to the Berry Defendants or their designees of Two Hundred Fifty Million United

9

States Dollars ($250,000,000) plus a ten percent (10%) cumulative preferred return on the outstanding balance of such amount."

d. Transferring ownership, management, and control of Axis or any other interest of the entities involved in the Project inconsistent with the entity structure provided under the Investment Agreement constitutes a breach of the Investment Agreement.

## COUNT II- BREACH OF CONTRACT

26. Plaintiffs reallege and incorporate all preceding allegations.

27. Under the Compensation Agreement, Powers is entitled to be paid for the expenses he incurs in connection with this work on the Project. Powers performed and continues to perform by providing the services set forth in the Agreements.

28. Lawrence, Marty, and Bonnie (through Dennis) have failed to pay Powers' expenses incurred under the Compensation Agreement breaching the Agreements.

29. Powers has been damaged in an amount that exceeds the jurisdictional limits of this Court.

## REQUEST FOR TEMPORARY INJUNCTION

30. Plaintiffs reallege and incorporate all preceding allegations.

31. Marty and Bonnie have breached and/or intend to breach their agreements with Plaintiffs and have expressed their intent to proceed with a course of action that will result in additional breaches in the future. More specifically, Marty and Bonnie have expressed (through the General Counsel of their company) their intent to take the Project for the three Berry Defendants and to deprive Plaintiffs of their ownership interest. As part of this plan to steal Plaintiffs' interest in the Project, Marty and Bonnie have devised a plan to either transfer Axis to

another Berry entity or transfer assets held by Axis to another Berry entity. If Marty and Bonnie are allowed to proceed to transfer ownership, management, and control of Axis to themselves, Plaintiffs will be deprived of their agreed to and bargained for management rights and 20% interest in the Project. Indeed, "loss of management rights over a company are unique, irreplaceable, and cannot be measured by a certain pecuniary standard." *Cheniere Energy, Inc. v. Parallax Enterprises LLC*, 585 S.W.3d 70, 83 (Tex. App.—Houston [14th Dist.] 2019, pet. dism'd); *see also Sonwalker v. St. Luke's Sugarland P'ship, L.L.P.*, 394 S.W.3d 186, 201 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (holding that termination of interest in a limited liability partnership would irreparably injure the Plaintiff because the Plaintiff would lose management rights like selecting a governing board and blocking major actions).

32.     If Defendants are not immediately enjoined from violating the Investment Agreement, Plaintiffs will suffer concrete, particularized and irreparable harm. Plaintiffs will lose their management rights and 20% interest, both of which are unique and cannot be purchased on the open market.

33.     Therefore, absent Court intervention, Plaintiffs will have no adequate remedy at law. The only adequate relief, while the merits of the claims are being determined, is to maintain the status quo of ownership of Axis and all other entities and assets associated with the Project. Otherwise, Plaintiffs bargained-for rights and interest could be irreparably lost forever.

34.     The injury to Plaintiffs should Defendants be allowed to proceed with breaching their agreements would greatly outweigh any injury (to the extent there is injury at all) to Defendants in delaying any change in ownership of Axis or of any other entity, property, or tangible or intangible rights associated with the Project until the Court rules on the merits of Plaintiffs' claims.

35. To preserve the status quo and Plaintiffs' rights during the pendency of this action, Plaintiffs respectfully request that the Court grant and enter a temporary injunction precluding Defendants, their employees, agents, representatives, and any others acting on their behalf from taking any of the following actions unless expressly permitted by this Court to do so:

    a. Holding any meetings or taking any action for or on behalf of Axis unless called by or approved by the Manager Lone Star Ports Enterprises, LLC;

    b. Changing, altering, or transferring in any way the permit (SWG-2018-00789) issued to Axis;

    c. Changing, altering, or transferring in any way the ownership, management, or tangible or intangible rights of Axis;

    d. Changing, altering, or transferring in any way the ownership, management, assets, or tangible or intangible rights held by the entities formed for the Project which is the subject of this lawsuit;

    e. Holding any meetings that in any way seek to affect the management or ownership interest of Powers or Allied Ports, LLC in the Project or in any of the entities formed for the Project;

    f. Taking any action that would impact or affect Powers' or Allied Ports, LLC's 20% ownership interest in the Project that is the subject of this lawsuit or in any of the entities formed for the Project;

**CONDITIONS PRECEDENT**

36. All conditions precedent have been performed or have been excused or waived.

12

**ATTORNEYS' FEES**

37.    Plaintiffs invokes and pleads Chapters 37 and 38 of the Civil Practices and Remedies Code of the State of Texas and requests an award of attorneys' fees thereunder.

38.    Plaintiffs had to retain the undersigned law firm to file this lawsuit and protect their rights. Plaintiffs request that this Court grant such attorney's fees as this Court may deem reasonable and necessary for representing it in this action and for any appeals thereafter.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury in this action of all claims so triable.

**PRAYER FOR RELIEF**

Plaintiffs request the following relief:

A.  A Declaration that:

    a.  The Compensation Agreement is a valid, enforceable, agreement against Lawrence Berry, Marty Berry, and Bonnie Berry (as successor to Dennis Berry);

    b.  The Investment Agreement is a valid, enforceable agreement against Lawrence Berry, Marty Berry, and Bonnie Berry (as successor to Dennis Berry);

    c.  The Investment Agreement provides that Plaintiff Powers owns, through his designee, Allied Ports, LLC, a twenty percent (20%) interest in the Project (as defined in the Investment Agreement) subject to "priority distributions to the Berry Defendants or their designees of Two Hundred Fifty Million United States Dollars ($250,000,000) plus a ten percent (10%) cumulative preferred return on the outstanding balance of such amount."

13

d. Transferring ownership, management, and control of Axis or any other interest of the entities involved in the Project inconsistent with the entity structure provided under the Investment Agreement constitutes a breach of the Investment Agreement.

B. Compensatory damages in an amount to be proven at trial;

C. Temporary and Injunctive Relief precluding Defendants, their employees, agents, representatives, and any others acting on their behalf from taking any of the following actions unless expressly permitted by this Court to do so:

a. Holding any meetings or taking any action for or on behalf of Axis unless called by or approved by the Manager Lone Star Ports Enterprises, LLC;

b. Changing, altering, or transferring in any way the permit (SWG-2018-00789) issued to Axis;

c. Changing, altering, or transferring in any way the ownership, management, or tangible or intangible rights of Axis;

d. Changing, altering, or transferring in any way the ownership, management, assets, or tangible or intangible rights held by the entities formed for the Project which is the subject of this lawsuit;

e. Holding any meetings that in any way seek to affect the management or ownership interest of Powers or Allied Ports, LLC in the Project or in any of the entities formed for the Project;

f. Taking any action that would impact or affect Powers' or Allied Ports, LLC's 20% ownership interest in the Project that is the subject of this lawsuit or in any of the entities formed for the Project;

D.  An award of attorneys' fees in an amount to be proven at trial;

E.  Pre- and post-judgment interest; and

F.  All such other and further costs and relief as the Court deems just and proper.

DATED: November 11, 2024                    Respectfully submitted,

                                            */s/ Alistair B. Dawson*
                                            Alistair B. Dawson
                                            State Bar No. 05596100
                                            M. Jake McClellan
                                            State Bar No. 24109525
                                            Madeline E. Gay
                                            State Bar No. 24138681
                                            E-mail: adawson@beckredden.com
                                            E-mail: jmcclellan@beckredden.com
                                            E-mail: mgay@beckredden.com
                                            1221 McKinney Street, Suite 4500
                                            Houston, Texas 77010-2010
                                            Telephone:    (713) 951-3700
                                            Telecopier:   (713) 951-3720

                                            **ATTORNEYS FOR PLAINTIFFS**

**Automated Certificate of eService**
This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Lisa Verm on behalf of Alistair Dawson
Bar No. 5596100
lverm@beckredden.com
Envelope ID: 94155620
Filing Code Description: Amended Filing
Filing Description: Plaintiffs' Verified First Amended Petition and
Application for Temporary Restraining Order and Temporary Injunction
Status as of 11/11/2024 4:40 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Alistair B. Dawson | | adawson@beckredden.com | 11/11/2024 3:26:58 PM | SENT |
| Michael JakeMcClellan | | jmcclellan@beckredden.com | 11/11/2024 3:26:58 PM | SENT |
| Madeline Gay | | mgay@beckredden.com | 11/11/2024 3:26:58 PM | SENT |
| Douglas AAllison | | doug@dallisonlaw.com | 11/11/2024 3:26:58 PM | SENT |
| Susan Gonzales | | susan@dallisonlaw.com | 11/11/2024 3:26:58 PM | SENT |
| Kim Brunkenhoefer | | kim@dallisonlaw.com | 11/11/2024 3:26:58 PM | SENT |

# EXHIBIT 13

| | | |
|---|---|---|
| ALBERT THEODORE POWERS; ALLIED PORTS LLC, | § § § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| AXIS MIDSTREAM HOLDINGS, LLC; ALLEN LAWRENCE BERRY; MARVIN GLENN BERRY; AND BONNIE BERRY, as successor in interest to DENNIS WAYNE BERRY | § § § § § | |
| | § | |
| *Defendants.* | § | 215th JUDICIAL DISTRICT |

## PLAINTIFFS' VERIFIED SECOND AMENDED PETITION AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION

## SUMMARY OF PLAINTIFFS' CLAIMS

Plaintiffs Albert Theodore Powers ("Powers") and Allied Ports LLC ("Allied") file this lawsuit to protect their management rights and 20% interest in a crude oil delivery system and terminal project. The three Berry brothers entered into agreements with Powers wherein he and/or Allied was entitled to, among other things, a 20% ownership interest in a company called Lone Star Ports Holdings, LLC in connection with what is referred to as the Lone Star Ports Project. After working for years on the Project – and with the Project on the verge of taking off, Defendants Marvin Glenn Berry ("Marty") and Bonnie Berry, as successor in interest to Dennis Wayne Berry ("Bonnie"), have made clear they will not honor their agreements or acknowledge Allied's ownership interest in Lone Star Ports Holdings, LLC even though their own brother Defendant Allen Lawrence Berry ("Lawrence") acknowledges Plaintiffs' interest. Further, as set forth below, Marty and Bonnie are improperly trying to take control of Defendant Axis Midstream Holdings,

1

LLC ("Axis") by improperly and without authority purporting to call a meeting of Axis for the purpose of changing the Manager and officers of Axis and otherwise taking control of Axis for their own benefit to the exclusion of the Plaintiffs. In so doing, Marty and Bonnie are improperly interfering with the corporate governance of Axis. Plaintiffs need immediate assistance from the Court to enjoin Defendants from conducting any unauthorized and improper meetings in which Marty and Bonnie intend to illegally and without authority transfer management, ownership and control of Axis into Berry GP, Inc. or another Berry-controlled entity outside the agreed to corporate structure for the Project and/or transfer the ownership, assets, tangible or intangible rights, or the permit for the Project to another Berry controlled interest or otherwise interfere with the corporate governance of Axis. What limited documents have been obtained thus far confirm that the Berry Defendants plan to take control of the Project and deprive Plaintiffs of their management and ownership interest. Without the Court's intervention, Plaintiffs will be irreparably harmed and will have no adequate remedy for the loss of their rights and interest.

**PARTIES**

1. Plaintiff Albert Theodore Powers is an individual residing in New York, New York.

2. Plaintiff Allied Ports, LLC is a Delaware limited liability company and designee of Powers' interest under the agreements with the Berry Defendants. Its registered agent's address is at 16192 Coastal Hwy, Lewes, Delaware 19958.

3. Defendant Marvin Glenn Berry is an individual residing in Nueces County, Texas. He can be served at 1414 Corn Products Road, Corpus Christi, Texas or wherever he may be found. Defendant Marvin Glenn Berry may also be served through his counsel Doug Allison, Law Office of Douglas Allison,403 N. Tancahua St., Corpus Christi, Texas 78401

2

4.     Defendant Bonnie Berry is an individual residing in Nueces County, Texas.  On information and belief,[1] she is the widow and successor in interest to Dennis Wayne Berry, who is deceased.  She can be served at 1414 Corn Products Road, Corpus Christi, Texas or wherever she may be found.  Defendant Bonnie Berry may also be served through her counsel Doug Allison, Law Office of Douglas Allison,403 N. Tancahua St., Corpus Christi, Texas 78401

5.     Defendant Allen Lawrence Berry is an individual residing in Harris County, Texas.  He can be served at 5005 Riverway, Suite 440, Houston, Texas 77056 or wherever he may be found.  Defendant Allen Lawrence Berry may also be served through his counsel Barrett Reasoner, Gibbs & Bruns, 1100 Louisiana Street, Suite 5300 Houston, Texas 77002

6.     When appropriate, Marty, Bonnie, and Lawrence will be referred to collectively as the "Berry Defendants."

7.     Defendant Axis Midstream Holdings, LLC is a Texas limited liability company.  Its sole member and manager is Lone Star Ports Enterprises, LLC.  Axis can be served through its alleged registered agent, Mike H. Hummell, at 1414 Valero Way, Corpus Christi, Texas 78409.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction because the relief sought is within the jurisdictional limits of this Court.  At this time, Plaintiffs seek monetary and non-monetary declaratory relief and attorneys' fees and expenses.  Tex. R. Civ. P. 47.

9.     Venue is proper in this district because Powers and the Berry Defendants entered into written agreements constituting a "major transaction" providing for venue in Harris County, Texas.  Tex. Civ. Prac. & Rem. Code § 15.020.[2]  Venue is additionally proper because one of the

---

[1] Throughout this Petition, references to the "Berry Defendants" includes actions taken by Dennis Wayne Berry, whose interest in the Project discussed further below is now understood to be owned by his widow, Bonnie Berry.

[2] While this lawsuit is based on agreements between Plaintiffs and the Berry Defendants, Plaintiffs are aware of a separate lawsuit pending in Corpus Christi among several members of the Berry family and employees of some of the

3

defendants is a citizen of Harris County, Texas, and a substantial part of the events giving rise to Plaintiffs' claims occurred in Harris County, Texas. Tex. Civ. Prac. & Rem. Code §15.002.

## FACTS

10.     In 2018, Defendant Lawrence came up with the idea of creating a crude oil delivery and export facility in and around the Corpus Christi Port (the "Project"). Lawrence and his brothers Marty and Dennis decided to pursue the Project. The Project has been touted by the Port of Corpus Christi as a "state-of-the-art petroleum export terminal" and the "deepest-draft safe harbor crude export facility in the nation when commissioned."[3]

11.     On October 31, 2018, Defendant Lawrence telephoned Plaintiff Powers in New York and requested him to come to Houston because he and his brothers needed Powers' expertise for the Project. The Berry Defendants had previously worked with Powers (who was at the time of the prior engagement a business transaction lawyer). The Berry Defendants engaged Plaintiff Powers to represent them and advise them in shaping, structuring, securing financing for, and furthering development of the Project. The Berry Defendants sought Powers' expertise because they were in the process of negotiating with a private equity firm to obtain financing for the Project.

12.     Powers met with Lawrence Berry in Houston in November 2018 to, among other things, discuss his compensation in connection with his role in the Project, they agreed that Powers would be paid a base compensation of $100,000 per month plus expenses and receive a 20% interest in the Project subject to priority distributions to the Berry Defendants. This agreement was confirmed by the Berry Defendants at a later meeting in early December 2018.

---

companies that the Berry Defendants jointly own together. Plaintiffs are not parties to that lawsuit and do not seek to adjudicate any of the claims and issues being decided in that lawsuit.

[3] https://portofcc.com/port-of-corpus-christi-commission-approves-50-year-lease-agreement-with-carlyle-group-joint-venture/ (last accessed October 30, 2024).

4

13.     This agreement was later memorialized in a written Compensation Agreement and written Investment Agreement in 2019 (collectively, the "Agreements"), confirming the compensation of $100,000 per month plus expenses and a 20% interest in the Project subject to priority distributions to the Berry Defendants of $250,000,000 plus a 10% preferred return on the outstanding balance of such amount. **Ex. 1**; **Ex. 2**.

14.     At first, all parties performed the Agreements. Powers spent most of his working time in Houston where he stayed in an apartment paid for by the Berry Defendants and he worked tireless hours on the Project. Powers' work involved developing and implementing a structure for the Project and trying to arrange a financing package for the Project. On behalf of the Berry Defendants and himself, Powers created several entities and drafted operating agreements for those entities. Those documents were shared and fully discussed with all of the Berry Defendants. There were various meetings (many of which took place in Houston, Texas) between Powers and the Berry Defendants to discuss the Project and the structure of the Project. In addition, Powers negotiated the terms of a potential transaction with a private equity firm on behalf of the Berry Defendants and himself. Eventually, in February 2019, Powers' efforts resulted in a signed term sheet with a well-respected private equity firm, the Carlyle Group, though that transaction ultimately was not completed. The term sheet with the Carlyle Group values the interest of the Berry Defendants in the Project at a minimum of $400,000,000 meaning that Plaintiffs' ownership interest in Lone Star Holdings, LLC and in the Project is worth at least $30 million. As the parties had agreed, the Berry Defendants paid Powers $100,000 per month plus expenses beginning in November 2018.[4]

---

[4] In January 2020, the Berry Defendants terminated the monthly compensation portion of the Compensation Agreement effective April 30, 2020, but requested that Powers continue to work on the Project. The Berry Defendants agreed that they would continue to reimburse Powers for his expenses incurred. Knowing he had an ownership interest in the Project, Powers agreed to do so. In response to the communication from the Berry Defendants, Powers

5

15.     The Investment Agreement sets forth a specific process for creating and structuring the entities involved in the Project.  **Ex. 2** at ¶¶ 1-2.  Accordingly, Powers and the Berry Defendants set about to structure the chain of entities to hold different interests.  Pursuant to the Investment Agreement, Powers formed and designated Plaintiff Allied Ports LLC to own his 20% interest. In most of the documents exchanged between the parties, the agreed to corporate structure for the Project was as follows:



16.     In this agreed to structure for the Project, the five owners of the Project are listed along the top.  Redfish Bay Terminals, Inc. ("Redfish") is believed to be owned or beneficially owned by Berry GP, Inc. (the Berry Defendants' company), Capella is believed to be beneficially owned by or for the benefit of Lawrence and his family, Arcturus is believed to be beneficially owned by or for the benefit of Bonnie (through Dennis) and her family, Sirius is believed to be

confirmed that the termination of the monthly payment had no impact on the ownership interest in the Project under the terms of the Investment Agreement.  The Berry Defendants continued to pay Powers' expenses under the agreement until June 2023, when the last payment from the Berry Defendants was received.

beneficially owned by or for the benefit of Marty and his family, and Allied Ports is owned by Powers. Thus, the Parties agreed that the Project is owned in equal percentages by the three Berry Defendants, Powers (subject to the $250 million hurdle and the 10% priority return thereon) and Redfish. This structure was reaffirmed and further memorialized in two separate written Amended and Restated Operating Agreements of Lone Star Ports Holdings, LLC (including the current Operating Agreement) and has been in place for more than five years. Now that the permit for the Project has been obtained from the U.S. Army Corps of Engineers, the Project is worth significantly more than when the Carlyle Group entered into its term sheet. Indeed, counsel for Marty and Bonnie Berry recently announced to this Court that the Project has a value in excess of $1 billion. Using that valuation (and the true value may be more), the value of Plaintiffs' ownership interest in Lone Star Holdings, LLC and in the Project is worth more than $200 million.

17. Of the several entities formed, in particular focus in this lawsuit (and the temporary relief sought) is Defendant Axis. Axis was formed to hold intangible property of the Project, including the permitting rights associated with development of the Project. Axis's sole Member and Manager is Lone Star Ports Enterprises, LLC ("LSPE"), which through the chain of entities above is ultimately managed by Plaintiff Allied Ports, LLC.[5] Most importantly, none of the Berry Defendants (including Marty and Bonnie) have individual ownership or management rights in Axis. Relevant to this dispute, only LSPE has the right to call a meeting of Axis – and Marty and Bonnie have not right to call such a meeting.

18. During the first six years of the development of the Project, almost all of the work was performed by Lawerence, Powers, staff, and third-party consultants. Very little, if any, of the

---

[5] LSPE's sole Member and Manager is Lone Star Ports Ventures, LLC ("LSPV"). LSPV's sole Member and Manager is Lone Star Ports Holdings, LLC ("LSPH"). LSPH has five Members, each owning 20% of the membership units. Plaintiff Allied Ports LLC is LSPH's sole Manager.

7

work was done by Marty or Dennis Berry.  However, things changed in 2024 when Marty and Bonnie sensed that the permit for the Project was about to be approved.  Now, Marty and Bonnie contend that the Project is owned by the Berry Defendants and that the Plaintiffs have no ownership interest in the Project.   On August 28, 2024, Mike Hummell, the General Counsel of Berry GP, Inc. wrote to Lawerence expressing that the Project was *only* owned by the Berry Defendants:

> The Berry Companies appreciate your stated willingness to make sure that each of the companies owned jointly by you, Dennis (now Bonnie) and Marty are properly papered to reflect that ownership and management rest exclusively with the three of you. As of this writing I have not seen anything to reflect follow through on your commitment. For entities which list you as sole manager, you can make the changes without the need for any additional meetings. Some of the entities reflected involvement of people that were not or have not been approved by the Owners.  Getting these matters clarified is good for everybody.

**Ex. 3**.  Stated differently, the Berry Companies were now trying to proceed with the Project without including Plaintiffs and were seeking to deprive the Plaintiffs of the ownership that they had earned.

19.     In the same letter, Hummell suggested that ownership and control of the Project should be transferred to Berry GP or any Berry-owned entity.  *See id.* ("I suggest you, Bonnie and Marty consider consolidating ownership into a Berry entity to reflect this.").

20.     In the same letter, Hummell recognized that Berry GP, Marty, or Bonnie did not own Axis and that it was instead owned by Lone Star Ports Enterprises LLC—one of the entities in the chain of ownership created as contemplated by the Investment Agreement.   *Id*.  The letter further requested that Lawrence provide Marty and Bonnie "with the name or names of the true owner of Axis Midstream Holdings, LLC." *Id*.

8

21. On October 22, 2024, the Project received monumental news—the Department of the Army issued Axis a permit for construction of the Project. Almost six years of work was beginning to take shape. But just one day later, Berry GP's General Counsel Hummell sent an email (acting for Berry GP, Marty, and Bonnie) indicating that he was "going to file paperwork" to change the ownership of the Axis *solely* to the Berry Defendants, even after he previously recognized that the Berry Defendants did not own Axis. **Ex. 4**. Changing the ownership of Axis is part of an overall plan to divest Plaintiffs of their interest by breaching the Investment Agreement by taking Axis out of the established and agreed to ownership chain of the Project now that the permit has been issued.

22. Marty and Bonnie purported to call a "meeting of owners" of Axis for November 6, 2024, where they intended to take action on (1) "Appointment and/or removal of Company Managers" and (2) Appointment and/or removal of Officers." **Ex. 5**. This meeting was obviously improper given Marty and Bonnie are admittedly not "owners" of Axis. Moreover, changing the ownership and management would effectively divest Allied Ports of its ownership and management rights in the Project, which constitutes a breach of the Investment Agreement. Moreover, the purported meeting of Axis violates the governing corporate documents of Axis which give the sole right to call such a meeting to LSPE. As such, the action of Defendants Marty and Bonnie Berry affect the internal affairs of Axis. The Court has since issued a Temporary Restraining Order that, among other things, restrained the November 6, 2024 meeting from moving forward. For the reasons set forth below, Plaintiffs assert their causes of action and seek the Court's assistance to enjoin the defendants from interfering with their ownership rights in the Project, interfering with the appropriate governance and internal affairs of Axis or otherwise interfering with the Project.

9

## CAUSES OF ACTION

## COUNT I- DECLARATORY JUDGMENT

23.    Plaintiffs reallege and incorporate all preceding allegations.

24.    Plaintiffs seek a declaratory judgment to determine the rights, status, or other legal relations of the parties related to the ownership, the applicable operating agreements, and corporate structure of the project at issue.  See Tex. Civ. Prac. & Rem. Code § 37.004(a).  A dispute exists between the parties, as the Investment Agreement sets forth the proper entity structure, ownership, and management of the Project.  Importantly, the Investment Agreement may be construed by the Court before there has been an actual breach.  Tex. Civ. Prac. & Rem. Code 37.004.

25.    Plaintiffs seek the following declarations:

a.  The Compensation Agreement is a valid, enforceable, agreement against Lawrence Berry, Marty Berry, and Bonnie Berry (as successor to Dennis Berry);

b.  The Investment Agreement is a valid, enforceable agreement against Lawrence Berry, Marty Berry, and Bonnie Berry (as successor to Dennis Berry);

c.  The Investment Agreement provides that Plaintiff Powers owns, through his designee, Allied Ports, LLC, a twenty percent (20%) interest in the Project (as defined in the Investment Agreement) subject to "priority distributions to the Berry Defendants or their designees of Two Hundred Fifty Million United States Dollars ($250,000,000) plus a ten percent (10%) cumulative preferred return on the outstanding balance of such amount."

d.  Transferring ownership, management, and control of Axis or any other interest of the entities involved in the Project inconsistent with the entity structure

10

provided under the Investment Agreement constitutes a breach of the Investment Agreement.

## COUNT II- BREACH OF CONTRACT

26.     Plaintiffs reallege and incorporate all preceding allegations.

27.     Under the Compensation Agreement, Powers is entitled to be paid for the expenses he incurs in connection with this work on the Project.  Powers performed and continues to perform by providing the services set forth in the Agreements.

28.     Lawrence, Marty, and Bonnie (through Dennis) have failed to pay Powers' expenses incurred under the Compensation Agreement breaching the Agreements.

29.     Powers has been damaged in an amount that exceeds the jurisdictional limits of this Court.

## REQUEST FOR TEMPORARY INJUNCTION

30.     Plaintiffs reallege and incorporate all preceding allegations.

31.     Marty and Bonnie have breached and/or intend to breach their agreements with Plaintiffs and have expressed their intent to proceed with a course of action that will result in additional breaches in the future.  More specifically, Marty and Bonnie have expressed (through the General Counsel of their company) their intent to take the Project for the three Berry Defendants and to deprive Plaintiffs of their ownership interest.  As part of this plan to steal Plaintiffs' interest in the Project, Marty and Bonnie have devised a plan to either transfer Axis to another Berry entity or transfer assets held by Axis to another Berry entity.  If Marty and Bonnie are allowed to proceed to transfer ownership, management, and control of Axis to themselves, Plaintiffs will be deprived of their agreed to and bargained for management rights and 20% interest in the Project.  Indeed, "loss of management rights over a company are unique, irreplaceable, and

11

cannot be measured by a certain pecuniary standard." *Cheniere Energy, Inc. v. Parallax Enterprises LLC*, 585 S.W.3d 70, 83 (Tex. App.—Houston [14th Dist.] 2019, pet. dism'd); *see also Sonwalker v. St. Luke's Sugarland P'ship, L.L.P.*, 394 S.W.3d 186, 201 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (holding that termination of interest in a limited liability partnership would irreparably injure the Plaintiff because the Plaintiff would lose management rights like selecting a governing board and blocking major actions).

32.     If Defendants are not immediately enjoined from violating the Investment Agreement, Plaintiffs will suffer concrete, particularized and irreparable harm.  Plaintiffs will lose their management rights and 20% interest, both of which are unique and cannot be purchased on the open market.

33.     Therefore, absent Court intervention, Plaintiffs will have no adequate remedy at law.  The only adequate relief, while the merits of the claims are being determined, is to maintain the status quo of ownership of Axis and all other entities and assets associated with the Project. Otherwise, Plaintiffs bargained-for rights and interest could be irreparably lost forever.

34.     The injury to Plaintiffs should Defendants be allowed to proceed with breaching their agreements would greatly outweigh any injury (to the extent there is injury at all) to Defendants in delaying any change in ownership of Axis or of any other entity, property, or tangible or intangible rights associated with the Project until the Court rules on the merits of Plaintiffs' claims.

35.     To preserve the status quo and Plaintiffs' rights during the pendency of this action, Plaintiffs respectfully request that the Court grant and enter a temporary injunction precluding Defendants, their employees, agents, representatives, and any others acting on their behalf from taking any of the following actions unless expressly permitted by this Court to do so:

12

a. Holding any meetings or taking any action for or on behalf of Axis unless called by or approved by the Manager Lone Star Ports Enterprises, LLC;

b. Changing, altering, or transferring in any way the permit (SWG-2018-00789) issued to Axis;

c. Changing, altering, or transferring in any way the ownership, management, or tangible or intangible rights of Axis;

d. Changing, altering, or transferring in any way the ownership, management, assets, or tangible or intangible rights held by the entities formed for the Project which is the subject of this lawsuit;

e. Holding any meetings that in any way seek to affect the management or ownership interest of Powers or Allied Ports, LLC in the Project or in any of the entities formed for the Project;

f. Taking any action that would impact or affect Powers' or Allied Ports, LLC's 20% ownership interest in the Project that is the subject of this lawsuit or in any of the entities formed for the Project;

## CONDITIONS PRECEDENT

36. All conditions precedent have been performed or have been excused or waived.

**ATTORNEYS' FEES**

37.     Plaintiffs invokes and pleads Chapters 37 and 38 of the Civil Practices and Remedies Code of the State of Texas and requests an award of attorneys' fees thereunder.

38.     Plaintiffs had to retain the undersigned law firm to file this lawsuit and protect their rights. Plaintiffs request that this Court grant such attorney's fees as this Court may deem reasonable and necessary for representing it in this action and for any appeals thereafter.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury in this action of all claims so triable.

**PRAYER FOR RELIEF**

Plaintiffs request the following relief:

A.  A Declaration that:

   a.  The Compensation Agreement is a valid, enforceable, agreement against Lawrence Berry, Marty Berry, and Bonnie Berry (as successor to Dennis Berry);

   b.  The Investment Agreement is a valid, enforceable agreement against Lawrence Berry, Marty Berry, and Bonnie Berry (as successor to Dennis Berry);

   c.  The Investment Agreement provides that Plaintiff Powers owns, through his designee, Allied Ports, LLC, a twenty percent (20%) interest in the Project (as defined in the Investment Agreement) subject to "priority distributions to the Berry Defendants or their designees of Two Hundred Fifty Million United States Dollars ($250,000,000) plus a ten percent (10%) cumulative preferred return on the outstanding balance of such amount."

14

d. Transferring ownership, management, and control of Axis or any other interest of the entities involved in the Project inconsistent with the entity structure provided under the Investment Agreement constitutes a breach of the Investment Agreement.

B. Compensatory damages in an amount to be proven at trial;

C. Temporary and Injunctive Relief precluding Defendants, their employees, agents, representatives, and any others acting on their behalf from taking any of the following actions unless expressly permitted by this Court to do so:

a. Holding any meetings or taking any action for or on behalf of Axis unless called by or approved by the Manager Lone Star Ports Enterprises, LLC;

b. Changing, altering, or transferring in any way the permit (SWG-2018-00789) issued to Axis;

c. Changing, altering, or transferring in any way the ownership, management, or tangible or intangible rights of Axis;

d. Changing, altering, or transferring in any way the ownership, management, assets, or tangible or intangible rights held by the entities formed for the Project which is the subject of this lawsuit;

e. Holding any meetings that in any way seek to affect the management or ownership interest of Powers or Allied Ports, LLC in the Project or in any of the entities formed for the Project;

f. Taking any action that would impact or affect Powers' or Allied Ports, LLC's 20% ownership interest in the Project that is the subject of this lawsuit or in any of the entities formed for the Project;

15

D. An award of attorneys' fees in an amount to be proven at trial;

E. Pre- and post-judgment interest; and

F. All such other and further costs and relief as the Court deems just and proper.

DATED: November 13, 2024

Respectfully submitted,

*/s/ Alistair B. Dawson*
Alistair B. Dawson
State Bar No. 05596100
M. Jake McClellan
State Bar No. 24109525
Madeline E. Gay
State Bar No. 24138681
E-mail: adawson@beckredden.com
E-mail: jmcclellan@beckredden.com
E-mail: mgay@beckredden.com
1221 McKinney Street, Suite 4500
Houston, Texas 77010-2010
Telephone:    (713) 951-3700
Telecopier:    (713) 951-3720

**ATTORNEYS FOR PLAINTIFFS**

**EXHIBIT 14**

E-filed in the Office of the Clerk
for the Business Court of Texas
11/27/2024 1:23 PM
Accepted by: Beverly Crumley
Case Number: 24-BC11A-0025

**CAUSE NO. 24-BC11A-0025**

| | | |
|---|---|---|
| ALBERT THEODORE POWERS; ALLIED PORTS LLC, | § § § § | IN THE BUSINESS COURT |
| *Plaintiffs,* | § § | |
| v. | § § § | ELEVENTH DIVISION |
| AXIS MIDSTREAM HOLDINGS, LLC; ALLEN LAWRENCE BERRY; MARVIN GLENN BERRY; AND BONNIE BERRY, as successor in interest to DENNIS WAYNE BERRY | § § § § § § § | |
| *Defendants.* | § | HARRIS COUNTY, TEXAS |

**PLAINTIFFS' VERIFIED THIRD AMENDED PETITION AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION**

<u>SUMMARY OF PLAINTIFFS' CLAIMS</u>

Plaintiffs Albert Theodore Powers ("Powers") and Allied Ports LLC ("Allied") file this lawsuit to protect their management rights and 20% interest in a crude oil delivery system and terminal project. The three Berry brothers entered into agreements with Powers wherein he and/or Allied was entitled to, among other things, a 20% ownership interest in a company called Lone Star Ports Holdings, LLC in connection with what is referred to as the Lone Star Ports Project. After working for years on the Project – and with the Project on the verge of taking off, Defendants Marvin Glenn Berry ("Marty") and Bonnie Berry, as successor in interest to Dennis Wayne Berry ("Bonnie"), have made clear they will not honor their agreements or acknowledge Allied's ownership interest in Lone Star Ports Holdings, LLC even though their own brother Defendant Allen Lawrence Berry ("Lawrence") acknowledges Plaintiffs' interest. Further, as set forth below, Marty and Bonnie are improperly trying to take control of Defendant Axis Midstream Holdings,

1

LLC ("Axis") by improperly and without authority purporting to call a meeting of Axis for the purpose of changing the Manager and officers of Axis and otherwise taking control of Axis for their own benefit to the exclusion of the Plaintiffs. In so doing, Marty and Bonnie are improperly interfering with the governance of Axis. Plaintiffs need immediate assistance from the Court to enjoin Defendants from conducting any unauthorized and improper meetings in which Marty and Bonnie intend to illegally and without authority transfer management, ownership and control of Axis into Berry GP, Inc. or another Berry-controlled entity outside the agreed holding structure for the Project and/or transfer the ownership, assets, tangible or intangible rights, or permits for the Project to another Berry controlled interest or otherwise interfere with the governance of Axis. What limited documents have been obtained thus far confirm that the Berry Defendants plan to take control of the Project and deprive Plaintiffs of their management and ownership interests. Without the Court's intervention, Plaintiffs will be irreparably harmed and will have no adequate remedy for the loss of their rights and interest.

## PARTIES

1. Plaintiff Albert Theodore Powers is an individual residing in New York, New York. At the time of the events that are the subject of this lawsuit, he was a resident of New York, New York.

2. Plaintiff Allied Ports, LLC is a Delaware limited liability company and designee of Powers' interest under the agreements with the Berry Defendants. Its registered agent's address is 16192 Coastal Hwy, Lewes, Delaware 19958.

3. Defendant Marvin Glenn Berry is an individual residing in Nueces County, Texas. He can be served at 1414 Corn Products Road, Corpus Christi, Texas or wherever he may be found.

2

Defendant Marvin Glenn Berry may also be served through his counsel Doug Allison, Law Office of Douglas Allison,403 N. Tancahua St., Corpus Christi, Texas 78401.

4.      Defendant Bonnie Berry is an individual residing in Nueces County, Texas.  On information and belief,[1] she is the widow and successor in interest to Dennis Wayne Berry, who is deceased.  She can be served at 1414 Corn Products Road, Corpus Christi, Texas or wherever she may be found.  Defendant Bonnie Berry may also be served through her counsel Doug Allison, Law Office of Douglas Allison,403 N. Tancahua St., Corpus Christi, Texas 78401.

5.      Defendant Allen Lawrence Berry is an individual residing in Harris County, Texas. He can be served at 5005 Riverway, Suite 440, Houston, Texas 77056 or wherever he may be found.  Defendant Allen Lawrence Berry may also be served through his counsel Barrett Reasoner, Gibbs & Bruns, 1100 Louisiana Street, Suite 5300 Houston, Texas 77002.

6.      When appropriate, Marty, Bonnie, and Lawrence will be referred to collectively as the "Berry Defendants."

7.      Defendant Axis Midstream Holdings, LLC is a Texas limited liability company.  Its sole member and manager is Lone Star Ports Enterprises, LLC.  Axis has already been served through its alleged registered agent, Mike H. Hummell, at 1414 Valero Way, Corpus Christi, Texas 78409.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction because the relief sought is within the jurisdictional limits of this Court.  At this time, Plaintiffs seek monetary and non-monetary declaratory relief and attorneys' fees and expenses in excess of $10,000,000.  Tex. R. Civ. P. 47; Tex. Gov't Code 25A.001(14) (Qualified Transaction).

---

[1] Throughout this Petition, references to the "Berry Defendants" includes actions taken by Dennis Wayne Berry, whose interest in the Project discussed further below is now understood to be owned by his widow, Bonnie Berry.

3

9. Venue is proper in this district because Powers, a citizen of New York, and the Berry Defendants, citizens of Texas, entered into agreements with a mandatory forum selection clause wherein each party consented to "exclusive jurisdiction" in Harris County, Texas to the exclusion of other courts and waived objections to Harris County as the forum and venue for the claims asserted in this lawsuit and others that may arise under the agreements. *See* **Ex. 2** (the "Investment Agreement") at § 5(a). Alternatively, the written agreements underlying Plaintiffs' claims constitute a "major transaction" providing for venue in Harris County, Texas. Tex. Civ. Prac. & Rem. Code § 15.020.[2] Venue is additionally proper because one of the defendants is a citizen of Harris County, Texas, and a substantial part of the events giving rise to Plaintiffs' claims occurred in Harris County, Texas. Tex. Civ. Prac. & Rem. Code §15.002.

## FACTS

10. In 2018, Defendant Lawrence came up with the idea of creating a crude oil delivery and export facility in and around the Corpus Christi Port (the "Project"). Lawrence and his brothers Marty and Dennis decided to pursue the Project. The Project has been touted by the Port of Corpus Christi as a "state-of-the-art petroleum export terminal" and the "deepest-draft safe harbor crude export facility in the nation when commissioned."[3]

11. On October 31, 2018, Defendant Lawrence telephoned Plaintiff Powers in New York and requested him to come to Houston because he and his brothers needed Powers' expertise for the Project. The Berry Defendants had previously worked with Powers (who was at the time of the prior engagement a business transaction lawyer). The Berry Defendants engaged Plaintiff

---

[2] While this lawsuit is based on agreements between Plaintiffs and the Berry Defendants, Plaintiffs are aware of a separate lawsuit pending in Corpus Christi among several members of the Berry family and employees of some of the companies that the Berry Defendants jointly own together. Plaintiffs are not parties to that lawsuit and do not seek to adjudicate any of the claims and issues being decided in that lawsuit.

[3] https://portofcc.com/port-of-corpus-christi-commission-approves-50-year-lease-agreement-with-carlyle-group-joint-venture/ (last accessed October 30, 2024).

4

Powers to represent them and advise them in shaping, structuring, securing financing for, and furthering development of the Project. The Berry Defendants sought Powers' expertise because they were in the process of negotiating with a private equity firm to obtain financing for the Project.

12. Powers met with Lawrence Berry in Houston in November 2018 to, among other things, discuss Powers' compensation in connection with his role in the Project. They agreed that Powers would be paid a base compensation of $100,000 per month plus expenses and receive a 20% interest in the Project subject to priority distributions to the Berry Defendants. This agreement was confirmed by the Berry Defendants at a later meeting in early December 2018.

13. This agreement was later memorialized in a written Compensation Agreement and written Investment Agreement in 2019 (collectively, the "Agreements"), confirming the compensation of $100,000 per month plus expenses and a 20% interest in the Project subject to priority distributions to the Berry Defendants of $250,000,000 plus a 10% preferred return on the outstanding balance of such amount. **Ex. 1**; **Ex. 2**. At the time that the Agreements were executed by the parties, Powers believed that the Project had a value in excess of $400,000,000. Thus, the value of Powers' ownership interest in the Project was in excess of $80,000.000.

14. At first, all parties performed the Agreements. Powers spent most of his working time in Houston where he stayed in an apartment paid for by the Berry Defendants, and he worked tireless hours on the Project. In addition, Powers was paid the $100,000 monthly stipend for his work for eighteen months and was reimbursed for expenses as set forth in the Agreements.[4] Powers has been paid more than $2,000,000 by the Berry Defendants under the Agreements.

---

[4] In January 2020, the Berry Defendants terminated the monthly compensation portion of the Compensation Agreement effective April 30, 2020, but requested that Powers continue to work on the Project. The Berry Defendants agreed that they would continue to reimburse Powers for his expenses incurred. Knowing he had an ownership interest in the Project, Powers agreed to do so. In response to the communication from the Berry Defendants, Powers confirmed that the termination of the monthly payment had no impact on the ownership interest in the Project under the terms of the Investment Agreement. The Berry Defendants continued to pay Powers' expenses under the agreement until June 2023, when the last payment from the Berry Defendants was received.

15.     Powers' work involved developing and implementing a structure for the Project and trying to arrange a financing package for the Project. On behalf of the Berry Defendants and himself, Powers created several entities for the Project. The formation of these entities was paid for by the Berry Defendants. Powers also drafted operating agreements for those entities. Those documents were shared and fully discussed with all of the Berry Defendants. Never once did any of the Berry Defendants ever complain or assert that the holding structure being created and put in place by Powers was wrong or inconsistent with the agreement of the parties. In addition, there were various meetings (many of which took place in Houston, Texas) between Powers and the Berry Defendants to discuss the Project and the structure of the Project. In addition, Powers negotiated the terms of a potential transaction with a private equity firm on behalf of the Berry Defendants and himself. Eventually, in February 2019, Powers' efforts resulted in a signed term sheet with a well-respected private equity firm, the Carlyle Group, though that transaction ultimately was not completed. The term sheet with the Carlyle Group values the interest of the Berry Defendants in the Project at a minimum of $400,000,000 meaning that Plaintiffs' ownership interest in Lone Star Holdings, LLC and in the Project is worth at least $80,000,000. Under the terms of the Carlyle term sheet, the Berry Defendants were to receive at least $320,000,000 for their interest in the Project.

16.     The Investment Agreement anticipates that Powers would create and structure the entities involved in the Project. **Ex. 2** at ¶¶ 1-2. Accordingly, Powers and the Berry Defendants set about to structure the chain of entities to hold different interests. Pursuant to the Investment Agreement, Powers formed and designated Plaintiff Allied Ports LLC to own his 20% interest. In

most of the documents exchanged between the parties, the agreed holding structure for the Project was as follows:



17.      In this agreed structure for the Project, the five owners of the Project are listed along the top.  Redfish Bay Terminals, Inc. ("Redfish") is believed to be owned or beneficially owned by Berry GP, Inc. (the Berry Defendants' company), Capella is believed to be beneficially owned by or for the benefit of Lawrence and his family, Arcturus is believed to be beneficially owned by or for the benefit of Bonnie (through Dennis) and her family, Sirius is believed to be beneficially owned by or for the benefit of Marty and his family, and Allied Ports is owned by Powers.  Thus, the Parties agreed that the Project is owned in equal percentages by the three Berry Defendants, Powers (subject to the $250 million hurdle and the 10% priority return thereon) and Redfish.  This structure was reaffirmed and further memorialized in two separate written Amended and Restated Operating Agreements of Lone Star Ports Holdings, LLC (including the current Operating Agreement) and has been in place for more than five years.  Now that the permit for the Project has been obtained from the U.S. Army Corps of Engineers, the Project is worth significantly more

than when the Carlyle Group entered into its term sheet. Indeed, counsel for Marty and Bonnie Berry recently announced to Judge Palmer in the 215th District Court that the Project has a value in excess of $1 billion. Using that valuation (and the true value may be more), the value of Plaintiffs' ownership interest in Lone Star Holdings, LLC and in the Project is worth more than $200 million.

18.     Of the several entities formed, in particular focus in this lawsuit (and the temporary relief sought) is Defendant Axis. Axis holds intangible property of the Project, including the permitting rights associated with development of the Project. Axis's sole Member and Manager is Lone Star Ports Enterprises, LLC ("LSPE"), which through the chain of entities above is ultimately managed by Plaintiffs.[5] Most importantly, none of the Berry Defendants (including Marty and Bonnie) have individual ownership or management rights in Axis. Relevant to this dispute, only LSPE has the right to call a meeting of Axis – and Marty and Bonnie have no right to call such a meeting.

19.     During the first six years of the development of the Project, almost all of the work was performed by Lawerence, Powers, staff, and third-party consultants. Very little, if any, of the work was done by Marty or Dennis Berry. However, things changed in 2024 when Marty and Bonnie sensed that the most important Federal permit for the Project was about to be approved. Now, Marty and Bonnie contend that the Project is owned by the Berry Defendants and that the Plaintiffs have no ownership interest in the Project. On July 26, 2024, Powers was alerted that a meeting was being called of the "Shareholders, Directors and Owners" of some of the entities involved in the Project, including Axis. *See* **Ex. 6**. Notably, none of the owners of Axis actually

---

[5] LSPE's sole Member and Manager is Lone Star Ports Ventures, LLC ("LSPV"). LSPV's sole Member and Manager is Lone Star Ports Holdings, LLC ("LSPH"). LSPH has five Members, each owning 20% of the membership units. Plaintiff Allied Ports LLC is LSPH's sole Manager. Plaintiff Powers is the sole Manager of Allied Ports LLC.

8

called the meeting and those who purported to call the meeting are not owners or managers of Axis and have no legal authority to call such a meeting. In response to the attempt to call this meeting, Powers notified the Berry Defendants that he was a 20% owner of the Project and that he wanted to attend any meetings that involved the Project. *See* **Ex. 7**. Powers did attend the meeting that took place on August 6, 2024. During the course of that meeting, Powers once again described the holding structure for the Project, that Allied Ports LLC owned 20% of Lone Star Ports Holdings, LLC and that Axis was owned and managed by Lone Star Ports Enterprises, LLC. None of the Berry Defendants challenged Plaintiffs' ownership interest in the Project (or in Lone Star Ports Holdings, LLC) and none of the Berry Defendants disputed Powers' description of the holding structure for the Project. Nor did any of the Berry Defendants object to Powers' request to be notified of any future meetings to discuss or address any aspect of the Project.

20.     Despite the information that was shared with the Berry Defendants at the August 6, 2024 meeting setting forth the holding structure for the Project, on August 28, 2024, Mike Hummell, the General Counsel of Berry GP, Inc. wrote to Lawerence expressing that the Project was ***only*** owned by the Berry Defendants:

> The Berry Companies appreciate your stated willingness to make sure that each of the companies owned jointly by you, Dennis (now Bonnie) and Marty are properly papered to reflect that ownership and management rest exclusively with the three of you. As of this writing I have not seen anything to reflect follow through on your commitment. For entities which list you as sole manager, you can make the changes without the need for any additional meetings. Some of the entities reflected involvement of people that were not or have not been approved by the Owners. Getting these matters clarified is good for everybody.

9

**Ex. 3**. Stated differently, the Berry Companies were now trying to proceed with the Project without including Plaintiffs and were seeking to deprive the Plaintiffs of the ownership that they had earned.

21. In the same letter, Hummell suggested that ownership and control of the Project should be transferred to Berry GP or any Berry-owned entity. *See id.* ("I suggest you, Bonnie and Marty consider consolidating ownership into a Berry entity to reflect this.").

22. In the same letter, Hummell recognized that Berry GP, Marty, or Bonnie did not own Axis and that it was instead owned by Lone Star Ports Enterprises LLC—one of the entities in the chain of ownership created as contemplated by the Investment Agreement. *Id.* The letter further requested that Lawrence provide Marty and Bonnie "with the name or names of the true owner of Axis Midstream Holdings, LLC." *Id.*

23. On October 22, 2024, the Project received monumental news—the Department of the Army issued Axis a permit for construction of the Project. Almost six years of work was beginning to take shape. But just one day later, Berry GP's General Counsel Hummell sent an email (acting for Berry GP, Marty, and Bonnie) indicating that he was "going to file paperwork" to change the ownership of Axis *solely* to the Berry Defendants, even after he previously recognized that the Berry Defendants did not own Axis. **Ex. 4**. Changing the ownership of Axis is part of an overall plan to divest Plaintiffs of their interest by breaching the Investment Agreement by taking Axis out of the established and agreed ownership chain of the Project now that the permit has been issued.

24. Marty and Bonnie purported to call a "meeting of owners" of Axis for November 6, 2024, where they intended to take action on (1) "Appointment and/or removal of Company Managers" and (2) Appointment and/or removal of Officers." **Ex. 5**. This meeting was obviously

improper given Marty and Bonnie are admittedly not "owners" of Axis. Further, Marty and Bonnie intentionally did not provide notice of this meeting to Powers as he had previously requested. Moreover, changing the ownership and management would effectively divest Plaintiffs of their ownership and management rights in the Project, which constitutes a breach of the Investment Agreement. Moreover, the purported meeting of Axis violates the governing documents of Axis which give the sole right to call such a meeting to LSPE. As such, the action of Defendants Marty and Bonnie Berry affect the internal affairs of Axis. On October 31, 2024, Judge Reeder, sitting as the Ancillary Judge for Harris County, issued a Temporary Restraining Order that, among other things, restrained the November 6, 2024 meeting from moving forward. For the reasons set forth below, Plaintiffs assert their causes of action and seek the Court's assistance to enjoin the defendants from interfering with their ownership rights in the Project, interfering with the appropriate governance and internal affairs of Axis or otherwise interfering with the Project.

## CAUSES OF ACTION
### COUNT I- DECLARATORY JUDGMENT

25.     Plaintiffs reallege and incorporate all preceding allegations.

26.     Plaintiffs seek a declaratory judgment to determine the rights, status, or other legal relations of the parties related to the ownership, the applicable operating agreements, and holding structure of the project at issue. See Tex. Civ. Prac. & Rem. Code § 37.004(a). A dispute exists between the parties, as the Investment Agreement sets forth the proper entity structure, ownership, and management of the Project. Importantly, the Investment Agreement may be construed by the Court before there has been an actual breach. Tex. Civ. Prac. & Rem. Code 37.004.

27.     Plaintiffs seek the following declarations:

11

a. The Compensation Agreement is a valid, enforceable, agreement against Lawrence Berry, Marty Berry, and Bonnie Berry (as successor to Dennis Berry);

b. The Investment Agreement is a valid, enforceable agreement against Lawrence Berry, Marty Berry, and Bonnie Berry (as successor to Dennis Berry);

c. The Investment Agreement provides that Plaintiff Powers owns, through his designee, Allied Ports, LLC, a twenty percent (20%) interest in the Project (as defined in the Investment Agreement) subject to "priority distributions to the Berry Defendants or their designees of Two Hundred Fifty Million United States Dollars ($250,000,000) plus a ten percent (10%) cumulative preferred return on the outstanding balance of such amount."

d. Transferring ownership, management, and control of Axis or any other interest of the entities involved in the Project inconsistent with the entity structure provided under the Investment Agreement constitutes a breach of the Investment Agreement.

**COUNT II- BREACH OF CONTRACT**

28. Plaintiffs reallege and incorporate all preceding allegations.

29. Under the Compensation Agreement, Powers is entitled to be paid for the expenses he has incurred and continues to incur in connection with this work on the Project. Powers performed and continues to perform by providing the services set forth in the Agreements.

30. Lawrence, Marty, and Bonnie (through Dennis) have failed to pay Powers' expenses incurred under the Compensation Agreement breaching the Agreements.

31. Powers has been damaged in an amount that exceeds the jurisdictional limits of this Court.

## REQUEST FOR TEMPORARY INJUNCTION

32. Plaintiffs reallege and incorporate all preceding allegations.

33. Marty and Bonnie have breached and/or intend to breach their agreements with Plaintiffs and have expressed their intent to proceed with a course of action that will result in additional breaches in the future. More specifically, Marty and Bonnie have expressed (through the General Counsel of their company) their intent to take the Project for the three Berry Defendants and to deprive Plaintiffs of their ownership interest. As part of this plan to steal Plaintiffs' interest in the Project, Marty and Bonnie have devised a plan to either transfer Axis to another Berry entity or transfer assets held by Axis to another Berry entity. If Marty and Bonnie are allowed to proceed to transfer ownership, management, and control of Axis to themselves, Plaintiffs will be deprived of their agreed to and bargained for management rights and 20% interest in the Project. Indeed, "loss of management rights over a company are unique, irreplaceable, and cannot be measured by a certain pecuniary standard." *Cheniere Energy, Inc. v. Parallax Enterprises LLC*, 585 S.W.3d 70, 83 (Tex. App.—Houston [14th Dist.] 2019, pet. dism'd); *see also Sonwalker v. St. Luke's Sugarland P'ship, L.L.P.*, 394 S.W.3d 186, 201 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (holding that termination of interest in a limited liability partnership would irreparably injure the Plaintiff because the Plaintiff would lose management rights like selecting a governing board and blocking major actions).

34. If Defendants are not immediately enjoined from violating the Investment Agreement, Plaintiffs will suffer concrete, particularized and irreparable harm. Plaintiffs will lose

13

their management rights and 20% interest, both of which are unique and cannot be purchased on the open market.

35. Therefore, absent Court intervention, Plaintiffs will have no adequate remedy at law. The only adequate relief, while the merits of the claims are being determined, is to maintain the status quo of ownership of Axis and all other entities and assets associated with the Project. Otherwise, Plaintiffs bargained-for rights and interest could be irreparably lost forever.

36. The injury to Plaintiffs should Defendants be allowed to proceed with breaching their agreements would greatly outweigh any injury (to the extent there is injury at all) to Defendants in delaying any change in ownership of Axis or of any other entity, property, or tangible or intangible rights associated with the Project until the Court rules on the merits of Plaintiffs' claims.

37. To preserve the status quo and Plaintiffs' rights during the pendency of this action, Plaintiffs respectfully request that the Court grant and enter a temporary injunction precluding Defendants, their employees, agents, representatives, and any others acting on their behalf from taking any of the following actions unless expressly permitted by this Court to do so:

a. Holding any meetings or taking any action for or on behalf of Axis unless called by or approved by the Manager Lone Star Ports Enterprises, LLC;

b. Changing, altering, or transferring in any way the permit (SWG-2018-00789) issued to Axis;

c. Changing, altering, or transferring in any way the ownership, management, or tangible or intangible rights of Axis;

14

d. Changing, altering, or transferring in any way the ownership, management, assets, or tangible or intangible rights held by the entities formed for the Project which is the subject of this lawsuit;

e. Holding any meetings that in any way seek to affect the management or ownership interest of Powers or Allied Ports, LLC in the Project or in any of the entities formed for the Project;

f. Taking any action that would impact or affect Powers' or Allied Ports, LLC's 20% ownership interest in the Project that is the subject of this lawsuit or in any of the entities formed for the Project;

## CONDITIONS PRECEDENT

38.     All conditions precedent have been performed or have been excused or waived.

## ATTORNEYS' FEES

39.     Plaintiffs invokes and pleads Chapters 37 and 38 of the Civil Practices and Remedies Code of the State of Texas and requests an award of attorneys' fees thereunder.

40.     Plaintiffs had to retain the undersigned law firm to file this lawsuit and protect their rights. Plaintiffs request that this Court grant such attorney's fees as this Court may deem reasonable and necessary for representing it in this action and for any appeals thereafter.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury in this action of all claims so triable.

## PRAYER FOR RELIEF

Plaintiffs request the following relief:

A.  A Declaration that:

a. The Compensation Agreement is a valid, enforceable, agreement against Lawrence Berry, Marty Berry, and Bonnie Berry (as successor to Dennis Berry);

b. The Investment Agreement is a valid, enforceable agreement against Lawrence Berry, Marty Berry, and Bonnie Berry (as successor to Dennis Berry);

c. The Investment Agreement provides that Plaintiff Powers owns, through his designee, Allied Ports, LLC, a twenty percent (20%) interest in the Project (as defined in the Investment Agreement) subject to "priority distributions to the Berry Defendants or their designees of Two Hundred Fifty Million United States Dollars ($250,000,000) plus a ten percent (10%) cumulative preferred return on the outstanding balance of such amount."

d. Transferring ownership, management, and control of Axis or any other interest of the entities involved in the Project inconsistent with the entity structure provided under the Investment Agreement constitutes a breach of the Investment Agreement.

B. Compensatory damages in an amount to be proven at trial;

C. Temporary and Injunctive Relief precluding Defendants, their employees, agents, representatives, and any others acting on their behalf from taking any of the following actions unless expressly permitted by this Court to do so:

a. Holding any meetings or taking any action for or on behalf of Axis unless called by or approved by the Manager Lone Star Ports Enterprises, LLC;

b. Changing, altering, or transferring in any way the permit (SWG-2018-00789) issued to Axis;

16

c. Changing, altering, or transferring in any way the ownership, management, or tangible or intangible rights of Axis;

d. Changing, altering, or transferring in any way the ownership, management, assets, or tangible or intangible rights held by the entities formed for the Project which is the subject of this lawsuit;

e. Holding any meetings that in any way seek to affect the management or ownership interest of Powers or Allied Ports, LLC in the Project or in any of the entities formed for the Project;

f. Taking any action that would impact or affect Powers' or Allied Ports, LLC's 20% ownership interest in the Project that is the subject of this lawsuit or in any of the entities formed for the Project;

D. An award of attorneys' fees in an amount to be proven at trial;

E. Pre- and post-judgment interest; and

F. All such other and further costs and relief as the Court deems just and proper.

DATED: November 27, 2024

Respectfully submitted,

*/s/ Alistair B. Dawson*
Alistair B. Dawson
State Bar No. 05596100
M. Jake McClellan
State Bar No. 24109525
Madeline E. Gay
State Bar No. 24138681
E-mail: adawson@beckredden.com
E-mail: jmcclellan@beckredden.com
E-mail: mgay@beckredden.com
1221 McKinney Street, Suite 4500
Houston, Texas 77010-2010
Telephone:     (713) 951-3700
Telecopier:     (713) 951-3720

**ATTORNEYS FOR PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of this document was served on counsel of record in this matter in accordance with Rules 21 and 21a of the Texas Rules of Civil Procedure on this 27th day of November, 2024.

*/s/ M. Jake McClellan*
M. Jake McClellan

18

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Lisa Verm on behalf of Alistair Dawson
Bar No. 5596100
lverm@beckredden.com
Envelope ID: 94778675
Filing Code Description: Amended Filing
Filing Description: Plaintiffs' Verified Third Amended Petition and Application for Temporary Restraining Order and Temporary Injunction
Status as of 11/27/2024 2:07 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Barrett H.Reasoner | | breasoner@gibbsbruns.com | 11/27/2024 1:23:20 PM | SENT |
| Michael R.Absmeier | | mabsmeier@gibbsbruns.com | 11/27/2024 1:23:20 PM | SENT |
| Rosa Brennan | | rbrennan@gibbsbruns.com | 11/27/2024 1:23:20 PM | SENT |
| Douglas Allison | 1083500 | doug@dallisonlaw.com | 11/27/2024 1:23:20 PM | SENT |
| Alistair Dawson | 5596100 | adawson@beckredden.com | 11/27/2024 1:23:20 PM | SENT |
| Michael Hummell | 10271100 | hummellm@bayltd.com | 11/27/2024 1:23:20 PM | SENT |
| Michael McClellan | 24109525 | jmcclellan@beckredden.com | 11/27/2024 1:23:20 PM | SENT |
| Sydney Ballesteros | | sballesteros@gibbsbruns.com | 11/27/2024 1:23:20 PM | SENT |
| Madeline Gay | | mgay@beckredden.com | 11/27/2024 1:23:20 PM | SENT |
| Business Court 11A | | BCDivision11A@txcourts.gov | 11/27/2024 1:23:20 PM | SENT |
| Roxanne Graham | | rgraham@gibbsbruns.com | 11/27/2024 1:23:20 PM | SENT |
| Christina Pena | | cpena@gibbsbruns.com | 11/27/2024 1:23:20 PM | SENT |
| Kim Brunkenhoefer | | kim@dallisonlaw.com | 11/27/2024 1:23:20 PM | SENT |
| Susan Gonzales | | susan@dallisonlaw.com | 11/27/2024 1:23:20 PM | SENT |
| Bruce Baldree | | bbaldree@gibbsbruns.com | 11/27/2024 1:23:20 PM | SENT |

**EXHIBIT 15**

11/27/2023 11:34 AM
Marilyn Burgess - District Clerk Harris County
Envelope No. 81947481
By: Monica Jackson
Filed: 11/27/2023 11:14 AM

## 2023-81703 / Court: 333

CAUSE NO.: _____

| | | |
|---|---|---|
| LAWRENCE BERRY, individually and derivatively on behalf of BERRY GP, INC., | § § § § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § § | |
| BERRY GP, INC., | § § | |
| *Nominal Plaintiff,* | § § | HARRIS COUNTY, TEXAS |
| v. | § § | |
| MARTY BERRY, ROBERT RICKETT, ROBERT POWERS, MICHAEL HUMMELL, BERRY GP, INC., BERRY OPERATING COMPANY LLC, and BERRY CONTRACTING LP, | § § § § § § | **JURY TRIAL DEMANDED** |
| *Defendants.* | § § | _____ JUDICIAL DISTRICT |

---

### PLAINTIFFS' ORIGINAL VERIFIED PETITION AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION

---

TO THE HONORABLE JUDGE OF THIS COURT:

Lawrence Berry ("Lawrence" or "Plaintiff"), on his own behalf and derivatively on behalf of Berry GP, Inc. (with Lawrence, "Plaintiffs"), files this Original Verified Petition and Application for Temporary Restraining Order and Temporary Injunction against Marty Berry, Robert Rickett ("Rickett"), Robert "Rob" Powers ("Powers"), Michael "Mike" Hummell ("Hummell"), Berry GP, Inc., Berry Operating Company LLC, and Berry Contracting LP (collectively, "Defendants"). Plaintiffs assert claims for breach of fiduciary duty, a demand for an equitable accounting, a demand for books and records, and an application for temporary restraining order and temporary injunction as described herein. In support of these claims, Plaintiffs respectfully show as follows:

1

Certified Document Number: 111508476 - Page 1 of 27

# I.   INTRODUCTION

1.   This action concerns the management and finances of several Texas companies—Berry GP, Inc.; Berry Operating Company LLC; and Berry Contracting LP (collectively, the "Berry Entities")—which are majority owned in equal shares by Plaintiff Lawrence Berry and his two brothers, Marty Berry ("Marty") and Dennis Berry ("Dennis"). In the past several months, it has become apparent that the Berry Entities have been unlawfully usurped, controlled, and mismanaged in secret by Defendants Marty Berry; Marty's son-in-law, Robert Rickett; Rob Powers, the President and Chief Executive Officer of Berry GP, Inc; and Mike Hummell, Berry GP, Inc.'s Vice President and General Counsel.

2.   The Berry Entities operate a large organization of companies engaged in the construction, fabrication, and maintenance contracting industries throughout the United States, and have successfully done so since the 1950s. While the Berry Entities were founded and originally controlled by Lawrence's father, ownership passed to Lawrence and his brothers beginning in the 1990s.

3.   In recent months, Lawrence—an officer, director, and shareholder of the Berry Entities—has come to learn that Marty Berry, with assistance from Robert Rickett, Rob Powers, and Mike Hummell, has been mismanaging the Berry Entities' finances such that he imperiled a long-standing line of credit that represented the Berry Entities' primary source of operational funding, causing that line of credit to be placed in default. Further, Powers and Hummell colluded in secret to authorize a self-dealing loan agreement from Marty and Dennis—themselves officers, directors, and shareholders of the Berry Entities—to the Berry Entities without notice or consultation with the other officers and directors. Finally, presumably in an attempt to repay their self-interested loan, Defendants have recently begun secretly attempting to sell the company's real

2

property, including an important and valuable dock facility, without notice to or authorization from the Board of Directors. This type of undisclosed engagement in self-dealing and ultra vires transactions violates the fiduciary obligations and Texas law.

4. When Lawrence inquired about this mismanagement and apparent covert self-dealing through valid requests for books and records information, his requests went ignored, in further violation of Texas law.

5. Lawrence, both directly and derivatively on behalf of the Berry Entities, brings this lawsuit against Marty Berry, Rickett, Powers, Hummell, and the Berry Entities, to recover damages, enforce his rights to inspect the Berry Entities' books and records, and to demand an accounting of the Berry Entities' finances.

## II.   DISCOVERY LEVEL

6. Discovery should be conducted in accordance with a Level 3 tailored discovery control plan under Rule 190.4 of the Texas Rules of Civil Procedure.

## III.   JURISDICTION AND VENUE

7. Plaintiffs seek monetary relief of over $1,000,000, including damages, penalties, costs, expenses, pre- and post-judgment interest, and attorney fees, as well as non-monetary relief. The relief sought by Plaintiffs is within the jurisdiction of this Court.

8. The Court has subject matter jurisdiction to hear this matter because the amount in controversy exceeds the jurisdictional minimum of this Court.

9. This Court has personal jurisdiction over Defendant Marty Berry because he is a resident of Texas and Plaintiffs' claims against him arise directly from his contacts with and activities in this state.

3

10. This Court has personal jurisdiction over Defendant Robert Rickett because he is a resident of Texas and Plaintiffs' claims against him arise directly from his contacts with and activities in this state.

11. This Court has personal jurisdiction over Defendant Robert Powers because he is a resident of Texas and Plaintiffs' claims against him arise directly from his contacts with and activities in this state.

12. This Court has personal jurisdiction over Defendant Michael Hummell because he is a resident of Texas and Plaintiffs' claims against him arise directly from his contacts with and activities in this state.

13. This Court has personal jurisdiction over Defendant Berry Contracting LP because it is a Texas limited partnership headquartered in this state.

14. This Court has personal jurisdiction over Berry GP, Inc. because it is a Texas corporation headquartered in this state.

15. This Court has personal jurisdiction over Defendant Berry Operating Company LLC because it is a Texas limited liability corporation headquartered in this state.

16. Venue is proper in Harris County, Texas because Harris County, Texas is the county where a substantial part of the events or omissions giving rise to this suit occurred. TEX. CIV. PRAC. & REM. CODE §§ 15.002 & 15.005.

## IV. PARTIES AND SERVICE

17. Plaintiff Lawrence Berry is an individual residing in Harris County, Texas. At all relevant times, Lawrence has owned shares of Berry GP, Inc., Berry Operating Company LLC, and Berry Contracting LP individually, through a series of holding companies. Lawrence is also the beneficial owner of the shares in those companies held in the Allen Lawrence Berry Trust.

4

Finally, at all relevant times, Lawrence has been an Officer, Director, and/or shareholder of Berry GP, Inc., Berry Operating Company LLC, and Berry Contracting LP.

18. Defendant Berry Contracting LP, doing business as Bay Ltd., is a Texas limited partnership with a registered address at 1414 Corn Products Road, Corpus Christi, Texas 78409. Berry GP, Inc. is its registered agent for service of process and can be served at 1414 Corn Products Road, Corpus Christi, Texas 78409.

19. Defendant Berry Operating Company LLC is a Texas limited liability company with a registered address at 1414 Corn Products Road, Corpus Christi, Texas 78409. Mike Hummell is its registered agent for service of process and can be served at 1414 Corn Products Road, Corpus Christi, Texas 78409.

20. Defendant Berry GP, Inc. is a Texas corporation with a registered address at 1414 Corn Products Road, Corpus Christi, Texas 78409. Mike Hummell is its registered agent for service of process and can be served at 1414 Corn Products Road, Corpus Christi, Texas 78409.

21. Defendant Marty Berry is a natural person. Marty Berry is an Officer, Director, and shareholder of Berry GP, Inc., Berry Operating Company LLC, and Berry Contracting LP, and he maintains custody and control over the corporate records of Berry GP, Inc., Berry Operating Company LLC, and Berry Contracting LP. Marty Berry can be served at his office at 1414 Corn Products Road, Corpus Christi, Texas 78409.

22. Defendant Robert Rickett is a natural person. He is Marty Berry's son-in-law, and an employee of the Berry Entities. He can be served at his office at 1414 Corn Products Road, Corpus Christi, Texas 78409.

23. Defendant Robert Powers is a natural person. He is the President and Chief Executive Officer of Berry GP, Inc. and he maintains custody and control over the corporate

5

records of Berry GP, Inc., Berry Operating Company LLC, and Berry Contracting LP. Mr. Powers can be served at his office at 1414 Corn Products Road, Corpus Christi, Texas 78409.

24.     Defendant Mike Hummell is a natural person. He is the Vice President and General Counsel of Berry GP, Inc. Mr. Hummell can be served at his office at 1414 Corn Products Road, Corpus Christi, Texas 78409.

## V.     FACTUAL BACKGROUND

### A.     The Berry Entities are a family operation.

25.     The Berry Entities and their subsidiaries are a group of companies focused on the construction, fabrication, and maintenance contracting industries throughout the United States. The Berry Entities were founded in the 1950s by Lawrence Berry's father, Marvin Berry, who ran the organization for several decades.

26.     Marvin Berry had four sons: Plaintiff Lawrence Berry, Marty Berry, Dennis Berry, and Kenneth Berry. When Marvin passed away in 1997, control of the Berry Entities began shifting to his sons, although the other brothers bought Kenneth out several years ago. LDMA Limited Partnership ("LDMA") sits at the top of the Berry organization. LDMA's 3% general partner is Becon, Inc., which is owned in equal shares by Lawrence, Marty, and Dennis. Lawrence, Marty, and Dennis are each direct 19% limited partners of LDMA, and each is also a beneficial owner of trusts which are 11 2/3% limited partners of LDMA. The remaining 5% limited partner of LDMA is Lone Star Equipment, Inc., which is a subsidiary of Berry Contracting LP.

27.     LDMA owns Berry GP, Inc., which in turn owns several holding companies which own Berry Operating Company LLC, which in turn functions as the 1% owner and general partner of Berry Contracting LP.

6

28. An organizational chart reflecting the structure and ownership of the various entities at issue is attached hereto as Exhibit A.

29. While the Berry Entities employ several officers who are not members of the Berry Family—including Defendant Powers, who serves as President and Chief Executive Officer of Berry GP, Inc., and Defendant Hummell, who serves as Vice President and General Counsel of Berry GP, Inc.—ownership and primary control of the Berry Entities is vested with Lawrence and his two brothers.

30. The Berry Entities are primarily governed by the Board of Directors of Berry GP, Inc. (the "Board"), in accordance with the Bylaws of Berry GP, Inc., which are attached hereto as Exhibit B. The Board consists of directors Lawrence, Marty, and Dennis.

**B. Defendants have excluded Lawrence from key decisions related to the Berry Entities, including improper self-interested transactions.**

31. Despite Marvin Berry's wishes that the Berry Entities operate as a family business, it has become clear that Marty, with the assistance of Rickett, Powers, and Hummell, has gone behind Lawrence's back to exclude him from key decisions related to the Berry Entities, instead choosing to engage in self-dealing and attempt major corporate transactions without informing the other officers and directors of his actions.

32. For instance, in the past several years, Defendants have, among many other things:

- Purported to approve the acquisition of major equipment such as cranes and "yellow iron" without Board discussion or authorization;

- Bought "rolling stock" equipment such as motor cranes through a company unaffiliated with the Berry Entities without first presenting the opportunity to the Board or the Berry Entities, then leased the cranes back to the Berry Entities in a self-dealing transaction without approval from the Board;

- Negotiated and purported to approve terms with major equipment lenders that include significant potential negative impacts to the Berry Entities without Board discussion or authorization;

7

- Marketed corporate aircraft owned by the Berry Entities for resale without Board discussion or authorization;

- Acquired property in key economic development zones or property adjacent to Berry Entities' property in Robert Rickett's name, using Berry Entities' funds, without first discussing with or seeking authorization from the Board, and without any apparent effort to transfer title to the Berry Entities; and

- Deliberately dissolved the largest revenue producing division of the Berry Entities by systematically terminating key individuals material to that division's structure and revenue development.

33. Of particular concern, Lawrence recently came to learn that Marty, Rickett, Powers, and Hummell have engaged in improper self-dealing transactions with the Berry Entities.

34. Specifically, it appears that Powers and Hummell approved and executed a loan agreement between Marty and Dennis, on the one hand, and one of the Berry Entities, on the other, by which Marty and Dennis loaned a total of approximately $75 million to the Berry Entities (the "Berry Loan"). Although Powers has thus far refused to provide the loan documents despite requests from Lawrence, Lawrence has been informed that Marty loaned $45 million and Dennis loaned $30 million to one or more of the Berry Entities.

35. Despite being an officer, director, and shareholder of the Berry Entities, Lawrence was never directly informed about the Berry Loan, never consulted about its propriety, and never asked to vote on it as an officer, director, or shareholder. Nor has Lawrence been informed about the terms of the Berry Loan; what, if any, collateral secures the notes; how the proceeds of the Berry Loan were used; or how, when, and to what extent Marty and Dennis expect repayment from the Berry Entities with respect to the Berry Loan.

36. Review of the limited financial information to which Lawrence has been privy indicates that the Berry Entities have made payments to Marty and Dennis, which presumably represent payments in service of the Berry Loan. However, because the self-dealing loans were

8

made without Board authorization and Defendants have refused to provide the requested documentation to Lawrence, the extent of those improper payments is presently unclear.

37. The Berry Loan transaction was never discussed by the directors of Berry GP, Inc., was not voted on at any meeting of the directors, and does not appear in any minutes of Board meetings. In fact, it appears that Powers, Hummell, Marty, and Dennis were the only individuals at the Berry Entities who were aware that they were encumbering the Berry Entities with this $75 million unauthorized debt.

38. Plaintiffs recently learned that Defendants Marty Berry, Rickett, Powers, and Hummell have offered to sell some of the Berry Entities' vital real property assets, including a dock facility and adjacent real property that generates tens of thousands of dollars in monthly revenue, presumably in an effort to repay the unauthorized and self-interested loans. Plaintiffs believe that Marty, Rickett, Powers, and Hummell intend to sell the Berry real property to raise funds for additional unauthorized self-dealing payments to Marty and Dennis in service of the Berry Loans.

39. Plaintiffs recently were made aware that in or around late May 2023, Defendants began an effort to sell the dock facility and other real property to at least one third party. In their communications to that third party, Defendants falsely represented that "the principals at Berry G.P. have decided to open two strategic properties to the marketplace." *See* Ex. C (May 30, 2023 Letter from Berry G.P. to Port of Corpus Christi). In truth, the decision to sell significant company assets was made unilaterally by Marty and without calling a Board meeting and without discussion with or notice to Lawrence.

Certified Document Number: 111508476 - Page 10 of 27

C. **Marty, Dennis, and Powers have threatened the financial operations of the Berry Entities.**

40. Until recently, the Berry Entities relied on a $50,000,000.00 revolving line of credit (the "LOC") with International Bank of Commerce ("IBC") for general operations. This LOC was governed by a loan agreement between several of the Berry Entities and IBC, dated March 31, 2019 (the "Loan Agreement").

41. The Loan Agreement contained provisions allowing IBC to invoke default if certain conditions were not met, including particular thresholds for EBITDA and combined net profit after taxes.

42. Under Defendants' mismanagement, the Berry Entities recently failed to meet certain of the thresholds detailed in the Loan Agreement.

43. In fact, IBC recently made repeated requests to Powers and other members of the Berry Entities' management team for information related to standard reporting as part of the Loan Agreement covenants. This includes quarterly financials, WIP reports, financial projections, and more. It appears as if the management team either refused or was unable to produce this information to IBC. Further, when IBC made an effort to schedule a meeting to discuss the status of the Berry Entities in person, Powers and Marty did not show up, imperiling the 30-year banking relationship with IBC. Lawrence was never informed that IBC was sending repeated requests for information, that the Berry Entities were struggling to produce accurate or timely reporting, or that IBC had attempted to schedule meetings to discuss the problems in person.

44. Accordingly, on March 13, 2023, IBC sent a letter to Powers informing him that IBC had placed the LOC in default. IBC asserted that the Berry Entities had failed to achieve the minimum EBITDA and net profits targets for the 2022 fiscal year. Powers did not share this letter with Lawrence at the time.

10

45.     Because of these claimed defaults, IBC (1) elected to limit future advances to the Berry Entities on the LOC to $30 million rather than the full $50 million, and (2) accelerated maturation of the LOC to March 31, 2023, at which time IBC was going to require the entire balance to be due and payable.

46.     Following this March 13, 2023 letter, IBC and counsel for the Berry Entities engaged in additional correspondence regarding the extension of the LOC. On March 28, 2023, IBC proposed an extension of the LOC to October 1, 2023, pursuant to several terms, including a reduction of the LOC from $50 million to $30 million and a requirement that the $75 million debt purportedly owed by the Berry Entities to Marty and Dennis be subordinated to the LOC debt owed to IBC. On March 30, 2023, counsel for the Berry Entities responded and rejected many of these terms, including the subordination proposal. Lawrence was not consulted regarding these decisions, nor was he made aware of the IBC proposal at the time.

47.     As a result of the March 30, 2023 rejection letter from the Berry Entities, IBC appears to have placed the LOC into default. Despite being an officer, director, and shareholder of the Berry Entities, Lawrence was not informed of the precise status of the LOC with IBC, nor of the Berry Entities' plan for ensuring sufficient liquidity to fund its operations. Powers has apparently decided, presumably in coordination with Marty, to keep Lawrence in the dark regarding the Berry Entities' financial status.

48.     Following the collapse of the IBC banking relationship, Powers has been in negotiations with Frost Bank to obtain a new revolving line of credit. Plaintiffs understand that as part of these negotiations, Powers is contemplating pledging the Berry Entities' real property as collateral, including the Entities' commercial property in Corpus Christi. Lawrence has not been

11

fully apprised of the situation with Frost Bank, nor has he been consulted about or asked to approve the collateralization of any of the Berry Entities' real property.

49. Indeed, as part of the negotiations with Frost Bank, Powers and Marty executed a "Certificate of Corporate Resolutions" that purports to set forth "resolutions duly adopted either: (a) at a meeting of [Berry GP, Inc.'s] Board of Directors duly called and held, at which meeting a quorum was present and acting throughout, or (b) by unanimous written consent of the Board of Directors of [Berry GP, Inc.], which resolutions save not in any way been amended or modified[.]". *See* Ex. D. No such Board meeting was ever held, and Lawrence was never notified of or asked to approve any written consents adopting the purported resolutions contained in this "Certificate of Corporate Resolutions."

### D. Powers refuses to honor Lawrence's legitimate requests for information related to the Berry Entities.

50. On April 18, 2023, Lawrence sent an email to Powers and Jim Klein—CFO of Berry GP, Inc.—copying Marty and Dennis. This email attached a memorandum of "Key Concerns" that the Berry Entities apparently received from IBC and requested information from Powers and Klein related to the financial condition of the Berry Entities.

51. Lawrence sent the information request so that he could better understand the Berry Entities' present financial condition and what may have caused the Berry Entities to purportedly fail to meet the thresholds included in the Loan Agreement with IBC. Lawrence also requested information related to the Berry Loan, since he has still been kept in the dark as to the nature and terms of that debt.

52. As an officer, director, and shareholder of the Berry Entities, Lawrence is entitled to inspect the books and records of the Berry Entities, and a valid request such as the April 18,

2023 email should have been honored. However, Lawrence never received a response to his April 18, 2023 request, much less access to any of the books and records he requested.

## VI.  CAUSES OF ACTION

### COUNT 1
### Breach of Fiduciary Duty
### (against Marty Berry, Rob Powers, and Mike Hummell)

53.  Plaintiffs incorporate the above paragraphs as if set forth herein in their entirety.

54.  Defendant Marty Berry has been a shareholder, officer, and director of Berry GP, Inc. at all relevant times. Defendant Rob Powers has served as President and Chief Executive Officer of Berry GP, Inc. at all relevant times. Defendant Mike Hummell has served as Vice President and Chief Executive Officer of Berry GP, Inc. at all relevant times. In those positions, Marty, Powers, and Hummell owe certain fiduciary duties to the Berry Entities, including the duty of loyalty and the duty of utmost good faith, fairness, and honesty. These duties that Marty, Powers, and Hummell owe to the Berry Entities encompass obligations and/or duties to refrain from allowing self-dealing and to make full disclosure of information.

55.  While serving in their respective positions, Marty, Powers, and Hummell have engaged in, directed, approved, and/or taken actions in contravention of the fiduciary duties they owe to the Berry Entities, including without limitation the following willful and intentional misconduct:

A.  Self-Dealing

i.  Marty, Powers, and Hummell approved and directed at least one of the Berry Entities to enter into a loan agreement with Marty and Dennis—who are themselves officers, directors, and shareholders of Berry GP, Inc. and the other

13

Berry Entities—without giving notice to or obtaining the consent or approval of Berry GP, Inc.'s Board;

    ii. At a minimum, Marty's, Powers's, and Hummell's actions breached their fiduciary duties of loyalty to Berry GP, Inc. and amounted to self-dealing.

B.     <u>Unauthorized Acts and Failure to Make Full and Adequate Disclosure</u>

    i. Marty, Powers, and Hummell failed to disclose their unauthorized decision to sell vital company assets and the self-dealing Berry Loan and failed to properly seek or obtain board approval or approval of the sole disinterested director for those self-dealing transactions;

    ii. Marty, Powers, and Hummell similarly failed to disclose the Berry Entities' financial information to Lawrence before IBC held the Berry Entities in default with respect to the LOC.

These and other actions by Marty, Powers, and Hummell amounted to breaches of their fiduciary duties of loyalty to the Berry Entities and to behave with the utmost good faith, fairness, and honesty.

56.     The Berry Entities and Lawrence have been damaged by the Defendants' self-dealing, unauthorized acts, breaches of fiduciary duty, and failure to make full disclosure.

57.     Because Berry GP, Inc. operates as a closely held corporation and Defendants have concealed information and refused to share requested information with Lawrence—an officer, director, and shareholder—about the operations of the Berry Entities, justice requires treating this claim as a direct action by Lawrence, with any recovery being paid directly to Lawrence, pursuant to Tex. Bus. Org. Code § 21.563.

58.     Alternatively, Plaintiffs bring these claims derivatively on behalf of Berry GP, Inc.

14

**Knowing Participation in a Breach of Fiduciary Duty**
**(against Robert Rickett)**

59.     Plaintiffs incorporate the above paragraphs as if set forth herein in their entirety.

60.     Defendant Robert Rickett is Marty Berry's son-in-law, and he has been an employee of the Berry Entities at all relevant times.

61.     Defendants Marty, Powers, and Hummell have fiduciary duties to Plaintiffs.

62.     As an employee of the Berry Entities, Rickett is aware of Marty's, Powers's, and Hummell's fiduciary duties to Plaintiffs.

63.     Marty, Powers, and Hummell breached their fiduciary duties to Plaintiffs, as referenced in paragraphs 53-58, above.

64.     Defendant Rickett participated in Marty's, Powers's, and Hummell's breaches of fiduciary duty by assisting in the marketing of vital company assets without first seeking or obtaining board approval, or approval of Lawrence as the sole disinterested director.

65.     Rickett had knowledge that Marty's, Powers's, and Hummell's conduct constituted a breach of their fiduciary duties, and he acted with intent to assist those breaches.

66.     Rickett's assistance with and participation in this breach is evidenced by his letter to the Port of Corpus Christi, which indicates "the principals at Berry G.P. have decided to open two strategic properties to the marketplace." *See* Ex. C. Rickett was aware that no Board meeting had taken place and that Lawrence had not approved the marketing and sale of this property.

67.     Rickett's assistance was a substantial factor in causing Marty, Powers and Hummell to breach their fiduciary duties, causing damage to Plaintiffs.

68.     Because Berry GP, Inc. operates as a closely held corporation and Defendants have concealed information and refused to share requested information with Lawrence—an officer,

15

director, and shareholder—about the operations of the Berry Entities, justice requires treating this claim as a direct action by Lawrence, with any recovery being paid directly to Lawrence, pursuant to Tex. Bus. Org. Code § 21.563.

69.     Alternatively, Plaintiffs bring these claims derivatively on behalf of Berry GP, Inc.

## COUNT 3
## Demand for an Equitable Accounting

70.     Plaintiffs incorporate the above paragraphs as if set forth herein in their entirety.

71.     As an officer and director of Berry GP, Inc. at all relevant times, Marty owed fiduciary duties to Berry GP, Inc. that give rise to grounds for an accounting. Additionally, as officers of Berry GP, Inc. at all relevant times, Powers and Hummell owe fiduciary duties to Berry GP, Inc. that give rise to grounds for an accounting.

72.     Defendants have provided Lawrence with almost no financial records related to the Berry Entities. The task of determining whether those records are accurate or complete, and the need to verify details about the concealment, wrongdoing, and mismanagement detailed above, is likely to be complex. Adequate relief is unlikely to be obtained at law or through traditional discovery. Performing an accurate accounting for the Berry Entities is likely to require the creation of accurate financial records where none exist, as opposed to merely granting Plaintiff access to the Berry Entities' existing records.

73.     Plaintiffs therefore seeks an order appointing an independent auditor and requiring the Berry Entities, Marty, Powers, and Hummell to prepare and present accurate financial records, which properly account for all corporate receipts, expenditures, assets, and liabilities for Berry GP, Inc. and its subsidiaries, including without limitation the other Berry Entities, since January 2023. *See* TEX. R. CIV. P. 172.

74.     Plaintiffs bring this claim derivatively on behalf of Berry GP, Inc.

16

Certified Document Number: 111508476 - Page 16 of 27

## COUNT 4
## Demand for Books and Records

75.     Plaintiffs incorporate the above paragraphs as if set forth in their entirety.

76.     At all relevant times, Plaintiff Lawrence Berry has been a shareholder of at least 5% of Berry GP, Inc.

77.     On April 18, 2023, Lawrence sent a good faith written demand to Powers for books and records related to Berry GP, Inc. and its subsidiaries, including without limitation the other Berry Entities. However, this request was ignored, and Lawrence never received a response.

78.     As a shareholder of Berry GP, Inc. for at least six months immediately preceding that April 18, 2023 demand, and as a holder of at least 5% of all of the outstanding shares in Berry GP, Inc., Lawrence is entitled to examine and copy Berry GP, Inc.'s books, records of account, minutes, and share transfer records. TEX. BUS. ORG. CODE § 21.218.

79.     The Bylaws of Berry GP, Inc. do not alter or limit Lawrence's right to inspect Berry GP, Inc.'s books and records. Indeed, Section XXIV states that "the books, accounts and records of [Berry GP, Inc.] shall be open to inspection by the shareholders at all reasonable times[.]" *See* Ex. B, at 11.

80.     Powers never responded to Lawrence's lawful request, let alone provided any reason why Lawrence would not be entitled to inspect the books and records of Berry GP, Inc. and its subsidiaries.

81.     Plaintiff Lawrence Berry therefore seeks an order compelling the production for examination of the books and records of Berry GP, Inc. and its subsidiaries, including but not limited to the other Berry Entities, pursuant to Section 21.218(c) of the Texas Business Organizations Code.

82.     Plaintiff Lawrence Berry brings this claim directly.

17

## VII. APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION

83.     Plaintiffs incorporate the above paragraphs as if set forth in their entirety.

84.     Plaintiffs attach and incorporate by reference the Verification of Lawrence Berry, which verifies the allegations relevant to this application for injunctive relief. Plaintiffs also attach and incorporate by reference the Affidavit of Lawrence Berry, which supports the allegations relevant to this application for injunctive relief.

85.     Pursuant to Rules 680 and 681 of the Texas Rules of Civil Procedure and Texas Civil Practice and Remedies Code §§ 65.011(1), (3), and (5), Plaintiffs request that the Court issue a TRO and a temporary injunction enjoining Marty Berry, Robert Rickett, Rob Powers, Mike Hummell, and the Berry Entities from selling, mortgaging, or otherwise encumbering any of the Berry Entities' real property without the approval of the disinterested members of the Board of Directors. Because Marty and Dennis are interested directors in any potential sale transaction by virtue of their concealed, self-dealing loan transaction with the Berry Entities, the approval of Lawrence—the sole disinterested director—is required for any such transaction. Plaintiffs further request that upon final trial on the merits, the Court award a permanent injunction against Defendants for the same activity.

86.     By this filing, Plaintiffs merely seek to preserve the status quo. *See In re Newton*, 146 S.W.3d 648, 651 (Tex. 2004) ("The purpose of a TRO is to preserve the status quo, which we have defined as the last, actual peaceable, non-contested status which preceded the pending controversy.") (citations and quotations omitted). At present, the Berry Entities are in negotiations to obtain a new revolving line of credit with Frost Bank, to replace the LOC with IBC. The Berry Entities have also been encumbered by $75 million worth of debt through the unauthorized and self-dealing Berry Loan. Defendants have threatened to sell, mortgage, or otherwise encumber the

18

Certified Document Number: 111508476 - Page 18 of 27

Berry Entities' real property either to secure financing with Frost Bank or to raise money to make unauthorized payments to Marty and Dennis in service of the Berry Loan. But the Defendants are not authorized to do so absent approval from the members of the Board who are disinterested with respect to the Berry Loan—namely, Lawrence Berry. With this application for injunctive relief, Plaintiffs seek to preserve the Berry Entities' current financial status and prevent the Defendants from causing irreparable harm by selling or encumbering the Berry Entities' real property without proper authorization.

87.     To obtain a TRO and temporary injunction, Plaintiffs must show a cause of action against Defendants, a probable right to relief, and probable injury. *See, e.g., Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). The "probable injury" requirement has been divided into subcategories of: (1) imminent harm; (2) irreparable injury; and (3) inadequate remedy at law. *See id.* In cases involving real or personal property such as this one, the movant need not show the lack of an adequate remedy at law. TEX. CIV. PRAC. & REM. CODE § 65.011(5).

**A.     Defendants have committed and threaten to commit further torts against Plaintiffs. Plaintiffs have a right to relief from such torts.**

88.     Defendants are already liable for causes of action 1-4, above. If Defendants are permitted to direct the Berry Entities to sell, mortgage, or encumber the Berry Entities' real property absent authorization from the sole disinterested Director, they will continue to commit breaches of fiduciary duty and deprive the company of critical assets, causing additional damage to Plaintiffs.

89.     To be entitled to a TRO and temporary injunction, Plaintiffs need not show that they will prevail at trial on these causes of action. Rather, Plaintiffs must merely plead a cause or causes of action and present some evidence that tends to sustain them. *Intercont'l Terminals Co., LLC v. Vopak North America, Inc.*, 354 S.W.3d 887, 897 (Tex. App.—Houston [1st Dist.] 2011, no

19

pet.). The unauthorized sale or encumbrance of the Berry Entities' unique and valuable real property—especially if done in furtherance of the repayment of the self-dealing Berry Loan—would not only bolster the causes of action above but would supply all the evidence necessary for Plaintiffs to prevail on them.

90. Further, in the fiduciary self-dealing context, a "presumption of unfairness" attaches to the transactions of the fiduciary, shifting the burden to the defendant to prove the fairness of the transactions. *See Texas Bank & Trust Co. v. Moore*, 595 S.W.2d 502, 508-09 (Tex. 1980). If that presumption cannot be rebutted at the TRO or temporary injunction stage, then the injunction should be granted if the plaintiff has presented a prima facie case of the existence of a fiduciary relationship and a probable breach of that duty. *See Health Discovery Corp. v. Williams*, 148 S.W.3d 167, 169-70 (Tex. App.—Waco 2004, no pet.). Here, Plaintiffs have made a prima facia case that Defendants owed fiduciary duties to the Berry Entities and to the other officers of the Berry Entities and that Defendants have breached those duties.

**B.     The harm facing Plaintiffs is imminent.**

91. For the purposes of obtaining an injunction, an injury is "imminent" if one has expressed "demonstrable intent to do that for which injunctive relief is sought," *Harbor Perfusion, Inc. v. Floyd*, 45 S.W.3d 713, 717-18 (Tex. App.—Corpus Christi 2001, no pet.), or if the "defendant will engage in the activity sought to be enjoined." *Schmidt v. Richardson*, 420 S.W.3d 442, 447 (Tex. App.—Dallas 2014, no writ).

92. Defendants have already expressed an intent to pledge the Berry Entities' real property as collateral in negotiations surrounding the new line of credit with Frost Bank. Defendants have also made unauthorized offers to sell other real property belonging to the Berry Entities, including a unique and valuable commercial dock and other real property. Defendants

20

are believed to be selling such assets to raise money for further unauthorized payments in service of the self-dealing Berry Loan. Without a TRO and temporary injunction, it is exceedingly likely that Defendants will sell or encumber the Berry Entities' unique and valuable real property without first getting proper approval from Lawrence, the Berry Entities' only disinterested director, thus causing harm to Plaintiffs.

**C.      The harm facing Plaintiffs is irreparable.**

93.      If Defendants are not enjoined as requested above, the harm Plaintiffs will suffer is irreparable. "An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard." *Butnaru*, 84 S.W.3d at 204. Injury is likewise irreparable if "damages [are] not presently ascertainable or readily subject to calculation." *Wright v. Sport Supply Group, Inc.*, 137 S.W.3d 289, 294 (Tex. App.—Beaumont 2004, no pet.) (citing *Butnaru*, 84 S.W.3d at 204). Additionally, "[d]isruption to a business can be irreparable harm," and "assigning a dollar amount to such intangibles as a company's loss of clientele, goodwill, marketing techniques, and office stability, among others, is not easy." *Intercont'l Terminals Co., LLC*, 354 S.W.3d at 896.

94.      Further, trial courts typically grant injunctive relief in "actions involving real property because real estate is generally considered unique" and "irreplaceable," such that money damages are generally inadequate. *See Chenier Energy, Inc. v. Parallax Enterprises LLC*, 585 S.W.3d 70, 76-77 (Tex. App.—Houston [14th Dist.] 2019, pet. dism'd) (citing cases).

95.      First, as explained above, Plaintiffs have already been damaged by Defendants' actions, but the extent of that damage is not readily ascertainable because of Defendants intentional concealment of information and the lack of clear records detailing the financial status of the Berry Entities. Additionally, Defendants actions have already caused irreparable harm to the Berry

21

Entities' decades-long banking relationship with IBC and could cause similar harm to the new banking relationship with Frost Bank. Assigning a dollar amount to remedy this kind of intangible but serious harm is not easy.

96.     Second, Plaintiffs understand that Defendants intend to pledge the Berry Entities' real property as collateral to secure an increase to the new Frost Bank line of credit, without proper authorization from the disinterested member of the Board of Directors. Should unauthorized self-dealing payments to Marty and Dennis made in service of the Berry Loan imperil the line of credit with Frost Bank such that the company's real property interests are threatened, Plaintiffs will be irreparably harmed as a result.

97.     Third, Defendants have been secretly attempting sell—without notice to or authorization from the board—other real property belonging to the Berry Entities, including the company's valuable dock facility, presumably to raise funds to make additional self-dealing payments to Marty and Dennis. The sale of any real property for that purpose must be approved by Lawrence as the only disinterested Director. If Defendants dispose of such real property without the requisite approval, Plaintiffs will be irreparably harmed.

**D.     Plaintiffs lack an adequate remedy at law, or in the alternative, are not required to prove lack of an adequate remedy at law.**

98.     Because Plaintiffs move for a TRO and temporary injunction under Section 65.011(5) of the Texas Civil Practice and Remedies Code, they are not required to prove lack of an adequate remedy at law. *See* TEX. CIV. PRAC. & REM. CODE § 65.011(5) ("A writ of injunction may be granted if: (5) irreparable injury to real or personal property is threatened, *irrespective of any remedy at law*.") (emphasis added).

99.     Alternatively, Plaintiffs have no adequate remedy at law, so a TRO and temporary injunction must issue. An irreparable injury is one that, by definition, has no adequate remedy at

22

law. *See, e.g., Kennedy v. Gulf Coast Cancer & Diag. Center at Southeast, Inc.*, 326 S.W.3d 352, 260 (Tex. App.—Houston [1st Dist.] 2010, no pet.) ("An injury is irreparable if there is no adequate remedy at law; if for example, a prevailing applicant could not be compensated adequately in damages or if damages cannot be measured by any certain pecuniary standard.") (citations omitted). As explained above, the injuries Plaintiffs will suffer—including the likely loss of unique and valuable real property belonging to the company—cannot be adequately compensated in damages, and Plaintiffs thus have no adequate remedy at law.

100. Further, to justify denial of an application for injunction, a remedy at law must be as "complete, practical, and efficient to the prompt administration of justice as is equitable relief." *Tex. Black Iron, Inc. v. Arawak Energy Int. 'l Ltd.*, 572 S.W.3d 579, 584 (Tex. App.—Houston [14th Dist.] 2017, no pet.). Here, the equitable relief that Plaintiffs seek is for the purpose of avoiding harm that could not be responded to fully in money damages, including threatening the status of the Berry Entities' real property interests. Damages would be an incomplete remedy at best, because the harm Defendants threatens to impose on Plaintiffs is non-monetary in part. *See RWI Constr., Inc. v. Comerica Bank*, 583 S.W.3d 269, 275 (Tex. App.—Dallas Apr. 12, 2019, no pet.) ("Generally, an adequate remedy at law exists and injunctive relief is improper where any potential harm may be adequately cured by monetary damages.").

**E.     Plaintiffs are entitled to a TRO and temporary injunction and are willing to post bond.**

101. For the reasons set forth above, Plaintiffs are entitled to a TRO and temporary injunction. Plaintiffs request that upon notice and hearing, the Court enjoin Defendants from selling, mortgaging, or otherwise encumbering any of the Berry Entities' real property without the approval of the sole disinterested member of the Board of Directors, Lawrence Berry. Plaintiffs

23

further request that upon final hearing, the Court award a permanent injunction against Defendants for the same conduct.

102. Plaintiffs stand ready willing and able to provide and file an appropriate bond as required by the Court.

## VIII. ATTORNEY'S FEES

103. Plaintiff Lawrence Berry is entitled to recover his attorneys' fees incurred in this matter pursuant to Sections 21.222 and 21.561 of the Texas Business Organizations Code.

## IX. JURY DEMAND

104. Plaintiffs hereby request a jury trial and tenders the appropriate jury fee in conjunction with filing this Original Petition.

## X. CONDITIONS PRECEDENT

105. Plaintiffs plead that all conditions precedent to the relief requested have been satisfied, waived, excused, and/or are deemed as a matter of law to have been satisfied.

## XI. PRAYER

106. Plaintiffs respectfully pray that Defendants be cited to appear and answer herein, and that the Court:

(1) Enter a temporary restraining order restraining Defendants from selling, mortgaging, or otherwise encumbering any of the Berry Entities' real property without the approval of the sole disinterested member of the Board of Directors, Lawrence Berry;

(2) Set a hearing for temporary injunction, and after such hearing, issue a temporary injunction enjoining Defendants from selling, mortgaging, or otherwise encumbering any of the Berry Entities' real property without the approval of the sole disinterested member of the Board of Directors, Lawrence Berry;

(3) Order that Plaintiffs recover from Defendants the reasonable costs and expenses Plaintiffs incurred in obtaining the temporary injunction;

Certified Document Number: 111508476 - Page 24 of 27

(4)     Order that Defendants produce the books and records of the Berry Entities for inspection by Plaintiff Lawrence Berry;

(5)     Order that Plaintiff Lawrence Berry recover from Defendants the reasonable costs and expenses Plaintiff incurred in obtaining the books and records;

(6)     Appoint an independent auditor and order Defendants to prepare and present accurate financial records, which properly account for all corporate receipts, expenditures, assets, and liabilities for Berry GP, Inc. and its subsidiaries, including without limitation the other Berry Entities, since January 2023;

(7)     Set a trial date and upon final hearing enter a permanent injunction that enjoins Defendants from performing the acts described above, and order that Plaintiffs have final judgment against Defendants for breach of fiduciary duty and award:

    (i)     compensatory, actual, consequential, restitutionary, and disgorgement damages,

    (ii)    exemplary damages,

    (iii)   pre-judgment interest,

    (iv)    post-judgment interest,

    (v)     reasonable and necessary attorneys' fees and costs, and

    (vi)    any other relief to which Plaintiffs may show themselves justly entitled.

Dated: November 27, 2023

Respectfully submitted,

By: /s/ Barrett Reasoner
Barrett Reasoner
State Bar No. 16641980
breasoner@gibbsbruns.com
Michael Absmeier
State Bar No. 24050195
mabsmeier@gibbsbruns.com
L. Bruce Baldree
State Bar No. 24116064
bbaldree@gibbsbruns.com
**GIBBS & BRUNS LLP**
1100 Louisiana, Suite 5300
Houston, Texas 77002
Tel: 713.650.8805

Certified Document Number: 111508476 - Page 25 of 27

Fax: 713.750.0903

and

Butch Boyd
State Bar No. 00783694
butchboyd@butchboydlawfirm.com
**BUTCH BOYD LAW FIRM**
2905 Sackett Street
Houston, Texas 77098
Tel: 713.589.8477

**ATTORNEYS FOR PLAINTIFF**

Certified Document Number: 111508476 - Page 26 of 27

**EXHIBIT 16**

11/27/2023 11:34:00 AM
Marilyn Burgess - District Clerk
Harris County
Envelope No: 81947481
By: JACKSON, MONICA J
Filed: 11/27/2023 11:14:09 AM

Pgs-3

TRORX
STBNX
CASO

## 2023-81703 / Court: 333

CAUSE NO.: _____

| | | |
|---|---|---|
| LAWRENCE BERRY, individually and derivatively on behalf of BERRY GP, INC., | §<br>§<br>§<br>§<br>§<br>§ | IN THE DISTRICT COURT OF |
| *Plaintiff,* | §<br>§ | |
| BERRY GP, INC., | §<br>§ | |
| *Nominal Plaintiff,* | §<br>§<br>§ | HARRIS COUNTY, TEXAS |
| v. | §<br>§<br>§ | |
| MARTY BERRY, ROBERT RICKETT, ROBERT POWERS, MICHAEL HUMMELL, BERRY GP, INC., BERRY OPERATING COMPANY LLC, and BERRY CONTRACTING LP, | §<br>§<br>§<br>§<br>§<br>§ | **JURY TRIAL DEMANDED** |
| *Defendants.* | §<br>§ | _____ JUDICIAL DISTRICT |

## TEMPORARY RESTRAINING ORDER AGAINST DEFENDANTS AND ORDER SETTING HEARING FOR TEMPORARY INJUNCTION

On this date, the Court heard Plaintiffs Lawrence Berry and Berry GP, Inc.'s application for a temporary restraining order against Defendants Marty Berry, Robert Rickett, Robert Powers, Michael Hummell, Berry GP, Inc., Berry Operating Company LLC, and Berry Contracting LP. The application was presented with notice to the Defendants. The Court, after considering Plaintiffs' TRO application, any response, the pleadings, the affidavits, any evidence submitted, and arguments of counsel, finds that the application is well-taken and should be in all things GRANTED.

In particular, the Court finds the following:

*Unofficial Copy Office of Marilyn Burgess District Clerk*

1

1. The evidence shows that Plaintiffs will suffer probable, imminent, and irreparable injury before the temporary injunction hearing if the Court does not issue a temporary restraining order against Defendants because Defendants have expressed an intent to pledge the Berry Entities' real property as collateral without approval from the sole disinterested Director of Berry GP, Inc., Lawrence Berry. Further, Defendants have expressed an intent to sell other real property belonging to the Berry Entities without similar approval. These actions threaten harm to the Berry Entities' real property interests such that money damages are an inadequate remedy.

2. It is necessary to enjoin the Defendants as ordered herein in order to prevent this harm.

It is therefore ORDERED that Defendants Marty Berry, Robert Rickett, Robert Powers, Michael Hummell, Berry GP, Inc., Berry Operating Company LLC, and Berry Contracting LP, and any other parties acting in concert with Defendants, are immediately restrained from selling, mortgaging, or otherwise encumbering any of the Berry Entities' real property without the approval of the sole disinterested member of the Board of Directors, Lawrence Berry.

It is further ORDERED that the Clerk of the Court issue a writ of injunction to Defendants Marty Berry, Robert Rickett, Robert Powers, Michael Hummell, Berry GP, Inc., Berry Operating Company LLC, and Berry Contracting LP in accordance with the terms of this Order.

It is further ORDERED the Plaintiffs Lawrence Berry and Berry GP, Inc. file a bond payable to Defendants Marty Berry, Robert Rickett, Robert Powers, Michael Hummell, Berry GP, Inc., Berry Operating Company LLC, and Berry Contracting LP in the amount of $50,000.00 with two or more sureties as security for this temporary restraining order. The bond must be filed and approved by the Clerk of the Court before any writ of injunction may issue pursuant to this

2

temporary restraining order. The Plaintiffs may post a cash deposit in lieu of a bond under Texas Rule of Civil Procedure 14c.

It is further ORDERED that Plaintiffs' application for a temporary injunction is set for hearing on the 12 day of December , 2023 at 10 :30 am 333rd in this Court. The purpose of the hearing is to determine whether the Court should issue a temporary injunction against Defendants as requested by Plaintiffs pending a full trial on the merits.

This Order expires on December 12 , 2023.

EXECUTED on this ____ day of _____, 2023 at _____ o'clock ___.

Signed:
11/28/2023

12:44 pm

The Honorable Judge Presiding

Unofficial Copy Office of Marilyn Burgess District Clerk

3

# EXHIBIT 17

CAUSE NO.: 2023-81703

| | | |
|---|---|---|
| LAWRENCE BERRY, individually and derivatively on behalf of BERRY GP, INC., | § § § § | IN THE DISTRICT COURT OF |
| *Plaintiff.* | § § | |
| BERRY GP, INC., | § § | |
| *Nominal Plaintiff,* | § § | HARRIS COUNTY, TEXAS |
| v. | § § | |
| MARTY BERRY, ROBERT RICKETT, ROBERT POWERS, MICHAEL HUMMELL, BERRY GP, INC., BERRY OPERATING COMPANY LLC, and BERRY CONTRACTING LP, | § § § § § § § | |
| *Defendants.* | § § | 333rd JUDICIAL DISTRICT |

F I L E D
Marilyn Burgess
District Clerk
DEC 07 2023
Time:___11:2 am___
Harris County, Texas
By_____
Deputy

## AMENDED TEMPORARY RESTRAINING ORDER

On this date, the Court heard Plaintiffs' Motion to Modify the Temporary Restraining Order. The Court, after considering the motion, any response, the pleadings, the affidavits, any evidence submitted, arguments of counsel, and the agreement of the parties rules as follows:

In particular, the Court finds the following:

1. Plaintiffs will suffer probable, imminent, and irreparable injury before the temporary injunction hearing if the Court does not issue a temporary restraining order against Defendants.

2. It is necessary to enjoin the Defendants as follows.

It is therefore ORDERED that Defendants Marty Berry, Robert Rickett, Robert Powers, Michael Hummell, Berry GP, Inc., Berry Operating Company LLC, and Berry Contracting LP, and

1

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

any other parties acting in concert with Defendants, are restrained from selling any of the Berry Entities' real property.

It is further ORDERED that Defendants and any other parties acting in concert with Defendants are immediately restrained from modifying the composition of the Board of Directors of any of the Berry Entities, including but not limited to removing Lawrence Berry as a Director or diluting his vote by adding new Directors. Defendants and any other parties acting in concert are further restrained from removing Lawrence Berry from his current Officer position(s) with the Berry Entities.

It is further ORDERED that the Clerk of the Court issue a writ of injunction to Defendants Marty Berry, Robert Rickett, Robert Powers, Michael Hummell, Berry GP, Inc., Berry Operating Company LLC, and Berry Contracting LP in accordance with the terms of this Order.

It is further ORDERED that Plaintiffs Lawrence Berry and Berry GP, Inc. have already filed sufficient bond as security for this amended temporary restraining order such that a writ of injunction may issue upon execution of this order.

The court understands that the parties have agreed to entry of a court order granting Robert Powers' and Marty Berry's Motion to Transfer Venue, and that one or more of the parties will submit a court order in support of such transfer of the case to the District Court of Nueces County, Texas. The parties agree to cooperate in the filing of any such related documents required to effectuate such transfer.

It is further ORDERED that by agreement of the parties, this amended temporary restraining order will remain in effect until the case has been transferred to Nueces County District Court and the matters raised in Plaintiffs' application for temporary injunction (including Plaintiffs' motion to modify) have been heard and ruled upon.

All relief requested and not granted herein in denied without prejudice.


EXECUTED on this 7th day of December, 2023 at __11:24__ o'clock _am_


_____

The Honorable Judge Tanya Garrison

Unofficial Copy Office of Marilyn Burgess District Clerk

**EXHIBIT 18**

12/14/2023 4:32 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 82594843
By: Alan Robledo
Filed: 12/14/2023 4:32 PM

**CAUSE NO. 2023-81703**

| | | |
|---|---|---|
| LAWRENCE BERRY, individually and derivatively on behalf of BERRY GP, INC. | § § § § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § § | |
| BERRY GP, INC., | § | |
| *Nominal Plaintiff,* | § | HARRIS COUNTY, TEXAS |
| v. | § § | |
| MARTY BERRY, ROBERT RICKETT, ROBERT POWERS, MICHAEL HUMMELL, BERRY GP, INC., BERRY OPERATING COMPANY, LLC and BERRY CONTRACTING LP | § § § § § § | |
| *Defendants.* | § | **333rd JUDICIAL DISTRICT** |

## AGREED ORDER GRANTING DEFENDANTS MARTY BERRY'S AND ROBERT POWERS' EMERGENCY MOTIONS TO TRANSFER VENUE

On this day, the Court considered Defendants Marty Berry's and Robert Powers' Emergency Motions to Transfer Venue (the "Motions"), and after having reviewed the Motions, any response thereto (if any), the pleadings on file, affidavits on file, and the agreements as between Marty Berry, Robert Powers, and Lawrence Berry, the Court makes the following finding and rulings:

The parties stipulate and the Court finds that venue is proper in Nueces County, Texas.

Plaintiffs Lawrence Berry and Berry GP, Inc. have reached an agreement with Defendants Robert Powers and Marty Berry that venue is proper in Nueces County and to transfer venue of this case to Nueces County, Texas.

It is therefore, ORDERED that all proceedings in the above-numbered and styled cause are hereby immediately transferred to a District Court of Nueces County, Texas, and the District Clerk

and the Court's clerk are directed to and shall prepare and transfer the file immediately to Nueces County, Texas.

SIGNED this _____ day of _____, 202___.

Signed:
12/22/2023    *Dan Hinde*

JUDGE PRESIDING

Respectfully submitted,

By: */s/ Barrett Reasoner*
Barrett Reasoner
State Bar No. 16641980
breasoner@gibbsbruns.com
Michael Absmeier
State Bar No. 24050195
mabsmeier@gibbsbruns.com
L. Bruce Baldree
State Bar No. 24116064
bbaldree@gibbsbruns.com
**GIBBS & BRUNS LLP**
1100 Louisiana, Suite 5300
Houston, Texas 77002
Tel: 713.650.8805
Fax: 713.750.0903

and

By: */s/ Butch Boyd*
Butch Boyd
State Bar No. 00783694
butchboyd@butchboydlawfirm.com
**BUTCH BOYD LAW FIRM**
2905 Sackett Street
Houston, Texas 77098
Tel: 713.589.8477

**ATTORNEYS FOR PLAINTIFFS**

Respectfully submitted,

By: */s/ Clay Steely*
Clay M. Steely
State Bar No. 00791725
csteely@porterhedges.com
William R. Stukenberg
State Bar No. 24051397
wstukenberg@porterhedges.com
**PORTER HEDGES LLP**
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6669

**ATTORNEYS FOR DEFENDANT ROBERT POWERS**

By: */s/ Douglas Allison*
Douglas Allison
State Bar No. 01083500
doug@dallisonlaw.com
**LAW OFFICE OF DOUGLAS ALLISON**
403 N. Tancahua Street
Corpus Christi, Texas 78401
Telephone: (361) 888-6002

**ATTORNEY FOR DEFENDANT MARTY BERRY**

2

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Kim Brunkenhoefer on behalf of Douglas Allison
Bar No. 1083500
kim@dallisonlaw.com
Envelope ID: 82594843
Filing Code Description: Proposed Order
Filing Description: Agreed Order Granting Defendants Marty Berry's And Robert Powers' Emergency Motions To Transfer Venue
Status as of 12/15/2023 8:32 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Barrett H.Reasoner | | breasoner@gibbsbruns.com | 12/14/2023 4:32:59 PM | SENT |
| Michael R.Absmeier | | mabsmeier@gibbsbruns.com | 12/14/2023 4:32:59 PM | SENT |
| Roxanne Graham | | rgraham@gibbsbruns.com | 12/14/2023 4:32:59 PM | SENT |
| Christina Pena | | cpena@gibbsbruns.com | 12/14/2023 4:32:59 PM | SENT |
| Bruce Baldree | | bbaldree@gibbsbruns.com | 12/14/2023 4:32:59 PM | SENT |
| Sherry Rakestraw | | srakestraw@gibbsbruns.com | 12/14/2023 4:32:59 PM | SENT |
| Butch Boyd | | butchboyd@butchboydlawfirm.com | 12/14/2023 4:32:59 PM | SENT |
| Douglas AAllison | | doug@dallisonlaw.com | 12/14/2023 4:32:59 PM | SENT |
| Kim Brunkenhoefer | | kim@dallisonlaw.com | 12/14/2023 4:32:59 PM | SENT |
| Susan Gonzales | | susan@dallisonlaw.com | 12/14/2023 4:32:59 PM | SENT |
| William R Stukenberg | | wstukenberg@porterhedges.com | 12/14/2023 4:32:59 PM | SENT |
| Clay MSteely | | csteely@porterhedges.com | 12/14/2023 4:32:59 PM | SENT |

# EXHIBIT 19

CAUSE NO.: 2024DCV-0045-C

| | | |
|---|---|---|
| LAWRENCE BERRY, individually and as Trustee of the ALLEN LAWRENCE BERRY TRUST, directly and derivatively on behalf of BECON, INC.; LDMA LIMITED PARTNERSHIP; and BERRY GP, INC.; | § § § § § § § § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § § | |
| BERRY GP, INC.; LDMA LIMITED PARTNERSHIP; and BECON, INC.; | § § § § | NUECES COUNTY, TEXAS |
| *Nominal Plaintiffs,* | § § | |
| v. | § § § | **JURY TRIAL DEMANDED** |
| MARTY BERRY; MICHAEL HUMMELL; BERRY GP, INC.; BERRY OPERATING COMPANY LLC; and BERRY CONTRACTING LP; | § § § § § | 94TH JUDICIAL DISTRICT |
| *Defendants*. | § § § | |

## PLAINTIFF'S SECOND AMENDED PETITION

TO THE HONORABLE JUDGE OF THIS COURT:

Lawrence Berry ("Lawrence" or "Plaintiff"), in his personal capacity and as Trustee of the Allen Lawrence Berry Trust, directly and derivatively on behalf of Becon, Inc., LDMA Limited Partnership, and Berry GP, Inc. (with Lawrence, "Plaintiffs"), files this Second Amended Petition against Marty Berry ("Marty"), Michael "Mike" Hummell ("Hummell"), Berry GP, Inc., Berry Operating Company LLC, and Berry Contracting LP (collectively, "Defendants"). Plaintiff asserts claims for breach of fiduciary duty, knowing participation in a breach of fiduciary duty, declaratory judgment, conversion, corporate waste, a demand for an equitable accounting, and a demand for books and records. In support of these claims, Plaintiff respectfully shows as follows:

1

1.    This action concerns the management and finances of several Texas companies—Berry GP, Inc.; Berry Operating Company LLC; and Berry Contracting LP (collectively, the "Berry Entities")—which are majority owned in equal shares by Plaintiff Lawrence Berry and his two brothers, Marty Berry ("Marty") and Dennis Berry ("Dennis"). In the past several months, it has become apparent that the Berry Entities have been unlawfully usurped, controlled, and mismanaged in secret by Defendants Marty Berry and Mike Hummell, Berry GP, Inc.'s Vice President and General Counsel.

2.    The Berry Entities operate a large organization of companies engaged in the construction, fabrication, and maintenance contracting industries throughout the United States, and have successfully done so since the 1950s. While the Berry Entities were founded and originally controlled by Lawrence's father, ownership passed to Lawrence and his brothers beginning in the 1990s.

3.    In recent months, Lawrence—an officer, director, and shareholder of the Berry Entities—has come to learn that Marty Berry, with assistance from Mike Hummell and other management personnel, has been mismanaging the Berry Entities' finances such that he imperiled a long-standing line of credit that represented the Berry Entities' primary source of operational funding, causing that line of credit to be placed in default. Further, Hummell and other management personnel colluded in secret to authorize self-dealing loan agreements from Marty and Dennis—themselves officers, directors, and shareholders of the Berry Entities—to the Berry Entities without notice or consultation with the other officers and directors. What is more, Marty has been secretly usurping corporate opportunities by buying cranes through a personally owned company, and then leasing the cranes back to the Berry Entities in a series of undisclosed self-

dealing transactions. Finally, presumably in an attempt to repay the self-interested loans, Defendants have recently begun secretly attempting to sell the company's real property, including an important and valuable dock facility, without notice to or authorization from the Board of Directors. This type of undisclosed engagement in self-dealing and ultra vires transactions violates the Defendants' fiduciary obligations and Texas law.

4. When Lawrence inquired about this mismanagement and apparent covert self-dealing through valid requests for books and records information, his requests went ignored, in further violation of Texas law.

5. Lawrence, both directly and derivatively on behalf of the Berry Entities, brings this lawsuit against Marty Berry, Hummell, and the Berry Entities, to recover damages, enforce his rights to inspect the Berry Entities' books and records, and to demand an accounting of the Berry Entities' finances.

## II. DISCOVERY LEVEL

6. Discovery should be conducted in accordance with a Level 3 tailored discovery control plan under Rule 190.4 of the Texas Rules of Civil Procedure.

## III. JURISDICTION AND VENUE

7. Plaintiff seeks monetary relief of over $1,000,000, including damages, penalties, costs, expenses, pre- and post-judgment interest, and attorney fees, as well as non-monetary relief. The relief sought by Plaintiff is within the jurisdiction of this Court.

8. The Court has subject matter jurisdiction to hear this matter because the amount in controversy exceeds the jurisdictional minimum of this Court.

3

9. This Court has personal jurisdiction over Defendant Marty Berry because he is a resident of Texas and Plaintiff's claims against him arise directly from his contacts with and activities in this state.

10. This Court has personal jurisdiction over Defendant Michael Hummell because he is a resident of Texas and Plaintiff's claims against him arise directly from his contacts with and activities in this state.

11. This Court has personal jurisdiction over Defendant Berry Contracting LP because it is a Texas limited partnership headquartered in this state.

12. This Court has personal jurisdiction over Berry GP, Inc. because it is a Texas corporation headquartered in this state.

13. This Court has personal jurisdiction over Becon, Inc. because it is a Texas corporation headquartered in this state.

14. This Court has personal jurisdiction over LDMA Partnership because it is a Texas limited partnership.

15. This Court has personal jurisdiction over Defendant Berry Operating Company LLC because it is a Texas limited liability corporation headquartered in this state.

16. Venue is proper in Nueces County, Texas because it is the county of the Berry Entities' principal offices in this state.

## IV. PARTIES AND SERVICE

17. Plaintiff Lawrence Berry is an individual residing in Harris County, Texas. At all relevant times, Lawrence has owned shares of Berry GP, Inc., Berry Operating Company LLC, and Berry Contracting LP individually, through a series of holding companies, including Becon, Inc. and LDMA Limited Partnership. Lawrence is also the beneficial owner of the shares in those

4

companies held in the Allen Lawrence Berry Trust. Finally, at all relevant times, Lawrence has been an Officer, Director, partner, and/or shareholder of LDMA Limited Partnership; Becon, Inc.; Berry GP, Inc.; Berry Operating Company LL;, and Berry Contracting LP.

18. Nominal Plaintiff LDMA Limited Partnership is a Texas limited partnership with a registered address at 1414 Valero Way, Corpus Christi, Texas 78409. Berry GP, Inc. is its registered agent for service of process and it can be served at 1414 Valero Way, Corpus Christi, Texas 78409.

19. Nominal Plaintiff Becon, Inc. is a Texas corporation with a registered address at 1414 Corn Products Road, Corpus Christi, Texas 78409. Charles Vanaman is its registered agent for service of process and it can be served at 1414 Corn Products Road, Corpus Christi, Texas 78409.

20. Defendant Berry Contracting LP, doing business as Bay Ltd., is a Texas limited partnership with a registered address at 1414 Corn Products Road, Corpus Christi, Texas 78409. Berry GP, Inc. is its registered agent for service of process and it can be served at 1414 Corn Products Road, Corpus Christi, Texas 78409.

21. Defendant Berry Operating Company LLC is a Texas limited liability company with a registered address at 1414 Corn Products Road, Corpus Christi, Texas 78409. Mike Hummell is its registered agent for service of process and it can be served at 1414 Corn Products Road, Corpus Christi, Texas 78409.

22. Defendant Berry GP, Inc. is a Texas corporation with a registered address at 1414 Corn Products Road, Corpus Christi, Texas 78409. Mike Hummell is its registered agent for service of process and it can be served at 1414 Corn Products Road, Corpus Christi, Texas 78409.

23. Defendant Marty Berry is a natural person. Marty Berry is an Officer, Director, and shareholder of Berry GP, Inc., Berry Operating Company LLC, and Berry Contracting LP, and he

maintains custody and control over the corporate records of Berry GP, Inc., Berry Operating Company LLC, and Berry Contracting LP. Marty Berry can be served at his office at 1414 Corn Products Road, Corpus Christi, Texas 78409.

24. Defendant Mike Hummell is a natural person. He is the Vice President and General Counsel of Berry GP, Inc. Mr. Hummell can be served at his office at 1414 Corn Products Road, Corpus Christi, Texas 78409.

## V. STANDING

25. Plaintiff Lawrence Berry is a 19% limited partner of LDMA Limited Partnership ("LDMA"). Lawrence Berry is also the Trustee of the Allen Lawrence Berry Trust, which is a 11 2/3% limited partner of LDMA. LDMA owns Berry GP, Inc., which is the umbrella company over the Berry Entities and their subsidiaries.

26. Lawrence Berry is also a 1/3 shareholder of Becon, Inc., which is the 3% general partner of LDMA.

27. Lawrence Berry—in his personal capacity and as Trustee of the Allen Lawrence Berry Trust—has standing to bring these claims directly and derivatively on behalf of LDMA Limited Partnership, Becon, Inc., and Berry GP, Inc. pursuant to Texas Business Organizations Code §§ 21.563 & 153.413, as well as Texas common law providing for representative actions in closely held limited partnerships and corporations.

## VI. FACTUAL BACKGROUND

**A. The Berry Entities are a family operation.**

28. The Berry Entities and their subsidiaries are a group of companies focused on the construction, fabrication, and maintenance contracting industries throughout the United States.

6

The Berry Entities were founded in the 1950s by Lawrence Berry's father, Marvin Berry, who ran the organization for several decades.

29. Marvin Berry had four sons: Plaintiff Lawrence Berry, Marty Berry, Dennis Berry, and Kenneth Berry. When Marvin passed away in 1997, control of the Berry Entities began shifting to his sons, although the other brothers bought Kenneth out several years ago. LDMA sits at the top of the Berry organization. LDMA's 3% general partner is Becon, Inc., which is owned in equal shares by Lawrence, Marty, and Dennis. Lawrence, Marty, and Dennis are each direct 19% limited partners of LDMA, and each is also a beneficial owner of trusts which are 11 2/3% limited partners of LDMA. The remaining 5% limited partner of LDMA is Lone Star Equipment, Inc., which is a subsidiary of Berry Contracting LP. Dennis Berry passed away in 2024 and, on information and belief, his shares passed via his estate plan.

30. LDMA owns Berry GP, Inc., which in turn owns several holding companies which own Berry Operating Company LLC, which in turn functions as the 1% owner and general partner of Berry Contracting LP.

31. An organizational chart reflecting the structure and ownership of the various entities at issue is attached hereto as Exhibit A.

32. While the Berry Entities employ several officers who are not members of the Berry Family—including Robert Powers, who has served as President and Chief Executive Officer of Berry GP, Inc., and Defendant Hummell, who serves as Vice President and General Counsel of Berry GP, Inc.—ownership and control of the Berry Entities is vested with Lawrence and the other shareholders.

33.     The Berry Entities are governed by the Board of Directors of Berry GP, Inc. (the "Board"), in accordance with the Bylaws of Berry GP, Inc., which are attached hereto as Exhibit B. The Board consists of directors Lawrence, Marty, and Dennis Berry's wife—Bonnie Berry.

**B.     Defendants have excluded Lawrence from key decisions related to the Berry Entities, including improper self-interested transactions.**

34.     Despite Marvin Berry's wishes that the Berry Entities operate as a family business, it has become clear that Marty, with Hummell's assistance, has gone behind Lawrence's back to exclude him from key decisions related to the Berry Entities, instead choosing to engage in self-dealing and attempt major corporate transactions without informing the other officers and directors of his actions.

35.     For instance, in the past several years, Defendants have, among many other things:

- Purported to approve the acquisition of major equipment such as cranes and "yellow iron" without Board discussion or authorization;

- Negotiated and purported to approve terms with major equipment lenders that include significant potential negative impacts to the Berry Entities without Board discussion or authorization;

- Marketed corporate aircraft owned by the Berry Entities for resale without Board discussion or authorization; and

- Deliberately dissolved the largest revenue producing division of the Berry Entities by systematically terminating key individuals material to that division's structure and revenue development.

36.     Of particular concern, Lawrence recently came to learn that Marty has engaged in multiple improper self-dealing transactions with the Berry Entities.

37.     Specifically, it appears that Rob Powers and Defendant Hummell approved and executed two loan agreements, each between Marty and Dennis on the one hand, and one of the Berry Entities on the other, by which Marty and Dennis loaned a total of approximately $75 million to the Berry Entities (the "Berry Loans"). For nearly a year, Defendants refused to provide the

loan documents or information about the loan terms despite requests from Lawrence. After being forced to file this lawsuit, Lawrence was finally provided with the purported loan documents and learned that Marty loaned $45 million and Dennis loaned $30 million to one or more of the Berry Entities.

38. Despite being an officer, director, and shareholder of the Berry Entities, Lawrence was never directly informed about the Berry Loans, never consulted about their propriety, and never asked to vote on them as an officer, director, or shareholder. Nor was Lawrence informed about the terms of the Berry Loans; how the proceeds of the Berry Loans were used; or how, when, and to what extent Marty and Dennis expected repayment from the Berry Entities with respect to the Berry Loans.

39. Review of the limited financial information to which Lawrence has been privy since the filing of this lawsuit indicates that the Berry Entities have made payments to Marty and Dennis in service of the Berry Loan. In particular, Marty approved payments to himself of at least $10 million in principal, despite the purported promissory note governing his loan indicating that the loan is not payable until December 31, 2024. Because the self-dealing loans were made without Board authorization and Defendants have largely refused to provide the requested documentation to Lawrence, the extent of further improper payments is presently unclear.

40. Prior to the filing of this lawsuit, the Berry Loan transactions were never discussed by the directors of Berry GP, Inc., were not voted on at any meeting of the directors, and do not appear in any minutes of Board meetings. In fact, it appears that Powers, Hummell, Marty, and Dennis were the only individuals at the Berry Entities who were aware that they were encumbering the Berry Entities with this $75 million unauthorized debt.

9

41.     Lawrence also recently came to learn that Defendant Marty Berry has been purchasing "rolling stock" equipment such as motor cranes through a company unaffiliated with the Berry Entities called Western Gulf Equipment LLC ("Western Gulf").  Western Gulf was originally established as a special purpose entity that would purchase a portion of a crane in Canada in conjunction with a Canadian affiliate of the Berry Entities, and then lease the crane back to that Canadian affiliate.  This original transaction was fully disclosed and approved by the Board.  However, Western Gulf now appears to have purchased at least six (6) additional cranes without first presenting the opportunity to the Board or the Berry Entities, and then leased those cranes back to the Berry Entities in a self-dealing transaction—again, without disclosing the transaction to the Board or seeking Board approval.  According to the limited financial information presented to Lawrence, it appears that Western Gulf is leasing seven (7) cranes to the Berry Entities at a total rate of $449,000 per month.  To date, the full extent of Marty's undisclosed, self-dealing transactions with Western Gulf remains unclear.

42.     Plaintiff understands that Western Gulf is wholly owned by Marty Berry and his wife, Courtenay Berry, and that the registered address for Western Gulf is the Berry Entities' headquarters in Corpus Christi.  What is more, the registered agent for Western Gulf is Mike Hummell, indicating that Defendant Hummell is aware of Marty's self-dealing transactions perpetrated through Western Gulf.  On information and belief, Marty uses corporate assets of the Berry Entities to operate Western Gulf for his own personal gain.

43.     Plaintiff also recently learned that Defendants have offered to sell some of the Berry Entities' vital real property assets, including a dock facility and adjacent real property that generates tens of thousands of dollars in monthly revenue, presumably in an effort to repay the unauthorized and self-interested loans.  Plaintiff believes that Marty intends to sell the Berry real

10

property to raise funds for additional unauthorized self-dealing payments to himself in service of the Berry Loans.

44. Plaintiff recently was made aware that in or around late May 2023, Defendants began an effort to sell the dock facility and other real property to at least one third party. In their communications to that third party, Defendants falsely represented that "the principals at Berry G.P. have decided to open two strategic properties to the marketplace." *See* Ex. C (May 30, 2023 Letter from Berry G.P. to Port of Corpus Christi). In truth, the decision to sell significant company assets was made unilaterally by Marty and without calling a Board meeting and without discussion with or notice to Lawrence.

**C. Defendants have threatened the financial operations of the Berry Entities.**

45. Until recently, the Berry Entities relied on a $50,000,000.00 revolving line of credit (the "LOC") with International Bank of Commerce ("IBC") for general operations. This LOC was governed by a loan agreement between several of the Berry Entities and IBC, dated March 31, 2019 (the "Loan Agreement").

46. The Loan Agreement contained provisions allowing IBC to invoke default if certain conditions were not met, including particular thresholds for EBITDA and combined net profit after taxes.

47. Under Defendants' mismanagement, the Berry Entities recently failed to meet certain of the thresholds detailed in the Loan Agreement.

48. In fact, IBC recently made repeated requests to members of the Berry Entities' management team for information related to standard reporting as part of the Loan Agreement covenants. This includes quarterly financials, WIP reports, financial projections, and more. It appears as if the management team either refused or was unable to produce this information to

11

IBC. Further, when IBC made an effort to schedule a meeting with the Board of Directors to discuss the status of the Berry Entities in person, Marty did not show up, imperiling the 30-year banking relationship with IBC. Lawrence was never informed that IBC was sending repeated requests for information, that the Berry Entities were struggling to produce accurate or timely reporting, or that IBC had attempted to schedule meetings with the Board of Directors to discuss the problems in person.

49. Accordingly, on March 13, 2023, IBC sent a letter to the Berry Entities informing them that IBC had placed the LOC in default. IBC asserted that the Berry Entities had failed to achieve the minimum EBITDA and net profits targets for the 2022 fiscal year. Defendants did not share this letter with Lawrence at the time.

50. Because of these claimed defaults, IBC (1) elected to limit future advances to the Berry Entities on the LOC to $30 million rather than the full $50 million, and (2) accelerated maturation of the LOC to March 31, 2023, at which time IBC was going to require the entire balance to be due and payable.

51. Following this March 13, 2023 letter, IBC and counsel for the Berry Entities engaged in additional correspondence regarding the extension of the LOC. On March 28, 2023, IBC proposed an extension of the LOC to October 1, 2023, pursuant to several terms, including a reduction of the LOC from $50 million to $30 million, a requirement that the $75 million debt purportedly owed by the Berry Entities to Marty and Dennis be subordinated to the LOC debt owed to IBC, and a requirement that no payments be made on that debt until the Berry Entities' indebtedness to IBC was fully satisfied. On March 30, 2023, counsel for the Berry Entities responded and rejected many of these terms, including the subordination and repayment proposals.

12

Lawrence was not consulted regarding these decisions, nor was he made aware of the IBC proposal at the time.

52.     As a result of the March 30, 2023 rejection letter from the Berry Entities, IBC appears to have placed the LOC into default.  Despite being an officer, director, and shareholder of the Berry Entities, Lawrence was not informed of the precise status of the LOC with IBC, nor of the Berry Entities' plan for ensuring sufficient liquidity to fund its operations.  Defendants apparently decided to keep Lawrence in the dark regarding the Berry Entities' financial status.

53.     Following the collapse of the IBC banking relationship, Marty unilaterally caused the Berry Entities to repay himself $10 million in principal on his loan, despite the fact that the terms of the purported promissory note governing his loan did not require Berry GP to make any principal or interest payments to Marty until December 31, 2024.

54.     Around the same time, Defendants began negotiations with Frost Bank to obtain a new revolving line of credit.  As part of these negotiations, Defendants pledged the Berry Entities' real property as collateral, including the Entities' commercial property in Corpus Christi.  Lawrence was not fully apprised of the situation with Frost Bank, nor was he initially consulted about or asked to approve the collateralization of any of the Berry Entities' real property.

55.     Indeed, as part of the negotiations with Frost Bank, Marty executed a "Certificate of Corporate Resolutions" that purports to set forth "resolutions duly adopted either: (a) at a meeting of [Berry GP, Inc.'s] Board of Directors duly called and held, at which meeting a quorum was present and acting throughout, or (b) by unanimous written consent of the Board of Directors of [Berry GP, Inc.], which resolutions save not in any way been amended or modified[.]". *See* Ex. D.  No such Board meeting was ever held, and Lawrence was never notified of or asked to approve

any written consents adopting the purported resolutions contained in this "Certificate of Corporate Resolutions."

56. Lawrence has since signed resolutions authorizing the creation of a Frost Bank relationship because it is in the best interest of the Berry Entities to receive outside financing.

**D. Defendants refuse to honor Lawrence's legitimate requests for information related to the Berry Entities.**

57. On April 18, 2023, Lawrence sent an email to Powers and Jim Klein—CFO of Berry GP, Inc.—copying Marty and Dennis. This email attached a memorandum of "Key Concerns" that the Berry Entities apparently received from IBC and requested information from Powers and Klein related to the financial condition of the Berry Entities.

58. Lawrence sent the information request so that he could better understand the Berry Entities' present financial condition and what may have caused the Berry Entities to purportedly fail to meet the thresholds included in the Loan Agreement with IBC. Lawrence also requested information related to the Berry Loans, since he has still been kept in the dark as to the nature and terms of that debt.

59. As an officer, director, and shareholder of the Berry Entities, Lawrence is entitled to inspect the books and records of the Berry Entities, and a valid request such as the April 18, 2023 email should have been honored. However, Lawrence never received a response to his April 18, 2023 request, much less access to any of the books and records he requested.

60. Lawrence has made numerous other requests for information since April 18, 2023, including since filing this lawsuit, but all have been ignored or refused.

**E. Defendants attempt to ratify their own improper conduct.**

61. Immediately after filing his Original Petition on November 27, 2023, Plaintiff secured a hearing on the application for temporary restraining order and provided notice to

14

Defendants. The hearing took place on November 28, 2023 in the Harris County Ancillary Court before the Honorable Lauren Reeder. Despite receiving notice from Plaintiff nearly 24 hours previously, Defendants did not appear at the temporary restraining order hearing.

62. After considering Plaintiff's Original Petition and evidence, Judge Reeder granted the Berry TRO on November 28, 2023, enjoining Defendants from selling, mortgaging, or otherwise encumbering any of the Berry Entities' real property without the approval of the disinterested members of the Board of Directors.

63. On the evening of December 1, 2023, Defendants sent an email to Lawrence, attaching two "notices of special meetings."

64. The first purported to give notice that a "Special Meeting of the Board of Directors" of Berry GP, Inc. was called by Marty and Dennis Berry to be held on December 7, 2023 (the "Board Notice"). The Board Notice, which was signed by Marty and Dennis Berry, indicated that the purpose of the Board meeting was to discuss the following agenda items:

    a. Defense and indemnity for Marty Berry, Robert Powers, Robert Rickett, and Mike Hummell in Cause No 2023-81703 in the District Court of Harris County, and any location to which such claims may be transferred;

    b. Discussion and action regarding the employment contract of CEO Robert Powers;

    c. Clarification and ratification concerning previous board action on loans from shareholders Dennis Berry and Marty Berry to Berry Contracting, L.P. and offer to Lawrence Berry to participate in said loans for up to 100%;

    d. Clarification and ratification of previous board and employee action concerning the sale of the Berry Dock and adjacent real property, and of moving forward with the sale after resolution of pending litigation;

    e. Discussion and action on marketing corporate aircraft and use of corporate aircraft pending sale;

    f. Consider and take action on need to transfer title to property acquired in Robert Rickett's name, using Berry funds, to any Berry owned Company;

g. Discussions and ratification of previous board action concerning the discontinuation of banking relations with International Bank of Commerce;

h. Discussion and ratification of previous board action establishing a banking relationship with Frost Bank;

i. Discussion and ratification of previous board action establishing an operational credit line and any other action needed to provide security for loans;

j. Evaluation of accounts as to any and all director debt (individually or director owned or controlled entities) to any Berry owned Company and development of plans for repayment; and

k. Other business.

65. The second purported to give notice that a "Special Meeting of the Shareholders" of Berry GP, Inc. was called by Marty and Dennis Berry to be held on December 7, 2023 immediately following the Special Meeting of the Board of Directors (the "Shareholder Notice"). The Shareholder Notice, which was also signed by Marty and Dennis Berry, indicated that the purpose of the shareholder meeting was to discuss the following agenda items:

a. Discussion and action concerning the election of and/or removal of Directors.

66. The Special Meetings of the Board of Directors and Shareholders took place on December 7, 2023 while counsel for the parties were reaching agreement on the Agreed TRO. At the Special Meeting of the Board of Directors, Marty and Dennis Berry purported to ratify—frequently over Lawrence's objection—all of the topics and actions listed in the Board Notice. This included topics on which Marty and Dennis were unquestionably interested Directors, such as "defense and indemnity" and "loans from shareholders Dennis Berry and Marty Berry."

67. After the meeting, Defendant Hummell circulated proposed meeting minutes to the members of the Board, including Lawrence. The minutes incorrectly reflected that certain of the agenda items had passed, despite the fact that they required—and had not gotten—approval by disinterested members of the Board of Directors. Accordingly, Lawrence sent redlines of the

16

minutes back to Defendant Hummell in advance of the upcoming December 12, 2023 Board meeting, which properly reflected what had occurred at the December 7, 2023 meeting.

68. At the December 12, 2023 meeting, Defendant Hummell claimed that he "could not open" the redlines that Lawrence had sent—despite the fact that they were sent as PDFs. Further, Marty and Dennis purported to accept Hummell's incorrect meeting minutes, over Lawrence's objection.

69. The same conduct occurred again at the February 13, 2024 meeting of the Shareholders of Berry GP, Inc., at which Marty and Bonnie Berry purported to ratify post hoc a number of actions over Lawrence's objections. Several of those votes should not have passed, since they failed to garner approval from a majority of the disinterested shareholders.

## VII. CAUSES OF ACTION

### COUNT 1
### Breach of Fiduciary Duty
### (against Marty Berry and Mike Hummell)

70. Plaintiff incorporates the above paragraphs as if set forth herein in their entirety.

71. Defendant Marty Berry has been a shareholder, officer, and director of Berry GP, Inc. at all relevant times. Defendant Mike Hummell has served as Vice President and Chief Executive Officer of Berry GP, Inc. at all relevant times. In those positions, Marty and Hummell owe certain fiduciary duties to the Berry Entities, including the duty of loyalty and the duty of utmost good faith, fairness, and honesty. These duties that Marty and Hummell owe to the Berry Entities encompass obligations and/or duties to refrain from allowing self-dealing and to make full disclosure of information.

17

72.     While serving in their respective positions, Marty and Hummell have engaged in, directed, approved, and/or taken actions in contravention of the fiduciary duties they owe to the Berry Entities, including without limitation the following willful and intentional misconduct:

A.      Self-Dealing

   i.   Marty and Hummell approved and directed at least one of the Berry Entities to enter into loan agreements with Marty and Dennis—who are themselves officers, directors, and shareholders of Berry GP, Inc. and the other Berry Entities—without giving notice to or obtaining the consent or approval of Berry GP, Inc.'s Board;

   ii.  At a minimum, Marty's and Hummell's actions breached their fiduciary duties of loyalty to Berry GP, Inc. and amounted to self-dealing.

B.      Unauthorized Acts and Failure to Make Full and Adequate Disclosure

   i.   Marty and Hummell failed to disclose their unauthorized decision to sell vital company assets and the self-dealing Berry Loans and failed to properly seek or obtain board approval or approval of the sole disinterested director for those self-dealing transactions;

   ii.  Marty and Hummell similarly failed to disclose the Berry Entities' financial information to Lawrence before IBC held the Berry Entities in default with respect to the LOC.

C.      Usurpation of Corporate Opportunity and Self-Dealing

   i.   Marty directed his wholly owned company—Western Gulf Equipment—to purchase cranes without first presenting the opportunities to the Board or the Berry Entities. Then, Marty directed Western Gulf to lease those cranes back

18

to the Berry Entities, without disclosing such lease transactions to the Board or seeking approval by the disinterested members of the Board. Mike Hummell participated in these actions as the registered agent for Western Gulf Equipment. These and other actions by Marty and Hummell amounted to breaches of their fiduciary duties of loyalty to the Berry Entities and to behave with the utmost good faith, fairness, and honesty.

73. The Berry Entities and Lawrence have been damaged by the Defendants' self-dealing, unauthorized acts, breaches of fiduciary duty, and failure to make full disclosure.

74. Because Berry GP, Inc., Becon, Inc., and LDMA Limited Partnership operate as closely held entities—and Defendants have concealed information and refused to share requested information with Lawrence—an officer, director, and shareholder—about the operations of the Berry Entities, justice requires treating this claim as a direct action by Lawrence, with any recovery being paid directly to Lawrence, pursuant to Tex. Bus. Org. Code §§ 21.563 and 153.413.

75. Alternatively, Plaintiff brings these claims derivatively on behalf of LDMA Limited Partnership, Becon Inc., and Berry GP, Inc.

**COUNT 2**
**Knowing Participation in a Breach of Fiduciary Duty**
**(against Mike Hummell)**

76. Plaintiff incorporates the above paragraphs as if set forth herein in their entirety.

77. Defendant Mike Hummell knowingly participated in a breach of fiduciary duty by Defendant Marty Berry.

78. Marty has been a shareholder, officer, and director of Berry GP, Inc. at all relevant times. In those positions, Marty owes certain fiduciary duties to the Berry Entities, including the duty of loyalty and the duty of utmost good faith, fairness, and honesty. These duties that Marty

19

owes to the Berry Entities encompass obligations and/or duties to refrain from allowing self-dealing and to make full disclosure of information.

79. Hummell has served as Vice President and Chief Executive Officer of Berry GP, Inc. at all relevant times, and knew of Marty's fiduciary relationship with the Berry Entities.

80. Marty breached his fiduciary relationship to the Berry Entities, as detailed in the above allegations and in Paragraph 72.

81. Hummell participated and substantially assisted Marty in the breach of his fiduciary duties, including by serving as registered agent for Marty's personally owned company—Western Gulf Equipment—and by suppressing information to Plaintiff regarding Marty's self-dealing and usurpation of corporate opportunities.

82. Hummell was aware that he was participating in the breach of Marty's fiduciary relationship.

83. Hummell's assistance and participation was a substantial factor in causing Marty's breach of fiduciary duty.

84. Having knowingly participated in breach of Marty's fiduciary duties, Hummell is jointly and severally liable for breaches of fiduciary duties by Marty.

85. The Berry Entities and Lawrence have been damaged by these breaches of fiduciary duty, and by Hummell's knowing participation in same.

86. Because Berry GP, Inc., Becon, Inc., and LDMA Limited Partnership operate as closely held entities—and Defendants have concealed information and refused to share requested information with Lawrence—an officer, director, and shareholder—about the operations of the Berry Entities, justice requires treating this claim as a direct action by Lawrence, with any recovery being paid directly to Lawrence, pursuant to Tex. Bus. Org. Code §§ 21.563 and 153.413.

20

87. Alternatively, Plaintiff brings this claim derivatively on behalf of LDMA Limited Partnership, Becon Inc., and Berry GP, Inc.

## COUNT 3
### Demand for an Equitable Accounting

88. Plaintiff incorporates the above paragraphs as if set forth herein in their entirety.

89. As an officer and director of Berry GP, Inc. at all relevant times, Marty owed fiduciary duties to Berry GP, Inc. that give rise to grounds for an accounting. Additionally, as an officers of Berry GP, Inc. at all relevant times, Hummell owes fiduciary duties to Berry GP, Inc. that give rise to grounds for an accounting.

90. Defendants have provided Lawrence with almost no financial records related to the Berry Entities. The task of determining whether those records are accurate or complete, and the need to verify details about the concealment, wrongdoing, and mismanagement detailed above, is likely to be complex. Adequate relief is unlikely to be obtained at law or through traditional discovery. Performing an accurate accounting for the Berry Entities is likely to require the creation of accurate financial records where none exist, as opposed to merely granting Plaintiff access to the Berry Entities' existing records.

91. Plaintiff therefore seek an order appointing an independent auditor and requiring the Berry Entities, Marty, and Hummell to prepare and present accurate financial records, which properly account for all corporate receipts, expenditures, assets, and liabilities for Berry GP, Inc. and its subsidiaries, including without limitation the other Berry Entities, since January 2023. *See* TEX. R. CIV. P. 172.

92. Plaintiff bring this claim derivatively on behalf of LDMA Limited Partnership, Becon Inc., and Berry GP, Inc.

21

## COUNT 4
## Demand for Books and Records

93.     Plaintiff incorporates the above paragraphs as if set forth in their entirety.

94.     At all relevant times, Plaintiff Lawrence Berry has been a shareholder of at least 5% of Berry GP, Inc. through his interests in LDMA Limited Partnership and Becon, Inc.

95.     On April 18, 2023, Lawrence sent a good faith written demand to Defendants for books and records related to Berry GP, Inc. and its subsidiaries, including without limitation the other Berry Entities.  However, this request was ignored, and Lawrence never received a response.

96.     As a shareholder of Berry GP, Inc. for at least six months immediately preceding that April 18, 2023 demand, and as a holder of at least 5% of all of the outstanding shares in Berry GP, Inc., Lawrence is entitled to examine and copy Berry GP, Inc.'s books, records of account, minutes, and share transfer records.  TEX. BUS. ORG. CODE § 21.218.

97.     The Bylaws of Berry GP, Inc. do not alter or limit Lawrence's right to inspect Berry GP, Inc.'s books and records.  Indeed, Section XXIV states that "the books, accounts and records of [Berry GP, Inc.] shall be open to inspection by the shareholders at all reasonable times[.]" *See* Ex. B, at 11.

98.     Defendants never responded to Lawrence's lawful request, let alone provided any reason why Lawrence would not be entitled to inspect the books and records of Berry GP, Inc. and its subsidiaries.

99.     Plaintiff Lawrence Berry therefore seeks an order compelling the production for examination of the books and records of Berry GP, Inc. and its subsidiaries, including but not limited to the other Berry Entities, pursuant to Section 21.218(c) of the Texas Business Organizations Code.

100. Plaintiff Lawrence Berry brings this claim directly and derivatively on behalf of LDMA Limited Partnership, Becon Inc., and Berry GP, Inc.

## COUNT 5
## Declaratory Judgment

101. Plaintiff incorporates the above paragraphs as if set forth in their entirety.

102. Pursuant to TEX. CIV. PRAC. & REM. CODE § 37.001 *et. seq.*, Plaintiff seeks a judicial declaration of his rights, status, and other legal relations with respect to Defendants under the Berry GP bylaws and laws of the State of Texas.

103. First, Plaintiff seeks a judicial declaration that the purported December 7, 2023 "ratifications" of the following agenda items were ineffectual, because they were not procured with the approval of a majority of the fully informed and disinterested members of the Board of Directors, nor were they approved in good faith by a vote of the disinterested shareholders after disclosure of all material facts:

   a. Defense and indemnity for Marty Berry, Robert Powers, Robert Rickett, and Mike Hummell in Cause No 2023-81703 in the District Court of Harris County, and any location to which such claims may be transferred;

   b. Clarification and ratification concerning previous board action on loans from shareholders Dennis Berry and Marty Berry to Berry Contracting, L.P. and offer to Lawrence Berry to participate in said loans for up to 100%;

   c. Clarification and ratification of previous board and employee action concerning the sale of the Berry Dock and adjacent real property, and of moving forward with the sale after resolution of pending litigation;

   d. Discussion and action on marketing corporate aircraft and use of corporate aircraft pending sale; and

   e. Discussions and ratification of previous board action concerning the discontinuation of banking relations with International Bank of Commerce;

104. Second, Plaintiff seeks a judicial declaration that the purported February 13, 2024 "ratifications" or "resolutions" were ineffectual, because they were not approved by a majority of

23

the fully informed and disinterested members of the Board of Directors, nor were they approved in good faith by a vote of a majority of the fully informed and disinterested shareholders:

a.  BE IT RESOLVED that all action previously taken by any Director of Berry GP, Inc. or any employee of Bay Ltd. to promote, advertise, or seek offers for the sale of the Berry Dock is hereby ratified. The Board further determines that the Berry Dock and adjacent property is to remain listed for sale and that no sale shall take place pending the resolution of the TRO currently in place in Nueces County, Texas.

b.  BE IT RESOLVED that the loans made to Berry GP Inc. by Dennis Berry and Marty Berry in July 2022 are recognized as fair, and in the best interest of Berry GP, and are ratified.

c.  BE IT RESOLVED that the two (2) aircraft owned by Berry GP Inc. are to remain listed for sale, and are to be sold upon approval of an acceptable offer to purchase.

d.  BE IT RESOLVED that all actions taken by any director of Berry GP, Inc. or any employee of Bay Ltd. including Robert Powers and Mike Hummell, in furtherance of discontinuing the banking relations between Berry GP, Inc. and International Bank of Commerce is hereby ratified.

e.  BE IT RESOLVED that the acquisition of cranes or other equipment by Marty Berry, individually or through any company he owns or controls, and the subsequent leasing of that company to any Berry company for performing the work of that Berry company, is approved. To the extent such conduct has occurred in the past, it is ratified.

105.  Each of the "ratifications" or "resolutions" detailed above required informed approval by a majority of the disinterested Directors or Shareholders, pursuant to TEX. BUS. ORGS. CODE § 21.418. However, they were not approved by a majority of the disinterested Directors or Shareholders, because Lawrence Berry objected.

106.  Plaintiff brings this claim individually and derivatively on behalf of LDMA Limited Partnership, Becon Inc., and Berry GP, Inc.

### COUNT 6
### Conversion

107.  Plaintiff incorporates the above paragraphs as if set forth in their entirety.

108.  Pursuant to Texas law, Defendants are liable to Plaintiff for conversion.

24

109. Becon Inc., LDMA Limited Partnership and Berry GP, Inc. have the right to possess property of the Berry Entities.

110. By unlawfully voting to indemnify themselves and advance themselves litigation costs—over the objection of Lawrence as the sole disinterested member of the Board for such vote—Defendants are depriving Plaintiffs of their rightful interest in the property of the Berry Entities.

111. Lawrence's objection to the vote constitutes his demand for the return of the advanced litigation fees. Alternatively, demand was not required.

112. As a result of Defendants' unlawful vote and improper squandering of the Berry Entities' money, LDMA Limited Partnership, Becon Inc., and Berry GP, Inc. have suffered damages within the jurisdictional limits of this Court. Further, under the Texas Damages Act and Texas common law, Plaintiff is entitled to recover exemplary damages because Defendants acted with actual malice when converting the Berry Entities' property.

113. Because Berry GP, Inc., Becon, Inc., and LDMA Limited Partnership operate as closely held entities—and Defendants have concealed information and refused to share requested information with Lawrence—an officer, director, and shareholder—about the operations of the Berry Entities, justice requires treating this claim as a direct action by Lawrence, with any recovery being paid directly to Lawrence, pursuant to Tex. Bus. Org. Code §§ 21.563 and 153.413.

114. Alternatively, Plaintiff brings this claim derivatively on behalf of LDMA Limited Partnership, Becon Inc., and Berry GP, Inc.

## COUNT 7
### Corporate Waste (against Marty Berry)

115. Plaintiff incorporates the above paragraphs as if set forth in their entirety.

25

116. Defendant Marty Berry's use of corporate assets for personal applications constitutes corporate waste.

117. In particular, on information and belief, Defendant Marty Berry uses assets of the Berry Entities to operate his personally-owned company, Western Gulf Equipment. Defendant Marty Berry does not provide adequate consideration to the Berry Entities in return for these uses of Berry Entity assets, and instead further encumbers the Berry Entities by charging lease payments for the Berry Entities' use of Western Gulf cranes. There is no business justification for using the Berry Entities' corporate assets for Defendant Marty Berry's personal applications without adequate consideration.

118. Further, Defendant Marty Berry approved payments to himself from the Berry Entities of at least $10 million in principal on his undisclosed and improper self-dealing loan, despite the purported promissory note governing his loan indicating that the loan is not payable until December 31, 2024. There is no business justification for using the Berry Entities' corporate assets to make such voluntary payments for Marty's personal benefit, thus depriving the Berry Entities' of vital liquidity.

119. Finally, on information and belief, Plaintiff understands that Defendant Marty Berry engages in additional corporate waste by using other Berry Entity assets for personal applications without adequate consideration. However, because Plaintiff has been denied adequate access to the Berry Entities' books and records, the scope and extent of that additional corporate waste is not yet clear. Plaintiff reserves the right to add additional claims for corporate waste after a proper accounting has been made and Plaintiff has been able to perform a fulsome review of the Entities' books and records.

120. The Berry Entities and Lawrence have been damaged by Defendant Marty Berry's waste of corporate assets.

121. Because Berry GP, Inc., Becon, Inc., and LDMA Limited Partnership operate as closely held entities—and Defendants have concealed information and refused to share requested information with Lawrence—an officer, director, and shareholder—about the operations of the Berry Entities, justice requires treating this claim as a direct action by Lawrence, with any recovery being paid directly to Lawrence, pursuant to Tex. Bus. Org. Code §§ 21.563 and 153.413.

122. Alternatively, Plaintiff brings this claim derivatively on behalf of LDMA Limited Partnership, Becon Inc., and Berry GP, Inc.

## VIII. APPLICATION FOR PERMANENT INJUNCTION

123. Plaintiff incorporates the above paragraphs as if set forth in their entirety.

124. Plaintiff also incorporates its February 15, 2024 Brief in Support of Temporary Injunction and its March 14, 2024 Verified Application for Temporary Injunction as if set forth in their entirety.

125. Plaintiff requests that the Court issue a permanent injunction enjoining Defendants from selling any of the Berry Entities' real property without first giving forty-eight hours' (48) written notice to Lawrence Berry, including details of the proposed transaction. Further, Plaintiff requests that the court issue a permanent injunction enjoining Defendants from removing Lawrence Berry from the Board of Directors of Berry GP, Inc. or any related entities. Plaintiff further requests that upon final trial on the merits, the Court award a permanent injunction against Defendants for the same activity.

126. Unless this Court grants Plaintiff's application and permanently restrains Defendants from the wrongful acts described above, Plaintiff will suffer imminent harm and

27

irreparable injury for which Plaintiff will have no adequate remedy at law. In cases involving real or personal property such as this one, the movant need not show the lack of an adequate remedy at law. TEX. CIV. PRAC. & REM. CODE § 65.011(5).

**A.      The harm facing Plaintiff is imminent.**

127.   For the purposes of obtaining an injunction, an injury is "imminent" if one has expressed "demonstrable intent to do that for which injunctive relief is sought," *Harbor Perfusion, Inc. v. Floyd*, 45 S.W.3d 713, 717-18 (Tex. App.—Corpus Christi 2001, no pet.), or if the "defendant will engage in the activity sought to be enjoined." *Schmidt v. Richardson*, 420 S.W.3d 442, 447 (Tex. App.—Dallas 2014, no writ).

128.   Defendants have already made unauthorized offers to sell real property belonging to the Berry Entities, including a unique and valuable commercial dock and other real property. Defendants are believed to be selling such assets to raise money for further unauthorized payments in service of the self-dealing Berry Loan. This past behavior, coupled with the Defendants' recent purported Board and shareholder resolutions, demonstrates that Defendants intend to engage in activity that will undoubtedly alter the status quo—and irreparably harm Lawrence—if they are not permanently enjoined from doing so.

**B.      The harm facing Plaintiff is irreparable.**

129.   If Defendants are not enjoined as requested above, the harm Plaintiff will suffer is irreparable. "An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard." *Butnaru*, 84 S.W.3d at 204. Injury is likewise irreparable if "damages [are] not presently ascertainable or readily subject to calculation." *Wright v. Sport Supply Group, Inc.*, 137 S.W.3d 289, 294 (Tex. App.—Beaumont 2004, no pet.) (citing *Butnaru*, 84 S.W.3d at 204). The loss of management

rights over a company can constitute irreparable harm, because those rights are "unique, irreplaceable, and 'cannot be measured by any certain pecuniary standard.'" *Cheniere Energy, Inc. v. Parallax Enters.*, 585 S.W.3d 70, 83 (Tex. App.—Houston [14th Dist.] 2019, pet. dism'd (citing *Sonwalkar v. St. Luke's Sugar Land P'ship, L.L.P.*, 394 S.W.3d 186, 201 (Tex. App.—Houston [1st Dist.] 2012, no pet.)). Additionally, "a trial court may grant injunctive relief when the enjoined conduct threatens to disrupt an ongoing business." *Sonwalkar*, 394 S.W.3d at 199; *see also Intercont'l Terminals Co., LLC*, 354 S.W.3d at 896 ("[d]isruption to a business can be irreparable harm," and "assigning a dollar amount to such intangibles as a company's loss of clientele, goodwill, marketing techniques, and office stability, among others, is not easy.").

130. Further, trial courts typically grant injunctive relief in "actions involving real property because real estate is generally considered unique" and "irreplaceable," such that money damages are generally inadequate. *See Chenier Energy*, 585 S.W.3d at 76-77 (citing cases).

131. First, as explained above, Plaintiff has already been damaged by Defendants' actions, but the extent of that damage is not readily ascertainable because of Defendants intentional concealment of information and the lack of clear records detailing the financial status of the Berry Entities. Additionally, Defendants' actions have already caused irreparable harm to the Berry Entities' decades-long banking relationship with IBC and could cause similar harm to the new banking relationship with Frost Bank. Assigning a dollar amount to remedy this kind of intangible but serious harm is not easy.

132. Second, Plaintiff understands that Defendants have pledged the Berry Entities' real property as collateral to secure an increase to the new Frost Bank line of credit. Should unauthorized self-dealing payments made in service of the Berry Loans imperil the line of credit

with Frost Bank such that the company's real property interests are threatened, Plaintiff will be irreparably harmed as a result.

133. Third, Defendants have been secretly attempting sell—without notice to or authorization from the Board—other real property belonging to the Berry Entities, including the company's valuable dock facility, presumably to raise funds to make additional self-dealing payments. If Defendants dispose of such real property without the requisite notice or approval, Plaintiff will be irreparably harmed.

**C.      Plaintiff lacks an adequate remedy at law, or in the alternative, is not required to prove lack of an adequate remedy at law.**

134. Because Plaintiff applies for an injunction under Section 65.011(5) of the Texas Civil Practice and Remedies Code, he is not required to prove lack of an adequate remedy at law. *See* TEX. CIV. PRAC. & REM. CODE § 65.011(5) ("A writ of injunction may be granted if: (5) irreparable injury to real or personal property is threatened, *irrespective of any remedy at law*.") (emphasis added).

135. Alternatively, Plaintiff has no adequate remedy at law, so a permanent injunction must issue. An irreparable injury is one that, by definition, has no adequate remedy at law. *See, e.g., Kennedy v. Gulf Coast Cancer & Diag. Center at Southeast, Inc.*, 326 S.W.3d 352, 260 (Tex. App.—Houston [1st Dist.] 2010, no pet.) ("An injury is irreparable if there is no adequate remedy at law; if for example, a prevailing applicant could not be compensated adequately in damages or if damages cannot be measured by any certain pecuniary standard.") (citations omitted). As explained above, the injuries Plaintiff will suffer—including the likely loss of management rights and of unique and valuable real property belonging to the company—cannot be adequately compensated in damages, and Plaintiff thus has no adequate remedy at law.

136. Further, to justify denial of an application for injunction, a remedy at law must be as "complete, practical, and efficient to the prompt administration of justice as is equitable relief." *Tex. Black Iron, Inc. v. Arawak Energy Int.'l Ltd.*, 572 S.W.3d 579, 584 (Tex. App.—Houston [14th Dist.] 2017, no pet.). Here, the equitable relief that Plaintiff seeks is for the purpose of avoiding harm that could not be responded to fully in money damages, including threatening the status of the Berry Entities' real property interests and of Plaintiff's management rights in the Berry Entities. Damages would be an incomplete remedy at best, because the harm Defendants threatens to impose on Plaintiff is non-monetary in part. *See RWI Constr., Inc. v. Comerica Bank*, 583 S.W.3d 269, 275 (Tex. App.—Dallas Apr. 12, 2019, no pet.) ("Generally, an adequate remedy at law exists and injunctive relief is improper where any potential harm may be adequately cured by monetary damages.").

**D. Plaintiff is entitled to a permanent injunction.**

137. For the reasons set forth above, Plaintiff is entitled to a permanent injunction. Plaintiff requests that upon final hearing, the Court permanently enjoin Defendants from (1) removing Lawrence Berry from the Board of Directors of Berry GP, Inc. or any related entities; and (2) voting on the sale of the Berry Entities' real property without first giving forty-eight (48) hours' written notice to Lawrence Berry, including details of the proposed transaction.

## IX. ATTORNEY'S FEES

138. Plaintiff Lawrence Berry is entitled to recover his attorneys' fees incurred in this matter pursuant to Sections 21.222 and 21.561 of the Texas Business Organizations Code and Section 37.009 of the Texas Civil Practice and Remedies Code.

## X. JURY DEMAND

139. Plaintiff hereby requests a jury trial.

## XI.    CONDITIONS PRECEDENT

140.    Plaintiff pleads that all conditions precedent to the relief requested have been satisfied, waived, excused, and/or are deemed as a matter of law to have been satisfied.

## XII.    PRAYER

141.    Plaintiff respectfully prays that Defendants be cited to appear and answer herein, and that the Court:

(1)    Order that Defendants produce the books and records of the Berry Entities for inspection by Plaintiff Lawrence Berry;

(2)    Order that Plaintiff Lawrence Berry recover from Defendants the reasonable costs and expenses Plaintiff incurred in obtaining the books and records;

(3)    Appoint an independent auditor and order Defendants to prepare and present accurate financial records, which properly account for all corporate receipts, expenditures, assets, and liabilities for Berry GP, Inc. and its subsidiaries, including without limitation the other Berry Entities, since January 2023;

(4)    Set a trial date and upon final hearing enter a permanent injunction that enjoins Defendants from (1) removing Lawrence Berry from the Board of Directors of Berry GP, Inc. or any related entities, and (2) voting on the sale of the Berry Entities' real property without first giving forty-eight (48) hours' written notice to Lawrence Berry, including details of the proposed transaction; and order that Plaintiff have final judgment against Defendants breach of fiduciary duty, knowing participation in a breach of fiduciary duty, declaratory judgment, conversion, and corporate waste and award:

(i)    compensatory, actual, consequential, restitutionary, and disgorgement damages,

(ii)    exemplary damages,

(iii)    pre-judgment interest,

(iv)    post-judgment interest,

(v)    reasonable and necessary attorneys' fees and costs, and

(vi)    any other relief to which Plaintiff may show himself justly entitled.

Dated: October 11, 2024

Respectfully submitted,

By: */s/ Barrett Reasoner*
Barrett Reasoner
State Bar No. 16641980
breasoner@gibbsbruns.com
Michael Absmeier
State Bar No. 24050195
mabsmeier@gibbsbruns.com
L. Bruce Baldree
State Bar No. 24116064
bbaldree@gibbsbruns.com
**GIBBS & BRUNS LLP**
1100 Louisiana, Suite 5300
Houston, Texas 77002
Tel: 713.650.8805
Fax: 713.750.0903

and

Butch Boyd
State Bar No. 00783694
butchboyd@butchboydlawfirm.com
**BUTCH BOYD LAW FIRM**
2905 Sackett Street
Houston, Texas 77098
Tel: 713.589.8477

and

Gabi S. Canales
State Bar No. 24012376
gabilaw14@gmail.com
**GABI CANALES LAW OFFICE**
5262 South Staples St., Suite 100
Corpus Christi, Texas 78411
Tel: 361.887.4700
Fax: 361.887.4761

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that on October 11, 2024, a true and correct copy of this document was served on all counsel of record pursuant to the Texas Rules of Civil Procedure.

                    */s/ Bruce Baldree*
                    L. Bruce Baldree

# EXHIBIT 20

## CAUSE NO. 2024DCV-0045-C

| | | |
|---|---|---|
| LAWRENCE BERRY, individually and derivatively on behalf of BERRY GP, INC. | § § § § | IN THE DISTRICT COURT |
| Plaintiff, | § § | |
| BERRY GP, INC., | § § | |
| Nominal Plaintiff, | § | NUECES COUNTY, TEXAS |
| v. | § § § | |
| MARTY BERRY, ROBERT RICKETT, ROBERT POWERS, MICHAEL HUMMELL, BERRY GP, INC., BERRY OPERATING COMPANY, LLC and BERRY CONTRACTING LOP | § § § § § § § | |
| Defendants. | § § § | 94TH JUDICIAL DISTRICT |

## COUNTER-PLAINTIFFS' FIRST AMENDED ORIGINAL PETITION ASSERTING COUNTER-CLAIMS

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COME Berry GP Inc., Berry Operating Company LLC, Berry Contracting LP, and Marty Berry, sometimes collectively referred to as Counter-Plaintiffs, and make and file this Counter-Plaintiffs' First Amended Original Petition Asserting Counter-Claims complaining of A. Lawrence Berry, in his personal capacity and as Trustee of the Allen Lawrence Berry Trust, sometimes referred to as Counter-Defendants, and in support of same would show:

1

I.

PARTIES

1.     Berry GP Inc. ("Berry GP") is a Texas corporation with its principal office at 1414 Corn Products Road, Corpus Christi, Texas 78409.  Berry GP is one of the "Berry Entities" as may be referenced herein.

2.     Berry Operating Company LLC ("Berry Operating") is a Texas limited liability company with its principal office at 1414 Corn Products Road, Corpus Christi, Texas 78409.  Berry Operating is one of the "Berry Entities" as may be referenced herein.

3.     Berry Contracting LP (d/b/a Bay Ltd. ("Bay Ltd.")) is a Texas limited partnership with its principal office at 1414 Corn Products Road, Corpus Christi, Texas 78409.  Bay Ltd. is one of the "Berry Entities" as may be referenced herein.

4.     Marty Berry ("M.Berry") is a natural person who is presently an Officer, Director, and shareholder of Berry GP, Berry Operating, and Bay Ltd.  Marty Berry resides in Nueces County, Texas.

5.     A. Lawrence Berry ("L.Berry") is a natural person who is presently an Officer, Director, and shareholder of Berry GP, Berry Operating, and Bay Ltd.  A. Lawrence Berry resides in Harris County, Texas.  A. Lawrence Berry may and shall be served by notice of these proceedings upon legal counsel for A. Lawrence Berry:  Mr. Barrett Reasoner, Gibbs & Bruns LLP, 1100 Louisiana, Suite 5300, Houston, Texas 77002.  Service shall be by electronic means, and in such manner as complies with the Texas Rules of Civil Procedure.

6.     Allen Lawrence Berry, as Trustee of the Allen Lawrence Berry Trust ("ALB Trust") is a trust wherein Allen Lawrence Berry serves as trustee of the ALB Trust, and is – along with others – a beneficiary of the Trust.  ALB Trust has already appeared in these proceedings, and thus this

Counter-Plaintiffs First Amended Original Petition Asserting Counter-Claims will be served upon Allen Lawrence Berry, Trustee, and the Trust by service upon their attorney: Mr. Barrett Reasoner, Gibbs & Bruns LLP, 1100 Louisiana, Suite 5300, Houston, Texas 77002. Service shall be by electronic means, and in such manner as complies with the Texas Rules of Civil Procedure.

6. Berry GP, Berry Operating, Bay Ltd., Marty Berry, and A. Lawrence Berry may be sometimes referred to as the "Parties," or any one of them referred to as a "Party."

7. L.Berry is the original Plaintiff in this legal action by having filed Plaintiffs' Original Verified Petition and Application for Temporary Restraining Order and Temporary Injunction ("Plaintiffs' Verified Petition"). The legal action initiated by Plaintiffs' Verified Petition was filed in Harris County, Texas, but promptly transferred to Nueces County, Texas. A Counter-Plaintiffs' Original Petition Asserting Counter-Claims was filed as counter-claim to Plaintiffs' Verified Petition in compliance with Texas Rule of Civil Procedure ("TRCP") 97. L.Berry, adding Lawrence Berry in his capacity as trustee of the Allen Lawrence Berry Trust ("Trust"), then filed Plaintiffs' First Amended Verified Petition and Application for Temporary Injunction. This Counter-Plaintiffs' First Amended Original Petition Asserting Counter-Claims is now being filed as counter-claim to Plaintiffs' First Amended Verified Petition and Application for Temporary Injunction in compliance with Texas Rule of Civil Procedure ("TRCP") 97.

## II.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over all Parties. Specifically, Berry GP, Berry Operating, and Bay Ltd. are legal entities formed in Texas that maintain their principal offices in Texas. M.Berry and L.Berry reside in Texas. As such, all Parties have sufficient contacts with the State of Texas and, therefore, are subject to the jurisdiction of this Court.

3

9. Venue is proper in Nueces County, Texas, pursuant to TCPRC Chapter 15, section 15.002(a)(1) inasmuch as Nueces County is the location where all or a substantial part of the events or omissions giving rise to the claims occurred. See Exhibit C (with attachments). Moreover, venue is proper in Nueces County, Texas, pursuant to TCPRC Chapter 15, section 15.063(3). See Exhibit B.

## III.

## DISCOVERY

10. Discovery should be conducted in accordance with Level 3, as permitted by TRCP 109.4.

## IV.

## EXECUTIVE SUMMARY

11. Counter-Plaintiffs file this amended counter-petition asserting claims against L.Berry and the Trust for conversion, breach of fiduciary duty, breach of contract, unjust enrichment, breach of constructive trust, fraud, and other causes of action. Counter-Plaintiffs' causes of action pleaded against and complaining of L.Berry and Trust are directly responsive to L.Berry's claims for self-dealing and breach of fiduciary duty filed against one or more Counter-Plaintiffs. For all claims referenced in this Counter-Plaintiffs' First Amended Original Petition Asserting Counter-Claims, Counter-Plaintiffs now sue Counter-Defendants.

## VI.

## FACTUAL BACKGROUND

12. The Berry Entities and Berry-Related Entities are a large organization of companies engaged in various businesses throughout the United States, and have successfully done so since the 1950s.

4

13.     Marvin Berry had four (4) sons:  Marty Berry (M.Berry), Dennis Berry (D.Berry), A. Lawrence Berry (L.Berry), and Kenneth Berry.  After Marvin Berry passed in 1997, control of the Berry Entities shifted to Laura Berry (Marvin's wife), and then to their (Marvin's and Laura's) sons — M.Berry, D.Berry, and L.Berry.  LDMA LP ("LDMA") sits at the top of the Berry Entities.  LDMA's 3% general partner is Beacon Inc. which is owned by M.Berry, D.Berry, and L.Berry. LDMA owns Berry GP which, through a series of legal entities, own Berry Operating and Bay Ltd.  The Board of Directors of Berry GP (M.Berry, Bonnie Berry, L.Berry, and Chrissy Hinojosa Phd.) — in accordance with the by-laws of Berry GP — primarily govern Berry GP, the Berry Entities, and some of the other affiliated entities (indirectly).   All considered (generally), ownership of the Berry Entities is vested with M.Berry, Bonnie Berry, and L.Berry (shareholders); and control of the Berry Entities (generally, at a policy level) is with M.Berry, Bonnie Berry, L.Berry, and Chrissy Hinojsa Phd. (all serving as directors of Berry GP).

14.     For purposes of this pleading, the Berry Entities refers to Berry GP, Berry Operating, and Bay Ltd.  For purposes of this pleading, the Berry-Related Entities refer to the Allen Lawrence Berry 2007 Trust, Orca Assets GP LLC ("Orca"), Inner Channel Investments Inc. ("ICI"), Orca ICI Development ("Orca ICI," a Texas partnership), Orca ICI Development JV, Orca Petroleum Ltd., Orca Properties LLC (a/k/a Orca Specialty Equipment LLC, Providence Plantation, and/or Casa de Juego), West 17th Resources LLC, Gansevoort Investments LLC, Halcon Mineral Interest LLC, Zilker Acquisitions LLC, Three Rivers Pipe and Rental LLC, Southern Comfort Equipment, Ridgefield Energy Investments LLC, Ridgefield Energy Operating LLC, Ridgefield Eagle Ford LLC, Ridgefield Eagle Ford Minerals LLC, Ridgefield Permian LLC, Ridgefield Permian Minerals LLC, Ridgefield Energy Partners LLC, CEC Ridgefield Holdings LLC, Blue Wagon Energy Investments LLC, Alamo Resources IV JV LLC, B.B.I. Inc., Escopeta Oil & Gas

Corporation, Furie Operating Alaska LLC, Helios Power Capital LLC, Danskammer Energy LLC, Berry Y&V Fabricators LLC (and related companies). The Berry Entities and Berry-Related Entities may be sometimes referred to as the "Berry Companies."

15. The Berry Companies, except for the Trust, are and have been started up, owned (legally and/or beneficially), held in trust, managed, developed, operated, and/or controlled at various times by and through Berry GP, and/or by and through (in part) M.Berry, D.Berry, and/or L.Berry (one or all of them), since the 2000s. Such business practices are investments for one or more of the Berry Entities and/or their owners/shareholders.

16. As an example of how Berry Entities invested, Counter-Plaintiffs invested substantially in ICI, ICI Orca, and Orca. Specifically, Counter-Plaintiffs seeded capital (money, assets, manpower) to Orca to start-up, manage, develop, operate, and/or control an investment in the Eagle Ford Shale and/or Permian Basin — which, in turn, became seed-money/assets (including mineral interests as assets) for several of the Berry-Related Entities (the "Investment").

17. From time to time, M.Berry, D.Berry, and/or L.Berry (or all of them) had meetings to discuss how to manage the Investment, whether to sell or continue with the Investment, and other business-type meetings/discussions.

18. Seeded capital money/assets from Counter-Plaintiffs to ICI to Orca/ICI to Orca involved an agreement/contract as between these legal entities requiring payment-in-full for the base value of the seeded money/assets received by Orca. In contravention of such agreement/contract, L.Berry, individually and as trustee for the Trust, has very recently refused to pay as required by the agreement/contract.

19. Seeded capital money/assets from Counter-Plaintiffs to ICI to Orca/ICI to Orca also included the agreement/contract that L.Berry/Orca/Trust (all or in part) would initiate the

6

Investment (start-up); manage, develop, operate, and control the Investment, and hold the Investment in trust and for the benefit of Counter-Plaintiffs. In contravention of such agreement/contract, L.Berry/Orca/Trust (all or in part) has engaged a series of self-dealing transactions without notice to, consultation with, or vote (in-meeting or otherwise) of a majority of the owners/shareholders/directors of Counter-Plaintiffs.

20. Specifically, L.Berry/Trust has participated in self-dealing transactions involving the Investment (and the Investment's earnings) — taking of seeded money and assets of value (wealth) for personal benefit, and not for the benefit of any one or more of the Counter-Plaintiffs. This on-going practice by L.Berry/Orca/Trust of self-dealing transactions and ultra vires transactions violates the fiduciary obligations owed by L.Berry, individually and as trustee of the Trust, to Counter-Plaintiffs (and others).

21. In furtherance of L.Berry's/Trust's wrongful conduct, L.Berry/Trust has intentionally obscured self-dealing transactions by transfers of money/assets of substantial value to and/or through the Berry-Related Entities. All such transactions constitute L.Berry's, individually and as trustee for the Trust, wrongful taking of money and assets belonging to, held in trust for, and held for the benefit of Counter-Plaintiffs. L.Berry, individually and as trustee for the Trust, has and is engaged in wrongful takings, and also has failed to disclose same (as is required by his (L.Berry's, individually and as trustee of the Trust) fiduciary duties owed).

22. L.Berry's (individually and as trustee of the Trust) wrongful conduct (as described herein) continues to-date. Counter-Plaintiffs file this legal action to demand L.Berry (individually and as trustee of the Trust) provide financial information as shall be requested through the legal discovery process. Counter-Plaintiffs now plead the following claims and causes of action against L.Berry

7

(individually and as trustee of the Trust) and the Trust: conversion, breach of fiduciary duty, breach of contract, unjust enrichment, breach of constructive trust, and fraud.

## VII.
## CAUSES OF ACTION
### Count 1
### Conversion

23. Counter-Plaintiffs incorporate all paragraphs herein as if set forth within Count 1 in their entirety.

24. Counter-Plaintiffs would show that L.Berry (individually and as trustee of the Trust, Counter-Defendants) are liable to Counter-Plaintiffs for conversion of Counter-Plaintiffs' Investment (+ earnings). Specifically, Counter-Plaintiffs seeded capital (money, assets) to L.Berry/Orca/Trust (and their benefit) to start-up, manage, develop, operate, and/or control an investment in the Eagle Ford Shale and/or Permian Basin — which, in turn, became seed-money/assets for several of the Berry-Related Entities (the Investment). L.Berry and the Trust were to hold the Investment (+ earnings) in trust for Counter-Plaintiffs.[1] Wrongfully, L.Berry and the Trust have absconded with the Investment (+ earnings) through a series of self-dealing transactions without notice to, consultation with, or vote (in-meeting or otherwise) of a majority of the owners/shareholders/directors of Counter-Plaintiffs. L.Berry's wrongful conduct is a conversion of Counter-Plaintiffs' Investment (+ earnings).

25. The elements of conversion are: 1) claimants (Counter-Plaintiffs) owned or were entitled to possession of property; 2) another assumes or exercises control of the property in an unauthorized manner to the exclusion of the claimants; and 3) the claimants' demand for return of

---

[1] Although some monies have been paid by L.Berry or one of his legal entities to one or more Counter-Plaintiffs as part of these transactions, the amounts of money paid have only been a partial repayment of monies owed to Counter-Plaintiffs — still in disregard for that which was agreed to be held in trust by L.Berry for Counter-Plaintiffs.

the property is refused. By this Counter-Plaintiffs' First Amended Counter-Claim these Counter-Plaintiffs continue to request return of all converted assets. In this case, Counter-Plaintiffs clearly own and are entitled to possession of the Investment (+ earnings). Such Investment (+ earnings) were supposed to be held in trust by L.Berry, individually and as trustee for the Trust (the sole person in control of such Investment (+ earnings)) for Counter-Plaintiffs. Counter-Defendants have wrongfully assumed and exercised control over such Investment (+ earnings), and done so in a manner unauthorized by Counter-Plaintiffs and to the exclusion of Counter-Plaintiffs. Further, and in disregard of requests from Counter-Plaintiffs, Counter-Defendants have failed and refused to return the Investment (+ earnings) to Counter-Plaintiffs. This is a wrongful conversion of such Investment (+ earnings) — the money/assets — belonging to Counter-Plaintiffs, for which Counter-Plaintiffs now sue.

26.     Counter-Defendants' wrongful conversion of Counter-Plaintiffs' Investment (+ earnings) has caused substantial financial harm and losses to Counter-Plaintiffs. Counter-Plaintiffs now sue for the return of such Investment (+ earnings), or alternatively for the value of such Investment (+ earnings).

**Count 2**
**Breach of Fiduciary Duty**

27.     Counter-Plaintiffs incorporate all paragraphs herein as if set forth within Count 2 in their entirety.

28.     Counter-Defendant L.Berry has been a shareholder, officer, and director of Counter-Plaintiffs for all relevant times. Counter-Defendants held the Investment (+ earnings) in trust for Counter-Plaintiffs all relevant times. As such, Counter-Defendants owe fiduciary duties to Counter-Plaintiffs for all relevant times. The fiduciary duties owed by Counter-Defendants to Counter-Plaintiffs include, but are not limited to, the duty of loyalty, duty of utmost good faith and

9

fair dealing, and duty of fairness and honesty. The fiduciary duties owed by Counter-Defendants to Counter-Plaintiffs further include putting Counter-Plaintiffs' interest before his (L.Berry's, individually and as trustee of the Trust) own interest, inclusive of devoting full time and efforts in favor of Counter-Plaintiffs' best interests — not L.Berry's own or just the Trust's interests. These duties that Counter-Defendants owe to Counter-Plaintiffs encompass obligations and/or duties to refrain from self-dealing transactions and to make full disclosures of information.

29.     While owing fiduciary duties to Counter-Plaintiffs, Counter-Defendants have engaged in, directed, approved, and/or taken actions in contravention of fiduciary duties owed, including but without limited to the following:

  a. L.Berry/Trust took substantial money/assets from Counter-Plaintiffs, and failed to invest same in the name of and/or for the benefit of Counter-Plaintiffs (thereby putting their own financial interest ahead of Counter-Plaintiffs' financial interest). By way of example, L.Berry and Trust took Counter-Plaintiffs money/assets yet wrongfully placed things of value (mineral leases) into Orca (a legal entity that ultimately (later) was determined to be 100% for the benefit of Trust). This breach of fiduciary duty caused substantial financial harm and losses to Counter-Plaintiffs, and for which Counter-Plaintiffs now sue.

  b. L.Berry/Trust were supposed to hold the Investment (+ earnings) in trust for Counter-Plaintiffs, yet L.Berry/Trust refuses to account for and surrender such Investment (+ earnings) in favor of Counter-Plaintiffs — but rather appears to have absconded with the Investment (+ earnings). This failure to hold, account for, and then surrender the Investment (+ earnings) for the benefit

10

of Counter-Plaintiffs is self-dealing — and a breach of fiduciary duty. This breach of fiduciary duty has caused substantial financial harm and losses to Counter-Plaintiffs, and for which Counter-Plaintiffs now sue.

c.  L.Berry/Trust took the Investment (+ earnings) for their own benefit (as set forth above), and did so without full disclosure of details of the Investment (and earnings) to Counter-Plaintiffs.  Rather than comply with Counter-Defendants' fiduciary duties owed, Counter-Defendants have engaged a series of transactions to obscure Counter-Plaintiffs' rights to its Investment (+ earnings).  This lack of full disclosure is L.Berry's and Trust's breach of fiduciary duty of full disclosure and candor owed to Counter-Plaintiffs.  This breach of fiduciary duty has caused substantial financial harm and losses to Counter-Plaintiffs, and for which Counter-Plaintiffs now sue.

d.  L.Berry/Trust have used Counter-Plaintiffs money/assets to promote and make profit for their own businesses in various manners and locations. This is more self-dealing, and a breach of the fiduciary duty owed by L.Berry/Trust to the Counter-Plaintiffs.  This breach of fiduciary duty has caused substantial financial harm and losses to the Counter-Plaintiffs, and for which Counter-Plaintiffs now sue.

e.  There are additional transactions / ventures by Counter-Defendants that are a breach of fiduciary duties owed to Counter-Plaintiffs, and all of which have caused substantial financial harm and losses to Counter-Plaintiffs. For same, Counter-Plaintiffs now sue.

11

30.     Counter-Defendants have taken money/assets/manpower from one or more of the Counter-Plaintiffs; the Investment (+ earnings) from one or more of Counter-Plaintiffs; misappropriated equipment, personnel, and other assets from one or more of the Counter-Plaintiffs; and all to the detriment of one or more of the Counter-Plaintiffs — while only benefiting Counter-Defendants. This is self-dealing. All such conduct described herein evidences Counter-Defendants' breaches of fiduciary duties owed; that is, self-dealing, advancing their (L.Berry's/Trust's) own interest rather than Counter-Plaintiffs' interest, breaches of loyalty to the Counter-Plaintiffs, breaches of good faith and fair dealing owed to Counter-Plaintiffs, breaches of full disclosure and candor owed to Counter-Plaintiffs, and more. Counter-Defendants' misconduct has been and continues to be designed as a subterfuge of obligations to the Counter-Plaintiffs (whereas other shareholders who may have received benefits account for same to the Berry Entities). Counter-Defendants' breaches of fiduciary duties owed to Counter-Plaintiffs have caused substantial financial harm and losses to Counter-Plaintiffs, for which Counter-Plaintiffs now sue.

**Count 3**
**Breach of Contract**

31.     Counter-Plaintiffs incorporate all paragraphs herein as if set forth within Count 3 in their entirety.

32.     As noted herein, seeded capital money/assets from Counter-Plaintiffs included the agreement/contract that L.Berry, individually and as trustee of the Trust, would initiate the Investment (start-up); manage, develop, operate, and control the Investment, and hold the Investment (+ earnings) in trust and for the benefit of Counter-Plaintiffs. In contravention of such agreement/contract, L.Berry, individually and as trustee of the Trust, have refused to perform as promised, but rather engaged a series of self-dealing transactions designed to allow L.Berry and

12

the Trust to keep all (or some) of the Investment (+ earnings) for himself (L.Berry) and/or the Trust.

33. Counter-Defendants' refusals to abide by the agreement/contract is a breach of agreement/contract. Counter-Defendants' breach of the agreement/contract has caused Counter-Plaintiffs substantial financial harm and losses, and for such substantial financial harm and losses Counter-Plaintiffs now sue.

**Count 4**
**Unjust Enrichment**

34. Counter-Plaintiffs incorporate all paragraphs herein as if set forth within Count 4 in their entirety.

35. Recent events now give rise to a concern on Counter-Plaintiffs' behalf that Counter-Defendants may deny the agreement/contract (and/or some terms of the agreement/contract) as between Counter-Plaintiffs and Counter-Defendants — all in an effort by Counter-Defendants to wrongfully abscond with Counter-Plaintiffs' Investment + earnings. Such a result would be inequitable, and unjustly enrich Counter-Defendants.

36. Counter-Plaintiffs would show that Counter-Plaintiffs did, in fact, provide seed capital money/assets from Counter-Plaintiffs to Orca/ICI /Orca as a benefit to Counter-Defendants, and to allow Counter-Defendants to invest (again, the Investment). This benefit to Counter-Defendants was provided by Counter-Plaintiffs, and it will cause a substantial detriment to Counter-Plaintiffs if the Investment + earnings are not returned to Counter-Plaintiffs. As such, equity demands that the Investment + earnings be returned to Counter-Plaintiffs or compensation for value.

37. For these reasons set forth herein, Counter-Plaintiffs now sue Counter-Defendants for unjust enrichment, as fairness demands Counter-Plaintiffs be made whole by: (1) return of all

Investment (+ earnings); or (2) the value of all Investment (+ earnings) be paid by Counter-Defendants to Counter-Plaintiffs.

## Count 5
### Breach of Constructive Trust

38.     Counter-Plaintiffs incorporate all paragraphs herein as if set forth within Count 5 in their entirety.

39.     As noted above, Counter-Defendant L.Berry has been a shareholder, officer, and director of Counter-Plaintiffs for all relevant times.  Counter-Defendant L.Berry held the Investment (+ earnings) in trust for Counter-Plaintiffs for all relevant times.  L.Berry, as trustee for the Trust, held the Investment (+ earnings) in trust for the Counter-Plaintiffs for all relevant times.  As such, Counter-Defendants owed and owe fiduciary duties to Counter-Plaintiffs for all relevant times.

40.     Counter-Plaintiffs made transfer of monies/assets to Counter-Defendants (money, manpower, and assets).  Counter-Plaintiffs made these transfers of monies/assets in reliance upon Counter-Defendants' promise to protect and deliver Counter-Plaintiffs' share of the Investment (+ earnings) to Counter-Plaintiffs.

41.     Counter-Defendants now refuse to perform upon Counter-Defendants' promise (but rather now wants to keep for L.Berry's and his Trust's own gain/profit all of the Investment (+ earnings)).  As such, Counter-Defendants will be unjustly enriched.  Given these facts, Counter-Plaintiffs now sue for breach of constructive trust for the Investment (+ earnings) and related, traceable monies/assets.  All such monies and assets should be placed in a constructive trust for the benefit of Counter-Plaintiffs or distributed to same.

## Count 6
## Fraud

42.     Counter-Plaintiffs incorporate all paragraphs herein as if set forth within Count 6 in their entirety.

43.     As noted above, Counter-Plaintiffs invested heavily ($millions$, the Investment) in ICI, Orca ICI, Orca, and other Berry-Related Entities for the benefit of Counter-Plaintiffs. Such Investment was seed-money/assets for — and investment in — Berry-Related Companies.

44.     Counter-Plaintiffs invested the millions of dollars/assets based specifically upon Counter-Defendants' representations/promises to start-up, manage, develop, operate, and/or control investments in the Eagle Ford Shale and/or Permian Basin for the benefit of Counter-Plaintiffs (which is also for the benefit of L.Berry and his Trust, in part).

45.     More specifically, and to induce the Investment, Counter-Defendants promised to re-pay the original value of the Investment ($millions$) to the Counter-Plaintiffs; and further promised that the Investment would be for the benefit of the Counter-Plaintiffs (and understandably so given that L.Berry and the Trust would still share substantially in the benefits/profits).

46.     Instead, Counter-Defendants — although Counter-Defendants have paid some interest-only payments from time to time — have absconded with all or a substantial portion of the value of the Investment monies/assets + earnings. On information and belief, Counter-Defendants apparently made interest payments to prolong the process (run out the clock) — all the while never intending to re-pay the original value of the Investment; and all the while never intending to deliver such Investment (+ earnings) to Counter-Plaintiffs.

47.     Presently, Counter-Defendants have gone dark on this discussion, and thereby indicated that L.Berry, individually and as trustee for the Trust, never intended to abide by the representations/promises designed to induce the Investment.

15

48. Counter-Defendants' fraud/fraud in the inducement has resulted in substantial, unearned profits for Counter-Defendants, personally and for the Trust; and great financial losses to the Counter-Plaintiffs.

49. The above-described conduct constitutes fraud and fraud in the inducement, and thus is actionable in favor of one or more of the Counter-Plaintiffs. For such fraud and fraud in the inducement, the Counter-Plaintiffs now file and assert all such claims and causes of action against Counter-Defendants.

## VIII.
## CAUSATION

50. Counter-Plaintiffs incorporate all above paragraphs as if set forth herein in their entirety.

51. Counter-Plaintiffs would show that all causes of action/claims set forth herein have been the cause, proximate cause, producing cause, and cause-in-fact of substantial harm and financial losses to Counter-Plaintiffs. For all such harm and financial losses, these Counter-Plaintiffs sue.

## IX.
## LEGAL DAMAGES

52. Counter-Plaintiffs incorporate all above paragraphs as if set forth herein in their entirety.

53. For all harm and financial losses suffered by Counter-Plaintiffs and arising from wrongful and/or inequitable conduct of Counter-Defendants, these Counter-Plaintiffs now sue.

54. Counter-Plaintiffs file all causes of action/claims as set forth herein to recover monetary relief for the substantial harm and financial damages suffered by Counter-Plaintiffs; to wit; compensatory damages, actual damages, consequential damages, restitution damages, disgorgement damages, and other damages. Counter-Plaintiffs claims asserted herein are for substantial harm and financial losses greatly in excess of $1,000,000.00.

55. Counter-Plaintiffs file all causes of action/claims as set forth herein to recover monetary relief for the harm and financial damages suffered by Counter-Plaintiffs; to wit; attorneys' fees.

56. Counter-Plaintiffs file all causes of action/claims as set forth herein to recover monetary relief for the harm and financial damages suffered by Counter-Plaintiffs; to wit; prejudgment and post-judgment interests — as allowed by law.

WHEREFORE, PREMISES CONSIDERED, Counter-Plaintiffs pray for all relief as requested herein, for costs of court in addition thereto, and for such other and further relief to which Counter-Plaintiffs may show themselves justly entitled as against Counter-Defendants (L.Berry and the ALB Trust).

Respectfully submitted,

**LAW OFFICE OF DOUGLAS ALLISON**

By: */s/ Douglas A. Allison*
    Douglas A. Allison
    State Bar No. 01083500
    doug@dallisonlaw.com
    403 N. Tancahua Street
    Corpus Christi, Texas 78401
    Telephone: (361) 888-6002
    Facsimile: (361) 888-6651

    ATTORNEY FOR MARTY BERRY,
    BERRY GP, INC., BERRY
    OPERATING COMPANY, LLC and
    BERRY CONTRACTING LOP

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of April 2024, a true and correct copy of the above was served upon the attorneys of record in the above entitled and numbered cause, via e-service.

    */s/ Douglas A. Allison*
    Douglas A. Allison

17

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Susan Gonzales on behalf of Douglas Allison
Bar No. 1083500
susan@dallisonlaw.com
Envelope ID: 86636332
Filing Code Description: Amended Petition
Filing Description: Counter-Plaintiffs' First Amended Original Petition Asserting Counter-Claims
Status as of 4/22/2024 9:35 AM CST

Associated Case Party: Lawrence Berry

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Barrett H.Reasoner | | breasoner@gibbsbruns.com | 4/14/2024 9:47:50 PM | SENT |
| Michael R.Absmeier | | mabsmeier@gibbsbruns.com | 4/14/2024 9:47:50 PM | SENT |
| Roxanne Graham | | rgraham@gibbsbruns.com | 4/14/2024 9:47:50 PM | SENT |
| Christina Pena | | cpena@gibbsbruns.com | 4/14/2024 9:47:50 PM | SENT |
| Bruce Baldree | | bbaldree@gibbsbruns.com | 4/14/2024 9:47:50 PM | SENT |
| Sherry Rakestraw | | srakestraw@gibbsbruns.com | 4/14/2024 9:47:50 PM | SENT |
| Butch Boyd | | butchboyd@butchboydlawfirm.com | 4/14/2024 9:47:50 PM | SENT |
| Katrina Chamblee-Boyd | | katrinaboyd@butchboydlawfirm.com | 4/14/2024 9:47:50 PM | SENT |

Associated Case Party: Marty Berry

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Douglas Allison | | doug@dallisonlaw.com | 4/14/2024 9:47:50 PM | SENT |
| Kim Brunkenhoefer | | kim@dallisonlaw.com | 4/14/2024 9:47:50 PM | SENT |
| Susan Gonzales | | susan@dallisonlaw.com | 4/14/2024 9:47:50 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Shanna Gohlke | | gohlkes@bayltd.com | 4/14/2024 9:47:50 PM | SENT |
| Stephanie Jennings | | sjennings@porterhedges.com | 4/14/2024 9:47:50 PM | SENT |
| Cheri Deason | | cdeason@porterhedges.com | 4/14/2024 9:47:50 PM | SENT |

Associated Case Party: Robert Rickett

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Susan Gonzales on behalf of Douglas Allison
Bar No. 1083500
susan@dallisonlaw.com
Envelope ID: 86636332
Filing Code Description: Amended Petition
Filing Description: Counter-Plaintiffs' First Amended Original Petition Asserting Counter-Claims
Status as of 4/22/2024 9:35 AM CST

Associated Case Party: Robert Rickett

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Van Huseman | | vhuseman@husemanlawfirm.com | 4/14/2024 9:47:50 PM | SENT |
| John Swallow | | jswallow@husemanlawfirm.com | 4/14/2024 9:47:50 PM | SENT |

Associated Case Party: Robert Powers

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Clay Steely | | csteely@porterhedges.com | 4/14/2024 9:47:50 PM | SENT |
| William  Stukenberg | | wstukenberg@porterhedges.com | 4/14/2024 9:47:50 PM | SENT |

Associated Case Party: Michael Hummell

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Van  Huseman | | vhuseman@husemanlawfirm.com | 4/14/2024 9:47:50 PM | SENT |
| John Swallow | | jswallow@husemanlawfirm.com | 4/14/2024 9:47:50 PM | SENT |

EXHIBIT 21

1

REPORTER'S RECORD
TRIAL COURT CAUSE NO. 2024DCV-0045-C

LAWRENCE BERRY,                    )    IN THE DISTRICT COURT
Individually and                   )
derivatively on behalf             )
of BERRY GP, INC.                  )
                                   )
  Plaintiff,                       )
                                   )
BERRY GP, INC.,                    )
                                   )    94TH JUDICIAL DISTRICT
  Nominal Plaintiff,               )
                                   )
v.                                 )
                                   )
MARTY BERRY, ROBERT                )
RICKETT, ROBERT POWERS,            )
MICHAEL HUMMELL, BERRY             )
GP, INC., BERRY                    )
OPERATING COMPANY, LLC             )
and BERRY CONTRACTING              )
LOP                                )
                                   )
  Defendant                        )    NUECES COUNTY, TEXAS


_____

MOTION FOR TEMPORARY INJUNCTION
_____


On February 16, 2024, the following proceedings came on to be heard in the above-entitled and numbered cause before the HONORABLE BOBBY GALVAN, Judge Presiding, held in Corpus Christi, Nueces County, Texas..

Proceedings reported by Machine Shorthand.

APPEARANCES:

MR. BARRETT REASONER
SBOT NO. 16641980
MR. MICHAEL ABSMEIER
SBOT NO. 24050195
MR. BRUCE BALDREE
SBOT NO. 24116064
Gibbs & Bruns, LLP
1100 Louisiana, Suite 5300
Houston, Texas  77002
(713) 650-8805

AND

MR. BUTCH BOYD
SBOT NO. 00783694
Butch Boyd Law Firm
2905 Sackett Street
Houston, Texas 77098
(713) 589-8477

AND

MS. GABBIE S. CANALES
SBOT NO. 24012376
Law Office of Gabbie Canales
5262 South Staples, Suite 100
Corpus Christi, Texas 78411
(361) 887-4700

ATTORNEYS FOR PLAINTIFF, LAWRENCE BERRY

MR. DOUGLAS A. ALLISON
Law Office of Douglas Allison
SBOT NO. 01083500
403 North Tancahua Street
Corpus Christi, Texas 78401
(361) 888-6002

ATTORNEY FOR DEFENDANTS, BERRY GP, BERRY OPERATING,
BERRY CONTRACTING AND MARTY BERRY

APPEARANCES (CONTINUED):


MR. F. VAN HUSEMAN
SBOT NO. 10323500
Huseman Law Firm
615 North Upper Broadway Street, Suite 2000
Corpus Christi, Texas  78401
(361) 883-3563

ATTORNEY FOR DEFENDANTS, MIKE HUMMELL
AND ROBERT RICKETT


MR. CLAY STEELY
SBOT NO. 00791725
Porter Hedges, LLC
1000 Main Street, Floor 36
Houston, TX 77002
(713) 226-6669

ATTORNEY FOR DEFENDANT, ROBERT POWERS

INDEX

FEBRUARY 16, 2024                                PAGE

COURT CALLS CASE............................. 6
ANNOUNCEMENTS BY COUNSEL..................... 6
PRELIMINARY MATTERS.......................... 6
TEMPORARY INJUNCTION
OPENING STATEMENTS
  BY MR. REASONER........................... 13
  BY MR. ALLISON............................ 22
  BY MR. HUSEMAN............................ 37

PLAINTIFF'S WITNESSES:
LAWRENCE BERRY
 DIRECT BY MR. BOYD......................... 40,88
 CROSS BY MR. ALLISON....................... 115,125
 CROSS BY MR. HUSEMAN....................... 177
 CROSS BY MR. STEELY........................ 206
 REDIRECT BY MR. BOYD....................... 216

MARVIN MARTY BERRY
(ADVERSE)
 CROSS BY MR. REASONER...................... 228

PROCEEDINGS ADJOURNED....................... 268
COURT REPORTER'S CERTIFICATE................ 269

INDEX TO EXHIBITS

FOR THE PLAINTIFF:

| NO. | DESCRIPTION | OFFERED | ADMITTED |
|---|---|---|---|
| PTX1 | EMAIL 01/16/23 | 54 | 54 |
| PTX2 | COMBINED & CONSOLIDATED BALANCE SHEETS 09/21/23 | 59 | 59 |
| PTX3 | COMBINED & CONSOLIDATED BALANCE SHEETS 10/31/22 | 62 | 62 |
| PTX4 | COMBINED & CONSOLIDATED BALANCE SHEETS 10/31/22 | 62 | 62 |
| PTX5 | EMAIL 03/03/23 | 65 | 65 |
| PTX6 | LETTER 03/13/23 | 68 | 68 |
| PTX7 | EMAIL/LETTER 03/20/23 | 71 | 71 |
| PTX8 | EMAIL 12/06/23 AND PROMISSORY NOTE 07/08/22 | 74 | 74 |
| PTX9 | AFFIDAVIT (DENNIS & MARTY) | 79 | 79 |
| PTX10 | GENERAL LEDGER 01/19/24 | 84 | 84 |
| PTX11 | LETTER 05/30/23 | 87 | 87 |
| PTX12 | MEMO AND EMAIL 04-18-23 | 93 | 93 |

INDEX TO EXHIBITS

FOR THE PLAINTIFF: (CONTINUED)

| NO. | DESCRIPTION | OFFERED | ADMITTED |
|---|---|---|---|
| PTX13 | NOTICE SPECIAL MTG 12/01/23 | 96 | 97 |
| PTX14 | MINUTES SPECIAL MTG | 99 | 99 |
| PTX15 | BOARD MINUTES | 101 | 101 |
| PTX16 | RESOLUTIONS SPEC. MTG | 102 | 102 |
| PTX17 | LEDGER | 104 | 105 |
| PTX18 | SECT. OF STATE DOCS | 106 | 106 |
| PTX19 | RESOLUTIONS SPEC. MTG 02/13/24 | 108 | 108 |
| PTX20 | EMAIL 06/14/23 | 223 | 224,225 |
| PTX21 | EMAIL 07/07/23 | 223 | 224,225 |
| PTX22 | EMAIL 07/21/23 | 223 | 224,225 |
| PTX23 | EMAIL 12/06/23 | 113 | 113 |
| PTX26 | EMAIL 04/13/23 | 72 | 72 |
| PTX27 | PROMISSORY NOTE 07/08/22 | 239 | 239 |
| PTX28 | PROMISSORY NOTE 07/08/22 | 239 | 239 |
| PTX29 | LETTER 02/24/23 | 246 | 246 |
| PTX30 | CONSOLIDATED FINANCIAL REPORT10/31/22 | 250 | 250 |
| PTX31 | EMAIL/LETTER 03/28/23 | 265 | 265 |
| PTX32 | EMAIL/LETTER 03/30/23 | 265 | 265 |

FOR THE DEFENDANT MARTY BERRY:

| NO. | DESCRIPTION | OFFERED | ADMITTED |
|---|---|---|---|
| 4 | PROMISSORY NOTES (MARVIN & DENNIS) | 167 | 168,169 |
| 5 | SUBORDINATION AGREEMENTS | 170,172 | 172 |
| 8 | EMAIL 02/01/23 (ONE PAGE) | 182 | 182 |
| 10 | EMAIL 01/27/22 | 173,175 | 176 |
| 11 | EMAIL 02/10/23 | 173,175 | 176 |
| 12 | EMAIL 03/03/23 | 173,175 | 176 |
| 14 | EMAIL 02/05/24 | 173,175 | 176 |
| 15 | EMAIL 02/19 (BAY 001819) | 173,175 | 176 |

FOR THE DEFENDANT MIKE HUMMELL:

| NO. | DESCRIPTION | OFFERED | ADMITTED |
|---|---|---|---|
| 1 | RESOLUTIONS SPEC. MTG 12/07/23 | 227 | 227 |
| 2 | LETTER 12/07/23 | 227 | 227 |
| 3 | RULE 11 AGREEMENT (Nueces) | 227 | 227 |
| 4 | RULE 11 AGREEMENT (Harris) | 227 | 227 |

P R O C E E D I N G S

(February 16, 2024)

THE COURT: All right. Be seated. Court calls 2024DCV-45C, Lawrence Berry v. Marty Berry, et al. I guess, let's get appearances.

MR. REASONER: Good morning, Your Honor, Barrett Reasoner for the plaintiff and we have our client here, Mr. Lawrence Berry, Butch Boyd, Mike Absmeier, Gabbie Canales and Bruce Baldree. Thank you, sir.

THE COURT: All right.

MR. STEELY: Your Honor, Clay Steely here on behalf of Robert Powers and he's in the courtroom as well.

THE COURT: Okay.

MR. ALLISON: Your Honor, Doug Allison here. I represent Marty Berry and what we call Berry GP, Berry Contracting, and Berry Operating. And also with me today is my client Marty Berry, and also, Ms. Bonnie Berry. I don't know if the Court's aware of it, the three brothers are all Dennis and Marty and Lawrence.

THE COURT: Yeah.

MR. ALLISON: Thank you.

MR. HUMMELL: I would normally have

Mr. Huseman, my attorney introducing me, but since he's just now walking in --

THE COURT: There he is. I'm a little early.

MR. ALLISON: It's your cue.

THE COURT: We're just taking announcements.

MR. ALLISON: Make an announcement for the record, Van.

MR. HUSEMAN: I'm here for Mike Hummell, Your Honor, I'm ready to go.

THE COURT: Okay.

MR. HUSEMAN: I got caught in a line. I showed up over there, there's nobody at the check in. Three seconds later, there are 20 people lined up.

THE COURT: I got you. No, I mean, I'm early, so. I mean, unless we had -- if anybody's missing, I'll wait.

MR. HUSEMAN: If you're ahead of me, I'm late.

THE COURT: No, no, no, you're not late. You're not late. I'm just early. Okay. Well, I'm ready.

MR. ALLISON: We have a preliminary matter that we think we need to address before, a couple of

things.

THE COURT: Okay.

MR. ALLISON: One, I think that our intention, even if we say "We're offering this into evidence," I think for today's purposes -- and there's a provision in our protective order that we'll submit to the Court -- we haven't done it yet, but we've all agreed to it -- that allows us to handle documents in camera if they are sensitive, which there's probably a lot of financially sensitive information that will be handled today. So I think we're going to handle exhibits today, even if we say "we offer it into evidence," what we're really doing is giving them in camera to the Court.

THE COURT: Okay. So they're in evidence, but under seal?

MR. ALLISON: Yeah. And I don't -- I think we have to probably go through a different process if we actually seal them, but we're going to treat them like they're sealed and let you hold them in camera for now.

MR. ABSMEIER: That's right, Your Honor. Our agreed protective order allows us to do that and then we confer and we either publicly file them or come back and ask the Court to seal them. So that's what we'll do after the hearing.

THE COURT: Okay. I'll work with you. If that's you-all's agreement, that's fine with me.

MR. ALLISON: One other matter that's a preliminary matter for us, Your Honor.

THE COURT: Okay.

MR. ALLISON: I say preliminary, it goes to the motion. Are you ready for that?

THE COURT: Yeah.

MR. ALLISON: For their application.

THE COURT: I don't have anything else here on the docket all day long.

MR. ALLISON: Before we get into any of the merits, Your Honor, they filed a, basically, a minority shareholder suit.

THE COURT: I thought -- and I've tried some of those over the years, but I thought that wasn't a cause of action in Texas anymore.

MR. ALLISON: It's extremely limited after the *Richie* case, okay, and that's the seminal case on it, and then it shook the earth when it came down from the Texas Supreme Court.

THE COURT: I remember.

MR. ALLISON: Okay. And what they have done, Your Honor, is they have filed for Lawrence Berry -- let me say it correctly -- for Lawrence Berry

on his behalf, and derivatively, on behalf of Berry GP, Inc. And it's a shareholder's derivative claim. He's not a shareholder, so we're asking the Court to dismiss it. There's a defect in the parties, and it's just unequivocal. He is not a shareholder of Berry GP.

THE COURT: Well, I mean, I --

MR. ABSMEIER: Your Honor, there's no motion -- no 91a motion to dismiss before the Court today.

THE COURT: I mean, that's not before the Court today.

MR. ALLISON: It's a jurisdictional issue.

THE COURT: Well, I'm not hearing it today, Mr. Allison.

MR. ALLISON: You're not?

THE COURT: You're dropping it right on me right now and I'm not going to hear it today without -- I'm not going to make a snap judgment like that. You may be correct.

MR. ALLISON: Okay.

THE COURT: But to make a snap judgment like that on a case is not --

MR. ALLISON: Okay.

THE COURT: -- how I operate.

MR. ALLISON: I'll say it this way, it is

incumbent on us to point out a defect in the parties and to --

THE COURT: And to set it for hearing.

MR. ALLISON: Well, no, and to tell the Court that -- inform the Court however -- by whatever means. And we came to the realization that Berry GP is wholly owned by a partnership, LDMA, and we have that certificate.

THE COURT: I mean, all that may be true --

MR. ALLISON: Okay.

THE COURT: -- but we just need to hash this out, and I think -- I mean --

MR. ALLISON: Okay.

THE COURT: -- you're dropping something on me that takes some thought and I haven't thought about it because this is the first I've heard of it.

MR. ABSMEIER: Okay. Right, Your Honor. It's either plea to the jurisdiction or Rule 91a motion to dismiss.

THE COURT: I mean, we can do all that.

MR. ALLISON: It's jurisdictional to you. You can take it up at any time.

THE COURT: I can take it up at any time and I guess it can even be brought up on appeal.

MR. ALLISION: And you're not taking it up

now. I heard you.

MR. REASONER: And like you, Your Honor, this is the first we're hearing this argument.

THE COURT: So, I mean, I can't make a snap judgment like that. I don't feel comfortable, so. But we can set that for hearing and we'll hash it out. Okay?

MR. ALLISON: Thank you, Your Honor.

MR. REASONER: Your Honor, we -- in talking among the two parties, if the Court will allow it, we thought a brief 15, 20-minute opening a side would be helpful.

THE COURT: Yeah. I'm up for it.

MR. REASONER: Okay. Thank you. May I proceed or anything else?

THE COURT: You may proceed.

MR. REASONER: Okay.

THE COURT: Now do I need to get anybody on Zoom?

MR. REASONER: I don't -- not on our end, Your Honor.

THE COURT: Does anybody -- does anybody -- and maybe even later on if anybody has an out of town witness that wants to testify by Zoom, just let me know and we can do that. Okay?

MR. REASONER: Thank you.

THE COURT: So I'm not going to get on Zoom then. I'm just pulling up the file electronically.

All right. Go ahead.

MR. REASONER: And, Your Honor, may I approach?

THE COURT: Yes, sir.

MR. REASONER: Some slides that we'll have them on the screen, but just for Court and counsel.

Your Honor, Barrett Reasoner on behalf of Lawrence Berry and we very much appreciate the opportunity to be heard today.

This is an extremely important matter to Mr. Berry. As the Court, I think knows, this involves a family business founded in part by the Berrys' father back in the '50s, that has continued over the years, and this is a dispute about serious concerns with the way it's being managed and what's happened here with insider transactions that have come to light.

As the Court, I believe knows, Lawrence Berry is a one-third owner, Marty Berry is a one-third owner, and sadly, the estate of their brother Dennis, as the Court, I believe is aware, is a one-third owner as well. And in recent years, Lawrence Berry has been frozen out of the management and operation of the Berry

entities, and has, through persistence, discovered some self-dealing insider transactions that are extremely troubling and that are the reason for this lawsuit.

If you go to the second slide, Your Honor, we, just at a very high level, we note what's going to be talked about today. The first is Marty Berry having a $45,000,000 loan, that was not disclosed to Lawrence, to Berry GP back in 2022. Another issue is the placing up for sale of a dock and adjacent property that was extremely important to the Bay business and was again done -- put up for sale without disclosure. Lawrence Berry had to learn of it from a third party.

You will also hear that Marty Berry personally bought and leased back a number of cranes. He bought in the company of his own, a number of cranes and leased those back to the company, again, without disclosure to Lawrence. That was -- it was through an entity, you'll hear, Your Honor, called Western Gulf Equipment. It was originally set up for the purpose of purchasing one crane in a Canadian transaction where Marty Berry owned part of it and Bay owned part of it. What happened then, though, was the acquisition of additional cranes that were rented back to Bay at 50, $60,000 a month, et cetera. You'll see the numbers. Again, without board approval, without disclosure to

Lawrence Berry, a classic self-interested or insider transaction.

You'll also hear, Your Honor, evidence about Marty and other defendants failing to notify Lawrence Berry of a meeting with the president of IBC, the banking institution that the company had a banking relationship with over 25 years, a meeting scheduled with Dennis Nixon who was coming in from Laredo for such a meeting. Lawrence never informed about that, folks didn't show up for the meeting, and a notice of default was sent that very -- was sent out that very end of the day. So a relationship of 25-plus years, providing lifeblood of the company, ended, again, with Lawrence being woven into the discussion.

They now, Your Honor, after this lawsuit has been filed, you're going to see a series of resolutions where they had been the last couple of few months tried to ratify this conduct that's taken place over a period of time, ratify this -- these actions. And I sub -- I'll submit to the Court that not only is that not effective to cleanse actions that took place earlier, it shows the inadequacy of what was actually done during the real time when these transactions were actually going on.

Your Honor, we've included here, also, a

timeline, which I will not -- I will not take the Court through piece by piece, but it's just for your reference to orient you as to when some of these events took place. You'll hear that these loans, that there was by Marty for 45,000,000, and his brother Dennis for 30,000,000 to the company, for a total of 75 back in July of 2022. And in January, you'll see Lawrence Berry is making inquiries, trying to get documentation when reference is seen to that in some financials down the road. And Mr. Powers indicates, well, I don't believe those have been signed up yet. So again, he gets on the scent of this and finds out about it. No question, Judge, as to this, the crane transactions, and other things you'll hear about that they were insider transactions.

You'll hear the other side trying to suggest that Lawrence Berry knew, but you won't hear them be able to fairly challenge the idea that these were insider related party transactions; the loans, the crane rentals and the like.

Again, the marketing of the dock, a key asset for the company, that's something you'll hear that Lawrence Berry had to learn about from a third party.

Now, where are we, Your Honor, in the -- in the status of this case? As the Court knows, I think

from previous hearings, there was a TRO down in Houston, which was turned into an agreed TRO when the case was transferred here. That had an injunction against sales and against modifying the composition of the board and the idea was that it would remain in effect till this Court could hear and decide the issue.

Here today, Your Honor, we have narrowed the relief we are requesting, if we go to the next slide. What we're asking at this point, Your Honor, through the trial of this case is two things: One, that defendants be enjoined from removing Lawrence Berry from the board of directors. That's critical. Their ability to remove -- and let me say, in agendas for shareholder meetings and board meetings, they've talked about consideration -- on the agenda, consideration of removal or addition of board members and board member actions, et cetera. No question that's on their -- on their plans, on their minds and in their plans. Removal would keep Lawrence Berry even further in the dark about what the company's doing and any insider transactions.

The second thing we're asking for in this -- in this targeted relief, Your Honor, is again, just two weeks notice of a sale of real property, just two weeks written notice with details about what the sale will involve. What that will allow Lawrence Berry

to do, is if there is something untoward or something where it's appropriate, he could come to the Court and, you know, challenge or complain about the transaction. If not, he wouldn't. But he would have the information, he would have notice. That is not an onerous thing to ask of the company and not something that's going to keep the company from going about its business. These folks can and have outvoted him on issues. That's not why we're here.

On the temporary injunction standard, Your Honor, if we go to the next slide, the Court is well familiar with the requirements for that. I want to hone in on the elements of the probable injury piece which has subcategories, if we can go to the next slide.

Importantly, Your Honor, we need not, and we cite the *Intercontinental Terminals* case to you. We need not show that we will prevail. We think the evidence you'll see points you in that direction, but that's not the standard here today. We have to show that the causes of action are there and that we've got some evidence that tends to sustain them. And we believe that the evidence that's going to be presented to this Court will well meet that standard.

The second bullet there is critical, though here, fiduciary self-dealing context, and that's where

we are. You're not going to hear a denial that, for example, Marty Berry owed a fiduciary duty to the company as a director, I don't believe that's going to be contested, and that there were transactions in which he was on both sides. In those instances, Your Honor, the law is that there is a presumption of unfairness and that involves a burden shifting to Mr. Berry to prove the fairness of the transactions. So that's a critical burden issue for the Court to keep in mind.

And finally, we cite the *Health Discovery* court case there at the bottom which says that if that presumption cannot be rebutted at the TI stage, it should be granted if the plaintiff presents a prima fascia case, which we believe we absolutely are able to do here.

If we go to the status quo, Your Honor, in the next slide, that, as you know, is the last peaceable noncontested status, and that's -- that's what we're asking for, board -- that the board seat remains through this trial until the case is decided and that notice be provided. There's a situation where that's completely justified when you look at additional debt on an insider transaction that was not disclosed, and there's an expression, you'll see, in shareholder resolutions that they've passed after this case came, after we filed this

case. That resolution says they're going to continue marketing the -- not sell until after the TRO issue is resolved, but there's an attempt to continue marketing that, so this is an issue that is ripe for discussion.

And as I said there at the bottom on the threat to remove Lawrence Berry, that has been implicit in the notices and things that they have filed and that they have served on the -- on the shareholders and the directors.

The imminent harm piece, again, their actions and this course of conduct where insider transactions have gone on make it clear that there is a demonstrable -- demonstrable intent to do these things, and that express intent that's implicit to take Mr. Lawrence Berry off the board.

On irreparable harm, Your Honor, the Court is well familiar with the general standards there about something that cannot be adequately compensated in damages, but the third point in particular, I think, is important there, Judge, about real property, and I think we brought this up before.

Texas case law is strong on the notion that real property is unique and irreplaceable, and in situations like that, that's something that money cannot replace and something that is generally appropriate for

injunctive relief, and that's what we're asking for here.

The final slide, Your Honor, what you're going to hear from the other side, I have no doubt, and it will be eloquently done, but the point is going to be, look, he is a minority shareholder, he's -- I mean, minority director. He's one of three directors. He's getting outvoted. Too bad. That happens. So sad, but it's not the basis for a lawsuit. That's the argument. What that misses, Your Honor, is a critical issue here, and we've cited to the Court there on the right side of the page, the Texas Business Organizations Code, Section 21.418. It talks about self-interested transactions, a transaction between a corporation and one or more directors. Again, loans, personal loans to the company, renting equipment that you own to the company, nobody's going to be able to fairly deny that those are such transactions.

What do you need for that to be viable? What do you need for that to -- to pass muster under Texas law? Two things: Disclosure under (b)1 there, Your Honor, the material facts have to be disclosed or known by, that's critical. And you'll see that that was not present here. But also, at the bottom, it's got to be approved by a majority of the disinterested

directors, and in these transactions, it's undeniable that Lawrence Berry was a disinterested director.

There are some where Ms. Berry, Bonnie Berry, as the successor to her husband, is disinterested as well. But you look at a vote for a -- from a majority. There are transactions that the company is treating as having been passed and having been approved by a vote from Marty Berry that he can vote, but you need disinterested votes for it to be a legitimate transaction.

And finally, Judge, in a similar case, the *Florie Rinehart* case out of the Houston First Court of Appeals in 2017, a situation where the Court was faced with a similar situation involving a TI where there was an effort to remove a disinterested director and ratification by an interested director. The Court affirmed a temporary injunction in that instance and that's what this Court should do here.

Thank you very much for your time.

THE COURT: Thank you. We'll see if you're going to put this eloquently as counsel --

MR. REASONER: I've seen him before.

MR. ALLISON: I lose. I lose. I lose.

Like Doug Tinker said one time, "I'm old, I'm fat, and I'm bald, and I don't deserve any of that."

So I don't think I'm going to be so eloquent, and I'm not going to be so beautiful, but I am going to be direct and I'm going to be candid. And I want to -- I do have a presentation, and I'm going to get to that in a second, but I want to be real up front with the Court. You've already heard me say, I don't think they have a cause of action pleaded. One of the elements for their request for a temporary injunction is they have to show a probable relief, a probable --

THE COURT: Probable right of recovery.

MR. ALLISON: -- right of recovery. Okay. I knew I was going to mess that up right from the beginning. A probable right of recovery. If they don't have a cause of action and they did it incorrectly, they lose. If they try -- if they have the right entities here, which they don't; if they had the shareholder here, which they don't, they don't even have a shareholder in this lawsuit for Berry GP, okay, which is the only shareholder derivative suit that they've stated. So if they don't have a shareholder in the lawsuit, they don't have the right parties, it's a defect in the parties, they lose.

Let's assume for a minute they had one -- and now I'm going to get to the point the Court brought up a moment ago. Let's assume that they had a

shareholder, in which they don't, but let's assume they did and then we're under the *Richie* case, okay? *Richie* talks about really six causes of action, none of which are this one. One of them has to do with books and records. And it says your remedy -- they do plead that, but it says your remedy is to come to court and get them to give you the books and records. One of them is withholding or refusing to declare dividends. That's not pleaded. One of them is termination of employment and a shareholder can have a claim for that. That's not pleaded and not in this case. One of them is misapplication of funds. If you stretch it, maybe that's what they're saying, but they don't get there, and let me circle back to that because that comes up to what they just talked about, which is 21.418. And then, the other one is manipulation of stock value, and you don't have that.

On 21.418, and this is super interesting, what they're really trying to do, Judge, is create a new cause of action. They cited you 21.418 and you're right when you said earlier, I thought the Supreme Court pretty well did away with those. They did, they left very few exceptions and they drew a hard line in the sand. And now they are saying that under 21.418, there's a cause of action created. They say it's under

418(e). I have that here in front of me. 418(e) says -- by the way, I'm going to be just up front. It doesn't create a cause of action in any way, shape, or form. It talks about -- this is a safe harbor statute. In other words, if you do certain things, you can't be sued. It does not say if you do this or that you can be sued. And they specifically cite in their pleading the 24.418(e) that says this: If at least one of the conditions up there are satisfied, and that is, if the shareholders say the loan was fair, okay, neither the corporation nor any of the corporation's shareholders will have a cause of action against the persons who did what they called self-dealing.

It's saying you don't have a cause of action if you do these things up here. It does not in any way, shape, or form say you have a cause of action under a -- what they characterize as self-dealing. That's a very different matter that requires a very different -- well, first of all, I don't even think they're alleging that the loan from Marty Berry to the company -- we'll get to that in a minute. But I don't even think they're even alleging that it was not in the company's best interest. And under a shareholder derivative lawsuit, we don't owe a fiduciary duty, Marty does not owe a fiduciary to Lawrence. So I think they

have completely failed to state a cause of action.

I want to, in just very bullet-point fashion, before I launch into the presentation say this: Yes, Marty Berry did loan $45,000,000 to the company. He did it in the wake of COVID. He did it when there were no bank loan monies available. He did it when the company needed money for growth because they had two great prospects, Tesla and Venture Global, okay? And it was done for the benefit of the company in, I think, probably late July of 2022, super important because I've just heard this story about how they didn't know and he had to fight for knowledge, and he was kept in the dark and how tenacious he was. And on their own timeline, it says he knew because of -- and it's true. When you look at the balance sheet, it's on there and it was given to him by email and so he knew. One was in July of 2022. He knew as of September 2022, and the loan was not documented until February of 2023. Interest rate, and signed, and all that, because finally the auditor said, no, we've got to have a piece of paper for it. So he wasn't kept in the dark. He was told and I want to point this out.

For September, October, November and December of 2022, they didn't rush over here to the courthouse and say, "Stop that loan, it's a terrible

thing, it's self-dealing." For January, February, March, April, May, June, July, August, September, October of 2023 -- sorry.

THE COURT: Yeah, you broke the speed limit.

MR. ALLISON: I know, I saw the look. I saw the look.

For those months, they didn't come over and ask for a TRO. Why? Because it was good for the company, okay? Those notes are at five -- or excuse me, those notes -- those loans were made at a quarter percent above prime. Those notes have been subordinated to -- it would have been IBC if they renewed, and now Frost.

Everybody's interested. Lawrence is interested in them. Marty's interested in them. Dennis, by the way, gave 30,000,000. Mrs. Berry has made loans to the company the same way. I mean, they waited a year and a half and now they're claiming there's going to be some imminent harm if you don't enjoin them.

The other one that they brought up is the dock being for sale. Now you will hear conflicting testimony on it. We are sure as we can be that it was talked about and that Lawrence knew always, up front and

ahead of time. I'm sure he's going to say he didn't know, but okay. All those conversations were taking place in March and April of 2023. There was a letter sent to the Port of Corpus Christi in May of '23. They have -- that kind of -- that went nowhere. The only other interested party has been Buckeye, and that was in about September. Lawrence has always known about it. He didn't run in May of 2023. He didn't run to the courthouse and say you got to stop this sale. I mean, he waited another six, eight months, and now they're acting like the sky is falling.

I don't know how you can -- by the way, it's very clear to us, we are not going to sell it, obviously with the TRO in place. We are not going to sell it with -- without a vote on it, okay? It has to go in front of the board. That's just -- that's in our bylaws. They don't need any additional protection. And we are only going to sell it if we get the right price and the right terms. But there's no board approval needed to market it. That's within the purview of the CEO to -- to -- which is Mr. Rob Powers, that's been within his purview to sell it or at least to market it, okay?

The last one that they brought up that I want to talk about real quickly is the removal as a

director. The *Richie* case is very, very clear. They've declined, in very strong words, the Texas Supreme Court did, that they are not here to create common law causes of action. We have a statutory scheme that governs corporations, period. And the courts, and they were talking about -- they were talking about trial courts here and they were talking about the Texas Supreme Court essentially, they didn't use this word, but loathed the idea of taking over when the legislation -- when the legislature has spoken. If the legislature puts a rule into place, they made it pretty clear we're going to follow those rules. They did that on the books and records in accounting and they said that in their opinion.

In this case, there's a specific statute, I want to say it's 21.419, but I may be wrong on that, and it expressly allows directors, like Mr. Berry, like Lawrence Berry, to be appointed or removed by majority vote, period. There's no -- there's no exception. There's no interested party exception in this statute. It is very clear.

I will go ahead and see if I can bring all this up. Because we are here, obviously, on a TI. He has said the exact same two things: They want to enjoin us from being able to sell the dock without notice,

completely unnecessary. There's no reason for it. It's in our bylaws how that has to be handled. We should follow the bylaws. We do not need the Court to be stepping in, with all due respect, to this governance issue. We will follow the Texas Business Organizations Code. We will follow our bylaws. We have never not done that with regard to the sale of property. They want to be -- want us to be enjoined from removing Lawrence Berry. By the way, that was -- he was -- the exact agenda item that they're terrified about that says, consider appointment removal of directors, was on the agenda in December 7th. They had that meeting and they appointed Bonnie Berry. They didn't remove and they could have. They didn't. It was on the agenda again, because yeah, with all this erratic behavior, it needs to be talked about. What will happen, I don't know, but what I do know is Texas law says it is the decision of a majority of the board.

This is some of the language out of *Richie*, the second part of the slide. "This Court has the prerogative to superimpose a common law cause of action upon statutory framework, though not to alter or contravene the statutory framework."

Respectfully, that's what they're asking you to do by stepping in and forbidding the company to

follow 21.419, which allows removal of a director on a majority vote. I think -- I think what they're asking you to do runs directly afoul of what the Texas Supreme Court has told us.

They have the burden, Your Honor, to prove, obviously a probable right of relief. I understand the Court was very clear with me. We are not jumping to that issue solely as a matter of law, the defected parties, but it is their burden to prove that the right parties are here. And then, if it's -- if they carry their burden and prove that the right parties are here, I'm going to tell you they can't do that. We have the certificate and it's -- he has zero shares. 100 percent of the shares of Berry GP are owned by the partnership, LDMA, don't ever get confused by the A. It's Allen Lawrence Berry. So it's Laura, Dennis, Marty, Allen Berry. LDMA is the partnership. It has 100 percent ownership of the shares. They have the burden to carry that. They cannot.

They have the burden then to prove that they have a cause of action in the wake of *Richie* as a shareholder, if they're a shareholder, which they're not. I'm moving on. They have the burden to prove that they have a cause of action. They have not pled any of the recognized causes of action under *Richie*, except

they're trying to invent a new cause of action under the guise of self-dealing, a new cause of action under the guise of self-dealing, under 4.18 -- 21.418, and as I've gone through with the Court, they can't do that because it's a safe harbor provision. It does not create a cause of action when you read it.

So they have that burden and then they have the burden to prove imminent harm and irreparable injury. How can there be imminent harm when we don't even have a buyer for the property? It's been on -- it's been on the market and they've known it's been on the market for months. We say -- we say almost a year. They'll tell you months. And now we're rushing to the courthouse to get a TRO, to what? To prove -- to prove I'm mighty? To ask the Court to do something, quite frankly, that we don't think in any way, shape, or form is supported? But what we do know is they cannot show imminent harm because it is -- there's no buyer. There's nothing imminent. There's nothing imminent that's going to happen. And they -- with all due respect, they can't show irreparable injury.

For all we know right now, when the buyer shows up, if they gave a fantastic offer -- I don't want to ever say that. If they gave a fair offer, one we really, really, really liked, maybe all three of them

would agree to sell it. We can't know because -- we can't know because we don't even know if there's a harm because we don't even know what the purchase price would be.

With regard to the same burdens, they have the same burdens when it comes to proving their ask that Lawrence Berry not be removed. They have to show that they have a cause of action for it, first of all, and I want to point this out, it was not -- there was no mention of don't remove Lawrence Berry as director in their original pleading that was filed November 28th, 2023. What they did is when they saw the agenda item that resulted in Bonnie being put on the board, appointed director, they hit the panic button and ran over and did an amended TRO and said, don't remove him, we went up and agreed to it. You know the rest of that story.

They have not pleaded any cause of action that precludes removal of Lawrence Berry. In fact, to the contrary, Texas law tells us you can remove him. And I don't know of any cause of action that says you cannot, that they can prove a probable right of recovery.

I do want to -- because they emphasized it, I do want to go through the full timeline on the Berry

dock. There was a -- they did talk about it at a director's meeting early 2023. We've known that Lawrence doesn't want to sell it. We know that Marty and Dennis do want to sell it. One of the reasons that Mike Hummell, knowing of course, Dennis' health situation, asks for there to be those meetings in the December and I guess February time frame that we have had was to have it of record. And now we have Lawrence Berry saying, oh, it never happened. We say it did happen. So Mr. Hummell, as general counsel, wanted to make sure we had a record that both Dennis and Marty were in favor of marketing it. So we had that meeting. They think it's something sinister. We think that they have a right to have meetings and to ratify the actions of their members and to make sure the wishes of the directors are recorded, which they did.

But that was also discussed back in early 2023, voted two to one. Lawrence knew the dock was being marketed. It was marketed to the Port. It's been marketed to Buckeye. This is interesting. We have a text message -- and of course, remember, their claim is that Lawrence had defied it and was kept in the dark and what a terrible -- what a terrible life he's had trying to get information. We have a text message. He said, Hey, what property's for sale? Rob Powers sends him

back and says, you know, no serious offers and he refers to a dock and a piece of property over in Sinton.  That was in October of '23.

And so right after Mr. Berry gets the information that there's no serious buyers or nothing really happening on a property that's being marketed, he goes and gets a TRO and formed no real discussions in October of '23.

Presently, there are no active negotiations or anything that looks like it's going to be a sale of the dock, nothing imminent.  And I've already touched on the last one that the bylaws require the board of directors to vote.  That's on 21, on the provision relating to removal of directors.

I probably want to end by, kind of, circling back to the last point, because what they really tried to do -- and I guess, hats off, creative, trying to get around *Richie*, trying to say 419 creates a cause of action.  But it's even worse than that.  What they say is -- and this is super important under 419 -- that if you are a -- if you're not disinterested, okay, the only thing that 418 precludes you voting on is that transaction between you and the company.  That's it.  It would not preclude Marty or Dennis, now Bonnie, from voting on a contract to sell real property.  That's not

a transaction between the director and the company. 418 is limited to the director and the company. 418 would not preclude a vote on adding or removing a director. Adding or removing a director is not the loan from Marty or the loan from Dennis. So when you read 418, which of course, doesn't create a cause of action, you will also need to understand, please, that at most, it precludes Marty or Dennis, now Bonnie, from voting on the loan at most if they can prove that they're somehow contrary to the corporation on it. It, at most, precludes a vote there. Never would it preclude them voting on the sale of real estate and never would it preclude -- which I don't think they're even asking that now. It sounds like now they're only asking for notice which, under our bylaws, we've got to give it anyway, so we don't need -- there's no -- let me say it this way. If the bylaws already require it, they don't need relief. There's no imminent harm threatened. We're going to follow our bylaws. I don't think the Court needs to enter an order that restrains us from disobeying our bylaws.

All of that said, we look forward to kind of putting on the evidence, Your Honor. I think you will see clearly that this idea that he thinks were secreted or hid from them, I don't mind telling you, I think the loans are private. I know they're private. I

know my client, Marty, wishes nobody knew about it. I mean, that's just not his thing, okay? It doesn't mean that they were hidden or kept secret. Put on the books. Lawrence got it in September and knew about it for a year and a half before right now, where he's now, for the first time, really complaining about it to the Court.

So we think the evidence will show also on IBC, he was kept informed, on Frost, he was kept informed. We have emails where we sent him the notes. We have emails where he participated in the decision making with IBC. We have emails where he was informed about the Frost line of credit and how that was evolving, kept him in the loop on all of that and we'll show those to Your Honor.

So, respectfully, we don't think there's any reason -- we don't think they can carry their burden, and we don't think there's any reason for injunctive relief.

Thank you.

THE COURT: Okay.

MR. HUSEMAN: If I might have a couple of minutes of your time, Your Honor, on this. Following him is sort of like drafting in a bicycle race. He's sort of gets sucked along. And Doug's presentation I

thought was factually, conceptually, and legally pretty dense, and pretty much on point. But there's one thing, which I wanted to focus the light on a little bit more, because I think it has the ability to be a key to this whole thing.

Mr. Reasoner and Doug both passed lightly over the ratification process by the shareholders of the company which has occurred now and documented. The basic concept, and it's true not just for this company, but for basically any business you want to talk about, the owners get to decide how the business is run. That's why even AT&T has shareholders because they get direction from the owners as to how things are to be done.

In this particular case, the importance of this, in that they have had duly-called shareholder meetings in which the things that they are complaining about were ratified. In other words, given a stamp of approval by the shareholders, the people who own the company, in fairly open meeting, basically it has the effect, in my view, of mooting a lot of these issues on this. And even if you were to assume there was something wrong with the way things have been done last year, or the year before or whatever, once the ratification has occurred by the owners of the company,

that's basically the end of it.

And the idea, and Doug said this, the truth is he said it, the idea of getting the Court to come in here and undo what is the express voted will of the owners of the company without any basis in law to do that, is, I think, a step too far. So that was the one point I wanted to put a little light on, Your Honor.

THE COURT: Okay.

MR. STEELY: I'm going to reserve my comments till the end, Judge, in the interest of time.

THE COURT: Okay, all right. Well, then let's take some evidence.

MR. BOYD: Your Honor, we'll be calling Mr. Lawrence Berry next. Could I ask if he could have two minutes to run to the restroom?

THE COURT: Yeah, we can -- we can take a short break.

(Recess.)

THE COURT: All right. Be seated, call your first witness.

MR. BOYD: Your Honor, plaintiff calls Mr. Lawrence Berry.

THE COURT: All right, come on down.

(Oath administered.)

THE COURT: Be seated. You may proceed.

ALLEN LAWRENCE BERRY,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. BOYD:

Q.    Good morning, Lawrence.  Would you please state your full name for the record?

A.    Allen Lawrence Berry.

Q.    Lawrence, where were you born and raised?

A.    Corpus Christi, Texas, in Annaville.

Q.    How long had you -- did you live in Corpus before you moved?

A.    I moved in '98.

Q.    Okay.  And you were born in '65?

A.    Yes, sir.

Q.    Okay.  What school did you attend here in Corpus?

A.    Tuloso-Midway.

Q.    And did you go to college?

A.    Yes, sir, Texas A&M.

Q.    Okay.  At some point in your career, you moved to Houston; is that right?

A.    Yes, sir.

Q.    Okay.  What brought you to Houston or took you to Houston?

A.    I was getting a divorce, so I moved to Houston.

Q.   Did you continue to work for the Berry companies?

A.   Yes, I have, to this day.

Q.   And when I say the "Berry companies," I'm talking about all of the companies, and there are many, correct?

A.   Yes, sir.  You need a flow sheet to understand it.

Q.   Okay.  Who are the owners of the Berry companies, presently?

A.   The heirs of Dennis Berry, Marty Berry, and Allen Lawrence Berry.

Q.   All right.  What percentage are owned by each of the three?

A.   A third, a third, and a third.

Q.   Okay.  And that's how your parents structured their succession plan; is that right?

A.   Yes, sir.

Q.   Okay.  I want to talk about the board as it existed during the 2000s.  That would have been yourself, and your older brothers, Marty Berry and Dennis Berry?

A.   Yes, sir.

Q.   Historically, how did the three of you get along?

A.    Great.

Q.    Were you-all able to manage the company, handle any differences you may have without problems?

A.    Yes, sir.  I think we've been good custodians of the company, probably up until Ed Martin's demise.

Q.    All right.  And who was Ed Martin?

A.    The previous CEO that after my -- we lost my father, that we brought in to manage the various assets.

Q.    Okay.  And you said, Ed Martin, his demise, you're talking about when he got ill and --

A.    Yeah, when he had a stroke, yes, sir.

Q.    Okay.  Were there times when matters would come before the board where the vote would be three to zero in favor?

A.    We usually tried for unanimity, yes.

Q.    All right.  Were there times when it was three to zero against doing projects?

A.    With a few notable exceptions, usually we strove for unanimity.

Q.    Okay.  However striving for that, were there also times where there were two-to-one votes?

A.    Of course.

Q.    Okay.  Were there instances where you were outvoted by Dennis and Marty?

A.    I'm sure there are.

Q.   And you didn't sue in those instances, did you?

A.   No, sir.

Q.   And you're not here in this lawsuit trying to change the majority rules of the Berry companies, right?

A.   No, sir.

Q.   Do you believe that the majority should manage a company?

A.   I think the enterprise should be managed in what's in the best interest of the enterprise.

Q.   Okay.  So as long as it's in the best interests of the company, you don't object to the two-to-one vote?

A.   Of course not.

Q.   Okay.  I want to talk a little bit about what precipitated this lawsuit.  Can you tell the Court what was going on that was disturbing to you from a 30,000-foot level -- we'll get into some of the details when we get to the exhibits -- that caused you concern enough to file this lawsuit?  And let me stop there.  Did you want to file this lawsuit?

A.   No, sir.

Q.   Did you feel like you had no other choice?

A.   Yes, sir.

Q.   Okay.  Tell the Court a little bit about what precipitated you filing the lawsuit?

A.   Well, I've been working on projects, trying to

increase utilization at the Berry dock. We had to deal with Marathon back in the day that almost got to completion and then collapsed with the price collapse in Eagle Ford in probably about '12 or '13. So we have the Citgo attached acreage and the Bay yard and Redfish Bay Terminal -- pardon me, and Diamond Cut, which is sort of all interconnected with some right-of-way stuff. And so we've been marching there, and then we had an opportunity, it looked like, with Pin Oak, who are the successors to, I guess, Trifinery and Trisergeant.

We had an opportunity to take the dock to deep water for Pin Oak to increase the capacity there. They've got a deal that was conceived by A.J. Brass that's not very good, and ideally, we get the barrels going across the dock and increase cash flow.

Part of that process, this was really Ken Luhan's project, the ex-president of Bay, or the retired president of Bay. So in order to do the -- there's two different methodologies, Ken's and my way and we end up kind of a hybrid. It's been evaluated and engineered about 20 times, but we looked at the most cost effective way was to move the bulkhead line, leave the docking that currently existed and put a bridge out. And so I've been working towards that with Pin Oak.

So I had a request to Sean Strawbridge

about moving the bulkhead line and where Strawbridge was replaced, I went down to meet with Kent Britton at the -- at the Port of Corpus Christi to see what the status was on moving the bulkhead line, because you know, there was not much a hand over with regards to Strawbridge, or at least it was not transparent.

Q. Okay. Let me -- let me stop you right there. When was that meeting?

A. Right before I -- this is right before I filed lawsuit.

Q. Okay. And Kent Britton is whom?

A. Is the new CEO of the Port of Corpus Christi.

Q. And he took Mr. Strawbridge's place, right?

A. Yes, he did.

Q. Back up a little bit. We're going to get to that meeting, and I know that was the meeting where they gave you the letter that Mr. Rickett had written to Mr. Strawbridge.

In terms of information flow, traditionally through the years, were you able to get the information you requested?

A. Yes, sir.

Q. Okay. As a board member of the Berry companies, as an owner of the companies, along with your brothers, you were entitled and historically had been

able to get this information?

A. Yes, sir.

Q. Did that change at some point?

A. Yeah, I think the market change was after Ed's demise.

Q. I'm sorry?

A. After Ed left, yes. It's been a much more difficult post Ed Martin.

Q. Okay. Did that cause you frustration?

A. Yes, sir.

Q. Why did you want the information?

A. Because I'm a good custodian -- I want to know what's going on. From a business standpoint, there's a lot of risk modeling incurred here in the contracting business and I had dire and desperate concerns, and still do, about -- about operationally where we are and I'm still being fire-walled out.

Q. All right. Has the board ever or the company ever sold real property?

A. Yes, sir.

Q. Many times?

A. I wouldn't say -- we're not really developers. We usually buy, but yes, we sold property on occasion.

Q. Okay. And have you voted to sell real property if you thought it was in the best interest of the

company?

A. Yes, sir, at the last board meeting, I believe.

Q. At the last board meeting. When was that?

A. Like, lately.

Q. Like, this past --

A. Yes, sir.

Q. It was this week, wasn't it?

A. Yes, sir.

Q. Okay. What did you vote to sell?

A. Some miscellaneous tract that was a borrowed source in Sinton.

Q. And was that indeed a three-zero vote?

A. Yes, sir.

Q. Okay. You voted for it, Marty Berry voted for it, and Bonnie Berry voted for it?

A. Yes, sir.

Q. Okay. On that vein, have you-all been having regular board meetings even after this lawsuit was filed?

A. Yes, sir.

Q. Have you-all been conducting business?

A. Yes, sir.

Q. Have you been holding votes?

A. Yes, sir. They've been holding votes.

Q. And that's what you-all have done for years at

the board level?

A. Yeah, we've historically been all pulling on the rope together.

Q. I want to look at just the micro timeframe for a minute. Since you filed the lawsuit, have there been instances, just like we just discussed, where the vote's been three to zero?

A. Pardon me?

Q. Have there been three-zero votes like there was on selling that property?

A. Yes, sir.

Q. Have there been two-to-one votes?

A. Yes, sir.

Q. And the company has taken the position on all those two-to-one votes that those resolutions or those projects passed; is that right?

A. Yes, sir.

Q. Let's talk about the Berry dock, that's the Berry inner-harbor dock; is that right?

A. Yes, sir.

Q. All right. Who -- under whose leadership was that either acquired or constructed?

A. My father built the dock in the late '70s for the Corpus Christi Petro-Chem project to bring in the vessels. You know, it was a pretty massive cap X, but

nonetheless, he thought there was room for a heavy-lift dock on the inner harbor and he was correct as we found, you know, billions of dollars of stuff that's gone through that dock through the years. And, of course, it was a significant contributor when the refinery was running.

Q. Okay. And by the refinery, what are you referring to?

A. The refinery is -- when I refer to the refinery, I'm saying when Trifinery was there, which was originally my father, Baynes Manning and Sandy Brass. Baynes Manning ends up, ultimately, I believe, staying at Saber/Valero in the trading capacity and didn't come in. So the refinery was built by dad and Sandy Brass.

And then, it's -- with the economic model being based off of a off-date agreement with P to V divide discount, asphalting heavies that the unit would process, it was kind of a lay up deal, the discount was so deep. And then, lo and behold, Mr. Brass gets caught. Right when we're going to start the plant, Mr. Brass gets caught selling feedstock as bunker in Miami and we lose the agreement and then just kills that project.

Q. All right. And through the years, has the dock been a valuable asset to the Berrys?

A. Business couldn't have been here without it.

Q. Okay.

A. Until -- until we -- until those tanks went there and we lost our fabrication facility. Our fab area there, it was instrumental to this business, probably the most important piece.

Q. Okay. Earlier in his opening statement, you heard Mr. Allison state that under the bylaws, they have to give the board ten days' notice before they can sell real property. Do you remember that part of his opening?

A. Yes, sir.

Q. All right. That wouldn't be true if they kicked you off the board, would it?

A. No, sir.

Q. Tell me about docks in the inner harbor. Are there many docks?

A. Numerous docks.

Q. Are there many for sale?

A. No, sir.

Q. Do you believe that the Berry dock would be irreplaceable if it was sold?

A. I think the maximum value for the company is to own it and tariff there just like we have for decades.

Q. All right. If an offer was made for the Berry

dock and the 16 acres, which we'll talk about in a moment, and you felt it was in the best interest of the company, would you vote to sell it?

A. Yes, sir.

Q. So you would weigh the value of the dock versus the value of the offer in the best interest of the company?

A. Of course.

Q. All right. I'm going to turn now and talk about some of the exhibits.

MR. BOYD: Your Honor, if I may approach?

THE COURT: You may.

Q. (BY MR. BOYD) I'm going to hand you what's marked as PTX1. Mr. Berry, without going into the contents of the email chain, do you recognize this email chain?

A. Yes, sir.

Q. All right. The subject matter of the email chain is going towards the loans that Marty Berry and Dennis Berry made to the company; is that right?

A. Yes, sir.

Q. Okay. And this is dated January the 16th and you're making inquiry after having seen it in accounting records that were provided to you and your staff in Houston; is that right?

A. Yes, sir.

Q. Okay. Do the Berry companies maintain a Houston presence?

A. Yes, sir.

Q. All right. Can you tell the Court what goes on in Houston, historically? I know there's been some changes.

A. Well, we have maintenance agreements at the Valero plants, base load maintenance. We've done large-scale capital work there, some successful, some not so successful through the years. We have had a yard there since the -- I don't know, I bought that from I believe Halliburton in probably '99. I can't remember, somewhere in there, in Friendswood, which we later -- I later replaced with the facility that was Belma's on Alameda where the shops and storage -- where the steel warehouse is now.

Q. Okay. Having seen the related party --

A. Oh --

Q. Okay. Go ahead. I'm sorry.

A. You asked what transpired in Houston. Then my office, historically, at Riverway has been a sales and marketing office as well as administering all of our work -- all of our international work out of there, which was significant.

Q. Okay. Does Bay still have an office at Riverway in Houston?

A. No, sir. They moved out.

Q. Going back to this email, at some point in time -- and we're going to talk about it -- you received some accounting records from the company that showed a related party note or notes in the amount of $75,000,000; do you remember that?

A. Yes, sir.

Q. At that point in time, had you ever seen any loan documentation related to that transaction?

A. No, nowhere had it ever been mentioned to me.

Q. Okay. Had it ever been brought up at a board meeting?

A. No, sir.

Q. Had it ever been voted on by the three owners of the company?

A. No, sir, it had not.

Q. Okay. Had the company ever done a transaction of that size without documenting it contemporaneous to the transaction?

A. Absolutely not.

Q. Do you find that to be abnormal or normal?

A. It's unusual.

Q. Okay. And having seen the financial statements

where this transaction or these transactions were listed in the accounting records, did that cause you concern?

A. Yes, sir, compounded with the absence of any information, absolutely.

Q. All right. And is that what this email is about?

A. Yes, sir.

MR. BOYD: Your Honor, at this point, we'd offer PTX1.

MR. ALLISON: No objection, Your Honor.

THE COURT: It's admitted.

Q. (BY MR. BOYD) All right. Let's talk about the email. If you go to the second page of the exhibit, that's an email that really starts on the first page, page 1 of 2. From Mr. Powers -- and who is Mr. Powers? He's here in the courtroom today, but who is he?

THE COURT: I don't mean to interrupt you, but if you want me to look at this contemporaneously, I've only got one page.

MR. BOYD: I think it's on the very back. Sorry. It's on the very top. It's very short.

THE COURT: Oh, it's little. Okay. I'm sorry. My fault.

Q. (BY MR. BOYD) So Mr. Powers emails you and what does he say? And this is on the back of page 1.

A. "Is this what you're looking for? Let me know. Thanks."

Q. And the PDF that's referenced --

A. Orca note.

Q. Okay. And that was not what you were looking for?

A. No, sir.

Q. All right. And so what did you respond to Mr. Powers?

A. No. That I requested the paperwork for the $75,000,000 related party receivable on the Berry GP books.

Q. All right. And the date of that?

A. January 16th.

Q. And what was Mr. Powers' response to your clarifying exactly what you wanted?

A. "Okay. That is not executed yet to my knowledge. I will follow up and see if it's signed yet."

Q. Okay. After he told you that the paperwork had not been executed, what did you say in response to that?

A. "I know nothing about any of this," because I did not.

Q. All right. We're going to go to Exhibit 2.

MR. BOYD: May I approach?

THE COURT: Yes, sir. Is that one for me?

MR. BOYD: Yes, sir. Some of this will also be front and back.

THE COURT: That's okay.

Q. (BY MR. BOYD) All right, Mr. Berry, I need you to take a look at PTX No. 2. Without going into details of its content, let me know if you recognize it?

A. Yes, sir.

Q. Okay.

MR. BOYD: Clay, this is one of the ones that was not produced by you-all.

MR. STEELY: Got you. These two stacks, Butch, are they one exhibit? I'm trying to figure out what you handed? You handed Doug two stacks or am I wrong?

MR. ALLISON: And just so you know, I know you didn't mean anything, but I do think they're both produced, but skipping aside, you're obviously using one without Bates page numbers, and that's okay, we've just got to mark them or something.

MR. BOYD: They're marked as PTX2.

MR. ALLISON: Okay. Great.

MR. ABSMEIER: And I can explain why there's some thin ones. The only document I think Mr. Boyd is going to show is the first attachment. So

you have a copy there that has the full attachment. The second attachment is a very long spreadsheet that we're not even getting into. So you have one for --

MR. ALLISON: The income statement versus the balance sheet, I think?

MR. ABSMEIER: Yes, some kind of spreadsheet. It's a balance sheet that's a 45-pages --

MR. ALLISON: I understand your comment.

MR. ABSMEIER: -- spreadsheet.

MR. STEELY: You're going to mark the whole one?

MR. ABSMEIER: I'm marking the whole one for the record.

THE COURT: There's two.

MR. STEELY: That's why I was wondering why we got two exhibits when we were talking about one. Thank you.

Q. (BY MR. BOYD) Have you had a chance to review this? And for your reference, Mr. Berry, I'm only going to be talking about the email chain and then, three pages of over it's Combined and Consolidated Balance Sheets.

A. Okay.

Q. Tell the Court who Tonja Fulghum is.

A. My assistant and aide-de-camp.

Q. I'm sorry?

A. My assistant and aide-de-camp.

Q. All right. Who does she work for presently?

A. For me.

Q. Who did she work for the past 27 years?

A. Berry GP.

Q. And she was officed in Houston?

A. No, she was originally officed here. I poached her from Coastal.

Q. But during that time period that she was working in Houston, by whom was she employed?

A. Berry GP.

Q. And she worked for the Berry companies for 27 years?

A. Yes, primarily, yes, sir.

Q. Who does she now work for you?

A. She was terminated.

Q. When?

A. Last couple of weeks.

Q. So after this lawsuit was filed?

A. Yeah. More than one person terminated without cause.

Q. Her husband was also terminated, right?

A. Yes. After 40 something years of making us money, yes, without cause.

Q. And he worked for the Berrys for 40 years?

A. Yes, sir.

Q. And having looked at this email chain and the attached accounting records, do you recognize these to be Berry GP, Inc., and affiliates Combined and Consolidated Financial Statements for the period ending July 31st, 2022?

A. Yes, sir.

Q. Okay.

MR. BOYD: Your Honor, at this time, I would move to introduce PTX2.

MR. ALLISON: No objection.

THE COURT: No objections? All right. Hearing no objections, it's admitted.

Q. (BY MR. BOYD) Was it common practice for Ms. Fulghum, when she worked both for you but really for Berry GP, to ask Corpus accounting to send over accounting records?

A. Yes, sir.

Q. Okay. And as part of her job function, would she facilitate various transactions between really the owners in the company and assist the accounting department here in Corpus?

A. Yes, sir.

Q. When she would request this, was that typically

at your request?

A. Sometimes, yes. Yes.

Q. Okay.

A. Yes, but not always. I couldn't say.

Q. All right. I want to turn over to the Combined and Consolidated Balance Sheet.

A. Yes, sir.

Q. July 31st, 2022. And I want you to come down three-quarters of the page and tell me if you see the Note payable - related party?

A. Yes, sir.

Q. Is this the accounting record where you first learned about the related party note payable?

A. Yes, sir, I believe so.

Q. Now, this is for the period ending July 31st, 2022, but this was actually sent over to you and Tonja on September 21st; is that right?

A. Yes, sir, I would assume so.

Q. Okay. How was that entry on the books and records brought to your attention?

A. By accounting at Riverway.

Q. Did you then, after it was brought to your attention by an accountant, have a meeting with Tonja about this?

A. Of course.

Q.   Okay.  And this is what you testified earlier that caused you concern?

A.   Yes, sir.

Q.   I'm going to hand you PTX3 and PTX4.  And PTX3 starts at Bates Bay 000473, and 4 starts at Bay 000479.

MR. BOYD:  May I approach?

THE COURT:  Yes, sir.

MR. BOYD:  With your permission, I'll approach freely, if you'll allow it?

THE COURT:  That's fine.

MR. BOYD:  That's PTX3 and PTX4.

THE COURT:  Okay.

Q.   (BY MR. BOYD)  Again, Mr. Berry, without going into the contents, can you just tell the Court what PTX3 and PTX4 are?

A.   They appear to be Combined and Consolidated Balance Sheets for Berry GP.

Q.   Okay.  And --

A.   But it's a format I'm not used to seeing.

Q.   Okay.  This was an Excel spreadsheet that was converted to a PDF.  It kind of --

A.   Okay.

Q.   -- it changes the formatting, so we didn't have the data.  You see on there, you can tell that by the number signs in certain columns; do you see that?

A. Yes. Yes.

Q. Do you know what causes that?

A. Pardon me?

Q. Do you know what causes that not to be an actual number and to be a string of number signs?

A. No, I do not.

Q. Okay. Well, when a PDF -- when an Excel spreadsheet is converted to a PDF and the column is not wide enough to hold the number in this format, it defaults to a number sign.

A. Okay.

Q. All right. And fortunately, for us, the numbers I want to talk to you about are here.

MR. BOYD: With that said, Your Honor, I would offer PTX3 and PTX4.

MR. ALLISON: No objection.

THE COURT: All right, hearing no objection, they're admitted.

Q. (BY MR. BOYD) On PTX3, what is the date at the top?

A. October 31 of 2022.

Q. All right. On the note payable - related party for October 2022, what is the amount shown?

A. 75,000,000.

Q. Okay. What I want you to do now, is if you'll

take PTX4 and fold -- not fold, crease, but just bend PTX3 so you can see both sheets note payable row, okay?

A. Yes, sir.

Q. Are you with me?

A. Yes, sir.

Q. Before we do that, what is the date on PTX4?

A. October 31st of 2022.

Q. So it's the very same date as the PTX3?

A. Yes, sir.

Q. Okay. On PTX3, you testified the amount shown for this related party note is $75,000,000; is that right?

A. Yes, sir.

Q. What is the amount shown for the very same period on PTX4?

A. 76,361,301.

Q. Okay. Can you explain the discrepancy?

A. No, sir.

Q. Why not?

A. Same date, same -- it would need to backup.

Q. Do you have the backup?

A. I do not.

Q. Have you requested the backup?

A. Yes, sir, I have.

Q. Has it been forthcoming?

A.   No, sir.

Q.   Now I want to turn to Exhibit PTX5, which is Bates Bay 000953.  Lawrence, in the spring of 2023, prior to your current lender, who was the long-standing lender for the Berry companies that provided your revolving line of credit?

A.   International Bank of Commerce.

Q.   How long had that relationship existed?

A.   Twenty-plus years.

Q.   All right.  Who was your -- who were the Berrys -- who was the Berrys' banker at IBC?

A.   Gus Barrera here in town and, of course, Dennis Nixon's the chairman who runs the bank.

Q.   All right.  Did you-all have -- you-all being the Berrys -- have a relationship with Dennis Nixon?

A.   Pardon me?

Q.   Did you have a relationship with Mr. Nixon?

A.   Yeah, I know Dennis.

Q.   Okay.

A.   He knows us.  He's been our banker a long time.

Q.   All right.  Have you seen this email before this litigation?

A.   No, sir.

Q.   Okay.  But you see that it's from the bank to Mr. Powers, right?

A.   Yes, sir.

Q.   Okay.  Did you come to learn, at some point, that Mr. Nixon traveled to Corpus Christi to meet with the board of the Berry companies?

A.   Yes, sir, in a board meeting.

Q.   Okay.  Were you ever informed of that board meeting?

A.   No, sir.  Was I ever informed of this meeting?

Q.   Yes, sir.

A.   No, sir.

Q.   But you were -- you did learn, after the fact, that Mr. Nixon traveled to Corpus?

A.   Yes, sir.

Q.   How did you learn that?

A.   In the board meeting when I was informed that we had -- that they canceled our revolving line of credit.

Q.   Okay.  We're going to talk about that in a minute.

MR. BOYD:  At this time, Your Honor, I would offer PTX5.

MR. ALLISON:  No objection.

THE COURT:  All right.  Hearing no objection, 5 is admitted.

Q.   (BY MR. BOYD) Okay, in this email from

Mr. Barrera to Rob Powers, what is he seeking?

A. Seeking a meeting with the -- with the board of directors with Dennis Nixon, which is not unprecedented. This had occurred once before, a long time ago.

Q. When the chairman of the board of a bank that is extending a $50,000,000 or greater line of credit so the Berry companies asks for a meeting, what would you do?

A. Pick up the phone and call everybody and say, we better get our stuff together.

Q. Okay. It's a serious event, right?

A. Probably the most serious one in an ongoing enterprise of this scale.

Q. Can you explain why that is?

A. We can't transact business with our clients with these -- with as much -- as much stuff gets disputed, it's just every time it takes so much capital and there are never -- they're never -- the payments are never timely, nobody scheduled it, and then when you throw in the disputes and retainers, et cetera, you've got to have a revolver, man.

Q. Okay. The company, the Berry companies, does it require a lot of capital to continue as a going concern?

A. Massive amounts, yes, sir.

Q.   What -- at the board meeting, what did you learn had happened when Mr. Nixon flew to Corpus for the meeting on the 13th?

A.   He showed -- he showed up for the meeting and we weren't there.  He apparently hollered at -- at Mr. Powers and then left.

Q.   Okay.  And you learned that during the board meeting?

A.   Yes, sir.

Q.   Okay.  After the board meeting, did you have occasion to visit with your brother, Marty Berry?

A.   Yes, sir.

Q.   About the meeting?

A.   Yes, sir.

Q.   Did you ask him why he wasn't at the meeting?

A.   I certainly did.

Q.   What did he say?

A.   He said, "I'm not going to that meeting with Dennis Nixon and get my ass eat out."

Q.   So he didn't want to go have the meeting with Mr. Nixon because he knew it was not going to be an easy meeting?

A.   Well, the previous time when this had occurred, it was not an easy meeting.

Q.   I'm going to hand you PTX6, which is Bates Bay

000111 and ask you if you recognize that?

A. Yes, sir.

Q. All right. Have you seen this before today?

A. I believe so.

Q. Was this discussed at the March 14th board meeting?

A. Yes, sir.

MR. BOYD: At this point, I would offer PTX6.

MR. ALLISON: No objection.

THE COURT: All right, hearing no objection, 6 is admitted.

Q. (BY MR. BOYD) Can you tell the Court who Scott Landreth is? Do you know?

A. I assume he's counsel for the bank.

Q. All right. And so he wrote this letter on March 13th, 2023. And right above Mr. Powers' name it was, I guess to the attention to or written to, he writes in all bold caps "Notice of Default." Do you see that?

A. Yes, sir.

Q. What does that mean to you?

A. That contractually, we're not -- we're not in our lane.

Q. Okay. Meaning that you're out of compliance

with the loan companies?

A.   Yes, sir.

Q.   If you'll read the first two sentences of Mr. Landreth's letter, please, into the record.

A.   "This law firm represents International Bank of Commerce, the Lender, in connection with the referenced revolving line of credit loan.  I'm writing you to inform you that the lender recently determined that the borrowers are in default under the loan agreement for at least two reasons."

Q.   Okay.  Were these items the reasons this letter discussed at the March 14th board meeting?

A.   Okay.  One more -- restate the question.

Q.   Did you-all discuss the fact that IBC viewed you to be in default at the March 14th board meeting?

A.   Yes, I believe we did.

Q.   Okay.  Would you agree that a notice of default from the bank holding your revolving line of credit to an entity the size of the Berry companies is a serious event?

A.   Yeah, it's a major crisis.

Q.   Okay.  I'm going to show you PTX7, which is Bay 000122, I'm going to ask you to review that while I'm passing that out.  I'm going to organize that and get it back.

Mr. Berry, I'm going to ask you to take a second and review of that document and we'll talk about it, please.

A. Yes, sir.

Q. All right. Again, this letter is written by Scott Landreth, right, on the third page?

A. Yes, sir.

Q. The attorney representing IBC Bank. And who is it addressed to?

A. Mike Hummell.

Q. Okay. Mr. Hummell's here in the courtroom today and his role with the Berry companies is what?

A. General counsel.

Q. Okay. Can you go to the middle of the first paragraph where it says, "You probably also know"?

A. Yes, sir.

Q. And read to the end of that paragraph.

A. "You probably also know that the resulting audit has raised numerous concerns on this end. My client had nonetheless hoped to have its questions answered and reach an agreement concerning a year-long extension. That was the purpose of a meeting to include Berry family members scheduled for last Monday."

Q. Okay. Let's go on to the second paragraph, and if you'll read that for me?

A.    "For reasons unknown to us, the meeting was unilaterally canceled and no resolution was reached.  We are left to believe the financial condition of the borrowers has gotten even worse as my client has yet to receive required financial statements for the quarter ending January 31st, 2023 or the detailed financial information requested by Mr. Barrera.  Timely reporting of accurate financial information has been a reoccurring problem."

Q.    Okay.  Again, if you had known about the meeting, you would have arrived in Corpus, and even if you were by yourself, had the meeting; is that right?

A.    Absolutely.

Q.    Okay.  I'm going to skip over to PTX6 -- 26. I'm sorry.

MR. BOYD:  Your Honor, in case I didn't do it, I would offer PTX7.

MR. ALLISON:  No objection.

THE COURT:  Hearing no objection, it's admitted.

So is this 26?

MR. BOYD:  Yes, sir.

THE COURT:  Okay.

Q.    (BY MR. BOYD)  Have you had a chance to review PTX26?

A. Yes, sir.

Q. All right. Do you recognize it?

A. Yes, sir.

Q. Generally speaking, what is it?

A. A letter to me -- from me to Dennis Nixon requesting a meeting.

Q. Okay.

MR. BOYD: At this time, I would offer PTX26.

MR. ALLISON: No objection.

THE COURT: All right. Hearing no objection, 26 is admitted.

Q. (BY MR. BOYD) All right. So it is indeed a letter from you to Mr. Nixon, the chairman of the board of IBC, and what are you conveying to him or requesting from him?

A. I'm requesting a meeting so I could find out what, from his perspective, what transpired.

Q. Why -- why did you want that meeting?

A. Because it was nonsensical to me --

Q. What was?

A. The termination. And I wanted to hear from the horse's mouth why it occurred.

Q. Okay. Did you ultimately have that meeting?

A. Yes, I did.

Q. Okay. When was that meeting?

A. Sometime after this letter. I've had --

Q. Do you remember --

A. -- multiple meetings with Mr. Nixon.

Q. Okay. Was Mr. Nixon -- did he convey that he was upset that there was nobody there to meet him at the board of directors?

A. Yes, sir.

Q. What did you say to him?

A. I apologized profusely and told him I didn't have knowledge of the meeting or I would have been there. What else are you gonna do?

Q. Why did you do that?

A. Well, because this is a small -- this is a small village down here and you're going to need those bankers later on and I wanted to make sure we could always go back. I mean, IBC's a bank.

Q. All right. At least as between you and Mr. Nixon, did the meeting end on good terms?

A. Absolutely.

MR. BOYD: I'm going to go to PTX8.

Q. (BY MR. BOYD) Lawrence, I'm going to hand you PTX8, and as with the other exhibits, ask you to review it and I'll talk about it, please.

THE COURT: Okay.

Q.   (BY MR. BOYD)   Have you had a chance to review PTX8?

A.   Yes, sir.

Q.   Okay.  And this is an email from Marty Berry and the company's lawyer to the lawyers sitting at this table; is that right?

A.   Yes, sir.  I believe so.  Yes, sir.

Q.   Okay.  And it attaches a promissory note; is that right?

A.   Yes, sir.

Q.   And do you now recognize the promissory note?

A.   Yes, sir, I see it here.

Q.   Okay.  And the date of this transmittal is December 6, 2023, correct?

A.   That is correct.

Q.   Okay.

MR. BOYD:   At this time, I would offer PTX8.

MR. ALLISON:   No objection.

THE COURT:   All right, hearing no objection, 8 is admitted.

Q.   (BY MR. BOYD)   So on December the 6th, in the afternoon, Mr. Allison transmits to us via email, "us" being the lawyers in this room.  I think Mr. Huseman had not entered an appearance at that time, but he sent it

to everybody at this table and Mr. Steely.  Do you see that?

A.   Yes, sir.

Q.   Okay.  And what's the subject line say?

A.   "Marty's loan doc to Berry GP."

Q.   Okay.  And indeed attached is a promissory note signed by Marty Berry, correct?

A.   That is correct.

Q.   All right.  This was not Bates stamped.  It was prior to production, but the actual promissory note is Bay -- or the actual Bates stamp promissory note is Bay 000023.  What is the date of the promissory note?

A.   July 8th of 2022.

Q.   Okay.  I want you to find at your witness stand, please, Exhibit No. 1, please.

A.   Yes, sir.

Q.   All right.  So some seven months later, Mr. Powers emails you and tells you that the promissory note or loan docs had not been executed yet.  Do you remember that exhibit and that email?

A.   Yes, sir.

Q.   Okay.  If his email is accurate and truthful, and I assume you'd expect your CEO to be truthful with you?

A.   Yes, sir.

Q. Then this document would necessarily have to have been created after that date and backdated; is that right?

A. Yes, sir.

Q. Is this the first time you became aware of the loan documentation that you had been asking for for quite sometime?

A. Yes, sir.

Q. This was sent on January -- or December 6. Were you aware that not only was there a board meeting going on over here on December 7th; you attended, right?

A. (Nodding head up and down.)

Q. But that your -- you lawyers were in court in Harris County, Texas; do you remember that?

A. Yes, sir.

Q. And you and I talked on the phone some, and Mr. Allison was talking with Mr. Hummell and, perhaps, Mr. Berry out in the hall. Do you remember that?

A. Yes, sir.

Q. Okay. And during that board meeting, Bonnie Berry was elected to the board?

A. Yes, sir.

Q. Okay. And I've listened to the board meeting. What did you ask Dennis before he voted?

A. If Bonnie was taking his place.

Q. Well, did you also ask him if that's what he wanted?

A. Yeah.

Q. Okay.

A. Yes, sir.

Q. And he told you yes?

A. Yes, sir.

Q. And how did you vote?

A. Yes, affirmative.

Q. And you stand by that vote?

A. Of course.

Q. At any time, have you been provided a plan by the CEO, by the company, to pay this note back?

A. No, sir, I have not.

Q. Does that cause you concern?

A. This whole thing causes me concern. It's the largest transaction, financial transaction we've probably ever done, individually with the enterprise, and there's no -- where it says contracting on the front side and when you turn it and there's no contract and there's no note, and then, like this is abnormal.

Q. Okay. And it obviously caused IBC concern?

MR. STEELY: Objection as to speculation, Your Honor.

THE COURT: Sustained as to speculation.

A. Since --

THE COURT: Wait, wait. It's sustained.

Q. (BY MR. BOYD) Let me ask it a different way. Did IBC default the loan?

A. Yes, IBC defaulted our loan, yes, sir.

Q. I want you to look at the Term of Payment for the note, please, sir; do you see that? It's right on the first page.

A. Yes, sir. Yes, sir.

Q. Okay. Tell us what the Term of Payment, first paragraph says.

A. "The interest shall be accrued monthly beginning July 31st of 2022 and payable upon maturity. The note is due and payable in full on May -- December 21st of 2024."

Q. So the note specifically sets out what the terms are, right?

A. Yes, sir.

Q. Does it require any payments of either interest or principal before December 31st of 2024?

A. No, it does not.

Q. All right. I'm going to show you Plaintiff's Exhibit 10 -- oh, I'm sorry, 9, PTX9. Have you had a chance to review this?

A. Yes, sir.

Q. Okay. I'm going to represent to you that this was attached to a pleading filed in Harris County on December 7th for that hearing that was conducted in Harris County on extending, amending the TRO. What is the date that this was signed by Marty Berry? It's on the last page.

A. 7th day of December 2023.

Q. Okay. I want to talk about Marty Berry's sworn testimony to the Court in Harris County. I want to go to the loans to Berry GP.

A. Yes, sir.

Q. Start reading where it says "The company need." If you'll read that into the record, please, sir.

MR. ALLISON: Not --

THE COURT: What page are we on? I'm confused.

MR. BOYD: I'm sorry?

MR. ALLISON: Have you offered it yet?

MR. BOYD: No, you're right. No. Thanks. We offer PTX9.

MR. HUSEMAN: I'm sorry, what number?

THE COURT: Hearing no objection, it's admitted. I think the witness might be a little confused too.

A. Yeah, I am.

Q.    (BY MR. BOYD)  I want you to go to the first page.

A.    Yes, sir.

Q.    Loans to Berry GP.  Do you see that?

A.    Yes, sir.

Q.    And come to the second sentence of that paragraph and start reading "The Company need."

A.    "The Company need for money in the summer of 2022 was so extreme that we decided -- we met to decide how to best handle a capital infusion.  We decided to put in money ourselves.  Lawrence refused to contribute to the effort, so the two of us put up the entire $75 million."

Q.    Okay.  Let me stop you there.  Number one, did you have any idea that the company needed capital at that point in time?

A.    No, sir.

Q.    Did -- was a cash call, a formal cash call ever presented to you as one of the owners --

A.    No, sir.

Q.    -- of the Berry companies?

A.    No, sir.

Q.    Had you even heard about this potential transaction in the summer of 2022?

A.    No, sir.

Q. Did you ever refuse to contribute to the effort?

A. No, sir.

Q. Okay. I want to come down into that paragraph where it starts, almost three or four lines up, "We've not been repaid for our loans." Do you see where Marty Berry swears --

A. Yes, sir.

Q. -- under oath to that sentence?

A. "We have not been repaid for our loans and are unlikely to recover our loans anytime soon. We have not received any interest payments."

Q. Okay. We're going to come back to that in just a second, but if you'll read the very last sentence of that page that goes into the top of the next page, please.

A. "He continues to refuse to use his personal funds to assist the company."

Q. All right. That last sentence, is that true?

A. No, it's a lie.

Q. All right. Had you spent personal funds to benefit the Berry companies?

A. Still doing it every day.

Q. Millions of dollars?

A. I've spent millions, yes, sir.

Q. Okay. What types of expenditures have you made on behalf of the Berry companies?

A. Salaries, capital expenditures incrementally, buying cranes for no markup and tender them to the company.

Q. Do you routinely buy industrial-type equipment and iron at auctions?

A. Yes, sir, for the -- usually for only -- mostly for the benefit of corporate.

Q. Okay. And you don't turn around and mark that up after you buy it?

A. No, sir, I do not.

Q. I want you to describe for the Court even though -- well, I want you to describe for the Court the Citation X transaction that the company owns.

A. Citation X was in a SCC forfeiture auction in Waco, Texas. I kind of watch all the government auction stuff and Dennis had expressed some desire for a Citation X at one time, so I took the liberty of having my pilots review the -- my personal pilots review the dataset, and then I had corporate's pilots go up and do a once over on the bird because they were more Cessna oriented. Looked good. Went to the auction. It was just a perfect storm, just me and the engine guy there, and we captured it for 2,000,000 and some change.

Q.   Okay.   Based on fair market value of that airplane at that time, what would it have been approximately?

A.   Probably 7.   I think I could have flipped it for 7.   I had somebody call.   I can't remember.   I think George Dodge called me at the time and asked me if I'd sell it.

Q.   And George Dodge is who?

A.   Charter operator in Houston, one of the big ones, Western Airways.

Q.   All right.   Could you -- I mean, were you prohibited from purchasing this for yourself?

A.   No.

Q.   Okay.   How did the purchase get structured?

A.   Corporate closed it.

Q.   And corporate owns that airplane?

A.   Yes, sir.

Q.   Did that airplane, or airplanes in general, come up at the last meeting of the owners?

A.   Yeah.   Yes, it did.

Q.   And was there an agenda item for approval to sell the corporate aircraft?

A.   Yes, there was.

Q.   All right.   And Marty Berry voted in favor of that?

A.   Yes, sir.

Q.   Bonnie Berry voted in favor of that?

A.   Yes, sir.

Q.   And how did you vote?

A.   I don't recall.  I think I voted no.

Q.   Well, I think that you also said, if you want to sell the airplanes, that's fine; is that what you said?

A.   Yes, sir.

Q.   Okay.  So few sentences up, Marty Berry swears under oath that he hasn't been repaid for the loans; do you see that, and you read it into the record, right?

A.   Yes, sir.

Q.   Okay.  I'm going to hand you PTX10.  Lawrence, do you recognize this as a financial document of Berry GP, Inc.?

A.   It appears to be a Berry GP ledger account.

MR. BOYD:  At this time I would offer PTX10, which is Bay 000025.

MR. ALLISON:  No objection.

THE COURT:  All right.  Hearing no objection, it's admitted.

Q.   (BY MR. BOYD)  All right.  So this is part of the company's general ledger, and I want to come down, and if you look at 7/8/2022, we have M. Berry loan

proceeds; do you see that?

A.   Yes, sir.

Q.   And M. Berry is Marty Berry?

A.   I would assume so, yes, sir.

Q.   And it has a credit amount of how much?

A.   $45,000,000.

Q.   After that, the entry is 4/11/2023 note payment; do you see that?

A.   Yes, sir.

Q.   And it has the initials this time, MGB.  That's Marty Berry, right?

A.   Yes, sir.

Q.   And it reflects a payment in the amount of $10,000,000, does it not?

A.   Yes, sir, it does.

Q.   Okay.  And you would agree with me, would you not, that 4/11/2023 is before December 7th, 2023, correct?

A.   Yes, sir.

Q.   And we know what happened on December 7th, 2023, Marty Berry swore under oath that he had not received loan payment; do you recall that?

A.   Yes, sir.

Q.   And you do understand, from our conversation, that this document was presented to the judge in Harris

County presiding over this case at that time; do you understand that?

A. Yes, sir.

Q. Okay. So Marty Berry lied to that Court?

A. Yes, sir.

Q. That's perjury, right?

A. Yes, sir, I believe it is.

Q. All right. I want to turn over to PTX11, which is Bay 001342. Let me know when you've had an opportunity -- I'm only going to be talking to you about the first page. The complete exhibit is much longer.

A. Yes, sir. I'm familiar with it.

Q. All right. And it's a letter from -- I don't want to get into the subject, but it's a letter from Robert Rickett to Sean Strawbridge at the Port Authority, right?

A. Yes, sir, it is.

Q. And who is Robert Rickett?

A. Robert Rickett is Marty's son-in-law, and sort of the land guy at Berry Contracting now.

Q. All right.

A. The real property guy. Pardon me.

Q. Okay. When this lawsuit was filed, he was included as a defendant; is that right?

A. Yes, sir.

Q. And you authorized your lawyers to dismisses him from this lawsuit this week, right?

A. Yes, sir.

Q. Okay. And is that because he had signed an affidavit acknowledging that the property he was holding belonged to corporate?

A. Yes, sir.

Q. Okay.

A. And agreed to return -- to transfer it.

Q. All right. And your complaint about all that was what, in terms of him holding title to property that really belongs to the Berry entities?

A. There's no reason for it.

Q. What you wanted was it to be deeded to the company, the rightful owner who had paid for it?

A. Yes, as it should be.

Q. Okay.

MR. BOYD: At this time, I would offer PTX11.

THE COURT: Any objection?

MR. ALLISON: No, Your Honor.

THE COURT: Hearing no objection, it's admitted.

All right. I'm going to take a little break and we'll continue on.

THE BAILIFF: All rise, please.

(Recess.)

THE COURT: Okay. Are we ready? Let's do it. Witness back on stand. Mr. Berry is still under oath. You-all can be seated. Are we ready?

MR. REASONER: Yes, Your Honor, we're ready.

THE COURT: Okay. Let's do it. You may proceed.

MR. BOYD: Thank you, Your Honor.

DIRECT EXAMINATION (CONTINUED)

BY MR. BOYD:

Q. Lawrence, when we took our break, we were looking at PTX11 which has been admitted. Could you tell the Court what this letter is about?

A. It's a letter to Sean Strawbridge from Robert Rickett. It states that the principals of Berry GP have decided to open two strategic properties to the marketplace.

Q. Okay. Is this the first time that you learned it was an active marketing campaign for the Berry dock?

A. Yes, sir.

Q. Okay. And this was presented to you by whom at the Port?

A. Well, I went down to talk about moving that

bulkhead line with Kent and there was a couple of other Port guys there, I can't remember whom, and in the process I said I want to know what the status is. They said, why would you care, you're selling it? I go, no, but the dock's not for sale. They say, yeah, it is. I said, no, it's not. They start laughing, and say, yeah, it is. And they said, we'll give me a second and they came back with the letter.

Q. And you had never seen this letter?

A. No, sir, I did not, had not. In thinking that this property was incremental for the business, you know, you're going to make -- you're going to lock up, you know, a lot of infrastructure that you can't use it anymore without the dock.

Q. And I understand this meeting took place on November 14th of 2023; does that comport your memory?

A. I believe so.

Q. Okay. The first sentence of Mr. Rickett's letter to Mr. Strawbridge -- and by the way, was Sean Strawbridge at the Port on May 30th of 2023, or had he already severed --

A. No, he was still there then, I believe.

Q. Okay. "After immense consideration, the principals at Berry GP have decided to open two strategic properties to the marketplace." It talks

about synergy. The two properties are the Berry dock and then that 16-acre tract close to the Berry dock, right?

A. Yes, sir, that we commonly refer to as the Citgo property.

Q. Right. Would you agree, those properties are synergist?

A. Yes, sir.

Q. Does that provide Berry entities with strategic operations to combine a facility of some sort on the 16 acres with the Berry dock?

A. Yes, sir.

Q. And what was the purpose of you wanting to discuss the bulkheads; what does that do to the Berry companies?

A. Decreases the cap X on the ship dock.

Q. And why is that?

A. Because you don't have to tear out the existing dock ideally.

Q. I want to go to the first phrase or the first sentence. "After immense consideration, the principals at Berry GP." First, who are the principals at Berry GP?

A. Marty, Dennis and -- the Estate of Dennis Berry and Lawrence at this time.

Q. On May 30th, 2023, it would have been Marty, yourself and Dennis Berry?

A. Yes, sir.

Q. Okay. Were you ever given an opportunity for immense consideration for this letter to go out?

A. No, sir.

Q. Okay. Did you ever decide to open two strategic properties to the marketplace?

A. Not for sale.

Q. So you had no idea this had been presented to the Court?

A. No, sir, I did not.

Q. You did understand that perhaps Marty, and perhaps Dennis, might have disagreed with you?

A. Yes, sir.

Q. Okay. Would you have liked to have had the opportunity to have an in-depth discussion before this was actually proffered to the Port of Corpus Christi?

A. Yes, I told them whenever, after I found out about it, I told them at the time that they couldn't sell the property because it was their lender's now.

Q. Okay. There have been occasions where you have made specific requests of management to provide you certain information, correct?

A. Yes, sir.

Q. Can you -- can you sit here today and state with certainty, the dates you made the request, number one?

A. Numerous times.

Q. But can you state the specific dates?

A. No, sir, I can't state specific dates.

Q. Can you tell the Court, on a specific date, I requested these specific documents?

A. I -- yes, I can, probably if I had the document.

Q. Okay. But, I mean, I know you know you made requests, but I'm talking the line item specific request. Can you sit here and recite that right now?

A. The request?

Q. Yeah.

A. No, I cannot.

Q. Okay. I'm going to hand you PTX12 and ask you to review it. I'm going to ask you to review the email and attachment for me, please, and take your time.

A. Okay, yes, sir.

Q. Have you had a chance to review it?

A. Yes, sir.

Q. As it relates to April 18th, does this refresh your recollection of the specific items you requested of Mr. Powers and Mr. Klein?

A. Yes, sir, it does.

Q. And who is Mr. Klein?

A. The CFO --

Q. Okay. And --

A. -- who replaced Diane Decou.

Q. I'm sorry?

A. The CFO that replaced Diane Decou.

Q. Okay. And would this agent testify to the Court accurately about what you were requesting from the company?

A. Yes, sir, it will.

MR. BOYD: I offer PTX12.

THE COURT: No objection? Objection, no objection?

MR. ALLISON: No objection.

THE COURT: All right. It's admitted.

Q. (BY MR. BOYD) All right. So the front page of this is an email from you to Mr. Powers and Mr. Klein advising them to see an attached request for information; is that accurate?

A. Yes, sir.

Q. All right. If you'll look at the attachment, and that is a memo indeed from you to Mr. Powers and Mr. Klein?

A. Yes, sir.

Q.   And you cc'd your partners, right?

A.   Yes, sir.

Q.   And Marty and Dennis?

A.   Yes, sir.

Q.   Okay.  Can you tell us what type of information you were looking for, first off?

A.   The key information it requires to properly administer my part to -- for the betterment of the enterprise.

Q.   Okay.  The first three items relate to what topic?

A.   The IBC line.

Q.   Okay.  You wanted to have a better understanding about what transpired between the company and IBC?

A.   Yes, sir.

Q.   All right.  Because that had concerned you the way that that had gone down; is that right?

A.   Yeah, the line was canceled before I ever knew there was a problem.

Q.   Okay.  Item 4, what does that relate to?

A.   A copy of the loan agreement, the loan between Marty and Dennis and Berry GP.

Q.   Okay.  That would be -- loan agreement, would include a loan agreement, loan docs, notes?

A. A payment schedule plan, there's like a whole bunch of hoops you have to jump through historically to borrow this kind of money.

Q. All right.

A. Or to lend it.

Q. And some seven months, three weeks later is the first time you get that note through litigation; is that accurate?

A. Yes, sir.

MR. STEELY: Objection, leading, Your Honor.

THE COURT: Don't lead, sustained.

Q. (BY MR. BOYD) What does item 5 relate to?

A. All equipment assets that were purchased on the IBC revolving letter of credit.

Q. All right. And what were you wanting that information for?

A. Trying to find -- I was trying to find out if we were squandering our revolving that's supposed to be for current receivables because the way it functions now it's not like it was way back in the day when I was there actively, you know, on the fourth floor. I wanted to make sure that they haven't, you know, bought static assets, i.e., equipment, whatever, with that LC that's supposed to be a revolver for invoices. Because the way

it's done it's not tied directly to the invoices anymore.

Q. Okay. Is this all information that you were requesting as an owner, as a board member, and --

A. And executive.

Q. Yeah. Did you ever receive this information?

A. No, sir, no one ever answered.

Q. I'm going to hand you PTX13. Lawrence, if you'll take a minute to review PTX13 which is Bates Bay 000026. Have you had a chance to --

A. Yes, sir.

Q. Do you recognize this document?

A. Yes, sir.

Q. Okay. This is a Notice of Special Meeting of Directors that was sent out on December 1st for a meeting on December 7th?

A. Yes, sir.

Q. Okay. This is the type of meeting-type communications that you received related to the board function; is that accurate?

A. Yes, sir.

MR. BOYD: Okay. At this time, I offer PTX13.

MR. ALLISON: No objection.

THE COURT: All right, hearing no

objection, 13's admitted.

Q. (BY MR. BOYD) Did you indeed attend the meeting on December 7th?

A. Yes, sir, I did.

Q. Okay. Item No. 1 that was put up for consideration and vote was defense and indemnity for Marty Berry, Robert Powers, Robert Rickett, and Mike Hummell in this lawsuit which at that time was pending over in Harris County?

A. Yes, sir.

Q. All right. Did that indeed come up for consideration?

A. Yes, sir.

Q. Okay. And how did Marty Berry vote?

A. For it.

Q. How did Dennis Berry vote?

A. For.

Q. And how did you vote?

A. Against.

Q. Okay. On item No. 3, in December of last year, late last year, what is that item relating to?

A. Clarification and ratification concerning previous board actions on loans from shareholders Dennis and Marty Berry to Berry Contracting LP, and offer to Lawrence Berry to participate in said loans for up to

100 percent.

Q. Okay. Did that come up for consideration by the board?

A. Yes, it did.

Q. Okay. Is that the first time that participation in these related party notes had been offered to you?

A. Yes, sir, it was.

Q. How did you vote on this?

A. On this, no.

Q. And you're the only partner in the company who didn't have a related party note related to the 75,000,000; is that right?

A. That is correct. And this is a do-over, you know, it's after the fact, and you know, the methodology was poorly executed, you know, we lost our revolver for God's sake.

Q. Why didn't you participate in this offer?

A. Because I still don't have enough information to decide one way or the other.

Q. Had it been offered to you contemporaneously with the original transaction and loan, would you have considered it?

A. I would have considered it.

Q. Would you have done so without full

information?

A. No.

Q. I'm going to show you PTX14. Do you recognize this document?

A. Yes, sir.

Q. And it appears to be your red line of board minutes, as a general description?

A. Yes, sir.

MR. BOYD: At this time I offer PTX14.

MR. ALLISON: No objection.

THE COURT: It's admitted.

Q. (BY MR. BOYD) After receiving the board minutes, which would be the black line here, you took opportunity to have those minutes red lined, correct?

A. Yes, sir.

Q. What did you do with your red line copy?

A. Sent it to Mike Hummell.

Q. I'm sorry?

A. Sent it to Mike Hummell, if I recall.

Q. Okay. Does this accurately reflect your disagreement with the company's version of the minutes from that meeting?

A. Yes, sir.

Q. Okay. At the meeting to adopt the minutes, what happened?

A.    None of these were incorporated.

Q.    Did you state that you had sent your red lines, your objections to the minutes?

A.    Yes, I did.

Q.    And this wasn't included in the corporate record?

A.    No, but they passed it anyway.

Q.    I'm sorry?

A.    No, but they passed them anyway.

Q.    What were you told as to why they weren't put into the corporate records?

A.    They couldn't open them.

Q.    Couldn't open them.  Wasn't this sent in a PDF?

A.    Yes, sir.

Q.    So did you have any trouble opening it?

A.    No, sir.

        MR. BOYD:  Out of abundance of caution, if I didn't offer it, I offer PTX14.

        MR. REASONER:  It was admitted already.

        MR. BOYD:  I think so.

        MR. REASONER:  It was admitted.

        MR. STEELY:  It's up to the Judge to decide.

        MR. REASONER:  He already did.

Q.    (BY MR. BOYD) I'm going to hand you PX15, and

it's Bates Bay 000001.  Are these the minutes of that very board meeting we were talking about?

A.  Yes, sir.

Q.  Okay.  And you were in attendance at this meeting?

A.  Yes, sir.

MR. BOYD:  Offer PTX15, Your Honor.

MR. ALLISON:  No objection.

THE COURT:  All right, it's admitted.

Q.  (BY MR. BOYD) All right.  If you go down to the item that says, "Marty made a motion to accept meeting minutes for 2023."  Do you see that?  It's about halfway down the page.

A.  Yes, sir.

Q.  Okay.  Can you read that into the record, please?

A.  "Marty made a motion to accept meeting minutes for 2023.  Dennis seconded motion and all were in favor with no one opposed.  Lawrence said he sent Hummell a red line of the meetings."

Q.  All right.  It says, "no one opposed" but you made it clear you didn't agree with the minutes?

A.  No, I said -- I said --

MR. STEELY:  Objection, leading, Your Honor.

THE COURT: Sustained, don't lead.

Q. (BY MR. BOYD) Did you make it clear?

A. Yeah, I thought. I think I did, that it was a railroad, and it wasn't being addressed.

Q. This PTX16 is Bate Bay 000027. Lawrence, if you could review that for us, please?

A. Yes, sir.

Q. Is this a Berry GP, corporate resolution at a special meeting of directors?

A. Yes, sir.

Q. Dated December 7th, 2023?

A. Yes, sir.

MR. BOYD: Plaintiff's offers PTX16.

MR. ALLISON: No objection.

THE COURT: All right, it's admitted.

Q. (BY MR. BOYD) So this came up for vote in front of the three partners, right?

A. Yes, sir.

Q. And did you have any interest in this transaction or involvement with this transaction?

A. No, sir.

Q. Okay. And how did you vote?

A. Well, I would have voted no.

Q. When the 75,000,000 influx of capital came into the corporate coffers, did you have an opportunity to

learn what it was spent on?

A. No, I have not.

Q. Has Jim Klein ever reported to you on what items that money went to fund?

A. No, the only -- I think the only knowledge I have came from Dennis Nixon that when Dennis Nixon asked him what happened to the 75, he said he spent it.

Q. Is that something that you want your CFO saying to your chairman of the board of the bank giving you a revolving line of credit?

A. I think it was probably the death nail for our revolver.

Q. To this day, do you have any idea what this money was used for?

A. I would assume it was spent to pay off vendors at B&B, but I don't really understand the methodology to dump in $75,000,000 for either draw down or a milestone schedule. There's just a whole bunch question marks that make -- that are nonsensical to me.

Q. My, question though is, to this day, do you have any idea what this money was spent for?

A. No, sir.

Q. In your view, why is this transaction not fair to the Berry entities?

A. I don't know what the interest rate was, wasn't

given the opportunity to participate.  I mean, we all had the same pile of money, equal shares, so I don't understand why I wasn't included, honestly.

Q.  What was your view of the corporate plan related to paying these notes back?

A.  I don't know of it.

Q.  Nobody's ever shared with you a strategy to pay these notes back?

A.  No, sir.

Q.  And as it appears on the books we've talked about earlier, in December of this year, some $65,000,000 will come due, plus interest, on those notes; is that your understanding?

A.  Yes, sir.

Q.  I'm going to hand you PTX17.  Lawrence, let me ask you to review this, and after reviewing it, do you appreciate that this is an accounts payable ledger of the Berry companies?

A.  It would appear to be so, yes, sir.

Q.  Okay.  In the middle there, I know it's tough to read --

MR. BOYD:  Well, but before that, I would offer PTX17.

THE COURT:  Any objection?

MR. ALLISON:  No, Your Honor.

THE COURT: All right. Then it's admitted.

Q. (BY MR. BOYD) That appears to be an accounts payable to what entity? It's at the bottom of those columns there.

A. Western Gulf Equipment.

Q. Okay. And what is Western Gulf Equipment?

A. It's apparently Marty Berry's basic equipment company. It's a -- it's an equipment leasing company owned solely by Marty and his wife.

Q. All right. And if you look at the ledger, how many cranes does it appear that Marty and Courtenay Berry are building to the Berry entities?

A. Seven, I believe.

Q. How many cranes are you aware of that that company owned?

A. I wasn't aware it was a company. I was aware that Marty -- we had a one-off that we did on a big crane that we were using money that we jointly had from our -- our Canadian entities that we own solely, and we had money and we had -- we had a new requirement here for a crane and Marty said he'd make up the shortfall for his own account, which I wouldn't have a problem with, you know, and that was fine, for one, for one. But the rest of these I had no knowledge of.

Q. All right. If you add up the billings, which

appears to be from 7/1 to 9/1, which is three months, what is the total rental revenue to Western Gulf?

A. A million 347.

Q. So it's significant monies?

A. Yes, sir.

Q. Who owns the equity in those cranes?

A. That would be Marty and Courtenay.

Q. I'm going to hand you PTX18. Mr. Berry, do you recognize this to be documents from the Secretary of State and Texas Franchise Tax Public Information Report related to Western Gulf Equipment?

A. Yes, sir.

Q. And this is the company you just testified is owned by your brother Marty?

A. Yes, sir.

Q. And your sister-in-law Courtenay?

A. That's what I was told.

Q. And if you turn --

A. Yes, sir.

MR. BOYD: At this time I offer PTX18.

MR. ALLISON: No objection.

THE COURT: All right, hearing none, it's admitted.

Q. (BY MR. BOYD) If you turn over to the second page, who is the registered agent?

A. Mike Hummell.

Q. And if you turn --

A. Hold on, hold on, I'm sorry, Chuck Vanaman.

Q. That was the first page. Chuck Vanaman used to be general counsel; is that right?

A. Yeah, that is correct.

Q. Okay. And he's since retired, right?

A. Yes, sir, yes, sir.

Q. And Mr. Hummell is his successor?

A. Yes, sir, that is correct.

Q. All right. So, originally, it was Chuck Vanaman, and then when he retired, I presume, that's when Mike Hummell took over. But regardless, Mike Hummell is the registered agent?

A. Yes, sir.

Q. If you turn over to the next page Texas Franchise Tax Public Information Report; do you see that?

A. Yes, sir.

Q. Section A?

A. Yes, sir.

Q. Where it says name, title and mailing address of each officer, director, member, general partner or manager?

A. Yes, sir.

Q. Who is listed?

A. Marvin Berry.

Q. Marvin is Marty?

A. Marvin Glen, yeah.

Q. What is his title?

A. Manager.

Q. Who is the second manager?

A. Courtenay Berry.

Q. And she is Marty's wife?

A. Yes, sir. She's the manager as well.

Q. Okay. I'm going to hand you PTX19, Bates Bay 002145. Lawrence, if you'd take a minute to review that.

A. Yes, sir.

Q. Does this document purport to be the resolutions of a special meeting of shareholders that occurred earlier this week?

A. Yes, sir.

Q. And this is one of the corporate documents maintained by Berry entities?

A. Yes, sir.

MR. BOYD: Move to introduce PTX19.

MR. ALLISON: No objection.

THE COURT: All right, hearing none, it's admitted.

Q. (BY MR. BOYD) You attended this meeting; is that right?

A. Yes, sir, I did.

Q. And this is a resolution related to the topic we were just talking about, right?

A. Yes, sir.

Q. Okay. Can you read into the record what the resolution was?

A. "Be it resolved that the acquisition of cranes or other equipment by Marty Berry, individually or through any company he owns or controls, and the subsequent leasing of that equipment to any Berry company for performing the work of that Berry company, is approved. To that extent such conduct has occurred in the past, it is ratified."

Q. All right. Marty Berry voted on this?

A. Yes, he did.

Q. Okay. And of course, this subject matter directly relates to a company that he and his wife owned; do you degree with that?

A. Yes, solely.

Q. Okay. How did he vote?

A. Affirmative.

Q. Okay. You're totally disinterested from this transaction, would you agree, as the director?

MR. ALLISON: Objection, leading.

A. I'm disinterested?

THE COURT: Sustained.

MR. BOYD: I didn't hear the objection.

THE COURT: It's a leading question.

Q. (BY MR. BOYD) As a director, do you have any ownership interest in Gulf Western?

A. No, I do not.

Q. Okay. Do you have any financial or other ties to that company, other than the fact that the company you co-owned with your partners makes payments?

A. At the end -- this ain't right. This is just wrong. I mean, this is Basic Equipment made over, but just for Marty.

Q. All right. How did you vote?

A. No.

Q. Bonnie Berry is in the same position as you, I suspect; she doesn't have an interest?

MR. ALLISON: Objection, leading.

THE COURT: Sustained.

Q. (BY MR. BOYD) Does Bonnie Berry have an interest in Gulf Western?

A. No, she does not, as far as I know.

Q. Okay. And she voted yes?

A. Nonsensical, I just don't think she has enough

knowledge yet, honestly.

Q. What is it specifically that upsets you about that transaction, Gulf Western --

A. This is how --

Q. -- and the arrangement --

A. This is how we came to own Berry Contracting. I mean, we started Basic Equipment way back in the day as the leasing entity to Berry Contracting. Over term, our father was kind enough to let us take risk and build value by leveraging off of his books, and ultimately, when we folded -- that's how we originally came in by folding in the equity that we built up in Basic for this, and this -- this ain't right. That's why it upsets me. I just can't believe that, like, I had no knowledge of this.

And by the way, it can't be fair. I mean, all the evaluation, everybody running, all the sales force, even the procurement site is all going to be actuated by Berry GP direct employees, okay, finding them, scoping them out, hiring consultants, et cetera, but Marty's closing them in his name and then re-renting to us, no, without giving his partners the opportunity to participate.

Q. Is that historically how the partners have conducted themselves?

A.   Absolutely not.

Q.   Lawrence, I'm going to hand you PTX23. Lawrence, if you'll take an opportunity to review the email except for the date, the attachment to that email?

A.   Yes, sir.

Q.   Do you recognize this document?

A.   Yes, sir.

Q.   All right.  And the email is dated what date?

A.   December 6th.

Q.   Okay.  And who is it sent to?

A.   Marty Berry, Dennis Berry, Rob Powers and Mike Hummell.

Q.   All right.  And the attachment, without getting into the details of the substance, what would you describe this document to be?

A.   A clear description of the situation as I see it.

Q.   Okay.  In what capacity were you sharing this with your partners and the general counsel and the CEO?

A.   All three as a owner, shareholder, and employee.

Q.   And the purpose related to the record was what?

A.   To substan -- to clearly state my position.

Q.   Okay.  As a board member?

A.   Yes, sir.

MR. BOYD: Plaintiffs offer PTX23.

THE COURT: Okay, no objection?

(No audible or visible response.)

THE COURT: Hearing none, it's admitted.

Q. (BY MR. BOYD) Lawrence, I want you to take your time going through this. And I want to turn your attention to page 3 and ask you to read that into the record?

A. The whole -- all of page 3?

Q. No, that paragraph that says, "I object." I'm sorry.

A. "I object to the improper 'ratification' of 'previous board action,'" in parenthesis -- I'm sorry.

"I object to the improper 'ratification' of 'previous board action' that never took place and I cannot vote in any favor of any such 'ratification' unless I determine it's in the best interest of the company after full disclosure of all material facts."

Q. Okay. And why is it that you take that position that's articulated in that paragraph? Why are you stating this and why are you taking this position?

A. Because they -- you can't just sit around and have a do-over on all -- on all the minutes, and to say this is just the way it is -- we did all these things back in the day, that now we're going to say they're

okay.  Come on.

Q.  At this time that you wrote this, did you have full disclosure of all material facts?

A.  I still don't.

Q.  Earlier we talked about Tommy Naybar and Tonja Fulghum?

A.  Yes, sir.

Q.  Do you remember that?

A.  Yes, sir.

Q.  The termination?

A.  Yes, sir.

Q.  Were there any other employees that worked in Houston who were terminated?

A.  Yeah, Mike.

Q.  And in your view, were those key personnel or not?

A.  I think the key person, T.J. Smith was terminated at the same time to which I didn't -- I didn't have notice of, I had to hear about it from somebody else, and he's probably -- other than people with the last name Berry -- -the longest-term employee there and a double vice president, I might add.  And somebody that was on dad's never fire list but.

MR. BOYD:  Give me one second, Your Honor.

THE COURT:  Okay.

MR. BOYD:  Pass the witness.

THE COURT:  Who goes first?

MR. ALLISON:  I guess I do.

THE COURT:  Okay.

CROSS-EXAMINATION

BY MR. ALLISON:

Q.   Mr. Berry, may I call you Lawrence, so the record's clear, since we have several Berrys?

A.   Sure.  Yes, sir.

Q.   And I want to make sure that we get -- our lunch hour's coming pretty quick, so I want to make sure before we break for lunch, whenever that happens, that we have our arms around, really, the core of your complaints; okay?

A.   Yes, sir.

Q.   And I understand that -- well, let me back up. You heard your lawyer in opening say the only thing that you're looking for injunctive relief on are two things, right?

A.   Yes, sir.

Q.   One of those things you're looking for injunctive relief is that the sale of real property not occur without, I forget what he said, 10 or 14 days' notice to you.  That's one of your requests for injunctive relief, right?

A.    Yes, sir.

Q.    The other request for injunctive relief is that you not be removed from the board, right?

A.    Yes, sir.

Q.    And obviously, you have a series of things where you have disagreed on votes with your brothers, and also, more recently, with Bonnie, right?

A.    I believe that's in votes where we voted different ways, but yes.

Q.    Okay.  I mean, sometimes those were two-to-one votes, with you being on the short end of that two-to-one vote?

A.    Yes, sir.

Q.    And the list of things where you think you have these complaints about being on the short end of those votes include votes that ratified the very -- the very -- the loans from Marty Berry and Dennis Berry, right?

A.    Okay.  Restate the question, please.

Q.    Yeah.  One of the things that you -- there was a vote to ratify the loan from Marty Berry to the company, right?

A.    Yes, sir.

Q.    And the vote when Dennis was there was two to one, with you being on the short end of the vote, right?

A.    Yes, sir.

Q. And the vote when Bonnie was there was two to one, again, with you being on the short end of the vote, right?

A. Yes, sir.

Q. Okay. And that's one of the things where you feel like you've been treated unfairly, I guess, by the process of how you came about knowing it, et cetera?

A. Yes.

Q. Okay. And another thing that I think that you were outvoted on it sounds like was the meeting minutes, right?

A. Yes, sir.

Q. And you got outvoted on that. Again, that was when Bonnie was there and Marty and you, right?

A. I believe so, yes, sir.

Q. And a two-to-one vote against you?

A. Yes, sir.

Q. And you thought that was also unfair?

A. Since they weren't corrected, yes.

Q. Okay. Well, according to them, they voted to approve the minutes and you thought the minutes were incorrect, right?

A. Yes, sir.

Q. And that's why you had the split two-to-one vote?

A. Yes, sir.

Q. Okay. And -- and the other thing that you had voted have been on short end of the two-to-one vote has been on whether or not the company should sell the dock, right?

A. Yes, sir.

Q. And you think the company should not sell the dock and you got outvoted two to one, first by Dennis and Marty against your one vote, and then later in a meeting, Bonnie and Marty voting to continue to market and you were against that, right?

A. Yes, sir.

Q. Were you voting against marketing the dock, that's all that it was about, right?

A. I don't have enough information to decide one way or the other currently.

Q. Okay. You don't have enough information to know whether you should vote for marketing the dock, right?

A. I think we had enough pending opportunities for the dock, it probably wasn't the right time to be marketing, honestly, the highest and best use. So this is really about me helping preserve the position of the enterprise, and nothing else, and there's -- there was numerous -- I mean, I've been steady pinging away with

Pin Oak for years and I'm the one -- and when we didn't have control of this dock, I'm the one that got it back, for God's sake.

Q. Okay. Try and listen my question. You said you didn't have enough information to make a vote, is that what you said a moment ago?

A. No. I said, I needed more information, but so at the end of the day, it's going to be no.

Q. Okay. So you voted no not because you're against it, you voted no because you didn't know enough information about it?

A. I voted no -- no -- both.

Q. You voted yes and no?

A. No, I voted no for both of those reasons.

Q. For -- for -- okay, and the two reasons are because you didn't have enough information to have a yes vote, right?

A. Well, there's no compelling reason to market it, so the answer's no.

Q. And that's something I think that you actually felt very strongly about, correct?

A. Yes, I'm trying to increase the -- the revenue streams to the company.

Q. But is it fair that you felt very passionately about your no vote on the dock, you're strongly against

it?

A. I think without proper review, yes, I'm strongly against it.

Q. Okay. And, you know, you're strongly against it even though you don't have enough information on it, right?

A. Well, there's no -- I couldn't say, I'm -- I would not sell the dock because you're stranding a bunch of assets there. So the answer is it would have to be a really compelling number to get me to sell the dock.

Q. Okay. And so --

A. And I think it weakens our position to market a key operating asset that we're trying to get a throughput agreement for from one of our clients that's actually paying day in and day out, you know, it's not the right -- I don't think it's the right thing to do.

Q. So if it were a big enough number -- you just said, if it were a large enough amount of money, you would consider voting yes for the sale of the dock, right?

A. At some number, of course.

Q. Okay. And so it's not that you're against selling it, it's just you want to make sure you get the right price for it?

A. I would -- no, that's not what I said. There's

always going to be a price you can sell something, okay, so, and at the end of the day, this is a key operating asset of this company, like it would drastically impact it to sell it. I'm against selling the dock, simple as that.

Q. Okay. The only way you can know if you're going to get a number that you'd say yes to is to market the dock; agreed?

A. No. Unsolicited offers come in all the time.

Q. Okay. So, but one of the ways that you can find out if you can get a big enough number is to market the dock?

A. Yeah, but I'd probably tell my partners if I was going to.

Q. Oh, you were going to market the dock?

A. Yeah.

Q. Okay. And you told that -- when you say "partners," did you tell Marty and Dennis both that you were going to market the dock?

A. No, I didn't say that. I said if I was going to, I would tell my partners.

Q. Okay. And have you ever --

A. I haven't marketed the dock.

Q. Okay. Let me make sure we get our list complete and we'll come back to that in a little bit.

Other than voting no against the Berry loans and the loans from Marty -- by the way, you're also against, I guess, any -- are you also against the loan that Dennis made? Are you opposed to the one that Dennis made for $30,000,000 to the company at the same time Marty made his loan?

A. I'm not suing Dennis.

Q. I realize that. But are you opposed to it the same way you're opposed to Marty?

A. I'm opposed to things transpiring that I'm not given a notice of and so the answer would be yes.

Q. Okay. So you're equally opposed to what Dennis did as you are to what Marty did?

A. I don't have enough information to say that. Dennis was sick --

Q. What's --

A. Dennis was sick and I didn't see him. I don't know what Dennis was told, okay?

Q. Well, you don't know what Marty was told either, right, if you weren't there?

A. This is true, but Marty's the one orchestrating this, not Dennis.

Q. Well, and your mother has also made loans as well, right?

A. I'm sure.

Q. Yeah. And are you equally opposed to those loans when she made them in support of the company?

A. No, I wouldn't say I would be because --

Q. Would you be in favor of the loans --

A. -- if I had knowledge of them.

Q. Okay. But you would be in favor of loans if your mother made them, even though you're against loans if Marty makes them?

A. I'm against loans I don't have knowledge of.

Q. Okay. And that's so you would be -- I mean, equally against Dennis and Marty and your mother if they made loans to the company?

A. I'm -- I will be opposed to loans I don't know about.

Q. Okay. But you obviously know about the one that Marty made, right?

A. No, I didn't know about it.

Q. Well, no, you've already told us and it's in your attorney's timeline that you knew about it as of September of 2022, right?

A. Yes, sir.

Q. Okay. And so you -- it happened, apparently, the transfer of funds happened in, I guess July of 2022; you've seen that document, right?

A. Yeah, but I was asking for this data all the

way through.

Q. And it looks like when you sent an email to Jim Klein, he's the CFO, right?

A. Yes, sir.

Q. It looks like when you sent an email to him, he sent you back the documents that showed the loan same day?

A. I don't think so.

Q. Pardon?

A. I don't think so.

Q. And whatever the email indicates it was like -- are you complaining about Jim Klein, too?

A. Pardon me?

Q. Are you complaining about Jim Klein also?

A. I -- I -- you'd have to reference the document. I mean, you're going pretty quick and you're not really --

MR. ALLISON: May I approach, Your Honor? I'll show it to him.

THE COURT: Yeah. Show him the document.

Let's do this go ahead and break for lunch and you can find the document and you can show the witness after lunch. See you-all at 1:30.

MR. BOYD: Thank you, Your Honor.

MR. ABSMEIER: Thank you, Your Honor.

MR. BOYD: Thank you, Your Honor.

(Noon recess.)

THE COURT: All right. Are you ready on cross?

MR. ALLISON: Yes, sir.

THE COURT: All right. Go ahead.

CROSS-EXAMINATION (CONTINUED)

BY MR. ALLISON:

Q. Before the break, Lawrence, I think we were talking about -- my mistake -- this way, it was kind of two different things, the dock, and then we were also looking over here for some documents on how you received information. We were looking for a document at the break. Do you recognize, I'm going to call this Defendant's Exhibit 6?

THE COURT: Is that already in evidence?

MR. ALLISON: No, it is not.

THE COURT: Okay.

MR. ALLISON: And I figure since there's no jury, doing it this way so everybody can see it.

THE COURT: No, it's fine, I like -- I don't mind doing it this way.

MR. ALLISON: Okay.

THE COURT: I just -- if something's in evidence, maybe we can just not get a -- some --

MR. ALLISON: I went and looked, the one I was looking for before the break, I think I determined I couldn't find it in evidence, that's why --

THE COURT: If it's not in evidence, go right ahead.

MR. REASONER: Do you have a Bates number or an exhibit number?

THE COURT: So they can get their copy out.

MR. ALLISON: 1971 Bates number is the first page of it.

MR. BOYD: Do you have a copy for us or not?

MR. ALLISON: I do not. I did mine electronically.

MR. REASONER: I thought you-all put it in evidence. That looks like the one introduced.

MR. ALLISON: I thought. I couldn't find it into evidence.

MR. BOYD: It's PTX2.

THE COURT: Hold on. Hold on.

MR. BOYD: But ours doesn't have a Bates. Okay.

THE COURT: Is it 2?

MR. BOYD: I'm looking.

THE COURT: 2 is kind of thick but.

MR. ALLISON: And I have it in a small document. That may be what they're looking for.

MR. BOYD: No, it's the same. It may be shorter because that's what they're using, Your Honor, but it appears to be the same.

THE COURT: Okay.

MR. ALLISON: Have you got it?

THE WITNESS: I think so.

THE COURT: Oh, it's the back side, right?

THE WITNESS: It's configured different but I think it's the same thing.

MR. BOYD: It is configured different, but it is the same communication.

MR. ALLISON: I'll use theirs for the moment.

THE COURT: Then use theirs, it's PTX2.

Q. (BY MR. ALLISON) On PTX2, before the break, we were talking about that, and I think that was one of the documents you talked about sort of one of the typical ways you would receive information would be through Tonja?

A. Yes, sir. And --

Q. And this one's the email from Tonja, and PX-2 the way we see it there, would that be typically how you would receive information about the company when you

would make requests?

A.   Yes -- yes, sir.

Q.   And in this particular instance, it looks like Tonja sent the -- Tonja sent the email on what day?  Was it September 21, 2022?

A.   If it is -- oh, there we go at the bottom, September 21, 2023.

Q.   At 12:36 p.m.; is that right?

A.   Yes, sir.

Q.   And asking for basically current P/L and B/S meaning balance statement, right?

A.   Apparently, yes, sir.

Q.   And got a response from Jim that says, "Apologize for the delay."  Do you see that?

A.   Yes, sir.  I'm reading backwards.

Q.   That's okay.  And Jim responded, his response, although he's apologizing for the delay, was same day at 2:24 p.m., right?

A.   Yes, sir.

Q.   And I think you told us earlier this September time frame is when, to your recollection, you first remember learning about the $75,000,000 loaned to the company, 45 of it from Marty, and 30 from Dennis, right?

A.   Yes, sir.

Q.   Okay.  Do you recall -- and I'll be very

specific about this. Do you recall having conversations with Marty Berry where he encouraged you to also pitch in, in other words, loan money to the company?

A. No.

Q. Did you ever have conversations with Dennis where he encouraged you to pitch in or loan money to the company?

A. Way back then?

Q. Yes, sir.

A. No, sir.

Q. In 20 -- let's say just in 2022?

A. No, sir, not that I recall.

Q. Okay. And I appreciate the caution in your answer. You're not saying, no, you're saying you just don't recall it if you did?

A. No, I'm saying no.

Q. You're saying no?

A. Yeah, I'm pretty sure I'm saying no, yes.

Q. Okay. Okay. And --

MR. ALLISON: I need a charger.

(Discussion off the record at counsel table.)

THE COURT: If you're in front of the jury it never fails it doesn't work.

Q. (BY MR. ALLISON) I want to walk through the

kind of your recollection then. The next document I want you to look at is going to be Plaintiff's Exhibit No. 7. Do you recall this series of emails?

A. Where are we?

THE COURT: Why don't you let them know what -- is it already in or?

MR. REASONER: It should be in front of him, Your Honor, I think Plaintiff's 7, if you can find it.

MR. BOYD: Plaintiff's 7 is the letter from IBC's lawyer.

MR. ALLISON: It's Defendant's Exhibit 7. Sorry, I said Plaintiff's.

MR. BOYD: Oh, Defendant's 7. Do we have a Bates on that?

MR. ALLISON: Yeah, it's 1967 Bates page.

Q. (BY MR. ALLISON) Do you remember this exchange of emails in January, sir?

MR. BOYD: And that's PTX No. 1.

THE COURT: This is 1?

MR. ABSMEIER: Yes, Your Honor.

MR. BOYD: Yes, Your Honor.

MR. ABSMEIER: Same as PTX.

THE COURT: Well, all right, it's already in evidence, I guess, Mr. Allison, PTX1.

MR. ALLISON: I'll refer to it as PTX1.

THE COURT: Yeah, PTX1. Do you have it, Mr. Berry?

THE WITNESS: Yes, I've got it in my hand.

Q. (BY MR. ALLISON) Do you recall this email exchange?

A. Yes, sir.

Q. And initially, this email exchange you asked, I guess, for company's receivables and so you got something back other than the Marty Berry and Dennis Berry loans which would be booked as payables, right?

A. Yes, sir.

Q. And what you got back then -- okay, but you understand from reading the financials, that clearly, the place you noticed in September of 2022, what you noticed were the Marty and Dennis loans listed as notes payable by the company, because it's money owed back to Lawrence, right? I'm sorry, money owed back to Marty and Dennis, right?

A. Yes, sir.

Q. Okay. But this one you got a receivable, and this one talks about Orca. Can you tell us what Orca is?

A. Orca -- Orca was an EMP company that owned conventional space.

Q. Okay. And Orca is a company that you took lead on; is that a fair statement?

A. I believe I'm the founder, yes, sir.

Q. Okay. And but it's also a company that millions of dollars were put in by the Berry brother companies, right?

A. I don't think it was put in, it was lent.

Q. You don't think it was what?

A. It wasn't put -- it wasn't contributed, it was lent.

Q. Okay. And so right now the note -- the note is about a $16,000,000 note that you owed to the company, right?

A. I think we'd have to have some accountants to figure that out.

Q. But it's in the millions?

A. Yes, sir, but there's -- there's a bunch of mitigating factors.

Q. But it's in the tens of millions; you'd at least know that, right, sir?

A. Yes, sir, but I'm not sure what the amount is.

Q. Okay. So but it's tens of millions, however many tens of millions?

A. I don't personally don't think it's anything, but no -- yes, it's posted in the books as some number.

Q.   Okay.   And you know that's come up at recent board meetings, correct?

A.   Yes, sir.

Q.   And the Orca discussion also includes discussion of what they call ICI, right?

A.   Yes, sir.

Q.   And there was discussion -- did you guys have a discussion about how much was owed and that you needed to pay it?

A.   Yes, sir, I said once the accountants get done figure and out what we owe, I'll pay.

Q.   And so, was that a unanimous vote that you would pay what you owed?

A.   I don't know that a vote transpired.

Q.   Okay.   But you -- if there's a specific amount and you disagree with the amount, will you vote no on it?

A.   Pardon me?

Q.   If there's an accounting done, and you disagree with that accounting, are you going to vote no to that repayment?

A.   I couldn't say.

Q.   Pardon?

A.   I couldn't say.

Q.   You're going to have to -- you're going wait

and see what the facts are and then vote?

A. I couldn't -- I couldn't say right now. I'm not following what your query is.

Q. Well, let me put it this way. You talked earlier in your testimony that sometimes you're lacking information, right?

A. Yes, sir.

Q. Are you telling us you lack information on your own note to the company?

A. No, how it's administered and accounted for at Bay.

Q. Okay. Did you keep track of how much you owed, how many tens of millions?

A. Yes, sir, there's accountants in my office that keep track of these things.

Q. Okay. And would you trust your accountant to say how many tens of millions it is that you owe to the company?

A. It's not tens, it's not plural. It would be ten million or more, but not tens of millions.

Q. Okay. Ten plus million, okay.

A. X.

Q. And if you agree with the accounting done by your accountant and they ask for that amount, would you vote yes on it?

A.   If -- if it's clear -- it's going to be what I owe and what I'll pay.

Q.   But if -- let me try it again.  If you agree with your accountant on the amount owed and that's the amount they want, the companies want back, would you vote yes that you have to repay it?

A.   Yes, sir, I guess I would.

Q.   Okay.  So you think -- and you think you should be entitled to vote on that, right?

A.   Pardon me?

Q.   You would vote on it like you just said because you feel like you have a right to vote; don't you?

A.   It's -- I would have a right to vote if I knew about it, yes, knew it was disclosed, of course.

Q.   Okay.  And so, would you be interested in that loan?

A.   I'm not sure I understand the question.

Q.   Well, in your memo, that memo where you talked about -- do you remember this memo, Plaintiff's Exhibit No. 23, the long email from you to Marty and Dennis and Robert and Michael Hummell; do you remember that?

A.   Yes, sir.

Q.   If you look down on page 3 of it.  And you told us earlier -- I'll let you find it.

A.   Okay.

Q. You got it?

A. Yes, sir.

Q. I'm on page 3 of that. Do you remember you told us earlier that you wrote this to Marty and the different people that are listed?

A. Yes, sir.

Q. And how long did it take you to write it, would you say?

A. I couldn't say, I don't recall, or --

Q. You can't recall?

A. No, I can't say.

Q. Pardon?

A. I can't -- I couldn't say.

Q. Okay. But you -- do you see where on page 3 you cited Section 21.418, down at the bottom?

A. Yes, sir.

Q. And you used the phrase there "by approval of the majority of the disinterested directors," and you put it in bold. Do you see that?

A. Yes, sir.

Q. Do you know where -- you've got that phrase, I guess, by your interpretation of 21.418?

A. I'm sure counsel assisted me with this.

Q. Okay. A minute ago you said you wrote it. Did you write all this?

A. Did I draft every item here? Well, it's under my signature, so I guess, ultimately, yes.

Q. Okay. So you wrote it. And when you talk about a disinterested director, do you see that at the bottom of page 3?

A. Yes, sir.

Q. Would you -- because what you're saying in this memo is that you think only disinterested directors should be allowed to vote, right?

A. That is correct.

Q. And so with the Orca note for 10,000,000 plus dollars, you said you would vote, you would vote in favor of paying it if you owed it, right?

A. Well, who was I voting for? Myself or the company or whom? I'm confused about your query.

Q. As the director, that's the only way you get to vote?

A. I would pay, but these are apple and oranges is what you're talking about.

Q. Okay. Well, did you -- for example, if you didn't owe the money and they said you owed it, would you vote against them making you repay it?

A. Say that again.

Q. Would you vote against them making you repay it if they brought it up for a vote?

A.   Would they --

Q.   Would you say, no, I don't vote -- I don't owe it, I vote no?

A.   The question -- okay, I'm just having a hard time following you.

Q.   I apologize.  Let's say they said you owed $30,000,000 when they do their accounting?

A.   Okay.

Q.   And they make a motion for you to pay $30,000,000.

A.   Okay.

Q.   Are you going to vote yes or no?

A.   If I owed 30,000,000, yes.

Q.   What if your accounting says you only owe $15,000,000?

A.   Then I would probably vote no.

Q.   Okay.  But you have a right to vote?

A.   It would -- well, I wouldn't -- this is -- disinterested, interested.  This is not -- this is apple and oranges compared to what the case we're talking about.

Q.   Okay.  Well, in the Orca, the example that we're using here, there's a written note, a promissory note, right?

A.   Yes, sir.

Q. Okay. And that's a note or a transaction between you and the company, right?

A. Yes, sir, it's a -- well, yes, sir.

Q. Okay. And so do you think, though, that the rule about interested and disinterested voting part -- let me ask you this. If you were -- let's change it a little bit. Let's say that -- well, let me back up. Do you think you are an interested person in that note that has your name on it, that promissory note?

A. I would say I think it would be by definition.

Q. Okay. Now, Orca though, did all kinds of other business not related to that note, correct?

A. Yes, sir.

Q. I think they developed mineral interest, correct?

A. Yes, sir.

Q. And did investments; is that correct?

A. Yes, sir, I guess.

Q. Okay. And each one of those required company approval, right?

A. Okay, I'm not following you. Which company?

Q. Well, whichever company. Orca, we're talking about Orca, using it as an example?

A. Okay.

Q. Okay. And were you -- do you think it was fair

and right for you to be able to vote on other business of Orca like investments and direct where those investments went?

A. As the CEO? Once again, I don't understand.

Q. Well, you were an owner, weren't you, one of the owners?

A. I am the owner.

Q. Okay. Originally, though, for years, it was three owners, right, you and your brothers?

A. No, sir.

Q. No?

A. I don't think so.

Q. So you were taking Berry company money and putting into Orca, but they weren't getting the ownership; is that your position?

A. They were a party to every bit of it, and it was for a fee, and if you go back and look through the documents, you'll see it's all addressed. It was completely disclosed to everybody.

Q. Okay. Well, let's not get sidetracked here. So were you the sole decision maker then, or were there other partners that you had as you developed those assets?

A. Well, it was a team effort, but -- yeah, I guess. Yes, I made the decisions.

Q. Okay. And but some of them, I think you joint ventured later on with Conoco and other people, didn't you?

A. Well, we were going to get in petroleum haul, there's working interest, there's not interest participant, there's all kinds of stuff mixed in it.

Q. Right. Some of them had multiple people that would vote on investments, right?

A. On a well by well basis?

Q. Sure.

A. Sure.

Q. Okay. And even though you were interested in this Orca loan, because you've told us you were interested in the Orca loan with the company, do you think it was okay for you to vote on other subject matters?

A. I'd have to see specifically what you mean, because I'm not following.

Q. Okay. But, I mean, you can be interested in the loan and be uninterested in other votes; is that fair to say?

A. You'd have to give me a better scenario than that, I'm not following.

Q. Okay. Well, let's go ahead and go to -- and I'll go ahead and pull it out.

MR. ALLISON: It's 26, Plaintiff's Exhibit 26, Your Honor, and I don't believe it's in evidence. Actually, I have a hard copy too, if it helps.

MR. BALDREE: Plaintiff's Exhibit 26?

MR. ALLISON: I'm sorry, Defendant's Exhibit 26.

MR. BALDREE: Your screen is not working, Doug.

MR. ALLISON: Like I said, I've got a hard copy, too. We'll do it that way.

I've got all kinds of technical problems today. I apologize, Your Honor. May I approach?

THE COURT: Yes.

MR. BOYD: Do you have one for us?

MR. ALLISON: It's a statute.

THE COURT: I think John got it up. John got it to work.

MR. ALLISON: Okay. I'll give him a courtesy copy then.

THE COURT: Okay.

MR. ALLISON: Your Honor, we'd offer Defendant's Exhibit 26.

MR. BOYD: Well, I guess --

THE COURT: I mean, if it's a statute, I'll just take judicial notice of it.

MR. BOYD: And that document is not a complete copy of the section, but I --

THE COURT: I'll take judicial notice of the statute.

MR. BOYD: Understood.

Q. (BY MR. ALLISON) Tell me when you're through reviewing it, sir.

A. Okay.

Q. You see that if you look at Section A that this section applies to a -- first of all, it's got to be a contract or transaction; do you see that?

A. Yes, sir.

Q. Between the corporation, and let's say that's Berry GP, because that's what we're talking about here today; fair enough?

A. Yes, sir.

Q. So this section or statute applies to a contract or transaction between a corporation and one or more directors; do you see that?

A. Yes, sir.

Q. Okay. So it's a contract or transaction that is not with the director, then this statute does not apply, correct?

MR. BOYD: Objection, calls for a legal conclusion.

MR. ALLISON: Your Honor, it's -- he wrote a -- he wrote a four-page memo on it.

THE COURT: He can -- I'll allow it.

Q. (BY MR. ALLISON) If it's not --

THE COURT: With the understanding -- are you an attorney?

THE WITNESS: No, sir.

THE COURT: Okay. With the understanding he's a lay witness.

MR. ALLISON: I understand, Your Honor. With the same understanding that he wrote the four- or five-page memo.

MR. BOYD: Objection, he said he wrote --

THE COURT: Sidebar, sustained.

Q. (BY MR. ALLISON) Do you see where it says that: This section applies to a contract or a transaction between a corporation and one or more officers or directors, right?

A. Yes, sir.

Q. And so that is -- this is the statute you've quoted in this case as sort of defining what is or what is not a disinterested director, right?

A. Yes.

Q. And it only applies to the contract or transaction between the corporation and the director,

right?

A. I assume so.

Q. You say you think so?

A. I assume so, I don't know.

Q. Okay. You see where it says that in the paper in front of you, right?

A. Well, is there a question?

Q. It says that: This section only applies to the contract or transaction between a corporation and one or more directors that enter into a contract or transaction, right?

A. Yeah. Where are we on this?

Q. A1?

A. A1. Okay. Yes, sir.

Q. Do you see that?

A. Yes, sir.

Q. Okay. Let me make sure we're good. This section relating to disinterested or interested directors only applies to a contract or a transaction with one or more directors or officers, right?

A. Yes, sir.

Q. Okay. And obviously, if there was a sale of real property, that would be a contract between Berry GP and some third party, whether it's the Port, or Buckeye, or somebody else, whoever might buy it, right?

MR. BOYD: Objection, vague.

THE COURT: That's overruled.

A. Say that. Okay. Is there a question in there?

Q. (BY MR. ALLISON) Right. This would -- if there was a contract for the sale of a dock, that would be a contract between Berry GP and the Port, or Buckeye, or some third party, right?

A. Yes, sir.

Q. Okay. And so since this section only applies to contracts between or transactions between the corporation and the directors or officers, this section wouldn't apply to the sale of the very dock, right?

MR. BOYD: Objection --

A. I don't agree.

MR. BOYD: -- legal conclusion, vague.

THE COURT: I mean, it does call for a conclusion from a lay witness. I mean, you can certainly make the pitch to me later on.

MR. ALLISON: I am going to follow up and you give me guidance here.

THE COURT: Okay.

Q. (BY MR. ALLISON) You say you disagree. What's the basis of your disagreement?

A. Well, because -- their interested directors closed the loan --

MR. BOYD: Objection, Your Honor.

A. -- transaction on real --

MR. BOYD: Hang on, Mr. Berry.

You sustained the objection.

THE COURT: I did.

MR. BOYD: He's now answering the question that came on the heels of your sustaining.

THE COURT: Well then ask another question.

MR. ALLISON: And I just -- he had a reason I was --

Q. (BY MR. ALLISON) The next question, it's the next question. Give us your reasoning. Give us your reasoning about how this applies?

MR. BOYD: Same objection.

THE COURT: I think -- I think it's a legal conclusion. It calls for a conclusion and he's not an expert witness.

Q. (BY MR. ALLISON) On the Berry dock, right now it accounts for -- I know you keep referring it to as a core asset, correct?

A. Yes, sir.

Q. And revenue per year is about 2.2, 2.3 million per year, correct?

A. Might be right now.

Q. Okay. And the overall revenue of the company

right now is more in the neighborhood of 7 to 800,000,000 a year, right?

A. It's -- yes, it's a lot.

Q. Pardon?

A. Yes, sir, it's a lot.

Q. Right. And so even though you refer to it as a core asset, the math that we just said, meaning that it's, what, two out of 100 would be 2 percent so it's an eighth of that which is less than a half percent of your revenue, the dock?

A. But you're not -- well, you're -- it's an incomplete question. You're not --

Q. Let me try again. Right now -- and it's been this way I think for years -- the dock is less than a half percent of the company revenue, right?

A. I think we'd have to go historically to get to where you're going.

Q. Okay. But you recognize that $2,000,000 if that's all it's revenuing, and you're making 800 in revenue a year, that's less than a half percent on the dock, for the dock?

A. This is true, but I also would say that you've got a couple of a hundred -- a vast amount of -- at some cost at 1414 Corn Products Road that needs that heavy -- that needs that facility to be valuable at all,

otherwise, you can just cut it all and sell it for scrap as the way things currently set.

Q. Okay. Part of --

A. So it's inner connected to the main Berry yard, so to say it has no value because of what's being transpired or transacted right now, I would say we can't afford to sell it because there's a lot more super module projects coming down with L and G attached to the ones that are already permitted, so we need to keep our options open.

Q. Okay. And so one of the discussions when you've been debating in the back room, so to speak, or at the directors meetings whether or not you're going to sell the dock, Marty has told you, has he not, well, if we sell it, we can reserve the right to remove super modules - using your words - super modules across the dock for a fixed fee, right?

A. I wouldn't know any of that, would I?

Q. Well, but that's -- that would be part of the sales condition that Marty's proposed, right?

A. I don't know.

Q. You didn't hear him say those things?

A. No, I don't know what happens. But I tell you one thing, you're going to have a hard time. You need that dock.

Q.   Well, how often have you used it in the last year?

A.   Things get used every day.

Q.   No, for the -- I don't mean -- I don't mean Pin Oak or the small barge companies.  How often have you -- when's the last time you did a super module --

A.   I flew in this morning and there's a vessel sitting on it for shipping that wasn't there yesterday.

Q.   No, no, no.  How often --

A.   It wasn't on there the last time I was here.

Q.   How often has Berry -- when's the last time Berry did a super module?

A.   There, I don't know that.  I think it was quarters for Leviathan.

Q.   July?

A.   I said the quarters for Leviathan.  I don't remember the day it shipped.

Q.   Okay.

A.   It's been a while.

Q.   Okay.  More than once in the last year?

A.   I couldn't say.

Q.   Okay.  So it's rarely used by Berry for the super modules?

A.   It's got a vessel sitting on it right now and you couldn't go out with it.  Once again, you sure do

have a lot of yard there and we all know the heavy lift dock in the ports is not accessible so.

Q. Do you recall, though, the conversation with Marty where he said, if we sell it, we can reserve the right to a certain amount of use over that dock to meet our business needs?

A. No, I don't recall that conversation, actually.

Q. Okay. Would that be a smart thing to do?

A. Absolutely, it would be a necessary, but like I said, if you sold it you ain't going to be able to use it.

Q. Unless you reserve some right on it?

A. Yes, sir, but then how restrictive can you be, you've got to have to taker pays there, okay, so you got LDs, and so how often are you going to get to use it.

Q. Because most of the docks in the Port of Corpus Christi are moving liquids, right?

A. Yes, sir, this port is all, pretty much all liquids.

Q. Yeah, and so that's --

A. With a few exceptions Gulf or Kiewit.

Q. Yeah. Liquids are probably the highest and best use for docks in our port?

A. Depends on how you look at it. It depends if you look at it from an employment standpoint, and from

the enterprise, you know, we're in the service business so I would say, no, liquids probably isn't the highest and best use in regards to our company because we ain't in the liquids business unless it's totaling.

Q. Well, let me put it this way. When companies that are doing liquids across the crude oil, across their docks, they're making hundreds of millions of dollars instead of $2,000,000 off their dock, right?

A. Yes, but our dock's moving hydrocarbon liquids across it, that's where the revenue's coming from now is liquids.

Q. Okay. And so you recognize that your super modules are not the highest and best use for a dock, right?

A. From the corporate standpoint, I'd have to disagree. You got a couple of hundreds million dollars of some cost there you're going to abandon? No, I don't think so.

Q. From a money standpoint you can make more money moving liquids across them than you can super modules?

A. Yeah, but you'd have to have contracts and a lot of other things. It's a big question mark, so I couldn't say that.

Q. Anyway, so that's -- what I've just kind of laid out with you, that's really been the disagreement

between you on the one hand and Dennis and -- and Marty on the other hand about sell the dock or don't sell the dock, right?

A. No, not really, I think the disagreement was that I didn't know about it.

Q. Okay. So now that you know about it, you're okay with selling the dock, if the price is right --

A. I didn't say that.

Q. -- like you told us?

A. I didn't say that. I said at some point there's a number there that we sell, but we have -- we have -- we have pending stuff with Pin Oak, there's other options for the dock.

Q. And -- and you know for -- for how many years have you and Marty and Dennis, until recently, of course, how many years have you-all been making those decisions together?

A. At least since '98.

Q. Yeah. And have -- you know, even though I understand sometimes one or the other of you would disagree, except most of those were unanimous decisions, you told us, right?

A. Yes, sir, and we don't sell much.

Q. We don't what?

A. We don't sell much.

Q.   Okay.   No, but I mean, the business decisions, you do a lot of business decisions?

A.   Yes, sir.

Q.   And so, what, are you all in agreement over the last 20 plus years 80 percent of the time, 90 percent making business decisions?

A.   Probably 90 percent of the time, actually.

Q.   90?

A.   Yes, sir.

Q.   Okay.   And so what we're talking about on whether or not you would sell the dock or not sell the dock is obviously just a matter of business judgment and you disagree with them?

A.   I wouldn't sell operational assets, period.   If I was going to sell assets that belonged to the company to pay back the loans, I would sell superfluous assets all day long.

Q.   Okay.   Is that a yes to my question?   You have a disagreement with them about whether or not you should sell the dock for business reasons?

A.   For business reasons.   Okay.   You're going to have to -- say it again.

Q.   Your business judgment is different than theirs, that's why it's a two-to-one vote?

A.   No, it's not at all.   I think their conditions

are different. They have this loan and that's the driver.

Q. Well, actually, the loan, since you bring it up, the loan is actually collateralized by the dock, right?

A. It is now.

Q. The Frost Bank loan, right?

A. Yes, sir.

Q. And the Frost Bank loan is also -- the IBC Bank was also collateralized by the dock, right?

A. Yes, sir.

Q. And so, any money from selling the dock would first go, at Frost's option, to repay the Frost Bank loan, right?

A. It may or may not, it depends on if you get a waiver from them or not.

Q. Okay. But they have the first right, it's up to them?

A. Yes, sir.

Q. Okay. And so that's how loan proceeds would go first, or excuse me, that's how any dock sales proceeds would go first would be to pay off debt normally, right?

A. Not necessarily.

Q. Okay. Who would you pay first?

A. If I was Marty Berry over there, I'd pay myself

at the end of the day, but in all truthfulness, it doesn't really make any difference because the -- like I said, there's conflict -- they made these loans and the only reason we're talking about -- we never sell anything, okay, that's the bottom line. And for -- we wake up, and all of a sudden, we are selling things. And operational assets when we've got all these, a multitude of properties that are superfluous that aren't core assets, I just don't understand.

Q. Okay. Didn't you say earlier that you just voted to sell some property like a week or two ago?

A. No, like this week.

Q. Pardon?

A. This week.

Q. Yeah. So you do sell things?

A. Very seldom.

Q. But you just said you don't sell things?

A. Very seldom do we sell things. I think the history will prove that very seldom do the Berrys sell anything.

Q. And the Three Rivers yard, didn't you take lead on selling that real estate?

A. No, if I'd have took lead, I'd had it papered correctly. I did not.

Q. Okay. But you're the one who voted for selling

it, didn't you?

A.   Because it was past the tipping point.

Q.   So, is that a yes to my question, you voted yes to sell that real estate?

A.   Yes, sir.

Q.   Okay.   So you just said on the note, if it were your note, you'd pay yourself back?

A.   Well, I was being facetious, okay, honestly, okay?   The money's going to come in, it's going to go where it's supposed to go.

Q.   And that's the way you would expect it to be handled here, right?

A.   Pardon me?

Q.   That you would expect it to be handled exactly that way if the dock sold?

A.   I would expect to be given knowledge that we were going to start selling things would be the first thing.

Q.   Okay.   And then when it sells, you would expect the money to be done or utilized in a way that was in the best interest of the business?

A.   Of the enterprise, yes, sir.

Q.   Okay.   And you would expect that that would happen, right?

A.   If we -- if we all agree to do something, yes.

Q. Or if it's even a two-to-one vote, sometimes it's a two-to-one vote and you've got to follow the two-to-one vote; you've testified to that already?

A. Yes, sir.

Q. Okay. Because you -- I want to point -- you understand, usually, you used the term I think in your memo, "self-dealing." Do you know what I'm referring to?

A. Yes, sir.

Q. And that's usually used when somebody is taking money from the corporation, right, taking something of benefit? Dealing for yourself as opposed to dealing for the corporation?

A. For the enterprise, yes.

Q. Okay. And in this instance, I mean, a classic self-dealing is if I give my -- if I just take, you know, tens of millions of dollars from the company and don't pay it back, that would be self-dealing, right?

A. If you buy a crane and lease it to the company, that would be self-dealing too.

Q. Well, use my example. If you take tens of millions of dollars from the company and you don't pay it back, is that self-dealing?

A. Pardon me?

Q. If you take tens of millions of dollars from

the company and you don't pay it back, is that self-dealing?

A. I would have to see the scenario.

Q. Well, like the Orca scenario where you took tens of millions --

A. Once again, I'm going to restate, on the work, if I owe it, I'm going to pay it. There's -- it's as simple as that.

Q. Yeah, but you haven't, have you?

A. Because it's been a performing note.

Q. It's in default now, isn't it?

A. May very well be. This is a legal question, in all honesty.

Q. Okay. So, but would that be self-dealing if you took -- just hypothetically, if you took tens of millions of dollars for yourself and didn't pay it back from the company, would that be self-dealing?

A. It may be.

Q. Okay. What if you gave tens of millions dollars to support your company? That would be selfless, wouldn't it?

A. No, sir. I would give my partner the opportunity to participate.

Q. Okay. And are you telling -- and if they give you the opportunity to participate, then do you agree

that it is not self-dealing?

A. If there's been no change in condition and everything's ideally the same point, then you might be -- you'd be right if I would have said no back in the day. But I never was given that opportunity, Doug.

Q. Okay. But let's just try to stay focused here. If you're given the same opportunity to participate as Marty has and Dennis has, then we agree, that is not self-dealing, right?

A. If we were all three at the same time at the same conditions then, if it's all -- no, how would it be self-dealing? We'd all be in.

Q. Okay. And you're telling us neither Dennis nor Marty ever offered you that opportunity, right?

A. Absolutely.

Q. Okay. And so there's no recording of a board meeting where they made you that offer recently?

A. Okay. Once again, I qualified and said it had to be ideal to the same situation. No, the change of conditions, everything's different. Okay, I can't get any information and you're saying it's the same. No, it's not the same.

Q. Okay. Well, they -- for example, the note is at prime plus a quarter percent; you know that, right?

A. I know I've seen documents here that say that,

but where were those documents when I asked for them? They've been backdated for God's sake. I mean, where were they? I don't understand.

Q. I know you don't understand, so listen to my question. Five and a quarter percent, do you think that's a fair interest rate?

A. I don't know, I'd have to see what T bills are at.

Q. Okay. You've had -- I think you've been asked several times whether or not you think -- because if they voted in the meetings, whether or not it was a fair transaction; do you remember those votes, you voted against it?

A. Yes, sir.

Q. And that's been going on -- the first one of those meetings, they've had repetitive meetings since December, early December, right?

A. Yes, sir.

Q. Okay. And every time they have a meeting, you say you need more information, right?

A. Yes, sir.

Q. To decide if it's fair or not, right?

A. Okay. I'm listening.

Q. In other words, you keep saying, I need more information to decide if it's fair, right?

A. I need more information, period.

Q. Okay. And you got, obviously, lawyers and I think you mentioned your accountant a while ago. With resources like your lawyers and accountants, can you -- wouldn't they be able to help you know what was a fair loan, a fair advance?

A. It would be fair if I was given knowledge of it and I didn't have to sue to find out about it and get the documents.

Q. Okay. So your complaint really, and we know that you found out about it in September instead of July of 2022. Your complaint is that two-month delay? At least the documents show us that much, right?

A. Okay. Once again, you're losing me. So my complaint is what?

Q. Your complaint is -- because we've already seen the timeline, your lawyer put it up on the board -- that the loans were made in July and that you found out about it in September of 2022, same year?

A. No, there's a line item on -- on a -- on a deal. Where's the loan agreements? Where's the worksheets? Where's the repayment schedule? No, I didn't find out about it. So they got -- there's an entry in here that just says related party loans. So, once again, where's all the worksheets? Where's the

documents? Where's the repayment schedule? I never heard of such a thing of this scope and scale. Okay, what if you don't have a plan? Hell, I don't know that. They must be pretty easy.

Q. But is a .25 percent above prime, do you think that's a fair interest rate?

A. I'd have to see --

MR. BOYD: Objection, asked and answered.

A. I'd have to see what the --

THE COURT: Sustained.

A. -- T bills are at today.

THE COURT: Asked and answered.

Q. (BY MR. ALLISON) And you know that the loan now is subrogated to Frost, right?

A. Yes, sir.

Q. Okay. And that means that Frost gets paid before Dennis or Marty ever see a penny, right?

A. Well, yes, sir.

Q. And so do you think that is a great position to be in for Dennis and Marty?

A. They're the ones that threw their money in, not me. And they agreed to it, so that would be a question you'll have to ask Marty when he's sitting up here.

Q. And when, in fact, you would refuse to do it if you were subrogated, right?

A. Pardon me?

Q. You would refuse to make the loan to the company if you were subrogated, right?

A. I couldn't say that.

Q. Well, you know it's a disadvantageous position to be subrogated, right?

A. Doug, I understand that.

Q. Okay. And you know that it's also a loan that was made without security, right?

A. Yes, sir.

Q. Now, when the banks, when they get -- when they give a loan, like Frost, or IBC, I think it's true of both of them, they actually require a lot of pledge of assets or collateral in order to secure the loan, right?

A. Yes, sir.

Q. And you know that, for example, Frost then and IBC, because they're requiring security for the loan, that means, by comparison, the Marty loan and the Dennis loan are disadvantaged, right?

A. I'd say they are what they are.

Q. Well, you'd rather be -- as a businesses man, you'd rather have security for your loan than have no security like Marty and Dennis, right?

A. Yes.

Q. Okay. So the fact that they're at five and a

quarter percent, and they're subrogated, and they're not -- there's no security supporting or collateral supporting the loans that's -- that's a bad loan if you're the lender, right?

A. Yeah. It wasn't like that when they made the loan, though, was it?

Q. Well, you were saying there used to a pledge agreement or a collateral agreement?

A. No, I'm saying there wasn't.

Q. Right. And not having -- let me put it this way. Banks -- banks we know insist on having collateral?

THE COURT: I think I get your point on this thing.

MR. ALLISON: Pardon?

THE COURT: I think I get your point on this thing.

MR. ALLISON: Okay.

Q. (BY MR. ALLISON) By comparison, Frost also required, you know this, $20,000,000 in a cash CD as part of the collateral for the Frost line of credit, right?

A. Incrementally, yes, sir, I believe so.

Q. Okay. And obviously, Marty and Dennis did not get the benefit of cash in a CD from the company in

order to make the loan, right?

A. I couldn't say.

Q. Well, have you ever seen any evidence that somebody put a cash CD in securing --

A. I don't even -- Doug, I don't even know where the money was spent so I couldn't say.

Q. I'm not trying to argue with you. You know that you don't have any evidence that there's any CD backing Marty's loan or Dennis's loan, correct?

A. No, sir.

Q. I think we had a double negative in there. We're agreeing with each other, right?

A. I guess we are.

Q. Okay. So -- and again, very different than taking money from the company if you're giving money to the company and it's at a prime plus a quarter rate, and no security, no collateral, and it's subrogated to the line of credit, in this instance with Frost, that is a great loan for the company, isn't it?

A. It was so great it got our revolver counsel, okay? That's the bottom line, that's how good it was, it affected the lifeblood of this company, calls IBC, because it was poorly planned and poorly executed and Dennis Nixon when, okay, came to talk about it, Jim Klein told him that they'd spent the money and the bells

went off, okay?  And when he asked for the --

MR. STEELY:  I'll object to hearsay --

THE COURT:  Sustained.

MR. STEELY:  -- to what Mr. Klein is saying and what --

THE COURT:  Sustained as to hearsay.

Q.  (BY MR. ALLISON) Okay.  I'm going to use two things in your answer.  You said it was so great and then you also talked about your belief that it was the cause of IBC breakup, right?

A.  Once again, from the time that Jim Klein told Dennis Nixon that the money was spent --

MR. STEELY:  Objection, hearsay.

A.  -- Dennis is a damn good banker --

THE COURT:  Sustained as to hearsay.

A.  Dennis is a damn good --

THE COURT:  Wait, wait, wait.  Ask another question.

MR. ALLISON:  I don't think it's been put into evidence, Your Honor.  This is Defendant's Exhibit 4, it's the promissory note.  We'd offer that into evidence.  We've talked about it.

MR. BOYD:  I'm sorry, which one?

MR. ALLISON:  Did you-all put it in?

THE COURT:  It's the note.  I think it's

part of -- isn't it part of an exhibit?

MR. BOYD: Dennis Berry's note is not into evidence.

THE COURT: Okay, all right.

MR. BOYD: And we have no objection.

THE COURT: All right. It's admitted.

MR. ALLISON: And also we have --

THE COURT: But I need a hard copy.

MR. ALLISON: Okay. And we coordinated with the court reporter ahead of time and I think we have that worked out.

MR. REASONER: Doug, what exhibit was that?

MR. ABSMEIER: Defendant's 4, right?

MR. ALLISON: Pardon?

MR. REASONER: Defendant's 4 is Dennis Berry's note, is that the same?

MR. ALLISON: Yes.

MR. ABSMEIER: And is it --

MR. ALLISON: It doesn't have anything else in it so we're clear on the record.

MR. ABSMEIER: If it's Bay 21 and 22, I have a hard copy I can give the Court.

MR. ALLISON: I've already gone over the terms with him. I'm not going to do it. I'm just making sure they're in the record.

MR. BOYD: But is the Bates the same?

MR. ALLISON: It is Bates page 21 through 25.

MR. BOYD: Okay. So it's both notes?

MR. ALLISON: Yes, it's both notes and actually the ledger.

THE COURT: Okay. So no objection, I take it, over here?

MR. BOYD: No objection.

THE COURT: All right, it's admitted.

COURT REPORTER: Which ones were those, 5? What numbers were they?

MR. ALLISON: Defendant's 4, I believe.

THE COURT: It's Defendant's 4, it's one exhibit, right?

MR. ALLISON: Yes.

THE COURT: It's several pages long.

MR. ALLISON: It's the note with Dennis, the note with Marty and the ledger.

THE COURT: Okay. And you've provided a hard copy for --

MR. ALLISON: I've not, but I'm not going to ask him any questions on it.

THE COURT: No, I'm with you.

MR. ALLISON: But for the court reporter?

THE COURT: For the court reporter. I mean, because she holds the exhibits, and -- and if I have to go back and take this under advisement, or whatnot, I've got to be able to see the exhibits.

MR. ALLISON: Okay. I will get us a hard copy. I know we called and we were under the impression to go ahead and do them electronically, but we'll go ahead --

THE COURT: Oh, did you file it electronically?

MR. ALLISON: I don't know if we filed it or not. I know that they communicated.

THE COURT: If you filed it electronically, it's fine but.

MR. ALLISON: Okay. I will double-check and make sure we close that loop.

THE COURT: Because then I can -- then I can --

MR. ALLISON: And then we'd offer Exhibit 5, we've already talked about it, Your Honor, it's the subrogation agreements.

MR. BOYD: Just for clarification, and I apologize. When you say "filed" through the Court's e-filing system?

MR. ALLISON: That is normally how we would

do that.

MR. BOYD:  How are we going to do that with our confidential?

MR. ALLISON:  Oh, yeah.  Okay, thank you.

THE COURT:  Yeah, true enough.

MR. ALLISON:  We'll get hard copies and handle them the way we've talked about, Your Honor.

THE COURT:  And if -- and if it does get -- and if it -- and if you have filed it, I can -- I guess, I don't know, I guess I'll have to seal it.

MR. BOYD:  I don't believe it's been filed because I didn't see a docket notification come up.

THE COURT:  Okay, okay.

MR. STEELY:  I haven't seen it.

THE COURT:  Okay.

MR. ALLISON:  Your Honor?

THE COURT:  Sometimes it hasn't been accepted and nonetheless.

MR. ALLISON:  Your Honor, we'd offer --

MR. BOYD:  It's a complicated world we live in.

THE COURT:  It's a complicated world and the computers run half of it.

MR. BOYD:  True.

THE COURT:  And it's true.  It becomes very

frustrating, but it's true.

MR. ALLISON: And, Your Honor, we'd also offer Exhibit No. 5 which are the subrogation agreements.

MR. ABSMEIER: Doug, can you give us the Bates number on those?

MR. BOYD: No objection.

THE COURT: All right.

MR. BOYD: Subject to this house cleaning, which we need to do after the fact.

MR. STEELY: They have 9 through 20. Bates 9 through 20.

MR. ALLISON: Yes.

THE COURT: Then 5 is admitted.

Q. (BY MR. ALLISON) And it raises a point, not only were Marty and Dennis's loans subrogated to the Frost loan, but there's a separate line of credit for equipment with Wells Fargo, correct?

A. Yes, sir.

Q. And they were also subrogated to the Wells Fargo loans, right?

A. I'm not sure about that, but I guess, if you say so.

Q. Well, Exhibit No. 5 is in evidence now, if you want to look at it. See that says Wells Fargo and --

A. Yes, sir.

Q. -- you can read it if you want. If the record shows that, you're --

THE COURT: I mean, if you want to take -- it's about time for a break. If you want him to be able to look at the document --

MR. ALLISON: I don't think I need to. I'm just moving on.

THE COURT: All right. Well, I'm going to take a little break and then we'll start up again.

THE BAILIFF: All rise, please.

(Recess.)

THE COURT: All right. Ladies and gentlemen, be seated. Still your cross.

MR. ALLISON: I believe we coordinated with plaintiffs' counsel and the court reporter. We have a series we're going to go through and we're going to offer them, they've been previewed already. I don't think there's any objections, I think we're going to get her hard copies. I think we have a plan. Do you guys agree?

MR. BOYD: Agreed, Your Honor.

THE COURT: Okay. Very good.

MR. ALLISON: With that, Your Honor, we will offer Defendant's Exhibits 10, 11, 12, 13, 14, and

15.

THE COURT: All right. No objection?

MR. ABSMEIER: One question, sorry. You told me when we conferred that you were not offering 13 so if you're offering it, I need to know the Bates number and confirm.

MR. ALLISON: I thought I said I'm not offering 8, but that's okay, I'm going to use your 5 instead of 8 and then let me try and answer your question for 13.

MR. ABSMEIER: Can we go through exhibit by exhibit with you giving us the Bates number and us telling you agreed or not?

MR. ALLISON: Oh, you know what?

MR. ABSMEIER: That way it's on the record what the document is.

MR. ALLISON: Yeah, I don't need 8, because you already put it in. We did have that discussion too. So it's --

MR. STEELY: Are we on the record?

THE COURT: I don't know.

(Laughter.)

MR. STEELY: Before we start announcing all these agreements, let's get it on the record.

COURT REPORTER: We are, we are.

THE COURT: All right. Apparently, we are. It's on the record.

MR. ALLISON: We're offering 10, 11, 12, 14 and 15.

THE COURT: All right. And with that?

MR. ABSMEIER: I just need to know the Bates number for each of those. Is --

MR. ALLISON: I'll just call them out as we went is what I thought you wanted me to do.

MR. ABSMEIER: No. I want you to put them on the record before we agree.

MR. ALLISON: Okay.

MR. ABSMEIER: That way we're agreeing on a Bates number that represents Exhibit 10 instead of an unknown document that --

MR. STEELY: How about I help you out, Doug?

MR. ALLISON: Yeah.

MR. STEELY: Exhibit 10 is Bates 0799.

MR. ABSMEIER: Agreed.

MR. STEELY: What's the next one?

MR. ABSMEIER: 11.

MR. STEELY: Exhibit 11 is Bay 0902. And this will be 11.

MR. ABSMEIER: Agreed.

MR. STEELY: Doug, 12.

MR. ABSMEIER: You said opening Bates number.

MR. STEELY: Yeah.

MR. ABSMEIER: Oh, yes, sir.

MR. STEELY: It looks like it's 0954.

MR. ABSMEIER: Agreed.

MR. REASONER: 14 is next.

MR. STEELY: Bay 0984 through 0987.

MR. ABSMEIER: Agreed.

MR. REASONER: And 15.

MR. STEELY: 15, Doug, also?

MR. ALLISON: 15 is in it, yes.

MR. STEELY: This looks like it is Bay 01819.

MR. ABSMEIER: That's agreed.

So no objections, Your Honor, to those exhibits.

THE COURT: Then they are all admitted.

COURT REPORTER: Just for clarification, 13 is or isn't?

MR. ABSMEIER: 13 is not being offered.

MR. ALLISON: I'm going to use -- my 13 is their No. 6, so I'm going to use that.

THE COURT: Okay.

MR. ALLISON:  May I proceed, Your Honor?

MR. STEELY:  So 10 through 15 are in, but not offering to 13?

MR. ALLISON:  Correct.

CROSS-EXAMINATION (CONTINUED)

BY MR. ALLISON:

Q.   Right before the break you were saying that the failure to disclose Dennis and Marty's notes, that's what blew up the IBC Bank?

A.   Yes, sir.

Q.   Why do you say that blew up the IBC Bank loan?

A.   One of the first things Dennis Nixon told me.

MR. STEELY:  Objection, hearsay.

THE COURT:  Okay, let's do this.  We can't talk about what other people said.  You can say there was a conversation with Dennis Nixon.

MR. ALLISON:  Okay.

THE COURT:  Okay.

MR. ALLISON:  I'll try to ask my question more where I wouldn't elicit hearsay.

Q.   (BY MR. ALLISON)  Let me rephrase it this way. Were you at the March 13th meeting when Dennis Nixon came to Corpus Christi?

A.   I didn't have notice, no, I was not there, nor did I have notice of that meeting.

Q. Okay. And did you review any of the paperwork in that late February, early --

(Cellphone ringing.)

MR. ALLISON: Can you-all hear that or is it just me?

THE COURT: No, we can hear it.

(Pause in proceedings.)

Q. (BY MR. ALLISON) Were you at -- have you reviewed any of the paperwork from the bank from IBC in that late February, early March time frame for the March 13th meeting with Dennis Nixon?

A. I need to see the document. I couldn't say.

Q. Okay. And what you do know, though, Plaintiff's Exhibit 5, that's a letter your counsel referred to a moment ago, is that right, during his questions of you?

A. Yes, sir.

Q. And go ahead -- go ahead and tell us the date of that letter.

A. March 3rd.

MR. BOYD: Doug, just so we have clarity, that's Bay 000953 email; is that right?

THE WITNESS: Yes, sir.

MR. BOYD: Okay.

Q. (BY MR. ALLISON) And go ahead and read that

March 3rd email is from who to who?

A. From Gus Barrera, our banker, to Rob Powers on March 3rd at 2:16. "Rob, hello. My boss, Dennis Nixon, would like to set up a meeting with the Board of Directors for Berry the week of March 13th. Please let me know what date would work best for the meeting. Thank you for your help. Gus Barrera."

Q. So the proposed meeting was going to be the week of March 13th, correct?

A. Yes, sir, yes, sir.

Q. Okay. It doesn't say which day during the week of March 13th, right?

A. No, sir.

Q. And it doesn't say a time, right?

A. No, sir.

Q. Would you agree that it's fair to characterize that as a request for a meeting?

A. Yes, sir.

Q. Sometime during that week?

A. Yes, sir.

Q. And have you ever seen any other email or text message or anything that confirmed a date or time for the meeting?

A. No, sir, I have not.

Q. For example, do you know if there's anything

out there that set the meeting for March 14 or March 15, or March 16 or March 17?

A. Not that I have seen, no, sir.

Q. Okay. So far as you know -- based upon the evidence that we have here, as far as you know, there was no specific date or time ever set for the meeting?

A. I know Dennis Nixon got on a jet and flew to Corpus for a meeting, so he must have thought there was.

Q. He must have thought there was, right?

A. Yes, sir.

Q. Okay.

A. And I never had notice, so if there's going to be -- I'm on the board of directors and nobody told me about it, so I really couldn't say one way or the other.

Q. Yeah. And Rob, from Mr. Powers' standpoint, that's who the letter is to or the email is to, right? Correct, sir?

A. Yes, sir.

Q. And he -- he would be the one to know if there was ever an actual meeting set up or just this request for the meeting; fair enough?

A. Yes, sir.

Q. Okay. And so if Mr. Powers testifies that it was never solidified which day of the week or what time they were coming, you would have no information to

disagree with that?

A.   Other than Dennis Nixon showed up for a meeting.

Q.   Obviously, Dennis Nixon thought it was on one day, and from the record, it looks like Rob has no information about which day of the week?

A.   Well, I know I never got any inquiry about a meeting in this week, in this period.

Q.   Yeah.  And for all you know, Marty never got notice either because there was no date set?

A.   No, I know Marty said he -- there was a meeting and he told me that in his office right after the board meeting.

Q.   Yeah.  Marty said there was a meeting, yes. After it happened -- I'm repeating what you said.  After it happened, Marty knew there was a meeting, right?

MR. BOYD:  Objection, mischaracterizes his testimony.

MR. ALLISON:  That's exactly what he said.

A.   No, Marty knew there was a meeting.

THE COURT:  Overruled, that's overruled.

Q.   (BY MR. ALLISON) When in compare -- and the meeting happened, or at least Dennis Nixon showed up on March 13th, we know that, right?

A.   The day before the board meeting.

Q. And when were the --

MR. ALLISON: I am going to need Exhibit No. 8, which is Bates page numbers 894, and I'll use that page only.

MR. BOYD: 894?

MR. ALLISON: Yes. We'd offer Exhibit 8, Your Honor, modified to be that one page only, Bates page 894.

MR. ABSMEIER: Let me just check it very quickly.

MR. REASONER: Defendant's Exhibit 8.

MR. BOYD: No objection, Your Honor.

THE COURT: All right, it's admitted.

Q. (BY MR. ALLISON) Just so we can start working through some dates here, Lawrence, if you look, you can see that the date that Marty's and Dennis's notes were sent to IBC is on what date?

A. February 1st of 2023.

Q. Okay. And then Exhibit No. 11 already's been admitted. On February 10 which is after the -- excuse me, which is nine days after the notes, formal notes were provided for Marty and Dennis to the bank to IBC. On February 10th, what is this? I'll blow it up for you a little bit.

A. Thank you.

MR. REASONER: I'm sorry, what exhibit is this, Doug?

MR. ALLISON: 11.

MR. BOYD: Lawrence, if you need to get closer, with the Court's permission, you can walk over --

THE COURT: Yeah, you can. Can you see it or?

THE WITNESS: Yes, sir, I see it.

THE COURT: Okay.

A. I read it.

Q. (BY MR. ALLISON) Do you see that Exhibit No. 11, it's a letter from Gus Barrera, you said he's the president of IBC, right?

A. No, I think he's our banker here, I'm not sure what his title is.

Q. It's a letter to Mr. Powers, the CEO of Berry GP, right?

A. Yes, sir.

Q. It says, "The Berry GP, Inc., currently has a line of credit with our bank in the amount of $50,000,000. The line of credit has a maturity date of March 31, 2023." Have I read that so far correctly?

A. Yes, sir.

Q. "This letter evidences our commitment to renew

this line of credit to Berry GP, Inc., in the amount much $50,000,000."  Did I read that correctly?

A.   Yes, sir.

Q.   It says "that it's subject to receipt and final review of the audit by RSM US LLP."  Do you see that?

A.   Yes, sir.

Q.   Okay.  So even after, even after IBC Bank got the notes from Dennis and Marty, it was after that date when IBC confirmed their commitment to renew the line of credit, right?

A.   Yes, sir.

Q.   And if you look at Exhibit 10, is that another letter from Gus Barrera to IBC Bank?

MR. BOYD:  Doug, can you extend it?

A.   Doug, you're going to have to blow that up, please.

MR. REASONER:  He's trying to look at it from over there.

MR. ALLISON:  Okay.  Is that better?

MR. REASONER:  Can you see it, sir?

Q.   (BY MR. ALLISON) Can you see it, Lawrence?

A.   Yes, sir.

Q.   Okay.  By the way, for Gus Barrera, it does say he's president and CEO of the bank; is that right?

A.   Yes, sir.

Q. And on January 27, 2022, it says, "This letter," on the second line, "evidences our commitment to renew this line of credit to Berry GP, Inc., in the amount of $50,000,000." Do you see that?

A. Yes, sir.

Q. Okay. So in January and February, and February date after IBC's receipt of the letters --

MR. ALLISON: Okay, that's supposed to be January 27, 2023, or is this is the old one?

(Counsel conferring at counsel table out of court reporter's hearing.)

Q. (BY MR. ALLISON) But clearly, after the bank received the letters, if you look at Exhibit No. 11, after the bank received the letters, the loan notes from Marty and Dennis, IBC after that date, renewed the $50,000,000 line of credit, right?

A. But they didn't.

Q. They made their commitment to do it --

A. But they didn't.

Q. -- even though they had -- in other words, earlier you said that the fact that Marty and Dennis had put money into the company, made those loans, you said that's what caused the blow up with IBC, right?

A. I think, yes, absolutely, because Jim Klein said he spent it.

Q. But what we see when we look at the actual documentary evidence is that IBC Bank had the notes, and then after that date, wrote the letter renewing the line of credit, right?

A. It says, "They have the commitment to renew this line of credit."

Q. Right.

A. "Subject to audit."

Q. And we've gone over this, this is Exhibit No. 12, it's already into evidence so I'm not going to go through it again. This is the March 3 invitation for a meeting sometime during the week of March 13, right?

A. Yes, sir.

Q. And then we have the email string between Gus Barrera and I believe Rob; do you see that?

A. Yes, sir.

Q. And it looks like there's an older one in there, it looks like they must text each other, maybe, but from the one March 13th says, "Good morning, I'm picking up Mr. Nixon at the airport, assuming no delays, see you at 10:00 a.m., thanks." Do you see that?

MR. REASONER: Excuse me, could we get an exhibit number on that?

MR. ALLISON: Yeah, this is 15.

A. Yes, sir.

Q.   (BY MR. ALLISON) And Rob says, "There are no board members here.  They all had to go out of town on urgent business.  I am here and happy to meet with him."  Did I read that correctly?

A.   Yes, sir.  But reading it looks to me like there was a meeting.

Q.   Pardon?

A.   Reading that it looks like there's a meeting scheduled to me.

Q.   Well, it looks like he said, "We landed, I'm picking him up and we're headed your way."  Right?

A.   Yes, sir, and he gives him a response, like there's a meeting.

Q.   Okay.  When you say -- it says what it says; fair enough?

A.   Are you saying m-e-e-t?

Q.   Pardon?

A.   "I am here and happy to meet."  There must have been one scheduled.

Q.   Yeah, I mean, what do you want him to say, sorry, don't come over?

A.   All I know is I'm a board member and Dennis is hoping to see him, I wasn't invited.

Q.   And you don't know if Marty or Dennis were, or what the plan was, do you?

A.   I couldn't say.

Q.   Pardon?

A.   I couldn't say.

Q.   That's right.  What --

A.   I would have been there, though.

Q.   Yeah.  Okay.  And do you know why it is that Rob didn't respond to the invitation for a meeting?

A.   I can't imagine.

Q.   Do you know why it is that Gus didn't follow up with another email that gave a specific date?

A.   I wouldn't -- I don't -- I don't know any of that.

Q.   Yeah.  Do you know why, for example, Gus didn't write and say, we need to meet on March 15th at 10 a.m.?  Do you know why he didn't do that?

A.   Because the ball was in Rob's court.

Q.   Pardon?

A.   The ball was in Rob's court.

Q.   Instead, obviously, Mr. Nixon thought there was a meeting and he came, and you know that to be true, right?

A.   I know there was a meeting scheduled and he showed up and we weren't -- there was no Berrys there, I do know that for sure, I'm certain.

Q.   Well, in fairness, what you told us earlier,

you don't know if there was a meeting actually scheduled, you just know there was --

A. There had to be a meeting scheduled, Dennis came in for it.

Q. Okay. In Dennis's mind there was a meeting scheduled?

A. Well, it says meet up there, and here's a request to Rob so.

Q. And then we know on that same day we have a text exchange where it's Robert. I assume that's Rob. "Just had a bad meeting with IBC Dennis Nixon. He came in attacking and cursing me and Jim, didn't end well." Do you see that?

A. Yeah. Whose this to?

MR. BOYD: Doug, what exhibit is this?

MR. BALDREE: What exhibit is this?

MR. ALLISON: 14.

A. And who are the parties?

Q. (BY MR. ALLISON) Pardon me?

A. Who are the parties?

Q. It's -- I'm going to speculate it's between Robert and somebody, okay?

A. Okay.

Q. We'll let him address that. He'll know better than you, right?

A.   It says meeting there again, had meeting.

Q.   But, I mean, confirm for us again, I think you told us, right, you don't know --

A.   I couldn't say one way or the other, no, sir.

Q.   You don't have any document or anything that confirms a date and a time of a meeting, right?  You just know Mr. Nixon came in?

A.   It says "meet" right there on your production.

Q.   After the time, this was after the fact?

A.   Okay.  I've got -- there's a whole bunch of things.  No, I couldn't say one way or the other, but there sure was a meeting.

Q.   There was a meeting.  He did -- Mr. Nixon came in and Rob met with him, right?  And then the next or the same day they sent a letter of default, right?

A.   Hell of a coincidence, isn't it?

Q.   Pardon?

A.   I said it's quite the coincidence, isn't it?

Q.   Well, do you think Mr. Nixon, from this email, do you think he was -- it says he was attacking and cursing; do you think he was angry?

A.   I'm sure Dennis was -- Mr. Nixon was disappointed that there was nobody there.

Q.   Well, so cursing and angry would be disappointed and not angry?

A.   I would say he -- I will say --

MR. BOYD:  I would object, Judge, speculation.

A.   -- that Mr. Nixon was --

THE COURT:  Sustained.

A.   -- was probably disappointed.  I couldn't say what he was thinking.

THE COURT:  Sustained.

Q.   (BY MR. ALLISON) And do you think that it was more of an emotional or a knee-jerk response by Mr. Nixon?

MR. BOYD:  Objection.

THE COURT:  Sustained.

A.   I couldn't say.

MR. REASONER:  Sir -- sorry -- just wait when the Judge sustains.

Q.   (BY MR. ALLISON) After all this happened with IBC Bank, what did you do?

A.   What did I do?  Start trying to get together packages to find a new lender.

Q.   Yeah.

A.   Called on everybody, the guys that we had teed up two years before to take it, tried to get all of them to come in.

Q.   And namely, your bank up in Houston that you

went to?

A. I banked everywhere, but we had Regions approached a couple of years ago and went down that road for a while, Bank of America as well for the ABL line, the asset-based lending line.

Q. Didn't you go to Cadence Bank and try to set up a meeting for $100,000,000 line of credit?

A. Yeah, I went to every bank in Houston probably.

Q. Okay. So you were out trying to find a suitable line of credit if things continued to fall apart with IBC, right?

A. Yes, sir.

Q. You made an effort on behalf of the company?

A. Absolutely.

Q. And you know that Marty did the same with Frost Bank, right?

A. I believe so, yes, sir.

Q. And ultimately, you-all have consummated an agreement with Frost Bank, correct?

A. Yes, sir.

Q. And the terms of that Frost Bank agreement include a better interest rate than IBC's interest rate, right?

A. I couldn't say. I didn't get the terms.

Q. And also encumber less real property; you know

that, right?

A.   Yes, sir.

Q.   Because the IBC rate, or excuse me, the IBC loan encumbered all real property, including the ranches, for example, right?

A.   Yes, sir.

Q.   And the Frost Bank encumbers less of the Berry companies' real property, correct?

A.   Yes, sir.

Q.   And has the Frost Bank has also a more favorable interest rate, doesn't it?

            MR. BOYD:  Objection, asked and answered.

            THE COURT:  I'll allow it.

A.   Yes, sir.

Q.   (BY MR. ALLISON) Okay.  And so, actually, even though there was this whatever happened with Mr. Nixon on March 13th that made whatever happen -- actually, the Berry companies and Berry GP have a more advantageous line of credit with Frost than they did with IBC, right?

A.   If you want to look at one, just through one lens, you could say that.  What about the impact over with all the vendors for this period when we wrote them, like it will take forever to get the pricing back competitive.

Q.   And in that same time frame, you wanted -- you

actually contacted Gallagher, the attorney, right?

A. Mike Gallagher, sure.

Q. Yes. And you basically asked Mike Gallagher to call Tony Sanchez, right?

A. Yes, sir.

Q. And Tony, of course, is one of the founders of IBC Bank, right?

A. Yes, sir.

Q. And I believe the phrase is, "to rattle the sword a little bit," in other words, to be aggressive with IBC, right?

A. I don't think that's the case at all, see what was -- see if there was any movement we could get.

Q. Okay. So you hired a plaintiff's lawyer --

A. I didn't hire anybody.

Q. Well, you had a plaintiff's lawyer call on your behalf to the founder of IBC to put leverage?

A. I had one of my friends trying to help me and us.

Q. Okay. Is Gallagher a pretty well-known plaintiff's lawyer?

A. I believe Fisher Gallagher represented us in our -- in the company's biggest loss to date in the courthouse.

Q. They do commercial litigation, right?

A. Yeah. Well, Mike's a plaintiff attorney, but Fisher Gallagher was a big firm in Houston at one time.

Q. Yeah. They would be the kind of law firm that would sue IBC, if you wanted them to?

A. Yes, sir, could very well be the case.

Q. Okay.

A. I think Mike didn't call him. Mike called a friend of his to try and help us, not the other thing, not to sue anybody.

MR. ALLISON: That's all I have. Thank you, sir.

THE COURT: Whose up?

MR. HUSEMAN: Oh, I am.

THE COURT: You may proceed.

CROSS-EXAMINATION

BY MR. HUSEMAN:

Q. Mr. Berry, what I'm going to do is I'm going to take a few minutes with you, and I'm not going to hopefully spend too long on this, but I'm going to break into little bites and I'm going to tell you in advance what we're going to be talking about, okay?

A. Yes, sir.

Q. And the first thing, you understand that I represent Mike, don't you?

A. Yes, sir.

Q. I did until Mr. Reasoner graciously complied with my request to dismiss Mr. Rickett earlier this week, and I represented him as well?

A. Yes, sir.

Q. And so I want to talk to you a little bit about Mike Hummell and his position in this lawsuit. First of all -- and maybe we can agree on all of these things -- would you agree with me that Mike Hummell does not own any part of any of the Berry entities?

A. Yes, sir.

Q. He doesn't own Berry GP, none of them; he does not have a financial stake in the businesses we're talking about?

A. No, sir, not that I'm aware of.

Q. All right. He is not on the board of directors?

A. No, sir.

Q. He doesn't have a vote at the shareholders meeting?

A. No, sir.

Q. His compensation comes by way of a salary, I presume?

A. Yes, sir.

Q. And his job is the general counsel for Berry, isn't it?

A. Yes, sir.

Q. That means he's Berry's lawyer?

A. Yes, sir.

Q. I mean, when you have legal work to do, he's the guy you go to?

A. If it's contracts and it's corporate, yes, sir.

Q. All right. And can you point to anything that Mike did or didn't do in relation to all of the things we're talking about here that was something about him personally as opposed to being a lawyer in the deal?

A. Yeah, he didn't pick up the phone and call me and tell me this stuff was going on.

Q. Okay. How did that affect him financially?

A. I couldn't say.

Q. Yeah. And the point I'm making on this, and I don't know that you disagree on it, but this is not Mike's company, he doesn't make the business decisions, he doesn't vote on it or any of that. He's -- he's the lawyer, isn't he?

A. Yes, sir.

Q. Okay. And the things that he did in this that regard you, it made -- in your pleadings, you had complaints about Mike did this, and Mike did that. All of those were consistent with him being a lawyer, basically, representing the other side from you, right?

A. He was partisan, yes, sir.

Q. Right. But he was an advocate, I guess that would be the lawyer way of saying it, he was an advocate for his clients, wasn't he?

A. Some of them. Are you saying with regards to the loans?

Q. No. With regard to the work that he did that you complained about it in the petition. Can you point to any instance in which Mike was not acting as an attorney for the Berry entities? In other words, would it point to something where you were working for Mike Hummell's financial interest, or something like that, anything other than being a lawyer?

A. Not specifically, no, sir.

Q. Okay. All right. I want to change topics here a little bit. I want to talk to you a little bit about the bank loan. I've been involved in banking personally for a long time, so this is of interest to me.

Is it your position that the loans that were made by your brothers to the company were insufficiently favorable to the company and should not have been entered into?

A. No. It is my position they should have been disclosed and I should have had the opportunity to participate.

Q.   Okay.  So you're not fussing about the terms of what was done, you're complaining about the fact that you didn't know about it; is that basically it?

A.   Yes, sir, but also, you'd have to say I'm not sure about the interest rate, I'm not even sure what the interest rate was originally.

Q.   Okay.  What is the interest rate on it?

A.   Prime, but some -- it's in the exhibits.

Q.   A quarter of a percent?

A.   Yes, sir.

Q.   And do you know anything -- do you know enough about financing?  Apparently, they do it at banks all the time.  Is prime plus a quarter percent a good rate or a bad rate?

A.   They say it could be -- yeah, it could be a good rate.

Q.   Yeah.

A.   It could be.

Q.   I mean, I can tell you our bank, if they offered corporate loans like that, there would be some questions asked.

          MR. BOYD:  Objection, sidebar.

          THE COURT:  Sustained.

Q.   (BY MR. HUSEMAN)  So if it's not a problem with the interest rate as far as the payment terms of the

loan, is there anything wrong with the terms of repayment?

A. Absolutely.

Q. Okay. What is wrong with that?

A. Well, you -- we -- they put in a bunch of money, didn't tell me about it, now there's a maturity date that's coming up, okay? And on top of that, the numbers keep changing. You can see from in here, and it just, A, it's poorly executed, it is, and it wasn't papered up properly at a contracting company.

Q. Okay. And you think the loans should have been payable at a different date?

A. I'm saying that there's no -- this is not -- this is violating pretty much every business thing you would do. And, by the way, I didn't have knowledge of it, Van.

Q. If you don't mind, stick to what I'm asking you. I know you want to tell your story. But is there anything wrong with the due date on the note when it matures?

A. Yes, sir, I don't know how we're going to pay it back.

Q. Okay. Is that a technical problem with the note, or is that simply a business decision?

A. No, I'd say it's a technical problem with the

note.  You would expect that.

Q.  All right.  And if you had been negotiating this note, what would you have set for the date?

A.  I couldn't say.

Q.  All right.  Okay.  And Doug touched on this a little bit.  Can you name any piece of Berry property, real property or personal property, or anything else the value of Berry's that is secured as collateral for the loans that your brothers made?

A.  Okay, one more time.

Q.  Sure.  You know what collateral is, don't you?

A.  Yes, sir.

Q.  And I'm encompassing all the collateral you can dream up:  real estate, backhoes, whatever, money in the bank.  Can you name one bit of collateral that your brothers got for the $75,000,000 of loan?

A.  Well, I guess it would be everything that's not -- that's not -- that's not pledged to Frost.

Q.  Have you seen any documents showing a security interest being granted to your brothers?

A.  No, sir, but at the end of the day, if the company has the obligation and it's booked, then they have access to everything else that's left over that hasn't been pledged to a bank --

Q.  Okay.  And that would be --

A. -- including the operating entity in total, everything.

Q. That would be after a judgment, perhaps, a default, right, where they'd have a judgment against the company? I'm talking about the security interest, collateral what we're talking about?

A. No, sir.

Q. Would you agree there was one?

A. No, sir, I've not.

Q. Pardon?

A. No, sir, I've not seen anything.

Q. All right. Okay. And we have the issue about the subordination we talked about before. You've gotten the papers from this loan since this lawsuit got moving, haven't you? You've seen the papers?

A. Yes, sir, we've seen -- yes, sir, there's been some produced documents.

Q. They've been produced to you. It was produced to you, for example, the loan papers, the subordination agreements, the correspondence with the bank about the loan. You've seen that stuff, haven't you?

A. Yes, sir.

Q. All right. Now I want to change gears here a little bit with you. If I understood what you were saying before lunch under the guidance of your lawyer,

you talked about your sister-in-law not having adequate knowledge to act appropriately as the director; do you remember that?

A. Yes, sir, I said she didn't know.

Q. And then -- and I'm going to characterize this as being more shocking. And you then said your brother Marty was a liar, and basically, had committed perjury; is that also what you said?

A. Yes, sir.

Q. Okay. Let's take that and break it into pieces. First of all, you said in the affidavit where you said the loan had not been repaid, is it your position that the loan has been repaid and that the debt has been satisfied?

A. No, but it's moved, the numbers are different on the sheets.

Q. Okay. We'll come to that. But is it your position -- and maybe you can answer this with a yes or no. Is it your position that the loan has been repaid or not?

A. Looking at the balance sheet, a portion of it has, yes, sir.

Q. Okay. So the loan has not been fully paid, has it?

A. No, sir.

Q. All right.

A. Partially.

Q. Okay. Now let's change gears here a little bit. Since you had these documents involving this loan that is obviously is of some importance to you, I'm sure you read through the documents, didn't you?

A. Yes, sir, tried to.

Q. All right.

A. I did.

Q. Do you remember -- and I'm referring to the Bates stamp number 13 produced to our opposition here, which is a subrogation agreement signed by brother Marty. You've read that, I presume, didn't you?

A. I think I have, yes, sir, if you're talking about the one with Frost.

Q. Uh-huh, I am. That's the thirteenth document produced to you. And would it surprise you, Mr. Berry, to learn that the subordination agreement that was given to Frost talks about a note dated July 8th, 2022, which is the one you're talking about in regard to Marty, right? That's the note date?

A. I'm not sure about the dates.

Q. I think it is.

A. Okay.

Q. And in the original -- and I'm going to read

this to you.

MR. HUSEMAN: Maybe if I can approach?

THE COURT: You may.

Q. (BY MR. HUSEMAN) I'm going let you read this for everybody in the courtroom, and this is -- what's the Bates number down there?

A. 13.

Q. Okay. And this is subordination agreement and it's signed by whom?

A. Marvin G. Berry, Marty.

Q. That's Marty. And it talks about the note dated July 8, 2022, right?

A. Yes, sir.

Q. Now read to the Judge what the following words say?

A. "In the original principal amount including 45,000,000 with a current principal balance of 35,000,000."

Q. Right. And so, any deception about what was owed or something, certainly, the bank knew about it, and it was in the paperwork of the company, wasn't it?

A. Well, that's what it says there.

Q. Right. And so when you go call your brother Marty a liar and a perjurer, accusing him of all these things, it might be useful to ask you, did you ever talk

to Marty about this, this particular issue?

A. No, because he never called me to talk about any of this back in the day.

Q. Did you send him an email?

A. No, sir, I haven't.

Q. A written note, anything, to find out what was going on with that $10,000,000?

A. Just found out about it --

Q. Yeah.

A. -- after we filed the suit.

Q. So you didn't know at that time that he had given all of the money he had, including money reserved for taxes, and had an arrangement that he can get the money back to pay his taxes? Did you notice the date -- the date of that $10,000,000 debit?

A. No, sir, I did not.

Q. It was April. Does that have a significance to you in terms of finances?

A. I would assume it was a tax payment.

Q. Okay.

MR. HUSEMAN: Pass the witness, Your Honor.

CROSS-EXAMINATION

BY MR. STEELY:

Q. Mr. Berry, how are you? Clay Steely, on behalf of Rob Powers. I'm going to touch on about four to

maybe five topics, and I'm going to try to be brief, okay?

A. Yes, sir.

Q. First of all, there's been these terms that's been thrown around: owner, shareholder, all these kind of things. I want to clear the record up. Number one, you personally, individually, are not a shareholder of Berry GP, correct?

A. We'd have to take and unwind all that. Like I said, you'd need a flow chart to figure out how this works.

Q. Well, I got one, but answer my question if you can. Do you have a stock certificate where you are the shareholder of Berry GP?

A. I got stock certificates in my office, but I couldn't say. I don't recall right now. I couldn't say.

Q. Are you familiar with an entity called LDMA?

A. Yes, sir.

Q. LDMA is a partnership; is that true?

A. Like this is getting into accounting things, but yes, sir, I believe it is.

Q. Okay. And LDMA has a general partner and limited partners; is that true?

A. I don't recall, but probably should have, it's

a partnership.

Q. Well, partnerships don't have stockholders, do they? They've got partners, right?

A. Okay. If you say so. I know I own a third of this and I used to have shares so.

Q. But my question's a little more subtle.

A. Okay.

Q. LDMA is a partnership; agreed?

A. Yes, sir.

Q. And as a partnership, there are not stockholders, correct?

A. That is correct, I believe so.

Q. And matter of fact, the one-third you keep talking about is you have an interest in an entity called Becon, Inc.; is that true?

A. I'd have to have the flow chart.

Q. All right.

MR. STEELY: May I approach, Your Honor?

THE COURT: Yes.

Q. (BY MR. STEELY) Let me show you what was attached to your original petition.

MR. STEELY: And I only got a couple of copies, but you-all are familiar with this, you-all are the ones that sent it.

MR. BOYD: Let me see. It may be what I

have right here.

MR. STEELY: That's exactly what you got in front of you.

Q. (BY MR. STEELY) Let me show you what we're going to mark as Powers Exhibit No. 2. Are you familiar with that diagram, sir? Pardon me if I have to look over your shoulder, I don't have very many copies. Seen that before?

A. It looks like one of those Peat Marwick and Main messes, yes, sir.

Q. When you approved the original petition that was filed in this case, this was attached. Did you approve that to be attached?

A. I assume I did.

Q. Are you familiar with that document?

A. I don't remember it specifically, but I get what it says.

Q. You'll agree with me that it shows at the top there is a partnership, LDMA, correct?

A. Yes, sir.

Q. And you'd also agree with me that there's a general partner named Becon, Inc., correct?

A. Oh, okay, yeah. Yes, sir.

Q. And that is the entity, Becon, Inc., is the entity, that according to this document, that you have a

one-third interest in; agreed?

A. I got a one-third interest in everything at 1414.

Q. Okay. But I'm asking you about what the document is that you-all filed down in Harris County shows?

A. Yes, sir, that's what it shows.

Q. Thank you. Now, this same LDMA limited partnership agreement.

MR. STEELY: May I have this?

Q. (BY MR. STEELY) Have you read the partnership agreement, sir?

A. I'm sure I've looked at it at some point in time.

Q. Do you have a copy of it?

A. No, sir, I do not.

Q. Can you cite for me the provision of the partnership agreement that gives you the authority to file a lawsuit on behalf of Berry GP?

A. No, sir.

Q. Let's shift gears. This idea about information exchange. There was this list that you-all pointed to on Plaintiff's Exhibit No. 12, let me see, let me see. If you have it up there, I don't need to approach. But this is the April 18th request from information from

Lawrence Berry to Robert Powers. Do you remember that --

A. Yes, sir.

Q. -- discussion?

A. Yes, sir.

Q. Now, this happened about the third Tuesday of April; agreed?

A. Yes, sir.

Q. You never took this list to the next shareholders meeting, did you?

A. Everybody was copied.

Q. That's not my question, sir. When you didn't get the answers to your question in April, did you take this to the next meeting, the May meeting and say, "Where's my information?"

A. I've asked in open forum numerous times, so yes, I don't know if I had it with me or not, but I did ask about it.

Q. Okay. Did you do it at the June meeting?

A. I've been asking for this information, both of which I haven't received all the way to now.

Q. Okay. But this is the only written piece that has been presented by your side where you're asking for this information; you'd agree with me? Where's all the other emails? Don't have them, do you?

A. No, sir, not handy.

Q. All right. Berry loans, I'm going to be brief about this. Do you want to unwind those loans?

A. Do I want to unwind the loans that --

Q. Yes, sir.

A. I don't even know where the money was spent.

Q. That's not my question, sir. If you had a magic wand and you say everybody else is an interested director, I'm the guy that gets to make the decision, you want to say, give the money back, we got to give the money back?

A. Absolutely.

Q. That's what you want to have happen?

A. If it didn't impact the company, of course. We're back flush like we were before IBC, yeah, that's all I could ask.

Q. The flush part aside, I'm trying to find out what you want to have happen to these loans. That's what I'm trying to find out. Do you want the company to have to --

A. I'd like see --

Q. -- their money back?

A. -- to see them paid back, absolutely.

Q. You'd like to see the brothers --

A. Without impacting the business.

Q. I apologize. Your brother's estate, you'd like to see that money paid back and wipe it clean?

A. Yeah, absolutely.

Q. To shift gears on you a little bit, Van touched on this a little bit. For the IBC or the Frost loans, if I asked you questions about interest rate, collateral, subordination and guarantees, you're just not in a position to give me all those details, correct?

A. No, sir.

Q. And you haven't done any independent analysis that when those instruments were entered into at that time frame, whether those were good deals or bad deals; agreed?

A. I think we didn't have enough options to -- yes, I agree with that, yes.

Q. I haven't seen that you-all have identified an expert in this case that says, I'm the guy that keeps up with the T bills, I think that's the example that you used, and says, these were good loans and they were bad loans. That's just not what you do and you don't have anybody here to say anything about that today, correct?

A. That is correct.

Q. You know something interesting, are you familiar with the bylaws -- I'm shifting gears -- the bylaws of Berry GP; have you read them?

A. Yes, sir.

Q. They're attached to your petition that was filed over in Houston; do you remember that?

A. Yes, sir, I'm familiar with the -- with the --

Q. You'd agree with me that there's nothing in these bylaws that prohibits Rob Powers, my client, from taking the actions that he took that you've complained about as he gets to manage and operate --

A. I don't agree with that at all.

Q. -- a $100 million company day to day?

A. I don't agree with that statement at all.

Q. Tell me what provision --

A. Okay. I think whenever my banker sends a message says that, hey, I want to see the owners in a meeting and it's not conveyed to me, that's a breach, man.

Q. Not conveyed or otherwise. You've already testified you don't know if a meeting was ever scheduled or not scheduled; you'd agree with me? Somebody sending a meeting request --

A. There's a meeting. If Dennis Nixon flies into town on his jet to come see us, there's a meeting, dude.

Q. Well, then shame on Dennis Nixon --

A. Yeah, unfortunately, we -- we needed him, unfortunately.

Q. I mean, maybe it was a miscommunication on both sides. What do you think?

A. Could be.

Q. Could be. But you don't know?

A. I know I was excluded.

Q. All right. But besides that, these other things that we've been talking about, the entering of the loans, the things like that, just as a day-to-day business matter, is there anything in the bylaws you can point me to that says the president and the CEO doesn't have those powers?

A. Yeah, but he's got to disclose them to his directors.

Q. Okay. Let's put disclosure aside for now because we've had a lot -- I'm not going to go back through --

A. Well, here, we've never let employees make the decisions on the banking or the assets.

Q. So is it --

A. Okay.

Q. Is it your testimony that every time a banking relationship is entered into, that the board is the one that makes that decision versus the president and CEO?

A. Yeah, it's pretty much say so. It's only happened two or three times.

Q. The last thing I want to touch on is concept of not being invited to participate in the Berry loans. If someone else takes the stand and says that's absolutely not true, you were told that and you were invited, is that person a liar?

A. Absolutely.

MR. STEELY: I think that's all I've got for now.

MR. BOYD: Redirect, Your Honor?

THE COURT: Redirect.

REDIRECT EXAMINATION

BY MR. BOYD:

Q. Mr. Berry, do you have Exhibit 7 available, please?

A. Yes, sir.

Q. All right. I want to go back to what Mr. Allison was talking to you about on why the bank canceled or noticed the default, the IBC default of the Berry; do you recall that?

A. Yes, sir.

Q. Okay. We talked about this briefly, but clearly, counsel for IBC in Exhibit PTX7 in the paragraph that starts, "For reasons unknown to us," they are very concerned that the meeting was unilaterally canceled, correct?

A. Yes, sir.

Q. And so this lawyer for IBC is clearly putting in a letter that there was a meeting, correct?

A. Yes, sir.

Q. All right. What conclusion did IBC draw from the failure of the board of directors to show up at the meeting?

MR. ALLISON: Your Honor --

Q. (BY MR. BOYD) It's in the next sentence?

MR. ALLISON: -- I'd object to speculation.

THE COURT: I mean, he can read from a document certainly.

MR. BOYD: And that's what I'm asking.

A. "Timely reporting of" --

MR. BOYD: Hang on.

THE COURT: No, that's fine, he can read from a document, otherwise, it's speculation. But if it's in the document and it's a piece of evidence, he can certainly read from it.

Q. (BY MR. BOYD) From the second sentence, "We are left."

A. "We are left to believe that the financial condition of the borrowers has gotten even worse as my client has yet to receive the required financial statements for the quarter ending January 31st of 2023,

or the detailed financial information requested by Mr. Barrera. Timely reporting of accurate financial information has been a recurring problem."

Q. Okay. So clearly, the failure to meet, the failure to provide information that they requested is being highlighted here as the problem?

A. Yes, sir.

Q. All right. As it relates to the what we call the Berry loans, the first time that you were invited to participate was after this lawsuit was filed?

A. Yes, they wanted a do-over.

Q. All right. I'm going to go back to questions that Mr. Steely asked you. He showed you the detailed list that you sent to Rob Powers requesting information?

A. Yes, sir.

Q. Do you remember that?

A. Yes, sir.

Q. And then he questioned you were there any other emails?

A. There are.

Q. Because he hadn't seen them; do you remember that?

A. Yes, sir.

Q. All right. And there are emails and I'm going the show these to you, PTX20, 21, 22, and 23 (sic).

COURT REPORTER: Mr. Boyd, I think you already have an Exhibit 23.

MR. BOYD: Thank you. They just pointed that out.

Q. (BY MR. BOYD) Here's 20, 21, 22.

A. Yes, sir.

Q. And I'm going to ask you to review all three of those while I give those to counsel.

MR. STEELY: Are those 21, 22, 23?

MR. ABSMEIER: Yeah. 20 is -- the one that's marked Exhibit J is 20. Exhibit K is 21.

MR. STEELY: Hold on, hold on.

MR. ABSMEIER: Exhibit K is 21 and L is 22. These were attached to one of our motions a few weeks ago.

MR. STEELY: Okay. There's only two of them?

MR. ABSMEIER: Should be three, J, K and L.

MR. STEELY: J, K and L.

MR. BALDREE: K may be behind the J.

MR. STEELY: K is?

MR. ABSMEIER: K is 21.

MR. BOYD: Let me know when you guys are ready. Are you ready?

MR. ALLISON: Yeah. We can follow up and

you'll get us some redacted copies, I guess?

MR. BOYD: We can talk about that later, but yes. Right now, they're redacted.

MR. ALLISON: And I just want to make sure in terms of, they showed up with some new things this morning. I think the only new thing we have are the stock certificates for Berry GP. I just want to make sure what the goose gander rule is in effect or however you want to handle that.

MR. BOYD: I'm sorry, what rule?

MR. ALLISON: The goose gander. You don't hang out with old lawyers?

MR. ABSMEIER: Your Honor, these were filed about two weeks ago when we had the hearing on our motion for protective order. These were attachments to it.

MR. ALLISON: There's been some new stuff, but that's, I think it was earlier, too. I'm just inquiring, are we -- we're not objecting to timeliness, right, with the TI hearing?

MR. BOYD: I'm not making any agreements related to geese and ganders and such, but I'm sure they'll be some quid pro quos as we go along.

MR. REASONER: We do not object to anything that you have offered so far as we've been able to see

it on your computer.

MR. HUSEMAN: You may not be goosing and gandering, but you are ducking, right?

MR. STEELY: And I don't know if there's an outstanding discovery request anyway. So you get to use whatever --

THE COURT: I usually use that goose and gander thing when there's drug testing involved in a case, whether it's a family law, or a criminal case. Usually family law, right, when it's like both sides -- one side asks for a drug test, and then I say, all right, goose and gander, and they both get the drug test.

MR. ALLISON: All I learned is when they start doing it, you got to call goose gander then, because you wait, then all of a sudden, the rule changes.

THE COURT: Well, I mean you know, a judge calls balls and strikes, but if nobody objects, then none -- the judge does nothing.

All right. So where are we?

MR. BOYD: Your Honor, I'm on Exhibit 20.

THE COURT: 20.

Q. (BY MR. BOYD) Mr. Berry, have you had a chance to review this?

A. Yes, sir.

Q. All right. Is this indeed an email from you to Mr. Klein and Mr. Powers requesting information?

A. Yes, sir.

Q. All right. I'm going to go to 21. Well, first off, on 20, the date of that is June 14th of 2023?

A. Yes, sir.

Q. All right. If you'll go to 21, please, sir?

A. Yes, sir.

Q. Is that another information request that you sent to Mr. Powers, Marty Berry, and Dennis Berry?

A. Yes, sir.

Q. And the date is what?

A. July 7th.

Q. Of 2023?

A. Yes, sir.

Q. Okay. And we go to 22. Is this yet another information request that you sent this time to Rob Powers?

A. Yes, sir.

Q. And the date of this is?

A. July 21st.

Q. 2023?

A. Yes, sir.

Q. All right.

MR. BOYD: At this time, plaintiffs would offer PTX20, 21 and 22.

THE COURT: No objection?

MR. ALLISON: Your Honor, we'd just object because they're incomplete, and I just really, I don't know they've blacked out things. And if you look at it, usually, the response email is above the, so I just --

THE COURT: So what's your objection, legal objection?

MR. ALLISON: That it's an incomplete document and therefore -- so the easy low hanging fruit is that it's hearsay probably, but.

THE COURT: Well, it is hearsay.

MR. ALLISON: Yeah, but the --

MR. BOYD: I have several responses, if I may?

THE COURT: I'm listening.

MR. BOYD: Okay. Number one, they're redacted because that's what's important to us, so it's attorney-client.

Number two, as to your hearsay objection, he opened the door, right, in the direct examination.

And number three, it begs the question, why haven't you-all produced this?

THE COURT: Well, I mean, honestly, we

don't address one another.

MR. BOYD: I'm sorry.

THE COURT: Okay. But -- so you say he opened the door so -- okay. Sorry, do you want to make another?

MR. BOYD: No, I've made my argument.

THE COURT: Okay. Well, as to that it's -- it's over --

MR. BOYD: I'm sorry.

THE COURT: Well, it sounds like your co-counsel is whispering something --

MR. ABSMEIER: Your Honor, I think it's not hearsay because it's a request for information, it's a verbal act which takes it out of the hearsay -- out of the hearsay rule. It's also admissible for notice to the -- to the defendant that he was requesting this information which is exactly what's at issue.

MR. BOYD: And it's also admissible because he opened the door by impeaching him --

THE COURT: Well, look -- okay, look, I mean, if it -- I'll allow it in only for the purposes of rebutting his questioning, so, I guess, yeah.

MR. BOYD: Thank you.

COURT REPORTER: For clarification, what is the --

THE COURT: For clarification, 22, 21 and 20 are admitted for the purposes of, I guess, rebutting his cross-examination.

What else?

MR. BOYD: Very few things, Your Honor.

Q. (BY MR. BOYD) Lawrence, you remember the affidavit that Martin signed --

A. Yes, sir.

Q. -- that we talked about? It mentioned the company being strapped for cash?

A. Yes, sir.

Q. Were you ever consulted about Marty taking $10,000,000 of the company's cash out of the company?

A. No, sir, I was not.

MR. BOYD: Pass the witness.

THE COURT: Recross? Mr. Allison, I mean you're up.

MR. ALLISON: I understand.

MR. HUSEMAN: Could we have five minutes?

THE COURT: Yeah, we can take a short break.

MR. STEELY: If we take a Court break, how is the Court's preference looking?

THE COURT: We end at 5.

MR. STEELY: Thank you very much.

THE COURT: It doesn't look like we're finishing today. That being the case, maybe we should coordinate with my court manager before she sneaks out and we happen to be in here at 5:00. She may or may not be there. Don't you think?

MR. REASONER: Good idea, Your Honor.

(Recess.)

THE COURT: Are you ready?

MR. ALLISON: We're ready.

MR. REASONER: We're ready.

THE COURT: Okay. Well, are we done with Mr. Berry?

MR. ALLISON: We gave them the heads up, we'll pass on the record. I was going to give you heads up before the jury came in.

MR. HUSEMAN: I have one exhibit which is titled H1, it's sitting there right in front of you.

THE COURT: Oh, yeah, yeah.

MR. HUSEMAN: And the other side has a couple of copies of it, and I've given your court reporter a copy. They've agreed, I think, to allow it to be admitted.

THE COURT: Okay.

MR. BALDREE: Do you-all have objections to H1?

MR. REASONER: No objection.

THE COURT: Okay.

MR. ABSMEIER: No objection.

THE COURT: Well, it's admitted.

MR. STEELY: And we're going to do H2, 3 and 4, that's these two Rule 11 Agreements and that one page we talked about, instead of questioning over and over. I'm all for that.

THE COURT: Anybody --

MR. BALDREE: No objections.

THE COURT: All right. They're admitted.

(Brief recess.)

MR. ABSMEIER: Can you read those into the record?

MR. STEELY: Yeah, so Hummell 2 is going to be Bay 1511. Hummell 3 is going to be Bay 1754 through 1755. And then I guess this is Hummell, 1, 2, 3, 4. It's Bay 1535 through 1536.

MR. ABSMEIER: Agreed, no objection.

THE COURT: Okay. Then they're admitted.

Okay. So Mr. Berry is off the stand. I guess, call your next witness. Let's get as much work done as we can.

MR. REASONER: We would like to call Marty Berry as an adverse witness, please.

MR. ALLISON: And just while we're on the record, yes, we pass in terms of further questions of Lawrence. I know he's going to be here and be available. I don't anticipate recalling, but we pass just to facilitate the timing.

THE COURT: Okay. Come forward.

(Oath administered.)

THE COURT: All right. You may proceed.

MR REASONER: Thank you, Your Honor.

MARVIN BERRY,

called as an adverse witness, having been first duly sworn, testified as follows:

CROSS-EXAMINATION

BY MR. REASONER:

Q. Good afternoon, Mr. Berry.

A. Howdy.

Q. And I'm going to -- since we've never met, I'm going to call you Mr. Berry, but when I say Mr. Berry, I'm referring to you; fair enough?

A. That be fine.

Q. Bay is a family company, is that a fair statement, sir?

A. I'd say it's fair to say.

Q. And as I understand the history, the predecessor of Bay was founded by your father and

another gentleman around the early '50s, is that a fair --

A.   1953.

Q.   '53, yes, sir.  And as I understand, his vision -- I never had the pleasure of meeting the man, but his vision was that his sons would run the company after his death; is that a fair statement?

A.   No, sir.

Q.   All right.  So what was his vision for who would run the company, in your view, sir?

A.   His wife would run the company.

Q.   All right.

A.   He left it to her.

Q.   Okay.  And did she run it for a time?

A.   Yes, she did.

Q.   How many years did she run it for?

A.   I couldn't recall that.

Q.   Two, twenty, forty?  Just no idea?

A.   Could be 10, I'm not sure exactly how many.

Q.   All right.  So for the -- but the last 20 years, plus, it's been you, Dennis and Lawrence; is that correct?

A.   And Ms. Berry.

Q.   And your mom has stayed involved?

A.   Yes, she has.

Q. Is she still active now?

A. She's still -- she's somewhat active, but not in the same capacity.

Q. My understanding is she's in her 90s but still sharp as a tack; is that a fair statement?

A. That would be true.

Q. I want to cut right to it, sir. As I understand it, you and your brother Dennis loaned a substantial sum of money each to Bay in the early part of July of 2022; is that correct, sir?

A. I'm not a hundred percent on the date, but that be true.

Q. And what was the reason for that -- those loans being made?

A. Financial stress on the company.

Q. All right. I think you had indicated in an affidavit that the company's need for cash was so extreme that you and your brother made these loans; is that right?

A. I can't speak for my brother.

Q. Okay. Well, you didn't pick up on what his motivations were at that time?

A. I didn't, I didn't make the loan at the same time.

Q. Oh, well, that would be a good thing to

clarify. What was the delta in time between your loan and your brother's loan?

A. Could have been 24 hours, could have been a week, I'm not sure about that.

Q. You just don't have any idea?

A. I -- I don't have a recollection of that at this time, but I know it wasn't at the same time.

Q. Okay. And you and Dennis discussed it?

A. I didn't discuss it with Dennis till he brought it up to me.

Q. Okay. So Dennis was the one who raised the issue with you of putting the money in?

A. No, sir, I didn't state that.

Q. State what happened. How did the loans come about?

A. By being at the office every day, I understood how complex the situation would get and we had more and more vendors calling, things were getting later and later, and we needed to shore up our company so it was time to put some money in. I walked in and offered money to Mr. Powers, the CEO, and he took it quite quickly.

Q. Okay. And that, and independently, your brother also walked in and offered money?

A. Yes, I guess he did it independently.

Q.   Because you didn't discuss it with him?

A.   I did discuss it with him.

Q.   Before or after you did it?

A.   Well, I'm talking -- let's talk about -- are you talking about my loan or his loan?

Q.   Well, both.  I guess, if you could just tell the Court your discussions with Dennis about the loans before they were made.

A.   Dennis came to me and said, "I think we need to put some money in the company."  I said, "I just did it."  He goes, "Well, I'm going to do the same, I think I'm going to put 20."  I said, "Put more."  And that was pretty much it.

Q.   All right.  Okay.  And, sir, if you -- I'm going to hand you what's been previously marked as December 4 -- Defendant's 4.  You guys have copies, too.  Do you have Defendant's 4?

A.   I believe I do.

Q.   These are copies of your loan and your brother's loans; is that correct?

A.   No.  I'm sorry.

Q.   Maybe you don't have it?

A.   It says Defendant's Exhibit Hummell 4.

Q.   Oh, not -- that's not it.

A.   Not it.

Q. I'm going to mark a new exhibit, sir, just to keep it clear of what I'm talking about. By the time we're done we'll have a lot of copies of these promissory notes.

MR. REASONER: Plaintiff's Exhibit 27.

THE COURT: Is this one for me?

MR. REASONER: Yes, Your Honor.

THE COURT: Okay.

MR. REASONER: Plaintiff's Exhibit 28.

Q. (BY MR. REASONER) All right. Sir, Plaintiff's Exhibit 27 is a promissory note is between you and the company; is that right?

A. That's correct.

Q. And as I understand what was said during opening argument, this was prepared many months later, maybe February of the following year; is that right?

A. I'm not sure on your date, but that's correct.

Q. It's consistent with your recollection that it was many months later?

A. Correct.

Q. And so at the time it was just a handshake between you and Mr. Powers, or how did it work?

A. That's it.

Q. All right. And the amount that you loaned was $45,000,000 at that time; is that correct?

A.    I believe that's correct.

Q.    And in looking at it, if we could look at Plaintiff's Exhibit 27, it says that under Terms of Payment down about three-quarters of the way down, "Interest shall be accrued monthly beginning July 31, 2022, and payable upon maturity.  The note is due and payable in full December 31, 2024."  Do you see that, sir?

A.    Yes, I do.

Q.    And that -- and as I understand it, that indicates that no payments were going to be due at all till the end; is that what you understood?

A.    Yes, I did.  Didn't want the stress of the company anymore.

Q.    And was this that was memorialized many months later, was this consistent with the terms that you and Rob Powers agreed to in his office orally?

A.    It's consistent with it, yes, it is.

Q.    So when you-all first talked about it, you agreed that nothing would be owed under it until the end of December 2024, correct?

A.    Actually, the end date probably we did later. I can't recall that.

Q.    All right.  But at some point --

A.    I planned on putting the money in as long we

needed, that was the deal.

Q. Okay. And you indicated that the company wouldn't have to pay anything on it until some point down the road?

A. Absolutely.

Q. And you understood, sir, during your experience in business, that this was a loan from an insider and that you were a board member, right?

A. It was a loan from an owner, absolutely.

Q. And you knew that that's not something you could negotiate the terms of with yourself, right?

A. I didn't.

Q. Okay. Because you were -- in fact, you were on -- you had interest on both sides of that transaction, right?

A. Well, if you think this is the super money making note, you might have to do some -- go into finances a little bit. It's not. This wasn't made to be advantageous for the guy loaning the money, which was me and my wife. This loan was made to help our company survive.

Q. Okay, sir. And that wasn't my question, and we can talk about that in a minute. But my question was, you understood that you were involved on both sides, that is, you are a director of the Bay Company and

subsidiaries, right?

A. Uh-huh, that's correct.

Q. Yes? And that however generous you might have felt you were being, you -- this was an obligation for the company to pay you money, correct?

A. That would be true.

Q. All right. And the rate on the note, if we go down about three-quarters of the way down, it was prime -- JP Morgan prime plus a quarter, correct?

A. That's correct.

Q. All right. And do you follow the prime rate? Do you read the *Wall Street Journal*, keep up with things like that?

A. I'm not.

Q. Okay.

A. This is probably equal to 5 point something.

Q. All right, sir. Well, let's see. And would it be consistent with your recollection that in say July of -- July 28, 2022, that the JP Morgan prime rate was 5.5 percent; does that sound about right to you?

A. It sounds fair enough, yes.

Q. Okay. And so adding .25 to that it would be 5.75; is that right?

A. Sounds correct.

Q. Okay. And just for comparative purposes

looking at -- all right.  So if you put your money now, for example, in a two-year treasury, you'd only get 4.2 percent; does that sound right to you?

A.   I haven't looked at one.

Q.   Okay.  Do you invest in treasuries?

A.   I do not.  I invest in our company.

Q.   All right.  Would it surprise you to know, based on your investment experience, that prime plus a quarter percent is better than what you can get on a two-year treasury?

A.   It wouldn't surprise me either way.  I know it's a better deal.  This is a better deal than IBC had with us.

Q.   Okay.

A.   For the company.

Q.   Before revolver banker?

A.   Yeah.

Q.   Yes, sir.

A.   Uh-huh.

Q.   Okay.  And we'll talk about that.

And then looking at Exhibit -- Plaintiff's Exhibit 28, sir, which I think is before you, that's -- as we talked about, that's your brother Dennis's loan, correct?

A.   Looks to be, yes.

Q. And these loans were not approved at any board meeting, were they, sir?

A. Not that I'm aware of.

Q. And you would be -- as a member of the board, you would be if they were approved at a board meeting, correct?

A. Missed one -- missed one meeting since we started.

Q. And you have no reason to believe that it was at that meeting that you missed that these were approved?

A. No, sir, I do not.

Q. Okay. And is it your position that sometime around the time these loans were made that you discussed them with your brother Lawrence?

A. I -- no, I didn't discuss it. I didn't discuss them with Lawrence, I didn't discuss them with Dennis. I thought this was a private deal. If they wanted to go invest, they knew the condition of the company, and Dennis did come forth and talk to me, I told you that already.

Q. All right, sir. But for your part, you personally did not ever discuss these loans with your brother Lawrence?

A. No.

Q. All right, sir. Let me ask you now. So look at what has been previously marked as Plaintiff's Exhibit 2. And I hope that's before you in the stack.

MR. REASONER: May I approach, Your Honor?

THE COURT: Yeah, go ahead.

Q. (BY MR. REASONER) Sorry, we've made a bit of a mess of it over the course of the day here. If you'll give me just a second. There we are.

All right, sir. Do you have Plaintiff's Exhibit 2 before you?

A. Yes, I do.

Q. And if we look at the second page of the document and you see that that's the first email is from Tonja Fulghum to Mr. Klein, Jim Klein?

A. First one's from Klein to Tonja.

MR. REASONER: Oh, and I apologize. I'm starting out slowly on admission of documents. I'd offer Plaintiff's Exhibit 27 and 28, please.

THE COURT: Anybody over here object?

MR. ALLISON: Are they the ones up there?

MR. REASONER: They're the ones that I already talked about, the two notes.

MR. ALLISON: That's fine.

THE COURT: All right. Hearing no objection, they're admitted.

Q. (BY MR. REASONER) Back to Plaintiff's Exhibit 2, sir. I apologize for the interruption. But did you indicate that you could see on the second page, there was a email to Tonja Fulgham to Jim Klein on December 21, 2022?

A. I don't know how you know that, but I'll take your word for it.

Q. Okay. Well, do you see the -- and it -- it's a sad statement on my life that I've looked at many of these. But if you look at the bottom of the front page, do you see it at the bottom there it says, "From Tonja Fulghum"?

A. Oh, okay, yeah, I didn't see the bottom. I got it. It's two pages.

Q. Yes, sir.

A. Okay.

Q. And that it appears to be sent September 21 of 2022, correct?

A. I'm sure that's correct, yeah.

Q. All right.

A. Yes, sir.

Q. And if we go the second page where it carries over, it's going to Mr. Klein and Mr. Powers with a copy to Lawrence Berry. Are you with me there?

A. Uh-huh.

Q. Yeah, I'm sorry, she can't -- we can communicate, "uh-huh" --

A. Yes, sir.

Q. -- but she can't take that down. Thank you.

You see there that Ms. Fulghum asked for a copy of the current P&L and balance sheet and financial information; do you see that inquiry?

A. Yes, I do. Yes.

Q. And then, if we go to the front, you see that Mr. Klein sends that along on the same day?

A. Yes.

Q. Okay. And then if we go to the third page of the document about three-quarters of the way down, do you see that you can -- that the reader can see an entry there, "Notes payable related party 75,590,920." Do you see that? I'm sorry, it's about three-quarters of the way down it's under "Liabilities and Equity" along the Combined and Consolidated Balance Sheet for the period ending July 31, 2022; are you with me there?

A. Yes, I am.

Q. And do you see, as we go down under Liabilities and Equity, maybe about 10 entries down, "Notes payable - related party 75 plus million." Do you see that?

A. Yes, I see that note. Yes, I see that note.

Q. Okay. And as a reader -- I take it you're a

reader of your company's balance sheets, with some regularity, aren't you?

A. From time to time.

Q. Yes, sir. And that entry was a reference to the loans from you and Dennis Berry to the company; true?

A. I'd have to assume that.

Q. All right. And "related party," you and -- that's a notation that you and Dennis Berry were both board members, correct?

A. I'd have to assume, yes.

Q. Okay. And the 590,000, was that interest that had accrued or what was -- do you know what that --

A. I do not know.

Q. And then let me ask you, sir, to look at Plaintiff's Exhibit 1, and I can help if it's not easily identifiable in your stacks there.

A. One page?

Q. It's a one-pager, yes.

A. Got it.

Q. And this is one that's cut off on over two pages so we're going to start at the bottom again. Do you see that Mr. Powers sends a -- sends an email on January 11, 2023 to Lawrence Berry saying, "Is this what you're looking for?" Do you see that, sir?

A. Yes, I found that.

Q. All right. And if we go up to the -- the front page, and we're one up from the bottom on January 16, do you see that Lawrence Berry responds, "No, the paperwork for the $75,000,000 related party receivable on the Berry GP books." Do you see that?

A. Yes, I do.

Q. And Mr. Powers' response there above, "Okay, that is not executed yet to my knowledge. I will follow up and see if it's signed yet." Do you see that?

A. Yes, I do.

Q. And, in fact, that was accurate, nothing had been signed up as of that time, right, to your knowledge?

A. I believe that's probably correct.

Q. And when we saw that they were ultimately signed, he was the signatory on behalf of the company, right?

A. Yes, he was.

Q. Because you couldn't sign and it wouldn't be much of a promissory note if you signed in both your capacity as a director of the company and as a lender, right?

A. I believe that answers itself, yes.

Q. All right. Okay. And then, you see that in

response about the middle of that first page, Mr. Berry says, "I know nothing about any of this." Do you see that?

A. Now -- now, earlier you told me I was Mr. Berry, so now you're talking about Lawrence?

Q. Fair.

A. I'm confused.

Q. Fair. I'm going to blame it on the hour of the day.

Now, you --

A. Yes, I see that.

Q. Okay. So let me ask a clean non-Berry ambiguous question. This is an email from Lawrence Berry in the middle of the page to Mr. Powers and he says, "I know nothing about any of this." Do you see that?

A. Yes, I do.

Q. And to your knowledge at that time, that was true that Lawrence Berry didn't because you hadn't had any discussions with him about it, correct?

A. To my knowledge, at that time, I wouldn't know one way or the other if he hadn't, if he talked to somebody else.

Q. All right.

A. We make company loans -- we make loans without

the board's knowledge, so that while he would even have to find out that way or know if he's got financials, he'd find out.  There's other loans in the company, you-all haven't even talk about them here, with other institutions today.

Q.  Okay.  But this is a biggie from two of the directors, right, they're big loans?

A.  They're all big, yes, sir.

Q.  Okay.  When you say they're all big, you're talking about the loans from banks and things?

A.  Of course.

Q.  All right.  But you didn't feel like there was any need for you to notify a fellow director that you had personally made a substantial loan to the company, correct?

A.  No, I did not.

Q.  All right.  But looking at the top of the page, do you see that Mr. Klein says to Mr. Powers, "It would be a payable.  I would think Marty or Dennis would have mentioned the loans."  Do you see that?

A.  I do see it.

Q.  Okay.  But for your part, you have not?

A.  I have not.

Q.  Okay.  And just -- sorry, sir, to close that loop there on, if you'd get Exhibit 1 in your hands

again, Plaintiff's Exhibit 1, just at that top exchange between Mr. Klein and Mr. Powers, we don't have any response from Mr. Powers saying, oh, I told Lawrence, or anything like that, do we?

A. I don't see any on this paper.

Q. Okay. Sir, I'm going to hand you a new document here and ask you about the relationship with IBC.

MR. REASONER: May I approach, Your Honor?

THE COURT: Yes, sir.

MR. REASONER: Plaintiff's Exhibit 29, PTX29.

THE COURT: All right.

Q. (BY MR. REASONER) Sir, I've handed you what's been marked Plaintiff's Exhibit 29; do you see that this is a February 24 letter from IBC's Gustavo Barrera to Rob Powers; is that correct?

A. That's correct.

MR. REASONER: I'll offer Exhibit 29, Plaintiff's Exhibit 29 into evidence.

MR. ALLISON: No objections, Your Honor.

THE COURT: Okay. Hearing no objection, it's admitted.

Q. (BY MR. REASONER) And just so we're clear, I've heard reference -- do you know Mr. Barrera and Dennis

Nixon?

A. Yes, I do.

Q. Okay. And I see Mr. Barrera here is president and CEO and he's in Corpus, and then, Mr. Nixon was in Laredo; is that right?

A. That's correct.

Q. What was the hierarchical relationship with -- who was up the chain between the two, how'd that work?

A. Well, I believe the largest stockholder is Mr. Nixon and he's also chairman of the board. And then, this would be his local representative. I think they probably have a lot of presidents and CEOs at the different banks.

Q. So he was the president of the Corpus --

A. Gustavo was, yes.

Q. Yes, okay, fair enough. And as I understand it, Bay had had a relationship, a banking relationship over some 25 years with IBC Bank; is that right?

A. That is correct.

Q. And then looking at this letter that we have before you now, Plaintiff's Exhibit 29, you see that in that first paragraph there is a commitment to renew the line of credit; is that right?

A. That's correct.

Q. And it does say, "Subject to our receipt and

review of the final audited financials," right?

A. That's correct.

Q. Which would have for the period ending October 31, 2022, correct?

A. That is correct.

MR. REASONER: May I, Your Honor?

THE COURT: Absolutely.

Q. (BY MR. REASONER) I'm handing you Plaintiff's Exhibit 30. Looking at Plaintiff's Exhibit 30, can you take a moment to orient yourself, sir, and see that this contains the audited financials for the period ending October 31, 2022?

A. I believe that to be true.

Q. All right. And we see as we go to -- and I'm just going by these Bates numbers at the bottom, about the fourth page the Bates number ends in 603. You see that it's signed by RSM out of San Antonio, correct?

A. I'm not sure that's a signature, but yes, whatever that is.

Q. Whatever that is. It's their stamp or whatever?

A. Yes, sir.

Q. All right. And they were your auditors, correct?

A. That's correct.

Q.   And this is the day after the letter that we just saw in Plaintiff's Exhibit 29 from IBC; is that correct?  Did you compare the dates?

A.   I'm going to do that if I can find it.  I can take your word for it.

Q.   Well, no, no.

A.   I mean, how do you do that?

Q.   Let's walk through it.  If we go, first, to orient us, do you still have Plaintiff's Exhibit 29 handy?

A.   Right here.

Q.   Yes, sir.  And that's February 24 --

A.   24th, right.

Q.   Okay.  And then the stamp or the audit letter accompanying the financials from RSM is dated February 25, the day after?

A.   All right.  On the last page, yes, that's correct.

Q.   All right.  And then if we go, please, sir, to the page Bates number Bay 620, 000620.  And tell me, when you're with me there, sir.

A.   I'm there.

Q.   All right.  And if we go about three-quarters of the way down the page you see it says, "Two unsecured notes payable to related parties with monthly interest

payments at New York prime rate plus 0.25%, maturing December 2024, $75,000,000." Do you see that, sir? It's probably easiest if you just look at the numbers on the right-hand column and find 75,000,000, then you see the text to the left of it?

A. Yes, I see it.

Q. And that's -- those related party notes are, again, your and Mr. Dennis Berry's loans, correct?

A. Seems to be, yes.

Q. And then, if you could, look at Plaintiff's Exhibit 5 which should still be in front of you.

MR. REASONER: Oh, and I'm sorry, Your Honor. If I could offer into evidence the financials, PTX30?

MR. ALLISON: No objection.

THE COURT: All right. Hearing none, it's admitted.

Q. (BY MR. REASONER) And we're back to PTX5.

A. I have it. Thank you.

Q. Oh, good. And you've heard folks -- and you've been in -- by the way, you've obviously been in the courtroom while Lawrence Berry was testifying, right?

A. Uh-huh.

Q. Yes, sir?

A. Yes, sir.

Q. Okay. And you see here that this is what was talked about earlier, which is an email from Gustavo Barrera to Mr. Powers on March 3rd, 2023, indicating that his boss Dennis Nixon would like to set up a meeting with the board in the week of March 13. Do you see that?

A. Yes, I do.

Q. And do you recall this being shared with you, sir?

A. This email, no, sir.

Q. Okay. Let me ask, do you recall Mr. Powers or anyone sharing with you the fact that the head of IBC wanted to meet we the directors of Bay?

A. Yes, I do.

Q. Okay. And how does -- who told you that?

A. Mr. Powers, CEO.

Q. And how did you respond?

A. I said that's not good.

Q. Okay.

A. He's only been here, you know, great relationship, 20 something years, but he only came down one time, so I assumed it wouldn't be good.

Q. So you'd not never had any meetings prior to this March of 2023 time frame, Mr. Nixon had never come?

A. No -- yes, one time.

Q.   Oh, I'm sorry, he had come one time before?

A.   Yes, 1997.

Q.   Okay.  And what was --

A.   Good on keeping up with customers.

Q.   What was the purpose of that visit?

A.   To tell us to sell all these assets and how to run our company.

Q.   All right.  And was that -- was that issue -- I take it from your tone, I take it you didn't agree with that advice?

A.   No, he's a very egotistical man.  It was -- I -- did we take his advice?  We did not take his advice.

Q.   Yes, sir.  And so, but I take it that given that the relationship continued long after 1997, I gathered that you-all got past the fact that you didn't want to follow his advice?

A.   It -- he's not in the construction business so. But we -- obviously, it was kind of as long as he stayed away, everything was great.  We had Mr. Shockley down here locally, he was a fantastic banker and we had a good relationship.

Q.   Okay.  And then, so my point is that the 1997 meeting did not lead to a break up or fracture in the relationship?

A.   Not at all.

Q. Okay. And so when you said it was not good, did you discuss with Mr. Powers dates in which you would be available to meet with Mr. Nixon?

A. I did not.

Q. Why is that?

A. It didn't come up.

Q. So he -- well, I guess I'm trying to understand that, in light of what you said earlier, which is that Mr. Powers conveyed that Mr. Nixon wanted to meet with the Bay directors; is that right?

A. Mr. Powers' exact words was "Dennis Dixon wants to come down and have a meeting," and I said, "That's not good," that's all, just it was my opinion.

Q. Okay.

A. And that was it.

Q. Okay. And so Mr. Powers didn't say, When are you available, or can -- will you meet with him or --

A. Not that I recall.

Q. Okay. So -- well --

A. Normally, if you were going to have a meeting with the board of directors, it will be on the board of directors meeting, that's when we've done it always before, so if anybody was coming to meet with us, that's when we meet.

Q. Did you suggest that Mr. Powers, that why don't

we have --

A. Of course not, he's CEO.

Q. Okay. Sorry, sir. I know it's late in the day, but for the court reporter's benefit, and so we can hear and understand each other, if you'd make sure I'm finished with my question.

A. Sure.

Q. I'll make sure you're finished with your answer.

My point was, when you heard from Mr. Powers that Mr. Nixon wanted to meet, did you suggest inviting him to a board meeting?

A. No.

Q. Did you suggest anything to facilitate a meeting with him?

A. No.

Q. Okay. Just said, that's not good, right?

A. That was it.

Q. Okay. Did you have any conversation with Lawrence Berry about the request that Mr. Nixon had made for a meeting?

A. I had a conversation with no one else.

Q. All right.

A. No one else.

Q. All right. And then, if we look, sir, it's

already been marked as Defendant's Exhibit 15, it's a text exchange. I can come help you if it's not handy.

MR. REASONER: May I, Your Honor?

THE COURT: Yeah, come on up.

MR. REASONER: You'd think a text message would stand out there.

THE COURT: Plaintiff's Exhibit 15?

MR. REASONER: Defendant's 15.

THE COURT: All right.

MR. ABSMEIER: I have copies.

MR. REASONER: That might quickest if you've got a copy, Mike, you can hand the witness and we can.

MR. ABSMEIER: Bay 1819. I've written Defendant's 15 on it.

Your Honor, do you have a copy of that? It doesn't have a sticker.

THE COURT: It doesn't look familiar, but I'll -- I'll put Defendant's 15.

MR. REASONER: That might have been the one that was only on the screen.

MR. BALDREE: It was just on the screen.

THE COURT: Yeah. Okay. All right.

MR. REASONER: Doug, we're going to put a hard copy in for you.

MR. ALLISON:  Thank you.

MR. REASONER:  So Defendant's Exhibit 15.

THE COURT:  So you're moving to introduce this?

MR. REASONER:  He already did but --

THE COURT:  What's your exhibit number and I'll just write it down here for my demonstrative?

MR. ALLISON:  I think it's 15.  It's one I --

THE COURT:  Oh, okay.

MR. REASONER:  I don't have a hard copy.

THE COURT:  Oh, okay.

MR. REASONER:  Defendant's Exhibit 15 and it was previously admitted.

MR. ABSMEIER:  They're going to provide a stickered copy later, Your Honor.

THE COURT:  Cool.

MR. REASONER:  And I'm sorry, you-all produced it.  Was this -- Doug, was this from Ron Powers' phone?  That's my assumption.

MR. ALLISON:  I believe that's my assumption as well.  I'll bet you he can help you there. I know Rob can, you can try with him.

MR. REASONER:  Oh, I know, but I'm asking you produced it, I thought you'd know.

MR. ALLISON: I got the document probably the same day you did so.

MR. REASONER: Okay.

Q. (BY MR. REASONER) I'm going to represent to you that there is a loose assumption that this is from Rob Powers' phone, but he has not testified so we'll find that out. But do you see that it's an exchange with Gus Barrera, the bottom half of the page being March 13; do you see that?

A. Yes, I do.

Q. And looking at this, you see that he says, "I'm picking up," on the morning of March 13, "I'm picking up Mr. Nixon at the airport. Assuming no delays, see you at 10 a.m. Thanks." Do you see that?

A. Yes, I do.

Q. And then it says, "Okay, there are no board members here, they all had to go out of town on urgent business. I am here and happy to meet with him." Do you see that?

A. Yes, I do.

Q. All right. And were you -- on the 13th of March, were you out of town on urgent business?

A. I was in -- I guess I was out of town.

Q. On urgent business?

A. I was looking at a job in Galveston.

Q.   Okay.   And did you know that Mr. Nixon was coming to town?

A.   I did not.

Q.   Had no information about that?

A.   Never, never scheduled.

Q.   All right.   Did you call Mr. Nixon to figure out what the mix up or confusion was?

A.   No, I did not.

Q.   Did you attempt to go see him in Laredo?

A.   Did not.

Q.   Okay.   Did you do anything to try to address the fact that the chairman had flown in from Laredo where apparently he thought there was a meeting and was apparently angry that none of the directors was there?

A.   So, I'm sorry, could you restate your question?

Q.   Yes, sir.   I asked, we know that Mr. Nixon showed up thinking there was a meeting of the directors, with the directors, right?

A.   Yes.

Q.   We know from Mr. Powers that he was upset that no directors were on hand, right?

A.   Yes.

Q.   And we know that you had not told Lawrence Berry that Mr. Nixon had requested a meeting as you heard from Mr. Powers, right?

A. That's correct, nor anybody else.

Q. Meaning, nor did you tell anyone else?

A. That's what I testified to earlier, yes.

Q. Okay. So you didn't tell Dennis Berry either?

A. No.

Q. Okay. And I'm asking, you said you didn't call Mr. Nixon, didn't try to go to Laredo, you didn't do anything to try to repair whatever damage was done to that relationship at that time, right?

A. No.

Q. All right, sir. And then let me ask you to look at --

A. Can I ask you a question? Did you hear my answer to that question?

Q. You said no?

A. You said I didn't do anything is what you said, right? So I said no.

Q. Ah, well I --

A. That's what you said. I just want to make sure you understand.

Q. Yeah. Well, no, that's fair and I appreciate it. So we were in sort of a double negative mode is the point.

A. Uh-huh.

Q. And I appreciate that. So let me ask a better

question.

What did you do, if anything, to try to repair the relationship with Mr. Nixon?

A.   I tried to talk him off the cliff but he couldn't stop getting over the fact that his man that worked for him all those years, the CEO and president here locally didn't tell him the truth that he didn't have a meeting, and he just kept screaming about the meeting.  And finally, I told him I had to get off the phone.

Q.   Okay.  So you said you hadn't called him, so this was him calling you?

A.   About a minute after he walked out of the meeting.

Q.   Okay.  And he was very upset and you were trying to tell him that his guy had screwed up and not actually scheduled a meeting?

A.   I was trying to tell him a lot of things.  It was very confusing when he called me because I didn't know why the heck he was calling me.  I took the call immediately, I said, here's Mr. Nixon calling, let's see what he wants and I took the call.  But all he could talk about is you didn't show up to the meeting.  I said, we didn't have a meeting, and never heard of a meeting, nothing was ever said.  But he was plenty upset

and I finally told him, I'm sorry, I'm driving and I can't, you know. And he started wanting to go over the financials and all the things that were wrong, and you know, I just had that letter of the 24th that you showed as one of the exhibits here, so I was -- I was confident we were going to have a line, but I knew when we hung up the phone his little feelings were hurt and I figured it was over with at that moment because he was plenty upset.

Q. And he was kind of chewing you out about some of the issues with the financials and otherwise?

A. Mostly just not showing up to his meeting.

Q. Well, you indicated he started going into the financials?

A. Then he went into the financials.

Q. Okay. And he had some concerns about some of those issues; is that correct?

A. That's correct, just --

Q. Did you have any other conversations or make any other efforts to try to address that fracture in the relationship?

A. I did not.

Q. Let me ask you to look at Plaintiff's Exhibit No. 6, please, sir.

A. Have we talked about it yet?

Q. It's been marked. You and I have not talked about it, sir.

A. Okay. I'm just making sure it's in this pile.

Q. It should be PX6. I do not have that, see that there?

THE COURT: I've got one is this what you're talking about?

MR. REASONER: Yes, yes, exactly.

THE COURT: Do you want to borrow that?

MR. REASONER: Oh, I hate to take yours, Your Honor.

THE COURT: That's all right.

MR. REASONER: Appreciate it, Your Honor.

Q. (BY MR. REASONER) And, sir, I've handed you the Judge's copy actually of Plaintiff's Exhibit 6. Do you see that this is a letter from a law firm representing IBC?

A. Yes.

Q. And you recall receiving that?

A. I don't recall receiving it, but I've seen it, yes.

Q. Okay. And that -- this was a notice of default that was fairly sent out by certified mail the same day of the meeting; is that correct?

A. It seems I was right, wasn't I?

Q.   What were you right about, sir?

A.   About the fact that I figured that it was going to be the end of our relationship.

Q.   Yeah, it sounds like you were correct, sir.

And -- but do you recall there was back and forth that took place in order to try to extend the line of credit in time so that you could find another lending source?

A.   Absolutely.

Q.   Okay.  And were you kept abreast of those discussions?

A.   Yes, somewhat, I made myself.

Q.   I'm going to hand you what has been marked as Plaintiff's Exhibit 31.  If I can take 6 back from you and we need to replace the court reporter's as 6.  We'll find it.  And here's 31, Your Honor.

THE COURT:  Okay.

MR. REASONER:  Sorry.  Plaintiff's Exhibit 31.

Q.   (BY MR. REASONER) In these negotiations, sir, about the possibility of extending for six months -- well, let's -- Exhibit 31, do you recall seeing this?  This is from IBC's lawyer dated March 28th, 2023, and it lays out there at the middle of the page, "Subject to the following revised framework, we now propose an

extension of the reference loan for six months to October 1, 2023 in order to allow your client to secure alternative financing."  Do you see that, sir?

A.   Yes, I do.

Q.   And do you recall looking at this list of conditions that they laid out?

A.   I'm sure if I read it closely I'd recall every one of them but.

Q.   Okay.  So you say you think you had a familiarity with what they were requesting?

A.   I felt like I have, yeah.

Q.   Okay.

A.   Yes, sir.

Q.   Can we go to 7 on the list, please, sir, which is on page Bay 119.  Do you see that it says, "All shareholder debt (including the $75,000,000 debt owing to Berry family members) must be subordinated to all indebtedness now or hereafter owing to the Lender by any of the Borrowers, and no payment whatsoever may be made on that subordinated debt until such indebtedness has been fully satisfied."  Do you see that, sir?

A.   I did.

Q.   All right.  So as I read that, they were demanding that it be subordinated and that there be no payments made the company on the loans to you and Dennis

Berry; is that correct?

A. I believe that's true.

MR. REASONER: Your Honor, I'd like to offer Plaintiff's Exhibit 31 into evidence, please.

MR. ALLISON: No objection.

THE COURT: Okay. Hearing no objection, it's admitted.

MR. REASONER: If I can quickly get through these two last exhibits, I'll be at a stopping point, Court's indulgence.

THE COURT: Okay.

MR. REASONER: Plaintiff's Exhibit 32.

MR. ALLISON: 32?

MR. REASONER: 32.

MR. ALLISON: If he's offering it, no objection.

MR. REASONER: I would like to offer it.

THE COURT: All right. Then it's admitted.

Q. (BY MR. REASONER) Sir, and this is a letter from Mr. Simank. I may be mispronouncing it.

THE COURT: Simank.

MR. ALLISON: Simank.

Q. (BY MR. REASONER) Oh, Simank. I apologize. I haven't met the gentleman. He was Bay's lawyer, right?

A. I believe, yes.

Q.    I'm sorry?

A.    Yes, that's true.

Q.    And he sends a letter here on March 30 responding to IBC's lawyer; true?

A.    Yes, that sounds correct.

Q.    All right.  Let's look, on the second page you see he responds to the item by item list, correct?

A.    Correct.

Q.    And on item No. 7, which is the request that it be subordinated and no payments be made, do you see the answer is "Response - Berry rejects the condition."  Do you see that?

A.    Yes.

Q.    And is that consistent with your recollection that Bay rejected that condition?  It actually says --

A.    I really don't remember that we rejected it, but I'm looking at it here.  I have to assume that we did.

Q.    Okay.  You don't have any reason to disagree?

A.    Nah, no reason to disagree.

Q.    And ultimately that, as you've alluded to that, 25-year relationship was not reparable; is that correct?  Well, it did not -- let me ask a better question.  You didn't come to an agreement on an extension, didn't you, or did you?

A. I believe we did come to an agreement on an extension.

Q. Okay. But it was just an extension so you could find someone else --

A. I don't know banking laws, and you're talking about an extension, and I don't think you do either, but when people get told, you got a loan, and then the next day they tell you, you don't have a loan, they weren't not going to give us the extension. It didn't make a difference. We also said we wouldn't personal guarantee. And there were a lot of things we rejected here. That a bank with the upper hand would have told you, okay, we're not making the loan. Oh, no, problem. They did extend it. Of course they extended it. They didn't have a choice but not to extend it.

Q. All right. But when we say -- just so we're speaking the same language -- they extended it for a limited period of time so that you can find some other company to borrow from, correct?

A. Absolutely.

Q. And let me ask you to look now, sir, at --

MR. REASONER: Actually, this is a good stopping point, Your Honor.

THE COURT: Yeah, it's about time. Okay. We've got a time to come back. We'll see you-all then.

MR. ALLISON:  Thank you, Your Honor.

MR. BOYD:  Thank you, Your Honor.

MR. REASONER:  Are we reconvening on March the 8th?

THE COURT:  On the 8th, that's it.

MR. REASONER:  At 9 a.m. or?

THE COURT:  Yeah, 9 a.m., same kind of thing.

(Proceedings adjourned.)

THE STATE OF TEXAS          *

COUNTY OF NUECES           *

I, Sara E. Rivera, Official Court Reporter, in and for the 94th District Court of Nueces County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted, tendered in an offer of proof, or offered into evidence.

WITNESS MY OFFICIAL HAND, this the 21st day of February, 2024.


/s/ Sara E. Rivera
SARA E. RIVERA, Texas CSR 4626
Expiration date:  04/30/2024
Official Court Reporter
94th District Court
901 Leopard Street, Room 901.01
Corpus Christi, Texas 78401
361-888-0658
Email:  sara.rivera@nuecescountytx.gov

REPORTER'S RECORD
TRIAL COURT CAUSE NO. 2024DCV-0045-C

| | | |
|---|---|---|
| LAWRENCE BERRY, Individually and Derivatively on behalf of BERRY GP, INC. | ) ) ) ) ) | IN THE DISTRICT COURT |
| Plaintiff | ) ) | |
| BERRY GP, INC., Normal Plaintiff | ) ) ) | 94TH JUDICIAL DISTRICT |
| VS. | ) ) ) | |
| MARTY BERRY, ROBERT RICKETT; ROBERT POWERS; MICHAEL HUMMELL; BERRY GP, INC.; BERRY OPERATING COMPANY, LLC; and BERRY CONTRACTING, LOP | ) ) ) ) ) ) ) | NUECES COUNTY, TEXAS |

_____

TEMPORARY INJUNCTION HEARING

(March 22, 2024)

_____

**DRAFT TRANSCRIPT**

APPEARANCES:

MR. BARRETT REASONER
SBOT NO. 16441980
MR. MICHAEL ABSMEIER
SBOT NO. 24050195
MR. BRUCE BALDTREE
SBOT NO. 24116064
Gibbs & Bruns, LLP
Houston, Texas
Telephone:  (713) 650-8805

        AND

MR. BUTCH BOYD
SBOT NO. 00783694
Butch Boyd Law Firm
2905 Sackett Street
Houston, Texas  77002
Telephone:  (713) 589-8744

        AND

MR. DOUGLAS A. ALLISON
SBOT NO. 01083500
Law Office of Douglas Allison
403 North Tancahua Street
Corpus Christi, Texas  78401
Telephone:  (361) 888-6002

        AND

MR. VAN HUSEMAN
Huseman Law Firm
615 North Upper Broadway, Suite 2000
Corpus Christi, Texas 78401
Telephone:  (361) 883-3563

        AND

MS. GABBIE S. CANALES
SBOT NO. 24012376
Law Office of Gabbie Canales
5262 South Staples, Suite 100
Corpus Christi, Texas  78411
Telephone:  (361) 887-4700

                * * * * * * * * * * * * * * * * * * * * * * * *

INDEX TO WITNESS

(Morning session)

MARCH 22, 2024                                    PAGE

MARTIN MARVIN BERRY (Continued - Adverse)
    Cross-examination (cont) by Mr. Reasoner......  13
    Direct examination by Mr. Allison.............  60
    Cross-examination by Mr. Huseman..............  125

P R O C E E D I N G S

March 22, 2024

(The following transcription is a continuation of proceedings held on February 16, 2024)

**(DRAFT TRANSCRIPT)**

THE COURT:  Okay.  We're back.

MR. ALLISON:  Your Honor, I don't know how you would like to proceed.  I think the things that are set today, we filed a motion to dismiss, you remember we had some issues about defective parties, so we filed what we think was the appropriate motion to dismiss and got that set for hearing.  They filed a response, we filed a reply.

THE COURT:  All right.

MR. ALLISON:  And then we also had a notice for today, the continuation of the --

THE COURT:  Of what we already started.

MR. ALLISON:  Of whatever we started, the TRO.

THE COURT:  The TRO.

MR. ALLISON:  And -- and the reason I say whatever is left of it, I think when we talk about the motion to dismiss you'll hear, at least me, talk about how they really abandoned a lot of their positions, and so I think we really need to understand what we're here

about today. However, and -- and all of that is, I think, good prelude to whatever we do today, Your Honor.

THE COURT: Okay.

MR. REASONER: Okay. Your Honor, from our perspective we're happy to argue anything, any time the Court wants to hear it. As the Court will recall, we're in the middle of a witness now, we'd like to continue with that. Frankly their motion, not to dive into the merits of it at this moment, but is basically saying we think we win. We think for these evidentiary --

THE COURT: I mean, it's -- it's almost --

MR. REASONER: -- reasons --

THE COURT: -- almost the same thing.

MR. REASONER: So we think closing, you know, after both parties put on their evidence, we should argue that and we're happy to do it, but interrupting, you know, our presentation of witnesses, we don't think is justified.

THE COURT: No, I agree. We'll finish with that. I mean, it's almost -- it's -- it's part and parcel of the same thing.

MR. ALLISON: And I don't -- I -- I hear that the -- on some issues yes, and on some issues, no. And the thing I want to be real careful of and however you want to proceed I'm going to listen, the thing I

want to be real careful of is remember that the original -- we're not just here on a application for TRO or for TI, we are here because we went up to Houston and we entered into what -- what we thought was a much shorter agreement, much more limited agreement. I understand Your Honor said, "No, you're going to live by it," we've been living by it, okay.

THE COURT: Fair.

MR. ALLISON: But we've got this agreement issue out there which means everything that's in that original TI, which now they've amended, they've abandoned most of it, and everything that's in the -- their motion to modify the TI, most of which they've abandoned, all of those things, we have an agreement that we need you to rule on those to release us from --

THE COURT: Well, I hope finish today.

MR. ALLISON: Yeah. Well --

THE COURT: I mean, I hope.

MR. REASONER: We're ready.

THE COURT: Look, I don't have anything else today.

MR. ALLISON: Okay.

THE COURT: This is it, all day long.

MR. ALLISON: Yeah.

THE COURT: Okay, so I hope we finish

today.

MR. ALLISON: You're getting my point. We need a ruling, not just on -- on what we're here on --

THE COURT: I'll give you a ruling.

MR. ALLISON: -- now.

MR. REASONER: Not just for the TI, Your Honor.

THE COURT: No. I --

MR. REASONER: So, we're ready.

THE COURT: I intend to -- I intend to put this piece of the case to bed today.

MR. ALLISON: Okay.

THE COURT: Okay? That's my plan.

MR. ALLISON: Got you.

THE COURT: We don't have anything else.

MR. ALLISON: Okay.

THE COURT: I don't have a plea, I don't have anything else all day long.

MR. ALLISON: Okay.

THE COURT: Okay? So, you know, I mean, I will say this: After the last -- after -- after the last hearing, well, I guess it's the same hearing, but after we recessed I went through, because it seems to me that your -- your position is that you want two things. You want -- you want me to restrain them from removing

Mr. Berry are from the board, that's one; and then two, you want this notice before you sell property, or before property is sold, so that he gets two weeks' notice. Now, as I read through the bylaws, and then there was the addendum, I saw that there is a procedure for removing a board member, okay? So, I will tell you, I'm un-inclined to interfere in that procedure that's already written.

I will also say that I saw, and I may have missed it, okay? I may have missed it, but I saw that there is a procedure for acquiring property; in the bylaws, there is a procedure written. I did not see a procedure for selling property. Now, I may have missed it, I may have missed it. And if there is such a procedure, well, then you guys point it out to me. I don't know, okay? And so to that effect, you know, I mean, I'll listen to what you've got to say about it because, you know, you -- you filed your motion, we're having a hearing, but I'm just telling you that I'm un-inclined to interfere with something that has a procedure written in the bylaws. I'm not saying no, I'm just saying I'm very un-inclined.

MR. REASONER: And, Your Honor, I hear the Court loud and clear. I think we believe that it is appropriate here, within the Court's equitable power, in

a situation where we have -- we've started to show and we'll continue to show the Court what's been done here to freeze Lawrence Berry, you know, an effective one-third owner of the operation from all information and that there is inside --

THE COURT: Yes.

MR. REASONER: -- so that keeping him within the Court's equitable power is ordering that he at least be kept on the board, so he has that level of information, that that is warranted here and will avoid irreparable harm to Mr. Berry.

THE COURT: I will listen. I'm just -- I'm just giving you my thoughts.

MR. REASONER: Understood, Your Honor.

THE COURT: As I've heard already a lot of testimony at -- at this point. I've already heard testimony and I've looked through the bylaws and then the addendum.

So, with that, I guess let's continue on and then after we're done with that, we will take up your motion to dismiss. But it's, you know --

MR. ALLISON: Because we --

MR. REASONER: We had Mr. Marty Berry on the stand. Sorry.

MR. ALLISON: Yes, Your Honor. We -- we do

think, just in direct response, what they're asking for now is totally different than what they originally asked for, with regard to sell real estate.  They -- originally they said -- their pleading was, and which is where we made our agreement, that their pleading was we can't sell real estate unless Lawrence, a one-third person, approves it.  So, they wanted minority rule.  They've now changed that completely.  The first time that changed, now they're -- now, you're right, now they're saying they don't want that -- that veto power, they don't want to require approval, they want two weeks' notice.

THE COURT:  That's what I thought.

MR. ALLISON:  That's what they're saying now.

THE COURT:  That's what they're saying, right?

MR. ALLISON:  That's what they're saying now.

MR. REASONER:  Well, before the last TI hearing, Your Honor, that's not changed, Your Honor.

MR. ALLISON:  That's what they're saying now.  And the point is they've completely changed the relief.  They've gone from we want a minority rule, we want the Judge to order that I have -- that Lawrence has

to approve it. Now they're saying they want notice. And we've -- we've responded -- I mean, there's nothing to --

THE COURT: I mean, I -- I'm going to get there.

MR. ALLISON: Yeah, we'll get there.

THE COURT: We'll get there.

MR. REASONER: Okay. And, Your Honor, just to be clear, that -- that was the same relief before this TI hearing, when it began.

THE COURT: Got you.

MR. REASONER: We have -- we have narrowed it from our TRO days because we're trying to put something in place that is protective but least invasive so -- till we try this case, and I think there is more than abundant justification for it.

THE COURT: I'm listening.

MR. REASONER: All right. Thank you.

THE COURT: So I guess, Mr. Berry, come on back. Get back on the stand. You're still under oath.

COURT BAILIFF: Please make sure your phone is on vibrate.

THE COURT: And watch your step.

COURT BAILIFF: Watch your step.

THE COURT: We don't want anybody falling.

MR. REASONER: And, Your Honor, we'd like to invoke the rule, please.

THE COURT: Okay. All right, the -- the rule is invoked. Obviously the parties are excluded, their spouses. Is there anybody else here that's a witness? I mean --

MR. HUSEMAN: He's a party.

THE COURT: He's a party.

MR. HUSEMAN: Yes.

MR. ALLISON: Yeah, Mr. Klein is here and he is represented -- he is a representative for one of the entities, Your Honor. I know that that's -- I forget which one.

THE COURT: Okay.

MR. HUSEMAN: GP.

MR. BOYD: For which one?

MR. ALLISON: For Berry GP.

THE COURT: Okay. Well, then I guess he gets to stay there too, but if there are any other witnesses that --

MR. REASONER: I'll take your word for that.

THE COURT: -- that happen to walk in --

MR. ALLISON: Yes, Your Honor.

THE COURT: -- the rule is invoked.

All right. So go ahead, continuation.

MARVIN MARTY BERRY

having been previously duly sworn, called as an adverse witness, testified as follows:

CROSS-EXAMINATION
(Continued)

BY MR. REASONER:

Q. Good morning, Mr. Berry.

A. Good morning.

Q. If we could look, sir, at Exhibit 10, Plaintiff's Exhibit 10, it should be among the exhibits that have already been introduced there in front of you. Do you have that before you, sir?

A. Yes, I do.

Q. Thank you. This is an excerpt, as I understand it, from the general ledger of Berry GP that was produced by your counsel. Do you recognize that format, sir?

A. I don't, but it -- that's what it is.

Q. Okay. You have no reason to doubt that's what it is?

A. Not at all.

Q. And do you see that this document shows that on April 11th, a principal payment on the loan from you, to the company that we've talked about, was made to you in the amount of ten million dollars?

A.   Yes, I do.

Q.   And that's consistent with your recollection that you received ten million dollars around this time, April 11th --

A.   Yes --

Q.   -- 2023?

A.   -- it is.

Q.   All right.  And if we could -- if we could get back in our rhythm of making sure we're not talking over each other, for the Court reporters's benefit.

And if we look back for a moment, sir, if you could look at 32, Plaintiff's Exhibit 32.  That was the letter, just to orient you, what was the letter from the Berry entities' lawyer in the negotiation with IBC that we saw on March 30, 2023.  Are you with me there, sir?

A.   Yes, I am.

Q.   And to refresh on that, we looked at page 2, item 7, and that was where the Berrys' lawyer indicated that you were rejecting the bank's condition that Mr. Berry -- that Mr. -- that your loan and Dennis Berry's loan be subordinated to the IBC loan and no payments be made until IBC is paid off.  Do you recall that?

A.   I don't, but that -- that sounds reasonable, you're in negotiations.

Q.   Okay.  And you said it was not inconsistent

with your recollection that you-all had rejected that at one point in the negotiations?

A. That's correct. There is a lot of things we rejected that were unacceptable.

Q. Yes, sir. And that was about - just so we orient ourselves on the time line here - it looks like it was 11 days, about, after that letter that -- that you then got this ten million dollar payment; is that correct?

A. I --

Q. So, that's just --

A. It seems close, yes.

Q. -- March 30 and then April 11; is that right?

A. That's correct.

Q. And there was not any board approval of the ten million dollars being paid to you, was there, sir?

A. There doesn't have to be.

Q. And I had a different question, sir. Your counsel is here, will be able to ask you --

A. Sure, sure.

Q. -- whatever you want to go into.

A. Sure.

Q. My question was, there was not any board approval of the payment of ten million dollars, was there?

A.   Not that I'm aware of.

Q.   And you did not discuss the repayment of ten million dollars, to you, with Mr. Lawrence Berry, did you, sir?

A.   No, I did not.

Q.   And if we look at Plaintiff Exhibit 27, sir, that was a copy of the note net, of your note that we looked at, sir.  Do you recall that, sir?

A.   Yes, I do.

Q.   And in looking at the terms of payment there, about three quarters of the way down the page, we saw that no payments were due until the end of the note, which was December 31, 2024; is that right, sir?

A.   Yes.

Q.   And so, the ten million dollars that was paid to you was not required to be paid under the terms of the note, was it?

A.   And you have to understand this note was made way after our original agreement.  I had an agreement with the CEO that I had to pay taxes on this money.  I was willing to leave it there, but I had to take money out for taxes.  If you look at the date of April, you'll find that's right before tax-paying time, and he knew he had that little bit of money that he was going to have to pay me back, to pay taxes.  So, I got that money back

from him.  That's not a loan repayment, that's a -- that's getting money to pay my taxes.  I said, "You want it all, or do you just want part of it?  I'll do whatever.  We're -- we're needing cash flow in this company."

Q.  Okay.

A.  "So, what do you want?"  And he told me, "Let me have it all.  I'll pay you back when your tax time comes."  I said, "No problem.  I just want my tax money, and we'll leave it, and let it ride."

Q.  Okay.  And let's break that down, if we could, sir.  So, the little bit of money you're talking about is the ten million dollars?

A.  That's correct.

Q.  All right.  We agree that in the written note there is no provision for a payment of ten million dollars along the way to you; is that right?

A.  That's correct.

Q.  Okay.  But the point you're making is, in the handshake deal that you had with Mr. Powers to loan money, you had talked about a ten million dollar payment being made for tax purposes; is that correct?

A.  I told him it would probably be around ten million dollars, yes, I did.

Q.  Okay.  And -- and again, just so we're clear,

that -- that loan was not anything that went before the board or was discussed with Lawrence Berry; correct?

A. It was not.

Q. Okay. And do you recall, sir, swearing out an affidavit, when this case was initially pending in Harris County, Texas?

A. Yes, I do.

Q. Can you go -- can you look with me at Plaintiff's Exhibit 9 in your stack, please, sir. Are you with me there, sir?

A. Yes, I am.

Q. All right. And that is an affidavit that you swore to, looking at the date here on page 3, December 7, 2023; correct?

A. Yes, that's correct.

Q. All right. And if we go to the -- the front page of that document, near the bottom of the page, you see it says: We have not been repaid for our loans and are unlikely to recover our loan any time soon.

You see that, sir?

A. Absolutely.

Q. All right. And was that --

A. Do you think it's different than that?

Q. Sir, let me --

A. You think it's different than that?

Q. Let me get a question out for you, if I could.

A. Okay.

Q. Do you believe that was an entirely accurate statement, sir?

A. I think it's totally accurate. When you get repaid for your loan, you don't have no loan. I was not repaid for my loan.

Q. All right. Would it -- would it have been more accurate, sir, to perhaps say that it has not been entirely repaid?

A. It could probably be more accurately stated a number of ways.

Q. Okay.

A. But, you know, it wasn't made to deceive anybody.

Q. All right.

A. The fact is, no loan repayment had been made.

Q. Okay.

A. I have not been repaid of my loan.

Q. Well, hold on. "No loan repayment had been made." Partially, right, ten million bucks?

A. I'm not great with English maybe, but repayment, to me, is when you pay it.

Q. Full repayment.

A. And I haven't been paid.

Q. Okay.

A. So, you know, we can jostle words back and forth, but the fact was, I believe I stand exactly by this, and so far I'm a hundred percent correct, I haven't been repaid.

Q. All right, sir. Well, and just so we're -- just so we're clear, you could get 30 million bucks and you wouldn't have been repaid, under your analysis; right?

A. I wouldn't have been repaid, that's correct.

Q. Okay.

A. You're getting good at math, that's correct.

Q. Well, no that's -- that's something I'm fairly not for, sir, so I'll -- I'll take that one. But at any rate, your -- if I read this affidavit, I would not know you'd gotten a substantial payment on the loan, right?

A. I guess in your interpretation, that would be true, yes.

Q. Would you be able to tell, from reading it that way?

A. Would I be able to tell?

Q. Would you be able --

A. Of course I'd be able to tell.

Q. Well, could you know --

A. I'm the one that wrote the affidavit.

Q. Well, how about somebody reading it who doesn't have the benefit of that? How about somebody who doesn't know how much money you'd gotten?

A. I don't -- I don't know if they'd know the exact numbers, you're probably correct, that doesn't say anything about how much interest you got or anything else.

Q. And it doesn't say you'd gotten any money back, right?

A. That's right.

Q. All right.

A. If that's what you if that's -- no repayment, I'll just say it's no repayment.

Q. Okay. I'll leave the subject, sir, but it doesn't say you'd gotten any money back here, does it?

A. It doesn't say -- it says what it says.

Q. Does it say you'd gotten any money back? Just so we close the subject.

A. No, it doesn't.

Q. Okay. And then let me ask you to look, sir, at the top of this page, the top of the affidavit, and this is -- this is on behalf -- this is an affidavit you and your brother Dennis Berry did; correct?

A. That's correct.

Q. Okay. And so when it says "we" it's talking

with the two of you-all, I guess?

A.   That's correct.

Q.   Yeah.  In the second sentence you say:  We are shareholders and directors of Berry GP, Inc., and multiple related entities.  Do you see that?

A.   Yes.

Q.   And was that -- was that statement accurate, when you swore to it?

A.   It was probably accurate in my mind at the time, but it's probably not accurate.  I mean, you need a flow chart to look at this, to understand the companies.  You know, LDMA is a -- is the top of it and that's -- that's a -- that's the partnership, so I missed that.

Q.   Okay.  Well, so and if you say it was accurate in your mind, I guess it was accurate in your mind because you-all are, in effect, beneficial shareholders of Berry GP, Inc.; is that right?

MR. ALLISON:  Objection, Your Honor, I think he is asking for really a legal conclusion.

MR. REASONER:  I'm asking why he swore to this, Your Honor.

THE COURT:  Well, then ask that.

A.   Well --

MR. ALLISON:  I think he needs to rephrase

his question.

Q. (By Mr. Reasoner) Well, sir --

MR. REASONER: Your Honor, may I ask that question?

THE COURT: Yes, ask the question.

MR. REASONER: Okay, thank you.

Q. (By Mr. Reasoner) My question, sir, did you believe that you and your brother were beneficial shareholders of Berry GP, Inc., because you owned shares through another entity?

A. What do you -- what do you mean by "beneficial"? I've never heard of that.

Q. You never heard that, beneficial --

A. Never heard --

Q. -- ownership?

A. -- beneficial. No, I haven't.

Q. Okay.

A. You mean shareholders?

Q. All right. Well, let's just say, in your own words, why did you swear that you were a shareholder of Berry GP, Inc.?

A. It was just a -- it was a -- it was a mistake. It was a mistake. We own -- there's only three owners in all these companies, no matter how -- we own companies that own companies, so there is only three

people involved, and three other entities involved in all these companies; that's it, there's nobody else. So, if I'm swearing that we're shareholders and in fact it's owned by a company that owns this company, it was a mistake, just like you made a mistake in your pleadings when you started this case.

Q. Okay.

A. So it's easily done, when you don't have a chart. You have to look at it.

Q. Sir, believe me Mr. Allison is chomping at the bit to let you argue with me, but if you'll just focus on my questions right now, we'll get through this a lot more quickly.

MR. ALLISON: Objection, sidebar, but I'll move on.

THE COURT: Sustained.

Q. (By Mr. Reasoner) Now, sir, the -- as you alluded to, the Berry GP shares are actually directly owned by the LDMA entity; correct?

A. That's correct.

Q. And you have a one-third ownership interest in LDMA; is that right?

MR. ALLISON: Objection. Well --

A. I do -- I do not think so.

Q. (By Mr. Reasoner) Okay. How much do you

believe you own, either directly or indirectly, of LDMA?

A. I believe it's in the 20 percentile, but I could be wrong on that, but I think that's about it.

Q. Okay. And who owns the rest of it, in your view?

A. A trust.

Q. Okay. And why I said indirectly or directly, is it the case that in terms of personal ownership and trusts, for the benefit of you or your immediate family, that you would own a third of LDMA?

A. Yes, I guess that would be correct. With -- with them together, I think I do own a third; yes, that's correct.

Q. Yes, sir. And --

A. But they're separate, they're completely different.

Q. Who is completely different, sir?

A. The trusts are different than an entity. It's an entity, it's not me, but personally I own 20 something percent.

Q. Understood, understood. And with the same description, sir, about either personally or through a trust benefiting them or their immediate family, would Lawrence and Dennis Berry, settling out his estate each also own a third of LDMA?

A.    Yes, I believe that's true.

Q.    And help me with the pronunciation, is it Becon?

A.    Becon.

Q.    Becon, okay.  Does Becon -- that's the GP of LDMA; is that correct?

A.    I believe that's correct.

Q.    And again, you own a third of Becon; is that right?

A.    That would be correct.

Q.    And similarly --

A.    Well, once again, it's -- do I own a third of it?  I own 20 something percent.

Q.    Okay.

MR. ALLISON:  And, Your Honor, can I just have a running objection to call for a legal conclusion, but I understand he's acting in a nonlegal sense.

THE COURT:  I'm -- yeah.  I mean, I -- I think it's a fair question to ask what you own and what you don't.

MR. ALLISON:  I -- and I'm -- I just don't want it to be interpreted later as though he is claiming to be a legal expert, saying that's what really is --

THE COURT:  No, I get that.

MR. ALLISON:  All right.

THE COURT: But I think, I mean, I think it's a fair question to ask what percentage of this company you own and what you don't.

MR. ALLISON: That's why I said, I just wanted -- I didn't want to keep --

THE COURT: All right.

MR. ALLISON: -- interrupting. I just -- whether it's a running objection, I just wanted to --

THE COURT: All right.

MR. ALLISON: -- understand to make sure --

THE COURT: Fair enough.

MR. ALLISON: -- we were understanding he is answering it in his capacity -- in his capacity at this time.

THE COURT: To the best of his ability.

MR. ALLISON: To the best of his ability, right.

THE COURT: All right.

Q. (By Mr. Reasoner) All right. Mr. Berry, just going back, I think you said you do own a third of Becon, but it might be partly through a trust?

A. That's true. It might be partly through my trust, I control a third of it.

Q. And with that same caveat, that it might be partly through trust, do Lawrence Berry and now the

estate of the Dennis Berry also own a third of Becon?

A. As long as their trust is in their control I believe that's true, yes, I believe that to be a true statement.

Q. And so I want to ask you about the decision to -- to market for sale the Berry dock and adjacent property for a moment, and to orient us, can you look at Plaintiff's Exhibit 11, please, sir.

A. Got it.

Q. Are you with me there, sir?

A. Yes.

Q. And do you see that this is a letter to the then CEO of the Port of Corpus Christi from Robert Rickett of Berry GP?

A. Yes, I do.

Q. And the date on this one is May 30, 2023; is that right?

A. Correct.

Q. And as I understood it Mr. Rickett, on behalf of Bay, was -- was letting the Port know that the Berry dock and adjacent property was being offered for sale; is that right?

A. That's correct.

Q. And I take it you were a part of decision to sell it?

A. The whole board was.

Q. The whole board was, all right. When -- when was the board meeting at which that decision was taken?

A. There's been a lot of board meetings, we have one every -- I would say since this is in May, I think it was February of that same year that we talked about offering it to Valero, offering it to our neighbors, offering it to the Port.

Q. All right.

A. Unanimously, I might add.

Q. And your -- your belief is that took place in February of 2023?

A. I could be wrong on that part, the exact date, but yes, that's my belief.

Q. In your view, obviously sometime before May 30, 2023; correct?

A. Yes.

Q. Have you seen, sir, any documentation, any board presentation, board minutes, or any other sort of document indicating board knowledge or approval of this offer for sale?

A. We weren't -- at that time before the lawsuit, our company was probably too laxed, and I would ask you the same thing, there is no -- there is no documentation.

Q. Uh-huh.

A. We had our meeting, we talked about it, and the CEO was supposed to go forward and go look for offers.

Q. Well, my --

A. And that's what we did. So, do we have any documents? We don't have any documents to say one way or the other, that I'd be willing to bet.

Q. Well, and let ask you this, though, sir: Back in those days, though, correct me if I'm wrong, but I believe I have seen PowerPoints, presentations, that would be made on issues that were going to be considered by the board at a particular meeting; is that consistent with your recollection?

A. That would be consistent. But on a piece of property that would have been around our whole life, you probably wouldn't have to have a map to show us where it's at.

Q. All right. Let me -- let me get a question out and then you take your position, sir.

My question was: Do you recall seeing, in any PowerPoint, a indication or presentation about the sale of the dock and adjacent property, in that time frame?

A. No PowerPoints.

Q. Okay. And what was the rationale, sir, behind offering the dock and adjacent property for sale, in

your view?

A. Tied up capital that doesn't justify the income we're getting for it.

Q. I'm sorry, I couldn't hear. It doesn't --

A. Capital tied up in a property that -- that doesn't justify the income for it. You look at the income you have coming in every year over the past ten years and you evaluate it, is it worth this or worth that. And if you got an offer for something much greater, then, you know, you take your money and reinvest it in something that would produce more money.

Q. And it's your position that -- that Lawrence Berry was aware of this and was in favor of it; correct, sir?

A. A hundred percent.

Q. All right. But you don't have any documents you could point to, to show us that; is that correct?

A. No, I don't.

Q. Okay. So looking at our -- our time line here, just so we have it, we looked at that letter on -- on March 30, 2023, that letter, that was PTX32, the letter from the lawyer rejecting the -- the subordination and no payments issue that IBC was asking for; do you remember that?

A. Uh-huh.

Q.   Yes?

A.   Yes, that's correct.

Q.   So, that's March 23.  And then we go a little bit, we saw on April 11, 2023 in PTX10, that's when you get the -- the ten million dollar payment, right?

A.   Correct.

Q.   We saw that.  And then we just now looked at PTX11, that's May 30, the dock being offered up for sale; is that right?

A.   That's correct.

Q.   Okay.  Let's look at one other document that we saw last time, and that is a Defendant's exhibit, Defendant's Exhibit 5.  Can you see if you have that near you, sir.  Defendant's Exhibit 5.  Is that there, sir?  Or if it's not, I'll -- I'll go hunt it down for you.

A.   Can you tell me what it is?  All these just say "Exhibit" or "Defendant's Exhibit"?  It doesn't say a number.

MR. REASONER:  May I approach, Your Honor?

THE COURT:  Yeah.

A.   There is no numbers.

Q.   (By Mr. Reasoner)  Sorry, sir.  This is what it looks like.  It's a series of bank documents.  Do we -- oh, here we go, Defendant's Exhibits.  May I, sir?

A.   Yeah, sure.   Same thing this one says.

Q.   Here we go.

A.   Okay.

Q.   I'll just keep this Defendant's stack right over there.   All right, sir.   Are you with me on Defendant's Exhibit 5?

A.   Yes.

Q.   And looking at this, you see this is a collection of bank documents?

A.   Yes.

Q.   And if we go to page, Bay 13, those Bates numbers in the lower right hand corner, it's the -- the subordination agreement?

A.   Yes, that's what I'm looking at.

Q.   Okay.   You'll see that this is your -- this is your subord -- personal subordination agreement with Frost; is that correct?

A.   Oh, I'm sorry.   You got another one you're looking at?

Q.   No, no.   It's Defendant's Exhibit 5.   Right --

MR. REASONER:   Sorry, Your Honor, may I?

THE COURT:   Yeah, yeah, go ahead.

Q.   (By Mr. Reasoner)   Okay, here we go, sir.   For me, it's the third page of the document.   Let me see. We've got a Bay 11, let's go to Bay -- oh, these are

single-sided, that's the difference.  Yeah, Bay 13.
There we go.  You with me there, sir?

A.   Yes.

Q.   And --

A.   But I can't tell this is Frost, without reading
it.

Q.   Take -- take a moment.  It's in the first
couple of lines.

A.   Okay.

Q.   You see that's the agreement between you
personally and Frost Bank; correct?

A.   Correct.

Q.   And it's a subordination agreement.  And if you
look down in paragraph number 2 there, it's got the
expected limitations on anything being paid on your loan
before Frost is paid off.  Do you see that?

A.   Yes.

Q.   And this -- if you look at the top, this is
effective August 1, 2023; correct?

A.   Correct.

Q.   So, am I right, sir, that between May 30, at
least when we see that the Port was offered the -- the
dock and adjacent property, and August 1 of 2023, there
would have been no prohibition on proceeds from the sale
of the dock and adjacent property being used to pay off

the loan from you and Dennis Berry; is that true?

A.    I'm not sure if that's true or not because this is the property that holds -- I thought this property, or I believe this property is in the Frost line, so I'm not sure on that date.  I can't -- I don't know.

Q.    Well, was there a subordination agreement that you had before August 1 of 2023?

A.    I don't recall.

Q.    Okay.  So you don't know of any prohibition before this?

A.    I don't recall.

Q.    Changing subjects, sir, do you own a company, along with your wife, called Western Gulf Equipment LLC; is that right?

A.    Yes, I do.

Q.    And let me ask you to look at Plaintiff's Exhibit 18, which is already in evidence.  It should be in your stack there.  You with me there, sir?

A.    Yes.

Q.    And the first page is a certificate of formation of limited liability company and the filing date on that is February 7 of 2019, it's in the upper right hand corner.  Did you see that, sir?

A.    I didn't hear your question.  Yeah.

Q.    Oh, I'm sorry, well, just let me know.

A.   I'm looking at it.

Q.   Let me know when you don't.  I was just going to say, sir, do you see in the upper right hand corner that the filing date on this was February 7, 2019?

A.   Yes, I do.

Q.   Okay.  And was that -- was that the first time that Western Gulf was formed, or was this just another iteration of a previously existing company?

A.   From my recollection, this is the first time it was formed.

Q.   Okay.  And it shows you at this point in the initial filing as the manager, correct?

A.   That's correct.

Q.   And then if we turn to the second document in your stack here, do you see that there is a document entitled -- again, we're in -- still in this Plaintiff's Exhibit 18.  The second document, "Statement of change of registered office or agent".  Do you see that, sir?

A.   Yes.

Q.   And the filing date on that is in the upper right hand corner again, February 4, 2020; true?

A.   True.

Q.   It shows Mike Hummell had become the registered agent for Western Gulf Equipment; is that right?

A.   That's correct.

Q. And then if we look at the last three documents here, they are all Texas franchise public information reports for 2021, 2022, and 2023; is that right?

A. That's correct.

Q. And that -- those you and your wife as the managers; true?

A. True.

Q. And as we talk about ownership, as we have been earlier, do you and your wife directly own Western Gulf Equipment, LLC?

A. Yes, we do.

Q. And was in a -- was Western Gulf Equipment originally set up to make a joint purchase between you and Bay of a crane?

A. No.

Q. Okay. Well, let me -- let ask a broader question. Was there a time when you personally went in on buying a crane with Bay or another Berry company?

A. You're going to have to define "Berry company" for me.

Q. Well, I don't want to miss you just by not being precise.

A. Because you're not precise enough, I'm just telling you.

Q. Well, that's one of my crosses to bear, sir,

but I guess my question is, broad as you want to make it, did you ever personally buy a crane, along with any Berry-related entity?

A.   No.

Q.   Okay.  Oh, well, yeah, that's -- my co-counsel is more awake than I am, I said "personally".  Did Western Gulf ever buy a crane, along with any Berry entity?

A.   No.

Q.   Did you ever buy -- did Western Gulf ever buy part of a crane?

A.   Yes.

Q.   Along with whom?

A.   With Bay Canada, a group out of Canada.

Q.   Ah, okay.  We're on to it, we're on to it now. Is Bay Canada -- was the reason you didn't include that in your previous answers is because Bay can did you is not a related entity to Berry companies?

A.   It's just owned by the brothers.  So I don't -- I don't -- it's not part of the LDMA.

Q.   Okay, fair enough.  Well, we got there eventually.

A.   You did.

Q.   Was it -- you made me work at it, though.

A.   Well --

Q. So, let's see where we are now. So Western Gulf bought part of a crane, along with Bay Canada, which was owned by the Berry brothers; is that right?

A. Correct.

Q. Correct, okay. And when was that, sir, if you remember?

A. February or March of 2019.

Q. Okay. And were there any other -- after that one crane, were there any other joint purchases of that kind?

A. No.

Q. Now, did -- on its own, did Western Gulf Equipment subsequently buy additional cranes?

A. Yes.

Q. How many, over time?

A. I believe six.

Q. And has Western Gulf Equipment rented -- rented those cranes back to -- to Bay?

A. Yes, they have.

Q. Let me ask you to look, please, sir, at Plaintiff's Exhibit 17, previously admitted. And -- and as I understand it and forgive the -- the fine print here, but is this part of a document that shows payments, ledger sheets showing payments by Bay?

A. I believe it to be true.

Q. Okay. And then if we look, about a third of the way down the page, do you see that Western Gulf Equipment, your company, is listed as a payee there in the left hand column?

A. Yes.

Q. And am I right, sir, in looking -- this -- this appears to cover a three-month period, is that right, July, August, and September of 2023?

A. I'm not sure how you know that, but I'll take your word for it.

Q. Well, I'm just looking at the -- if you go with me, under the Western Gulf section, do you see that it's July 1, 2023, and it's entered that way seven times; and then August 1, 2023, seven times; and then September 1, 2023, seven times. Do you see that?

A. No, sir, I do not.

MR. REASONER: May I?

A. I see --

THE COURT: You may.

A. -- I see October. If you look with your glasses a little closer, you'll see it's July -- I mean, it's July, August, and October.

Q. (By Mr. Reasoner) I thought September was the 9th month.

A. Well, mine says "10" on it. I don't -- show me

where you're looking at.

THE COURT: Why don't you show him.

MR. REASONER: May I?

THE COURT: Yeah, yeah, yeah.

Q. (By Mr. Reasoner) I could probably upgrade these glasses, sir, in your defense, that's true.

A. I'm looking here, I see 7, 8 and 10.

Q. Okay. So we're looking at different columns. I'm looking here.

A. Okay.

Q. 7, 8 and 9; do you see that?

A. Yeah. I can see that now, yeah.

Q. Okay. And perhaps it's --

A. Which column means what?

Q. Well, I'm -- I'm talking to one of the owners of the company, that's what -- maybe we can get to the bottom of it. Do you -- do you know which column reflects what on this?

A. I do not. The man back there in the back probably does real well, though.

Q. Okay. Well, we'll hear from him. But looking at this, sir, as you would read it, and I understand that -- that you're not the CFO, but does it appear that in total, at least, over this period of time, there was 1.347 million paid, from Bay, to your Western Gulf

Equipment Company?

A.   Without having any titles on this or anything else, I would assume that's what the -- that's the -- the number it adds to.

Q.   All right.  And as the owner of Western Gulf, does that -- does that income, over a period of -- of a few months, does that sound consistent with what you've been seeing over the years?

A.   Not at all.

Q.   Okay.  Is it high, low?

A.   We go months without any pay, and then we go months where you make a payment up and it might be 7 or $800,000.  So, to say it's consistent with what I'm seeing, no, it's not.

Q.   Okay.  So this is just one slice of the payment?

A.   Yeah.  It's just a -- it's just a slice, where they're actually paying.

Q.   Okay.  And so when they don't pay, I guess that becomes debt that Bay owes to your company, Western Gulf Equipment; is that right?

A.   That's correct.

Q.   And let's look, please, at Exhibit 33.

MR. REASONER:  May I approach, Your Honor?

THE COURT:  You may.

MR. REASONER:  Thank you, Your Honor.

THE COURT:  Thank you.

Q.  (By Mr. Reasoner)  Plaintiff's Exhibit 33, sir, is a -- is from a spreadsheet produced by the company here, a cash requirements report, and this is just an excerpt from it.  Is that -- is the cash requirements report, is that the type of document you've seen before?

A.  I have not.

Q.  You are aware that the company keeps such a report, aren't you?

A.  Of course.

Q.  And looking at -- you see here that there are -- there is an additional periods of time where amounts owed to Western Gulf Equipment are tracked; is that correct?

A.  Yes.

Q.  And then looking at the -- the second page on the total for this period of time, you see that it shows here 4.321 million dollars?

A.  Yes.

Q.  Yes, all right.  And is that -- and it looks like if we -- if we look here over this period, it's -- there is some entries from late 2023 and then March 2024; you see that, sir?

A.  Yes, I did.

Q.   And is this -- what -- does the 4.3 million, does that reflect an amount owed to your company?

A.   I can't answer that with accuracy because I know it's a large number that's been owed because they haven't paid since, I think, June or July of last year, so it's quite a bit of money.

Q.   Haven't paid you anything since June or July of 2023?

A.   That's what I recall, yeah, yes, sir.

Q.   But that -- that debt is being tracked and growing, correct?

A.   Absolutely.

Q.   And let me ask you, sir, the period when -- prior to this lawsuit when you were renting -- well, when Western Gulf Equipment was renting cranes to Bay, was that something that was ever approved by the Berry board?

A.   Which time period are you referring to?

Q.   Well, let's -- well, we're looking at mid 2023. Was that -- were those rental -- was the fact that you owned a company that was renting cranes to Bay, was that something that was raised with and approved by the board of Berry?

A.   Not required to be approved and it wasn't.

Q.   Okay.  And that's a -- you touched on my

question there at the end.  Did you -- was it ever approved by the board?

A.   No.

Q.   And you had not discussed, during that time, with Lawrence Berry, the fact that Western Gulf Equipment was renting cranes to Bay, had you?

A.   He was very aware of it.

Q.   Well, let's -- let's break that down.  Had you discussed it with Lawrence Berry?

A.   Probably not, probably I didn't.  It was probably through Barry Peterson.

Q.   You what, through Barry Peterson?

A.   It was probably through our equipment director.

Q.   Okay.  So your -- what you're saying is, first, you didn't discuss it with Lawrence Berry, right?

A.   That's 2019, I can't recall that.  So, I don't -- I --

Q.   And to the best of your ability you don't remember discussing it?

A.   I just said I don't -- don't recall it, that's correct.

Q.   But what you're telling us is that you believe that because the Bay equipment manager, Barry Peterson knew, that Lawrence Berry must have known; is that right?

A. Well, we own a company together and I do a deal with that company. I own a third of it, Lawrence owns a third of it, and Dennis, my brother who is passed now, owned a third of it.

Q. Which company?

A. That's -- that's the Canada company.

Q. For that one crane?

A. So -- so we made a deal with that crane, so they would have to know that I'm leasing because there was a written agreement how it would work, and it's their fiduciary duty to know, so --

Q. Could it be yours to tell them?

A. It -- it's -- I don't believe it is mine to tell them. I kept up with everything in the company. I'm keeping up with the finances in the company. It's your fiduciary duty as a director of the company to know what's going on. If you don't want to ask for the documents to get them, that's -- that's fine. He's produced his -- our CFO produces a lot of stuff that my brothers frankly never -- never asked for. It's just -- it's just part of it, but they knew about this, this was something that went through because it took -- it took everybody to put it together.

Q. And to be clear, sir, what you're talking about is the purchase of the one crane with Bay Canada; right?

A. Well, you -- do you recall your question? You asked me if he knew about the cranes and if Western Gulf had leased to the company. I had that crane leased to the company. And so --

Q. And we're talking --

A. And I've -- and I've answered your question exactly the way you asked it.

Q. And I think we have a singular versus plural problem.

A. Okay.

Q. Your point is certainly Lawrence Berry knew one crane had been purchased by Western Gulf and Bay together, Bay -- Bay Canada; right?

A. Correct.

Q. And I'm asking you about the additional six.

A. Okay, that's a different question. I don't know if he knew, I have no clue.

Q. Okay. Well, I'm -- I appreciate you clarifying what you were trying to answer. So, you don't have any clue if Lawrence Berry knew about the additional six cranes that Western Gulf Equipment bought and leased to Bay?

A. That's correct.

Q. Okay. And Bay, sir, has a subsidiary called Basic Equipment; is that right?

A. I believe that's correct, a wholly owned subsidiary, yes.

Q. Okay. And that's -- in fact, that's an entity, as I understand it, how you and your brothers first got into the business, is that right, by acquiring that entity?

A. It could be reasonably thought so, yes.

Q. And Basic Equipment owns cranes too; right?

A. They could.

Q. Well, I guess just to be more precise, have they -- to your -- to your knowledge, has Basic Equipment owned cranes in the past?

A. Yes.

Q. And has Basic Equipment rented out cranes in the past?

A. Yes.

Q. All right. So they -- so, Basic Equipment was doing similar things to what Western Gulf Equipment was doing; right?

A. In what time frame?

Q. At -- at some point.

A. Ten years apart, yes.

Q. Okay. Now, sir, in -- in recent months after this lawsuit was filed, the board and shareholders have taken certain actions with regard to purportedly

ratifying some prior acts; is that right?

A. That's correct.

Q. And let me ask you to look at Plaintiff's Exhibit 16, please, sir. Are you with me there, sir? Looking at "Berry GP, Inc., Resolution - Special Meeting of Directors, December 7, 2023."

A. Yes, sir, I see it.

Q. And it says in the second paragraph there: Be it resolved that the loans made to Berry GP by Dennis Berry and Marty Berry in July 2022 are recognized as fair, and in the best interest of Berry GP, and are ratifying.

Do you see that, sir?

A. Yes, I do.

Q. And you and Dennis Berry both voted in favor of this resolution; correct?

A. Yes; yes, we did.

Q. And Lawrence Berry did not vote in favor of that, did he?

A. He didn't sign this, obviously.

Q. Okay. And it's consistent with your memory that he did not vote in favor of it?

A. That would be true.

Q. Now, Lawrence was the only one, of the three of you, who was not involved in the loans; correct?

A.   That's correct.

Q.   Now, let's look at Exhibit 34, please, sir.

MR. REASONER:  May I, Your Honor?

THE COURT:  Yes.

MR. REASONER:  Your Honor, we would -- we would offer this collection of resolutions of special meeting of shareholders for Berry GP, Inc., from February of 2024 into as Exhibit 34.

MR. ALLISON:  No objection.

THE COURT:  No objection, Mr. Van Huseman?

MR. HUSEMAN:  No.

THE COURT:  Admitted.

MR. HUSEMAN:  We like it.

THE COURT:  All right.

MR. REASONER:  And, Your Honor, for housekeeping purposes, I'm reminded that I did not formally offer Exhibit 33, Plaintiff's Exhibit 33.

THE COURT:  33?

MR. REASONER:  The excerpt from that spreadsheet.

MR. ALLISON:  No objection.

THE COURT:  All right.  That's also admitted, although challenging to read.

MR. REASONER:  That it is, Your Honor.

Q.   (By Mr. Reasoner)  Now, sir, here, as I think I

just mentioned, these are resolutions from a special meeting of shareholders, February 13 of 2024; is that right?

A. Correct.

Q. And as we talked about this, this was an attempt to ratify some things that had happened in the past, right?

A. I don't believe it was an attempt, I think it ratified things that happened in the past.

Q. Well, and you're not -- as your counsel has pointed out repeatedly, you're not here to tell us the legal impact of what you did, are you?

A. No, but if I throw it out there, it's just all it is, I just -- it is just what I was thinking. We ratified it, yes.

Q. Fair enough, sir. And let's look at 2141, which is there at the bottom of the second page, the Bates number at the bottom. You see that that says - that is again on the loans - and it says: Be it resolved that the loans are recognized as fair and in the best interests of Berry GP.

Do you see that?

A. Yes.

Q. And there, you voted in favor, correct?

A. Yes.

Q. And Bonnie Berry, who was voting, tragically after her husband's death, she votes "Yes" as well; correct?

A. Correct.

Q. And Lawrence Berry votes "No." Right?

A. Correct.

Q. And again here, Lawrence Berry is the only one that has nothing to do -- no relationship to the loans; is that correct?

A. Well, he owns part of the company that the loans were from, but I guess in your -- just looking at this, that would be correct, he didn't make any loans.

Q. Okay. So he's impacted by them, but he -- he was not a lender?

A. He would be benefited by them, absolutely.

Q. Well, potentially, we'll see. That's a -- obviously, there is uncertainty --

A. That's a financial question, but you do get the chance.

Q. Right. When a -- when a company borrows money that can be a good or a bad thing, depending on how things play out, right, sir?

A. That's correct.

Q. But here, so, Lawrence Berry votes "No" but in

the -- written above hear it says "Passed". Is that correct?

A. That's correct.

Q. And then if we look at, sir, at 2145, if you go to that page with me. This is a resolution says: Be it resolved that the acquisition of cranes or other equipment by Marty Berry, individually or through any company he owns or controls, and the subsequent leasing of that equipment to any Berry company for performing work of that Berry company, is approved. To the extent such conduct has occurred in the past, it is ratified.

Do you see that?

A. Yes, I do.

Q. All right. And you vote "Yes". You, as we've discussed, your -- you're on both sides of this transaction; right?

A. I'm also a shareholder, too; that's correct.

Q. That's one -- well, you're a shareholder of Berry, and you own Western Gulf Equipment; right?

A. That's correct.

Q. Okay.

A. I own part of it, yes.

Q. With your wife, right?

A. That's correct.

Q. All right. And so the -- but the two folks who

have no involvement in Western Gulf Equipment, one votes "Yes," Bonnie Berry; and Lawrence Berry votes "No," right?

A.   That's correct.

Q.   Okay.  But written at the top here, it nevertheless, is "Passed".  Is that correct?

A.   Nevertheless passed, yes.  It's passed, yes. It passed.

Q.   In your view, I understand, sir.  It's written up there "Passed," right?

A.   "Passed."

MR. REASONER:  Pardon me, Your Honor.

THE COURT:  Yes.

Q.   (By Mr. Reasoner)  And was there -- was there a discussion of that, sir - if we can just stay on 2145 for a minute - it says there at the bottom:  To the extent that such conduct has occurred in the past.

Do you see that?

A.   Uh-huh.

Q.   Yes?

A.   Yes, I do.

Q.   All right.  Was there a discussion at that meeting, to -- to what extent this leasing of cranes had occurred in the past?

A.   No, not that I recall.

Q. Now, sir, I understand that, and I do not want to go into any specifics about the gentlemen's condition but -- but I understand that tragically the CEO, Mr. Powers, suffered from a stroke a few weeks ago; is that correct?

A. That's correct.

Q. And -- and I know everyone in this courtroom wishes him a speedy recovery. Sir, has the board appointed an interim CEO for the company?

A. No; not that I'm aware.

Q. Well, you would be, wouldn't you, as a member?

A. If I showed up at the meeting, that would be correct. So, yeah, I believe at this time there hasn't been one appointed.

Q. Well, is it -- is it fair to say that at a recent meeting Lawrence Berry proposed that the former president Ken Luhan serve on an interim basis, while Mr. Powers recovers?

A. I believe he said that, yes.

Q. Okay. And you were opposed to that; is that correct?

A. That's correct.

Q. And you have not --

A. Let me change that, I never had a chance to be opposed to it.

Q. All right. Why do you say that, sir? I thought that was a -- that was a motion made by --

A. Well --

Q. Sorry. Go ahead, sir.

A. So, when you run a meeting by *Robert's Rules of Order* and somebody makes a motion to do something, if there is not a second, then there is nothing to vote on.

Q. But you could have seconded it, couldn't you, sir?

A. But that didn't tell you how I was going to vote. I may change my mind after discussing it, but I didn't second it, you're correct, and neither did the other own of the company, did they second it. So, you had one guy, one Indian standing alone, and it failed.

Q. Okay. Well, let's just break it down. You could have seconded the motion to make Mr. Luhan an interim CEO or president of the company; correct?

A. I could have done a lot of things, but I did not.

Q. You did not do that?

A. I did not do that, you're correct.

Q. And your point is even if you had seconded it, that would not have obligated you to vote, to appoint Mr. Luhan as an interim CEO or president; true?

A. That's correct.

Q.   And you did not propose anyone else to serve as president or CEO while Mr. Powers recovers; true?

A.   That's true.

Q.   And who is running the company in that -- in that capacity?

A.   No one, today.

Q.   So, there is just no one at the helm?

A.   As the CEO of the company today, no one is running the company as a CEO today.  Each individual -- it's status quo throughout the company, people are handling their business.

Q.   Okay.  There is just no one that they report to at the top of the pyramid?

A.   That's correct.

Q.   Okay.  Did you -- when -- when Mr. Powers suffered the -- the tragic stroke, did you notify Lawrence Berry about that?

A.   I did not.

Q.   Let me ask you, sir, to look at PTX1 that we saw before in your stack there.  Do you remember, sir, this was an email exchange we looked at, PX-1, that was in January 16 of 2023?

A.   Yes.

Q.   Okay.  And in looking at the bottom we saw that Lawrence Berry there, at the very bottom, on January 16,

2023, clarifies that what he is asking about is the paperwork for the 75 million dollar related-party receivable on the books; do you see that?

A.   Yes, I do.

Q.   And there is a response from Mr. Powers:  Okay. That is not executed to my knowledge, I will follow-up and see if it's signed.

Do you see that?

A.   Yes, I do.

Q.   And then Mr. Berry above writes, "I know nothing about any of this."

Do you see that?

A.   Yes, I see it.

Q.   Okay.  But -- and we didn't see, on this document, a -- any further response from Mr. Powers to Lawrence Berry about this -- in this document PTX1; true?

A.   I believe that's correct, yes.

Q.   Okay.  Let's look at a new exhibit, Exhibit 35, please.

MR. REASONER:  May I, Your Honor?

THE COURT:  You may.

MR. REASONER:  Sorry.

Q.   (By Mr. Reasoner)  All right, sir.  I've handed you an email exchange marked as Plaintiff's Exhibit 35,

ALB -- Bates number ALB 843 through 845.

MR. REASONER: I'd like to offer that into evidence.

THE COURT: Any objection?

MR. ALLISON: No objection, Your Honor.

MR. HUSEMAN: (Moving head side to side.)

THE COURT: All right. Hearing no objection, it's admitted.

Q. (By Mr. Reasoner) And, sir, if you flip to the second page of this document, do you see that there is the same exchange between Mr. Powers and Lawrence Berry that we saw in PTX1, the clarification. And then the "I will follow-up" and "I know nothing of this," do you see those same things on the second page?

A. Yes.

Q. And then if we go to the front page, do you see that there is a response from Mr. Powers?

A. Yes.

Q. And he says, in the first paragraph, "Sorry for the delay. Marty made loan of 45 million and Dennis made loan of 30 million late last year. This money was used to pay all past due receivables and pay down loans. Paperwork has not been completed but will be to finalize audit."

Do you see that, sir?

A. Yes.

Q. And then in the next paragraph he says, "I did not bring up in board meeting because owner children in room. Mrs. Berry has made a number of loans as well."

Do you see that?

A. I do.

Q. And is that consistent -- I believe you testified to that, but just to be clear, is that consistent with your recollection, that the loans had not been brought up at a board meeting as of that time?

A. That would be correct.

Q. And Mr. Powers does not say in this email to Lawrence Berry, "I already told you about this," or "You know about this," or "We talked about this," does he?

A. I don't see anything to that.

Q. Okay.

MR. REASONER: I'll pass the witness. Thank you.

THE COURT: All right.

MR. ALLISON: Thank you, Your Honor.

THE COURT: Direct?

DIRECT EXAMINATION

BY MR. ALLISON:

Q. I'm going to, you know, follow-up on some of his things and then kind of shift gears in a little bit,

but I'm going to follow-up on some of his things.

How long have you and your brothers been, just generally speaking, owners?

A.   2000; beginning of 2000, I guess.

Q.   Twenty years, roughly?

A.   Yes, at least.

Q.   And how long has Rob Powers been CEO?

A.   Four, five years.

Q.   Who was CEO before him?

A.   Mr. Ackley, for a short period of time.

Q.   And before him?

A.   Ed Martin.

Q.   How long was Ed Martin the CEO?

A.   Twenty-five years or so.

Q.   Yeah.

A.   A long time.

Q.   Was he the CEO before you and your brothers became owners?

A.   Total owners or partial owners?

Q.   Fair enough.  I think you've answered my question.  I'll leave that there.

A.   He was, though.

Q.   Okay.  Was Ed Martin, how would you describe him as a CEO?

A.   Stern.

Q.   Did he --

A.   Cold.

Q.   Pardon?

A.   Stern, cold.

Q.   Yeah.

A.   Tough.

Q.   Was the way that the Berry companies -- according to the bylaws and according to just the way it's gone for the last 20 years, is this CEO position a strong position?

A.   Super strong position.

Q.   Yeah.

A.   Runs the company.

Q.   Yeah.  Do any of the owners, the way it's structured and has been structured for decades, do any of the owners have -- do they -- are they supposed to be running the company, day-to-day?

A.   No, they're not.

Q.   Are they supposed to be telling who -- which director over at -- whether it's Peterson over at Equipment, or whether it's somebody down at the dock, are they supposed to be down there telling them how to do their job?

A.   No.

Q.   Who is supposed to be running the company?

A. The CEO.

Q. Are the brothers or any of them supposed to be getting into signing contracts for the company?

A. No.

Q. Who signs the contracts for the company?

A. CEO and Lynn Wittington.

Q. Okay. And if you look at --

A. Actually, let me correct that, CEO or designee, that's what it says.

Q. Okay. And, for example, for -- for decades, has the company -- has Berry, whichever entity went through, I think it's Berry GP, but have -- have the Berry companies had an operating line of credit?

A. Yes, they have.

Q. For how many years has that been with IBC, roughly?

A. Thirty plus.

Q. Okay. And did -- did -- who would sign those -- those loan agreements, those operating line of credit agreements with IBC?

A. Well, normally they'd be the CEO, and they also ask for board members. Each one is kind of different, but sometimes you don't have to have owners.

Q. Okay. Okay. But -- but is the -- is the CEO typically who signs on behalf of the entity?

A.   Yes, sir, that's correct.

Q.   And are there just years' worth of documents that show that CEO has that power to borrow money?

A.   Absolutely.

Q.   Are there years' worth of practices where the CEO, for example with your mother and father maybe, but you correct me if I need to be corrected, would loan money to the company and the CEO would do that?

A.   Since the formation of the company it's been that way.

Q.   And has there been a history of your mother or father, or both of them, loaning money for many years back?

A.   Absolutely.  It continues to this day.

Q.   And I think, was there one as recent as March of 2022, where your mother loaned I think a couple of million dollars?

A.   That's correct.

Q.   And did she come to you beforehand and say, "Is this okay" or did you-all -- let ask you, did you-all vote on it at a board meeting?

A.   No, we did not.

Q.   Does the CEO, did he have authority to sign a loan document with your mother in March of 2022?

A.   Yes, he did.

Q.   Did he do that, in fact?

A.   Yes, he did.

Q.   And did --

A.   Well, I never saw it, okay?  I understand he did.

Q.   It's been produced in this litigation.

A.   Okay.

Q.   Okay.  Have you ever heard Lawrence say, "You know, the CEO doesn't have authority to sign that document with mom"?

A.   No, I haven't.

Q.   Have you ever heard Lawrence complain that "Look, mom is self-dealing"?

A.   No, I haven't.

Q.   And have you ever heard Lawrence say, "Hey, this is hurting the company, for mom to loan money to the company when the company needs it"?

A.   I have never heard that.

Q.   We're talking about a 2 million dollar loan in the early 2022 time frame, obviously yours and Dennis' loans were also in the 2022 time frame; correct?

A.   That's correct.

Q.   Were on the back side of coming out of Covid, right?  Sir?

A.   That's a yes.

Q. Tell -- just to give the jury -- just the give the Judge an idea, did -- during Covid were you guys -- a lot of the -- a lot of your business, I believe, fair to say, is providing manpower, labor to different businesses?

A. That's correct.

MR. REASONER: Your Honor, and if we could just proceed question/answer, the objection is leading.

THE COURT: All right. Don't lead.

MR. ALLISON: Okay.

THE COURT: Sustained.

Q. (By Mr. Allison) For example, the -- and I know I'm going to say the name a little bit wrong, is it Venture Global, that's a current job?

A. Yes.

Q. How many employees of Bay, and I know Berry is a lot, but in range, generally, how many employees of Bay have been working out on that Global Venture, Venture Global job?

A. Global Venture job, up to 3500, approximately.

Q. Now, back in the Covid days, for example, was Formosa a client?

A. Yes, they were.

Q. Were there other clients of Berry, where you would provide manpower?

A.    Many others, yes.

Q.    During Covid, were they saying "bring your employees over here, keep sending them"?

A.    Just the opposite of that.

Q.    Yeah.

A.    They sent 1000 people home in one day.

Q.    That put a squeeze on business?

A.    Huge squeeze.

Q.    And so with that, having -- was that a problem for a day, or a week, or for an extended period of time?

A.    It compounds and it turns into -- it turned into an extended period of time.

Q.    Is --

A.    Revenues dropped.

Q.    So coming out of Covid, let me ask you this: Your mother, she -- she is still very much with it?

A.    Yes, she is.

Q.    Yes.  In March of 2022, you think she knew what she was doing?

A.    Yes, she did.

Q.    Do you think -- do you believe, knowing what you know of that time frame, do you have an opinion on whether or not the company was in serious need of cash?

A.    I look at the cash reports weekly, they're sent to me, our standing, and I knew we were in terrible

shape.  We were in terrible shape.

Q.  Were you in a position to go up to market, for example, do you think, and get somebody, some bank to commit 75 million dollars worth of loans?

A.  I'll leave that up to the CFO, but in my opinion, absolutely not.

Q.  All right.

A.  Not anything with a reasonable rate.  I mean, it had been 18 percent or something crazy.

Q.  Were you keenly aware of that circumstance, in the 2022 time frame?

A.  Yes.

Q.  Do you believe Dennis was keenly aware, based on your conversations with him?

A.  A hundred percent aware.

Q.  Do you believe your mother was keenly aware?

A.  Yes, she was.

Q.  Did you-all -- when you -- when you made those loans, okay, let me just talk for you specifically, did you ever imagine, when you loaned money to the company, that somebody would claim you were hurting the company?

A.  Never in my wildest dreams.

Q.  Did your mother ever come to you, for example, and say "Why did you do that, you're hurting the company"?

A.   No.   She knew why we did it.

Q.   Was she supportive of it?

A.   Absolutely.

Q.   Has she continued, to this day, to be supportive of it?

A.   Yes, she has.

Q.   Did anybody, to your knowledge ever go to Dennis and say, "Dennis, why did you loan that -- why did you loan our company money, you're hurting it"?

A.   Lawrence may have but no one, that I'm aware of.

Q.   Did you ever go to Dennis and say, "Why did you put your 30 million dollars in, I mean, you're hurting the company here"?

A.   I did just the opposite.  When he told me he was going to put about 20, and I said, "That's not enough."  I told him to put more.

Q.   And why was that money needed for the company? Where were -- we're coming out of the Covid time frame. Give us some context.

A.   We were building up for a huge job that was going to take double the amount of lines we had at the bank at the time.  And we had -- we were -- did not have the cash flow.  We had vendors calling all the time, it disrupts your business.  We needed the money to come in

and pay off -- pay off our vendors and get us back up so we could look good. We needed to go and get a bigger line, we needed a bigger line. Our line was not enough. We knew going in on the Venture Global job we needed a hundred million dollar line.

Q. And let's walk through that a little bit with the Court. Why -- when -- when your employees go and they work for -- I don't know what you pay, do you pay every two weeks, twice a month? How do you pay them?

A. Weekly.

Q. Huh?

A. Weekly.

Q. Okay. At the end of a week, do you get paid by Global Venture? Global Venture/Venture Global?

A. Venture Global.

Q. Venture Global. Do you get paid by Global Venture every week?

A. No, we do not.

Q. And so, do you get to say your employees, "Hey, we -- we're not going to pay now you, we're not going to pay you until Global Venture comes through with their paycheck"?

A. It would be nice, but we don't get to do that.

Q. Who floats it?

A. We got to go to the bank and come up with the

money.

Q. Okay. So, is it fair to say one of the Berry companies floats it?

A. Absolutely.

Q. Using a line of credit?

A. Yes.

Q. Okay. And so, I mean, does Venture Global do they say, you know, "Don't worry, don't -- you know, you -- we'll pay you ahead of time, to make sure you're making payroll week-to-week, with all these people you're carrying?

A. No, they don't. We -- we push any customer we can to get paid as quick as we can.

Q. Okay. And so, do you have to have -- what are -- what do you need to have, in order to take a job like Venture Global?

A. Well, you need to have -- you need to have the line at the bank so when you bring in those -- it's a revolving line of credit, where we taken invoices, they immediately discount those by a percentage, and then you have to have enough line to cover all of the things that would happen up until you're going to get paid the next time. And so when you have 3500 employees, that's just there, that was just on that one job; it adds up quite rapidly, if you just do the math in your head. And

they're not $10 an hour, they're not $20 an hour, they're 30 plusers; it's a lot.

Q. Do you -- do you have a belief as to whether or not yours -- your loan to the company, your mother's loan to the company, Dennis' loan to the company, were those needed or not, in terms of being able to be successful with a job like Venture Global?

A. I'm confident in saying that we would have failed. Without having those loans, we could never have done the Venture Global job, impossible.

Q. And that Venture Global job, just to kind of give us some ends, and I don't know if you know these numbers off the top of your head, do you know, for example what total revenue was for the company during Covid years?

A. Covid years were around 400 million, a little over that.

Q. And for 2023, where -- now that Venture Global has come on board, and what does that move to?

A. 700 and something.

Q. 700 and something million per year in revenue?

A. Uh-huh.

Q. Sir?

A. Yes, that is correct.

Q. So, do you think that that has been helpful or

harmful to the company?

A.   Well, it's double-edged sword.  We're here in a courtroom, maybe it's been harmful, but no, I think it's been very helpful.  It's really good times.

Q.   Now, in terms of the CEO's Powers, what does he do, day-to-day?  Can you just give us a general description?

A.   Day-to-day, he runs the company.  Any -- any hot spots, anything that kicks up, if it's hiring, or you know, or reviewing -- reviewing financials, looking ahead.  Anything that -- you know, keeping the Indians in line.

THE COURT:  Hey, let's do this, let's take a break and then we'll continue on.

COURT BAILIFF:  All rise, please.


(Brief recess.)


THE COURT:  Mr. Berry, you're back on the stand.  And when you're ready, we may proceed.

MR. ALLISON:  Thank you.


DIRECT EXAMINATION
(Continued)

BY MR. ALLISON:
Q.   When -- and it may depend on the type of

information, but when you ask for or want information from one of the companies, one of the Berry-related company, who do you go to?

A. I go to the CEO.

Q. And do you go to like, a different department head and different people, or do you try to channel it? How do you do that?

A. I only go to the CEO. I don't want to get involved in the chain, he'll go down the ladder. Same thing if I deliver information to him, I just go to him and let him handle it.

Q. And when you -- how do you normally get information about what's going on with the company?

A. Well, depends on what -- you know, financial information?

Q. Let me ask you this, let me narrow my question a little bit: Do the different Berry companies have regular meetings?

A. Usually yearly shareholder meetings is what it would be.

Q. So the shareholder meetings are usually annual?

A. Annual.

Q. Yeah. And how about Berry GP, if I understand it, what's its relationship to operation of the Berry entities?

A. It's the top of the operating.

Q. And does Berry GP have meetings?

A. Yes, it does.

Q. How often?

A. I would say once a month.

Q. Has that been, more or less, the rule for years?

A. Since we've been going to board meetings.

Q. For decades?

A. Decades.

Q. Okay. And what role, if any, do those meetings of Berry GP play, for you to get information?

A. It updates you on big projects, safety in our company, which is the biggest thing, updates on safety, maybe making us aware of purchases or things that are going to be coming up that are going to require cash, general meetings. Most of that I would already know it, from being in the office every day.

Q. And let's go ahead and cover that, because what's your habit, in terms of going in to the office?

A. Every day it's needed, every day of the week.

Q. Do you go most -- do you sometimes go two or three weeks without going into the office?

A. Never.

Q. Generally speaking, on a weekly basis, are you

there one day a week or five days a week?

A.   Five days a week.

Q.   What was Dennis' practice, before he passed?

A.   Before he got cancer he was there most of the time.  And then he -- before he announced he had cancer he came in one day and said he was no longer going to be signing checks and he passed that to me, and he said he was going to be taking -- he was going to see the country a little bit, start moving around.

Q.   Okay.

A.   He would be over there, over-watching, oversee the -- the highway bids, when they came through.

Q.   And in terms of signing checks, after Dennis did what you just said, who took over the responsibility to sign checks?

A.   I did.

Q.   How many checks did you sign in a week?

A.   It depends, but it could be as many as a thousand.  It's maybe more.  It's a lot.

Q.   Okay.

A.   Every vendor, anybody that gets money from our company, there is only probably one percent that I don't sign.

Q.   Let's say for the last five years, has -- has -- let's not go five years because we're really

talking about 2022 and 2023, the last couple of years, or three, let's say three years; for the last three years, has it been Lawrence's practice to be there every day?

A. Lawrence lives in Houston, so he is not in our company every day.

Q. Is there anything that keeps him from being there every day? I mean, if he wanted to be there every day would he be able to be there every day?

A. Absolutely.

Q. If he -- does he have an office there?

A. No, I don't think he has an office there.

Q. If he wanted an office there, can he have an office there?

A. Absolutely.

Q. Yeah. Does he have a parking place there?

A. I'm not sure I do either but --

Q. Okay.

A. -- if I have one, if he would want it.

Q. Okay. But what was his -- for the last, say, three years, what was Lawrence's habit, in terms of coming into the office and, you know, learning what's going on?

A. Well, coming into the office at our board meetings.

Q.   Once a month?

A.   Uh-huh.  Yes, once a month.

Q.   Okay.  I'm just cuing you because that nice lady next to you, when you nod your head --

THE COURT:  We understand your nod, but --

THE WITNESS:  I forget.

THE COURT:  -- it's got -- it's got to go down.

THE WITNESS:  I forget.  I'll get there.

Q.   (By Mr. Allison)  And is there -- when you have these monthly board meetings, is there any limited -- in other words, I mean, if -- if you, as a director, you're having those board meetings, does it happen where somebody says "Hey, I got a question" and Rob says "No, I'm not going to tell you that"?

A.   That's never happened.  We have questions all the time.

Q.   And from what you said a moment ago, and I know we've seen all the agendas and all the parties have them, it looks like there is generally a -- and I know it varies, but generally, do you always talk about finances?

A.   I'd say yes, generally.

Q.   Generally, do you always talk about safety?

A.   A hundred percent, every time.

Q. I think it's always first on the agenda?

A. Absolutely. We have no business without being safe, so we talk about it first. Your Plaintiff attorneys took care of that.

Q. Now, generally, do you get updates on work in progress, what they call work in progress?

A. Sometimes, on the bigger jobs. Usually only if you're going to talk about jobs, you'd be talking about the ones in trouble.

Q. Fair. Generally, do you sometimes talk about equipment?

A. Yes, we do.

Q. Do you sometimes talk about real property?

A. Yes, we do.

Q. Do you sometimes -- I mean, as needed; fair enough?

A. Yes.

Q. Do you sometimes -- for example, during this time frame when, and we've heard some information about what happened with IBC and then the transition to Frost, during that period of time, were you talking about lines of credit every time?

A. That was -- we had emergency meetings I believe, in fact, just to talk about that, yes.

Q. And at all of those meetings would Lawrence

participate?

A. I believe so, yes.

Q. Yeah. Some of them were emergency by telephone?

A. Yes. There was still meetings, still our board meetings, yes.

Q. And I think there is some strings we'll get into them a little bit, but were you used to seeing those strings of texts from Rob, and have you and Dennis and Lawrence on the string?

A. Yes.

Q. And was Rob keeping you guys informed, with regard to the line of credit with IBC, after the blowup?

A. Yes.

Q. And was he keeping you informed with the line of credit discussions? How was he keeping you informed of --

MR. REASONER: Your Honor, objection. If we could just go to question and answer. I object to leading.

MR. ALLISON: I'll rephrase.

THE COURT: Okay.

Q. (By Mr. Allison) Were there text messages with regard to Frost Bank?

A. Yes.

Q. Are there text messages with -- and by "text messages" I want to ask you about ones with you, and Lawrence, and Dennis, and Rob on the string, okay?

A. Okay. Then you better ask that other one again.

Q. Pardon?

A. Frost, I don't believe there is a string. I can't remember if there is a string for Frost.

Q. Okay. We're getting there. Well, let me ask you this: Have you seen any of them, where Lawrence is talking about his negotiating with Cadence Bank?

A. Yes.

Q. Have you seen him where -- where -- well, one of them, did you send a text to -- do you remember the text you sent right after the notice of default draft to Lawrence?

A. Yes. I sent Lawrence that, I think the day after I got it or something, yes.

Q. You notified Lawrence?

A. I did, and Dennis.

Q. And again, just thinking to this time frame where we're talking about board meetings, where at even 2022, after the -- you made the loan, and Dennis made the loan, and your mom made the loan, in 2022 and 2023, up until he filed the lawsuit in November of 2023 did

Lawrence ever, for example, bring up a complaint that he wanted to change the bylaws, with regard to the sale of real estate?

A. No.

Q. Or ever bring up anything, that he wanted to change the bylaws with regard to the purchasing of real estate?

A. No.

Q. Did Lawrence, during that time frame, ever say that he wanted to, for example, have some sort of approval where a single -- a single director could kill a proposed purchase of real estate?

A. No.

Q. Did he ever bring it up in any of those board meetings for that period of time, where Lawrence said that he wanted to kind of change the bylaws where directors could not be removed?

A. No.

Q. Did he ever, during that period of time, say he wanted to change the bylaws where directors could not be added?

A. No.

Q. Did he ever make any complaints about the bylaws or wanting to change the bylaws for that year-and-a-half period of time, roughly, that we're

talking about?

A. Never; nothing.

Q. Did he ever make a motion to do it?

A. No.

Q. We know, and I think even in the opening statement Mr. Reasoner said that Lawrence, he refers to it, I think in the September of 2022 time frame, where financials were given to Lawrence which revealed or indicated the loans that you and Dennis had made; are you familiar with that document?

A. I think we looked at it, yes.

Q. Okay. And during that, from September of 2022 until November of 2023, did Lawrence -- let me take 2022 for -- for starters.

For September, October, November or December of 2022, did Lawrence ever come and say "Hey, I want to know more about these loans," did he ever come to you and say that?

A. Never.

Q. Did he ever bring it up in a board meeting and say, "I want more information on this," during a board meeting?

A. No.

Q. For, let's say, the first half of 2023, after -- and we have the emails where, clearly, he is

writing emails in January of 2023 about the loans;
correct?

A. Correct.

Q. So, from January, February, March, April, May,
June - I'm just doing that as a half year - in 2023, did
Lawrence ever come to you and say "Hey, I want to talk
to you about these loans"?

A. No.

Q. Did he ever bring it up in a board meeting?

A. No.

Q. Did he ever, ever ask, in a board meeting, to
get more information about the loans?

A. No. Well, same time frame? Same time frame
you're talking about?

Q. Yes.

A. Yeah.

Q. I'm still --

A. No.

Q. -- going in pieces. And you're about to make a
point that, for example, this last February meeting,
were you aware that he asked Jim to come bring a lot of
information?

A. Yes.

Q. Jim Klein, who is he?

A. He is our -- he is our chief financial officer.

Q. And what did Jim Klein do, in response to Lawrence's request to receive that information?

A. Provided all the information to the board at a -- on a PowerPoint.

Q. Yeah. And is that how it works?

A. Excuse me?

Q. If you ask for information from Jim Klein, what -- what normally happens?

A. Normally, if the owners ask for information from anybody they'll get it.

Q. Is that true for Lawrence?

A. Yes. For Lawrence, yes.

Q. Is that true for you?

A. Yes, it is.

Q. When -- when Lawrence -- obviously there is this email. Let's go ahead and move kind of more specifically. Do you have PX-35 up there?

A. Yes, I do.

Q. By the way, had you ever seen Robert Powers's response before?

A. I haven't.

Q. Yeah. But let's go ahead and go back.

MR. ALLISON: Your Honor, at this time we'd offer, I think when you combine it with Plaintiff's Exhibit No. 35, I think there is some things maybe not

on here, that are on our Exhibit No. 106, and we'd offer that at this time. I can give you the Bates numbers, if you want them.

(Court reporter speaking.)

MR. REASONER: And you say it is our exhibit but there is more?

MR. ALLISON: Yeah. I think -- and I think you actually said that when you brought it up. You said there is -- you had an exhibit that added to some earlier emails.

THE COURT: Well, I guess show it to him.

MR. ALLISON: That's what I'm finding.

THE COURT: Okay.

Q. (By Mr. Allison) Go ahead and look at Exhibit No -- we'll just go with Exhibit No. 35, PX; do you have that in front of you?

A. I do.

Q. Have you seen the rest of that string?

A. Well, I'm kind of looking up there at it. Is that the screen you have up there on -- on the show? It is.

MR. BALDTREE: Doug, is that PTX35 up there? What are we looking at?

MR. ALLISON: No, that is not. You had, I think, PTX35 with you up there.

Q. (By Mr. Allison) You have that?

A. Yes, I do.

Q. And is that the January string that you were asked questions about, by Mr. Reasoner?

A. Yes, it is.

Q. And do you see in the beginning of that string, is there a confusion about it being a reference to the Orca note?

A. I see that under the subject, "Orca note."

Q. Yes. What is the Orca note?

A. That's a -- that's a payable from Lawrence to the company.

Q. Okay. And originally when Lawrence asked for information about a note, Jim responded with what?

A. With the Orca note, because he asks about payable, I mean, a receivable, not payable.

Q. And with that Orca note, is that the same note the other day you were in the courtroom when Lawrence Berry was asked about Orca, correct?

A. Yes.

Q. Is that a note where he owes the company, I think the way we said it with him on the stand, was tens of millions of dollars?

MR. REASONER: Objection, leading.

THE COURT: All right. Sustained. Ask it

a different way.

Q. (By Mr. Allison) Were you here for his testimony with regard to what he owed on the Orca note?

A. Yes.

Q. And how was it characterized by his testimony? What's your recollection of that?

A. Tens of millions of dollars.

Q. And do you agree that -- that he owes the company, just on Orca alone, tens of millions of dollars?

A. Yes, I do.

Q. And is he in -- is that a performing note?

A. No.

Q. Is it in default?

A. It is in default, yes.

Q. During these years, same years, how long has that been a note, where money was owed by Lawrence, tens of millions of dollars was owed by Lawrence to the company?

A. I'd say ten plus years.

Q. And, for example, throughout Covid, during this time of cash crunch, when your mother was loaning money and you were loaning money, was it -- was that note, where Lawrence owed money to the company, there?

A. Yes.

Q.   And even to this day -- do you remember when the maturity date was?

A.   I do not.

Q.   Do you remember what year, when it came due?

A.   I do not.

Q.   Do you remember when it went into default?

A.   I believe it was this past summer when the -- there was not a payment made.

Q.   And has Lawrence paid it?

A.   No.

Q.   Now, in terms of kind of self-dealing, okay, if somebody has taken from the company, likes Lawrence in other words, taken money from the company and not paying it back, does that help Lawrence?

A.   A hundred percent.

Q.   Now, when you need money at the company and somebody like Lawrence has taken money from the company and not paying it back, is that helping the company?

A.   Absolutely not.

Q.   In your mind, is there a difference between where Lawrence has taken tens of millions from the company and in default and not paying it back, is there a difference between that and what your mother, and you, and Dennis had done?

A.   Huge difference.

Q. Okay. When you are giving money or loaning money to the company in the quantities that we're talking about, why did you do that?

A. I'm an owner of the company, it needs shoring up. It was obvious to me, by looking at the financials; very simple.

Q. Now, we talked a moment ago about Lawrence not coming to a board meeting, not asking questions about these loans from you, and Dennis, and your mother, we talked about that. At some point in time, have you had conversations more recent with Lawrence with regard to your loan and Dennis' loan?

A. Yes.

Q. Have there been any conversations with Lawrence where you've said, "Hey, do you think" -- again, what -- what have you done with Lawrence in those conversations?

A. Well, there were in different board meetings and shareholders meetings where he was offered a chance to take over our loans, equal our loans, participate in our loans in any way, and he continually said he didn't have enough information. But then we delivered notes, we delivered everything through counsel and to Lawrence again, and again, and again; no interest.

Q. Okay. So, how many times do you think you, yourself, face-to-face with Lawrence have said, "Hey, if

you want to step in my shoes, so to speak, for some or all of this loan you can do it," how many times have you told him that?

A. Five, six, or seven times.

Q. And has he ever taken you up on that offer?

A. Never.

Q. If it's such a great deal, has he ever -- and you understand by making a self-dealing allegation he is acting like you're -- you're doing yourself a big favor, not the company; you understand that, right?

A. Yes, I do.

Q. Has he ever explained to you why he thinks it's so, oh, it's a great deal for you Marty but I don't want any of it, has he ever explained that to you?

A. No, he has not.

Q. Has he ever offered any explanation on -- on how he thinks maybe you're taking an advantage of the company by having done this a couple year -- a year or so ago?

A. No. He said, over and over, that we've taken advantage of the company.

Q. Yeah. Has he ever explained it to you in a way that makes sense to you.

A. None whatsoever, no.

Q. In PX, Exhibit No. 35, towards the end of it,

in the part you hadn't seen, the email piece from Robert Powers, do you see that?

A. I did, yes.

Q. You got it?

A. Yes.

Q. It says: Marty made loan of 45 million and Dennis made loan of 30 million last -- late last year. This money was used to pay all past due receivables and pay down loans.

Did I read that correctly?

A. That's correct.

Q. If the money was used to pay receivables, do you think that's a benefit to the company?

A. Yes.

Q. If the money is used to pay down loans, do you think that's a benefit or a detriment to the company?

A. Definitely a benefit.

Q. Do you have a belief, whether or not what's stated there by Mr. Powers is true? In other words, was the money used to pay down receivables and pay down loans?

A. A hundred percent I have knowledge of that exactly, yes.

Q. Yeah. And was that important to do, with big jobs coming up like Venture Global?

A. Absolutely.

Q. I think -- let me just refresh or go -- go here. Same with PX Exhibit No. 35, it says: Paperwork has not been completed but will be to finalize audit.

Do you see that?

A. Yes.

Q. So before this January 16, 2023 date on the email, had you signed the actual note?

A. I don't believe so, no.

Q. But did the actual note need to be signed as part of the audit process?

A. Yes. The auditors required it.

Q. Prior to that, I know that using Mr. Reasoner's statement or characterization you sort of had a handshake or an agreement, I guess with Rob, that you were going to make these loans or make your loan; right?

A. Correct; my loan, yes.

Q. At that point in time, because he sort of said you're on -- you know, he tried to characterize it as you being on both sides. Let me just ask you, at that point in time when you had this agreement with Rob, did you -- did you have a specific discussion, where there was an agreement about an interest rate?

A. I did not.

Q. Did you --

A.   I had -- I had a discussion with him.  I said, "Treat me fair" is what I told him; that was it.

Q.   Okay.  When you left that discussion, did you know what percentage interest rate was going to be put in the note?

A.   I did not.  I was on the -- obviously, I'd have a chance to look at that before I signed anything, okay?

Q.   Fair enough.  Who was it that picked the prime, plus .25?  Was that you?

A.   No.

Q.   Do you know -- did anyone ever tell you, "Rob did it" or "Jim Klein did it" or anything like that?

A.   No.  No one told me that.

Q.   Back at the time?

A.   At the time.

Q.   Have you learned since?

A.   I believe Jim Klein, that's what I believe.  I haven't ever asked him exactly, but I believe it was Jim Klein.

Q.   And when you were presented with a note at prime, plus .25, did you sign it?

A.   Yes, I did.

Q.   When you signed it, did you think, "Oh, my gosh, I've got that hog here, this is -- this is a -- I've gone to town on this interest rate"?

A.   I don't anybody would have thought that.  No, I didn't think that.

Q.   Were you doing it because the interest rate was prime, plus .25, as opposed to prime, as opposed to 6 percent?  I mean, were you -- was the focus on the interest rate?

A.   I was doing it because the company had to have an injection of capital to continue on.

Q.   Did you ever in any way, shape or form, try to leverage, use your power, use authority, try to ever influence the terms of the loan with either Rob or Jim Klein?

A.   No.

Q.   Back in the same time frame, early 2023, you were aware -- obviously we've heard about May 13, 2023 is when Mr. Nixon same to town, right?

A.   Correct.

Q.   Okay.  So up until that point in time, how many times do you think that the IB -- is that generally the time of year that the IBC notes were being renewed?

A.   That's correct.

Q.   During that period of time, when the IBC's notes are being renewed, let's say early year, maybe late the previous year, but early 2023, had there been a renewal process?  I mean, who takes care of renewing the

notes?  Who does the day-today on that?

A.  CFO, and in coordination with your -- your CEO.

Q.  And CFO is Jim Klein?

A.  Jim Klein.

Q.  And is that something, where you would have been involved in sort of the day-to-day communications for renewal of a note with IBC?

A.  No.

Q.  For -- for how many years had that note been renewed on an annual basis?

A.  Probably 30 or something.

Q.  Okay.  And would it be in any way, shape or form typical for you, or Lawrence, or Dennis to be involved in that day-to-day exchanges of information for the renewal of the line of credit?

A.  It would not be, no.

Q.  So when we look, for example, then at January, February and March of 2023 emails, before the blowup with Nixon, should we expect to see a whole lot of communication with you about, you know, day-to-day what's going on over there?

A.  No.

Q.  When does it rise to the level -- in this case when did it rise to the level of all of a sudden hey, we need to be more -- you know, it can't -- when did it

reach the owner level?

A. When Mr. Nixon showed up in town unannounced, came to our offices.

Q. Before that, and I know there is emails, I don't know if you've seen them so much, before that, there are emails where the notes, yours and Dennis' notes, were provided to IBC; do you understand what I'm telling you?

A. Yes.

Q. I don't know, have you seen those emails?

A. I haven't seen those emails, but I know they were provided to our banks.

Q. Did you ever, knowing that they had been provided before the Dennis Nixon blowup, did you ever believe Dennis Nixon, ever hear anybody say "Hey, IBC's concerned that you loaned the company money, that's a bad thing"?

A. Never heard that from anyone.

Q. Did you ever hear any complaint by IBC that you and Dennis and your mother had loaned money?

A. Never mentioned it.

Q. Was it ever mentioned, that there needed to be more explanation, or more detail, or you had to come forward and give a statement or sign an affidavit, anything like that?

A.   Nothing.

Q.   Were you ever asked for a justification or an explanation, before the Dennis Nixon blowup?

A.   No.

Q.   Up until the Dennis Nixon blowup, did you think you were sort of - for lack of a better term - business with usually, with IBC?

A.   Absolutely.  They sent us a letter to that effect.

Q.   Are you aware of the letters they sent?

A.   Yes, I am.

Q.   And what did they make a commitment to do, before Dennis got in town and got upset?

A.   To extend the loan, waive the covenants that were broke, and loans of financials didn't have material changes, and they didn't.

Q.   Okay.  And by "material changes" in loans that means they've got to complete the audit and deliver it?

A.   Material changes in the financials that -- it wasn't just delivering those, but just -- if they hit out with the audit, everything would be great.

Q.   Okay.  Are you aware, for example, before Dennis came to town, is there an actual written letter from Gus?

A.   Yes.

Q.   About agreeing to renew the loan?

A.   Yes, there is.

Q.   Okay.  And agreeing to waive the covenants?

A.   Yes.

Q.   Okay.

A.   Any violated covenants, yes.

Q.   And I think those are in evidence, so I'm not going to go through with them right now.

In that process, did you become aware of - I know you were asked a few questions - of the requests to subordinate your loans to the Frost loan?  Well, really IBC and then the Frost loan.

A.   During that before Dennis Nixon blowup or after?

Q.   Well, before, let's start there.

A.   No, nothing before.

Q.   Okay.  Afterwards, was there a discussion about subordinating those loans?

A.   Yes, I believe there was.

Q.   I believe you characterized, you said a little while -- when Mr. Reasoner was asking you questions you said, "Yeah, that's kind of negotiating"?

A.   Absolutely.

Q.   Yeah.  Tell me -- tell the Judge what you meant by that.

A. Well, at the same time we'd never had to sign personally, that was another thing they put on the list, and that was a killer for the board; no one wanted to have to sign personally. So, you had all these -- they made 30 something requests, I believe, in change because of the Dennis Nixon blowup. So, all --

Q. And -- and --

A. -- these changes that we never would have had to make, if he hadn't gotten all excited.

Q. Let's -- let's go through that in a little bit more detail because you're talking specifically about IBC right now; right?

A. That's correct.

Q. Okay. After the Nixon blowup, there is that letter where there is just a long list of things that they want you to agree to?

A. Correct.

Q. Were you, and Lawrence, and Dennis agreed on your responses to those demands from IBC?

A. Did we sit down and -- I know we sat down and talked about personal guarantees. I'm not sure we went through every line item there, no.

Q. On personal guarantees, was -- were you -- were you agreeable to give them a personal guarantee?

A. No.

Q.   Was Lawrence?

A.   No.

Q.   Was Dennis?

A.   No.

Q.   So you-all weren't united on this idea? Because IBC now is demanding things after the blowup that they hadn't demanded before?

A.   That's correct.

Q.   Okay.  And was that a negotiating point?

A.   Yes.

Q.   Similarly, was this whole discussion of subordination a negotiating point?

A.   All of it was.  Yes, it was.

Q.   Was that information that you're talking about, on negotiating points like that, and I understand what you said a moment ago, you don't remember going line by line, but are you aware whether or not you, and Dennis, and Lawrence were all kept in the loop by Mr. Powers?

A.   I put myself in the loop, I can't speak for the other ones.

Q.   Okay.  Did you ultimately -- by the way, then -- then with Frost was there a point in time when Frost had a request for personal guarantees?

A.   Yes.

Q.   What did they want originally?

A. They wanted personal guarantees from all of us.

Q. Was that another negotiation?

A. Absolutely it was.

Q. Did anybody want to give -- any of the three brothers want to give personal guarantees?

A. It was getting ugly at that point, but no.

Q. And did you-all stand your ground together?

A. Yes.

Q. And did -- ultimately did Frost require a personal guarantee?

A. No, they did not.

Q. How did that happen?

A. I hate to get into all the details, but it happened by standing your ground.

Q. During this period of time when, you know, for example, are you familiar with Lawrence's letter that he wrote to Dennis Nixon?

A. I heard about it. I never read it.

Q. Okay. I'll use that -- I'll do that differently then. But during this period of time where were -- we saw the email, you remember the other testimony the other day where Lawrence asked -- answered some questions about Mr. Gallagher, the lawyer?

A. Yes.

Q. I mean, in that period of time, which I think

is March or April, it is April 2023, in that period of time, I mean, was Lawrence blaming you about IBC, or was he ready to go sue IBC?

A.  He was ready to go sue him.  I had never been blamed at that time.

Q.  And who -- do you know who Mr. Gallagher is?

A.  He is a Plaintiff attorney.

Q.  Yeah.  And was there any doubt about why Lawrence was reaching out to the Plaintiff lawyer with regard to put pressure on IBC?

A.  There wasn't.

Q.  Did that end up happening, where the company is brought in, in a lawsuit against IBC?

A.  No.  We never brought a lawsuit against IBC.

Q.  Instead, was the -- was the loan extended to allow the transition with Frost?

A.  Yes, it was.

Q.  I think you told Mr. Reasoner, a moment ago, that kind of -- that you -- I don't want to use the word "mistake," maybe you did, but that it's -- are you shareholder of Berry GP?

A.  I think LDMA is the owner of L -- of Berry GP.

Q.  Yeah.  The LDMA is --

A.  The partnership.

Q.  Are they -- is LDMA, to your knowledge, the

sole shareholder of Berry GP?

A.   I believe that's correct, yes.

Q.   And if you've said differently in the past, is that incorrect?

A.   If I've said it differently in the past, it was just a mistake.

Q.   Okay.  I think you used the word "mistake" earlier.

Since -- I don't know, some more awareness about that corporate structure.  He -- he showed you, I think, the board meetings with Berry GP or meetings with Berry GP.  In more recent -- in recent times, have there been a shareholder meeting with Becon, Inc., and LDMA?

A.   Yes, I believe that's correct.

Q.   Do you remember, was it a March meeting?

A.   I believe, yes.  I think that's probably correct.

Q.   And during that March meeting, was there a -- any vote with regard to -- do you know if it's Becon, Inc., general partner of LDMA, limited partnership that decides who are the directors of Berry GP?

A.   That is correct.

Q.   And was that brought up at the shareholder -- the correct Becon, Inc., shareholder level?

A.   Brought up as?

Q. Was it brought up at the March meeting to appoint a new director?

A. It may have been on the list, but we didn't do that.

Q. Well --

A. Oh, no, we did it in March. I think we did it in March, yes, we did.

Q. Was Bonnie's name --

A. Yes.

Q. Was she -- was she confirmed --

A. Yes.

Q. -- as a director?

A. That's correct, yes.

Q. Okay. By Becon, Inc.?

A. That's correct.

Q. Okay. By the shareholders?

A. By the shareholders.

Q. And did Lawrence vote for that or against it?

A. He voted for it.

Q. So and, of course Bonnie, is she voting Dennis' shares?

A. She is voting her shares.

Q. Point well taken. Did -- so, was the vote 2/1, 1/2, or unanimous, in -- in favor of Bonnie being a director?

A. Unanimous.

Q. And was there also a vote at that same shareholder meeting with regard to ratification of your loan?

A. Yes.

Q. And ratification of Dennis' loan?

A. Yes.

Q. Because nobody ratified mother's loan, did they?

A. They didn't.

Q. Okay. And at the shareholder level was there a vote to ratify the loan we've been talking about, that you made to Berry GP?

A. Yes.

Q. And what happened on that vote?

A. Two to one, Bonnie voted for it, I voted for it, Lawrence didn't. I think he abstained. I'd have to look at the document, but he didn't vote for it.

Q. Okay. You were asked questions about the Berry document, let's switch to that. You said around February of 2023, it was brought up at that meeting?

A. At a board meeting, yes.

Q. Okay. And do you have any doubt in your mind about that?

A. No. Well, the date may not be perfect, a lot

of water has gone under the bridge since then, but I know it happened before anybody was talking about doing anything with the dock.

Q. Okay. And let's go back and make sure, though. Does the CEO, for example, does -- does he need -- if he wants to sell a piece of real estate, does he need a vote from his directors?

A. A hundred percent. If he -- if he is going to sell a piece of real estate, it has to come to the board to be sold; always has been, always will.

Q. How long has that been the status quo or the rule at Berry GP?

A. From the beginning.

Q. For you, from the beginning?

A. Yes.

Q. Okay. Does he need permission to market a piece of real estate?

A. No, he doesn't.

Q. Okay. So, it was brought up at a meeting you're telling us, right, and more or less in February of 2023, but could he - and I'm not saying he would or not saying he did -- but could he have, if he wanted to, market it or kind of test the market? Could he do that, as CEO? Did he have that authority?

A. That's what he was instructed to do, was to go

test the waters. He wasn't -- he wasn't -- that was it, go test the waters.

Q. By the way, and there's been some complaint now, and the petition hasn't been heard much about here, was there also a complaint by Lawrence in a petition that you're selling the airplane and that he didn't want to you sell the airplane; do you remember that?

A. Yes, I do.

Q. Has that also been part of the suggestions?

A. I don't know if we brought up that at a board meeting or not, but it didn't have to be. But when you said, "I want to sell the planes" or "You're selling planes," it would not be me, that would be the company, they own the planes. They bought the planes. It would be under the CEO to make a decision, and he really doesn't have to come to us, if he sells them.

Q. Yeah, that's what I was going to ask you.

A. He could be jeopardizing his job, but he doesn't have to come to us.

Q. Fair enough. Yeah, does the CEO need permission to market the planes?

A. Absolutely not.

Q. Does the CEO need permission, by your bylaws, to sell the airplanes?

A. No, he does not.

Q. Okay. In this February or so time frame of 2023, can -- what can you tell us -- can you give us any information about -- or any more information about what was said about selling the dock? What was that conversation?

A. At the board meeting?

Q. Yes, sir.

A. You're talking about the board meeting? Just talk about the dock as a lazy asset that's not producing, and we ought to look at the value of it and see if we can get somebody that would offer a value that would make it good to get rid of it. We'd always keep the access to go across for the stuff from our company, like vessels we build and stuff, because there is a roll-on, roll-off aspect to that dock that they could -- you could always use, and you'd have to continue that, put that in the sale, but that was -- that was pretty much a known deal.

Q. To really understand that, please explain to the Court, what is it that Berry companies use the dock for?

A. We use the dock, our company uses the dock to -- the stuff that we produce at our main yard on Valero Way, there at Corn Products and 37, we produce modules, and we produce AS10 pressure vessels for

refineries alone, which you see standing up. We have to have a place to load them, and that's where we load them. We go down there to our heavy lift dock, take them down to Up River Road and then go down to our dock road, and they load straightaway.

Q. And do you do that every day, or once a week, or once a month? How often are you using the dock for that purpose?

A. Probably four or five months.

Q. Four or five months out of the year?

A. No, every -- one day out of -- maybe two days out of every -- about every four or five months, you know, in that time frame. It could be five vessels leaving for the same customer and it takes a week to do it, but then it might be six months we do nothing. It could be a year we do nothing.

Q. Okay.

A. But you've got to have some access.

Q. And I think probably most of them, but what are most of those docks down there -- what are most of those docks down there using in the Port inner harbor?

A. They're all petroleum docks.

Q. Yeah, it's all liquids and --

A. Liquids.

Q. Yeah. And how often are they generally -- how

many -- are they using those daily, generally?

A. They're using them. Every time there is an opening they bring another ship in.

Q. Yeah. And if you're using a dock, if you're a -- if you're moving crude, for example, and you're using the dock every day, and you're pumping a million barrels into a ship every two or three days and it's coming in and out, if you're having that frequency of the use of the dock, is that a more valuable use than using it every -- a week in six months?

MR. REASONER: And I've just got to, again, object.

THE COURT: Leading?

MR. REASONER: Yes.

THE COURT: Sustained.

MR. ALLISON: Yes.

Q. (By Mr. Allison) Do you have an opinion about whether or not using it once a month, or for a week every six months, is that getting the -- getting value out of that dock?

A. That's exactly why we want to go market it, go test the waters, because we weren't utilizing the dock.

Q. Okay.

A. Utilization was low.

Q. And are there other better uses of the dock,

when you look to your left in the ship channel, and you look to the right in your ship channel, are there other better uses for the dock?

A. Absolutely. I understand we do have barges that come in there and load liquids, but pennies, compared to what -- if you add it up, it's -- it's not justification of what we're doing or could be doing with that money.

Q. And you said something a moment ago about reserving use on the dock. What did you mean by that? If you sold it, you reserve use or something like that.

A. You'd reserve an easement so I could load out those vessels I talked about. You -- you would never sell that dock without having your -- and I said this in a board meeting recently too, the same thing. You would -- you have to -- we'd have to reserve the right to load. We'd never cut our throats. We don't just sell the dock and now we can't use the main yard to build vessels because we can't get them out and get them on the water. You've got to hold it, that's just common sense. No one ever talked about getting rid of the dock and all access to it, that's never happened.

THE COURT: Your plan to remain use of the dock, when you need it?

THE WITNESS: Access, yes, sir.

THE COURT: Right.

THE WITNESS: Yes, sir.

THE COURT: Sell it, but when you need it.

THE WITNESS: We'd pay a fee for that.

THE COURT: Yes.

THE WITNESS: Yeah.

Q. (By Mr. Allison) You could negotiate that into the deal?

A. If someone wants it, that's going to have to be negotiated into the deal.

Q. Okay. Now, we've heard about the letter to the Port of Corpus Christi, you remember that?

A. Yes.

Q. Are you aware of any negotiations where the Port has engaged with a process to maybe buy the dock?

A. I'm aware negotiations. I know they did a lot of footwork, yes.

Q. Okay. Did they ever make an offer to anybody?

A. No.

Q. Did the Port ever make an offer?

A. No.

Q. So it's been on the market for, I guess not quite a year, but are you aware of any offer from the Port of Corpus Christi?

A. No, nothing from the Port of Corpus Christi.

Q. You mentioned Valero a moment ago as being somebody that maybe to pre-market it to, or market it to; has -- has Valero made an offer on the dock?

A. Not that I'm aware.

Q. I think there is also -- there is an exhibit, are you aware of whether or not Buckeye expressed some interest, maybe?

A. Yes.

Q. And as -- do you know whether or not that resulted in an MDA being started?

A. I believe they -- it did, yes.

Q. And did Buckeye, are they interested in purchasing the Berry dock?

A. No.

Q. Have they expressed some -- there 16 acres that goes to the dock; right?

A. Yes.

Q. What do you-all call that?

A. Sixteen acres.

Q. Okay. Had Buckeye expressed some interest maybe in the 16 acres?

A. Yes, they have.

Q. And did it make sense to sell them the 16 acres and strand your dock?

A. No, it does not.

Q. Are you-all interested in making that deal with Citgo?

A. With Citgo?

Q. I'm sorry, are you-all interested in making a deal with Buckeye, where you sell them the 16 acres and not sell them the dock?

A. I would vote "No" on that. So no, I would not.

Q. And that's a good point; everybody gets a vote, right?

A. That's the way it works.

Q. How long has it been the way it works, where a majority of the three of you control whether there is a sale or not a sale?

A. Ever since the three of us had the right to vote.

THE COURT: That's the tradition?

THE WITNESS: Yes, sir.

Q. (By Mr. Allison) And to that point are you aware that the bylaws talk about a requirement for a vote in order to acquire property?

A. Yes.

Q. Okay. And do you think the rule is any different for -- for you? Do you think the rule is any different for you to, as far as selling property?

A. Absolutely not. I think it's the same.

Q. Okay.

A. And we've never exhibited it, if we had done any different than that, we've always gone before the board.

Q. In fact, has there been any -- and we understand that ever since I guess, the lawsuit, the application for temporary injunction that was done back in November of 2023 and amended, I guess about a week ago, are you aware generally of that?

A. Yes, I am.

Q. And, of course, all of those documents are -- well, they're asking for what they're asking for, right?

A. Yes.

Q. Okay. And you know some of those requests have to do with sale of real property, right?

A. Yes.

Q. And do you understand, for example, whether or not Lawrence is asking for some sort of injunctive relief where you -- you can't sell the property at this point, he wants you to not be able to sell it without two weeks' notice and notice of the date, right?

A. Yes.

Q. Okay. Did you recently have a board meeting where you sold property, real property?

A. Yes.

Q. When was that?

A. I think that's our very last board meeting, it was probably the first of this month.

Q. Okay.

A. March.

Q. Okay. And during this last board meeting, whenever that was, when you sold property, what real property got sold?

A. A piece of property, part of a piece of property outside of Sinton, Texas.

Q. Okay. And who did it get sold to?

A. Texas Department of Transportation, TXdot.

Q. And did you receive formal notice of a meeting where that would get voted on?

A. As formal a notice as we do in our company, yes.

Q. And -- and --

A. I think it was an agenda item or something like that.

Q. Okay. And when did you receive that agenda item, so that you could get this notice, formal or not?

A. Two or three days before the meeting.

Q. And did you have the meeting?

A. Yes, we did.

Q. And did the property -- was there a vote on

whether or not Berry GP would sell that real property?

A. Yes, there was.

Q. And what was that vote?

A. Unanimous vote of all three of the directors.

Q. You, Bonnie, and Lawrence?

A. That's correct.

Q. And during that meeting, did Lawrence complain, "Hey, we can't sell this because I need two weeks' advance notice before I can vote on this"?

A. No.

Q. Did he say anything, like in his current request right now, he says he wants all the details of the sale two weeks ahead of time, did he saying like "I need more details about the transaction before I can consider it"?

A. No, he did not.

Q. Did he -- do you remember anything -- was there a discussion about it?

A. Hell of a good deal, that was the discussion.

Q. Are you in -- you understand right now, I want to make sure, you understand that originally he'd asked that he alone would have to approve a sale of real estate for it to happen?

A. Did I understand that is what he asked for? Yes, I understand that.

Q. You understand now that he is not saying that anymore, that he doesn't -- that I think now he is willing to abide by a 2/1 vote, if that's what the vote is on the sale of the dock or real estate? I think that's his pleading now.

A. Okay. Well, I thought it was --

MR. REASONER: Excuse me. If we could just do question and answer, Your Honor. Objection leading.

MR. ALLISON: I just need to lay the predicate it for -- for the question, but I'll move on.

THE COURT: Don't lead.

Q. (By Mr. Allison) If the current pleading says "I, Lawrence, want two weeks' notice," is that agreeable to you?

A. Absolutely not; no, it's not.

Q. Why?

A. Well, why would you just have one board of director get singled out and he gets two-week notice? How about come to the -- change the bylaws and make it wherever gets two weeks' notice; I can vote for that. I'm not going to single out anybody. No one has anything special. It's a -- it's a business. It's run -- run it like a business. Let's just use our bylaws and go to the bylaws and change them. If it's something that will be changed, it will get changed. If

it makes sense, we'll change it.

Q. And let me ask you then, focus on with what you just said and talking about the two weeks. If you're going to have some sort of notice period, whether it's a week, or ten days, or two weeks, whatever the three of you or two out of the three might agree to, if you're going to have something like that, what if the deal came up and you-all had to make -- make a decision in three days?

A. That was the deal that came up.

Q. Tell me what you mean.

A. The TXdot deal was exactly that. They came up and they offered a large sum of money but if we didn't have an answer I think in five days, they were going to condemnation. It was a great deal. It had to be acted on. I mean, it was just a great deal. You should be able to -- you know, if you pass the deal where you got two weeks' notice you put in there or you could waive notice and you can vote. I mean, there is ways to do this, for the bylaws, if you wanted to do this.

Q. Okay. And do you think that -- well, with -- I'm trying to figure out how to ask it. With respect, do you think that that's a matter to be addressed in the bylaws?

A. Absolutely.

Q. Okay. At the beginning, do you remember whether or not Mr. Lawrence Berry's request was to not allow any sale or encumbrance or mortgaging on any property?

A. I do remember that.

Q. And was that -- how did that -- this is at a period of time, because now we're talking about November of '23, December '23, January '24, was that at a period of time, what was happening with Frost Bank?

A. We were signing notes and stuff which basically gave Lawrence the ability to turn down anything, without the say-so of the majority.

Q. Did that -- did that TRO or the injunctive relief sought, did it become an issue, in your discussions with Frost?

A. Absolutely.

Q. In a good way or a bad way?

A. Bad way.

Q. How so?

A. Well, you've got a owner of the company going for a TRO, and you're trying to negotiate a loan with a company that shows instability, it's never good.

Q. And specifically, was the dock part of the collateral with the Frost loan?

A. Yes, it was.

Q. Had it, for years, and years, and years been part of the collateral with the IBC loan?

A. Yes, it had.

Q. In your word "negotiations," were there negotiations then, where that was pulled out of the -- in other words, there was an exception made, so that the pledges could be made and I guess they -- Lawrence agreed ultimately? Fair enough?

A. That's -- that's correct.

Q. Okay. Sorry. Right now, is there any sale of the dock pending?

A. Nothing that I'm aware of.

Q. Is there any offer that you're aware of?

A. No.

Q. If there were an offer made -- first of all, let me ask you, if it's a low ball offer, does the CEO even have to bring it to the board?

A. No. He doesn't have to bring it to the board at all.

Q. If there is a serious offer, would you expect the CEO to bring it to the board?

A. Yes. I would kind of expect to hear about it, yes.

Q. Okay. And so whether it's from the Port, or from Valero, or Buckeye, or somebody else, or anybody

else, are you aware of any offer, let's say in the last month, that's come to your attention in any way, shape or form that was serious?

A. None, whatsoever; none.

Q. Have there been any serious offers at all? I'm assuming there's just been some talk. Have there been any serious offers at all, since it was marketed, beginning around May?

A. None at all.

Q. Do you expect -- do you think the sale of the dock is in any way, shape or form imminent?

A. No.

Q. Do you think that you would have the best interest of the company, on voting whether to sell or not sell, if there was a serious offer?

A. Yes.

Q. Do you think Bonnie would have the best interest of the company at heart, if she were considering to sell or not sell, if there were a serious offer?

A. Yes, I do.

Q. And I understand you and Lawrence have disagreed about the sale of the dock at times, right?

A. There's never been a pending sale. We haven't disagreed about the sale of the dock.

Q. Fair enough. There hasn't been -- there hasn't been an offer, so there is nothing --

A. Nothing.

Q. Okay. But -- but let me ask it this way: Whatever his perspective is, do you think he would vote what he thought was right? Whatever that is, do you think Lawrence would at least vote for what he thought was right?

A. I thought that before he filed that lawsuit, but I just don't know anymore.

Q. Do you think that -- and do you -- if -- if there were a sale of the dock right now, is the dock pledged as collateral?

A. Yes.

Q. To -- to who?

A. To Frost.

Q. And so if there were a sale, what does Frost have to right to do?

A. They take all the proceeds.

Q. And pay back their line of credit?

A. Yes, first and foremost.

Q. So, by signing subordination agreements, have you assured them of that?

A. Well, through the fact that it's collateralized with that loan, we've assured them of that there and the

subordination agreement. It just lets them know we're not going to be in the way.

Q. And your point is really well-taken, there is really two different reasons. They get first?

A. Yes.

THE COURT: Anything else?

MR. ALLISON: We'll pass at this time.

THE COURT: All right. How about you?

MR. HUSEMAN: I have just a few minutes. Of course, it's right before lunch.

THE COURT: That's fine.

MR. HUSEMAN: So we'll try to get it wrapped up before then.

THE COURT: I'm listening.

MR. HUSEMAN: All right.

CROSS-EXAMINATION

BY MR. HUSEMAN:

Q. Mr. Berry, you've been the focus of very skilled interrogation by Mr. Reasoner and Mr. Allison and it's very complicated, lots of documents and things. And will you assist me in perhaps trying to simplify the issues that are being presented here.

A. To me, I think what's trying to be presented here is that --

MR. REASONER: Your Honor, I don't think

there's a question pending.

MR. HUSEMAN:  Well, there was.

MR. REASONER:  I object, vague, vague.

MR. HUSEMAN:  Well --

THE COURT:  I mean, I think it's a "Yes" or "No" question.

MR. HUSEMAN:  Yeah.

Q.   (By Mr. Huseman)  Marty, would you help me simplify this thing for the Court a little bit?

A.   Yes.

Q.   Okay, there we go.  That will satisfy Mr. Reasoner's objection as well.

So, it strikes me that there is basically three birds under the blanket for your brother, at least as expressed by his lawyers.  One is the loan situation, where you and your brother Dennis, and maybe your mother, Laura, have lent money to the company; the other one, the second thing is the business about the cranes being bought and leased back to the company; and the third one is about the company able to sell certain assets, land, airplanes, but those were grass spurs are what I want to address with you.

To summarize the issue on the loan, the loan, if I heard you correctly, was obtained from you and from Dennis in order to provide adequate operating capital

for the company?

A.   Yes, sir.

Q.   You-all needed to meet current obligations, you had to pay back loans, things of that sort, and that's what the email in the Plaintiff's Exhibit 35 talks about?

A.   That's correct.

Q.   All right.  And if we dig into that just a little bit, there are a number of ways in which a company can increase its operating capital, it could, for example, sell ownership in the company, which would imply that if you gave them, say, 40 million bucks, that you get 40 million bucks for the ownership in return for it; that would be one way to raise capital, wouldn't it?

A.   Yes.

Q.   The would diminish your brother Lawrence's share in the company, if you did that, right?

A.   It would.

Q.   And you had the capability to do that, if you wanted to, but you didn't?

A.   Did not.

Q.   All right.  Another thing you could do, which I'm going to suggest would be a stupid financial, you could just give him the company, right?  Just write him a check and say here you go, Merry Christmas?

A. That's correct.

Q. The other way you could do it, and this is what's done commonly by companies, is they go to financial markets, get a note, because you-all couldn't do that because you were already tapped out on your line of credit with IBC, weren't you?

A. And all of our collateral was tied up.

Q. Everything was tied up, so there wasn't any lending. So, of course, you chose the thing that they're complaining, is what you did, is you make a loan to the company of millions of dollars of your money?

A. Yes.

Q. You did it for an interest rate, which was less than the going commercial rate at the time the loan was made, the interest rate that was suggested by the borrower --

A. Yes.

Q. -- right?

A. Yes.

Q. And you did it with no collateral?

A. Yes.

Q. You took a back seat, by the way, with that subordination agreement to the other lenders, in other words, you --

A. Yes.

Q. -- you took the back seat of the bus. And you gave them actually more than you could afford to give, but you actually gave them your tax reserve as part of a way to keep the company afloat and going; right?

A. That's correct.

MR. REASONER: Your Honor, I'm just going to have to respectfully object. We move from summary, to the leading and argument.

MR. HUSEMAN: Well, he's not my client, for one thing, Your Honor.

MR. REASONER: But I don't -- I don't believe he can lead this witness. He is --

MR. HUSEMAN: Why can't I?

MR. REASONER: -- a friendly witness.

MR. HUSEMAN: Why can't I?

MR. REASONER: Because he's not an adverse witness.

THE COURT: I think he is -- he is a witness associated with your side of the bar.

MR. REASONER: He is not an adverse witness.

THE COURT: I'll sustain.

MR. HUSEMAN: I guess it's whether he says "Yes" or not, Judge, I guess.

MR. REASONER: He may not be need --

THE COURT: I mean, I'm sure you're skillful enough to do it in a non-leading way and get your question.

MR. HUSEMAN: Oh, I'll give it a try, for a change.

Q. (By Mr. Huseman) Was the loan that you made, which was the last choice in terms of raising capital for the Berry entities, was that a good deal for you?

A. No.

Q. Was it a good deal for Berry?

A. Well, it's not -- not a good deal for me if I didn't believe in the company, but I own that company, so it was a good deal to sur -- to keep the company on survival. Yes, it was.

Q. Did that --

A. Personally, no.

Q. Did that play off, in relation to the bank? Did you tell the bank what you were doing?

A. I did not.

Q. Did they learn that?

A. Of course. Our CFO informed them immediately.

Q. Okay. And did you get good or bad feedback on that?

A. I don't think there was any feedback, that I heard.

Q. Okay. So anyway, you -- you took the last choice that you had, in terms of getting more operating capital in. And as -- as Mr. Allison had you point out a minute ago, you offered the same thing to your brother, any, all, or a piece, whatever, and he wasn't interested in doing that to help the company, was he?

A. He hasn't been, no.

Q. All right. So that's the first grass spur. The second thing about the cranes, tell the Judge, just in your own words, what sort of cranes we're talking about here.

A. These are ex -- the largest hydraulic cranes they make, they are 1200 tons. There is some different ones that aren't as big, but four of them are like that. They're huge cranes. They're made for putting up wind generation in west Texas, that's what you'd use them for, that's what we are using them for. Our director of the Heide (phon) Haul, our rigging group, we hired a man that was only from the wind farms, he said he needed these types of cranes to perform out there, and we started with one. And then we added one in about six, seven months, and then we added another one. And then we even added another one, and another one, and another one. It -- it was for a business unit that has -- has really done quite well.

THE COURT: These -- these are these big windmills that --

THE WITNESS: Yes.

THE COURT: -- that you see here also.

THE WITNESS: Wind generation, yes, sir.

THE COURT: And -- and -- okay.

Q. (By Mr. Huseman) So, the -- so, did the Berry companies, first of all, did they have the cranes that it would take to do these wind -- windmill farms?

A. No, sir, had none.

Q. Okay. And did you-all have the money to go buy the cranes or get the cranes to do that?

A. No, sir. But the first one, we -- we came together with some money with the company that the three brothers owned, they -- they took half of it, and then I took the --

Q. Rigging outfit?

A. Yes. And then I --

Q. Was it a rigging outfit?

A. Yes. And then I took the other half, and then so I owned 60 something percent of it.

Q. Uh-huh.

A. And then the company in our written agree -- and it was a loosely written agreement. The agreement was they're going to pay me for the first 12 months,

$70,000, they're going to pay me half of that back, and they were going to own that half of the crane, and it would go to Bay Canada.

Q. Uh-huh.

A. They never made all the payments, couldn't make the payments. They couldn't buy the crane, couldn't even make the payments.

Q. Okay.

A. But that didn't stop me from wanting to go on with more cranes because it was a huge production of capital. Just because they weren't paying, and in all fairness, not paying me, I told the people in accounting, "Don't pay me, I got vendors that need to be paid."

Q. Okay.

A. "You pay our vendors."

Q. Okay, let's slow down.

A. Okay.

Q. I want to --

A. Okay.

Q. I want to dissect it because you crammed a lot into one answer. The company didn't have money to buy the cranes; right?

A. That's correct.

Q. You-all wanted to get in the windmill business,

which you weren't in, and you didn't have the capital to do it?

A. That's correct.

Q. And so you, through your company, were instrumental in getting these cranes into Berry's hands, for getting in the windmill business?

A. Yes, sir.

Q. And it had a deal where they were going to pay you a lease rate on them, and then were going to eventually own them?

A. They never did.

Q. Buy -- buy you out on it?

A. They were going to -- they were going to basically own them after a year. They would take -- half the payment would apply to the crane --

Q. Uh-huh.

A. -- and they would end up buying the crane and owning it.

Q. And then you'd be out of it?

A. I'd be out of it.

Q. Okay. Well, there was a problem with that, wasn't there?

A. Money.

Q. Okay. Did -- are they -- is Berry companies -- were they making -- I presume they're making money off

the cranes, even as we sit here?

A. Yes, they are.

Q. When is the last time they made a payment to you for any of these lease payments?

A. I testified to that earlier, I believe it was June or July of last year.

Q. Okay. So about eight, nine months ago was the last time you received a payment on this deal?

A. That is correct.

Q. Okay. And if they were -- wanted to buy the cranes, per their original deal, would you be good with that?

A. I'd be good with that, up to a point. We'd like to get some payments first.

Q. Okay. All righty. And you've invested what? I'm told by post-it-note you've maybe invested as much as 25 million on these cranes?

A. It's -- it's a lot. Those first cranes were about 4 million a piece.

Q. And the crane -- and the company is making millions off of using them, as we speak?

A. Absolutely.

Q. And you -- and you're not getting paid a darn thing?

A. At this time, no, I'm not.

Q.   All right.  Okay.  Let's go to the third grass spur to get done before -- get that -- get this blanket cleaned up here.

About the land sales and sales of the airplane and all this, this stuff has all been handled in accordance with a set policy by the company for years, hasn't it?  That's what you told the Judge minutes ago?

A.   That's correct.

Q.   There's not ever been threatened and there's not going to be any sale done, which Lawrence Berry does not have a say in?

A.   That's correct.

Q.   Okay.  And do you see what theme is between these three complaints, what the motivating problem is in all of these?

A.   Do I see it?  Yes, I do.

Q.   Okay.  I want to suggest to you that the problem is that this is -- complaints are being made and complaints involving things where you're trying raise capital for the company, sell off an asset so you can use it elsewhere.  You know, you buy the cranes so the company can use them to make money because the company doesn't have to offer any capital goods.  Making a loan to the company you, your mom, your deceased brother all making loans for operating capital.  All of these things

have to do with the capital structure of the company, don't they?

A. They do.

Q. And so what's being asked here in court by these folks over here is that the Judge step in and substitute his judgment for the judgment of the business' management and this board; right?

MR. REASONER: Objection, leading, arguing.

THE COURT: Sustained.

Q. (By Mr. Huseman) Yeah. The problem here is that Mr. --

THE COURT: Look. I -- I get your point.

MR. HUSEMAN: Okay.

THE COURT: I get your point.

MR. HUSEMAN: All right.

Q. (By Mr. Huseman) And so, it's just that simple isn't it, it's -- it's a capital issue?

MR. REASONER: Objection.

THE COURT: Sustained, but I get your point.

MR. HUSEMAN: Okay, good. I'm talking too much anyway, Judge.

THE COURT: Well, I got the point.

MR. HUSEMAN: Okay.

THE COURT: I get the point you're trying

to get across.

MR. HUSEMAN: Okay.

THE COURT: Anything else, Mr. Huseman?

MR. HUSEMAN: No.

THE COURT: All right. Well, then I guess we'll take it for lunch, and we'll come back at 1:30 and we'll continue on then.

(Noon recess.)

STATE OF TEXAS      *

COUNTY OF NUECES *

          I, OLIVIA OBALLE-AGUILAR, official court reporter in and for the 117th District Court of Nueces County, Texas, certify that the above and foregoing contains a **DRAFT TRANSCRIPTION** of all portions of evidence and other proceedings requested by counsel for the parties to be transcribed.

          WITNESS MY HAND, this the 23rd day of March, 2024.

          /s/ Olivia Oballe-Aguilar

          _____

          OLIVIA OBALLE-AGUILAR
          Texas C.S.R. 2152
          Expiration date: 12/31/21
          117th District Court
          Official court reporter
          Nueces County, Texas
          Corpus Christi, Texas  78401
          Telephone: 361-888-0662

REPORTER'S RECORD
TRIAL COURT CAUSE NO. 2024DCV-0045-C

LAWRENCE BERRY,                    )    IN THE DISTRICT COURT
Individually and                   )
derivatively on behalf of          )
BERRY GP, INC.,                    )
                                   )
   Plaintiff,                      )
                                   )
BERRY GP, INC.,                    )
                                   )
   Nominal Plaintiff               )
                                   )
                                   )    NUECES COUNTY, TEXAS
VS.                                )
                                   )
                                   )
MARTY BERRY, ROBERT RICKETT,       )
ROBERT POWERS, MICHAEL             )
HUMMELL, BERRY GP, INC.,           )
BERRY OPERATING COMPANY,           )
LLC, and BERRY CONTRACTING         )
LOP                                )
                                   )
Defendant                          )    94TH JUDICIAL DISTRICT

---------------------------------
TEMPORARY INJUNCTION HEARING
(March 25, 2024)
---------------------------------

On the 25th day of March, 2024, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable BOBBY GALVAN, Judge presiding, held in Corpus Christi, Nueces, Texas;

Proceedings reported by machine shorthand.

A P P E A R A N C E S


FOR THE PLAINTIFF, LAWRENCE BERRY:
        MR. BARRETT REASONER
        SBOT NO. 16441980
        MR. MICHAEL ABSMEIER
        SBOT NO. 24050195
        MR. BRUCE BALDTREE
        SBOT NO. 24116064
        Gibbs & Bruns, LLP
        Houston, Texas
        Telephone: (713) 650-8805

AND


        MR. BUTCH BOYD
        SBOT NO. 00783694
        Butch Boyd Law Firm
        2905 Sackett Street
        Houston, Texas 77002
        Telephone: (713) 589-8744

AND


        MS. GABBIE S. CANALES
        SBOT NO. 24012376
        Law Office of Gabbie Canales
        5262 South Staples, Suite 100
        Corpus Christi, Texas 78411
        Telephone: (361) 887-4700

FOR THE DEFENDANTS, BERRY GP, BERRY OPERATING,
BERRY CONTRACTING, AND MARTY BERRY:
        MR. DOUGLAS A. ALLISON
        SBOT NO. 01083500
        Law Office of Douglas Allison
        403 North Tancahua Street
        Corpus Christi, Texas 78401
        Telephone: (361) 888-6002

AND


        MR. MICHAEL H. 'MIKE' HUMMELL, PRO SE
        SBOT NO. 10271100
        Berry Contracting LP
        1414 Corn Product Rd
        Corpus Christi, TX 78409-3020
        Telephone: (361) 693-2909

P R O C E E D I N G S

March 25, 2024

(In open court.)

THE COURT: Still under oath.

Okay. I don't know who was doing the questioning. I can't remember.

MR. ABSMEIER: I was, Your Honor.

THE COURT: All right. Then you're on.

MR. ABSMEIER: Thank you.

DIRECT EXAMINATION, CONTINUED

BY MR. ABSMEIER:

Q. Good morning, Ms. Fulghum.

A. Good morning.

Q. At the end of the day Friday we were finishing up our discussion of the Orca transaction and the amounts owed back and forth between Lawrence and the company; do you recall that?

A. Yes, sir.

Q. Okay. I want to quickly try to wrap that issue up. I'm gonna hand you what I'm marking 67.

MR. ABSMEIER: May I approach, Your Honor?

THE COURT: You may.

Q. (By Mr. Absmeier) This is 67.

A. Okay.

THE COURT: Yes, sir.

Q. (By Mr. Absmeier) Ms. Fulghum, do you recognize Exhibit 67 as an e-mail chain between you and Johnna Jones from

January of 2014?

A. Yes, sir.

Q. And the subject on that e-mail is "Update on Orca Promissory Note", correct?

A. Correct.

Q. Okay. If you go to the bottom e-mail Ms. Jones indicates that she had called you to see if you had an update in regards to the amount on the promissory note, right?

A. Yes.

Q. And you respond and indicate essentially that you hadn't spoken to Lawrence about it, right?

A. Yes.

Q. And you say, third sentence, "Have the financials been closed to accommodate the TxDOT bids", right?

A. Right.

Q. What was going on with the TxDOT bids at that point?

A. I think that they were trying to get --

MR. ALLISON: Your Honor, we just object to speculation. It sounds like she was not in the conversation.

THE COURT: Okay. All right.

MR. ABSMEIER: Your Honor, she's discussing the TxDOT bids in this e-mail.

THE COURT: Okay. Well, I guess you can rephrase the question in a way that it's not speculative.

MR. ABSMEIER: Okay.

Q. (By Mr. Absmeier) Ms. Fulghum, did you have an understanding as to what was going on with the TxDOT bids at that point in time?

A. What I understood was that they were pushing Lawrence to sign a document that converted a loan to a partnership agreement with some adjusted financials in support of getting bonding for TxDOT bids.

Q. Okay. And that is the conversion of the Orca entity from -- or the Orca transaction from a loan to a partnership where --

A. Yes, sir.

Q. Okay. That we talked about Friday, right?

A. Yes, sir.

Q. Okay. And was the point of that to enhance the Bay/Berry balance sheet to allow them to bid on this TxDOT work?

A. I assume that's what it was, yes.

Q. Okay. And you indicated there was some sort of mark to market component of that transaction?

A. That's right. They did a mark to market adjustment of the valuation of the leases of about 7 million dollars.

Q. And so at that point when the loan was converted to equity, was the equity valued the same as the loan amount or more?

A. More.

Q. Okay. So setting aside that conversion of the partnership and the mark to market adjustment you just explained, has Lawrence paid off the original loan amount plus interest?

A. Everything that Lawrence borrowed from the company has been paid, plus interest.

Q. Okay.

MR. ABSMEIER: Your Honor, move for the admission of Exhibit 67.

THE COURT: Okay.

MR. ALLISON: No objection.

THE COURT: It's admitted.

Q. (By Mr. Absmeier) After this lawsuit was filed, ma'am, did Berry begin -- Berry GP I'm talking about -- begin making demands for Lawrence to repay those amounts and other amounts due to the company?

A. Yes, sir.

Q. Okay. I want to talk with you briefly about some of your requests for information to the company on Lawrence's behalf. First, did you have a role in helping manage the balances, or track the balances that were owed back and forth between Lawrence and the company?

A. I had a role in helping to communicate the balances owed, yes.

Q. Okay. Did you periodically review the amounts that

you were tracking as due to the company and vise versa?

A. Yes, sir.

Q. Did Lawrence attempt to pay the items that you agreed were due?

A. Oh, yes, we did. We did clear some balances that were on the related party receivable schedule as we were able to confirm the amounts due, yes, sir.

Q. Did you find the times that the amounts charged were improper --

A. Yes.

Q. -- or things were being charged that weren't actually --

MR. ALLISON: Your Honor, we'll just object on relevance. It sounds like we're getting now into the -- there's this Orca thing, and there's the -- sometimes the partners would I think do something that was personal that would get charged to their account, which are personal accounts. And we haven't gone into that before and it just seems like once we go down that road --

THE COURT: I mean, look, it seems to me that the witness has testified that Lawrence paid back what was due. And I -- I allowed you to get into the Orca because they made a fuss about it. If what she's saying is he's paid back what's due then I think that's the end of it.

MR. ABSMEIER: Right. And, Your Honor, that's

fine. This is sort of a predicate for requests for information that are going unanswered. And it's a five-minute part of the direct. But I'm not gonna get into the amounts or fight about the numbers.

THE COURT: Okay. But I mean, if this is a discovery issue that's fine, but, I mean, we're here on a temporary injunction.

MR. ABSMEIER: Well, this is actually -- Your Honor, this goes to the point that Lawrence or his office requested information over and over again and doesn't get it.

THE COURT: Okay. Well, I'll give you a little bit of leeway on that point only.

MR. ABSMEIER: Okay.

Q. (By Mr. Absmeier) Do you have before you Exhibit 60? I guess you may recall this was the document that I had just put in front of you when we broke at the end of the day Friday; do you recall?

A. Yes.

MR. ABSMEIER: And, Your Honor, I offered this for admission at the end of the day. And there was no objection from Mr. Allison, but I don't -- in the transcript at least it doesn't reflect that it was admitted.

THE COURT: Okay. Well, then I guess it's admitted.

MR. ABSMEIER: Okay. Thank you, Your Honor.

Q.    (By Mr. Absmeier)  Ms. Fulghum, this is an e-mail from Lawrence Berry to Shanna Gohlke copying you, right?

A.    Yes.

Q.    And it's responding to an e-mail from Mr. Hummell with the subject, "Notice of Delinquent Account"; do you see that?

A.    Yes, sir.

Q.    Okay.  And the e-mail that Lawrence sent attached a couple of documents.  And, briefly, if you look at the last page there's a letter.  And the letter in the second paragraph references an attached e-mail chain reflecting some conversations, right?

A.    Yes.

Q.    Okay.  I want to look at that e-mail chain.  If you start at the page base labeled ALB904.  Do you see that that's a January 8th, 2024 e-mail from Gretchen Reed to Jim Klein Ccing you, right?

A.    Yes, sir.

Q.    And the subject's "Related Party Reconciliation"?

A.    Yes.

Q.    Who's Gretchen Reed by the way?

A.    Lawrence's CPA.

Q.    And does she report to you?

A.    Yes, sir.

Q.    Okay.  And she says, "After an initial review of the

Berry Family Related Expense Excel analysis, we are sending the attached request lists", right?

A. Yes.

Q. And if you go down to the second paragraph she says, "We're also sending you a reconciliation of amounts that Bay owes to Lawrence", and then it talks about 1.7 million dollars in expenses that should be netted against Lawrence's balance, right?

A. Correct.

Q. Okay. And I won't belabor this, but if you kind of scan down the next two pages of that e-mail there are some spreadsheets embedded in the e-mail, right?

A. That's right.

Q. And those are the various expenses back and forth that are trying to be reconciled here?

A. Yes, sir.

Q. Okay. Go to page ALB903, please.

A. Okay.

Q. The page before the one we were just looking at. This is a February 3rd e-mail from Gretchen Reed to Jim Klein; you see that, ma'am?

A. Yes.

Q. Okay. And so that's almost a month after that initial request for reconciliation, right?

A. That's correct.

Q. And Gretchen says, "Hi, Jim. Following up on the below request as we would like to continue to move forward reviewing the balances but need additional information", right?

A. Yes.

Q. Okay. And is it consistent with your recollection that no information -- that information that you had requested in early January still had not been provided as of early February?

A. It's been difficult to get this information for years.

Q. Okay. If you go up to the e-mail above that, which starts at the bottom prior page, Monday, February 12th, Ms. Reed, again, Ccing you follows up yet again, right?

A. Yes.

Q. She says, "Following up again on our request for supporting information"?

A. Right.

Q. And at that point you still hadn't received the information?

A. No, sir.

Q. Okay. If you go up to the e-mail above that, Mr. Klein says on February 13th, he apologizes. He said, "This has been slowed by the lack of effort by an admin that was assigned to the project", right?

A. (Moving head up and down.)

Q. And he says, "She's been replaced and the new admin should be getting this to you", right?

A. Yes.

Q. A couple weeks later you e-mail, right?

A. I did.

Q. This is February 28th now. And you say, "Jim, good morning. Any update on the status of this request for more information"; do you see that?

A. Yes, sir.

Q. At the top of 902?

A. Uh-huh.

Q. Following page -- or I'm sorry, the preceding page is ALB901; are you there?

A. Yes, sir.

Q. And this is February 29th. Mr. Klein says, "Tonja, they were attempting to gather up all the supporting documents to send with the detail. I told them to just send it with what they can get together quickly. Tomorrow they will send such", right?

A. Correct.

Q. And tomorrow as of February 29th would have been March 1 of '24?

A. Yes, sir.

Q. Did he send anything to you the next day?

A. I have not received anything.

Q. Did he ever send anything to you?

A. No, sir.

Q. Okay. So as you sit here today you still have not received any information from Mr. Klein?

A. None of the supporting document, no.

Q. Do you know if today exactly what, if anything, is logistically owed between the parties?

A. I don't know what is owed between the parties.

Q. You can set that aside, ma'am. Are you aware of other information requests that you or Lawrence has made to the company that have not been responded to?

A. I think in general there's a general lack of response of information.

Q. And why is it important for you to receive information to know what's going on with the company?

A. I mean, I received the information on Lawrence's request and give it to Lawrence so he can make decisions or understand what's happening with his company.

Q. Is Lawrence pursuing new jobs for the Berry entity?

A. Yes, he is.

Q. And does that lack of information affect his ability to do that?

A. It does. The lack of information and the lack of collaboration with the team in Corpus does, in fact, impact that.

Q. In the past year or two where have you and Lawrence gotten most of your information of about the company?

A. The Board meetings.

Q. And if Lawrence doesn't get updates of the monthly Board meetings, is there another way that you know of to get that information?

A. I think then the information could only come from the field, which is not always accurate.

Q. Okay. And are your requests to company management being responded to? Requests for information?

A. In some instances, yes, and in most instances, no.

Q. Okay. I want to briefly talk to you about your interactions with the CEO at Berry GP over the years.

A. Okay.

Q. You testified you worked for Berry for 27 years before you were terminated; is that right?

A. Yes, sir.

Q. Okay. In your job did you interact regularly with the various CEO's that have been in place at the entities?

A. I did.

Q. Okay. What in your experience was the role of the CEO?

A. Well, Mr. Martin I think was primarily involved in the financial wellbeing of the company, and they had a president Ken Luhan who oversaw the operations.

Q.    Was that -- did you view that CEO role as an important role in the company?

A.    Absolutely.

Q.    Did Lawrence, to your knowledge, have any role in selecting or hiring the CEOs prior to the current CEO?

A.    Yes.

Q.    What was that role?

A.    I think that they -- the brothers generally got along and talked and engaged in conversations about who they were going to put in that position.

Q.    What has Lawrence's role been in the company just directly?

A.    He mainly oversees the industrial division and large international projects.

Q.    And I think you talked earlier in your testimony about front end development of projects?

A.    Uh-huh.

Q.    And by that do I understand correctly that Lawrence has pursued and obtained large projects on behalf of Berry GP?

A.    Yes.

Q.    Can you just give a couple of examples?

A.    I mean, go back to CNRL Horizon project, there's some modular projects for Sunoco, Proman, Kazamba.  I mean, I can go through a litany of projects that he's pursued; some that he got and some that didn't pan out.

Q. What has Marty's role with the company been to your knowledge?

A. That he's a director and he's primarily overseeing equipment from my understanding.

Q. And that would be the equipment division of the company?

A. Yes, sir.

Q. What does the equipment division of the company do?

A. It's the largest -- one of the largest heavy haul companies in the United States I believe.

Q. And --

A. Cranes, heavy haul equipment.

Q. And the equipment division of the company, does that provide cranes to --

A. Internal and -- it's inside sales and outside sales, yeah. So it supports the industrial division and it also has its own business.

Q. Okay. And you understand now that Marty's running his own equipment company, Western Gulf Equipment, on the side?

A. I don't know what that -- I understand that there is some cranes that belong to Western Gulf Equipment, yes.

Q. Okay. And if -- if there are cranes with Western Gulf Equipment running inside or outside leasing, that would be in direct competition with the equipment division of the company?

A. We don't have any transparency into those lease agreements. But it would sound like that would be the case, yes.

Q. Okay. Thank you.

MR. ABSMEIER: I'll pass the witness.

THE COURT: Cross.

MR. ALLISON: Thank you, Your Honor.

CROSS EXAMINATION

BY MR. ALLISON:

Q. You were asked some questions about, I guess, these personal expenses that the company says are owed by Lawrence but have not been paid back to the company?

A. Yes, sir.

Q. And that goes back for, what, about ten years?

A. Even longer I believe. There's --

Q. 15 years?

A. Yeah.

Q. Okay.

A. Yeah. I think that's probably true.

Q. Right. So it's been about 15 years since he squared up?

A. It's been about that long, too, that we've been asking for the backup for the data for the charges. So, to be fair we did make it a wholesale effort.

Q. And those are personal charges? Things that Lawrence

went out and charged that were personal expenses but got the company to pay?

A. I don't have any idea, because I don't have the backup.

Q. Okay. And the backup document would be those receipts whenever Lawrence got whatever he got, it would be those receipts related to that transaction?

A. I don't think it's receipts, sir.

Q. Pardon?

A. Respectfully, I don't believe it's receipts. What I believe it is is probably where he used equipment or labor resources.

Q. Okay. And has -- did Lawrence keep his personal records on those transactions?

A. I don't know that we even knew they were being charged to him, so how would we have the personal records.

Q. I mean, did Lawrence keep track for himself how much he's using company assets without permission? What do you know?

A. I don't know.

Q. Okay. Because one source to go to -- and Jim Klein, for example, doesn't have 'em back 15 years ago, the other person you should ask is the guy who actually was at Alamo Ranch using the equipment and maybe kept a document on how much time he was using something for, right?

A.   I would guess that would be okay.

Q.   Have you asked Lawrence for that information?

A.   Lawrence has --

Q.   Have you asked him?

A.   No, sir.

Q.   Okay.  And you talked a little bit about Rob and his role, right?

A.   I don't think I talked about Rob and his role.

Q.   You talked about the CEO?

A.   Yes, sir, the CEO.

Q.   Okay.  Now, and first of all it looks like from the e-mails you've been going through most of that happens is it fair to say at the staff level?

A.   Yes.

Q.   Most of the exchange of the --

A.   Sure, yes.

Q.   Okay.  And we have stacks of other e-mails where information has been provided.  Certainly you're not arguing those exchanges don't occur?

A.   Oh, absolutely not.

Q.   Right.  There's a lot of information that trades hands, financial and otherwise, with Lawrence?

A.   Yes.

Q.   And with you as his representative or agent there sometimes?

A.    Yes, sir.

Q.    And I think if I've been -- and I've kind of looked at it and summarized it, but I'm gonna give you a chance to just say some of it.  There are multiple people that you reach out to with the Berry companies that get you information, whether it's business or personal information for Lawrence, right?

A.    I would say that's true.

Q.    Jim Klein?

A.    Jim Klein.

Q.    Go ahead and go through the list with me here.  Who do you reach out to?  Who are your go-to people at the company?

A.    When it comes to financial information?

Q.    Start there, sure.

A.    Only Jim Klein.

Q.    Okay.

A.    Is the only one.  But prior to him it was Diane Decou if we needed personal information.  On the related party receivables we do reach out direct to John Gibson from time to time, because I think he's the keeper of the records.

Q.    Okay.

A.    Okay.

Q.    Are all those people good people?

A.    Are they good people?

Q.    Yes.

A.   Yes, of course.

Q.   Do you think they're trying to -- and I understand some of it's 15 years old, some of what documents they have, what they don't have.  Do you think there's -- I mean, I guess any compliant you're making is against those people; is that what you're saying?

A.   No, sir.

Q.   Okay.  And you know for example -- and I don't -- I guess maybe I want to make sure I didn't hear it incorrectly.  I don't think you're complaining about Rob Powers or his not providing information, correct?

A.   I am -- I don't know how to say I'm not complaining.  What I'm saying is that we have made repeated requests for the backup.  For instance, 20 -- 2002 might be difficult to produce.  2023 should be relatively easy with the push of a button, right?  And so we did -- I did go and sit in 2019, 2020, 2021 with Diane and Barry Peterson and go through documents, and we did find instances where Lawrence had been charged when he shouldn't have been charged.

Q.   Okay.

A.   So, it's fair that we're asking for the backup.

Q.   It's fair you're asking and it's fair they're doing their best to try to respond?

A.   Sure, sure.  But 2023 should be -- 2022, 2023 we should be able to see it.

Q. And everything --

A. We ask for it on a quarterly basis.

Q. And everything we're talking about right now really is limited to personal expenses?

A. That's correct.

Q. Okay. And because you know, too, in terms of Rob and him doing his role, that Lawrence just voted to sort of reup or extend his contract, right?

A. Sure.

Q. Okay. So there's -- it's not that level of discord there at all obviously?

A. I don't know where it gets stopped.

Q. Okay.

A. Okay.

Q. Do you also have -- did you while you were working there for many of those 20-some-odd years -- I apologize. I don't remember the exact number.

A. Too many.

Q. Okay. For many of those years did you have your own key?

A. My own key to what?

Q. To access the building?

A. No, sir.

Q. To access files?

A. I had my own key to the building in Houston.

Q.   To the building?

A.   In Houston.  But I do not have access to any of the files in Corpus Christi; electronic or physical.

Q.   Isn't there a file room there that you were given assess to?

A.   In Corpus Christi?

Q.   Yes.

A.   No, sir.

Q.   You never copied files in Corpus Christi?

A.   I've copied files with permission in Corpus Christi where somebody went and got them for me.

Q.   Hopefully it's always with permission, right?

A.   Always with permission.

Q.   You're not supposed to be stealing files, and I'm not saying you are.

A.   No, no.  I would not.  I would not.

Q.   Okay.  So, when you copied them it was always with permission?

A.   And always that somebody brought me the file that I requested.

Q.   Okay.  And that happened many, many times?

A.   No, it did not happen many, many times.

Q.   How many times?

A.   Recently it happened one time.  Before that I did not go into the files.  I always request from the person

responsible the information. I don't go into a file room. I don't have a key.

Q. So the practice was for you to make a request, they bring you the file, they do the copies?

A. Or they'd e-mail it to me, yes, sir.

Q. Okay. And that's been done whether by e-mail or otherwise --

A. Most of the information transferred to me has been done by e-mail.

Q. Okay.

A. Okay.

Q. But then some of it is I'll hand you the file and let you work on it?

A. One time that I can think of recently that -- where that happened, yes.

Q. And who was it that handed you that file?

A. I believe it was Mrs. Berry.

Q. Okay. Has Mr. Hummell also been involved?

A. Yes, Mr. Hummell came in and helped me find some things, yes.

Q. Okay.

A. And Georgie helped me find some things, yes.

Q. Okay. Because sometimes it's hard to find and it's good to get help from people?

A. I wouldn't even know where to begin to look there. I

haven't worked at that office in years, sir.

Q. Good to have help from them, and they provided it at times?

A. Yes.

Q. Okay. And it sounds like in this process of reconciliation on the personal items that there has been some progress made, and some things have been credited, and -- you've made some headway, just not enough headway like you'd like?

A. Sure. So -- and if you look at the request that's in front of me right here, there are some math issues that need to be reconciled as well.

Q. Okay.

A. So it's -- it's --

MR. ALLISON: Nothing further, Your Honor.

THE COURT: Okay.

MR. HUMMELL: Just a few questions, Judge.

THE COURT: Yes, sir.

CROSS-EXAMINATION

BY MR. HUMMELL:

Q. Good morning, Tonja.

A. Good morning, Mr. Hummell.

Q. Just to touch on --

MR. ABSMEIER: Your Honor.

THE COURT: Excuse me?

MR. ABSMEIER: Mr. Hummell's a party.

THE COURT: Yeah, well.

MR. ALLISON: Just so you know, Mr. Huseman couldn't be here today, and Mr. Hummell is pro se today.

THE COURT: Well, I don't think there's anything in the rules that prohibit him from representing himself.

MR. ABSMEIER: No, sir. I don't think they do, Your Honor.

THE COURT: We all know the idiom, but you know.

MR. ALLISON: I apologize. I figured you saw he had a tie on today, and there was a reason for that. I should have given you --

THE COURT: All right.

MR. ALLISON: Sorry about that.

THE COURT: Go ahead.

Q. (By Mr. Hummell) Recognizing that I might have a fool for a client, I have a few questions for you, Tonja.

A. Okay.

Q. You mentioned earlier -- and I'm gonna stay focused on this stuff that you just covered this morning. You mentioned earlier about the 2023 stuff should be easy to find?

A. Uh-huh.

Q. Is that a yes?

A. Yes, sir.

Q. Okay. So can we agree that Lawrence should know if

he had company equipment, company labor doing something for him personally in the calendar year of 2023?

A. So, what we would do when we're given the backup information for what comprises that I think it's like close to 1.2 million dollars, and some of it is labor, right? And some of it is labor that we weren't expecting because that was supposedly on Bay, but that's okay. We can recognize that. But I -- we would take what is being invoiced and cross-check it with what we know that he has that's out there deployed.

Q. Did you understand my question?

A. Maybe I didn't.

Q. Okay. I understand why you, Lawrence, maybe other folks that work for Lawrence personally might need backup for company equipment, company labor charges that are on his personal account going back 10, 12, 14 years, however far back it goes. I get that. But I'm talking about 2023. And my question was, do you think he should be able to remember -- he should be able to know and you should be aware of the 2023 charges that were occurring in the past six or eight months?

A. We don't see what's being invoiced to him on a regular -- on a weekly basis, a monthly basis. It just gets applied somewhere in the accounting department. And so I don't think it's out of the realm of possibility that we could ask for a printed report of what's been charged.

Q. And you can't know?

A. I can't --

Q. Lawrence can't know?

A. I can't know.

Q. And Lawrence can't know?

A. I don't know that he would know. He's not out there wherever if the charges are being applied every day.

Q. And he doesn't know what he's asking to be done. Okay. I'll move on.

You testified earlier that Lawrence has paid back all of the money plus interest that -- I think you used the term that he has borrowed, right, on the Orca side?

A. On the Orca ICI, correct.

Q. Right. How much money was that?

A. There was -- I'd have to look at the spreadsheet, but it was 30,198,000 I think, or somewhere around there.

Q. Right around 30 million --

A. And he's paid all of that back.

Q. Paid all of it back?

A. Plus four million in interest.

Q. Okay. Are you familiar with the loan extensions that he was signing every year?

A. Yes, I am.

Q. Okay. And did he sign one last year, or two years ago that took him up to 2023?

A. I believe he did, yes.

Q.   Okay.  And that loan amount on the paper that he signed with the extension was 12.6 million more or less?

A.   Yes, sir.

Q.   All right.  And that loan was gonna mature in July?

A.   That's correct.

Q.   Of 2023?  And all that money was due and payable under that document last summer, right?

A.   Yes, sir.

Q.   And he didn't pay it; did he?

A.   No, he did not.

Q.   Okay.  Now, he didn't get an extension either like he had had for the past seven or eight years, right?

A.   Not to my knowledge.

Q.   All right.  So you say he's paid all the interest he owes.  He was paying around $250,000 twice a year in interest right up until July of '23, right?

A.   Yes.

Q.   Okay.  But you're saying he didn't owe any money. He's just paying a half million dollars in interest every year, but he doesn't owe the money, right?  Would you say?

A.   I am saying that.

Q.   Okay.  And he even made another interest payment just a few months ago?

A.   Yes, he did.

Q.   On money you say he doesn't owe?

A.   Yes, he did.

Q.   And you know that check wasn't cashed because the note's in default and we're not accepting the interest payments; we want the money, right?

A.   I did not know the check hadn't been cashed.  I'd have to ask Gretchen.

Q.   Okay.  All right.  I'm gonna change subjects now. Talking about cooperation.  Every time you've ever asked me for anything I've gotten it for you; haven't I?

A.   Yes.  We have a good relationship.

Q.   Okay.  And Shanna and Georgie always try to help you with anything you want, and it's always for Lawrence, right?

A.   Yes.

Q.   Okay.  When you wanted to come down from Houston and get in the file room and, you know, pick this and pick that and get me this and get me that, we had people devoted to helping you make sure you got everything you were asking for, right?

A.   Yes, sir.

Q.   And there won't be an e-mail or a document or a single complaint that they can bring to the Court to show the Judge that you had any problems getting anything you wanted from us, right?

A.   No, I had no problems with that.  As a matter of fact we still work well together, Shanna.

Q.   All right.  I want to talk briefly about I -- think

you said something about the cranes and Marty's company, right, competing against --

A.   What I believe I said was, "I don't have any transparency into what those agreements look like".

Q.   Okay.  Southern Comfort Equipment, you heard that?

A.   I have.

Q.   Is that Lawrence's equipment company?

A.   It's a company that he set up that never -- it's not even open anymore.  It never had one financial transaction in it.

Q.   And you know you're saying that, but tell me about the transparency there.  What have you given us that tells us what Southern Comfort Equipment was --

A.   I don't even --

Q.   Or what it did, or how much money it made?

A.   It never made any money.  I don't think he ever did anything with it.  I'm not even sure I remember what it was for.

Q.   How about Zilker Acquisitions?  What's that?

A.   A Shell company for buying oil and gas leases in the oil field.

Q.   Okay.  Is that a Lawrence company?

A.   Yes.

Q.   Okay.  What about Three Rivers Pipe and Rental?

A.   Yes.

Q.   Is that a Lawrence company?

A.   It was.

Q.   Okay.  What about Halcon Mineral Interests; is that a Lawrence company?

A.   It was, yes, sir.

Q.   Okay.  It got merged into West 17th Resources, right?

A.   It did.

Q.   And West 17th Resources is the company that Lawrence uses to pay the interest on the money that you say he no longer owes, right?

A.   Yes.

Q.   Okay.

MR. HUMMELL:  That's all I have.  Thank you, Judge.

THE COURT:  Okay.  Anything else?

MR. ABSMEIER:  Briefly, Your Honor.

REDIRECT EXAMINATION

BY MR. ABSMEIER:

Q.   Ms. Fulghum, can you just give a few examples of charges that you have seen that turned out to be incorrect?

A.   They are charges mostly related to whenever the equipment division goes and picks up equipment at auctions or small tools consumables at auctions.  Whenever they go do that they write on the ticket A-L Berry auction, and that gets invoiced in some cases to his personal account whenever it was

really for the benefit of Bay. So that's why we sat with Diane and Barry Peterson and went through all of the tickets to make sure that he was -- if it was Lawrence's stuff, it's Lawrence, and if it's Bay/Berry, it's Bay.

Q. And when you sat with Mr. Peterson and others, did you-all at least tentatively reconcile some of those charges?

A. We did. I'm not sure the credits were ever applied. That's one of those things that we haven't been able to get clarity on, but we did go through and reconcile for one year, a year and a half.

Q. Did anyone at the company explain to you why the credits never got applied?

A. No.

Q. Okay.

A. I think I have one e-mail from John Gibson that says it's upstairs.

Q. Okay. Are the amounts due on the Orca note entirely related to this mark to market transaction?

A. The 7 million dollars of it is related to the mark to market. The rest of it we'd have to get with the accounting to see what that is.

Q. Is that -- is the additional amount related to the conversion to a limited partnership?

A. Yes, sir.

MR. ABSMEIER: I have no further questions, Your

Honor.

THE COURT:  All right.  Anything else?

MR. ALLISON:  Nothing further, Your Honor.

THE COURT:  Anything else?

MR. HUMMELL:  No, Your Honor.

THE COURT:  You may stand down.  You're free to go about your business.

THE WITNESS:  Thank you.

THE COURT:  Call your next witness.

MR. REASONER:  Yes, Your Honor.  We call Professor Doug Moll as an expert witness, please.

THE COURT:  Okay.  Come forward.

COURT BAILIFF:  Raise your right hand, sir.

(Oath was administered.)

THE COURT:  Be seated.

COURT BAILIFF:  Watch your step, sir.

THE COURT:  You may proceed.

DOUGLAS MOLL,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. REASONER:

Q.    Sir, could you please state your name for the record?

A.    Sure.  Douglas Moll.

Q.    And what is your occupation, Mr. Moll?

A.    I am a law professor at the University of Houston Law

Center.

Q.   And what is your specialization, if any, there as a professor at University of Houston law school?

A.   My specialty is business organizations law and business law generally.

Q.   And can you give the Court a flavor of what kind of courses do you typically teach?

A.   Sure.  I teach business organizations.  I teach business torts.  I teach a doing deals class.  I teach some UCC classes.  Secured financing.

Q.   And can you tell us just prior to going into teaching, what academic degrees do you have, sir?

A.   I got a Bachelor's of Science in Commerce from the University of Virginia, and then I went to law school at Harvard Law School and, you know, just got a J.D.

Q.   And did you go right into teaching?

A.   No.  I spent a year clerking for Judge King on the Fifth Circuit Court of Appeals, and then I worked at what was called Fulbright & Jaworski at the time for approximately two years.

Q.   And then how long have you been a professor at University of Houston?

A.   So I've been at U of H since 1997.  So I think it's 27.  I think it's -- I always get confused if this is the start or end of my 27th year, but it's somewhere --

Q.   In that range?

A.   Yes, correct.

Q.   All right.  How would you define, sir, the phrase "corporate governance"?

A.   So corporate governance is a term that's used a lot. I guess from the 20,000 foot view I would say that corporate governance is how a business organization operates.  In other words, it involves the rights and the duties of the managers of the organization, as well as the rights and the duties of the owners of the organization.  Corporate governance -- some people use corporate governance to refer to all forms of business organizations.

Maybe it's just me, that personally drives me crazy, just because there's LLC's, there's partnerships, there's --

THE COURT:  Partnerships, sole proprietorships.

THE WITNESS:  Indeed.  So, I like to say, you know, organizational governance is probably for my picky self a slightly better term.  But I think we just mean generally when we're talking about business organizations how that organization operates.  What are the roles and duties of the managers?  What are the roles and duties of the owners?

Q.   Then to use your phrase "organizational governance", do you teach or lecture on that?

A.   Yes.  I mean, the -- I mean, I almost want to say the

entirety of the business organizations course, but certainly the bulk of the business organizations course is on the rights and duties of the managers of corporations, LLC's, partnerships, as well as the rights and duties of the owners of corporations, LLC's, partnerships, et cetera.

Q. And how long have you been teaching those type of courses?

A. I've taught business organizations since I got there, so, since 1997.

Q. And do you have any publications in the field of organizational governance, or corporate governance?

A. I mean, I would say every single one of my publications is on -- so, the answer's yes. And, I mean, that's what I write in. So everything I've done since I've been an academic has been in sort of that field of organizational governance as I defined.

Q. As a subset of this organizational governance concept, is there -- does the issue of related-party transactions, does that live within that subject matter?

A. Absolutely. I mean, problems related to conflicts of interest and the fiduciary duty of loyalty are many would argue perhaps one of the more important issues in organizational governance.

Q. So getting more specifics on your publications, have you published materials on the issue of related-party

transactions?

A. Yes. I have a treatise on closely held corporations where we have an entire section on the duty of loyalty in conflict of interest transactions. I have case books where we have entire, you know, large chapters on the duty of loyalty in conflict of interest transactions. I'm trying to think of any -- I mean, I certainly reference that material in some of my law review articles.

At the moment as I sit here I can't think of a, you know, law review article that was solely on that topic. But certainly the treatise and the case books have materials solely on that topic.

Q. Over the course of your, I think you said 27 years -- in the neighborhood of 27-year career, have you from time to time over that period of time served as an expert witness as you are today?

A. Yes.

Q. And have you given testimony -- well, why -- tell us kind of what context you have sort of testified in over the years?

A. I mean, sure. Again, if I was gonna generalize I would say most of the disputes where I've been asked to participate are in sort of a breach of duty, fiduciary duty or otherwise, whether someone has authority to do X or Y. So as I defined corporate or organizational governance earlier, I would

say with the exception of maybe one or two UCC cases, every case I've ever been retained on is in this organization governance, fiduciary duty space.

Q. And have some of those cases involved related-party transactions?

A. Absolutely. I mean, in terms of duty and loyalty issues, conflict of interest transactions, I would say many of them have.

Q. Have any -- you've talked about your publications. Have any of those been cited in judicial opinions, sir?

A. My publications? Yes.

MR. REASONER: May I have one moment, Your Honor?

THE COURT: Yes.

MR. REASONER: May I approach, Your Honor?

THE COURT: You may.

Q. (By Mr. Reasoner) Sir, I'm handing you what's been marked as Exhibit 68. Can you please identify that for us?

A. It looks like my CV.

Q. Okay. And can you take a moment to tell us if that appears to be a current -- current CV for you?

A. Sure. Yes. It does appear to have my latest law review article, so, yes. It looks -- it looks current.

Q. All right.

MR. REASONER: Your Honor, we offer Plaintiff's

Exhibit 68 into evidence, please.

MR. ALLISON: No objection.

THE COURT: Admitted.

Q. (By Mr. Reasoner) Now is it fair to say, sir, that you are still getting up the -- up to the learning curve in terms of the background of this matter that's now at an early stage?

A. Yes. I think that's very fair to say.

Q. Well, I want to -- with that in mind I want to ask you a couple of assumption questions. Sir, if you assume that directors of a corporation loaned money to that corporation, how would you characterize that transaction in general terms?

A. I mean, that is definitively a conflict of interest transaction. You have a fiduciary of the corporation who is loaning money personally to that corporation.

Q. And what concerns, if any, does a transaction of that kind raise for a closely held company?

A. Sure. By the way, let me just point out, when I say conflict of interest transaction, and you heard Mr. Reasoner related-party transaction, and sometimes people call them self-interested transactions, these are all as far as I'm concerned the same idea. The same concept.

And the reason they're the same concept and the concern that they raise is at the most simple level the fiduciary. In your example, a director owes a fiduciary duty

to the company. That means they're supposed to be thinking about the interest of the company. If the company -- I think your example was is the borrower just to make things really easy, what would be the company's interest be; borrow for a low rate of interest or borrow for a high rate of interest? Obviously, it would be the borrow at the lower rate of interest.

But the concern is that the fiduciary is also the lender. And so we're worried that instead of thinking about the company's interest, borrow at a low rate of interest, the fiduciary is thinking about his interest as a lender, which would be loan at a high rate of interest. That's why it's a conflict. That's what we would call a conflict or related-party transaction.

Q. And does that concern exist whether or not the lender is benevolent, well-meaning, nefarious, I mean, whatever their intent are? Is there a concern from a corporate governance standpoint about a transaction regardless?

A. Yes. I mean, we're always concerned. I mean, again, some people would argue the number 1 concern of corporate governance is conflicts and conflict of interest transactions. So, the first question is is it a conflict transaction? The answer in your hypothetical question is definitively yes. Now what someone's intentions were, or motives were, or something else is sort of a second question.

But it doesn't change that the law is concerned any time a fiduciary -- we're worried that the fiduciary because of their bias, their conflict, we're worried that that transaction is not on the up and up.

Q. Let me ask you to assume another scenario. And that is -- and, again, I'm gonna use names here just to orient us on the record, but with the understanding that at this point you haven't done a deep dive into -- nor has anyone, frankly, to the facts here. But assume a company owned by Marty Berry, who is a director of Berry GP, is leasing cranes to Berry GP or another entity of which he is a fiduciary. How would you characterize that transaction?

A. Well, again, that's clearly a conflict of interest transaction.

MR. HUMMELL: Judge --

THE WITNESS: Because --

MR. HUMMELL: I hate to slow up the proceedings here, but it seems to me that Mr. Reasoner's trying to get a witness to instruct you on the law. I don't think that's proper. I think that the Court having heard the facts already, and being familiar with the corporation code can determine the extent to which any of these transactions were interested-party transactions. We need a hired lawyer from Houston to come tell you how to interpret the corporation code.

I object to a witness attempting to instruct the

Court on the law.

MR. REASONER: And, Your Honor, I'm not asking him to interpret the code. I have simply asked him about these types of transactions, and he has written extensively and work in the corporate governance area, and he simply talking about how one would categorize them. I've not put a statute --

THE COURT: I'll allow it.

THE WITNESS: I hate to say this, but I kind of forgot the question.

THE COURT: Yeah. Reask the question.

MR. REASONER: Okay.

Q. (By Mr. Reasoner) Sir, if you assume a company owned by Marty Berry, who is a director of Berry GP, is leasing cranes to Berry GP or another entity of which he is a fiduciary, how would you characterize that transaction?

A. Yeah. So, again, that's a classic conflict of interest transaction, because you have a director of the company who owes a fiduciary duty to that company and is supposed to be thinking about the best interest of that company. And if the company is leasing -- again, if just to make it easy, if you want to lease for a high price or lease for a lower price, if you're the company who's leasing you want to lease for a low price.

But what are we worried about? We're worried that the fiduciary who's supposed to be thinking about our

company's interest is also over here as the lessor. And as the lessor he's thinking, do I want to lease for a high price or lease for a low price? We are worried that as the lessor I want to lease for a high price. So you should be thinking about lease for a low price, because you're a fiduciary of the company. We're worried that you're thinking about lease for a high price because you're also the lessor. That's a conflict.

Q. Can a conflict of interest or related-party transaction ever pass muster or be okay?

A. Absolutely.

Q. I used a couple of Latin phrases there. I hope I didn't lose you. No, is that -- can it ever be okay to do a conflict of interest transaction?

A. Absolutely. And just to be clear, I'm certainly not trying to say that conflict of interest transactions are per se illegal. They are not. The only thing that a conflict of interest -- the reason why it's important to identify a conflict of interest transaction is because we scrutinize those transactions more because of the concern over the conflict, over the bias.

Q. And based on your experience with closely held companies, how should a conflict of interest transaction or related-party transaction between a company and one of its directors be handled?

A. Well, of course, the Judge is -- you know, it's

certainly the Judge's province to apply the law. But, you know, there's three methods; there has to be full disclosure of material facts to disinterested directors, or full disclosure of material facts -- and I realize this is disputed a bit, but it would certainly be my opinion to disinterested sharers, or the transaction has to be fair to the company.

Q. All right. And those -- and let me ask you, sir, on the fairness. Is that a factual analysis that goes on if that comes up?

A. Yes, fairness is presumably a totality of the circumstances inquiry into everything related to the fairness of the transaction; from the fair price, to fair dealing, to -- yes, it's a factually --

THE COURT: An issue for the fact finder; whether it be the Court or the jury?

THE WITNESS: Did you say --

THE COURT: It would be an issue for the fact finder?

THE WITNESS: Absolutely.

THE COURT: Whether it be the Court or a jury?

THE WITNESS: Absolutely. I've never heard of -- I mean, I've just never heard of -- no one would describe fairness as a question of law. I've certainly never seen that.

Q. (By Mr. Reasoner) And, sir, why is it important that a process along the lines you have described is followed with

respect to these conflict of interest transactions?

A. Well, I mean, I guess let me first say because there's a statute, but obviously the Judge is -- you know, that's in the Judge's province. But if I would give my -- you know, if I could give my own sort of policy thought; the rational is when there's -- normally we trust our fiduciaries. We have a concept called the business judgment rule, and it's all about the idea that we trust fiduciaries.

When there is a conflict, we worry that the fiduciary's conflict has made that fiduciary less trustworthy. And so the statute is there to say, if we can find a substitute, trustworthy party, then we're okay. We can't trust the fiduciary anymore. We've got to look for a substitute trustworthy party. Who might that substitute trustworthy party be? Disinterested directors, disinterested sharers, or the Court, or a jury who would have to determine whether the transaction was fair.

So the whole concept behind conflicts of interest are, we're worried that our fiduciary can't be trusted. We're worried -- we're not saying definitively, but we're worried, and so we look for an substitute trustworthy party. And that's what the statute is doing.

Q. Thank you, first of all.

MR. REASONER: I'll pass the witness, Your Honor.

THE COURT: Cross.

CROSS-EXAMINATION

BY MR. ALLISON:

Q. I just want to be very clear. I know that Mr. Reasoner has said that you had limited information so far; fair enough?

A. That's fair.

Q. And I think you know just generally we're here because I guess Marty Berry -- one of the reasons anyway is Marty Berry made a loan to support the company at the time it needed capital. I think that's agreed to by everybody, right?

A. I don't know enough about the loan transaction and what the details were. I'm happy to take your word for it.

Q. Okay. And are you aware, for example, that his brother, Dennis, who's not been sued, that his brother Dennis also made a loan to the company in the same timeframe?

A. I think I am aware that Dennis made a loan. I'm not sure I was aware about the timeframe.

Q. If it's in the same timeframe, any reason to make those transactions different from each other, or are they same in the sense that they at least raise the issue you've said should be raised or looked at?

A. Assuming Dennis is a fiduciary, which I think he's a director, and he's loaned --

Q. He was. He's passed.

A. Okay. Yeah. And he's personally loaning money to a corporation in which he is a director, then, yes, that would be a conflict of interest transaction.

Q. And same thing for Mrs. Berry? If she's loaning money to the company and she's family and she's got an interest, then she's also in that category?

A. And she's a director of the company that she's loaning to?

Q. At the time I'm not sure. She's family. What if she's just family?

A. Well, the normal problem is you have a fiduciary loaning money to a company of which that fiduciary is a fiduciary. So I would just need to know more about Ms. Berry's relationship.

Q. And, for example, for Lawrence Berry -- Lawrence Berry I think you were in the courtroom when they were talking about that there's a -- this 31 million dollars that Lawrence Berry borrowed from the company; you heard that when you were in the courtroom, right?

A. I definitely heard you-all having some discussion about 30 million dollars.

Q. Maybe that caught you ear?

A. Yeah. I just don't -- I'm not sure I remember the context being a loan. There was something about -- you-all used some acronym.

Q. There was 31 million dollars that Lawrence took from the company in order to start up a business for the company, then that would also fall in that category? If he's given full control of it as a director?

A. I kind of lost you. What category? Conflict of interest category?

Q. If Lawrence takes 31 million dollars is that a related-party transaction?

A. You say takes 31 million dollars. Are you saying Lawrence borrowed 31 million dollars?

Q. Yes, sir.

A. From the company that he is a director of?

Q. Yes, sir.

A. So that would be a conflict of interest transaction because you have a fiduciary, Lawrence as a director, transacting with the company that he owes a fiduciary duty to. So, yes, that would be a conflict of interest.

Q. And, for example, if he still owes -- if the document still shows that he owes 12 million of those dollars, he's still in that conflict of interest situation?

A. I mean, I think that's fair, yes. I mean, even if you pay the loan off it doesn't change the fact that it was a conflict of interest transaction.

Q. Right. And so all of these -- you're not saying -- and I want to make sure -- you're not saying any of those

transactions are necessarily inappropriate?  You're saying that they have to be looked at to be evaluated?

A.   I think that's fair.  At this point I'm not saying that there's anything per se illegal or improper.  It's just that they fall in the category where additional scrutiny is needed as we discussed.

Q.   And the person to do that additional scrutiny should either be -- one person that can do it is the directors of the company if they're interested, right?

A.   With the full disclosure caveat.  A majority of the disinterested directors, I agree with you.

Q.   Okay.  And what you're referring to there we both know -- we all know probably in the courtroom is 21.408, right?

A.   I wish I could tell you I've memorized the section number, but I -- it's in 21, but I don't know if it's 408.

Q.   Okay.  Maybe I'm wrong on the number, but I'm -- we're on the same page, right?  There's a section that deals specifically with it?

A.   Correct.

Q.   And --

A.   In the corporations code.  There's also one on the LLC code.

Q.   Okay.  But on the corporations code -- let's stick on Chapter 21.  In the corporations code -- and I know you know this because of the way you answered the question.  It also

says that shareholders can also evaluate what -- and accept that transaction as fair or not in conflict, right?

A.    The statute does say that another body, in my opinion, a trustworthy body.  It says shareholders, and then that has produced a question in the number of jurisdictions about whether that means all shareholders including the interested shareholders, or simply the disinterested shareholders.

Q.    And you made that distinction very lightly when you were being asked questions a moment ago, but you made that distinction, right?

A.    Yes.

Q.    Yes.  And because you and I both know that Texas statute when it's talking about directors says the -- it uses the word -- it's got to be a vote of the disinterested directors, right?

A.    It does.

Q.    And you and I both know that when you look at that same Texas statute in Chapter 21 now when it talks about -- and it's in the same rule -- when it talks about shareholders it does not use the word "disinterested", correct?

A.    Well, it uses good faith.  And one would argue you could not make the decision in good faith if you're interested.  But the word "disinterested" is not technically in that subsection, I agree with you.

Q. It's not not technically, I mean, it's just not in it?

A. Well, that's fair. It's not in it with good faith; isn't it?

Q. Okay. But, well -- and do you feel the need to banter because you're on their side?

MR. REASONER: Objection, argumentative.

THE WITNESS: I feel the need to banter only in the sense that you're trying to suggest that it does not require disinterested shares and I think you are wrong.

Q. (By Mr. Allison) Okay. That's your opinion even though the word -- even though the Legislature put the word in there "disinterested", they put that word in there for directors, but the Legislature did not put the word in there for shareholders; that much we agree?

A. I would say it's my opinion the opinion of the overwhelming number of jurisdictions in the country, the opinion of Delaware when has the same statute that does not include the word "disinterested", and the opinion of the Delaware cases have interpreted their almost exact wording statute to conclude that it has to be disinterested shares.

Q. And so the answer to my question -- I know you want to give your argument, but the answer to my question is "correct", right?

A. I mean, I thought I answered your question, but now

you'd have to ask it again.

THE COURT: So, I guess, what you're saying is that there's no Texas cases that interpret this issue? Because you said there's Delaware cases that interpret the issue.

THE WITNESS: I am not aware of a Texas case that has interpreted that issue. I am aware of Delaware cases, New York cases, there's cases from a number of other jurisdictions. And there's treatises in Texas that have talked about the issue, but I am not aware of a Texas case.

THE COURT: Got you.

Q. (By Mr. Allison) And when you look at all of that, those circumstances you probably -- you want to look at the interest rate that was being charged, right?

A. What are we now talking about? We look at what?

Q. When a shareholder -- if the shareholder -- some of the factors to consider in terms of the fairness that you should look at the --

A. So now we're on the fairness prong?

Q. Sure. If you want to look at it that way, that's fine. One of the factors to consider in terms of whether or not there's anything improper, that's a word you used earlier, would be the amount of interest charged? The interest rate?

A. Let me just make sure I'm following you, because we just jumped from -- remember, there are three options --

Q. He asked his question --

(Simultaneous speaking.)

MR. REASONER:  If you'd let him finish his answer.

THE COURT:  Okay.  But we don't address one another, let's be clear, okay?

MR. REASONER:  I'm sorry, Your Honor.

THE COURT:  All right.  Why don't you ask another question, because it was --

Q.   (By Mr. Allison)  One of the -- if not the directors -- and by the way, are you aware that the shareholders in this case have voted and ratified the loan that we're talking about?

A.   I have seen written documentation, but when you say the shareholders?

Q.   There's only one shareholder, right?

A.   In a number of instances -- when you talk about shareholder ratification, the shareholder is -- I forgot the acronym for limited partnership.

Q.   Let me help you there.  I'll go ahead and do it so you have a clearer question.  The sole shareholder of Berry GP is LDMA Limited Partnership, correct?

A.   Of Berry GP, Inc., and you called it?

Q.   LDMA.

A.   I'm gonna take your word for it.  I think that's correct.

Q.   Okay.

A.   It's certainly a limited partnership.

Q.   Okay.  And that limited partnership, LDMA -- just so we have a record over there.  LDMA is solely controlled by a corporation called Becon, Inc., right?

A.   So as a limited partnership it will have a general partner.  I believe the general partner is a corporation, and you say it's Becon -- Becon, Inc.?

Q.   Yes, sir.

THE COURT:  It might be helpful to show him the chart.

MR. ALLISON:  I don't have it handy.  I'll do it on the board.

THE COURT:  I mean, I think --

MR. ALLISON:  I don't disagree.  Let me just -- that way you can refer to it.

THE WITNESS:  Okay.

MR. ALLISON:  I can do it, but I think it will be quicker here.

THE COURT:  Okay.

MR. REASONER:  Your Honor, may I approach?

THE COURT:  Yeah.

MR. REASONER:  It might help move us along.  This is PTX48, which is that chart.

MR. ALLISON:  If you have it that would be great.  Everybody can have one to look at.  Your Honor, they're

being helpful.

THE COURT: Perfect. All right.

MR. REASONER: Here you go.

THE COURT: Yeah. Thank you. Okay. Now we can all look together.

Q. (By Mr. Allison) Just looking at the chart as a reference point it's -- this particular copy's called ALB000866. Generally speaking if it helps your refresh your recollection, we have Becon, Inc., which is the sole general partner of LDMA, right?

A. That's what the chart shows, yes.

Q. And they are the sole shareholder of Berry GP, right?

A. They being LDMA Limited Partnership?

Q. Is the sole shareholder of Berry GP, Inc.?

A. I agree according to the chart.

Q. And my question then to you was just an awareness question. Are you aware that the sole shareholders -- excuse me, that the shareholders of Becon, Inc. have voted to ratify the loan that you've been talking about, or that's been talked about here?

A. I definitely saw some shareholder ratification documents. I'd have to look at them again to see exactly who ratified it.

Q. Okay. And --

A. But, again -- well, you know that we disagree over

whether that's a factor or not.

Q. And I appreciate you pointed out, that's your Delaware disinterested argument?

A. Well, it's my Texas disinterested argument. But anyway. Yes, I realize you and I disagree about this.

Q. Okay. And then the -- another safeguard -- well, and this is where we were going a minute ago -- both places. The Judge also obviously can look at that transaction, or a jury -- I think you've said that -- and evaluate it?

A. For fairness.

Q. Yes, right?

A. That's a third safe harbor so to speak.

Q. Okay. And the second one being shareholder ratification?

A. Yeah. I think of it as disinterested director authorizations, one; disinterested shareholder authorization, two; fairness, three. But that's just the way I think about it. That's nowhere in the statute.

Q. Any one of those three, then it's a proper transaction?

A. Well, technically any one of those three the transaction can't be challenged on the grounds of a conflict. If there's some other problem with the transaction, it of course can be challenged. But what the statute says you can no longer challenge the transaction on the grounds if there's a

conflict.

Q. Right. It actually says there's no cause of action is the word it uses, right?

A. I mean, we'd have to look. But the meaning of it is there is no -- you cannot challenge that transaction on the grounds of the conflict, but it makes it clear that if there is some other problem such as a duty of care problem, such as a waste problem, you could.

Q. Okay. But if it says you have no cause of action, you'd agree with the statute, right?

A. If it says no cause of action, it says no cause of action on the grounds of the conflict. That's the important part. It's not immunization. That statute is resolving the conflict problem. If there's another problem, you address the other problem separately.

Q. And it says, if at least one of the conditions of Subsection (b) -- and that's what we've been talking about -- is satisfied neither the corporation nor any other corporation shareholder will have a cause of action against any of the persons described in Subsection (a), which would be the person who made the loan?

A. Yeah. But there's more in there about if you have no cause of action for the conflict.

Q. You don't disagree with what I just read; that's Texas law, right?

A.   If you read it accurately, I don't disagree.

Q.   Okay.  And so would -- in -- when looking, whether it's a Judge, or the jury, or shareholders, or disinterested directors -- you and I both know we say that a little bit differently for the reasons we discussed.  Let's not argue about it now, right?  Fair enough?

A.   Sure.

Q.   Okay.  The interest rate would be one thing to look at, right?

A.   Again, I think now we're talking about the third prong, which is fairness.  And if we're looking at fairness and you're talking about loans, I would assume the interest rate is something you would look at.

Q.   And whether or not it was collateralized?  In other words, was there any security given to make sure it gets paid back?  That's another issue in terms of fairness, right?

A.   Let me just be clear.  I'm not sure that I'm an expert in what makes a particular loan fair or not.  I don't really see myself giving opinions on that.  But if you're just asking me in general for a loan, I would imagine interest rates are relevant, and whether it's secured or unsecured is probably relevant as well.

Q.   And whether it's subordinated or not to other loans to help the business do well and excel, that's another thing to consider?

A.    I would imagine the purpose of the loan is important.

Q.    Yeah.  If it was used to pay off debt, for example, that could be important, right?

A.    Again, I would imagine the purpose of the loan is important.  If the company needed it or not need it.

Q.    If it was used to pay off, for example, lines of credit so as to free up capital for the business to do more projects, that would be important, right?

A.    Yeah.  I mean, we're sitting here in a vacuum with me not knowing anything in the transaction, but sure.  As a general matter what would go into whether a transaction is fair to the company.  If it's a loan I would imagine you'd look at the sorts of things you're talking about.

Q.    And, by the way, I just want to correct this a small thing:  You said, we're in a vacuum.  Really you're speaking for yourself only.  You're a vacuum, right?

A.    I guess I was parroting Mr. Reasoner's comment that -- when he said we're all a little bit at the beginning of this, but okay.  Fair enough.  I'll say, I'm in a vacuum.

Q.    Okay.  And that goes back to why he doesn't make assumptions because you haven't really completed a full analysis?  You don't have the information to make certain judgments?

A.    That's certainly true.

Q.    Okay.  And you just said it a moment ago, and you're

not an expert, and you're not giving any testimony as to whether or not this was a fair transaction?

A. Yeah. I don't think I have the background to be saying whether a particular loan transactions -- unless it's just so obvious that it's beyond the canon. But I don't think that's going to be my province or role in this case.

Q. Okay.

A. I may piggy back off of somebody who does have that expertise, but I don't think I'm the person who will provide the expertise with about whether a loan transaction --

Q. You're not climbing out on that limb yet?

A. I don't think I will ever climb out on that limb unless I can piggy back off of someone who does have that expertise.

Q. Would one other factor in terms of evaluating the transaction be that Lawrence, for example, had an opportunity and was continued to give an opportunity to participate as a -- in the -- on the exact same terms?

A. Well, the question is whether it's fair to the corporation, to the company. So whether some shareholder was given an opportunity at the moment I'm not seeing how that's relevant.

Q. Okay. That's all. Thank you, sir.

MR. HUMMELL: No questions.

THE COURT: All right. Anything else?

MR. REASONER: Just briefly, Your Honor.

REDIRECT EXAMINATION

BY MR. REASONER:

Q. Sir, you had testified that on the second prong, the shareholder approval prong, there -- you say commentators have indicated that they believe that that -- that the good faith shareholder approval requires disinterested shareholders; is that what you testified to?

A. So some people have argued that even though the statute in that shareholder approval prong doesn't say disinterested as we were discussing, that perhaps that requirement gets read in through the good faith requirement, which is in that -- which is in that second provision.

Q. And you indicated that a number of states with the same or similar statutes have held -- in that way have held that shareholder approval requires disinterested shareholders?

A. Yes. So a number of states -- I mean, Delaware is always sort of particularly persuasive in this area, at least in my field. But Delaware has sort of done the deepest dive into this.

And if I could just say one other very quick thing, I mean, conflicts of interest are probably the most important issue in business organization. If you could bless a conflict of interest transaction via interested parties, it's -- it makes absolutely no sense. What would be the point of

giving additional scrutiny to a conflict transaction if the person who could bless it is also conflicted? It just -- which is the reason why Delaware in my opinion and all these other states have come to the same conclusion.

Q. All right. Are Kansas, Louisiana and New York among the other states that have come to that conclusion?

A. Kansas follows Delaware so I feel pretty confident. New York I have definitely read a case on. Louisiana, I don't quite remember.

Q. But your point -- again, hypothetically, if someone had -- was the majority shareholder and had stolen something from a company, the idea is it would not be appropriate to let that person as the majority shareholder bless his or her own theft; is that the concept?

A. Exactly. And, you know, I mean no disrespect, but to me it sort of shows the absurdity of the provision or of the position that interested shareholders could bless the transaction. Because if you owned a majority of the shares -- you being the interested party -- you could bless all of your conflicted transactions, which is absurd. What would be the point of having a statute that is designed to give more scrutiny to those transactions if it was just a fiction?

Q. And then finally, counsel was asking you about the third prong, the fairness prong, and you talked about that analysis. Are there subsets of that -- of the fairness

analysis?

A. So I guess Texas is probably less clear about this in terms of cases, but generally speaking -- the question that everybody's clear on is it has to be fair to the company. And so normally we look at both fair price, which is what's considered to be the substantive aspects of the transaction, as well as fair dealing, which is forget the substance, just how did -- how did these fiduciary treat the corporation? Did they make full disclosure to the company? Were they on the up and up?

And so normally you look at both sort of the procedural aspects of fairness as well as the substantive aspects of fairness.

Q. Thank you, sir.

MR. REASONER: That's all. I pass the witness, Your Honor.

THE COURT: Anything else?

MR. ALLISON: Just very quickly.

RECROSS-EXAMINATION

BY MR. ALLISON:

Q. With regard to -- do you know of any place where there's a stated reason on why the Legislature put the word "disinterested" for directors, and did not use the word "disinterested" for shareholders?

A. So when you say --

Q. -- a paper for us?

A. Yeah. When you say do you know, I mean, I suppose the short answer is no. But all the statutes, probably they're following the first statute that got passed.

Q. I'm not asking you to guess. The answer is no?

A. Well, no, then. I do not know the definitive reason.

Q. And you're familiar --

A. I just want point to point out that Delaware and most states have the same phraseology.

Q. And you keep going back to Delaware. You're familiar, of course, with the *Richie* case out of the Texas Supreme Court?

A. Yes.

Q. And is that also the law in Delaware?

A. Well, Delaware doesn't have a shareholder oppression doctrine, but there's no shareholder oppression cause of action in this dispute, so I'm not sure why it matters.

Q. Okay. Well, whether it matters or not, is the *Richie* case the law in the State of Texas?

A. Yes.

Q. Is it the law in the State of Delaware?

A. I guess I'm not sure what you mean. It would not be the law in the State of Delaware because it's a Texas case and Delaware doesn't have the shareholder oppression doctrine that *Richie* dealt with.

Q. Okay. That's all. Thank you.

MR. HUMMELL: Just a couple questions.

THE COURT: Okay.

RECROSS-EXAMINATION

BY MR. HUMMELL:

Q. You said something that intrigued me. I'd like to follow up on. And that is basically why would you ever allow shareholders to come back and ratify the misconduct of the directors? Or say it's okay, right? I mean, why would it ever be authorized or permitted for them to rubber stamp their misconduct, right? Is that kind of?

A. Well, their own conflicted transactions.

Q. Right. Okay. So let's talk about that for just a second, because I want to the make sure we're really clear on this. Prong number 1, one of the three methods, it's okay to have a disinterested -- or have an interested transaction, right?

A. It's okay on -- it's okay -- when you say it's okay, prong number 1 -- one, two, and three are all methods of saying you can no longer challenge the transaction on the grounds of the conflict.

Q. Right. So the first one was full disclosure to disinterested directors, right? That was the first one?

A. I agree.

Q. Okay. And the disinterested directors, in our case

since two of the three directors were involved in actually helping prop up the company in dire times, you would say that as long as they told Lawrence the disinterested director about it, that they could go ahead and have their vote and approve it; is that right?

A.   I would not agree with that.

Q.   Okay.  They can't vote on it, they can't approve it at all because they're interested?  Before the loans are even made, you're saying it can't be done, right?

A.   I'm not entirely sure I know what you're talking about, but there's two things going on.  Number 1 is somebody has to vote to actually authorize the transaction.  That can be can done with interested parties, but if that's a conflict of interest transaction that doesn't -- there's whether it was authorized and there's whether it was a breach of fiduciary duty.  If interested parties authorized a transaction, you still have the breach of fiduciary duty question.

That's the question that the statute speaks to.  And so you would have to get a vote by a majority of disinterested directors, which if I take your hypothetical would mean the one disinterested director would have to separately approve the transaction.

Q.   That's where I was going.  Thank you.  So on number 2, full disclosure to all the shareholders, right?  It's your same -- and your same theory applies under the Delaware rule,

there's only one person that gets to vote, right?

A. Well, I cannot --

Q. -- the disinterested --

A. Under the hypothetical that you just gave me if there's only one disinterested shareholder, then I agree. That's the shareholder that matters.

Q. Okay. And then finally the third one is a determination of whether or not the transaction is fair by somebody on the outside looking in?

A. I mean.

Q. And that would be I think you said either a jury or the Judge, right?

A. Oh, that's what you mean. Yeah, well, right. Some fact finder is going to have to determine that it is fair to the company.

Q. Okay. And you know who our fact finder is here today, right?

A. You mean the Judge?

Q. Well, I'm asking if you know. I don't want to suggest an answer.

A. I believe it is the Judge.

Q. Okay. And you went through the list of things that the Court can take into consideration in deciding fairness, and that included the purpose of the loan, right?

A. Well, again, I mentioned that I'm not sure I have any

particular expertise in this area.  I mean, I'm not an expert in loan transactions, but I would imagine if you're trying to determine the fairness of the loan transaction one of the things you would ask is what is the purpose of the loan?

Q.   Okay.  And payment terms, and on, and on, and on, right?

A.   Seems relevant to me.

MR. HUMMELL:  That's all I have, Judge.

THE COURT:  Okay.  Anything else?

MR. REASONER:  Nothing further, Your Honor.

THE COURT:  All right.  You may stand down. You're free to go about your business.

THE WITNESS:  Thank you.  Should I return the exhibit?

MR. ALLISON:  Just leave it there, sir.

MR. REASONER:  We rest, Your Honor.

THE COURT:  Okay.  Do you have any witnesses you wish to present?

MR. ALLISON:  We rest, Your Honor.

THE COURT:  Okay.  Well.

MR. ALLISON:  Your Honor, it's probably appropriate to inform the Court -- may I confer with him one second?

THE COURT:  Yeah.  Yeah.  In fact, let's take a short break and then we'll come back.

COURT BAILIFF: All rise, please.

MR. REASONER: Your Honor, would sort of a half hour each side on closing arguments?

THE COURT: Yeah, that's fine.

(Brief recess.)

THE COURT: Okay. We ready? Your motion.

MR. REASONER: Yes, Your Honor. May I approach?

THE COURT: You may. I've got that. Now, you may have updated it.

MR. REASONER: Oh, no. This is new and improved.

THE COURT: 2.0?

MR. REASONER: Hot off the presses.

THE COURT: All right. 2.0.

MR. REASONER: And, Your Honor, with the Court's permission, I'm gonna after a bit turn it over to Ms. Canales.

THE COURT: Okay.

MR. REASONER: We're gonna share the argument.

THE COURT: All right.

MR. REASONER: Your Honor, first, thank you on behalf of Mr. Lawrence Berry and our team for your time and careful attention. This is -- as you might imagine in a situation where it's family is involved and important issues, it's a very serious situation from Mr. Berry's perspective and the issues are important so we appreciate that.

If at you look at the second page, Your Honor, again, the requested relief that we've asked for -- and it's very I think focused -- and Ms. Canales will talk a little bit more about this, but focused and tailored at this point. One is the removal of Lawrence Berry from the Board, and then secondly simply notice on voting about sale of real property.

And as to the former, Your Honor, one of the things that the Court raised was the idea that keeping someone on the Board would be inconsistent with a procedure that exists for removal of folks from the Board and that sort of thing within the bylaws. But fundamentally -- and Ms. Canales will talk about the equitable power that the Court has here and in similar cases.

But fundamentally whenever the Court is asked to do irreparable harm to -- say this cannot happen until trial, or this must remain the same, that sort of thing, it is always something that is superimposed on the existing bylaws. Because in a typical situation the bylaws will allow a majority to do what they will. Here in a case that's like this where it's appropriate, the Court is saying you can't do this particular thing because we want to preserve the status quo because of the irreparable harm.

And I think the evidence has been clear, Your Honor. If we could go to slide -- well, and the second part -- the two weeks notice, there's been a suggestion by the other

side, well, you want that just for Lawrence. No. Of course, it would be for everyone.

The issue is that these folks, Mr. Marty Berry, has shown a propensity here to engage in transactions important, substantial, self-interested transactions while keeping Lawrence Berry totally in the dark. So there is a demonstrated need for some notice that would allow Lawrence Berry to -- he can still be outvoted, but to the extent anything untoward is going on, he would have the opportunity to have adequate notice.

And he has shown as a practical matter that he would -- when there is a short fuse and something is in the best interest of the company, he has voted in favor of transactions of that kind.

The third slide, Your Honor, is just to emphasize we really don't have a dispute here on the key transactions that we are focused on. The loan. The 45-million-dollar loan in particular from Marty Berry. Undisputed. You will not -- you haven't heard them say and you won't hear them say --

THE COURT: A lot of the facts aren't in much of a dispute.

MR. REASONER: Exactly, Your Honor.

THE COURT: I agree with that.

MR. REASONER: So, it was not disclosed to

Lawrence Berry, and it was not approved by the Board. And it is -- and I know Professor Moll said, and I know the Court knows, I mean, it is a quintessential conflict of interest or self-interested party, you know, related-party transaction. It's undeniable that that's what it is; a loan from one side or the other of the company.

Also you had a principle repayment that went on without disclosure in the amount of ten million dollars. And also the cranes. There is no dispute that Mr. Marty Berry said he has no idea, has no information that Lawrence Berry was told about the additional six cranes that are being rented to the tune of 450,000 in additional debt for the company every month, and that he does not contend that there was Board approval.

The Court is aware -- on the temporary injunction standard there on slide four, we believe those things have been absolutely shown. The irreparable harm here -- we had pointed the Court to cases saying in situations where someone will lose their place on the Board, their connection to the company, that that can be irreparable harm.

On the probable right to relief in slide five, again, we don't need to show the Court that we absolutely are going to win.

THE COURT: No.

MR. REASONER: We believe we will, but we -- what is the -- what's the key here, Your Honor, and we cited

the International Terminals case. You plead the causes of action and show some evidence that tends to sustain them. And we believe we have absolutely met that burden here, particularly in the self-dealing context where there is a presumption.

When you talk about a related-party or self-interested transaction, the law is clear that there is a presumption of unfairness that must be overcome by the defendants here. And they certainly cannot do that at the temporary injunctions stage.

Slide six. Again, these transactions where they're not disclosed and not approved during the realtime, that those are breaches of fiduciary duty. They certainly show some evidence of that for purposes of this stage.

Slide seven, Your Honor. On the safe harbor issue, the 21.418. I'm glad we finished with a very good discussion about that. They simply cannot fit themselves into any of the safe harbors. There's no contention on their part that disinterested directors voted later to approve these transactions.

And the shareholder piece. In Mr. Moll's testimony I think it became completely clear and obvious why other states that have the same statutory language that Texas, and Kansas, and others adopted from Delaware, why those states saw a good faith approval by the shareholder -- shareholders,

plural, needs to be disinterested shareholders. For the obvious reason that, you know, if a fraud fees or someone engaged in misconduct, if that person can just come in and say, yeah, I've got 51 percent and I've blessed it, that would gut the entire meaning of the statute. So that's why the commentators and why the cases have been consistent in how they interpret that.

And if we look, Your Honor, on the slide eight, the fairness piece. Fairness is something I think counsel was suggesting and you may hear them suggest, oh, well, the Judge can simply find it was fair today. That is a totality of circumstances analysis that needs to take place in this case by the fact finder.

And as we -- on slide eight as we've laid out there for the Court in the Estate of Poe case from the Texas Supreme Court, it's a two prong inquiry. You look at the decision making process. The failure to make full disclosure is an issue there. You look at the substantive fairness of the transaction. You do a deep dive, full analysis of the fairness of the transaction. They certainly have not been able to meet a burden at a temporary injunction stage at proving fairness of the transaction, nor could they.

On slide nine, again, these loans -- these undisputed -- the testimony is clear that they were not approved by the Board.

Slide ten. Undisputed testimony that Lawrence was not told of the loans. Remember Mr. Powers' e-mail there in Plaintiff's Exhibit 35 when Lawrence said in January 2023, I know nothing of this? And there on slide ten Plaintiff's Exhibit 35, Mr. Powers says, sorry, here's what it's all about. He tells about the loans. He says here's what it was used for. Didn't bring it up on a Board member, because some kids of the owners were there. Doesn't make any contention that Lawrence knew, nor has the other side presented any evidence that he did.

Slide 11, the fairness issue. Remember that Mr. Klein testified that the loans were initially accrued at 12 and a half percent interest, which would be a quite a high rate. His testimony is, well, that was -- that was -- somebody made a mistake, et cetera. All we know is that's the way it was be accrued on the front end, and then once Lawrence Berry was raising questions and concerns, and they documented it later -- months and months later -- then they added a more realistic interest rate. But, of course, still one that was higher than Mrs. Berry was being paid on hers.

If you look at slide 12. Remember that Laura Berry was being paid 3.75 percent interest, whereas Marty was being paid prime plus a quarter. So there's a lot to be delved into on the fairness of these particular undisclosed, unapproved transactions.

Slide 13, Judge, just a reminder there on the ten-million-dollar payment -- this -- Marty testified that that was, you know, a small payment that took place by preagreement. That -- ten million I think in any measure is substantial, and it was done again without any disclosure here in any way, shape, or form, and not approved by the Board.

14. On the Western Gulf issue. We went back and forth and there on the left -- because Marty Berry originally thought I was asking him about the original transaction between Bay Canada and Western Gulf Equipment where they bought one crane together. And I asked him, what about the six additional cranes that your company then bought and started renting to Bay? And he said, I have no clue if Lawrence Berry knew about those. And there was never any Board approval.

And I thought it was telling, Your Honor, during part of the back and forth on that, on the right-hand side where he was saying -- Mr. Marty Berry was saying, you know, there's a fiduciary duty on your part to know these things. Well, that has it backwards, Your Honor. The important thing under the law as the Court is aware is when you have a fiduciary duty and you're engaged in a related-party transaction, you've got the duty to disclose and get proper approval. It's not the case that they can never be okay and never be kosher, but you have the duty and you have the burden

as the party engaged in the related-party transaction.

Slide 15. These are significant, Your Honor, separate and apart from the loans, the Western Gulf transactions. Marty was not certain what the total was at this point. He said, at this snapshot in time that we looked at there on slide 15 it was 4.3 million dollars but he said it may be more. He said I have not been paid since June or July of last year. And that matters.

I mean, on the one hand he would argue, well, I'm not being benevolent. I'm not making them pay. On the other hand, this is saddling the company with a very high amount of debt going into the future to add with the loan. So, again, it is a totality of the circumstances analysis that needs to take place on this undisclosed, unapproved transaction.

Slide 16, just emphasizes the point that on the -- on the Western Gulf transactions -- well, on the loans, excuse me, the approval of the loans where they've tried to ratify things after this lawsuit. There's only one party who was not part of the loans, Ms. Bonnie Berry was through her husband and the estate.

THE COURT: In all fairness the loans are separate.

MR. REASONER: Yes.

THE COURT: Okay. So presumably Dennis Berry

could vote on Marty Berry's loan. But if he votes "no" and Dennis votes "yes" or "no" -- his wife -- you still don't have a majority. I get that, okay?

MR. REASONER: Yes. So you've got -- either way -- even if you say they can vote on the loans that they weren't a part of --

THE COURT: Which I think they could.

MR. REASONER: Yes. I think that's fair, Your Honor. They have a deadlock.

THE COURT: Yeah. They have a deadlock.

MR. REASONER: They have a deadlock and this -- but, of course, on the corporate documents they wrote passed. And you raised a good point, Your Honor, because on the Western Gulf Equipment, that is the situation. It was a deadlock in their after-the-fact attempt to ratify it because Bonnie Berry has no interest in Western Gulf Equipment.

THE COURT: Right.

MR. REASONER: She voted to ratify it later. Lawrence voted "no". So that was a deadlock on the Western Gulf Equipment.

THE COURT: But I think the same analysis goes with the loans.

MR. REASONER: I think that's fair, Your Honor.

THE COURT: All right.

MR. REASONER: A deadlock situation. And,

again, in 17, this is -- we talked about this during Mr. Moll's testimony, there are Courts that have -- Delaware, Kansas, Louisiana, and New York. And if you look in the Texas practice series on the right-hand side there on slide 17, that makes the point that we were talking about.

However, it would be odd if interested directors could bless their -- could not bless their self-dealing transactions at the Board level, but could bless their self-dealing at the shareholder level if they owned enough shares. Cases from other jurisdictions refuse to allow an interested shareholder to vote to bless a self-dealing transaction. This is -- this would seem to be the preferable view.

And below that Professor Moll and Professor Ragazo, who wrote a book on the closely held corporations, they made the same argument. And that's what the other courts have followed. And just as we talked through it, it makes all the sense in the world that you would want to protect from that kind of a situation.

So, as we talked about on slide 18, the shareholder resolutions. Again, they have not -- in either the crane situation or the loans, they have not had a majority of shareholders -- disinterested shareholders approve the transactions.

19, the marketing of the dock. Again, that is

simply a situation they're entitled to outvote him, but to take key and material assets and freeze out one of the directors from knowledge of an attempt to market, that is what is problematic and one of the sources of our compliant here.

They've talked less about it, Your Honor, on the defect of the parties at this point, but just to sort of close the loop on that on slide 20. It is under *Sneed v Webre*, shareholder -- owning shares in a parent company would allow you to bring claim derivatively involving the subsidiary. And that's Texas Supreme Court very clear. But regardless --

THE COURT: But you cleaned that up, so.

MR. REASONER: Yeah. All the players are here. So, and if you look at slide 21, we have talked about who -- I went through with Marty Berry about who owns what, and I don't think that's -- that is in dispute at this point. So with that I'll turn it over to Ms. Canales.

THE COURT: Okay.

MR. REASONER: Thank you.

MS. CANALES: Your Honor, may I proceed?

THE COURT: Yeah.

MS. CANALES: Judge, basically we're here to protect the status quo, okay, for injunctive relief. Currently Lawrence is basically asking for two things; that the status quo be kept -- one, that he not be removed from the Board while this litigation is pending, and, two, that he gets two weeks

notice prior to the sale of property.

THE COURT: And that he gets to vote on that?

MS. CANALES: Correct. So -- but he can be outvoted. So, in essence, what he is asking for would in no way affect the day-to-day operations of the company. They could still do what they wanted to do assuming they outvoted him. But he is in no way asking for anything to change the day-to-day operation of the company.

The reason we're here before this Court today is because it is imperative to keep the current status quo of this business. And the reason for that, Your Honor, is what potentially could happen would be irreparable harm, things that we could not undo, Judge. If they sell things. If they do things that the courts have long recognized that, especially with real estate, once it's gone, it's gone.

Your Honor, you can see through the testimony that has come out that Lawrence has had trouble getting information. Tonja testified that sometimes the only way he got information was attending the Board meetings. Having Lawrence sit in a Board meeting so that he can understand and take part of what's going on with his business until this litigation is resolved is not asking too much, Judge. It's asking that he be able to have a seat at the table so that he can hear what's going on.

And the reason he needs to do that, Judge, is

because if something is wrong, then he gets to come to you. Obviously there's something wrong, Judge. We're making huge loans -- two huge loans that later they're trying to ratify. And Mr. Marty Berry said, well, I can come back and ratify it even if it's wrong. Your Honor, that's not what the spirit of the law is. That's not what we -- that is why we as directors and as shareholders, we owe a upmost duty of loyalty to the corporation, so much so that you have to put its interest before yours. It has to be an uncorrupted interest.

So, for example, when they make these loans, it's okay as you heard the expert testify, but then let's get one of these uninterested persons to ratify it. But in essence what this does, Judge, is dilute Mr. Lawrence Berry's shares. This crane debacle and having -- that's clearly self-dealing, Your Honor.

THE COURT: Well, I mean, there's no doubt about that. But as the witness testified, that doesn't make it illegal.

MS. CANALES: No, it doesn't, Judge, but where we're at today is -- because at the end of this we're all gonna hash this out. And at the end when we actually come to trial and we all have more evidence, and depositions are taken, and we figure out what's going on, maybe it is in the best interest of the company. Maybe it was fair. But it on its face nobody has shown you that it is.

We've seen that 12 percent interest. That's what they -- they later come back and say, oh, no. We didn't mean that. But that was after this suit, Judge. The harm that would be caused would be irreparable, not only to the company, but to Mr. Berry himself, so both entities would be harmed.

The Court at the end -- another issue, Judge, that I know was somewhat telling to me -- and, of course, this didn't happen at the beginning, but we've got our CEO, Mr. Powers, who, you know, prayers to Mr. Powers and we hope for a speedy recovery, but we've been operating this company with nobody at the helm. And Mr. Marty Berry testified, we're not even looking. But he's over there acting, which, again, Your Honor, presents a problem for this immediate situation. Because we've got an interested person, who's now loaned millions of dollars, who is gonna be able to ratify actions and do things that would cause irreparable harm to the business as well as to Mr. Berry.

How can we not even have an interim search? Who is driving this train right now? Who do we have protecting the interest of Berry? Who do we have protecting the corporation? I know, Your Honor, at the beginning when we first started this hearing you made a statement, and you said, I am not inclined to alter what the bylaws say.

THE COURT: Bylaws say.

MS. CANALES: But, Your Honor, this Court on a

daily basis hears injunctions, and it hears equitable relief. And this Court --

THE COURT: I'm not saying I can't.

MS. CANALES: No, I understand, Judge. But -- and I think that we have shown why you should. But because the bylaws suggest, Your Honor, that the -- how you can and can't remove a director, the whole purpose of injunctive relief is an equitable one. And just like, Your Honor, until death do us part. You hear injunctions and restraining orders daily.

And when you go to marry somebody, you make a contract. It's basically your bylaws, I'm not gonna -- you know, this -- and we change those rules daily, Judge. No, you can't spend money. No, you can't do this, you know, because it's the Court's right to protect the assets. It's the Court's right to protect and keep the status quo while the litigation is pending. And this is no different from that, Your Honor.

And, again, what is imperative to know or to recognize is that Mr. Lawrence Berry is not asking for special treatment. He's not asking -- he's just asking, I want to sit here until this litigation is over so that I can protect and come to you, Judge, if something happens. He can always be outvoted. So he's not asking for any special treatment. Everybody should have the two weeks notice before they sell property. I think it's imperative that they get that.

I think that -- and in the past I think it was

in the testimony, Judge, that when they needed to do a quick sale Lawrence ratified one of those. He's not here to do what is not in the best interest of the company. He's in the -- he wants to make sure that everybody is acting on the up and up, Judge.

And based on why we're seeking injunctive relief, and based on what Mr. Berry is asking for, I believe that our injunction should be granted and that our two prongs that we should have. That Mr. Berry should be allowed at least pending this litigation to sit on the Board, and then that he should be allowed to have notification as to the property. And, again, Your Honor, I believe you said that there was no -- nothing in the bylaws on the sale of property.

THE COURT: I don't think so unless you guys found it. I didn't.

MS. CANALES: No, Your Honor, we did not.

THE COURT: I found it for the acquisition, but I didn't find it for the sale.

MS. CANALES: You know, Your Honor, because as the Court heard and the evidence before this Court is because Mr. Lawrence is having difficulties getting information, and it is imperative that he get that. And as such, Your Honor, we would ask that the injunction be granted.

THE COURT: Okay.

MR. ALLISON: Thank you, Your Honor. I'm gonna

kind of jump right into something, and then I'm gonna back up a little bit.

THE COURT: Okay.

MR. ALLISON: The part I want to jump into real hard is status quo, because the status quo for decades -- this is -- was that the shareholders get to choose, nominate, elect, or remove directors. That's even been the status quo before Lawrence, or Marty, or Dennis were ever directors. That goes back to Mr. And Mrs. Berry. That goes back to a document that I know you've read that I think was written in the 50's. It is very clear that the status quo is that the shareholder -- it's really a shareholder, but it's then shareholders of Becon that direct LDMA, who those directors nominated and elected are.

It has long, long, and always for those Berry companies been that the status quo is that the shareholder or shareholders get to nominate, elect, or remove directors. That's the status quo. If it were not in the document, which it is, you're right, then we also know -- and I don't have the provision, because I don't think there's any disagreement about this -- we also know Texas law allows the exact same thing. Period.

There is no reason to change that status quo. I'm gonna get into that discussion in a minute. I do want to jump to something you just raised. The status quo for decades has been -- and I know exactly what you read, and I've read the

same thing, and it uses the word "acquire", and you got to read the rest of the document to see how all that kind of fits together. And I'm gonna start with where we agree, and tell you what we think.

I think everybody probably agrees that the status quo is to acquire property, that there has to be a vote of the directors, okay? That's very clear. Now, for decades -- because -- and, again, you got to read the whole document. I'm sure you're familiar. I thought it was kind of interesting that it wasn't said more specifically. But I think when you read the entire document and the way that they --

THE COURT: And the addendum from the -- there was an addendum from the 80's I think.

MR. ALLISON: Right. When you read all of it, I think that the clear intent or the upshot, the spirit of it, if not the written word that also has been lived by as though it was written word for decade, is they follow the same practice for selling real property. I don't think you've heard anybody --

THE COURT: Well, and your client testified as to such.

MR. ALLISON: Absolutely. And nobody's disagreed with that.

Now, if -- so in his mind it's in there, okay? And in the Board -- in the members -- in the director's minds,

that's what they've been doing. That's been the status quo for decades. If it weren't in there -- and I'm suggesting that from their reading it is, but I understand the gap, okay -- then if you look at from Chapter 21, and I think from the last witness we're clear, that's the right one that applies to for-profit corporations. 21.462 says, a corporation -- that would be Berry GP, and -- that's Berry docks owned by Berry GP, it says, quote, a corporation may convey real property of the corporation when authorized by appropriate resolution of the Board of Directors.

So, if we want to read the document to say it's not in there -- and you understand why we think it's really in there and it's been the status quo for decades -- it's still in the law. And we would follow that -- and nobody said we've ever violated that law. No one ever said we've gone against that law. No one ever said, I need a safeguard from the law protection that's already there.

I mean, they -- everybody -- it was a month ago that Lawrence Berry went in, they had the sale of real property -- it was a two-day notice because the Board of Directors doesn't require much notice. He goes in and he looks at it and everybody agreed unanimously to sell real property.

THE COURT: To TxDOT?

MR. ALLISON: Yeah. To TxDOT, okay? And there's not been a problem with that status quo for decades.

Now, I want to say this at the outset: This idea that here's a loan that they say is self-dealing and bad, and here's the crane business, and somehow that has a nexus to don't let us -- don't let us change the rules, change the status quo on sale of real property? If they sold the real property -- and I'm just going straight to kind of the guts of it, and then like I said I want to step back.

But what does the crane business have to do with whether or not they sell a dock that is collateralizing -- by everyone's agreement -- collateralizing the Frost line of credit? If they sell the dock, gonna go to Bay Frost, okay? It's at least gonna be a big discussion that everybody here -- gonna hear about, talk about. Number 1. So, I mean, there's just no nexus.

Also, what did it have them do this idea of -- I mean, come on, the crane business has been going on since 2019. The loan has been out there for over a year now. Nothing's changed. There's no panic. It has nothing to do with -- really, quite frankly this idea of who gets to serve as director? Who gets to serve as director is a function of the bylaws and Texas law. So I think there's just -- there's so -- they're trying to make a huge leap by saying because he made a loan over a year ago that somehow now I get to stay on the Board forever and you can't sell property.

Now -- and I want to jump again to the heart of

something here.  Selling property that's been on the market for a year, since before May -- since -- been talked about apparently in a Board meeting Lawrence said remembered in February or March of 2023, been on the market clearly since May of 2023, here we are about a year later.  We've got no nibbles.  No bites -- magic word, nothing imminent.

And we're gonna enjoin people from doing something when there's nothing imminent?  When we don't even have an offer.  When we don't even have a nibble.  We don't even have a thought about -- and quite frankly, there would have to be, because we would do what we've done for decades and follow Texas laws as far as what -- requiring, you know, the directors to talk about it and take a vote on it.  I've read that section.

And so we think -- we know the discussion goes something like this, that the dock is not getting its highest and best use.  They use it, what, a week or two out of the every six months?  They're just not getting value of it.  It may be -- may be, we're not there yet -- maybe that if they get a company that wants to run liquids across it, that will make it hugely valuable to that company when it's not that valuable to our needs, and we reserve use of the dock when we offload large modules.

And then there may be a situation that quite frankly -- I honestly believe this, and maybe I'm just naive, I

actually think there is -- that Marty, and Bonnie, and Lawrence would agree if the right deal presents itself, I have an idea they'd agree. We don't even have a reason to think they'd disagree on it, other than he has fear of it. Marty has been very clear that he's not gonna sell it unless there are a reservation of a right to allow it to be used when they need to have use of it. Whether you it call that an easement or some sort of contracted for right where they get to use it a certain numbers of weeks per year at a certain rate, there's a million ways to cut that deal.

So, I guess what I wanted to say at the very outset is in terms -- I want to be very, very clear. The status quo is not, you know, Lawrence gets to be on the Board for life. That's not the status quo. Or Lawrence gets to be on the Board even if the other shareholders and directors want him, that's not the status quo. The status quo has always been that that Board -- that serving as a director is at the pleasure of the shareholders. It's been the way before they got there, and it's been that way ever since they got there, and it's been that way in the Texas laws and it's that way in the bylaws.

The status quo has also been that the piece of property -- any piece of property -- I mean, I guess he wants you to just enjoin one piece of property really. When you get down to it, he's voting for the rest of them, you know, to the

extent that's going to come up. It's rare we've heard from the witness stand that they sell real property. But there is absolutely no justification for changing the way it has worked well for years.

And as -- he is a director right now. I'm not even gonna speculate on what will happen. I will say on December 7th they could have removed him if they wanted to. They didn't. They appointed Bonnie, okay? They could have made that motion. It's within the confines what was noticed for a meeting for consideration of directors.

They got all up in arms about it, ran down here, lit their hair on fire, and here we are. And I'm not saying they won't, especially now, but it is their prerogative to have that conversation in accord with the bylaws and the Texas law. So we think the status quo is very cleer and very, very much in our favor.

I do want to back up a little bit and I do have -- in a reply that's on file, I want to the point out they really have been a moving target. Originally they wanted relief that we not interfere with Lawrence's right to vote as a shareholder. There's never been a hint of that. There's never been a suggestion of that. There's never been any inkling of that. And then they have since amended and withdrawn that request, and so I think it clearly is also denied.

They originally -- you'll remember, Your Honor,

they wanted to have you forbid the directors, which their witness on the stand for them says the directors -- disinterested directors have a right to consider whether or not they ratify the loan, or ratify the crane business, or ratify as they have the dealings with Frost Bank and IBC. Their own witness says they have a right to have those votes, okay? And originally they wanted to deprive us of the right to do that as directors. They're no longer asking for that relief.

They also want you to -- or they used to want you to forbid us from ratification as shareholders. They're no longer asking for that relief. So all of those requests should be denied.

They originally also were asking that we not be allowed to elect new directors. They have -- and then he voted for Bonnie to be elected as a director. He not only voted for that on December 7th, but he also voted -- Lawrence did -- for Bonnie to be a director of Becon -- which is the top company -- voted for her to be a director as of March 13th or 14th, 2024, this year. So they've withdrawn that request and we should prevail on that.

They've also -- and the one that becomes more germane here they originally asked that all of the people -- Ricketts (sic.), Marty, Powers, Hummell, Berry entities -- be enjoined from selling, mortgaging, or otherwise encumbering any real property that were Berry entities. They went and got a

TRO that says that -- ex parte, we were not there -- up in Houston. Then they got -- then they backed off of it now and said, okay, we realize that we cannot enjoin you from selling -- by the way, they've since agreed to it because they realized they were interfering grossly with the Frost Bank line of credit negotiations, and then they backed off, and now they're just saying, well, we just want two weeks notice, okay?

And, I mean, I just got to say this at the outset: I don't know why we're here asking, you know, for the Court to rewrite bylaws for us. Or to be the one who pens a bylaw. Something that Marty has said, you know what, you know, I can't do it the way you asked for it in your new pleading -- very clear, because in his new pleading what they're asking for right now is special treatment for Lawrence that he get notice.

I know Mr. Reasoner just said, oh, that's not the way we meant that. That's what it asked for. So they're really asking you then to step into the shoes of the company and rewrite the rules even though there's never been a problem with it in the it past and I don't think I'll be a problem with it now.

Sorry I said that so fast.

THE COURT: You broke the speed limit.

MR. ALLISON: I did on that one.

I mean, there's just -- there's no -- there's no threat whatsoever. No one's ever said we're gonna let a

shareholder know. No one's ever said that. In fact, we always let him know. In fact, he usually votes with us on it. In fact, he's been in this discussion. And we know they have this whole discussion about, he doesn't want to sell it at all, Bonnie's okay with selling it, and we know that Lawrence -- excuse me, that Marty's real big on, hey, we're not getting full value out of that piece of property. If we can sell it and maintain the use and benefit for our company by having an access agreement or whatever you want to call it, a use agreement, then he thinks maybe there's a window out there where that can happen.

But there's -- we've worked together on this for years. They can't point to a single time we've tried to sell real property without letting him know. He's a shareholder. He has a right to know. He'll get to know. We don't need you to rewrite -- with all due respect, rewrite bylaws, or rewrite Texas law which already says that there's a requirement of a director vote. And we quite frankly don't think we need help with the bylaws. We think -- we read them that way already, and that, you know, maybe they want to put it in there more express. He can make a motion. But I -- it's just beyond me on why we're here trying to get you to write bylaws.

So all of that said, I think it is very, very clear that they are here not on the original TI that needs to -- that's denied by having been be abandoned, but we want a

ruling on it. I think you understand --

THE COURT: No, I agree.

MR. ALLISON: You understand --

THE COURT: I agree with that.

MR. ALLISON: That's why I bring it up.

THE COURT: They've got two specific requests today and that's all I'm considering.

MR. ALLISON: And now we're down to that -- those other ones need to be denied because of the --

THE COURT: All right. So they're denied.

MR. ALLISON: All right. So we're here on two things that, first of all, have no nexus to the causes of action pleaded, right? There's no nexus between the cranes and the property. There's no nexus between the cranes or between the -- Marty's loan, and Dennis' loan, and his mother's loan that are at very low interest rates, in this case set by the company. That in this case there's only one person, and it's in an e-mail that Rob Powers says we took those loans and we paid off debt and we paid off lines of credit. We needed those loans in order to continue to do business.

We did those loans and they were disclosed. And I know they think they should have been disclosed sooner, but they were disclosed as of September of 2022, and it's been more than a year before he decides to make it an issue. Those loans have been in place, were disclosed to the bank, have been

subordinated to the Frost line of credit and the Wells Fargo line of credit.

We have professional staff that has done it, and they come up with this 12.5 calculation, which is hog wash and I don't even want to beat on it too much. But, I mean, they tried to scope up something when -- and they put in, by the way, a lot of other documents, Your Honor, that when you do the calculation I think it's like five percent.

All of those documents are in the record to show that the loan has been carried, just like their bookkeeper said -- or I shouldn't say that, accountant, CFO. CFO is the correct term. Just like their CFO said, hey, if that was a mistake then we've obviously corrected it, okay? And now they want to latch on to one piece of evidence to, you know, try to say you're criminal, you're horrible, you're bad, and you're, you know, a bad actor. That's just not what's going on here.

They are asking for those two specific forms of relief. Both of the relief sought by them, which is advanced notice, okay? They will get notice of the director's meeting, and he's a shareholder. He'll get information and continue to get information. He does. I think the record has shown he gets a lot of information. Apparently, there's a breakdown on some of that when it comes to some personal expenses that go back 15 years, but, I mean, the (indiscernible).

And that the status quo also is we have a right

under the Texas law if we want to to notice it and remove him or affirm him as a director, and we would like to continue to follow Texas law. There is no imminent harm. There is nobody's hair that should be on fire. There's -- truly we think there is no probable right of recovery. I think under the *Richie* case, and knowing what we know about 21.418, there is no probable right for recovery. In fact, it says there's no cause of action that arises out of that. There is a safe harbor.

I mean, there are so many reasons I think that the requests to, quite frankly, interfere with an important business in this community, there are so many reasons to try to deescalate. And we need to deescalate. And the idea that -- that there's gonna be a word out on the street, if they got their way, that now Lawrence is in charge and that now, you know, the Court's running the company, it's a train wreck. And its just not supported by Texas law. Thank you.

THE COURT: Okay. All right. So, the Court has heard evidence over a three-day period. Temporary injunction's requested. Bylaws provide for the removal and appointment of a Board of Director, so I'm not gonna interfere with that.

With regards to the second issue the Court will partially grant for any sale of real property there must be 48 hours notice to all of the Board members; whoever they may be at the time. Board members may participate by phone in the

vote if they choose. This only applies to real property. Granted and rendered.

(End of proceedings.)

REPORTER'S CERTIFICATE

THE STATE OF TEXAS )
COUNTY OF NUECES )

I, ALICIA BROOKS, Deputy Official Court Reporter in and for the District Courts of Nueces County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that the total cost for the preparation of this Reporter's Record is $234 and was paid by Huseman Law Firm, PLLC.

WITNESS MY OFFICIAL HAND this the 29th day of April, 2024.


/S/Alicia Brooks
ALICIA BROOKS, Texas CSR #8726
Expiration Date: 03/31/2025
Deputy Official Court Reporter
Nueces County, Texas
901 Leopard St. Rm 402
Corpus Christi, Texas 78401
361-888-0751
Alicia.brooks@nuecescountytx.gov

EXHIBIT 22    1

REPORTER'S RECORD
TRIAL COURT CAUSE NO. 2024DCV-0045-C

LAWRENCE BERRY,                    )
Individually and                  ) IN THE DISTRICT COURT
Derivatively on behalf            )
Of BERRY GP, INC.                 )
                                  )
     Plaintiff                    )
                                  )
BERRY GP, INC.,                   )
     Normal Plaintiff             )
                                  )
VS.                               ) NUECES COUNTY, TEXAS
                                  )
MARTY BERRY, ROBERT               )
RICKETT;                          )
ROBERT POWERS;                    )
MICHAEL HUMMELL;                  )
BERRY GP, INC.; BERRY             )
OPERATING COMPANY, LLC;           )
and BERRY CONTRACTING,            )
LOP                               ) 94TH JUDICIAL DISTRICT


------------------------------

JUDGE'S RULING

------------------------------


On the 25th day of March, 2024, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable BOBBY GALVAN, Judge presiding, held in Corpus Christi, Nueces, Texas;


Proceedings reported by machine shorthand.

A P P E A R A N C E S


MR. BARRETT REASONER
SBOT NO. 16441980
MR. MICHAEL ABSMEIER
SBOT NO. 24050195
MR. BRUCE BALDTREE
SBOT NO. 24116064
Gibbs & Bruns, LLP
Houston, Texas
Telephone: (713) 650-8805

        AND

MR. BUTCH BOYD
SBOT NO. 00783694
Butch Boyd Law Firm
2905 Sackett Street
Houston, Texas 77002
Telephone: (713) 589-8744

        AND

MR. DOUGLAS A. ALLISON
SBOT NO. 01083500
Law Office of Douglas Allison
403 North Tancahua Street
Corpus Christi, Texas 78401
Telephone: (361) 888-6002

        AND

MR. VAN HUSEMAN
Huseman Law Firm
615 North Upper Broadway, Suite 2000
Corpus Christi, Texas 78401
Telephone: (361) 883-3563

        AND

MS. GABBIE S. CANALES
SBOT NO. 24012376
Law Office of Gabbie Canales
5262 South Staples, Suite 100
Corpus Christi, Texas 78411
Telephone: (361) 887-4700

P R O C E E D I N G S

March 25, 2024

(In open court.)

THE COURT: Okay. All right. So, the Court has heard evidence over a three-day period. Temporary injunction's requested. Bylaws provide for the removal and appointment of a Board of Director, so I'm not gonna interfere with that.

With regards to the second issue the Court will partially grant for any sale of real property there must be 48 hours notice to all of the Board members; whoever they may be at the time. Board members may participate by phone in the vote if they choose. This only applies to real property. Granted and rendered.

(End of requested portion.)

REPORTER'S CERTIFICATE

THE STATE OF TEXAS   )
COUNTY OF NUECES     )

    I, ALICIA BROOKS, Deputy Official Court Reporter in and for the District Courts of Nueces County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

    I further certify that the total cost for the preparation of this Reporter's Record is $40 and was paid by Doug Allison.

    WITNESS MY OFFICIAL HAND this the 26th day of March, 2024.

                    /S/Alicia Brooks
                    ALICIA BROOKS, Texas CSR #8726
                    Expiration Date:  03/31/2025
                    Deputy Official Court Reporter
                    Nueces County, Texas
                    Corpus Christi, Texas
                    361-888-0751

# EXHIBIT 23

E-filed in the Office of the Clerk
for the Business Court of Texas
11/20/2024 5:42 PM
Accepted by: Beverly Crumley
Case Number: 24-BC11A-0025

CAUSE NO.: 2024DCV-0045-C

| | | |
|---|---|---|
| LAWRENCE BERRY, individually and and as Trustee of the ALLEN LAWRENCE BERRY TRUST, directly and derivatively on behalf of BECON, INC.; LDMA LIMITED PARTNERSHIP; and BERRY GP, INC. | § § § § § § § § § | IN THE DISTRICT COURT |
| *Plaintiff,* | § § | |
| BERRY GP, INC.; LDMA LIMITEDPARTNERSHIP; and BECON, INC.; | § § § | |
| *Nominal Plaintiff,* | § § § | NUECES COUNTY, TEXAS |
| v. | § § § | |
| MARTY BERRY, MICHAEL HUMMELL, BERRY GP, INC., BERRY OPERATING COMPANY, LLC and BERRY CONTRACTING LP | § § § § § § | |
| *Defendants.* | § | 94TH JUDICIAL DISTRICT |

---

**DEFENDANTS BERRY GP, INC.'S
BERRY OPERATING COMPANY, LLC'S
AND BERRY CONTRACTING LP'S
FIRST SET OF REQUESTS FOR PRODUCTION TO ALLEN LAWRENCE BERRY,
INDIVIDUALLY AND AS TRUSTEE OF ALLEN LAWRENCE BERRY 2007 TRUST**

---

To:     Plaintiff Lawrence Berry, individually and as Trustee of the Allen Lawrence Berry Trust (a/k/a Allen Lawrence Berry 2007 Trust), by and through attorney of record, Barrett Reasoner, Gibbs & Bruns LLP, 1100 Louisiana Street, Suite 5300, Houston, Texas 77002.

Berry GP Inc. ("Berry GP"), Berry Operating Company LLC ("Berry Operating"), and Berry Contracting LP ("Bay Ltd."), together the "Berry Entities," hereby serve these First Set of Requests for Production on Allen Lawrence Berry, individually and as Trustee of the Allen Berry Trust (a/k/a Allen Lawrence Berry 2007 Trust).  Allen Lawrence Berry's, individually and as

1

EXHIBIT 11

Trustee of the Allen Lawrence Berry Trust, responses and objections to these Requests for Production ("Requests"), including all production of documents, shall be due within thirty (30) days after the service of these Requests, in accordance with the Texas Rules of Civil Procedure.

Respectfully submitted,

**LAW OFFICE OF DOUGLAS ALLISON**

By: */s/ Douglas Allison*
Douglas Allison
State Bar No. 01083500
doug@dallisonlaw.com
403 N. Tancahua Street
Corpus Christi, Texas 78401
Telephone: (361) 888-6002

ATTORNEY FOR DEFENDANTS

**CERTIFICATE OF SERVICE**

I hereby certify that on the 8th day of May 2024, a true and correct copy of the above was served upon the attorneys of record in the above-entitled and numbered cause, via e-service.

*/s/ Douglas Allison*
Douglas A. Allison

2

EXHIBIT 11

The definitions used in these Requests, and general instructions regarding production and the manner in which electronically stored information should be produced, are as follow:

## DEFINITIONS

1.      "**Communication**" shall have the broadest meaning allowable under the Texas Rules of Civil Procedure and includes the transmission, sending, and/or receipt of information of any kind, or the attempt to elicit information of any kind, by and or through any means, including but not limited to speech, writing, language, electronic mail, instant messages, text messages, calendars, faxes, and all forms of electronic transmission.  Requests for Communications also include a request for all documents concerning such Communications.

2.      "**Document**" or "**documents**" shall have the broadest possible meaning—including that set forth in Texas Rule of Civil Procedure 192.3(b)—and includes but is not limited to, all originals, non-identical copies and drafts of any written, printed, handwritten, recorded or graphic matter of any kind, however produced or reproduced, and regardless of where located, including, but not limited to, any work paper, correspondence, memorandum, note, research, checklist, opinion, minutes, inter office or intra office communications, email message, text message, report, chart, graph, summary, index, diary, desk or pocket calendar, notebook, any magnetic or other recording tape, computer data (including information or programs stored in a computer, whether or not ever printed out or displayed), photograph, microfiche, microfilm, videotape, motion picture, and electronic, mechanical, or electrical record or representation of any kind, including, but not limited to, tape, cassette, disc, magnetic card or recording, or other electronically stored information ("ESI"). "**Document**" or "**documents**" shall also include the file folders in which said documents are maintained and any table of contents or index thereto, and copies of documents of which the originals have been destroyed pursuant to a document destruction policy or otherwise.

3

EXHIBIT 11

3. "**Refer**" "**referring**" "**relate**" "**regarding**" or "**relating or referring to**" means concerning, constituting, describing, evidencing, consisting of, referring to, pertaining to, reflecting, or in any way logically or factually connected with the matter discussed, in whole or part, directly or indirectly.

4. "**Possession, custody, or control**" of an item means that the person or entity either has physical possession of the item or has a right to possession equal to or superior to that of the person who has physical possession of the item.

5. "**Person**" means any natural person, corporation, firm, association, partnership, joint venture, proprietorship, governmental body, or any other organization, business, or legal entity, and all predecessors or successors in interest, as the context requires.

6. "**And**" and "**or**" shall be both conjunctive and disjunctive and shall be construed broadly to make the request inclusive rather than exclusive, that is, to bring within the scope of the request all responses that might otherwise be construed to be outside the scope of the request.

7. "**All**" shall mean "**any**" and vice versa.

8. "**Lawsuit**" or "**Action**" means the above-styled case.

9. "**Petition**" refers to Plaintiffs' First Amended Original Petition and Amended Application for Temporary Restraining Order ("TRO") and Temporary Injunction.

10. **Counter-Petition"** refers to Defendants' First Amended Petition Asserting Counter-Claims against Plaintiffs.

11. "**Plaintiffs**" refers to Allen Lawrence Berry, on his own behalf (individually), and as Trustee of The Allen Lawrence Berry 2007 Trust (a/k/a Allen Lawrence Berry Trust), and their agents, representatives, affiliates, employees, attorneys, and consultants.

EXHIBIT 11

12. "**Berry Entities**" refers collectively to Berry GP Inc., Berry Operating Company LLC, and Berry Contracting LP (a/k/a Bay Ltd.), including their subsidiaries, affiliates, officers, directors, employees, owners, and shareholders.

13. "**Berry GP, Inc.**" refers to Berry GP, Inc., including its subsidiaries, affiliates, officers, directors, employees, owners, and shareholders.

14. "**Berry Operating Company LLC**" refers to Berry Operating Company LLC, including its subsidiaries, affiliates, officers, directors, employees, owners, and shareholders.

15. "**Berry Contracting LP**" or "**Bay Ltd.**" refers to Berry Contracting LP doing business as Bay Ltd., including its subsidiaries, affiliates, officers, directors, employees, owners, and shareholders.

16. **Board of Directors**" refers to the Board of Directors of Berry GP, Inc.

17. "**Director**" refers to any member of the Board of Directors of Berry GP, Inc.

18. "**Rickett**" refers to Robert Rickett.

19. "**Powers**" refers to Robert "Rob" Powers.

20. "**Hummell**" refers to Michael "Mike" Hummell.

21. "**Dennis**" refers to Dennis Berry.

22. "**Marty**" refers to Marty Berry.

23. "**Klein**" refers to James Klein.

24. "**Berry Loans**" refers to the loan agreements executed between Berry GP, Inc. and Marty and Dennis Berry, by which Marty and Dennis loaned a total of approximately $75 million to the Berry Entities.

25. "**Berry Dock**" refers to the dock facilities located in Nueces County, Texas owned by the Berry Entities or one of their subsidiaries.

26. "**Negotiable Instruments**" refers to checks, money orders, promissory notes, wire

EXHIBIT 11

transfer documents, and other signed documents that promise payment to a company or person, or such company's or person's assignee.

27.     "**Defendants**" refers to Marty Berry, Michael "Mike" Hummell, Berry GP Inc., Berry Operating Company LLC, and Berry Contracting LP.

28.     "**Western Gulf Equipment**" refers to Western Gulf Equipment LLC, its subsidiaries, affiliates, officers, directors, employees, owners, and shareholders.

29.     "**ICI**" refers to Inner Channel Investments, Inc., its agents, representatives, subsidiaries, affiliates, officers, directors, employees, attorneys, consultants, owners, and shareholders.

30.     "**Orca**" refers to Orca Assets GP LLC, its agents, representatives, subsidiaries, affiliates, officers, directors, employees, attorneys, consultants, owners, and shareholders.

31.     "**Orca ICI Development, JV**" and **"Orca ICI"** refer to the Orca ICI Development, JV partnership (sometimes referred to as Orca ICI Development, a partnership), its agents, representatives, subsidiaries, affiliates, officers, directors, employees, attorneys, consultants, owners, partners, and shareholders.

32.     **"Ridgefield Entities"** refers to Ridgefield Energy Investments LLC, Ridgefield Energy Operating LLC, Ridgefield Eagle Ford LLC, Ridgefield Eagle Ford Minerals LLC, Ridgefield Permian LLC, Ridgefield Permian Minerals LLC, Ridgefield Energy Partners LLC, Ridgefield Energy Inv LLC, and CEC Ridgefield Holdings LLC; and any one or more of their agents, representatives, subsidiaries, affiliates, officers, directors, employees, attorneys, consultants, owners, and shareholders.

33.     **"Orca Entities"** refers to Orca, Orca ICI, Orca Petroleum Ltd., and Orca Properties LLC; and any one or more of its agents, representatives, subsidiaries, affiliates, officers, directors, employees, attorneys, consultants, owners, and shareholders.

6

EXHIBIT 11

34. **"Berry-Related Companies" ("BRCs")** refers to The Allen Lawrence Berry 2007 Trust (a/k/a Allen Lawrence Berry Trust), Orca Assets GP LLC ("Orca"), Inner Channel Investments Inc. ("ICI"), Orca ICI Development, JV ("Orca ICI"), Orca Petroleum Ltd., Orca Properties LLC (a/k/a Orca Specialty Equipment LLC, Providence Plantation, and/or Casa de Juego), Orca Petroleum La LLC, West 17th Resources LLC ("West 17th"), Gansevoort Investments LLC ("Gansevoort"), Halcon Mineral Interest LLC ("Halcon"), Zilker Acquisitions LLC ("Zilker"), Three Rivers Pipe and Rental LLC ("3 Rivers"), Southern Comfort Equipment ("SCE"), Axis Midstream Holdings LLC ("Axis"), Lone Star Ports LLC ("Lone Star"), Ridgefield Energy Investments LLC, Ridgefield Energy Operating LLC, Ridgefield Eagle Ford LLC, Ridgefield Eagle Ford Minerals LLC, Ridgefield Permian LLC, Ridgefield Permian Minerals LLC, Ridgefield Energy Partners LLC, CEC Ridgefield Holdings LLC, Ridgefield Energy Inv LLC, Blue Wagon Energy Investments LLC ("Blue Wagon"), Alamo Resources IV JV LLC ("Alamo"), B.B.I. Inc. ("BBI"), Escopeta Oil & Gas Corporation ("Escopeta"), Furie Operating Alaska LLC ("Furie"), Helios Power Capital LLC ("Helios"), Danskammer Energy LLC ("Danskammer"), Berry Y&V Fabricators LLC ("Y&V"), Nueces Canyon Properties LLC ("Nueces"), Source Project Group LLC ("SPG"), Riverway Capital LLC, ("Riverway"), Opal Petroleum LLC ("Opal"), ALB Holdings LLC ("ALB Holdings"), Equalaire Systems Inc. ("Equalaire"), and Midway Junction Properties LLC ("Midway").

35. **"Ridgefield Property Interests"** refers to all of the rights, title, and interests in any real property (including but not limited to mineral interests) of any one or more of the Ridgefield Entities, including Ridgefield Eagle Ford LLC's, Ridgefield Eagle Ford Minerals LLC's, Ridgefield Permian LLC's, Ridgefield Permian Minerals LLC's, and/or Ridgefield Energy Inv LLC's mineral interests in DeWitt County (Tx), Karnes County (Tx), Reeves County (Tx), Atascosa County (Tx), Gonzales County (Tx),  Pecos County (Tx), and Ward County (Tx); and

EXHIBIT 11

further specifically including but not limited to such mineral interests as reflected in Instrument Nos. 128828, 140687, and 134272 (DeWitt County), Instrument No. 201900005590 (Karnes County), Instrument Nos. 2019019707, 2021000168, and 2020004569 (Reeves County), Instrument Nos. 203870 and 210527 (Atascosa County), Instrument Nos. 20303807 [Vol. 1339, Page 799] and 21306957 [Vol. 1362, page 557] (Gonzales County), Instrument Nos. 2020-170163 and 2021-173700 (Pecos County), and Instrument Nos. 2020-1815 and 2021-148 (Ward County). All "Instrument Nos." referenced herein may be found in the Citibank N.A. documents in possession of some or all of the Ridgefield Entities' documents granting Deeds of Trust to Citibank N.A. on referenced property/mineral interests.

EXHIBIT 11

## INSTRUCTIONS

1.      Each Request herein extends to all documents and communications in Your possession, custody, or control, or in the possession, custody, or control of anyone acting on Your behalf.

2.      If You object to any Request, please state with specificity all grounds for the objection so that the parties may meet and confer.

3.      These Requests are continuing in nature and require further and supplemental production as and whenever You acquire, make, or discover additional information responsive to these Requests between the time of initial response and the time of trial of this action.

4.      The use of the singular form of any word includes the plural and vice versa.

5.      The words "he" or "she" or any other masculine or feminine pronouns, or "it" or any other neutral pronouns, includes any person regardless of gender.

6.      Each request for production contemplates production of the document in its entirety, without abbreviation or deletions.

7.      All drafts of responsive documents must be produced, as well as all non-identical copies.  Duplicate versions of requested documents and communications are to be provided to the extent they have notes, annotations, markings, edits, additions, or deletions that render the document or communication different from the original, or to the extent that any metadata is different than in the original.  Identical copies of documents need not be produced.  The term "document" or "documents" shall include all drafts, redlines, track changes, handwritten interlineations, or other variations as well as the final versions.

EXHIBIT 11

8.      Produce requested documents *in their native form with all metadata intact*. Further, produce requested documents as they have been kept in the usual course of business, or organize and label them to correspond to the enumerated Requests. If no document or communication exists that is responsive to a particular Request, state that in writing.

9.      References in these Requests to any natural person shall be deemed to include that natural person's representatives, staff, agents, administrative assistants, attorneys, and employees.

10.      References in these Requests to any non-natural person shall be deemed to include that entity's respective members, directors, committees, representatives, staff, agents, administrative assistants, attorneys, and employees.

11.      Whether or not a document is responsive to these requests should be determined by an attorney. As to information that exists in electronic form, the electronic data must be produced pursuant to Rule 196.4.

12.      If any document called for by these Requests is withheld in whole or in part because you claim that it is privileged, constitutes attorney work product, or is otherwise exempt from discovery, set forth the grounds for withholding such document, its present location custodian, and additional information sufficient to identify the document and your reasons for withholding, including, but not limited to: the type of document, its date, author(s), recipient(s), general subject matter, the type of privilege asserted or reason for withholding, and the basis for asserting privilege.

13.      Whenever a document is not produced in full or is produced in redacted form, so indicate on the document and state with particularity the reason or reasons it is not being produced in full and describe to the best of Your knowledge, information, and belief, and with as much particularity as possible, those portions of the document which are not being produced.

EXHIBIT 11

14. Each Request requires a separate response that is as complete as possible. If you object to any part of a Request, identify the portion to which you object and produce all information, documents, and things responsive to the remainder of the Request.

15. If you object to any Request as vague or unclear, assume a reasonable meaning, state what the assumed meaning is, and respond to the Request according to the assumed meaning.

16. Plaintiff is willing to meet and confer regarding the scope of these Requests, including, but not limited to, the number and identify of relevant custodians, the use of search terms, the applicable time period, and any other reasonable limitation that would otherwise reduce the burden to You in responding to the Requests.

EXHIBIT 11

## <u>ELECTRONIC DOCUMENT PRODUCTION</u>

Pursuant to Tex. R. Civ. P. 196.4, Plaintiff requests that any electronic or magnetic data (which is included in the definition of "**document**" and "**documents**") that is responsive to a request herein be produced in native format in the form and manner in which they are kept in the ordinary course of Your business unless such document must be redacted to remove privileged content.

Information which requires redaction or documents that are not available in electronic form (i.e. hard copy paper documents) shall be produced as searchable single page .TIF or multipage .PDF images logical unitization preserved. Redactions should not be accomplished in a manner that serves to downgrade the ability to electronically search the unredacted portions of the document.

All documents produced in native format shall be identified by naming the item to correspond to a Bates number, which should reflect pagination of the item when printed to paper or converted to an image format for use in proceedings or when attached to exhibits in pleadings. For example, a Microsoft Word document produced by you in its native format might be named: TX00000000123.docx. Were the document to be printed out, page six of the printed item would be embossed with a unique identifier for that page, i.e. TX00000000123-0006. If it is not possible to emboss a page specific Bates number on the printed version of a document produced natively, then that document shall be provided in .TIF or .PDF format. If documents, such as electronic mail, are produced, the relationship between related documents (e.g., email attachments) should be preserved. In addition, all documents whose native format is that of an electronic spreadsheet, e.g., a Microsoft Excel file, shall also be produced in their native format, including the formulae imbedded in the spreadsheet and any metadata contained in the file, and should be linked via a "NATIVELINK" field in the DAT file. Plaintiff reserves the right to demand production in native format, including all metadata, of any other responsive documents for which the practical utility of TIFF-rendered production is limited, and You shall preserve all documents and metadata to which a duty of preservation attaches in their native format.

Documents produced in .TIF or .PDF format shall be identified by embossing a Bates number on each page in a manner that does not obscure content.

Parent/child relationships should be maintained (i.e., documents should be produced consecutively with their attachments). Folders and file names should be provided. The production should include a Concordance load file in .DAT format that includes: standard Concordance delimiters that divide the meta-data fields; a first line of the file containing the field names; and the following metadata fields:

- BEGBATES
- BEGATTACH
- CUSTODIAN
- TIMESENT
- TIMERCVD

- ENDBATES
- ENDATTACH
- DATESENT
- DATERCVD
- DATECREATED

12

EXHIBIT 11

- TIMECREATED
- TIMELASTMOD
- FROM
- CC
- TITLE
- AUTHOR
- FILENAME
- MD5HASH
- NATIVEFILE (Folder path for files provided natively)

- DATELASTMOD
- EMAIL_SUBJECT
- TO
- BCC
- SUBJECT
- FILEPATH
- FILEEXT
- FILESIZE
- OCRPATH (Folder path for multi-page text files)

Documents should be vertically de-duplicated by custodian, while ensuring that different versions of a document are not suppressed. All drafts of responsive documents must be produced, as well as non-identical copies.

If any aspect of the production format described above is not agreeable, please contact us to set up a meet-and-confer at your earliest convenience so we can work out a mutually agreeable solution.

EXHIBIT 11

## <u>DEFENDANTS' FIRST SET OF REQUESTS FOR PRODUCTION</u>

REQUEST NO. 1:
Produce articles of incorporation for each of the Berry-Related Companies, including all supplements and amendments thereto.

RESPONSE:


REQUEST NO. 2:
Produce all organizational charts (current and past) for each of the Berry-Related Companies, including all supplements and amendments thereto.

RESPONSE:


REQUEST NO. 3:
Produce all by-laws for each of the Berry-Related Companies, including all supplements and amendments thereto.

RESPONSE:


REQUEST NO. 4:
Produce all operating agreements (sometimes referred to as company agreements) for each of the Berry-Related Companies, including all supplements and amendments thereto.

RESPONSE:


REQUEST NO. 5:
Produce all partnership agreements for each of the Berry-Related Companies, including all supplements and amendments thereto.

RESPONSE:


REQUEST NO. 6:
Produce all business organization governing documents (including but not limited to by-laws, company agreements, operating agreements, and partnership agreements) relating to each of the Berry-Related Companies.

RESPONSE:

EXHIBIT 11

REQUEST NO. 7:
Produce all trust agreements for each of the Berry-Related Companies, including all supplements and amendments thereto.

RESPONSE:

REQUEST NO. 8:
Produce all of the following items for Orca:
    a)  Articles of Organization;
    b)  Certificate of Organization;
    c)  Operating Agreement;
    d)  Orca Assets GP LLC Organizational Meeting;
    e)  Articles of Organization;
    f)  Membership Interest Certificate;
    g)  Membership Interest Certificate stubs;
    h)  Membership Interest transfer ledger; and
    i)  Meeting Minutes for each and every meeting of Orca.

RESPONSE:

REQUEST NO. 9:
Produce all of the following items for Orca / ICI:
    a)  Articles of Organization;
    b)  Certificate of Organization;
    c)  Operating Agreement;
    d)  Orca / ICI Organizational Meeting;
    e)  Articles of Organization;
    f)  Membership Interest Certificate;
    g)  Membership Interest Certificate stubs;
    h)  Membership Interest transfer ledger; and
    i)  Meeting Minutes for each and every meeting of Orca / ICI.

RESPONSE:

REQUEST NO. 10:
Produce all of the following items for Gansevoort:
    a)  Articles of Organization;
    b)  Certificate of Organization;
    c)  Operating Agreement;
    d)  Orca Assets GP LLC Organizational Meeting;
    e)  Articles of Organization;
    f)  Membership Interest Certificate;
    g)  Membership Interest Certificate stubs;

EXHIBIT 11

h)  Membership Interest transfer ledger; and
i)  Meeting Minutes for each and every meeting of Orca.

RESPONSE:

REQUEST NO. 11
Produce all of the following items for Axis:
    a)  Articles of Organization;
    b)  Certificate of Organization;
    c)  Operating Agreement;
    d)  Axis Organizational Meeting;
    e)  Articles of Organization;
    f)  Membership Interest Certificate;
    g)  Membership Interest Certificate stubs;
    h)  Membership Interest transfer ledger; and
    i)  Meeting Minutes for each and every meeting of Axis.

RESPONSE:

REQUEST NO. 12
Produce all of the following items for the Ridgefield Entities:
    a)  Articles of Organization;
    b)  Certificate of Organization;
    c)  Operating Agreement;
    d)  Ridgefield Entities' Organizational Meeting;
    e)  Articles of Organization;
    f)  Membership Interest Certificate;
    g)  Membership Interest Certificate stubs;
    h)  Membership Interest transfer ledger; and
    i)  Meeting Minutes for each and every meeting of the Ridgefield Entities.

RESPONSE:

REQUEST NO. 13
Produce all of the following items for West 17th:
    a)  Articles of Organization;
    b)  Certificate of Organization;
    c)  Operating Agreement;
    d)  West 17th's Organizational Meeting;
    e)  Articles of Organization;
    f)  Membership Interest Certificate;
    g)  Membership Interest Certificate stubs;

16

EXHIBIT 11

h) Membership Interest transfer ledger; and

i) Meeting Minutes for each and every meeting of West 17th.

RESPONSE:


REQUEST NO. 14

Produce all of the following items for Lone Star Ports:

a) Articles of Organization;

b) Certificate of Organization;

c) Operating Agreement;

d) Lone Star Ports' Organizational Meeting;

e) Articles of Organization;

f) Membership Interest Certificate;

g) Membership Interest Certificate stubs;

h) Membership Interest transfer ledger; and

i) Meeting Minutes for each and every meeting of Lone Star Ports.

RESPONSE:


REQUEST NO. 15

Produce all of the following items for Riverway:

a) Articles of Organization;

b) Certificate of Organization;

c) Operating Agreement;

d) Riverway's Organizational Meeting;

e) Articles of Organization;

f) Membership Interest Certificate;

g) Membership Interest Certificate stubs;

h) Membership Interest transfer ledger; and

i) Meeting Minutes for each and every meeting of Riverway.

RESPONSE:


REQUEST NO. 16

Produce all of the following items for Escopeta/Furie:

a) Articles of Organization;

b) Certificate of Organization;

c) Operating Agreement;

d) Furie's Organizational Meeting;

e) Articles of Organization;

f) Membership Interest Certificate;

g) Membership Interest Certificate stubs;

EXHIBIT 11

    h) Membership Interest transfer ledger; and
    i) Meeting Minutes for each and every meeting of Furie.

RESPONSE:


REQUEST NO. 17
Produce all of the following items for ALB Holdings:
    a) Articles of Organization;
    b) Certificate of Organization;
    c) Operating Agreement;
    d) ALB Holdings' Organizational Meeting;
    e) Articles of Organization;
    f) Membership Interest Certificate;
    g) Membership Interest Certificate stubs;
    h) Membership Interest transfer ledger; and
    i) Meeting Minutes for each and every meeting of ALB Holdings.

RESPONSE:


REQUEST NO. 18
Produce all of the following items for Y & V:
    a) Articles of Organization;
    b) Certificate of Organization;
    c) Operating Agreement;
    d) Y & V's Organizational Meeting;
    e) Articles of Organization;
    f) Membership Interest Certificate;
    g) Membership Interest Certificate stubs;
    h) Membership Interest transfer ledger; and
    i) Meeting Minutes for each and every meeting of Y & V.

RESPONSE:


REQUEST NO. 19
Produce all of the following items for BBI:
    a) Articles of Organization;
    b) Certificate of Organization;
    c) Operating Agreement;
    d) BBI's Organizational Meeting;
    e) Articles of Organization;
    f) Membership Interest Certificate;
    g) Membership Interest Certificate stubs;

EXHIBIT 11

h) Membership Interest transfer ledger; and

i) Meeting Minutes for each and every meeting of BBI.

RESPONSE:

**ALB Trust**

REQUEST NO. 20:
Produce all trust agreements for the Allen Lawrence Berry 2007 Trust, including all supplements and amendments thereto.

RESPONSE:

REQUEST NO. 21:
Produce all Allen Lawrence Berry 2007 Trust books and records.

RESPONSE:

REQUEST NO. 22:
Produce all documents conveying/transferring anything of value to the Allen Lawrence Berry 2007 Trust. Please limit your response to such conveyances/transfers of things with a value greater than $50,000.00.

RESPONSE:

REQUEST NO. 23
Produce all documents conveying/transferring any mineral interests to/from the Allen Lawrence Berry 2007 Trust.

RESPONSE:

REQUEST NO. 24
Produce all documents conveying/transferring any real property interests to/from the Allen Lawrence Berry 29007 Trust.

RESPONSE:

EXHIBIT 11

REQUEST NO. 25
Produce all documents evidencing any distribution(s) to Allen Lawrence Berry from the Allen Lawrence Berry 2007 Trust.

RESPONSE:


REQUEST NO. 26
Produce copies of all Negotiable Instruments for payment of funds to Allen Lawrence Berry for any services rendered to the Allen Lawrence Berry 2007 Trust.

RESPONSE:


REQUEST NO. 27:
Produce all documents transferring funds (checks, wire transfer documents, negotiable instruments, and other such documents) to/from Allen Lawrence Berry 2007 Trust:
    a)  from/to Orca;
    b)  from/to Orca ICI;
    c)  from/to any one or more of the Ridgefield Entities;
    d)  from/to any one or more of the Orca Entities;
    e)  from/to Escopeta;
    f)  from/to Furie; and
    g)  from/to any of the Berry-Related Companies.
Please limit your response to the time period January 1, 2011 to present.

RESPONSE:


**Records of Meetings**

REQUEST NO. 28:
Produce all records of meetings of the principals, members, directors, or shareholders for each of the Berry-Related Companies.  Please limit your response to the time period January 1, 2019 to present – except for with any one or more of the Berry-Related Companies that did not exist or have such meetings during the identified period of time then produce all records for the most recent two (2) years of meetings of principals, members, directors, or shareholders for each of the Berry-Related Companies.

RESPONSE:

EXHIBIT 11

**Emails re: Formation**

REQUEST NO. 29:
Produce all communications relating to the formation of each of the Berry-Related Companies. For each of the Berry-Related Companies, please limit your response to the time period beginning six (6) months before date of formation and ending six (6) months after the date of formation.

RESPONSE:


**Finances**

REQUEST NO. 30:
Produce all documents relating to the finances for each of the Berry-Related Companies, including but not limited to monthly profit and loss statements, balance sheets, bank statements, and those ledgers and other documents showing capital contributions for each of the Berry-Related Companies. Please limit your responses to the time period beginning one (1) month prior to date of formation of each legal entity and ending twelve (12) months after the date of formation of such legal entity.

RESPONSE:


REQUEST NO. 31:
For all Berry-Related Companies still in existence, produce all documents relating to the finances for each of the Berry-Related Companies, including but not limited to monthly profit and loss statements, annual balance sheets, all monthly bank statements, and those ledgers and other documents showing capital contributions. Please limit your responses to the time period beginning January 1, 2019 to present.

RESPONSE:


REQUEST NO. 32:
For all Berry-Related Companies no longer in existence, produce all documents relating to finances for each of the Berry-Related Companies, including but not limited to monthly profit and loss statements, annual balance sheets, all monthly bank statements, and those ledgers and other documents showing capital contributions. Please limit your responses to the time period beginning four (4) years prior to the date each of the Berry-Related Entities ceased to exist and ending six (6) months after the date such entity ceased to exist.

RESPONSE:

EXHIBIT 11

REQUEST NO. 33:

For all Berry-Related Companies that may be considered dormant or inactive, produce all documents relating to the finances for such Berry-Related Companies, including but not limited to monthly profit and loss statements, annual balance sheets, all monthly bank statements, and those ledgers and other documents showing capital contributions. Please limit your response to the time period beginning four (4) years before prior to the date such legal entity became dormant or inactive and ending six (6) months after the legal entity became dormant or inactive.

RESPONSE:

REQUEST NO. 34:

Produce all documents relating to transfer of funds (checks, wire transfer documents, negotiable instruments, and other such documents) of more than $250,000.00 to/from any Berry-Related Company. Please limit your response to the time period beginning January 1, 2011 to present.

RESPONSE:

REQUEST NO. 35:

For each bank and/or financial account opened in the name of any one or more of the Berry-Related Companies, produce the bank's/financial institution's first statement of account; and produce the bank's/financial institution's last statement of account. To be clear, the purpose of this request is to allow – to the extent possible – tracing of monies moved from one bank/financial institution account to another. Please limit your response to the time period beginning January 1, 2014, to present.

RESPONSE:

REQUEST NO. 36:

Produce the following items for Orca:
   a) Current Balance Sheet;
   b) More recent consolidated financial statement inclusive of Orca's assets;
   c) Most recent annual Profit and Loss statement; and
   d) Most recent financial statement signed by any person with authority.

RESPONSE:

EXHIBIT 11

REQUEST NO. 37:
Produce the following items for Orca / ICI:
  a) Current Balance Sheet;
  b) More recent consolidated financial statement inclusive of Orca / ICI's assets;
  c) Most recent annual Profit and Loss statement; and
  d) Most recent financial statement signed by any person with authority.

RESPONSE:


REQUEST NO. 38:
Produce the following items for Gansevoort:
  a) Current Balance Sheet;
  b) More recent consolidated financial statement inclusive of Gansevoort's assets;
  c) Most recent annual Profit and Loss statement; and
  d) Most recent financial statement signed by any person with authority.

RESPONSE:


REQUEST NO. 39:
Produce the following items for Axis:
  a) Current Balance Sheet;
  b) More recent consolidated financial statement inclusive of Axis' assets;
  c) Most recent annual Profit and Loss statement; and
  d) Most recent financial statement signed by any person with authority.

RESPONSE:


REQUEST NO. 40:
Produce the following items for each of the Ridgefield Entities:
  a) Current Balance Sheet;
  b) More recent consolidated financial statement inclusive of Ridgefield Entities' (one or more of them) assets;
  c) Most recent annual Profit and Loss statement; and
  d) Most recent financial statement signed by any person with authority.

RESPONSE:

EXHIBIT 11

REQUEST NO. 41:

Produce the following items for West 17th:

    a) Current Balance Sheet;

    b) More recent consolidated financial statement inclusive of West 17th's assets;

    c) Most recent annual Profit and Loss statement; and

    d) Most recent financial statement signed by any person with authority.

RESPONSE:

REQUEST NO. 42:

Produce the following items for each of the Lone Star:

    a) Current Balance Sheet;

    b) More recent consolidated financial statement inclusive of Lone Star's assets;

    c) Most recent annual Profit and Loss statement; and

    d) Most recent financial statement signed by any person with authority.

RESPONSE:

REQUEST NO. 43:

Produce the following items for each of the Riverway:

    a) Current Balance Sheet;

    b) More recent consolidated financial statement inclusive of Riverway's assets;

    c) Most recent annual Profit and Loss statement; and

    d) Most recent financial statement signed by any person with authority.

RESPONSE:

REQUEST NO. 44:

Produce the following items for each of the Escopeta/Furie:

    a) Current Balance Sheet;

    b) More recent consolidated financial statement inclusive of Escopeta/Furie's assets;

    c) Most recent annual Profit and Loss statement; and

    d) Most recent financial statement signed by any person with authority.

RESPONSE:

EXHIBIT 11

REQUEST NO. 45:
Produce the following items for ALB Holdings :
    a) Current Balance Sheet;
    b) More recent consolidated financial statement inclusive of ALB Holding's assets;
    c) Most recent annual Profit and Loss statement; and
    d) Most recent financial statement signed by any person with authority.

RESPONSE:


REQUEST NO. 46:
Produce the following items for Y & V:
    a) Current Balance Sheet;
    b) More recent consolidated financial statement inclusive of Y & V's assets;
    c) Most recent annual Profit and Loss statement; and
    d) Most recent financial statement signed by any person with authority.

RESPONSE:


REQUEST NO. 47:
Produce the following items for BBI:
    a) Current Balance Sheet;
    b) More recent consolidated financial statement inclusive of BBI's assets;
    c) Most recent annual Profit and Loss statement; and
    d) Most recent financial statement signed by any person with authority.

RESPONSE:


REQUEST NO. 48:
Produce all bank statements, cancelled checks, and wire transfer documents for Orca. Please limit your response to the time period January 1, 2010 to present.

RESPONSE:


REQUEST NO. 49:
Produce all bank statements, cancelled checks, and wire transfer documents for Orca ICI. Please limit your response to the time period January 1, 2010 to present.

RESPONSE:

EXHIBIT 11

REQUEST NO. 50:
Produce all bank statements, cancelled checks, and wire transfer documents for Gansevoort. Please limit your response to the time period January 1, 2019 to present.

RESPONSE:


REQUEST NO. 51:
Produce all bank statements, cancelled checks, and wire transfer documents for Axis. Please limit your response to the time period January 1, 2019 to present.

RESPONSE:


REQUEST NO. 52:
Produce all bank statements, cancelled checks, and wire transfer documents for each of the Ridgefield Entities. Please limit your response to the time period January 1, 2019 to present.

RESPONSE:


REQUEST NO. 53:
Produce all bank statements, cancelled checks, and wire transfer documents for West 17th. Please limit your response to the time period January 1, 2019 to present.

RESPONSE:


REQUEST NO. 54:
Produce all bank statements, cancelled checks, and wire transfer documents for Lone Star. Please limit your response to the time period January 1, 2019 to present.

RESPONSE:


REQUEST NO. 55:
Produce all bank statements, cancelled checks, and wire transfer documents for Riverway. Please limit your response to the time period January 1, 2019 to present.

RESPONSE:

EXHIBIT 11

REQUEST NO. 56:
Produce all bank statements, cancelled checks, and wire transfer documents for Escopeta/Furie. Please limit your response to the time period January 1, 2019 to present.

RESPONSE:


REQUEST NO. 57:
Produce all bank statements, cancelled checks, and wire transfer documents for ALB Holdings. Please limit your response to the time period January 1, 2019 to present.

RESPONSE:


REQUEST NO. 58:
Produce all bank statements, cancelled checks, and wire transfer documents for Y & V. Please limit your response to the time period January 1, 2019 to present.

RESPONSE:


REQUEST NO. 59:
Produce all bank statements, cancelled checks, and wire transfer documents for BBI. Please limit your response to the time period January 1, 2019 to present.

RESPONSE:


REQUEST NO. 60:
Produce all of Allen Lawrence Berry's financial statements (signed by Allen Lawrence Berry). Please limit your response to such items that refer to any one or more of the Berry-Related Companies. Please limit your response to the time period January 1, 2017 to present.

RESPONSE:


REQUEST NO. 61:
Produce all agreements between Orca and ICI, including loan agreements, merger agreements, promissory notes, purchase agreements, purchase sale agreements, partnership agreements, and any amendments thereto.

RESPONSE:

EXHIBIT 11

REQUEST NO. 62:
Produce all agreements between Orca, ICI, Orca ICI, and/or Orca ICI Development JV (any two (2) or more of them), including any amendments, supplements, and/or exhibits/attachments/schedules to such agreements.

RESPONSE:


REQUEST NO. 63:
Produce all agreements between any one or more of the Orca Entities and any one or more of the Ridgefield Entities, including any amendments, supplements, and/or exhibits/ attachments/schedules to such agreements.

RESPONSE:


REQUEST NO. 64:
Produce all documents identifying all mineral interests acquired with the near-$32,000,000.00 provided to ICI by Berry GP (including such mineral interests that may have been acquired in the name of ICI, or Orca ICI. To be clear, the purpose of this request is to allow – to the extent possible – tracing of money received to purchase of specific mineral interest held by one or more of the Berry-Related Companies. Please limit your response to the time period January 1, 2014, to present.

RESPONSE:


REQUEST NO. 65:
Produce all documents referring to any transfer, trade, merger, sale, lease, gift, or other transaction changing ownership or control of mineral interests purchased, directly or indirectly, with any portion of the near-$32,000,000.00 provided by Berry GP and/or Orca Assets (or a related entity) to ICI and/or ICI Orca. To be clear, the purpose of this request is to allow – to the extent possible – tracing of mineral interests transferred or received by one or more of the Berry-Related Companies. Please limit your response to the time period beginning January 1, 2014, to present.

RESPONSE:


REQUEST NO. 66:
For each Berry-Related Company, produce all checks, wire transfer documents, and other negotiable instruments transferring money to Allen Lawrence Berry. Please limit your response to money transfers equal to or greater than $50,000.00.

RESPONSE:

EXHIBIT 11

REQUEST NO. 67:
For each Berry-Related Company, produce all checks, wire transfer documents, and other negotiable instruments transferring money to Allen Lawrence Berry 2007 Trust.  Please limit your response to money transfers equal to or greater than $50,000.00.

RESPONSE:


REQUEST NO. 68:
For each Berry-Related Company, produce all documents relating to a transfer, gift, conveyance, sale, trade, or lease of any asset to Allen Lawrence Berry.  Please limit your response to such transactions with a value equal to or greater than $50,000.00.

RESPONSE:


REQUEST NO. 69:
For each Berry-Related Company, produce all documents relating to a transfer, gift, conveyance, sale, trade, or lease of any asset to Allen Lawrence Berry 2007 Trust.  Please limit your response to such transactions with a value equal to or greater than $50,000.00.

RESPONSE:


**Mineral Interests**

REQUEST NO. 70:
Produce all documents conveying, selling, contributing, trading, exchanging, leasing, or in any manner transferring (by merger or otherwise) any mineral interest to/from any one or more of the Berry-Related Companies.  Please limit your response to the time period beginning January 1, 2011 to present.

RESPONSE:


REQUEST NO. 71:
Produce all documents conveying, selling, contributing, trading, exchanging, leasing, or in any manner transferring (by merger or otherwise) any mineral interest to/from Orca.  Please limit your response to the time period beginning January 1, 2011 to present.

RESPONSE:

EXHIBIT 11

REQUEST NO. 72:
Produce all documents conveying, selling, contributing, trading, exchanging, leasing, or in any manner transferring (by merger or otherwise) any mineral interest to/from Orca / ICI.  Please limit your response to the time period beginning January 1, 2011 to present.

RESPONSE:


REQUEST NO. 73:
Produce all documents conveying, selling, contributing, trading, exchanging, leasing, or in any manner transferring (by merger or otherwise) any mineral interest to/from any one or more of the Ridgefield Entities.  Please limit your response to the time period beginning January 1, 2011 to present.

RESPONSE:


REQUEST NO. 74:
Produce all documents conveying, selling, contributing, trading, exchanging, leasing, or in any manner transferring (by merger or otherwise) any mineral interest to/from BBI (including but not limited to conveyance, selling, contributing, trading, exchanging, leasing, or transferring (by merger or otherwise) a 10% mineral interest from BBI to Berry GP).  Please limit your response to the time period beginning January 1, 2011, to present.

RESPONSE:


REQUEST NO. 75:
Produce all documents conveying, selling, contributing, trading, exchanging, leasing, or in any manner transferring (by merger or otherwise) any mineral interest to/from Escopeta.  Please limit your response to the time period beginning January 1, 2011 to present.

RESPONSE:


REQUEST NO. 76:
Produce all documents conveying, selling, contributing, trading, exchanging, leasing, or in any manner transferring (by merger or otherwise) any mineral interest to/from Furie.  Please limit your response to the time period beginning January 1, 2011 to present.

RESPONSE:

EXHIBIT 11

REQUEST NO. 77:
Produce all documents conveying, selling, contributing, trading, exchanging, leasing, or in any manner transferring (by merger or otherwise) any mineral interest to/from the Allen Lawrence Berry 2007 Trust.  Please limit your response to the time period beginning January 1, 2011 to present.

RESPONSE:


REQUEST NO. 78:
Produce all Berry-Related Entities' documents conveying, selling, contributing, trading, exchanging, leasing, or in any manner transferring (by merger or otherwise) any mineral interest to/from B.B.I. Inc., including but not limited to the 'Kitchen Prospects: Lease Numbers #389185, #389186, #389189, #38189, #389190, #389191, #389192, #389193, #389194, #389202, #389203, #389212, and #389213.

RESPONSE:


REQUEST NO. 79
Produce all Berry-Related Entities' documents conveying, selling, contributing, trading, exchanging, or in any manner transferring (by merger or otherwise) any mineral interest to/from Escopeta; including but not limited to such documents relating to the Kitchen Prospects: Lease Numbers #389185, #389186, #389189, #38189, #389190, #389191, #389192, #389193, #389194, #389202, #389203, #389212, and #389213.

RESPONSE:


REQUEST NO. 80:
Produce all documents conveying, selling, contributing, trading, exchanging, leasing, or in any manner transferring (by merger or otherwise) any mineral interest any of the Ridgefield Property Interests.  Please limit your response to the time period beginning January 1, 2011 to present.


**Communications**

REQUEST NO. 81:
Produce all communications between and among Lawrence Berry, Marty Berry, Dennis Berry, Rob Powers, Mike Hummell, and/or Jim Klein relating to any of the Berry-Related Companies.  Please limit your response to the time period beginning January 1, 2019 to present.

RESPONSE:

31

EXHIBIT 11

REQUEST NO. 82:
Produce all communications between and among Lawrence Berry, Marty Berry, Dennis Berry, Rob Powers, Mike Hummell, and/or Jim Klein relating to any of the Berry-Related Companies. Please limit your response to the time period beginning six (6) months prior to the date of formation of each of the Berry-Related Companies, and ending six (6) months after the date of formation of each of the Berry-Related Companies.

RESPONSE:

**Lawsuits**

REQUEST NO. 83:
Produce original petitions for all lawsuits filed by Allen Lawrence Berry. Please limit your response to this request to the time period January 1, 2019, to present.

RESPONSE:

REQUEST NO. 84:
Produce original petitions for all lawsuits filed by Allen Lawrence Berry 2007 Trust. Please limit your response to this request to the time period beginning January 1, 2019, to present.

RESPONSE:

REQUEST NO. 85:
Produce original petitions for all lawsuits filed against Allen Lawrence Berry. Please limit your response to this request to the time period beginning January 1, 2019, to present.

RESPONSE:

REQUEST NO. 86:
Produce original petitions for all lawsuits filed against Allen Lawrence Berry 2007 Trust. Please limit your response to this request to the time period January 1, 2019, to present.

RESPONSE:

EXHIBIT 11

REQUEST NO. 87:
Produce original petitions for all lawsuits filed by or against any one or more of the Berry-Related Companies, or any company in which either Allen Lawrence Berry or the Allen Lawrence Berry 2007 Trust have (or then had) a controlling interest). Please limit your response to this request to the time period beginning January 1, 2014, to present.

RESPONSE:


REQUEST NO. 88:
Produce the most recent tax return for each of the Berry-Related Companies, whether such company still exists or not.

RESPONSE:


REQUEST NO. 89:
Produce all emails relating to any proposed purchase or sale of any one or more, or portion thereof, of the Berry Entities (including but not limited to your interest, Marty Berry's interest, and/or Dennis Berry's interest in any one or more of the Berry Entities (or related entities)). Please limit your response to the time period beginning January 1, 2020 to present.

RESPONSE:


REQUEST NO. 90:
Produce all emails relating to any proposed purchase or sale of LDMA Limited Partnership, or any portion thereof. Please limit your response to the time period beginning January 1, 2020 to present.

RESPONSE:


REQUEST NO. 91:
Produce all emails relating to any proposed purchase or sale of Becon Inc., or any portion thereof. Please limit your response to the time period beginning January 1, 2020 to present.

RESPONSE:


REQUEST NO. 92:
Produce all emails relating to any proposed purchase or sale of any one or more of the Berry-Related Entities, or any portion thereof. Please limit your response to the time period beginning January 1, 2020 to present.

RESPONSE:

EXHIBIT 11

REQUEST NO. 93:
Produce all Berry-Related Companies' invoices that relied, in whole or in part, upon information (man-hours worked, price of rented equipment, or other) contained in an invoice prepared by any one or more of the Berry Entities.

RESPONSE:


REQUEST NO. 94:   OMITTED.



REQUEST NO. 95:
Produce all payroll records for Y & V for the following time period:  January 1, 2020 to present.

RESPONSE:


REQUEST NO. 96:
Produce all documents and communications relating to BBI Inc.'s (sometimes B.B.I. Inc.) or a related company's sale of 10% of all of BBI Inc.'s and/or Allen Lawrence Berry's right, title and interest in approximately 98,000 net mineral acres in the Cook Inlet, Alaska (sometimes referred to as the 'Kitchen Prospects: Lease Numbers #389185, #389186, #389189, #38189, #389190, #389191, #389192, #389193, #389194, #389202, #389203, #389212, and #389213).   Your response to this request must include, at a minimum, all Negotiable Instruments relating to same, all lease/title transfer/conveyance/assignment and other documents relating to same, and email exchanges relating to same.

RESPONSE:


REQUEST NO. 97:
Produce all Negotiable Instruments relating to full or partial payment of any U.S. government Jones Act fine incurred by Furie Operating Alaska LLC and/or Escopeta Oil & Gas Corporation, or any of their related companies.  Please limit your response to the time period beginning January 1, 2017 to present.

RESPONSE:

EXHIBIT 11

REQUEST NO. 98:
Produce Escopeta Oil & Gas Corporation's (or its related company's/companies') application for a Jones Act waiver to use a foreign ship to move equipment to Alaska's Cook Inlet (with all attachments). Please limit your response to the time period beginning January 1, 2010 to present.

RESPONSE:


REQUEST NO. 99:
Produce all Department of Homeland Security (DHS) denials of any waiver(s) sought by Escopeta Oil & Gas Corporation's (or its related company's/companies') application for a Jones Act waiver to use a foreign ship to move equipment to Alaska's Cook Inlet. Please limit your response to the time period beginning January 1, 2010 to present.

RESPONSE:


REQUEST NO. 100:
For any one or more of the Berry-Related Companies, produce a copy of all documents (check, wire transfer, or other) evidencing full or partial payment to any company for use of the Chinese heavy-lift ship Kang Sheng Kou. Please limit your response to the time period beginning January 1, 2010 to present.

RESPONSE:


REQUEST NO. 101:
For any one or more of the Berry-Related Companies, produce a copy of all documents (check, wire transfer, or other) evidencing full or partial payment to any company to use the drill rig Spartan 151 (a jack-up rig owned by Spartan Offshore Drilling) in or near Alaska's Cook inlet. Please limit your response to the time period beginning January 1, 2010 to present.

RESPONSE:


REQUEST NO. 102:
For any one or more of the Berry-Related Companies, produce a copy of all documents (check, wire transfer, or other) evidencing full or partial payment to any company to use the jack-up rig Randolph Yost in or near Alaska's Cook inlet. Please limit your response to the time period beginning January 1, 2010 to present.

RESPONSE:

EXHIBIT 11

REQUEST NO. 103:
Produce all bank statements for account held in the name of Escopeta (Sterling Bank Houston, Texas ABA #113005549). Please limit your response to the time period beginning January 1, 2001 to present.

RESPONSE:


REQUEST NO. 104:
Produce the "Lease Assignment and Participation Agreement (the "LAPA") concerning the Cook Inlet Basin" – executed on or about October 22, 2010 – referred to in "Plaintiffs' [Allen Lawrence Berry, the Allen Lawrence Berry 2007 Trust, Danny S. Davis, and Taylor Minerals LLC] Verified First Amended Original Petition and Application for Temporary Injunction" in Cause No. 2023-29225 (Harris County, Texas).

RESPONSE:


REQUEST NO. 105:
Produce the "June 18, 2020 Assignment" referred to in "Plaintiffs' [Allen Lawrence Berry, the Allen Lawrence Berry 2007 Trust, Danny S. Davis, and Taylor Minerals LLC] Verified First Amended Original Petition and Application for Temporary Injunction" in Cause No. 2023-29225 (Harris County, Texas).

RESPONSE:


REQUEST NO. 106:
Produce all documents purporting to sell, convey, assign, pledge, gift, or otherwise transfer any right, title, and/or interest in "the Kitchen Prospects" (as this terms is used by Allen Lawrence Berry), Cook Inlet, Alaska; specifically lease numbers #389185, #389186, #389189, #38189, #389190, #389191, #389192, #389193, #389194, #389202, #389203, #389212, and #389213.

RESPONSE:


REQUEST NO. 107:
Produce all negotiable instruments (checks, wire transfer documents, and other) transferring funds from any of the Berry-Related Entities to Allen Lawrence Berry or the Allen Lawrence Berry 2007 Trust. Please limit your response to the time period beginning January 1, 2011 to present. Please further limit your response to such transfer of funds in excess of $100,000.00.

RESPONSE:

EXHIBIT 11

REQUEST NO. 108:
Produce all Frost Bank statements for Orca Assets GP LLC account number 560066192. Please limit your response to the time period January 1, 2014 to present.

RESPONSE:


REQUEST NO. 109:
Produce all books and records of Orca / ICI (the partnership). Orca, as Managing Partner, is the responsible party for maintenance of the books and records. Please limit your response to the time period January 1, 2014 to present.

RESPONSE:


REQUEST NO. 110:
Produce all bank records, including monthly bank statements, of Orca / ICI (the partnership). Orca, as Managing Partner, is the responsible party for maintenance of the partnership's bank statements. Please limit your response to the time period January 1, 2014 to present.

RESPONSE:


REQUEST NO. 111:
Produce all K-1s issued by Orca / ICI. Orca, as Managing Partner, is the responsible party for maintenance of such K-1s. Please limit your response to the time period January 1, 2014 to present.

RESPONSE:


REQUEST NO. 112:
Produce all tax returns issued by Orca / ICI. Orca, as Managing Partner, is the responsible party for maintenance of such tax returns.

RESPONSE:

REQUEST NO. 113:
Produce all books and records of Y & V. Please limit your response to the time period January 1, 2017, to present.

RESPONSE:

EXHIBIT 11

REQUEST NO. 114:
Produce all bank records, including monthly bank statements, of Y & V. Please limit your response to the time period beginning January 1, 2017, to present.

RESPONSE:


REQUEST NO. 115:
Produce all K-1s issued by Y & V. Please limit your response to the time period beginning January 1, 2017, to present.

RESPONSE:


REQUEST NO. 116:
Produce all tax returns issued by Y & V. Please limit your response to the time period beginning January 1, 2017, to present.

RESPONSE:


REQUEST NO. 117:
Produce all checks, wire transfer documents, and other negotiable instruments relating to distributions to members (owners) of Y & V. Please limit your response to the time period beginning January 1, 2017, to present.

RESPONSE:


REQUEST NO. 118:
Produce the Matador Purchase Agreement (dated on or about May 16, 2011) referred to in the Amended and Restated Partnership Agreement of Orca / ICI Development (effective on or about May 20, 2011).

RESPONSE:


REQUEST NO. 119:
For Allen Lawrence Berry, please produce all Form 1099, Form 1120, Form 1120-S, and Schedule K-1 documents. Please limit your response to the time period beginning January 1, 2014 to present.

RESPONSE:

EXHIBIT 11

REQUEST NO. 120:
For Allen Lawrence Berry 2007 Trust, please produce all Form 1099, Form 1120, Form 1120-S, and Schedule K-1 documents. Please limit your response to the time period beginning January 1, 2014 to present.

RESPONSE:

REQUEST NO. 121:
Produce all documents showing production of oil and gas (and other minerals, if any) from Ridgefield Property Interests.

RESPONSE:

REQUEST NO. 122:
For all Berry-Related Companies, produce all production reports for all Ridgefield Property Interests.

RESPONSE:

REQUEST NO. 123:
Produce all loan documents for any Berry-Related Company wherein mineral interests, or mineral production, was pledged as collateral, security, or somehow encumbered to secure the loan for one or more of the Berry-Related Companies. Please limit your response to the time period beginning January 1, 2014, to present.

RESPONSE:

REQUEST NO. 124:
Produce all loan documents for Allen Lawrence Berry wherein mineral interests, or mineral production, was pledged as collateral, security, or somehow encumbered to secure the loan for Allen Lawrence Berry. Please limit your response to the time period beginning January 1, 2014, to present.

RESPONSE:

EXHIBIT 11

REQUEST NO. 125:

Produce all loan documents for the Allen Lawrence Berry 2007n Trust wherein mineral interests, or mineral production, was pledged as collateral, security, or somehow encumbered to secure the loan for the Allen Lawrence Berry 2007 Trust.  Please limit your response to the time period beginning January 1, 2014, to present.

RESPONSE:

**CAUSE NO. 24-BC11A-0025**

| | | |
|---|---|---|
| ALBERT THEODORE POWERS; | § | IN THE BUSINESS COURT |
| ALLIED PORTS LLC, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | 11A – STATE OF TEXAS |
| | § | |
| AXIS MIDSTREAM HOLDINGS LLC; | § | |
| ALLEN LAWRENCE BERRY; | § | |
| MARVIN GLENN BERRY; and | § | |
| BONNIE BERRY, as successor in | § | |
| interest to DENNIS WAYNE BERRY | § | |
| | § | |
| *Defendants*. | § | HONORABLE SOFIA ADROGUE |

# DEFENDANTS' EXHIBIT 24

# AVAILABLE IN CAMERA

**EXHIBIT 25**

## CAUSE NO. 2024DCV-0045-C

| | | |
|---|---|---|
| LAWRENCE BERRY, individually and derivatively on behalf of BERRY GP, INC. | § § § § | IN THE DISTRICT COURT |
| Plaintiff, | § § | |
| BERRY GP, INC., | § § | |
| Nominal Plaintiff, | § § | NUECES COUNTY, TEXAS |
| v. | § § § | |
| MARTY BERRY, ROBERT RICKETT, ROBERT POWERS, MICHAEL HUMMELL, BERRY GP, INC., BERRY OPERATING COMPANY, LLC and BERRY CONTRACTING LOP | § § § § § § | |
| Defendants. | § | 94TH JUDICIAL DISTRICT |

## COUNTER-PLAINTIFFS' SECOND AMENDED ORIGINAL PETITION ASSERTING COUNTER-CLAIMS

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COME Berry GP Inc., Berry Operating Company LLC, Berry Contracting LP, and Marty Berry, sometimes collectively referred to as Counter-Plaintiffs, and make and file this Counter-Plaintiffs' First Amended Original Petition Asserting Counter-Claims complaining of A. Lawrence Berry, in his personal capacity and as Trustee of the Allen Lawrence Berry Trust, sometimes referred to as Counter-Defendants, and in support of same would show:

I.

## PARTIES

1. Berry GP Inc. ("Berry GP") is a Texas corporation with its principal office at 1414 Corn Products Road, Corpus Christi, Texas 78409. Berry GP is one of the "Berry Entities" as may be referenced herein.

1

2.     Berry Operating Company LLC ("Berry Operating") is a Texas limited liability company with its principal office at 1414 Corn Products Road, Corpus Christi, Texas 78409. Berry Operating is one of the "Berry Entities" as may be referenced herein.

3.     Berry Contracting LP (d/b/a Bay Ltd. ("Bay Ltd.")) is a Texas limited partnership with its principal office at 1414 Corn Products Road, Corpus Christi, Texas 78409. Bay Ltd. is one of the "Berry Entities" as may be referenced herein.

4.     Marty Berry ("M.Berry") is a natural person who is presently an Officer, Director, and shareholder of Berry GP, Berry Operating, and Bay Ltd. Marty Berry resides in Nueces County, Texas.

5.     A. Lawrence Berry ("L.Berry") is a natural person who is presently an Officer, Director, and shareholder of Berry GP, Berry Operating, and Bay Ltd. A. Lawrence Berry resides in Harris County, Texas. A. Lawrence Berry may and shall be served by notice of these proceedings upon legal counsel for A. Lawrence Berry: Mr. Barrett Reasoner, Gibbs & Bruns LLP, 1100 Louisiana, Suite 5300, Houston, Texas 77002. Service shall be by electronic means, and in such manner as complies with the Texas Rules of Civil Procedure.

6.     Allen Lawrence Berry, as Trustee of the Allen Lawrence Berry Trust ("ALB Trust") is a trust wherein Allen Lawrence Berry serves as trustee of the ALB Trust, and is – along with others – a beneficiary of the Trust. ALB Trust has already appeared in these proceedings, and thus this Counter-Plaintiffs First Amended Original Petition Asserting Counter-Claims will be served upon Allen Lawrence Berry, Trustee, and the Trust by service upon their attorney: Mr. Barrett Reasoner, Gibbs & Bruns LLP, 1100 Louisiana, Suite 5300, Houston, Texas 77002. Service shall be by electronic means, and in such manner as complies with the Texas Rules of Civil Procedure.

2

6.     Berry GP, Berry Operating, Bay Ltd., Marty Berry, and A. Lawrence Berry may be sometimes referred to as the "Parties," or any one of them referred to as a "Party."

7.     L.Berry is the original Plaintiff in this legal action by having filed Plaintiffs' Original Verified Petition and Application for Temporary Restraining Order and Temporary Injunction ("Plaintiffs' Verified Petition").  The legal action initiated by Plaintiffs' Verified Petition was filed in Harris County, Texas, but promptly transferred to Nueces County, Texas.  A Counter-Plaintiffs' Original Petition Asserting Counter-Claims was filed as counter-claim to Plaintiffs' Verified Petition in compliance with Texas Rule of Civil Procedure ("TRCP") 97.   L.Berry, adding Lawrence Berry in his capacity as trustee of the Allen Lawrence Berry Trust ("Trust"), then filed Plaintiffs' First Amended Verified Petition and Application for Temporary Injunction.  The Counter-Plaintiffs' First Amended Original Petition Asserting Counter-Claims was filed as counter-claim to Plaintiffs' First Amended Verified Petition and Application for Temporary Injunction in compliance with Texas Rule of Civil Procedure ("TRCP") 97.

## II.

### JURISDICTION AND VENUE

8.     This Court has jurisdiction over all Parties.  Specifically, Berry GP, Berry Operating, and Bay Ltd. are legal entities formed in Texas that maintain their principal offices in Texas.  M.Berry and L.Berry reside in Texas.  As such, all Parties have sufficient contacts with the State of Texas and, therefore, are subject to the jurisdiction of this Court.

9.     Venue is proper in Nueces County, Texas, pursuant to TCPRC Chapter 15, section 15.002(a)(1) inasmuch as Nueces County is the location where all or a substantial part of the events or omissions giving rise to the claims occurred; and section 15.011 inasmuch as Counter-Plaintiffs seek to recover an interest in and/or quiet title to real property. See Exhibit C (with attachment).

3

Moreover, venue is proper in Nueces County, Texas, pursuant to TCPRC Chapter 15, section 15.063(3). See Exhibit B.

## III.

## DISCOVERY

10. Discovery should be conducted in accordance with Level 3, as permitted by TRCP 109.4.

## IV.

## EXECUTIVE SUMMARY

11. Counter-Plaintiffs file this amended counter-petition asserting claims against L.Berry and the Trust for conversion, breach of fiduciary duty, breach of contract, unjust enrichment, breach of constructive trust, fraud, and other causes of action. Counter-Plaintiffs' causes of action pleaded against and complaining of L.Berry and Trust are directly responsive to L.Berry's claims for self-dealing and breach of fiduciary duty filed against one or more Counter-Plaintiffs. For all claims referenced in this Counter-Plaintiffs' Second Amended Original Petition Asserting Counter-Claims, Counter-Plaintiffs now sue Counter-Defendants.

## VI.

## FACTUAL BACKGROUND

12. The Berry Entities and Berry-Related Entities are a large organization of companies engaged in various businesses throughout the United States and have successfully done so since the 1950s.

13. Marvin Berry had four (4) sons: Marty Berry (M.Berry), Dennis Berry (D.Berry), A. Lawrence Berry (L.Berry), and Kenneth Berry. After Marvin Berry passed in 1997, control of the Berry Entities shifted to Laura Berry (Marvin's wife), and then to their (Marvin's and Laura's) sons — M.Berry, D.Berry, and L.Berry. LDMA LP ("LDMA") sits at the top of the Berry Entities.

4

LDMA's 3% general partner is Beacon Inc. which is owned by M.Berry, D.Berry, and L.Berry. LDMA owns Berry GP which, through a series of legal entities, own Berry Operating and Bay Ltd. The Board of Directors of Berry GP (M.Berry, Bonnie Berry, L.Berry, and Chrissy Hinojosa Phd.) — in accordance with the by-laws of Berry GP — primarily govern Berry GP, the Berry Entities, and some of the other affiliated entities (indirectly). All considered (generally), ownership of the Berry Entities is vested with M.Berry, Bonnie Berry, [1] and L.Berry (shareholders); and control of the Berry Entities (generally, at a policy level) is with M.Berry, Bonnie Berry, and Chrissy Hinojosa, Phd. (all serving as directors of Berry GP).[2]

14.     For purposes of this pleading, the Berry Entities refers to Berry GP, Berry Operating, and Bay Ltd. For purposes of this pleading, the Berry-Related Entities[3] refer to the Allen Lawrence Berry 2007 Trust, Redfish Bay Terminals Inc. ("RBT"), Orca Assets GP LLC ("Orca"), Inner Channel Investments Inc. ("ICI"), Orca ICI Development ("Orca ICI," a Texas partnership), Orca ICI Development JV, Orca Petroleum Ltd., Orca Properties LLC (a/k/a Orca Specialty Equipment LLC, Providence Plantation, and/or Casa de Juego), West 17th Resources LLC, Gansevoort Investments LLC, Axis Midstream Holdings LLC (TX), Lone Star Ports LLC (TX), Midway Junction Properties LLC (TX), Halcon Mineral Interest LLC, Zilker Acquisitions LLC, Three Rivers Pipe and Rental LLC, Southern Comfort Equipment, Ridgefield Energy Investments LLC, Ridgefield Energy Operating LLC, Ridgefield Eagle Ford LLC, Ridgefield Eagle Ford Minerals LLC, Ridgefield Permian LLC, Ridgefield Permian Minerals LLC, Ridgefield Energy Partners LLC, CEC Ridgefield Holdings LLC, Blue Wagon Energy Investments LLC, Alamo Resources

---

[1] Successor in interest to Dennis Berry, recently deceased.
[2] In mid-2024, L.Berry was removed as director of Berry GP.
[3] Please note that the definition of Berry-Related Entities in this Nueces County, Texas, legal action was broadened to include Axis Midstream Holdings LLC, Lone Star Ports LLC, Midway Junction Properties LLC, and Redfish Bay Terminals Inc. in May, 2024 (approximately six (6) months in advance of Allied Ports LLC's filing of a competing lawsuit in Harris County, Texas).

IV JV LLC, B.B.I. Inc., Escopeta Oil & Gas Corporation, Furie Operating Alaska LLC, Helios Power Capital LLC, Danskammer Energy LLC, Berry Y&V Fabricators LLC (and related companies). The Berry Entities and Berry-Related Entities may be sometimes referred to as the "Berry Companies."

15. The Berry-Related Entities, except for the Trust and RBT, are and have been started up, owned (legally and/or beneficially), held in trust, managed, developed, operated, and/or controlled at various times by and through Berry GP, and/or by and through (in part) M.Berry, D.Berry, and/or L.Berry (one or all of them), since the 2000s. Such business practices are investments for one or more of the Berry Entities and/or their owners/shareholders.

16. As an example of how Berry Entities invested, Counter-Plaintiffs invested substantially in ICI, ICI Orca, and Orca (related companies). Berry Entities/Counter-Plaintiffs also substantially invested in Axis and LSP (related companies). Specifically, Counter-Plaintiffs seeded capital (money, assets, manpower) to Orca/Axis (et al) to start-up, manage, develop, operate, and/or control an investments— which, in turn, became seed-money/assets (including mineral/real property interests as assets) for several of the Berry-Related Entities (the "Investment").

17. From time to time, M.Berry, D.Berry, and/or L.Berry (or all of them) had meetings to discuss how to manage the Investment, whether to sell or continue with the Investment, and other business-type meetings/discussions.

18. Seeded capital money/assets from Counter-Plaintiffs to some Berry-Related Entities involved an agreement/contract as between these legal entities requiring payment-in-full for the base value of the seeded money/assets received. In contravention of such agreement/contract, L.Berry, individually and as trustee for the Trust, has very recently refused to pay and/or transfer rights as required by the agreement/contract.

6

19.     Seeded capital money/assets from Counter-Plaintiffs to some Berry-Related Entities also included the agreement/contract that L.Berry/Trust (all or in part) would initiate the Investment (start-up); manage, develop, operate, and control the Investment, and hold the Investment in trust and for the benefit of Counter-Plaintiffs.  In contravention of such agreement/contract, L.Berry/Trust (all or in part) has engaged a series of self-dealing transactions without notice to, consultation with, or vote (in-meeting or otherwise) of a majority of the owners/shareholders/directors of Counter-Plaintiffs.

20.     Specifically, L.Berry/Trust has participated in self-dealing transactions involving the Investment (and the Investment's earnings) — taking of seeded money and assets of value (wealth) for personal benefit, and not for the benefit of any one or more of the Counter-Plaintiffs.  This on-going practice by L.Berry/Trust of self-dealing transactions and ultra vires transactions violates the fiduciary obligations owed by L.Berry, individually and as trustee of the Trust, to Counter-Plaintiffs (and others).

21.     In furtherance of L.Berry's/Trust's wrongful conduct, L.Berry/Trust has intentionally obscured self-dealing transactions by transfers of money/assets of substantial value to and/or through the Berry-Related Entities.  All such transactions constitute L.Berry's, individually and as trustee for the Trust, wrongful taking of money and assets belonging to, held in trust for, and held for the benefit of Counter-Plaintiffs.  L.Berry, individually and as trustee for the Trust, has and is engaged in wrongful takings, and also has failed to disclose same (as is required by his (L.Berry's, individually and as trustee of the Trust) fiduciary duties owed).

22.     L.Berry's (individually and as trustee of the Trust) wrongful conduct (as described herein) continues to-date.  Counter-Plaintiffs file this legal action to demand L.Berry (individually and as trustee of the Trust) provide financial information as shall be requested through the legal discovery

7

process.  Counter-Plaintiffs now plead the following claims and causes of action against L.Berry (individually and as trustee of the Trust) and the Trust:  conversion, breach of fiduciary duty, breach of contract, unjust enrichment, breach of constructive trust, and fraud.

**VII.**
**CAUSES OF ACTION**
**Count 1**
**Conversion**

23.     Counter-Plaintiffs incorporate all paragraphs herein as if set forth within Count 1  in their entirety.

24.     Counter-Plaintiffs would show that L.Berry (individually and as trustee of the Trust, Counter-Defendants) are liable to Counter-Plaintiffs for conversion of Counter-Plaintiffs' Investment (+ earnings).   Specifically, Counter-Plaintiffs seeded capital (money, assets) to L.Berry/Trust (and their benefit) to start-up, manage, develop, operate, and/or control Investment — which, in turn, became seed-money/assets for several of the Berry-Related Entities (the Investment).   L.Berry and the Trust were to hold the Investment (+ earnings) in trust for Counter-Plaintiffs.[4]  Wrongfully, L.Berry and the Trust have absconded with the Investment (+ earnings) through a series of self-dealing transactions without notice to, consultation with, or vote (in-meeting or otherwise) of a majority of the owners/shareholders/directors of Counter-Plaintiffs. L.Berry's/Trust's wrongful conduct is a conversion of Counter-Plaintiffs' Investment (+ earnings).

25.     The elements of conversion are: 1) claimants (Counter-Plaintiffs) owned or were  entitled to possession of property; 2) another assumes or exercises control of the property in an unauthorized manner to the exclusion of the claimants; and 3) the claimants' demand for return of

---

[4] Although some monies have been paid by L.Berry or one of his legal entities to one or more Counter-Plaintiffs as part of these transactions, the amounts of money paid have only been a partial repayment of monies owed to Counter-Plaintiffs — still in disregard for that which was agreed to be held in trust by L.Berry/Trust for Counter-Plaintiffs.

8

the property is refused. By this Counter-Plaintiffs' Second Amended Counter-Claim these Counter-Plaintiffs continue to request return of all converted assets. In this case, Counter-Plaintiffs clearly own and are entitled to possession of the Investment (+ earnings). Such Investment (+ earnings) were supposed to be held in trust by L.Berry, individually and as trustee for the Trust (the sole person in control of such Investment (+ earnings)) for Counter-Plaintiffs. Counter-Defendants have wrongfully assumed and exercised control over such Investment (+ earnings), and done so in a manner unauthorized by Counter-Plaintiffs and to the exclusion of Counter-Plaintiffs. Further, and in disregard of requests from Counter-Plaintiffs, Counter-Defendants have failed and refused to return the Investment (+ earnings) to Counter-Plaintiffs. This is a wrongful conversion of such Investment (+ earnings) — the money/assets — belonging to Counter-Plaintiffs, for which Counter-Plaintiffs now sue.

26. Counter-Defendants' wrongful conversion of Counter-Plaintiffs' Investment (+ earnings) has caused substantial financial harm and losses to Counter-Plaintiffs. Counter-Plaintiffs now sue for the return of such Investment (+ earnings), or alternatively for the value of such Investment (+ earnings).

## Count 2
## Breach of Fiduciary Duty

27. Counter-Plaintiffs incorporate all paragraphs herein as if set forth within Count 2 in their entirety.

28. Counter-Defendant L.Berry has been a shareholder, officer, and director of Counter-Plaintiffs for all relevant times. Counter-Defendants held the Investment (+ earnings) in trust for Counter-Plaintiffs all relevant times. As such, Counter-Defendants owe fiduciary duties to Counter-Plaintiffs for all relevant times. The fiduciary duties owed by Counter-Defendants to Counter-Plaintiffs include, but are not limited to, the duty of loyalty, duty of utmost good faith and

9

fair dealing, and duty of fairness and honesty. The fiduciary duties owed by Counter-Defendants to Counter-Plaintiffs further include putting Counter-Plaintiffs' interest before his (L.Berry's, individually and as trustee of the Trust) own interest, inclusive of devoting full time and efforts in favor of Counter-Plaintiffs' best interests — not L.Berry's own or just the Trust's interests. These duties that Counter-Defendants owe to Counter-Plaintiffs encompass obligations and/or duties to refrain from self-dealing transactions and to make full disclosures of information.

29. While owing fiduciary duties to Counter-Plaintiffs, Counter-Defendants have engaged in, directed, approved, and/or taken actions in contravention of fiduciary duties owed, including but without limited to the following:

a. L.Berry/Trust took substantial money/assets from Counter-Plaintiffs, and failed to invest same in the name of and/or for the benefit of Counter-Plaintiffs (thereby putting their own financial interest ahead of Counter-Plaintiffs' financial interest). By way of example, L.Berry and Trust took Counter-Plaintiffs money/assets yet wrongfully placed things of value (mineral leases) into Orca (a legal entity that ultimately (later) was determined to be 100% for the benefit of Trust). L.Berry and Trust took Counter-Plaintiffs money/assets for Axis/LSP, yet wrongfully purport to have transferred some of this interest to others (e.g., Allied Ports LLC); and other. This breach of fiduciary duty caused substantial financial harm and losses to Counter-Plaintiffs, and for which Counter-Plaintiffs now sue.

b. L.Berry/Trust were supposed to hold the Investment (+ earnings) in trust for Counter-Plaintiffs, yet L.Berry/Trust refuses to account for and surrender such Investment (+ earnings) in favor of Counter-Plaintiffs — but rather appears

10

to have absconded with the Investment (+ earnings). This failure to hold, account for, and then surrender the Investment (+ earnings) for the benefit of Counter-Plaintiffs is self-dealing — and a breach of fiduciary duty. This breach of fiduciary duty has caused substantial financial harm and losses to Counter-Plaintiffs, and for which Counter-Plaintiffs now sue.

c.   L.Berry/Trust took the Investment (+ earnings) for their own benefit (as set forth above), and did so without full disclosure of details of the Investment (and earnings) to Counter-Plaintiffs.   Rather than comply with Counter-Defendants' fiduciary duties owed, Counter-Defendants have engaged a series of transactions to obscure Counter-Plaintiffs' rights to its Investment (+ earnings). This lack of full disclosure is L.Berry's and Trust's breach of fiduciary duty of full disclosure and candor owed to Counter-Plaintiffs. This breach of fiduciary duty has caused substantial financial harm and losses to Counter-Plaintiffs, and for which Counter-Plaintiffs now sue.

d.   L.Berry/Trust have used Counter-Plaintiffs money/assets to promote and make profit for their own businesses in various manners and locations. This is more self-dealing, and a breach of the fiduciary duty owed by L.Berry/Trust to the Counter-Plaintiffs. This breach of fiduciary duty has caused substantial financial harm and losses to the Counter-Plaintiffs, and for which Counter-Plaintiffs now sue.

e.   There are additional transactions / ventures by Counter-Defendants that are a breach of fiduciary duties owed to Counter-Plaintiffs, and all of

which have caused substantial financial harm and losses to Counter-Plaintiffs.

For same, Counter-Plaintiffs now sue.

30. Counter-Defendants have taken money/assets/manpower from one or more of the Counter-Plaintiffs; the Investment (+ earnings) from one or more of Counter-Plaintiffs; misappropriated equipment, personnel, and other assets from one or more of the Counter-Plaintiffs; and all to the detriment of one or more of the Counter-Plaintiffs — while only benefiting Counter-Defendants. This is self-dealing. All such conduct described herein evidences Counter-Defendants' breaches of fiduciary duties owed; that is, self-dealing, advancing their (L.Berry's/Trust's) own interest rather than Counter-Plaintiffs' interest, breaches of loyalty to the Counter-Plaintiffs, breaches of good faith and fair dealing owed to Counter-Plaintiffs, breaches of full disclosure and candor owed to Counter-Plaintiffs, and more. Counter-Defendants' misconduct has been and continues to be designed as a subterfuge of obligations to the Counter-Plaintiffs (whereas other shareholders who may have received benefits account for same to the Berry Entities). Counter-Defendants' breaches of fiduciary duties owed to Counter-Plaintiffs have caused substantial financial harm and losses to Counter-Plaintiffs, for which Counter-Plaintiffs now sue.

### Count 3
### Breach of Contract

31. Counter-Plaintiffs incorporate all paragraphs herein as if set forth within Count 3 in their entirety.

32. As noted herein, seeded capital money/assets from Counter-Plaintiffs included the agreement/contract that L.Berry, individually and as trustee of the Trust, would initiate the Investment (start-up); manage, develop, operate, and control the Investment, and hold the Investment (+ earnings) in trust and for the benefit of Counter-Plaintiffs. In contravention of such agreement/contract, L.Berry, individually and as trustee of the Trust, have refused to perform as

12

promised, but rather engaged a series of self-dealing transactions designed to allow L.Berry and the Trust to keep all (or some) of the Investment (+ earnings) for himself (L.Berry) and/or the Trust.

33.     Counter-Defendants' refusals to abide by the agreement/contract is a breach of agreement/contract. Counter-Defendants' breach of the agreement/contract has caused Counter-Plaintiffs substantial financial harm and losses, and for such substantial financial harm and losses Counter-Plaintiffs now sue.

**Count 4**
**Unjust Enrichment**

34.     Counter-Plaintiffs incorporate all paragraphs herein as if set forth within Count 4 in their entirety.

35.     Recent events now give rise to a concern on Counter-Plaintiffs' behalf that Counter-Defendants may deny the agreement/contract (and/or some terms of the agreement/contract) as between Counter-Plaintiffs and Counter-Defendants — all in an effort by Counter-Defendants to wrongfully abscond with Counter-Plaintiffs' Investment + earnings. Such a result would be inequitable, and unjustly enrich Counter-Defendants.

36.     Counter-Plaintiffs would show that Counter-Plaintiffs did, in fact, provide seed capital money/assets from Counter-Plaintiffs to Orca/ICI /Orca and Axis/LSP as a benefit to Counter-Defendants, and to allow Counter-Defendants to invest (again, the Investment). This benefit to Counter-Defendants was provided by Counter-Plaintiffs, and it will cause a substantial detriment to Counter-Plaintiffs if the Investment + earnings are not returned to Counter-Plaintiffs. As such, equity demands that the Investment + earnings be returned to Counter-Plaintiffs or compensation for value.

37.     For these reasons set forth herein, Counter-Plaintiffs now sue Counter-Defendants for unjust enrichment, as fairness demands Counter-Plaintiffs be made whole by: (1) return of all Investment (+ earnings); or (2) the value of all Investment (+ earnings) be paid by Counter-Defendants to Counter-Plaintiffs.

**Count 5**
**Breach of Constructive Trust**

38.     Counter-Plaintiffs incorporate all paragraphs herein as if set forth within Count 5 in their entirety.

39.     As noted above, Counter-Defendant L.Berry has been a shareholder, officer, and director of Counter-Plaintiffs for all relevant times. Counter-Defendant L.Berry held the Investment (+ earnings) in trust for Counter-Plaintiffs for all relevant times. L.Berry, as trustee for the Trust, held the Investment (+ earnings) in trust for the Counter-Plaintiffs for all relevant times. As such, Counter-Defendants owed and owe fiduciary duties to Counter-Plaintiffs for all relevant times.

40.     Counter-Plaintiffs made transfer of monies/assets to Counter-Defendants (money, manpower, and assets). Counter-Plaintiffs made these transfers of monies/assets in reliance upon Counter-Defendants' promise to protect and deliver Counter-Plaintiffs' share of the Investment (+ earnings) to Counter-Plaintiffs.

41.     Counter-Defendants now refuse to perform upon Counter-Defendants' promise (but rather now wants to keep for L.Berry's and his Trust's own gain/profit all of the Investment (+ earnings)). As such, Counter-Defendants will be unjustly enriched. Given these facts, Counter-Plaintiffs now sue for breach of constructive trust for the Investment (+ earnings) and related, traceable monies/assets. All such monies and assets should be placed in a constructive trust for the benefit of Counter-Plaintiffs or distributed to same.

14

## Count 6
## Fraud

42.    Counter-Plaintiffs incorporate all paragraphs herein as if set forth within Count 6 in their entirety.

43.    As noted above, Counter-Plaintiffs invested heavily ($millions$, the Investment) in ICI/Orca ICI/Orca and Axis/LSP, and other Berry-Related Entities for the benefit of Counter-Plaintiffs.  Such Investment was seed-money/assets for — and investment in — Berry-Related Companies.

44.    Counter-Plaintiffs invested the millions of dollars/assets based specifically upon Counter-Defendants' representations/promises to start-up, manage, develop, operate, and/or control Investmentsfor the benefit of Counter-Plaintiffs (which is also for the benefit of L.Berry and his Trust, in part).

45.    More specifically, and to induce the Investment, Counter-Defendants promised to re-pay the original value of the Investment ($millions$) to the Counter-Plaintiffs; and further promised that the Investment would be for the benefit of the Counter-Plaintiffs (and understandably so given that L.Berry and the Trust would still share substantially in the benefits/profits).

46.    Instead, Counter-Defendants — although Counter-Defendants have paid some interest-only payments from time to time — have absconded with all or a substantial portion of the value of the Investment monies/assets + earnings.  On information and belief, Counter-Defendants apparently made interest payments to prolong the process (run out the clock) — all the while never intending to re-pay the original value of the Investment; and all the while never intending to deliver such Investment (+ earnings) to Counter-Plaintiffs.

47. Presently, Counter-Defendants have gone dark on this discussion, and thereby indicated that L.Berry, individually and as trustee for the Trust, never intended to abide by the representations/promises designed to induce the Investment.

48. Counter-Defendants' fraud/fraud in the inducement has resulted in substantial, unearned profits for Counter-Defendants, personally and for the Trust; and great financial losses to the Counter-Plaintiffs.

49. The above-described conduct constitutes fraud and fraud in the inducement, and thus is actionable in favor of one or more of the Counter-Plaintiffs. For such fraud and fraud in the inducement, the Counter-Plaintiffs now file and assert all such claims and causes of action against Counter-Defendants.

## VIII.
## CAUSATION

50. Counter-Plaintiffs incorporate all above paragraphs as if set forth herein in their entirety.

51. Counter-Plaintiffs would show that all causes of action/claims set forth herein have been the cause, proximate cause, producing cause, and cause-in-fact of substantial harm and financial losses to Counter-Plaintiffs. For all such harm and financial losses, these Counter-Plaintiffs sue.

## IX.
## LEGAL DAMAGES / REMEDIES

52. Counter-Plaintiffs incorporate all above paragraphs as if set forth herein in their entirety.

53. For all harm and financial losses suffered by Counter-Plaintiffs and arising from wrongful and/or inequitable conduct of Counter-Defendants, these Counter-Plaintiffs now sue.

54. Counter-Plaintiffs file all causes of action/claims as set forth herein to recover monetary relief for the substantial harm and financial damages suffered by Counter-Plaintiffs; to wit; compensatory damages, actual damages, consequential damages, restitution damages,

16

disgorgement damages, and other damages. Counter-Plaintiffs claims asserted herein are for substantial harm and financial losses greatly in excess of $1,000,000.00.

55.     Counter-Plaintiffs file all causes of action/claims as set forth herein to recover monetary relief for the harm and financial damages suffered by Counter-Plaintiffs; to wit; attorneys' fees.

56.     Counter-Plaintiffs file all causes of action/claims as set forth herein to recover monetary relief for the harm and financial damages suffered by Counter-Plaintiffs; to wit; prejudgment and post-judgment interests — as allowed by law.

57.     Counter-Plaintiffs, pursuant to Texas Civil Practice & Remedies Code ("TCPRC") section 37.004, seek declaration that transfers / conveyances / contracts / Manager appointments executed/ accepted by Counter-Defendant L.Berry (e.g., purportedly involving Orca Assets GP LLC, and/or Axis Midstream Holdings LLC (as wholly owned/Managed by Berry GP and/or Redfish Bay Terminal Inc.), and/or others)) without majority Board of Directors approval are void, void ab initio, voidable, invalid, and/or of no legal force or effect.

WHEREFORE, PREMISES CONSIDERED, Counter-Plaintiffs pray for all relief as requested herein, for costs of court in addition thereto, and for such other and further relief to which Counter-Plaintiffs may show themselves justly entitled as against Counter-Defendants (L.Berry and the ALB Trust).

Respectfully submitted,

**LAW OFFICE OF DOUGLAS ALLISON**

By: */s/ Douglas A. Allison*
    Douglas A. Allison
    State Bar No. 01083500
    doug@dallisonlaw.com
    403 N. Tancahua Street
    Corpus Christi, Texas 78401
    Telephone: (361) 888-6002
    Facsimile: (361) 888-6651

    ATTORNEY FOR MARTY BERRY,
    BERRY GP, INC., BERRY
    OPERATING COMPANY, LLC and
    BERRY CONTRACTING LOP

## CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of December 3, 2024, a true and correct copy of the above was served upon the attorneys of record in the above entitled and numbered cause, via e-service.

    */s/ Douglas A. Allison*
    Douglas A. Allison

18

**CAUSE NO. 24-BC11A-0025**

| | | |
|---|---|---|
| ALBERT THEODORE POWERS; | § | IN THE BUSINESS COURT |
| ALLIED PORTS LLC, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | 11A – STATE OF TEXAS |
| | § | |
| AXIS MIDSTREAM HOLDINGS LLC; | § | |
| ALLEN LAWRENCE BERRY; | § | |
| MARVIN GLENN BERRY; and | § | |
| BONNIE BERRY, as successor in | § | |
| interest to DENNIS WAYNE BERRY | § | |
| | § | |
| *Defendants.* | § | HONORABLE SOFIA ADROGUE |

# DEFENDANTS' EXHIBIT 26

# AVAILABLE IN CAMERA

# AMENDED AND RESTATED OPERATING AGREEMENT
## of
## LONE STAR PORTS ENTERPRISES, LLC

**THIS AMENDED AND RESTATED OPERATING AGREEMENT OF LONE STAR PORTS ENTERPRISES, LLC** is made and entered into as of the 21st day of April, 2020, by and between Lone Star Ports Ventures, LLC, a Delaware limited liability company ("**LSPV**"), and Lone Star Ports Enterprises, LLC, a Delaware limited liability company (the "**Company**").

1. **DEFINITIONS**. The following terms have the meanings ascribed to them below when used elsewhere in this Agreement with the initial letter capitalized.

"**Acceptance Notice**" has the meaning ascribed to that term in Section 9.4(c).

"**Act**" means the Delaware Limited Liability Company Act, 6 Delaware Code, Title 6, Chapter 18, as amended.

"**Additional Acceptance Notice**" has the meaning ascribed to that term in Section 9.4(c).

"**Additional Capital Contributions**" has the meaning ascribed to that term in Section 4.2.

"**Affiliates**" means, with respect to a specified individual or entity (a) any individual who is related to such individual to any degree by blood, marriage, or adoption, (b) any entity that directly or indirectly through one or more intermediaries controls, is controlled by, or is under common control with such individual or entity, whether by ownership of voting interests, management policies, contract, or otherwise, and (c) any officer, director, shareholder, owner, partner, member, trustee, manager, employee, or agent of such individual or entity.

"**Agreement**" means this Operating Agreement of Lone Star Ports Enterprises, LLC.

"**Axis**" means Axis Midstream Holdings, LLC, a Texas limited liability company.

"**Bay**" has the meaning ascribed to that term in Section 3.5.

"**Capital Account**" has the meaning ascribed to that term in Section 4.4.

"**Code**" means the Internal Revenue Code of 1986, as amended.

LONE STAR PORTS ENTERPRISES, LLC OPERATING AGREEMENT 042320.DOC

Confidential

ALB_001181

"**Company**" means Lone Star Ports Enterprises, LLC, a Delaware limited liability company.

"**Company Assets**" means any and all assets of the Company including without limitation any (a) real property, securities, contracts, accounts receivable, cash, or any other asset or receivable of the Company, (b) shares, operating interests, or other equity interests in any Affiliate of the Company, (c) other rights and interests, including incentive interests, incentive units, or other benefits in or from any Affiliate of the Company, and (d) other amounts directly or indirectly received, or distributions made in respect of, any Affiliate of the Company, including without limitation earnings, profits, proceeds, dividends, refinancing proceeds, disposition proceeds, incentive units or payments, and other receipts of any type or nature in respect of or relating to any Affiliate of the Company.

"**Company Expenses**" includes but is not limited to Company organizational costs, costs for tax return preparation, financial statement preparation and/or audits, legal fees and costs, filing, licensing, or other governmental fees, other third party audits, loan fees and servicing fees, Company administration costs, capital acquisition fees and costs including without limitation payments to third parties who are contracted to raise capital for the Company, loan brokerage and origination and/or other fees associated with any credit facilities, costs associated with ownership or operation of real property (e.g., property improvement and rehabilitation costs not otherwise capitalized, sales and leasing commissions, property taxes, property management, insurance premiums, utilities, and other expenses associated with ownership or operation of the property), and any other expenses associated with the operation of the Company or the management of Company Assets. Company Expenses may be direct costs, or allocated costs reimbursable to third parties or entities (including Manager or its Affiliates).

"**Co-Sale Notice**" has the meaning ascribed to that term in Section 9.4(d).

"**Co-Sale Right**" has the meaning ascribed to that term in Section 9.4(d).

"**Distributable Cash**" means cash generated from the Company's Assets and other operations of the Company after payment of or provision for Company Expenses and such amounts as Manager deems reasonable in order to provide for any anticipated, contingent, or unforeseen expenditures or liabilities of the Company. Distributable Cash shall be determined without regard to (a) capital contributions made by Members or (b) principal advanced on Company indebtedness.

"**Distributions**" means amounts which are from time to time distributed in cash or property to holders of Units.

"**EPCM Contract**" has the meaning ascribed to that term in Section 3.5.

2

Confidential

ALB_001182

"**Fair Market Value**" shall be determined by Manager based upon a combination of recent appraisals, third party valuations, and additional internal valuation methods, including but not limited to capitalization rate and income valuations.

"**Harbor Island Wood Tract Lease**" means the Commercial Ground Lease Agreement dated August 7, 2018 pursuant to which ERF Port Aransas, Inc., as lessor, leases the Harbor Island Wood Property to HIP, as assignee lessee, a copy of which is attached to this Agreement as Exhibit 3.

"**Harbor Island Wood Tract Property**" means the parcel of land on Harbor Island in Nueces County, Texas, which is leased from ERF Port Aransas, Inc., as lessor, to HIP, as assignee lessee, pursuant to the Harbor Island Wood Tract Lease, which property is described with greater particularity in the Harbor Island Wood Tract Lease

"**HIP**" means Harbor Island Properties, LLC, a Delaware limited liability company.

"**Information**" has the meaning ascribed to that term in Section 11.

"**Initial Capital Contribution**" has the meaning ascribed to that term in Section 4.1.

"**Intangible Rights**" means the rights and interests relating to the Project that have been transferred by LSPH and its Affiliates to Axis, which are listed in Exhibit 5 attached to this Agreement.

"**Issuing Notice**" has the meaning ascribed to that term in Section 9.7(a).

"**LSP**" means Lone Star Ports, LLC, a Delaware limited liability company.

"**LSPH**" means Lone Star Ports Holdings, LLC, a Delaware limited liability company.

"**LSPV**" means Lone Star Ports Ventures, LLC, a Delaware limited liability company.

"**LSTK**" has the meaning ascribed to that term in Section 3.5.

"**Manager**" means LSPV and/or such other Person or Persons who may be appointed by the Member(s) from time to time as the Manager or one of the Managers of the Company.

3

LONE STAR PORTS ENTERPRISES, LLC OPERATING AGREEMENT 042120.DOC

Confidential

ALB_001183

"**Member**" means any individual or entity holding Units that is a party to this Operating Agreement. At the time this Agreement is signed, the sole Member is LSPV.

"**Midway Junction Property**" means the parcel of land in San Patricio County, Texas, owned by MJP, which is described with greater particularity in Exhibit 1 attached to this Agreement.

"**MJP**" means Midway Junction Properties, LLC, a Delaware limited liability company.

"**New Units**" has the meaning ascribed to that term in Section 9.7(a).

"**Offer**" has the meaning ascribed to that term in Section 9.4(a).

"**Offer Notice**" has the meaning ascribed to that term in Section 9.4(b).

"**Operator**" has the meaning ascribed to that term in Section 3.4.

"**Other Member**" has the meaning ascribed to that term in Section 9.4(a).

"**Ownership Interest**" means, for each Member, that percentage which is obtained by dividing the number of Units held by such Member by the total number of all Units held by all Members.

"**Person**" means any individual, partnership, association, corporation, company, trust, governmental authority, or other entity having a separate legal personality.

"**POCCA**" means Port of Corpus Christi Authority of Nueces County, Texas.

"**POCCA Harbor Island Property**" means the 200-acre parcel of land on Harbor Island, Texas which is leased to LSP by POCCA pursuant to the POCCA Lease, which property is described with greater particularity in the POCCA Lease.

"**POCCA Lease**" means the Amended and Restated Lease Agreement by and between POCCA and LSP for the lease of the POCCA Harbor Island Property and the use of certain docks and berths that are to be constructed on and adjacent to Harbor Island, dated as of December 10. 2019, which was amended by a letter agreement dated March 31, 2020, copies of which are attached to this Agreement as Exhibit 4.

"**Project**" has the meaning ascribed to that term in Section 3.2.

4

Confidential

ALB_001184

**"Project Company"** means any entity formed or used in connection with the Project or any aspect of the Project, including without limitation the Company, LSP, MJP, RBP, HIP, and Axis.

**"RBP"** means Redfish Bay Properties, LLC, a Delaware limited liability company.

**"Redfish Bay Property"** means the parcels of land located in Aransas Pass, Texas which are owned by RBP and which are described with greater particularity in Exhibit 2 attached to this Agreement.

**"Special Matter"** has the meaning ascribed to that term in Section 7.6.

**"Special Meeting"** has the meaning ascribed to that term in Section 9.7(b).

**"Special Transfer Notice"** has the meaning ascribed to that term in Section 9.4(e).

**"Substitute Member"** means a Member who acquires Units from another Member, in compliance with the terms and conditions of Section 9.1.

**"Transfer"** has the meaning ascribed to that term in Section 9.1.

**"Transferring Member"** has the meaning ascribed to that term in Section 9.4(a).

**"Treasury Regulations"** means the United States Treasury Regulations enacted pursuant to the Code.

**"Unit"** or **"Units"** has the meaning ascribed to that term in Section 4.3.


## 2. ORGANIZATIONAL MATTERS.

**2.1 Formation.** The Company was organized under the Act as a Delaware limited liability company on May 31, 2019 pursuant to the filing of a Certificate of Formation with the Secretary of State of Delaware (Delaware State File Number 7445564).

**2.2 Name.** The name of the Company is Lone Star Ports Enterprises, LLC.

5

Confidential                                    ALB_001185

**2.3** **Principal Place of Business**. The principal place of business of the Company shall be 5005 Riverway Drive, Suite 440, Houston, Texas 77056, or such other place or places as Manager may from time to time determine.

**2.4** **Registered Office and Registered Agent**. The Company's initial registered office shall be at 16192 Coastal Highway, Lewes, Delaware 19958, and the name of the initial registered agent is Harvard Business Services, Inc. at the same address.

**2.5** **Names and Addresses of Members**. The name of the sole Member of the Company and its registered office address are as follows:

**Lone Star Ports Ventures, LLC**
16192 Coastal Highway
Lewes, Delaware 19958

The names of the Members, as amended from time to time and maintained in the Company's records, are hereby incorporated by reference.

**2.6** **Effect of Inconsistencies with the Act**. To the extent that the rights or obligations of any Member are different by reason of any provision of this Agreement than they would be in the absence of this Agreement, this Agreement shall, to the extent permitted by the Act, control.

**2.7** **Adoption of Agreement**. Each person acquiring Units in the Company shall be admitted as a Member and shall, by written instrument in form and substance acceptable to Manager, accept, adopt, and be bound by the terms and provisions of this Agreement, and such person shall each execute and deliver such other instruments as Manager reasonably deems necessary or appropriate to effect, and as a condition to, such acquisition of Units.

**2.8** **Fiscal Year**. The Company's taxable year will end on the 31st day of December in each year unless the Members unanimously agree to change that date.

**2.9** **Company Bank Accounts**. The Company's available cash will be deposited or placed in one or more accounts, which generally shall be at federally insured financial institutions. Each such account will consist of investments that are immediately liquid, and that are sufficiently safe while attempting to produce a yield (if any) on the Company's cash.

## 3. PURPOSES AND BUSINESS OF THE COMPANY; PROJECT; COMPANY AND PROJECT STRUCTURE.

**3.1** **Purposes and Business**. The purposes and businesses of the Company are to generate positive financial returns to Members by originating, acquiring,

6

Confidential

ALB_001186

holding, operating, exploiting, and disposing of assets and conducting such other business activities as from time to time shall be determined by the Members and as shall be permissible under relevant laws.

**3.2    The Project.**  The primary initial activities of the Company will be to serve as a holding company to hold all equity and operating interests in LSP, MJP, RBP, HIP, and Axis, which have been formed to develop, construct, own, and operate a hydrocarbons delivery system at facilities owned by LSP, MJP, RBP, and HIP and utilizing intangible property owned by Axis, which system will include tankage, shipping, reception, collection, consolidation, storage, transfer, staging, pumping, delivery, pipeline, and other facilities and a premier deep-water crude oil export terminal to be developed at and between the Midway Junction Property, the Redfish Bay Property, and the Harbor Island Property (collectively, the "**Project**").

**3.3    Structure of the Project.**  The initial organizational and holding structure for the Project will be that (a) the Member(s) will own all equity and operating interests in the Company, (b) the Company will own all equity and operating interests in LSP, MJP, RBP, HIP, and Axis, (c) LSP will own a leasehold interest in the POCCA Harbor Island Property pursuant to the POCCA Lease, (d) MJP will own the Midway Junction Property, (e) RBP will own the Redfish Bay Property, (f) HIP will own a leasehold interest in the Harbor Island Wood Tract Property pursuant to the Harbor Island Wood Tract Lease, (g) Axis will own the Intangible Rights, (h) the Company will enter into an operating agreement with an experienced marine crude oil terminal operator, as described in more detail in Section 3.4, (i) the Company, in collaboration with the Operator, Bay, and other consultants retained by the Company for the Project, will establish the detailed scope and standards for the Project, and (j) the Company will enter into an EPCM Contract with Bay Ltd. for the development and construction of the Project based upon those detailed scope and standards, as described in more detail in Section 3.5.

**3.4    The Operator.**  The Company intends to identify, and enter into a transaction with a highly regarded, experienced, and qualified crude oil marine port operator that has the ability to improve Project economics (the "**Operator**"), pursuant to which the Operator may (a) participate in the planning for and development of the Project, (b) enter into an operating agreement with a Project Company to operate one or more of the Project facilities after their completion, and (c) possibly make an equity investment in the Company or one or more Project Companies. Any such transaction and the terms of such transaction will require that (i) the Members agree on the identity of the Operator and the terms of any transactions or relationships with the Operator, (ii) the Members jointly negotiate in good faith the terms of the transactions or relationships with the Operator, and (iii) any equity or operating interest in the Company or any Project Company to be received by the Operator shall be in exchange for a cash equity contribution by the Operator to the Company or the Project Company at a value and on terms agreed by the Members.

7

Confidential                                                                                          ALB_001187

**3.5** **EPCM Contract**. The Members agree that Bay Ltd. and/or one or more other entities designated by Berry GP, Inc. ("**Bay**") will be the primary contractor for the Project pursuant to a contract for the management and execution of engineering, procurement, fabrication, and construction of the Project (the "**EPCM Contract**"). The scope, details, and terms of such EPCM contract will be negotiated in good faith between Bay and the Company, whereby Bay will self-perform all well-defined quantified elements of the primary scope of work for items within its published expertise, capability, and experience on a lump sum turn key ("**LSTK**") basis. Certain other mutually agreed specialty work (e.g. right-of-way acquisition, dredging, LB Pipeline installation, environmental mitigation, cultural and geotechnical soil studies, and similar specialty work), including work items insufficiently defined quantitatively as of the effective date of the EPCM Contract, will be performed, following development of respective definitive scopes of work, by third-party contractors, or Bay, on a competitive fixed cost, unit price, or modified lump sum basis managed and administered by Bay. All such items will initially be assigned a Target Budget line item for tracking purposes, but converted to one of the above alternative pricing methods once appropriate supporting investigations, studies, inspections, and/or preliminary engineering, including without limitation subsurface and hydrological conditions of the properties, have been performed. These supporting studies will require focused cooperation among the Company, Bay, and the Operator, as well as interim funding in order to support an aggressive timetable for completion of the Project.

The process for establishing the LSTK price for the Project will:

a) Follow industry norms and standards;
b) Include open book principles and industry metrics;
c) Establish competitive processes for solicitation and award of third-party subcontracted work;
d) Include Bay's agreed margin for all such work;
e) Include reasonable allowances for market risk and escalation;
f) Include a fair and reasonable mechanism for change for undefined or unanticipated elements of work;
g) Establish the extent to which Bay will provide management, oversight, and bonding for third-party contractors, and mechanisms for Bay to participate, if appropriate;
h) Be based on a neutral cash flow scenario for funding of work by Bay and all third-party subcontractors; and
i) If applicable, be subject to the review and comments of the Company's Engineer.

For bonding, risk mitigation, schedule attainment, and considering Bay's role as single source primary EPCM Contractor, Bay will retain the first right of refusal to perform work alternately priced by third parties following a private and confidential executive review of such proposals. With the agreement of Bay and the Company, Bay

8

Confidential

shall self-perform such selected work, provided its proposal is compliant, represents fair market value, and meets the Project schedule requirements.

## 4. CAPITAL AND CONTRIBUTIONS.

**4.1** **Capital Contributions**. The initial capital of the Company is the contribution by LSPV to the Company of all equity and operating interests in LSP, MJP, RBP, HIP, and Axis (collectively, the "**Initial Capital Contribution**").

**4.2** **Additional Capital Contributions**. The Members shall contribute to the capital of the Company from time to time such additional amounts of cash or other property as the Company determines is necessary to achieve the Company's purposes and conduct the Company's businesses, including without limitation all Company Expenses that cannot be paid from the Company's revenues ("**Additional Capital Contributions**"). No Member shall be required to make any Additional Capital Contributions.

**4.3** **Membership Units**. The interest of each Member in the capital and profits of the Company is represented by Units, which shall represent proportional Ownership Interests in the Company (each, a "Unit", and collectively, the "**Units**"). The initial number of Units in the Company is one (1) Unit, which Unit is held by LSPV and represents One Hundred Percent (100%) of the initial outstanding equity and operating interests in the Company.

**4.4** **Capital Accounts**. An individual capital account (a "**Capital Account**") shall be established and maintained for each Member in accordance with the following:

(a) There shall be credited to each Member's Account: (i) the amount of Capital Contributions by such Member to the Company in exchange for its Units in the Company pursuant to Section 4.1, (ii) the amount of cash and the Fair Market Value at the time of such contribution of any non-cash property contributed by such Member to the Company as Additional Capital Contributions, and (iii) such Member's share of the income and gain (and all items thereof) of the Company (including income or gain exempt from federal income tax and income and gain described in Treasury Regulation §1.704-1(b)(2)(iv)(g), but excluding income and gain described in Treasury Regulation §1.704-1(b)(4)(i)), as allocated pursuant to Section 5.1.

(b) There shall be charged against each Member's Capital Account: (i) the amount of cash and the Fair Market Value at the time of the relevant Distribution of all property distributed to such Member by the Company; (ii) such Member's share of expenditures of the Company described in Code §705(a)(2)(B); and (iii) such Member's share of the losses and deductions of the Company (including losses and deductions described in Treasury

9

Confidential

ALB_001189

Regulations §1.704-1(b)(2)(iv)(g), but excluding such Member's share of expenditures of the Company described in Code §705(a)(2)(B) and losses and deductions described in Treasury Regulations §1.704-1(b)(4)(i)), as allocated pursuant to Section 5.1.

(c)     It is the intent of the Members that the provisions of this Agreement relating to the establishment and maintenance of Capital Accounts comply with the requirements of Treasury Regulations §1.704-1(b)(2)(iv) or any successor provision, and that such provisions are interpreted and applied in a manner consistent with such Treasury Regulations or successor provision. Members' capital accounts may not necessarily reflect the stated value of the Members' investments and may not have a correlation to calculations of Unit values or any amounts payable to the Members pursuant to this Agreement, but allocations are intended to reflect the Members' interests in the Company and to have substantial economic effect.

## 5.     ALLOCATION OF PROFITS AND LOSSES; DISTRIBUTIONS.

**5.1     Allocation of Profits and Losses**. Each item of Company income, gain, loss, deduction, or credit shall be allocated among the Members in accordance with this Section 5.1. Net profits first shall be allocated to the Members having negative Capital Account balances, in proportion to their adjusted negative Capital Accounts. Any remaining profits or net losses shall be allocated to the Members to create Capital Account balances for the Members that are equal to the amount of cash that would be distributed under Section 5.2. If an allocation of net losses exceeds the positive Capital Account balances of the Members, the excess shall be allocated in accordance with the Members' Ownership Interests.

**5.2     Distributions of Cash and Property**. All distributions of cash and property from the Company shall be made in the following order of priority:

(a)     First, one hundred percent (100%) to the payment of interest and principal payments on any credit facility and/or debt obligations of the Company, to the extent thereof;

(b)     Second, one hundred percent (100%) to the payment of Company Expenses; and

(c)     Thereafter, to the Members, pro rata in proportion to their Ownership Interests.

The amount of all distributions of cash shall be the face value of such distributed cash. The amount of all distributions of Company Assets other than cash shall be the Fair Market Value of such distributed Company Assets.

10

Confidential                                                                ALB_001190

## 6. BOOKS OF ACCOUNT, RECORDS, AND REPORTS.

**6.1    Books and Records**. The Company shall maintain at its principal place of business the Company's books and records, a register showing a current and past list of the full names and last known addresses of its Members, a copy of its Certificate of Formation, a copy of this Agreement and all amendments thereto, copies of the Company's federal, state, and local tax returns and reports, if any, for the three most recent years, and copies of any financial statements of the Company for the three most recent years. The Company shall keep proper and complete records and books of account, entering fully and accurately all transactions and other matters relative to the Company's business as are usually entered into records and books of account maintained by persons engaged in businesses of a like character. The Company shall maintain its books and records in full accordance with generally accepted accounting principles and on the accrual basis (except in circumstances where it determines that the cash or income tax basis of accounting will be in the best interest of the Company). Each Member shall have access to all such information at all reasonable times.

**6.2    Financial Statements; Reports**. The Company will also employ a certified public accountant to prepare its tax returns and perform an audit of the Company's financial statements annually. The cost of any financial statements, tax returns, and audits will be paid by the Company. As soon as practicable following the close of each taxable year, the Company will provide the Members with information for their use in preparing documents required to be filed under federal and state income tax laws and other applicable laws. The cost for all such reports shall be borne by the Company.

**6.3    Tax Matters**.

    **(a)    Tax Elections**. The Company shall, without any further consent of the Members being required, make any and all elections for federal, state, local, and foreign tax purposes, file any tax returns, and execute any agreements or other documents relating to or affecting such tax matters, including agreements or other documents that bind the Members with respect to such tax matters or otherwise affect the rights of the Company and the Members.

    **(b)    Tax Classification**. The Company shall take such action as may be required under the Code and the Treasury Regulations to cause it to be taxable as a partnership for federal and state income tax purposes.

## 7. MEMBER; MEETINGS AND DECISIONS.

**7.1    Information Rights**. Each Member shall be entitled to full information regarding all Company, Project, and Project Company matters at all times.

11

Confidential                                                                                    ALB_001191

**7.2    Participation in Governance.**  Each Member shall be entitled to participation in all significant Company management and operational matters and to participation on governing or management bodies for the Company and each Project Company commensurate with the relevant ownership interests of the owners of the Company or the relevant Project Company.

**7.3    Members' Meetings.**  The Company shall hold meetings of the Members at mutually-agreeable times and places (which meetings may be conducted wholly or partially by telephone or other electronic means in which all participants are able to communicate with one another simultaneously) and the quorum for such meetings shall be the Manager and a majority of Members measured by Operating Interests, not numbers.  The Company shall hold at least one physical meeting of the Members in each year.  In addition, a meeting of Members shall be held if it is called by either Member in a written request for the meeting, describing the purpose or purposes for which it is to be held.  In either case, Manager shall call a meeting by providing written notice to the Members stating the purpose of the meeting, and the date, time, and place of the meeting.  Such meeting shall be held at a time and place designated by Manager not less than ten (10) days or more than thirty (30) days after Manager's written notice to the Members.  All meetings of Members shall be held at the principal office of the Company or any other place specified in the Notice of Meeting.

**7.4    Proxies.**  A Member may be represented at a meeting in person or by written proxy.  A proxy shall be in writing executed by the Member and filed with Manager before the commencement of the meeting.

**7.5    Voting.**  On each matter requiring action by the Members, each Member may vote the Member's Ownership Interest.

**7.6    Special Matters.**  Decisions regarding actions to be taken by the Company on the following matters (each, a "**Special Matter**") shall be made by unanimous agreement of the Members:

(a)    approval of the Company's annual capital and operating budgets;

(b)    any contractual arrangement between a Member and/or one or more of its Affiliates and the Company or any Project Company, including without limitation the EPCM Contract, the approval or disapproval of any other transaction by or relating to the Company or any Project Company in which any Member, member of the Advisory Board, or officer of the Company or any Project Company has an actual or potential conflict of interest, or any other transaction not in the ordinary course of the business of the Company or any Project Company;

12

Confidential

ALB_001192

(c)     any increase in the authorized or issued capital of the Company or any Project Company;

(d)     any amendment of the Governing Documents of the Company or any Project Company;

(e)     any distributions by the Company to any Member; provided, however, that the Members acknowledge and agree that, to the extent that the Company has positive net operating cash flow, including without limitation funds distributed to the Company from any Project Company, that is not required for the business purposes set forth in Sections 3.1 and 3.2 in any fiscal year or for reasonable reserves of the Company and the Project Companies, the amount of such operating net cash flow shall be distributed by the Company to its Members, in proportion to their Operating Interests;

(f)     any material change in the nature of the business of the Company or any Project Company;

(g)     any agreement pursuant to which the Company or any Project Company could be obligated to pay an amount greater than One Hundred Thousand Dollars ($100,000), including without limitation by way of any borrowing, guarantee, or pledge of assets by or on behalf of the Company or any Project Company, except as provided in this Agreement or otherwise in the ordinary course of business;

(h)     any sale or other disposition of assets of the Company or any Project Company having a value in excess of One Hundred Thousand Dollars (US$100,000), other than in the ordinary course of business;

(i)     any purchase or acquisition of assets or any interest in any other Person by the Company or any Project Company having a cost in excess of One Hundred Thousand Dollars (US$100,000), other than in the ordinary course of business;

(j)     any issuance of Operating Interests, Units, or other equity, debt, or operating interests in the Company, the Project, or any Project Company;

(k)     any determination that the Company or any Project Company has Additional Capital Requirements;

(l)     the appointment or replacement of the auditors, or substantial change in the accounting policies, of the Company or any Project Company;(m) the appointment or replacement of legal counsel or the commencement of, or decision to dismiss or settle, any legal or administrative proceedings relating to the Company or any Project Company;

13

Confidential

ALB_001193

(m)     the appointment, compensation, or termination of the senior officers of the Company and each Project Company;

(n)     any change in the number of Managers or the number of Managers to be nominated by each Member;

(o)     the approval or disapproval of a merger or other consolidation of the Company or any Project Company with another entity;

(p)     the approval or disapproval of the dissolution or reorganization of the Company or any Project Company;

(q)     incurrence by the Company or any Project Company of capital or operating expenses in excess of budgeted amounts; and

(r)     the termination, supersession, or amendment of this Agreement.

## 8.     MANAGER.

**8.1     Rights and Powers**. The Company shall be managed by the Manager. The initial sole Manager of the Company is Lone Star Ports Ventures, LLC. Manager has all of the rights and powers of a Manager as provided in the Act, this Agreement, and as otherwise provided by law.

**8.2     Liability to the Company; Indemnification**. To the greatest extent permitted by law, neither Manager nor any of its Affiliates shall be liable, responsible, or accountable in damages or otherwise to the Company or any Member for any action taken or failure to act on behalf of the Company within the scope of the authority conferred on Manager by this Agreement or by law unless such act or omission was performed or omitted fraudulently or in bad faith. To the greatest extent permitted by law, the Company shall indemnify and hold harmless Manager and each of its Affiliates against and from any personal loss, expense, damage, or injury suffered or sustained by Manager or such Affiliate by reason of any acts, omission, or alleged acts or omissions arising out of its activities on behalf of the Company or in furtherance of the interests of the Company, including but not limited to any judgment, award, settlement, attorney fees, and other costs or expenses incurred in connection with the defense of any actual or threatened action, proceeding, or claim and including any payments made by Manager to any of its Affiliates if the acts, omissions, or alleged acts or omissions upon which the actual or threatened action, proceeding, or claim is based were for a purpose reasonably believed to be in the best interests of the Company, and were not performed or omitted fraudulently or in bad faith by Manager or its Affiliates and were not in violation

14

Confidential

ALB_001194

of Manager's fiduciary obligations to the Company. Any indemnification shall only be from Company Assets.

**8.3** **Prohibited Acts**. Anything in this Agreement to the contrary notwithstanding, Manager shall not cause or permit the Company to: (a) reimburse Manager for expenses incurred or for salaries of its officers except as otherwise expressly provided in this Agreement or otherwise authorized by the Members or their Affiliates, (b) pay for any services performed by Manager or its Affiliates, except as authorized by the Members or their Affiliates, or (c) receive any rebate, kickback, or other inducement in connection with Company activities, or participate in reciprocal business arrangements which circumvent this provision.

**8.4** **Removal or Withdrawal of Manager**. The Members may, by unanimous written consent or affirmative vote, and with at least ninety (90) days' notice, remove Manager. The Members may then, by a majority vote or written consent, elect a new Manager provided; however, that such removal of Manager shall not become effective until the election of the new Manager. Manager may voluntarily resign as Manager at any time with at least ninety (90) days' written notice to the Members. In the event of Manager's resignation, a Manager may be substituted who is acceptable to Members holding a majority of the Ownership Interests. Manager's resignation shall not become effective until the election of a new Manager by the Members, or ninety (90) days from the date of Manager's resignation notice to the Members, whichever comes first. Any removal or resignation of Manager shall in no way impair or otherwise affect any rights of Manager attributable to the period prior to the effective date of removal, including without limitation Manager's Ownership Interest.

**8.5** **Power of Attorney**. Each Member who executes a signature page to this Agreement thereby irrevocably constitutes and appoints Manager, with full power of substitution, as its true and lawful attorney-in-fact, in its name, place, and stead to execute, acknowledge, swear to, verify, deliver, file, and publish, if necessary: (a) this Agreement; (b) all amendments, alterations, or changes to this Agreement, including amendments admitting a substituted or additional Member, if otherwise authorized under this Agreement; (c) all instruments which effect a change in the Company or a change in this Agreement; (d) all certificates or other instruments necessary to qualify or maintain the Company as a limited liability company in which the Members have limited liability in the jurisdictions(s) where the Company may conduct business; and (e) all instruments necessary to effect a dissolution, termination, and liquidation of the Company and cancellation of this Agreement when such dissolution, termination, liquidation, or cancellation is otherwise provided in this Agreement. This power of attorney is deemed coupled with an interest and shall survive the death or disability of a Member or the assignment or transfer of all or any part of the interest of such Member in the Company until the transferee or assignee shall have become a Substitute Member and shall have executed such instruments as Manager deems necessary to bind such transferee or assignee under the terms of this Agreement as it may hereafter be amended. Manager may exercise this power of attorney for each Member by listing all of the Members and

15

Confidential

ALB_001195

executing any instrument with a single signature of Manager acting as attorney-in-fact for all of them.

## 9. TRANSFERS OF UNITS.

**9.1 Transfers and Transferors.** No Member or any other Person shall sell, assign, transfer, dispose of, donate, mortgage, pledge, hypothecate, charge or otherwise encumber or deal with (each, a "**Transfer**") any of his/her/its Units except in strict compliance with this Section 9.1. Each Member hereby agrees that (a) it will not Transfer all or any fraction of his/her/its Units, except as permitted by this Agreement, (b) in no event, shall all or any part of its Units be transferred to a minor or a person who is incapacitated, except in trust or by will or intestate succession, and (c) it will pay all expenses, including attorneys' fees, incurred by the Company in connection with a Transfer of its Units. The Company shall not recognize for any purpose any purported Transfer of all or any part of any Units, unless (i) there shall have been filed with the Company a dated notice of such Transfer, in a form satisfactory to Manager, executed and acknowledged by both the transferor or such transferor's legal representative and the transferee, and (ii) such notice (A) contains the acceptance by the transferee of all the terms and provisions of this Agreement and such transferee's agreement to be bound hereby, and (B) represents that such Transfer was made in accordance with the terms and conditions of this Agreement and all applicable laws, rules, and regulations. Any Member which shall Transfer all of its Units shall cease to be a Member upon, but only upon, compliance with the provisions of this Section 9.1 and the admission by the Company of the transferee as a Member (a "**Substitute Member**") in such transferor Member's stead. Notwithstanding anything to the contrary contained in this Agreement, both the Company and Manager shall be entitled to treat a Member transferring all or any part of its Units as the absolute owner of such Units in all respects, and shall incur no liability for distributions made in good faith to such Member, until such time as a Substitute Member is admitted by the Company in such Member's stead in respect thereof.

**9.2 Substitute Members.** No Member shall have the right to cause a transferee of all or any part of such Member's Units to become a Substitute Member, except in strict compliance with the terms and conditions of Section 9.1. Unless and until a transferee of Units becomes a Substitute Member, such transferee shall have no rights with respect to such Units other than those rights with respect to allocations and distributions. Any such transferee of Unit(s) (whether pursuant to a voluntary or involuntary Transfer) shall be admitted to the Company as a Substitute Member only by satisfying the requirements of Section 9.1. Each transferee of all or part of a Member's Membership Units, as a condition to its admission as a Substitute Member, shall execute and acknowledge such instruments, in form and substance satisfactory to Manager, as Manager reasonably deems necessary or desirable to effectuate such admission and to confirm the agreement of such person to be bound by all the terms and provisions of this Agreement with respect to the Membership Units acquired. All reasonable expenses,

16

Confidential                                                                                    ALB_001196

including attorneys' fees, incurred by the Company in this connection shall be borne by such transferee.

**9.3** **Bankruptcy or Incapacity of a Member**. In the event of the bankruptcy or incapacity of a Member, the Company shall not be dissolved, and the Member's trustee in bankruptcy or other legal representative shall have no rights with respect to such Units other than those rights with respect to allocations and distributions applicable to the Units of such bankrupt or incapacitated Member as provided herein. Any Transfer to or from any trustee in bankruptcy, guardian, conservator, or legal representative shall be subject to the provisions of this Agreement.

**9.4** **Rights of First Refusal.**

**(a)** **Transfer by Members**. No Member or other Person who legally or beneficially directly or indirectly owns Units or the shares or other equity interests in a Member shall, directly or indirectly, Transfer any interest in or portion of any of the Units, the Company, any Member, any Person that directly or indirectly owns any shares or equity interests in a Member, or any of their respective Affiliates (each, a "**Transferring Member**"), unless it first shall have made an offer to sell to the other Members, in proportion to their Ownership Interests at the time of the proposed Transfer (the "**Other Members**"), the interest in or portion of the Units or other interests it proposes to Transfer in the manner prescribed in Section 9.4(b) (an "**Offer**"), and the Offer shall not have been accepted as prescribed in Section 9.4(c).

**(b)** **Making of Offer**. If a Transferring Member or other Person proposes to directly or indirectly Transfer any interest in or portion of any of the Units, the Company, a Member, any Person who directly or indirectly owns any shares or equity interests in a Member, or any of their respective Affiliates, it first shall make an offer to the Other Members, upon the terms and conditions of the proposed Transfer. The Offer shall be set forth in a Notice to the Other Members (an "**Offer Notice**") and shall include the name and address of the prospective Transferee and the terms and conditions of the proposed Transfer.

**(c)** **Acceptance of Offer**. After receiving the Offer Notice, the Other Members shall have thirty (30) days within which to elect to purchase all, but not less than all, of the interest in or portion of any of the Units or other interests proposed to be Transferred, in proportion to their Ownership Interests as of the date of the Offer Notice, Notice of such acceptance (each, an "**Acceptance Notice**") to be communicated to the Transferring Member within such thirty (30)-day period, and they shall have the further right to purchase any Units that are so proposed to be Transferred for which Acceptance Notices are not received within such thirty (30)-day period, in proportion to the Ownership Interests as of the date of the Offer Notice by Members that have provided Acceptance Notices, Notice of such further acceptance (an "**Additional**

17

Confidential                                                                 ALB_001197

**Acceptance Notice**") to be communicated to the Transferring Member within ten (10) days after the expiration of such initial thirty (30)-day period.

(d) **Co-Sale Right**. In lieu of accepting any Offer, the Other Members shall have thirty (30) days within which to elect to sell their Units to the prospective Transferee identified in the Offer, upon the same terms and conditions as contained in the Offer (the "**Co-Sale Right**"). If the Other Members elect to exercise this right, Notice of such election (a "**Co-Sale Notice**") shall be communicated to the Transferring Member within such thirty (30)-day period.

(e) **Special Transfer Provision**. In the event that (i) the Transferring Member or Transferring Members wish to make a bona fide Transfer of more than fifty percent (50%) of all outstanding Units to a bona fide third party Transferee, (ii) the Transferring Member makes an Offer to sell such Units to the Other Members in accordance with Sections 9.4(a) and 9.4(b), (iii) any Other Member does not accept such Offer in accordance with Section 9.4(c), and (iv) any Other Member does not exercise the Co-Sale Right in accordance with Section 9.4(d), the Transferring Members shall have the right, but not the obligation, to compel the Other Members to Transfer their Units to the prospective Transferee identified in the Offer, and each Other Member shall have the obligation to so Transfer its Units, on the same terms and conditions as the Transfer made by the Transferring Members, if the Transferring Member so compels the Other Member, and the proceeds received by all Members for the Units shall be pro rata in accordance with their percentage ownership of the Units so Transferred. In the event the Transferring Members wish to exercise the right to compel the Other Members to Transfer its Units pursuant to this Section 9.4(e), Notice of such election (a "**Special Transfer Notice**") shall be communicated to the Other Members.

(f) **Consummation of Transfers**. Any Transfer by one Member or another Person of any interest in or portion of Units, the Company, a Member, any Person that directly or indirectly owns any Units or other equity interest in a Member, or any of their respective Affiliates, to another Member or other Person pursuant to this Section 9.4 shall be consummated within sixty (60) days after the date of the Transferee Member's acceptance of the Transferor Member's Offer or the date on which such Member is required to sell or purchase such Units.

(g) **Release from Restriction**. If (i) an Offer is not accepted pursuant to Section 9.4(c), (ii) the Other Members do not elect to exercise the Co-Sale Right granted pursuant to Section 9.4(d), or (iii) a purchase is not consummated within the sixty (60)-day time limit provided for in Section 9.4(f), the Transferring Member may make a bona fide Transfer to the prospective Transferee named in the Offer, in strict accordance with the terms and conditions stated in the Offer and only if, prior to such Transfer, such prospective Transferee

18

Confidential                                                                                                ALB_001198

shall have agreed to be bound by the terms of this Agreement as though he or it were a Member and this Agreement shall have been amended to reflect the Transfer to such prospective Transferee. If the Transferring Member shall fail to make such Transfer within sixty (60) days after the expiration of the time provided for the acceptance of its offer by the last Member to which it has made an offer, however, such Units again shall become subject to all of the restrictions of this Section 9.4.

9.5 **Transfers to Affiliates**. The terms of Section 9.4 shall not apply to proposed Transfers by Members to their Affiliates; provided, however, that (a) any such Affiliate Transferee shall be bound by all terms and conditions of this Agreement, or (b) the Transferring Member shall remain liable for all of its obligations under this Agreement.

9.6 **Legend on Certificates**. Each certificate representing Units or any other direct or indirect interest in the Company now or hereafter held by the Members or their Affiliates shall be stamped with a legend in substantially the following form:

> "The transfer of and rights in the Units represented by this certificate are restricted under the terms of an Amended and Restated Operating Agreement of Lone Star Ports Enterprises, LLC, as amended from time to time, a copy of which is on file at the office of the Company issuing this certificate."

9.7 **Preemptive Rights**. The following shall apply to the allotment and issuance by the Company of any Units:

(a) If the Company proposes to issue additional Units ("**New Units**"), the New Units shall be offered to the Members at a price and upon terms determined by the Manager. The Company shall give written notice (the "**Issuing Notice**") to each of the Members, setting forth the price at which, and terms on which the New Units are being offered.

(b) The Issuing Notice shall state the time at which a special meeting of the Members (a "**Special Meeting**") shall be held for the purposes of this Section 9.7 at the principal office of the Company on a day which shall be not earlier than the 15th day following the date the Issuing Notice is given, provided that if the 15th day is a Saturday, Sunday, or statutory holiday, the date for the Special Meeting shall be the next following business day.

(c) Each Member wishing to purchase part or all of the New Units may attend the Special Meeting either personally or by his/her/its representative duly appointed for such purpose. A Member proposing to be represented at the Meeting shall deposit with the Manager at or prior to the

19

Confidential

ALB_001199

Special Meeting an instrument in writing, designating the representative and, if desired, an alternate representative or, alternate representatives, authorized to act on behalf of such Member at the Special Meeting.

(d)     The Manager shall preside at the Special Meeting and may prescribe such procedures for the conduct of the Special Meeting not inconsistent with the provisions of this Section 9.7 as he/she/it may consider appropriate for the purposes of carrying out the intent of this Section 9.7.

(e)     If the Members represented at the Special Meeting accept the offer stated in the Issuing Notice, the Members shall subscribe for the New Units in accordance with the Issuing Notice and shall execute a written subscription in accordance therewith which shall be accepted forthwith by the Company. The Members shall be entitled to subscribe for and purchase the New Units in such proportions as they may agree upon or, in default of such agreement, in proportion to their Ownership Interests.

(f)     Any New Units which are not subscribed for by the Members in accordance with this Section 9.7 may be offered by the Company to a third Person at the price and on the terms in the Issuing Notice, provided that no subscription shall be accepted by the Company for the sale of any such Units to a third Person except with the written consent of the holders of at least sixty percent (60%) of the Units outstanding at such time.

## 10.     TERM AND DISSOLUTION OF THE COMPANY.

**10.1     Term**. The Company is now existing and will continue indefinitely, except as provided in Section 10.2.

**10.2     Dissolution**. The Company will continue indefinitely until a date on which the Company has liquidated all of its Company Assets, or earlier upon the occurrence of any of the following events: (a) the disposition of all Company Assets and disbursement of all cash to the Members in accordance with Section 5.2; (b) the agreement by Members holding eighty percent (80%) of the Ownership Interests; or (c) the dissolution, bankruptcy, or resignation of Manager when an approved replacement is not obtained within a period of ninety (90) days after such dissolution, bankruptcy, or resignation.

**10.3     Liquidation**. If the Company dissolves, Manager (or if Manager has become bankrupt or terminated, then a liquidator or a liquidation committee selected by the holders of a majority of the Units) shall commence to wind up the affairs of the Company and to liquidate its investments. The holders of the Units shall continue to share profits and losses during the period of liquidation in the same proportion as before the dissolution. Manager (or such liquidator or liquidating committee) shall have full right and unlimited discretion to determine the time, manner, and terms of any sale or

20

Confidential

ALB_001200

sales of Company Assets, having due regard to the activity and condition of the relevant market and general financial economic conditions. Upon dissolution of the Company, the Company will be liquidated and the proceeds of liquidation will be applied in the priority set forth in Section 5.2.

**10.4** **Liquidation Statement**. Within a reasonable time following the completion of the liquidation of the Company Assets, Manager (or liquidator or liquidating committee) shall supply to each Member a statement by the Company's accountants setting forth the assets and liabilities of the Company as of the date of complete liquidation and each Member's portion of the liquidating Distributions pursuant to Section 5.2.

**10.5** **No Recourse to Assets or Members**. Each Member shall look solely to Company Assets for all Distributions with respect to the Company and its Capital Contribution, subsequent contributions, or share of profits or losses, and shall have no recourse (upon dissolution or otherwise) against any Member or Manager or their Affiliates. No Member shall have any right to demand or receive property other than cash upon dissolution and termination of the Company.

**10.6** **Termination**. Upon the completion of the liquidation of the Company and the distribution of all Company Assets, the Company shall terminate and Manager shall have the authority to execute and record the Certificate of Cancellation of the Company and any other documents required to effectuate the dissolution and termination of the Company.

**11.** **CONFIDENTIALITY**. Each of the Parties acknowledges that the Members will make available to one another certain documentation, information, and other matters in connection with the Members, the Company, their respective Affiliates, and their respective businesses (collectively, the "**Information**"). In consideration of receiving the Information, each of the Members undertakes and agrees, whether or not any such Information is strictly confidential or proprietary:

(a) not to make any use of the Information for any purpose other than in accordance with this Agreement;

(b) to hold all of the Information in the strictest confidence and not to disclose or divulge any part of the Information to any third Person without the prior written consent of the Member providing such Information, on such terms and conditions as such Member considers appropriate, unless such disclosure is absolutely required to be disclosed by a relevant governmental authority or stock exchange and the Person providing such Information is provided with a reasonable opportunity to object to the disclosure of such Information to such governmental authority prior to its disclosure;

21

LONE STAR PORTS ENTERPRISES, LLC OPERATING AGREEMENT 042120.DOC

Confidential

ALB_001201

(c)     not to make or solicit any announcement or disclosure regarding this Agreement, the other Members, the Company, their respective Affiliates, or their respective businesses, without express prior written consent;

(d)     to restrict access to the Information to those of its responsible employees and professional advisers who absolutely require such access and to impose upon all such employees and professional advisors obligations of confidentiality equivalent to those contained in this Agreement; and

(e)     not to copy, reproduce, or part with possession of any of the Information except as is strictly necessary and as is consistent with its obligations contained in this Agreement.

## 12.     MISCELLANEOUS PROVISIONS.

**12.1     Governing Law, Jurisdiction, and Venue**. This Agreement and all issues and questions concerning its application, construction, validity, interpretation, and enforcement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to any choice or conflict of laws provisions or rules (whether of the State of Delaware or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Delaware. The Company and each of the Members hereby agrees that any suit, action, or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort, or otherwise, shall be brought in the state or federal courts in New Castle County, Delaware, so long as one of such courts shall have subject-matter jurisdiction over such suit, action, or proceeding, and that any cause of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Delaware. The Company and each of the Members hereby irrevocably consents to the exclusive jurisdiction of such courts and of the appropriate appellate courts therefrom in any such suit, action, or proceeding and irrevocably waives, to the fullest extent permitted by relevant law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action, or proceeding in any such court or that any such suit, action, or proceeding which is brought in any such court has been brought in an inconvenient forum.

**12.2     Notices**. All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of (a) actual receipt, (b) the time of personal delivery to the person to be notified, (c) five (5) days after having been sent by registered or certified United States Post Office air mail, return receipt requested, postage prepaid, or (d) one (1) business day after deposit with a nationally recognized overnight air courier, freight prepaid, specifying next business day delivery, with written verification of receipt. All communications shall be sent to the Company and/or the Members, as the case may be, at their addresses as set forth in Section 2.4 or 2.5 or to such addresses as subsequently

22

LONE STAR PORTS ENTERPRISES, LLC OPERATING AGREEMENT 042120.DOC

Confidential

modified by written notice given in accordance with this Section 12.2. Each Party to this Agreement agrees to promptly notify the other Parties of any change in its address, and any failure to do so shall not affect the foregoing.

12.3 **Delays or Omissions**. No delay or omission to exercise any right, power, or remedy accruing to the Company or any Member under this Agreement, upon any breach or default of the Company or any other Member under this Agreement, shall impair any such right, power, or remedy of such non-breaching or non-defaulting Company or Member nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent, or approval of any kind or character on the part of the Company or any Member of any breach or default under this Agreement, or any waiver on the part of the Company or any Member of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to the Company or any Member, shall be cumulative and not alternative.

12.4 **Amendment, Waiver, and Termination**. This Agreement is subject to amendment only with the written consent of all Members; provided, however, that this Agreement may be amended from time to time by Manager to (a) cure any ambiguity or correct or supplement any provisions hereof which may be inconsistent with any other provision hereof, (b) correct any printing, stenographic, or clerical errors or omissions; (c) provide for the admission, withdrawal, or substitution of Members in accordance with this Agreement; (d) amend the maintained list of Members, any necessary information regarding any Member, (e) add and delete Members or Substitute Members; or (f) delete or add any provisions of this Agreement required to be so deleted or added by applicable law; provided, however, that no amendment shall be adopted pursuant to this Section 12.4 if such amendment would alter or result in the alteration of, the limited liability of the Members or the status of the Company as a partnership for federal income tax purposes. The power of attorney granted pursuant to Section 8.5 may be used by Manager to execute on behalf of a Member any document evidencing or effecting an amendment adopted in accordance with this Section 12.4. Any amendment, modification, termination, or waiver effected by written agreement of the Company and all Members, including pursuant to the foregoing two sentences, shall be binding upon the Company, all Members, and all of their respective successors and permitted assigns whether or not such successor, assignee, or other individual or entity entered into or approved such amendment, modification, termination, or waiver. No waivers of or exceptions to any term, condition, or provision of this Agreement, in any one or more instances, shall be deemed to be, or construed as, a further or continuing waiver of any such term, condition, or provision or any other term, condition, or provision.

12.5 **Binding Effect**. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the Company, all Members, and their

23

Confidential

ALB_001203

respective successors and permitted assigns. Nothing in this Agreement, express or implied, is intended to confer upon any individual or entity other than the parties to this Agreement or their respective successors and permitted assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement. Any successor or permitted assignee of any of the Members, including without limitation any prospective transferee who purchases any direct or indirect interest in the Project and/or any inter vivos or testamentary donee or transferee of any such interest, shall deliver to Manager, as a condition to any transfer or assignment, a counterpart signature page hereto pursuant to which such successor or permitted assignee shall confirm his or its agreement to be subject to and bound by all of the provisions set forth in this Agreement that were applicable to the predecessor or assignor of such successor or permitted assignee.

**12.6    Severability**. The invalidity or unenforceability of any provision of this Agreement shall in no way affect the validity or enforceability of any other provision.

**12.7    Titles and Subtitles; Sections and Exhibits**. The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement. A reference in this Agreement to a Section or Exhibit is, unless otherwise stated, a reference to a Section of or Exhibit to this Agreement.

**12.8    Counterparts**. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via electronic mail (including pdf or any electronic signature complying with the United States Federal ESIGN Act of 2000, i.e., www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

**12.9    Injunctive Relief**. In addition to any and all other remedies that may be available at law in the event of any breach of this Agreement, each party to this Agreement shall be entitled to specific performance of the agreements and obligations of the other parties hereunder and to such other injunctive or other equitable relief as may be granted by a court of competent jurisdiction.

**12.10    Advice of Counsel**. Each signatory to this Agreement hereby acknowledges that it has sought and obtained the advice of legal counsel before entering into this Agreement and has fully read and understands the meaning and import of all terms in this Agreement. No rule of construction shall apply to the disadvantage of Manager or any other Member because Manager or such other Member or its legal counsel was responsible for the preparation of this Agreement or any part of it.

24

Confidential     ALB_001204

**12.11** **Time of Essence.** The time and exactitude of the performance of each of the terms, obligations, covenants, and conditions of this Agreement are hereby declared and acknowledged by each signatory to this Agreement to be of the essence.

**12.12** **Entire Agreement.** This Agreement constitutes and expresses the entire agreement and understanding among the parties to this Agreement regarding all matters referred to herein; all previous discussions, promises, representations, and understandings relative thereto, if any, among the Parties, being been merged into this Agreement.

25

LONE STAR PORTS ENTERPRISES, LLC OPERATING AGREEMENT 042120.DOC

Confidential

**IN WITNESS WHEREOF**, the signatories to this Agreement, intending to be bound, have executed this Agreement as of the date first written above.

For and on behalf of
**LONE STAR PORTS ENTERPRISES, LLC,**
a Delaware limited liability company:

By _____
Name: _____

For and on behalf of
**LONE STAR PORTS VENTURES, LLC,**
a Delaware limited liability company

By _____
Name: _____

26

LONE STAR PORTS ENTERPRISES, LLC OPERATING AGREEMENT 042120.DOC

Confidential

ALB_001206

# EXHIBIT 1

## MIDWAY JUNCTION PROPERTY

Confidential

ALB_001207

# EXHIBIT 2

## REDFISH BAY PROPERTY

Confidential

ALB_001208

# EXHIBIT 3

## HARBOR ISLAND WOOD TRACT LEASE

Confidential

ALB_001209

# EXHIBIT 4

## POCCA LEASE

Confidential

ALB_001210

| | | |
|---|---|---|
| ALBERT THEODORE POWERS; | § | IN THE BUSINESS COURT |
| ALLIED PORTS LLC, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | 11A – STATE OF TEXAS |
| | § | |
| AXIS MIDSTREAM HOLDINGS LLC; | § | |
| ALLEN LAWRENCE BERRY; | § | |
| MARVIN GLENN BERRY; and | § | |
| BONNIE BERRY, as successor in | § | |
| interest to DENNIS WAYNE BERRY | § | |
| | § | |
| *Defendants.* | § | HONORABLE SOFIA ADROGUE |

# DEFENDANTS' EXHIBIT 27

# AVAILABLE IN CAMERA

## TRANSFER OF INTEREST

For adequate consideration, I, Allen Lawrence Berry, the Manager of Gansevoort Investments LLC do hereby transfer 100% interest in Axis Midstream Holdings LLC to Berry GP, Inc. effective this 30th day of November 2017.

_____
Allen Lawrence Berry

Confidential

ALB_007563

| | | |
|---|---|---|
| ALBERT THEODORE POWERS; | § | IN THE BUSINESS COURT |
| ALLIED PORTS LLC, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | 11A – STATE OF TEXAS |
| | § | |
| AXIS MIDSTREAM HOLDINGS LLC; | § | |
| ALLEN LAWRENCE BERRY; | § | |
| MARVIN GLENN BERRY; and | § | |
| BONNIE BERRY, as successor in | § | |
| interest to DENNIS WAYNE BERRY | § | |
| | § | |
| *Defendants.* | § | HONORABLE SOFIA ADROGUE |

# DEFENDANTS' EXHIBIT 28

# AVAILABLE IN CAMERA

# TRANSFER OF INTERESTS AND CHANGE OF MANAGER AGREEMENT

**THIS TRANSFER OF INTERESTS AND CHANGE OF MANAGER AGREEMENT** is made and entered into as of this 21st day of April, 2020 (the "**Effective Date**"), by and between Berry GP, Inc. a Texas corporation (the "**Transferor**"), and Redfish Bay Terminal, Inc, a Texas corporation (the "**Transferee**").

## RECITALS:

**WHEREAS**, Transferor owns One Hundred Percent (100%) of all equity and operating interests in Transferee; and

**WHEREAS**, Transferor owns One Hundred Percent (100%) of all equity and operating interests in Axis Midstream Holdings, LLC, a Texas limited liability company ("**Axis**"); and

**WHEREAS**, Transferor is the sole Member and Manager of Axis; and

**WHEREAS**, Transferor wishes to transfer to Transferee all equity and operating interests in Axis; and

**WHEREAS**, Transferee wishes to acquire from Transferor all equity and operating interests in Axis; and

**WHEREAS**, simultaneously with the transfer by Transferor to Transferee of all equity and operating interests in Axis, Transferor wishes to cease being the sole Member and Manager of Axis; and

**WHEREAS**, simultaneously with the transfer by Transferor to Transferee of all equity and operating interests in Axis, Transferee wishes to commence being the sole Member and Manager of Axis;

**NOW THEREFORE**, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the Transferor and the Transferee hereby agree as follows:

1. **Transfer of Operating Interests**. Effective as of the Effective Date, Transferor hereby irrevocably transfer to Transferee all equity and operating interests in Axis, free and clear of all liens, charges, pledges, options, mortgages, deeds of trust, hypothecations, encumbrances, security interests, claims, limitations, restrictions, or other rights or interests of any kind (including any restrictions on the right to vote, sell, or otherwise dispose of such right or interest). After such transfer, Transferor shall have no further direct interest in the equity and operating interests in Axis and Transferee shall own One Hundred Percent (100%) of all equity and operating interests in Axis.

2. **Acceptance of Operating Interests**. Effective as of the Effective Date, Transferee hereby accepts the transfer from Transferor of all equity and operating interests in Axis.

Confidential

ALB_001057

After such transfer, Transferee shall own One Hundred Percent (100%) of all equity and operating interests in Axis.

3. **Cessation By Transferor as Member and Manager**. Effective as of the Effective Date and simultaneously with the transfer by Transferor to Transferee of all equity and operating interests in Axis, Transferor shall cease to be the sole Member and Manager of Axis.

4. **Commencement By Transferee as Member and Manager.** Effective as of the Effective Date and simultaneously with the transfer by Transferor to Transferee of all equity and operating interests in Axis, Transferee shall commence being the sole Member and Manager of Axis.

          **IN WITNESS WHEREOF**, the signatories to this Transfer of Interests and Change of Managers Agreement, intending to be bound, have executed this Agreement as of the date first written above.

For and on behalf of
**BERRY GP, INC.**
a Texas corporation


By _____
Name: _____


For and on behalf of
**REDFISH BAY TERMINAL, INC.**
a Texas corporation


By _____
Name: Dennis W. Berry

| | | |
|---|---|---|
| ALBERT THEODORE POWERS; | § | IN THE BUSINESS COURT |
| ALLIED PORTS LLC, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | 11A – STATE OF TEXAS |
| | § | |
| AXIS MIDSTREAM HOLDINGS LLC; | § | |
| ALLEN LAWRENCE BERRY; | § | |
| MARVIN GLENN BERRY; and | § | |
| BONNIE BERRY, as successor in | § | |
| interest to DENNIS WAYNE BERRY | § | |
| | § | |
| *Defendants.* | § | HONORABLE SOFIA ADROGUE |

# DEFENDANTS' EXHIBIT 29

# AVAILABLE IN CAMERA

# BYLAWS OF

## BERRY CONTRACTING, INC.

### I.

TITLE: The title of the corporation is Berry Contracting, Inc.

### II.

LOCATION: The location of its principal office shall be 1414 Corn Products Road in the City of Corpus Christi, Nueces County, Texas

### III.

CORPORATE SEAL: The corporate seal of the company shall have inscribed thereon: "Berry Contracting, Inc."

### IV.

DIRECTORS: The property and business of the company will be managed and controlled by a board of directors consisting of not less than three nor more than seven members. They shall hold office until the next annual meeting of the shareholders or until their successors are elected and have qualified.

### V.

POWERS OF DIRECTORS: The board of directors shall have the management of the business of the company and in addition to the powers and authorities by these bylaws expressly conferred upon them, may exercise all such powers and do all such acts and things as may be exercised or done by the corporation, but subject, nevertheless, to the provisions of the statute, of the charter and of these bylaws and to any regulations from time to time made

Certified Document Number: 111508478 - Page 2 of 17

by the shareholders, provided that no regulations so made shall invalidate any prior act of the directors which would have been valid if such regulations had not been made.

Without prejudice to the general powers conferred by the last preceding clause and other powers conferred by these bylaws, it is hereby expressly declared that the board of directors shall have the following powers, that is to say:

To purchase and otherwise acquire for the company and property, rights or privileges which the company is authorized to acquire, at such prices and on such terms and conditions and for such consideration as they think proper. At their discretion, to pay for any property or rights acquired by the company, either wholly or partially, in money or in stocks, bonds, debentures, or other securities of the company.

To appoint, and at their discretion, remove or suspend, such subordinate managers, officers, assistants, clerks, agents, and servants, permanently or temporarily, as they may from time to time think fit, and to determine their duties and fix, and from time to time change their salaries or emoluments, and to require security in such instances and in such amounts as they think proper.

To confer, by resolution, upon any officer of the company the right to choose, remove or suspend such subordinate officers, agents or factors.

To appoint any person or persons to accept and hold in trust for the company any property belonging to the company or in

Certified Document Number: 111568478 - Page 3 of 17

which it is interested or for any other purpose, and to execute and do all such duties and things as may be requisite in relation to any such trust.

To create, make and issue mortgages, bonds, deeds of trust, trust agreements and negotiable or transferable instruments and securities, secured by mortgage or otherwise, and to do every other act and thing necessary to effectuate the same.

To determine who shall be authorized to sell on behalf of the company bills, notes, receipts, acceptances, endorsements, checks, releases, contracts and documents.

From time to time to provide for the management of the affairs of the company in such manner as they think proper and in particular, from time to time to delegate any of the powers of the board of directors to any committee, officer or agent, and to appoint any person to be the agent of the company with such powers, including the powers to subdelegate, and upon such terms as may be thought proper.

## VI.

MEETINGS OF THE DIRECTORS: The directors elected at the annual meeting of the shareholders shall meet immediately follow-ing each such meeting for the purpose of electing officers and considering any other business that may come before the board.

Other meetings of the directors may be held at such times, at such places and upon such notice as may be determined from time to time by the board.

Certified Document Number: 111508478 - Page 4 of 17

A majority of the whole board of directors shall be necessary to constitute a quorum for the transaction of business at all meetings. *VI-A added aug 11, 1981*

## VII.

MEETINGS OF THE SHAREHOLDERS: Meetings of the shareholders shall be held in the City of Corpus Christi, Nueces County, Texas, unless otherwise specified in the notice of any such meeting or waiver thereof.

All shareholders entitled to vote may vote at all meetings, either in person or by proxy in writing. All proxies shall be filed with the secretary of the meeting before being voted upon. A majority of the shareholders in amount of stock issued and outstanding, represented by the holders in person or by proxy, shall be requisite at all meetings to constitute a quorum for an election of directors or the transaction of other business.

The annual meeting of the shareholders shall be held on the second Tuesday of each August at 10 o'clock a.m. in each year, beginning with the year 1963, if not a legal holiday, and if a legal holiday, then on the day following, when they shall elect by a plurality vote, by ballot, a board of directors to serve for one year and until their successors are elected and have qualified, each shareholder being entitled to vote for each share of stock standing registered in his or her name on the twentieth day preceding the election, exclusive of the date of such election.

Notice of the annual meeting shall be mailed by the secretary to each shareholder entitled to vote at his or her last known post

Certified Document Number: 11508478 Page 5 of 17

office address, at least ten days prior to the meeting.

Special meetings of the shareholders may be called by the president, and shall be called at the request in writing or by vote of a majority of the board of directors or at the request in writing of the holders of a majority of the stock of the company issued and outstanding. Notice of each special meeting, indicating briefly the object or objects thereof, shall be mailed by the secretary to each shareholder at his or her last known post office address at least five days prior to the meeting.

## VIII.

STANDING COMMITTEES: The board of directors may appoint from their number, standing committees and may invest them with all their own powers, subject to such conditions as they may prescribe, and all committees thus appointed shall keep regular minutes of their transactions and shall cause them to be recorded in books to be kept for that purpose in the office of the company and shall report the same to the board of directors at their regular meeting.

## IX. *Amended Aug 11, 1981*

OFFICERS: The officers of the company shall consist of a president, one or more vice presidents, a secretary and treasurer, and one or more assistant secretaries or treasurers, and such subordinate officers as may from time to time be elected or appointed by the board of directors. Any person may hold more than one such office, except that the president and secretary shall not be the same person.

Certified Document Number: 111508478 - Page 6 of 17

OFFICERS - HOW CHOSEN: At the first meeting after their election and annually thereafter beginning on the second Tuesday of August, 1963, the directors shall elect the officers of the corporation, such officers to hold office for one year and until their successors are elected and have qualified. They shall be subject to removal during their respective terms of office for cause and may be removed at any time by a majority vote of the directors then in office.

## XI.

PRESIDENT: The president shall be the chief executive officer of the company; he shall preside at all meetings of the directors; he shall have general and active management of the business of the company; and shall see that all orders and resolutions of the board are carried into effect. He shall execute all contracts and agreements authorized by the board. He shall have the general supervision and direction of all the other officers of the company and shall see that their duties are properly performed. He shall be ex-officio member of all standing committees and shall have the general powers and duties of supervision and management usually vested in the office of the president of a corporation.

The president shall submit a report of the operations of the company for the fiscal year to the directors at their first regular meeting in each year, and to the shareholders at their

Certified Document Number: 1115088478 - Page 7 of 17

annual meeting, and from time to time shall report to the directors all matters within his knowledge which the interests of the company may require to be brought to their notice.

XI-A - *added Aug 11, 1981*
XII *amended Aug 11, 1981*

VICE PRESIDENT: Any vice president shall be vested with all the powers and shall perform all the duties of the president in his absence, and shall perform such other duties as may be prescribed by the board of directors.

XII-A *added Aug 11, 1981*
XIII.

SECRETARY: The secretary shall attend all sessions of the board and act as clerk thereof and record all votes and the minutes of all proceedings in a book to be kept by him for that purpose and shall perform like duties for the standing committees when required. He shall keep in safe custody the seal of the company and when authorized to do so shall affix the seal of said corporation to any instrument requiring the same, and the seal when so affixed shall be attested by the signature of the secretary.

He shall see that proper notice is given of all meetings of the shareholders of the company and of the board of directors and shall perform all such other duties as may be prescribed from time to time by the board of directors or the president.

XIV.

TREASURER: The treasurer shall keep full and accurate records of receipts and disbursements in books of accounts belonging to the company and shall deposit all money and other valuable effects in the name and to the credit of the company

Certified Document Number: 111508478 - Page 8 of 17

in the depository or depositories designated from time to time by resolution of the board of directors.

He shall disburse funds of the company as may be ordered by the board, or the president, taking proper vouchers for such disbursements, and shall render to the president and directors at the regular meetings of the board, or whenever they may require it, an account of all his transactions as treasurer and of the financial condition of the company. He shall keep the accounts of stock registered and transferred in such form and manner and under such regulations as the board of directors may prescribe. If required by the board of directors, he shall give the company a bond in form and in a sum with security satisfactory to the board of directors, for the faithful performance of the duties of his office and the restoration to the company, in case of his death, resignation or removal from office, of all books, papers, vouchers, money and other property of whatever kind in his possession belonging to the company. He shall perform such other duties as the board of directors may from time to time prescribe or require.

XV *Amended Aug 11, 1981*

VACANCIES: If the office of any director, or of the president, vice president, any secretary or treasurer or other officer or agent, one or more, becomes vacant by reason of death, resignation, retirement, disqualification, removal from office or otherwise, the directors in office, although less

Certified Document Number: 111508478—Page 9 of 17

than a quorum, by a majority vote, may choose a successor or successors who shall hold office for the unexpired term in respect of which such vacancy occurred.

XVI. *Amended Aug 11, 1981*

DUTIES DELEGATED: In the case of the absence of any officer of the company, the board of directors may delegate the powers and duties of such officer to any other officer or to any director for the time being.

XVII.

CERTIFICATE OF STOCK: Every shareholder shall have a certificate, signed by the president or vice president, and either the treasurer or the secretary, certifying the number of shares owned by him in such corporation.

XVIII.

TRANSFERS OF STOCK: All transfers of the stock of the company shall be made as required by the Uniform Stock Transfer Act. Certificates shall be surrendered and cancelled at the time of transfer. No transfer of stock shall be made within ten days next preceding the day appointed for paying a dividend.

XIX.

LOSS OF CERTIFICATES: In the case of loss or destruction of a certificate of stock, another may be issued in its place upon proof of such loss or destruction and the giving of a satisfactory bond of indemnity. The provisions of the Uniform Stock Transfer Act as to court order may be required.

XXI.

DIVIDENDS: Dividends upon the capital stock of the

Certified Document Number: 111568478 - Page 10 of 17

company when earned may be declared by the board of directors at any regular or special meeting. Before the payment of any dividends or making any distribution of profits there may be set aside out of the net profits of the company such sum or sums as the directors from time to time in their absolute discretion think proper as a reserve fund to meet contingencies, or for equalizing dividends, or for any such other purpose as the directors may think conducive to the best interest of the company.

## XXII.

CHECKS FOR MONEY: All checks, drafts, or orders for the payment of money shall be signed as directed by resolution of the board of directors from time to time.

## XXIII.

DEPOSITORY: A depository or depositories for the corporation shall be designated from time to time by the board of directors, and requested and directed to honor checks, drafts or other orders for the payment of money drawn in this corporation's name, including those payable to the individual order of any person or persons who name or names appear thereon as signed or signers thereof, when bearing or purporting to bear the signature of any person or persons authorized to sign the same by resolution of the board of directors, and said depository or depositories shall be entitled to honor and to charge this corporation with such checks, drafts, or other orders so drawn

Certified Document Number: 111588478 - Page 11 of 17

until and unless such authority and designation is revoked by resolution of the board of directors of said corporation and upon due notice to said depository or depositories.

## XXIV.

BOOKS AND RECORDS: The books, accounts and records of the company shall be open to inspection by the shareholders at all reasonable times which are to be fixed by resolution of the board of directors.

## XXV. *Amended Aug 9, 1966*

NOTICE: Whenever under the provisions of the statute or by these bylaws notice is required to be given to any director, officer or shareholder, it shall not be construed to mean personal notice, but such notice may be given in writing by depositing the same in the post office or letter box in a postpaid, sealed wrapper, addressed to such director, officer or shareholder at his or her address as the same appears in the books of the corporation; and the time when the same shall be mailed shall be deemed to be the time of the giving of such notice.

## XXVI. *Amended Aug. 9, 1966*

WAIVER OF NOTICE: Whenever any notice whatever is given or required to be given to any director, officer or shareholder, a waiver thereof in writing, signed by said shareholder, director, or officer, whether before or after the time stated in said waiver, shall be deemed equivalent thereto.

## XXVII.

AMENDMENT OF BYLAWS: These bylaws may be amended at any

Certified Document Number: 111508478 - Page 12 of 17

time and from time to time by a majority of the entire board of directors then in office at any regular or special meeting of the board of directors or by the vote of a majority of the shareholders in amount of the stock then issued and outstanding at any regular or special meeting of the shareholders.

By-Laws approved as correct:

_____
Marvin L. Berry, President

By-Laws attested as duly adopted:

_____
Mattie L. Boyce, Secretary-Treas.

Certified Document Number: 111508478 - Page 13 of 17

## AMENDMENT TO THE BY-LAWS
## BERRY CONTRACTING, INC.

BE IT RESOLVED that the By-Laws of Berry Contracting, Inc. be amended as follows:

That Article XXV and XXVI be amended by adding the following phrase to said Article XXVI:

"Attendance in person or by proxy at any meeting of shareholders, either annual or special, shall constitute waiver of notice of such shareholders meeting and it will not be necessary for a formal written waiver of notice to be executed by such shareholders."

"Attendance in person at any directors meeting, whether annual, regular, special or called, shall constitute waiver of notice of call of such meeting and shall not be necessary for such director so attending in person to execute a formal written waiver of notice of same."

By-Laws adopted this 9th day of August, 1966, at the annual meeting of shareholders and a copy ordered signed and affixed to the By-Laws of the Corporation.

Certified correct:

ATTEST:

Marvin L. Berry, President and
Chairman of Shareholders Meeting

Mattie L. Boyce, Secretary of
Shareholders Meeting and Secretary-
Treasurer of Corporation

Certified Document Number: 111508478 - Page 14 of 17

OFFICERS – HOW CHOSEN AND REMOVED: The President, Executive Vice President, Vice Presidents and the Secretary of the Corporation shall be elected by the Board of Directors at either its annual meeting (to be held on the second Tuesday of August of each year immediately following the annual meeting of the Shareholders) and shall serve for one year or until their successors have been elected provided however, that vacancies may be filled or new officers elected at any special meeting of the Board of Directors called for such purpose. All other Corporation employees shall be appointed by the President. The salaries and emoluments of all officers shall be determined by the President subject only to the right of review by the Board of Directors on the written request of a majority of the entire Board of Directors, but provided that no such review shall have retroactive effect on any officer. Any officer may be removed by a majority vote of the Board of Directors.

## XI-A
### (New Section)

EXECUTIVE VICE PRESIDENT: There is hereby created the office of Executive Vice President. The Executive Vice President shall be a person thoroughly familiar with the broad spectrum of activities and projects of the Corporation and its subsidiary entities and shall be a person knowledgeable in the business and professional affairs of the Corporation. The Executive Vice President shall act for, as and in the place of the President, in the event of absence or disability of the President. In addition, the Executive Vice President shall supervise the Vice Presidents, the Secretary, managers, departments and activities as directed by the President and is vested with broad executive management of the Corporation subject to direction of the Board of Directors and the President.

## XII
### (As Amended)

VICE PRESIDENT: If both the President and the Executive Vice President be absent, disabled or unable to serve or fulfill their duties, any vice president may and shall serve in the place of and perform all or any of the duties of the President and/or Executive Vice President; and shall, in addition, perform such regular and other duties, including supervision of departments, as may be prescribed by the Board of Directors or delegated or assigned by the President or Executive Vice President.

## XII-A
### (New Section)

GENERAL COUNSEL: There is herewith created the office of General Counsel of Berry Contracting, Inc. The person appointed General Counsel may be also designated as Vice President and shall receive such compensation and be employed on such terms and conditions as may be properly designated. The General Counsel shall supervise the Legal Department of the Corporation, shall be responsible for and direct the legal affairs of the Corporation including drafting and preparation of documents and instruments, shall provide legal counsel to the Corporation, and shall direct and hangle litigation and shall

-2-

VACANCIES: If the office of any director or any officer becomes vacant by reason of death, resignation, retirement, disqualification or removal from office or otherwise, the Directors then in office, although less than a quorum may, by a majority vote, choose a successor or successors who shall hold such office for the unexpired term of such officer or officers and until their successors be nominated and elected.

## XVI
### (As Amended)

DUTIES DELEGATED: In the case of the absence of any officer of the Company, the Board of Directors or the President may delegate for temporary purposes the powers and duties of such officer to any other officer or to any other Director.

I, R. W. Black, being Secretary of Berry Contracting, Inc. do certify that the foregoing amendments to the Bylaws of Berry Contracting, Inc. were duly, lawfully and legally adopted at an annual meeting of the Board of Directors held pursuant to the Bylaws on the 11th day of August, 1981.

WITNESS my hand and the seal of the corporation.

_____
R. W. BLACK, Secretary

Certified Document Number: 111508478 - Page 16 of 17

# AMENDMENT TO THE BY-LAWS
## BERRY CONTRACTING, INC.

BE IT RESOLVED that the By-Laws of Berry Contracting, Inc. be amended as follows:

That Article IV be amended as follows:

The Board of Directors shall consist of not less than two directors.

By-Laws adopted this 9th day of August 1982.

CERTIFIED CORRECT:

_Marvin L Berry_
Marvin L. Berry, President and
Chairman of Shareholders Meeting

ATTEST:

_D. E. Spangler_
D. E. Spangler, Secretary-Treasurer

Certified Document Number: 111508478 - Page 17 of 17



I, Marilyn Burgess, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   November 29, 2023

Certified Document Number:        111508478 Total Pages:  17

Marilyn Burgess, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 51.301 and 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**

| | | |
|---|---|---|
| ALBERT THEODORE POWERS; | § | IN THE BUSINESS COURT |
| ALLIED PORTS LLC, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | 11A – STATE OF TEXAS |
| | § | |
| AXIS MIDSTREAM HOLDINGS LLC; | § | |
| ALLEN LAWRENCE BERRY; | § | |
| MARVIN GLENN BERRY; and | § | |
| BONNIE BERRY, as successor in | § | |
| interest to DENNIS WAYNE BERRY | § | |
| | § | |
| *Defendants.* | § | HONORABLE SOFIA ADROGUE |

# DEFENDANTS' EXHIBIT 30

# AVAILABLE IN CAMERA

## TRANSFER OF INTERESTS AND CHANGE OF MANAGER AGREEMENT

**THIS TRANSFER OF INTERESTS AND CHANGE OF MANAGER AGREEMENT** is made and entered into as of this 21st day of April, 2020 (the "**Effective Date**"), by and between Redfish Bay Terminal, Inc. a Texas corporation (the "**Transferor**"), and Lone Star Ports Holdings, LLC, a Delaware limited liability company (the "**Transferee**").

### RECITALS:

**WHEREAS**, Transferor owns One Hundred Percent (100%) of all equity and operating interests in Transferee; and

**WHEREAS**, Transferor owns One Hundred Percent (100%) of all equity and operating interests in Axis Midstream Holdings, LLC, a Texas limited liability company ("**Axis**"); and

**WHEREAS**, Transferor is the sole Member and Manager of Axis; and

**WHEREAS**, Transferor wishes to transfer to Transferee all equity and operating interests in Axis; and

**WHEREAS**, Transferee wishes to acquire from Transferor all equity and operating interests in Axis; and

**WHEREAS**, simultaneously with the transfer by Transferor to Transferee of all equity and operating interests in Axis, Transferor wishes to cease being the sole Member and Manager of Axis; and

**WHEREAS**, simultaneously with the transfer by Transferor to Transferee of all equity and operating interests in Axis, Transferee wishes to commence being the sole Member and Manager of Axis;

**NOW THEREFORE**, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the Transferor and the Transferee hereby agree as follows:

1. **Transfer of Operating Interests**. Effective as of the Effective Date, Transferor hereby irrevocably transfer to Transferee all equity and operating interests in Axis, free and clear of all liens, charges, pledges, options, mortgages, deeds of trust, hypothecations, encumbrances, security interests, claims, limitations, restrictions, or other rights or interests of any kind (including any restrictions on the right to vote, sell, or otherwise dispose of such right or interest). After such transfer, Transferor shall have no further direct interest in the equity and operating interests in Axis and Transferee shall own One Hundred Percent (100%) of all equity and operating interests in Axis.

2. **Acceptance of Operating Interests**. Effective as of the Effective Date, Transferee hereby accepts the transfer from Transferor of all equity and operating interests in Axis.

After such transfer, Transferee shall own One Hundred Percent (100%) of all equity and operating interests in Axis.

3. **Cessation By Transferor as Member and Manager**. Effective as of the Effective Date and simultaneously with the transfer by Transferor to Transferee of all equity and operating interests in Axis, Transferor shall cease to be the sole Member and Manager of Axis.

4. **Commencement By Transferee as Member and Manager.** Effective as of the Effective Date and simultaneously with the transfer by Transferor to Transferee of all equity and operating interests in Axis, Transferee shall commence being the sole Member and Manager of Axis.

      **IN WITNESS WHEREOF**, the signatories to this Transfer of Interests and Change of Managers Agreement, intending to be bound, have executed this Agreement as of the date first written above.

For and on behalf of
**REDFISH BAY TERMINAL, INC.**
a Texas corporation


By _____
Name: _____


For and on behalf of
**LONE STAR PORTS HOLDINGS, LLC,**
a Delaware limited liability company


By _____
Name: _____

ALB_001062

**CAUSE NO. 24-BC11A-0025**

| | | |
|---|---|---|
| ALBERT THEODORE POWERS; | § | IN THE BUSINESS COURT |
| ALLIED PORTS LLC, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | 11A – STATE OF TEXAS |
| | § | |
| AXIS MIDSTREAM HOLDINGS LLC; | § | |
| ALLEN LAWRENCE BERRY; | § | |
| MARVIN GLENN BERRY; and | § | |
| BONNIE BERRY, as successor in | § | |
| interest to DENNIS WAYNE BERRY | § | |
| | § | |
| *Defendants.* | § | HONORABLE SOFIA ADROGUE |

# DEFENDANTS' EXHIBIT 31

# AVAILABLE IN CAMERA

BYLAWS
of
REDFISH BAY TERMINAL, INC.


## ARTICLE I - OFFICES

1.01 - **Principal Offices.** The principal offices of the corporation shall be at Beasley Road and Ocean Drive, Aransas Pass, Texas 78336.

1.02 - **Other Offices.** The corporation also may have offices at such other places, both within and without the State of Texas, as the Board of Directors may from time to time decide are necessary or proper for the business of the corporation.


## ARTICLE II - SHAREHOLDERS

2.01 - **Place of Meetings.** All meetings of the shareholders, for any purpose shall be held at such time and place, within or without the State of Texas, as shall be stated in the notice of the meeting or in a duly executed waiver of notice thereof.

2.02 - **Annual Meetings.** Annual meetings of the shareholders shall be held at company offices on the second Tuesday of November or as otherwise designated by the Board of Directors. At the meeting, the shareholders shall elect a Board of Directors and transact such other business as properly may be brought before the meeting.

2.03 - **Special Meetings.** Special meetings of the shareholders may be called for any purpose at any time by the President, or at the request in writing of any member of the Board of Directors, or at the request in writing of holders of not less than ten percent (10%) of all the shares entitled to vote at the meeting. A request directed to either the President or the Secretary shall state the purposes of the proposed meeting. Business transacted at any special meeting of the shareholders shall be confined to the purposes stated in the notice of the meeting.

2.04 - **Shareholders Lists.** At least ten (10) days before each meeting of shareholders, a complete list of the shareholders entitled to vote at the meeting, arranged in alphabetical order, with the address of each and the number of voting shares held by each, shall be prepared by the officer or agent having charge of the stock transfer books. For a period of ten (10) days prior to the meeting, the list shall be kept on file at the principal office of the corporation and shall be subject to inspection by any shareholder at any time during usual business hours. The list also shall be produced and kept open at the time and place of the meeting and shall be subject to inspection by any shareholder during the whole time of the meeting.

2.05 - **Notice of Meetings.** Written notice stating the place, day and hour of the meeting, and in the case of a special meeting the

purposes for which the meeting is called, shall be delivered not less than ten (10) nor more than fifty (50) days before the date of the meeting, either personally or by mail, by or at the direction of the President, the Secretary, or the officer or persons calling the meeting, to each shareholder of record entitled to vote at such meeting. If mailed, such notice shall be deemed to be delivered when deposited in the United States Mail, postage prepaid, addressed to the shareholder at his address as it appears on the stock transfer books of the corporation.

2.06 - **Quorum of Shareholders.** The holders of a majority of the shares issued and outstanding and entitled to vote at such meeting, present in person or represented by proxy, shall be requisite and shall constitute a quorum for the transaction of business at all meetings of the shareholders, except as otherwise provided by statute or the Articles of Incorporation or the Bylaws. If a quorum is not present or represented at any meeting of the shareholders, the shareholders entitled to vote thereat, present in person or represented by proxy, shall have the power to adjourn the meeting from time to time without notice other than announcement at the meeting, until a quorum is present or represented. At any continuation of a meeting following such adjournment, at which a quorum is present or represented, any business may be transacted which might have been transacted at the meeting as originally notified.

2.07 - **Action by Shareholders.** When a quorum is present at any meeting, the vote of the holders of a majority of the shares having voting power, present in person or represented by proxy, shall decide any question brought before such meeting unless the question is one upon which a different vote is required by statute or the Articles of Incorporation or these Bylaws. The shareholders present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal of enough shares to leave less than a quorum.

2.08 - **Voting and Proxies.** Subject to provisions in the Articles of Incorporation allowing cumulative voting in the election of directors, each outstanding share having voting power shall be entitled to one vote on each matter submitted to a vote at a meeting of the shareholders. A shareholder may vote either in person or by proxy executed in writing by the shareholder or by his duly authorized attorney in fact, but no proxy shall be valid after eleven (11) months from the date of its execution unless otherwise expressly provided in the proxy. Each proxy shall be revocable unless expressly provided in the proxy. Each proxy shall be revocable unless expressly provided therein to be irrevocable, and in no event shall it remain irrevocable for a period of more than eleven (11) months. Each proxy shall be filed with the Secretary of the corporation prior to or at the time of the meeting. Any vote must be taken by written ballot upon the oral or written request of any shareholder.

**2.09 - Action by Unanimous Written Consent.** Any action required or permitted by statute to be taken at a meeting of the shareholders may be taken without a meeting if a consent in writing, setting forth the action so taken, shall be signed by all of the shareholders entitled to vote with respect to the subject matter thereof, and such consent shall have the same force and effect as a unanimous vote of the shareholders. Any such signed consent, or a copy thereof, shall be placed in the minute book of the corporation.

**2.10 - Telephone Meetings.** In the absence of an express objection by a participant therein, meetings of the Board of Directors or shareholders may be held by means of conference telephone or similar communications equipment if all persons participating in the meeting can hear each other.

## ARTICLE III - DIRECTORS

**3.01 - Powers of Directors.** The business and affairs of the corporation shall be managed by its Board of Directors, which may exercise all powers of the corporation and do all lawful acts and things as are not by statute or by the Articles of Incorporation or by these Bylaws directed or required to be exercised or done by the shareholders.

**3.02 - Number and Qualification.** The number of directors which shall constitute the Board of Directors is four (4). Directors need not be shareholders of the corporation or residents of the State of Texas. The number of directors may be increased or decreased from time to time by amendment of the Bylaws, but no decrease shall have the effect of shortening the term of any incumbent director. The directors shall be elected at the annual meeting of the shareholders, and each director elected shall serve until his successor shall have been elected and qualified.

**3.03 - Filling Vacancies.** Any vacancy occurring in the Board of Directors by reason of death, resignation or removal may be filed by affirmative vote of a majority of the remaining directors, although such majority may constitute less than a quorum of the Board of Directors, or by affirmative vote of a majority of the shareholders if thee are no remaining directors. A director elected to fill a vacancy shall be elected for the unexpired term of his predecessor in office. Any directorship to be filled by reason of an increase in the number of directors shall be filled by election at an annual meeting or a special meeting of shareholders called for that purpose.

**3.04 - Resignation of Directors.** Any director may resign from his office at any time by delivering his written resignation to the Secretary, and such resignation shall be effective immediately upon delivery to the Secretary.

**3.05 - Removal of Directors.** Any director may be removed, with or without cause, at any special or annual meeting of the shareholders, by affirmative vote of a majority of the number of shares of the shareholders present in person or by proxy at such meeting and entitled to vote for the election of such director, if notice of intention to act upon such mater shall have been given in the notice calling such meeting.

**3.06 - Place of Meeting.** Regular or special meetings of the Board of Directors may be held either within or without the State of Texas.

**3.07 - Chairman of the Board.** The Chairman of the Board, if one be elected by the Board, shall preside at all meetings of the Board of Directors and shall have such other powers and duties as may from time to time be prescribed by the Board of Directors, upon written direction given to him pursuant to resolution duly adopted by the Board of Directors.

**3.08 - Annual Meetings.** The first meeting of each newly elected Board of Directors shall be held at such time and place as shall be fixed by the vote of the shareholders at the annual meeting, and no notice of such meeting shall be necessary to the newly elected directors in order legally to constitute the meeting, provided a quorum shall be present. If the shareholders fail to fix the time and place of such first meeting, it shall be held without notice immediately following the annual meeting of the shareholders, and at such time and place unless by unanimous consent of the directors then elected and servicing, such time or place shall be changed.

**3.09 - Regular Meetings.** Regular meetings of the Board of Directors may be held without notice at such time and place as shall from time to time be determined by the Board.

**3.10 - Special Meetings.** Special meetings of the Board of Directors may be called by the Chairman of the Board of Directors or the President and shall be called by the Secretary on the written request of two (2) directors. Notice of any special meeting of the Board of Directors shall be given to each director at least three (3) days before the date of the meeting.

**3.11 - Quorum of Directors.** At all meetings of the Board of Directors a majority of the directors shall constitute a quorum for the transaction of business, and the act of a majority of the directors present at any meeting at which there is a quorum shall be the act of the Board of Directors. If a quorum shall not be present at any meeting of the directors, the directors present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

**3.12 - Committees.** The Board of Directors, by resolution passed by a majority of the entire Board, may from time to time designate members of the Board to constitute committees, including an

executive committee, which shall in each case consist of such number of directors not less than two (2) and shall have and may exercise such powers, as the Board may determine and specify in the respective resolutions appointing them. A majority of all the members of any such committee may determine this action and fix the time and place of any meeting, unless the Board of Directors shall otherwise direct. The Board of Directors shall have power at any time to change the number and the members of any such committee, to fill vacancies, and to discharge any such committee.

**3.13 - Action by Unanimous Written Consent.** Any action required or permitted to be taken at a meeting of the Board of Directors or any committee may be taken without a meeting, if a consent in writing setting forth the action so taken is signed by all the members of the Board of Directors or such committee, as the case may be.

**3.14 - Compensation of Directors.** By resolution of the Board of Directors, the directors may be paid their expenses, if any, of attending each meeting of the Board, and may be paid a fixed sum for attending each meeting of the Board or a stated salary for serving as a director. No such payment shall preclude any director from serving the corporation in any other capacity and receive compensation therefor. Members of the executive committee or of special or standing committees may, by resolution of the Board of Directors, be allowed like compensation for attending committee meetings.

**3.15 - Minutes of Meetings.** The Board of Directors shall keep regular minutes of its proceedings, and such minutes shall be placed in the minute book of the corporation. Committees of the Board of Directors shall maintain a separate record of the minutes of their proceedings.

## ARTICLE IV - NOTICES

**4.01 - Method of Giving Notice.** Any notice to directors or shareholders shall be in writing and shall be delivered personally or mailed to the directors or shareholders at their respective addresses appearing on the books of the corporation. Notice by mail shall be deemed to be given at the time when the same shall be deposited in the United States mail, postage prepaid.

**4.02 - Waiver of Notice.** Any notice required to be given may be subject to a waiver thereof in writing, signed by the person or persons entitled to such notice, whether before or after the time stated therein; and such waiver shall be deemed equivalent to the giving of such notice in a timely manner. Any such signed waiver of notice, or a signed copy thereof, shall be placed in the minute book of the corporation. Attendance of such persons at any meeting shall constitute a waiver of notice of such meeting, except where the persons attend for the express purpose of objecting that the meeting is not lawfully convened.

## ARTICLE V - OFFICERS

5.01 - **Qualifications.**   The officers of the corporation need not be shareholders of the corporation or residents of the State of Texas.  The Board of Directors shall elect a President, one or more Vice Presidents, a Secretary, a Treasurer, a General Counsel, and such other officers, including a Chairman of the Board and assistant officers, as it may deem desirable to have to conduct the affairs of the corporation.  Any two (2) or more offices may be held by the same person, except that the offices of President and Secretary may not be held by the same person.

5.02 - **Compensation of Officers.**   The salaries of all officers of the corporation shall be fixed by the Board of Directors.   The Board of Directors shall have the power to enter into contracts for the employment and compensation of officers on such terms as the Board deems advisable.   No officer shall be disqualified form receiving a salary or other compensation by reason of the fact that he is also a director of the corporation.

5.03 - **Terms and Vacancies.**   The officers of the corporation shall hold office until their successors are elected or appointed and qualified or until their death, resignation, or removal from office.  Any vacancy occurring in any office of the corporation by death, resignation, removal, or otherwise, may be filled by the Board of Directors.

5.04 - **Removal of Officers.**   Any officer elected or appointed by the Board of Directors may be removed at any time by the Board, but such removal shall be without prejudice to the contract rights, if any, of the person so removed.   Election or appointment of an officer or employee shall not of itself create contract rights. Any officer may be removed, either with or without cause, by the Board of Directors at any regular or special meeting, or except in the case of an officer chosen by the Board of Directors, by any officer upon whom such power of removal may be conferred by the Board of Directors.

5.05 - **Resignation of Officers.**   Any officer may resign at any time by giving written notice to the Board of Directors, to the President, or to the Secretary of the corporation.   Any such resignation shall take effect at the date of the receipt of such notice or at any time later specified; and unless otherwise specified, the acceptance of such resignation shall not be necessary to make it effective.

5.06 - **General Authority of Officers.**   The Board of Directors, except as otherwise provided in these Bylaws, may authorize any officer to enter into any contract or execute and deliver any instrument in the name of and on behalf of the corporation, and such authority may be general or confined to specific instances. Unless so authorized, no officer, agent, or employee shall have any power or authority to bind the corporation by any contract or

engagement, to pledge its credit, or to render it liable pecuniarily for any purpose or in any amount.

5.07 - **Duties of President.** The President shall be the chief executive officer of the corporation, shall have general and active management and control of the business and affairs of the corporation, and shall see that all orders and resolutions of the Board of Directors are carried into effect. He shall preside at all meetings of the shareholders, and in the absence of a Chairman of the Board, at all meetings of the Board of Directors. He shall call regular and special meetings of the shareholders and directors in accordance with law and these Bylaws and shall preside at such meetings. He shall appoint, discharge, and fix the compensation of officers, agents, and employees other than those appointed by the Board of Directors. He shall sign all certificates representing shares of stock in the corporation. He shall perform other duties as may be prescribed from time to time by the Board of Directors.

5.08 - **Duties of Vice Presidents.** The Vice Presidents, in the order of their seniority, unless otherwise determined by the Board of Directors, shall in the absence or disability of the President perform the duties and have the authority and exercise the powers of the President. They shall perform such other duties and have such other authority and powers as the Board of Directors may from time to time prescribe, or as the President may from time to time delegate.

5.09 - **Duties of General Counsel.** The General Counsel shall supervise the Legal Department of the corporation, shall be responsible for and direct the legal affairs of the corporation including drafting and preparation of documents and instruments, shall provide legal counsel to the corporation, and shall direct and handle litigation and shall generally perform the duties of corporate attorney under the direction of the President and the Board of Directors. The General Counsel shall be a licensed attorney at law and a person schooled and knowledgeable in general corporation law and other activities in which the company engages. If the General Counsel is also named Vice President, he shall perform such executive duties as pertains to the office of Vice President and as be assigned and being in addition to that of General Counsel.

5.10 - **Duties of Secretary.** The Secretary shall attend all meetings of the Board of Directors and of shareholders and record all business transacted at such meetings in a minute book to be kept for that purpose; and he shall perform like duties for the standing committees when required. He shall give, or cause to be given, notice of all meetings of the shareholders and special meetings of the Board of Directors; and shall perform such other duties as may be prescribed by the Board of Directors or President, under whose supervision he shall be. He shall keep and take custody of the seal of the corporation, and when authorized by the Board of Directors, shall affix the name to any instrument requiring it, and when so affixed, it shall be attested by his

signature or by the signature of an assistant secretary or of the Treasurer.

**5.11 - Duties of Assistant Secretaries.** The assistant secretaries, in the order of their seniority, unless otherwise determined by the Board of Directors, shall in the absence or disability of the Secretary perform the duties and have the authority and exercise the powers of the Secretary. They shall perform such other duties and have such other powers as the Board of Directors may from time to time prescribe or as the President or Secretary from time to time may delegate.

**5.12 - Duties of Treasurer.** The Treasurer shall have the custody of the corporation's funds and securities; shall keep full and accurate accounts and records of receipts, disbursements, and other transactions in books belonging to the corporation; and shall deposit all funds and other valuable effects in the name and to the credit of the corporation in such depositories as may be designated by the Board of Directors. The Treasurer shall disburse funds of the corporation as may be ordered by the Board of Directors, taking proper vouchers for such disbursements, and shall render to the President and the Board of Directors, at the regular meetings of the Board or whenever they may require it, an account of all his transactions as Treasurer and of the financial condition of the corporation. The Treasurer shall perform such other duties and have such other authority as the Board of Directors may from time to time prescribe, or as the President may from time to time delegate.

**5.13 - Duties of Assistant Treasurers.** The Assistant Treasurers, in the order of their seniority, unless otherwise determined by the Board of Directors, shall in the absence or disability of the Treasurer perform the duties and have the authority and exercise the powers of the Treasurer. They shall perform such other duties and have such other powers as the Board of Directors may from time to time prescribe or as the President or Treasurer may from time to time delegate.

**5.14 - Execution of Instruments.** All documents, instruments, or writings of any nature shall be signed, executed, verified, acknowledged, and delivered by such officer or officers, or such agent or agents of the corporation, and in such manner as the Board of Directors from time to time may determine. All notes, drafts, acceptances, checks, endorsements, and all evidence of indebtedness of the corporation whatsoever shall be signed by such officer or officers or such agent or agents of the corporation, and in such manner as the Board of Directors from time to time may determine. Endorsements for deposit to the credit of the corporation in any of its duly authorized depositories shall be made in such manner as the Board of Directors may from time to time determine.

# ARTICLE VI - STOCK CERTIFICATES

6.01 - **Form of Certificates.** Certificates shall be delivered representing all shares to which shareholders are entitled. Certificates for shares of the stock of the corporation shall be in such form as shall be required by law and as shall be approved by the Board of Directors. Every certificate for shares issued by the corporation must be signed by the President or a Vice President and the Secretary or an Assistant Secretary. Such certificates shall bear a legend or legends in the form and containing the restrictions required to be thereon by the Texas Business Corporation Act, by the Securities Act of the State of Texas and any applicable registration acts and as required by the U.S. Securities Act of 1933 and subsequent acts affecting sales, issuance, registration and transfer of securities. Each certificate shall be consecutively numbered and shall be entered into the books of the corporation as it is issued. Each certificate shall state on the face thereof the holder's name, the number and class of shares, the par value of such shares, and such other matters as may be required by law, the Articles of Incorporation or these Bylaws.

6.02 - **Lost Certificate.** The Board of Directors may, upon making of an affidavit of the fact by a person claiming loss or destruction, direct a new certificate or certificates to be issued in place of any certificate previously issued by the corporation alleged to have been lost or destroyed. In so doing, the Board of Directors may in its discretion and as a condition precedent to the issuance (a) require the owner of the lost or destroyed certificate, or his legal representative, to advertise the same in such manner as it shall require; and/or (b) to give the corporation a bond (with a surety or sureties satisfactory to the corporation) in such sum as it may direct, as indemnity against any claim, or expense resulting from any claim, that may be made against the corporation with respect to the certificates alleged to have been lost or destroyed.

6.03 - **Transfer of Shares.** Shares of stock shall be transferable on the books of the corporation only by the holder thereof in person or by his duly authorized attorney. Upon surrender to the corporation or its transfer agent of a certificate representing shares properly endorsed or accompanied by proper evidence of succession, assignment, or authority to transfer, the corporation or its transfer agent shall issue a new certificate to the person entitled thereto, cancel the old certificates, and record the transaction upon its books.

6.04 - **Record Ownership Conclusive.** The corporation shall be entitled to treat the holder of any share or shares of stock as the holder in fact thereof, and accordingly shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person, whether or not it has express or other notice thereof, except as otherwise provided by law or by any stock purchase and redemption agreement to which the

stock may be subject, if such agreement has been formally executed or accepted by the Corporation.

6.05 - **Closing Transfer Books.** The Board of Directors shall have the power to close the stock transfer book of the corporation for a period not exceeding fifty (50) days preceding the date of any meeting of the shareholders, or the date for payment of any dividend, or the date for the allotment of rights, or the date when any change or conversion or exchange of capital stock shall go into effect. In lieu of closing the stock transfer books, the Board of Directors may fix in advance of a date, not exceeding fifty (50) days preceding the date of any meeting of shareholders, or the date for the payment of any dividend, or the date for allotment of rights, or the date when any change or conversion or exchange of capital stock shall go into effect. Such date shall serve as a record date for determination of the shareholders entitled to notice of and to vote any such meeting, or entitled to receive payment of any such dividends, or any such allotment or rights, or to exercise the rights in respect to any such change, conversion, or exchange of capital stock. In such case, only shareholders of record on the date so fixed shall be entitled to notice of and to vote at such meeting, or to receive payment of such dividend or allotment of rights, or to exercise such rights, as the case may be; notwithstanding any transfer of stock on the books of the corporation after any such record date fixed as herein provided.

6.06 - **Securities Act Restrictions.** Each shareholder, by accepting issuance of stock in the corporation, shall be deemed to have agreed that no transfer thereof may be made under any circumstances until and unless such shares shall have been registered under the Securities Act of 1933 or the Texas Securities Act, or the corporation shall have been provided with an opinion of counsel satisfactory to it that such registration is not required. The provisions of this paragraph shall be reflected by suitable legend on all certificates representing stock in the corporation.

### ARTICLE VII - MISCELLANEOUS PROVISIONS

7.01 - **Dividends.** Dividends may be declared by the Board of Directors at any regular or special meeting and may be paid in cash, in property, or in shares of the corporation, subject to the provisions of the Articles of Incorporation and to the laws of the State of Texas. The declaration and payment of dividends shall be at the discretion of the Board of Directors.

7.02 - **Reserves.** Before payment of any dividend, the Board of Directors may create and set aside funds and reserves such as the directors, from time to time and in their absolute discretion, believe proper to provide for contingencies, or to equalize dividends, or to repair or maintain any property of the corpora-tion, or for any other purpose they believe beneficial to the corporation. The directors may modify or abolish any such reserve or fund in the manner in which it was created.

7.03 - **Records.**   The corporation shall keep correct and complete books and records of account; and shall keep minutes of the proceedings of its shareholders and Board of Directors; and shall keep at its registered office or principal place of business, or at the office of its transfer agent or registrar, a record of its shareholders, giving the names and addresses of all shareholders and the number and class of the shares held by each.

7.04 - **Taxable Year.**   The taxable year of the corporation shall be fixed by resolution of the Board of Directors.

7.05 - **Statement of Condition.**   The Board of Directors shall present at each annual meeting of shareholders a full and clear statement of the business and condition of the corporation, including a reasonably detailed balance sheet, income statement, and surplus statement.

7.06 - **Seal.**   The corporation's seal shall be in such form as may be prescribed by the Board of Directors.   The seal may be used by causing it, or a facsimile thereof, to be impressed or affixed, or in any manner reproduced.

7.07 - **Indemnification for Judgments.**   The corporation shall indemnify any person who serves as a director, officer, agent, or employee of the corporation against expenses actually and necessarily incurred by such person; and against any amount paid in satisfaction of judgment in connection with any action, suit, or proceedings in which he is made a party by reason of being or having been such a director, officer, agent, or employee; except in relation to matters as to which he shall be adjudged in such action, suit, or proceeding to be liable for gross negligence or willful misconduct in the performance of his duties.

7.08 - **Indemnification for Settlements.**   The corporation also may reimburse to any such person described in the preceding paragraph the reasonable costs of settlement of any such proceeding, if it is found by a majority of the directors not involved in the proceeding that it was in the interest of the corporation to make such settlement, and that such person was not guilty of gross negligence or willful misconduct.   These rights of indemnification and reimbursement shall not be exclusive of any other right to which such person may be entitled by law, bylaw, agreement, shareholder's vote or otherwise.


### ARTICLE VIII - AMENDMENT AND CONSTRUCTION

8.01 - **Amendment.**   The power to alter, amend, or repeal the Bylaws or adopt new bylaws, subject to repeal or change by action of the shareholders, shall be vested in the Board of Directors.

8.02 - **Severability.**   If any portion of these Bylaws shall be invalid or inoperative, then so far as is reasonable, the remainder of these Bylaws shall be considered valid and operative, and effect

shall be given to the intent manifested by the portion held invalid or inoperative.

Unanimously adopted at the organization meeting of the Board of Directors on the 29th day of June 1992.

APPROVED CORRECT:

D. W. Berry

ATTEST:

K. L. Berry

lgl\rbtbylaw

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Susan Gonzales on behalf of Douglas Allison
Bar No. 1083500
susan@dallisonlaw.com
Envelope ID: 97253521
Filing Code Description: Appendix
Filing Description: Relators' Appendix Vol 2 of 5
Status as of 2/11/2025 4:24 PM CST

Associated Case Party: Marty Berry

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Douglas AAllison | | doug@dallisonlaw.com | 2/11/2025 3:36:52 PM | SENT |
| Vanessa AGilmore | | vg@robertsmarkland.com | 2/11/2025 3:36:52 PM | SENT |
| Kim Brunkenhoefer | | kim@dallisonlaw.com | 2/11/2025 3:36:52 PM | SENT |
| Susan Gonzales | | susan@dallisonlaw.com | 2/11/2025 3:36:52 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Rosa Brennan | | rbrennan@gibbsbruns.com | 2/11/2025 3:36:52 PM | SENT |
| Michelle Bultman | | MBultman@gibbsbruns.com | 2/11/2025 3:36:52 PM | SENT |
| Roxanne Graham | | rgraham@gibbsbruns.com | 2/11/2025 3:36:52 PM | SENT |
| Christina Pena | | cpena@gibbsbruns.com | 2/11/2025 3:36:52 PM | SENT |

Associated Case Party: AllenLawrenceBerry

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Michael Absmeier | 24050195 | mabsmeier@gibbsbruns.com | 2/11/2025 3:36:52 PM | SENT |
| Barrett Reasoner | 16641980 | breasoner@gibbsbruns.com | 2/11/2025 3:36:52 PM | SENT |
| Sydney Ballesteros | | sballesteros@gibbsbruns.com | 2/11/2025 3:36:52 PM | SENT |
| Bruce Baldree | | bbaldree@gibbsbruns.com | 2/11/2025 3:36:52 PM | SENT |

Associated Case Party: AlbertTheodorePowers

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Susan Gonzales on behalf of Douglas Allison
Bar No. 1083500
susan@dallisonlaw.com
Envelope ID: 97253521
Filing Code Description: Appendix
Filing Description: Relators' Appendix Vol 2 of 5
Status as of 2/11/2025 4:24 PM CST

Associated Case Party: AlbertTheodorePowers

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Alistair Dawson | 5596100 | adawson@beckredden.com | 2/11/2025 3:36:52 PM | SENT |

Associated Case Party: Allied Ports, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Roland Garcia | 7645250 | garciar@gtlaw.com | 2/11/2025 3:36:52 PM | SENT |